# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SOUND VIEW INNOVATIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:16-cv-00116-RGA |
| | ) | |
| FACEBOOK, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>JOINT CLAIM CONSTRUCTION BRIEF</u>

*Of Counsel:*
Alan S. Kellman
Tamir Packin
Richard M. Cowell
Jason Berrebi
Edward B. Geist
Tom BenGera
Wesley L. White
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Telephone:  (212) 351-3400
Facsimile:  (212) 351-3401
akellman@desmaraisllp.com
tpackin@desmaraisllp.com
rcowell@desmaraisllp.com
jberrebi@desmaraisllp.com
egeist@desmaraisllp.com
tbengera@desmraisllp.com
wwhite@desmaraisllp.com

John C. Phillips, Jr. (No. 110)
Megan C. Haney (No. 5016)
PHILLIPS,          GOLDMAN,
MCLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington, Delaware 19806-4204
Telephone:  (302) 655-4200
Facsimile:  (302) 655-4210
jcp@pgmhlaw.com
mch@pgmhlaw.com


*Attorneys for Plaintiff*
*Sound View Innovations, LLC*

OF COUNSEL:

Heidi L. Keefe
Sarah Whitney
Elizabeth Stameshkin
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

Phillip E. Morton
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC  20004
(202) 842-7800

Michael G. Rhodes
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA  94111-5800

March 9, 2017

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Karen Jacobs (#2881)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
kjacobs@mnat.com
jying@mnat.com

*Attorneys for Defendant Facebook, Inc.*

## TABLE OF CONTENTS

I.   DISPUTED CONSTRUCTIONS RELATING TO THE '845 PATENT ........................ 1

    A.   "spin" / "spinning" (term 1) / "spinning on the lock" (term 2) ............................. 1

    B.   "process" (term 3) ................................................................................................ 5

    C.   "linked queue structure of data records …" (term 4) .......................................... 7

II.  DISPUTED CONSTRUCTIONS RELATING TO THE '371 PATENT ........................ 9

    A.   "measurable characteristic of said memory" (terms 5, 9) ................................... 10

    B.   "controller" terms (terms 6-8) .............................................................................. 12

    C.   "[said time stamp is generated as a function of a] time stamp counter" (term 10) ............................................................................................................... 22

III. DISPUTED CONSTRUCTIONS RELATING TO THE '181 PATENT ....................... 24

    A.   "means to store a list of users including …" (term 11) ....................................... 25

    B.   "means for a user to input identification and password information" (term 12) ......................................................................................................................... 31

    C.   "means at said server to compare …" (term 13) ................................................. 34

    D.   "user" (term 14) ................................................................................................... 38

IV.  DISPUTED CONSTRUCTIONS RELATING TO THE '786 PATENT ...................... 41

    A.   "means in said client for inputting …" (term 16) ............................................... 42

    B.   "means in said client for storing a unique client address" (term 17) .................. 43

    C.   "communication means at said client for passing …" (term 18) ........................ 47

    D.   "means at said server to store information …" (term 19) .................................... 50

    E.   "means at said server to store dynamic status information …" (term 20) ........... 53

    F.   "means to authorize log in …" (term 21) ............................................................. 55

    G.   "dynamic status information" (term 22) .............................................................. 59

V.   DISPUTED CONSTRUCTIONS RELATING TO THE '486 PATENT ...................... 61

    A.   "messaging client" and "messaging client configured to…" (terms 23, 27-31) ......................................................................................................................... 62

    B.   "messaging server" and "messaging server configured to…" (term 24, 32-36) ......................................................................................................................... 72

    C.   "simple scripting language" (term 26) ................................................................. 79

    D.   Alleged *IPXL* terms (terms 37-42) ..................................................................... 82

VI.  DISPUTED CONSTRUCTIONS RELATING TO THE '860 PATENT ...................... 88

    A.   "augmentation file" (term 43) .............................................................................. 88

i

B.      "server" and "the server being operative to…"  (terms 44-45) ........................... 89

C.      "web content" (term 46)..................................................................................... 93

D.      "virtual client device"  (term 51) ....................................................................... 94

E.      "interpolating proxy server" terms  (terms 52-54)............................................... 96

VII.    AGREED-UPON CONSTRUCTIONS ........................................................................ 100

# **TABLE OF AUTHORITIES**

## **Cases**

*AllVoice Computing PLC v. Nuance Commc'ns, Inc.*,
  504 F.3d 1236 (Fed. Cir. 2007)................................................................................... 19

*Apex Inc. v. Raritan Computer, Inc.*,
  325 F.3d 1364 (Fed. Cir. 2003)................................................................................... 14

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008)................................................................................... 68

*Atser Research Techs., Inc. v. Raba-Kistner Consultants Inc.*,
  No. SA-07-CA-93-H, 2009 WL 691118 (W.D. Tex. Mar. 2, 2009) ....................................... 78

*August Tech. Corp. v. Camtek, LTD*,
  No. 05-1396, 2008 WL 2774696 (D. Minn. July 14, 2008) .................................................. 86

*Bayer Pharm. AG v. Watson Labs, Inc.*,
  No. 12-1726-LPS-CJB, 2014 WL 4954617 (D. Del. Sept. 30, 2014) ............................... 85, 86

*Blackbird Tech LLC v. ELB Elecs.*,
  Nos. 15-cv-56 (RGA), 15-cv-57 (RGA), 15-cv-58 (RGA), 15-cv-62 (RGA), 2016 WL
  7451622 (D. Del. Dec. 28, 2016).............................................................................. passim

*Blackboard Inc. v. Desire2Learn, Inc.*,
  574 F.3d 1371 (Fed. Cir. 2009)............................................................................... 29, 30

*Chanbond LLC v. Atlantic Broadband Grp., LLC*,
  No. 1-15:cv-00842-RGA through 00854, 2016 WL 7177612 (D. Del. Dec. 9, 2016)............. 11

*Chicago Bd. Options Exch., Inc. v. Int'l. Sec. Exch., LLC*,
  748 F.3d 1134 (Fed. Cir. 2014)................................................................................... 20

*Collaboration Props., Inc. v. Tandberg ASA*,
  No. C 05-01940, 2006 WL 1752140 (N.D. Cal. June 23, 2006) ....................................... 86, 87

*D.M.I., Inc. v. Deere & Co.*,
  755 F.2d 1570 (Fed. Cir. 1985)..................................................................................... 9

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2005)............................................................................... 80, 81

*Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*,
  412 F.3d 1291 (Fed. Cir. 2005)................................................................................... 21

*E-Contact Techs., LLC v. Apple, Inc.*,
   No. 11-cv-426, 2013 WL 12136607 (E.D. Tex. Apr. 16, 2013)............................................. 29

*Finisar Corp. v. DirecTV Grp., Inc.*,
   523 F.3d 1323 (Fed. Cir. 2008)............................................................................................. 17

*Fitbit, Inc. v. AliphCom*,
   2017 WL 386257 (N.D. Cal. Jan. 27, 2017) .......................................................................... 49

*Fortinet, Inc. v. Sophos, Inc.*,
   2015 WL 6513655 (N.D. Cal. Oct. 28, 2015).......................................................................... 49

*Gillespie v. Dywidag Sys. Int'l, USA*,
   501 F.3d 1285 (Fed. Cir. 2007)............................................................................................... 8

*Goss Int'l Americas, Inc. v. Graphic Mgmt. Assoc.*,
   739 F. Supp. 2d 1089 (N.D. Ill. 2010) ................................................................................... 18

*Greenberg v. Ethicon Endo-Surgery, Inc.*,
   91 F.3d 1580 (Fed. Cir. 1996)......................................................................................... 18, 70

*Halliburton Energy Servs. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008)............................................................................................. 86

*Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*,
   493 F.3d 1358 (Fed. Cir. 2007)..................................................................................... 3, 4, 40

*Immersion Corp. v. HTC Corp.*,
   No. 12-259-RGA, 2015 WL 581572 (D. Del. Feb. 11, 2015) ................................................ 11

*In re Katz Interactive Call Processing Patent Litigation*,
   639 F.3d 1303 (Fed. Cir. 2011)...................................................................................... passim

*Indacon, Inc. v. Facebook, Inc.*,
   824 F.3d 1352 (Fed. Cir. 2016)......................................................................................... 8, 59

*Int'l. Bus. Machines Corp. v. Priceline Grp. Inc.*,
   No. 15-137-LPS, 2016 WL 6405824 (D. Del. Oct. 28, 2016)................................................ 69

*InterDigital Communications, Inc. v. ZTE Corp.*,
   No. 1:13-cv-00009-RGA, 2014 WL 1620733 (D. Del. Apr. 22, 2014)............................. 86, 87

*Interval Licensing LLC v. AOL, Inc.*,
   766 F.3d 1364 (Fed. Cir. 2014)....................................................................................... 80, 81

*IPXL Holdings, LLC v. Amazon.com, Inc.*,
   430 F.3d 1377 (Fed. Cir. 2005)................................................................................. 84, 85, 86

*Irdeto Access, Inc. v. Echostar Satellite Corp.,*
  383 F.3d 1295 (Fed. Cir. 2004) ............................................................. 59

*Kara Tech. Inc. v. Stamps.com Inc.,*
  582 F.3d 1341 (Fed. Cir. 2009) ............................................................. 11

*Leader Techs. v. Facebook, Inc.,*
  770 F. Supp. 2d 686 (D. Del. 2011) ....................................................... 84

*M2M Sols. LLC v. Sierra Wireless America, Inc.,*
  Nos. 10-30-RGA, 10-32-RGA, 10-33-RGA, 2015 WL 5826816 (D. Del. Oct. 2, 2015) . 14, 19,
  65

*Markem-Imaje Corp. v. Zipher Ltd.,*
  No. 10-cv-112-PB, 2011 WL 5837087 (D.N.H. Nov. 21, 2011) ............................................. 17

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB,*
  344 F.3d 1205 (Fed. Cir. 2003) ............................................................ 28

*Media Rights Techs., Inc. v. Capital One Fin. Corp.,*
  800 F.3d 1366 (Fed. Cir. 2015) ............................................................ 16

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.,*
  520 F.3d 1367 (Fed. Cir. 2008) ............................................................ 86

*Milwaukee Elec. Tool Corp. v. Hitachi Koki Co.,*
  No. 09-C-948, 2012 WL 10161527 (E.D. Wis. Dec. 11, 2012) ............................................. 17

*Minton v. Nat'l Ass'n of Sec. Dealers,*
  197 F. Supp. 2d 699 (E.D. Tex. 2001) ............................................... 69, 78

*Net MoneyIN, Inc. v. Verisign, Inc.,*
  545 F.3d 1359 (Fed. Cir. 2008) ............................................ 17, 24, 92

*Nomadix, Inc. v. Hospitality Core Servs. LLC,*
  No. CV 14-08256, 2016 WL 344461 (C.D. Cal. Jan. 27, 2016) ............................................. 78

*Optimize Tech. Solutions, LLC v. Staples, Inc.,*
  No. 11-cv-419, 2013 WL 6170624 (E. D. Tex. Nov. 20, 2013) ............................................. 29

*Perdiem Co, v. IndusTrack LLC,*
  No. 2:15-cv-727, 2016 WL 3633627 (E.D. Tex. July 7, 2016) ............................................. 78

*Pi-Net Int'l Inc. v. JPMorgan Chase & Co.,*
  No. Civ. 12-282-SLR, 2014 WL 1997039 (D. Del. May 14, 2014) ....................................... 67

*Radware, Ltd. v. A10 Networks, Inc.,*
  Nos. C-13-02021, C-13 02024 RMW, 2014 WL 2738538 (N.D. Cal. June 11, 2014) ........... 85

*Rembrandt Data Technologies, LP v. AOL, LLC,*
  641 F.3d 1331 (Fed. Cir. 2011) ....................................................................... 85, 87

*Serrano v. Telular Corp.*,
  111 F.3d 1578 (Fed. Cir. 1997) ............................................................................ 9

*Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*,
  844 F.3d 1370 (Fed. Cir. 2017) ........................................................................... 81

*Soque Holdings (Berm.) Ltd. v. Keyscan, Inc.*,
  No. C 09-2651 MHP, 2010 WL 2292316 (N.D. Cal. June 7, 2010) ........................................ 67

*Sprint Commc'ns Co. v. Comcast IP Holdings, I, LLC*,
  No. 12-1013-RGA, 2014 WL 309432 (D. Del. Jan. 28, 2014) ................................................. 24

*Strikeforce Techs. Inc. v. PhoneFactor Inc.*,
  No. 13-490-RGA, 2015 WL 5708577 (D. Del. Sept. 29, 2015) ............................................... 19

*Subotincic v. 1274274 Ontario Inc.*,
  No. SACV 10-1946 AG (PJWx), 2012 WL 3112005 (C.D. Cal. June 14, 2012) ................... 14

*TecSec. Inc. v. Int'l. Bus. Machines Corp.*,
  731 F.3d 1336 (Fed. Cir. 2013) ..................................................................... 19, 92

*Triton Tech of Tex., LLC v. Nintendo of Am., Inc.*,
  753 F.3d 1375 (Fed. Cir. 2014) ........................................................................... 45

*TSI, Inc., v. Azbil BioVigilant, Inc.*,
  No. 12-cv-0083, 2013 WL 1149606 (D. Ariz. Mar. 19, 2013) ............................................... 38

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
  659 F.3d 1376 (Fed. Cir. 2011) ........................................................................... 19

*Verint Sys. Inc. v. Red Box Recorders Ltd.*,
  166 F. Supp. 3d 364 (S.D.N.Y. 2016) .................................................................... 67

*V-Formation, Inc. v. Benetton Grp. SpA*,
  401 F.3d 1307 (Fed. Cir. 2005) ............................................................................ 3

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ............................................................................. 1

## **Statutes**

35 U.S.C. § 112(f) ............................................................................... passim

## I.    DISPUTED CONSTRUCTIONS RELATING TO THE '845 PATENT

**Sound View's Summary of the '845 Patent:**

The '845 patent generally relates to improved, recoverable locks that prevent simultaneous access of shared memory structures in multi-processing environments. If a lock is busy, a process attempting to acquire the lock can wait or "spin" until the lock is released. (D.I. 64, Ex. A at 1:51-54.)[1] The '845 patent allows recovery if a process holding the lock, or waiting in line for the lock, terminates. (*Id*. at 3:50-53.)

### A.    "spin" / "spinning" (term 1) / "spinning on the lock" (term 2)

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 1 | "spin" / "spinning" | "wait" / "waiting" | *See* "spinning on the lock" |
| 2 | "spinning on the lock" | No construction necessary. | "repeatedly trying to acquire a lock in a tight loop; i.e., busy waiting" |

### 1.    Sound View's Opening Position

The patentee elected to specifically define "spin" and "spinning" in the specification, and thus that definition shall apply. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005). Throughout the '845 patent's specification, the patentee repeatedly defines "spin" and "spinning" as "wait" and "waiting," respectively: "[the processor] can *wait or 'spin,'*" (D.I. 64, Ex. A at 1:46-54); "whether the process is *spinning (WAITING)*," (*id*. at 3:3); "*spinning (waiting)* on a lock," (*id*. at 3:14); and "the process releasing the lock must *wait (spin)*," (*id*. at 8:19-20). (*See also id*. at

---

[1] Exhibits A-P and 1-10 cited herein are attached to the parties' Joint Claim Construction Chart (D.I. 64), filed December 22, 2016. Exhibits Q-AA and 11-17 are attached to the parties' Joint Appendix In Support Of Joint Claim Construction Brief, filed concurrently.

Fig. 2B.) When used in the specification, "spinning" is described as "*waiting* for exclusive access to the resource," and "*waiting* on the lock." (*Id.* at 3:19-21, 7:26).

Instead of adopting the meaning used throughout the specification, Facebook's proposed construction introduces several additional concepts, including "repeatedly trying to acquire the lock" and "a tight loop." The Court should not include "trying to acquire a lock in a *tight loop*" because it is ambiguous and likely will lead to disputes regarding a *tight* versus a non-tight loop. Nor should the Court require "spinning" to "repeatedly try to acquire the lock." The claims themselves show that when the patentee intended to claim "repeatedly trying to acquire the lock," they used that language, instead of merely "spinning on the lock." Indeed, claim 1 requires "one or more processes to *repeatedly attempt to gain ownership of the lock* when exclusive access to the shared resource is desired." (*Id.* at cl. 1.) Claim 1 also uses the term "spin lock" as opposed to "spinning on the lock" and Facebook's definition focuses on a statement in the background specifically related to a spin lock, a term used in claim 1, but not in claim 13. (*Id.* at 1:55-58). The Court should not import unclaimed limitations from claim 1 into claim 13. "Spin" / "spinning" should be construed as "waiting" and "spinning on the lock" should retain its plain and ordinary meaning (i.e., "waiting on the lock").

### 2. Facebook's Answering Position

The key dispute here is what it means to "**spin**" on the lock as recited in claim 13. Facebook's proposal for "spinning on the lock" – "repeatedly trying to acquire a lock in a tight loop; i.e., busy waiting" – directly tracks definitional language from the '845 patent:

> [A]n implementation in which a process repeatedly tries to acquire the lock in a tight loop *is called a spin lock* and the activity or retrying is known as "busy waiting" or simply "spinning".[2]

---

[2] Unless expressly noted, all underlining emphasis added and all other emphasis in the original.

2

(Ex. A, 1:55-58 (italics added).)  This definitional language is controlling.  *See, e.g.*, *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 493 F.3d 1358, 1361 (Fed. Cir. 2007).

This definition is also consistent with other portions of the intrinsic record.  For example, a prior art article by Anderson cited during prosecution similarly describes "spinning (or 'busy-waiting') for a lock to be released."  (Ex. 1, p.6.)  *See, e.g.*, *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) ("Prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence.") (citing cases).  Moreover, the '845 patent incorporates-by-reference an article by Mellor-Crummey *et al.* that likewise describes "*busy-wait* constructs in which processes repeatedly test shared variables to determine when they may proceed."  (Ex. 2, p.22; *see also* Ex. A, 2:24-33.)  Notably, the '845 patent purports to be an improvement over the spin lock algorithm disclosed in Mellor-Crummey, indicating that Mellor-Crummey accurately describes the baseline of what "spinning" means. (Ex. A, 4:8-18.)

Sound View's proposal that "spinning" simply means "waiting" should be rejected because it would encompass activities that clearly do not qualify as "spinning."  In particular, in addition to the definitional language noted above, both the Anderson and Mellor-Crummey articles explain that "spinning" is a particular type of "waiting":

> When a lock is busy, the waiting process can either **[1]** block, relinquishing the processor to do other work, or **[2]** spin ("busy-wait") until the lock is released.

(Ex. 1, p.6 (enumeration added).)

> Synchronization constructs can be divided into two classes:  **[1]** *blocking constructs* that deschedule waiting processes and **[2]** *busy-wait constructs* in which processes repeatedly test shared variables to determine when they may proceed.

(Ex. 2, p.22 (enumeration added).)  Sound View's attempt to sweep all forms of "waiting" into the term "spinning" should be rejected.  (Ex. 15, Chatterjee Decl., ¶¶ 36-40.)  Had the applicants

intended to cover all types of "waiting," they could have easily drafted claim 19 to recite "waiting on the lock." Sound View's overbroad proposal should be rejected.[3]

### 3.     Sound View's Reply Position

Facebook does not address any of Sound View's arguments. First, Facebook does not contest that its proposed construction adds ambiguity rather than clarity (e.g., "tight" loop) and includes phrases that were explicitly claimed when intended (e.g., cl. 1 claiming "repeatedly attempt[ing] to gain ownership of the lock."). Second, Facebook does not address the numerous instances in which the specification equates "spin"/ "spinning" with "wait" / "waiting." Instead, Facebook resorts to two prior art articles to assert that—despite the specification's use of "spin"/"spinning" and "wait"/"waiting" interchangeably—the term "spinning" should be limited to a particular kind of "waiting," i.e., "busy waiting." But Facebook points to no clear disavowal of "non-busy" waiting. And to the extent the patentee's meaning differs from the term's use in prior art, the patentee's meaning governs. *Honeywell Int'l., Inc. v. Universal Avionics Sys. Corp.*, 493 F.3d 1358, 1361 (Fed. Cir. 2007) ("When a patentee defines a claim term, the patentee's definition governs, even if it is contrary to the conventional meaning of the term." (citing *Phillips,* 415 F.3d at 1321)). Thus, the Court should reject Facebook's construction.

### 4.     Facebook's Sur-Reply Position

Sound View's "no clear disavowal of 'non-busy' waiting" argument misses the point. The claim does not recite "non-busy waiting"; it recites "spinning," which the specification defines as "an implementation in which a process repeatedly tries to acquires the lock in a tight loop" (Ex. A, '845, 1:55-57). Sound View's arguments about "disavowal" are inapposite. Nor

---

[3] The Court need not separately construe "spin" or "spinning" if the entire phrase "spinning on the lock" is construed or, alternatively, the Court could be construe them as "busy-wait" and "busy-waiting," respectively.

does the patent equate "spinning" with "waiting." The statements Sound View relies upon, such as "wait (spin)" ('845, 8:20) and "spinning (waiting)" ('845, 3:15), merely confirm what is undisputed – that "spinning" *is* waiting. But it is waiting of a particular type. None of those statements undermine the more specific definitional language.

### B.   "process" (term 3)

| Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|
| 3  "process" | No construction necessary. | "an address space (range of available addresses) and one or more threads of control that execute within that address space and its required system resources" |

### 1.      Sound View's Opening Position

The term "process" is a commonly understood English word that would have been readily understood by a person of skill in the art at the time of the invention, particularly in view of the specification. In the context of computer programming, a "process" is commonly defined as a "task" or "stream of activity." (Ex. Q at 387.) Throughout the specification, the patentee's use of the term "processes" is consistent with that plain meaning. For example, the patent describes a process as being able to perform activities such as "spinning on the lock," (*id.* at 3:16-18), "holding the lock," (*id.* at 2:38-42), "acquiring the lock," (*id.*), and "releasing the lock." (*Id.* at 8:18-20.) Facebook's proposed construction introduces additional technical terms that do not appear in the specification and would themselves require construction (e.g., "threads of control"). Accordingly the Court should not adopt Facebook's proposed construction.

### 2.      Facebook's Answering Position

Facebook's proposed construction for "process" as "an address space (range of available

addresses) and one or more threads of control that execute within that address space and its required system resources," is definitional language from the intrinsic record.  (Ex. 3, U.S. Patent No. 5, 392,433, 3:22-36; Ex. A, cover page [56] (listing '433 patent).)  The construction is also consistent with the understanding of one of ordinary skill in the art.  (Ex. 15 ¶¶ 42-45.)

Sound View's proposal that a "process" is simply a "task" or "stream of activity" should be rejected.  As Dr. Chatterjee explains, in the context of computer systems and operating systems, a "process" is a well-known concept with various properties.  (Ex. 15 ¶¶ 42-43.)  In fact, the extrinsic dictionary that Sound View relies (Ex. Q) on supports Facebook, not Sound View.  That dictionary states that a "process" is defined by machine instructions, a workspace (a block of locations within main memory[4]), and resources allocated to it.  (Plaintiff's Opening Claim Construction Brief ("Pl. Br."), Ex. Q, p.387.)  Despite pointing to a dictionary definition, Sound View's overly-simplistic proposal ignores the details of what actually defines a "process."

### 3.    Sound View's Reply Position

Although Facebook takes issue with Sound View's explanation, it does not address Sound View's concerns with Facebook's construction—that it introduces additional technical terms that do not appear in the specification which would themselves require construction. Moreover, Facebook concedes that the term "process" would have been readily understood by persons of ordinary skill in the art.  Because the parties agree that the patentee did not deviate from the well-understood plain and ordinary meaning, the Court should reject Facebook's overly-complex and confusing construction and adopt the plain and ordinary meaning.

### 4.    Facebook's Sur-Reply Position

Sound View does not dispute that Facebook's proposal accurately captures the meaning

---

[4] See Ex. 12, p.543 (definition of "workspace").

of "process."  And because "process" has "a variety of meanings" in the computer industry (Ex. 3, 3:22-24), it should be construed.

### C.   "linked queue structure of data records ..." (term 4)

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 4 | "linked queue structure of data records corresponding to a queue of processes" | No construction necessary. | "data structure containing data records in which each data record points to and/or is pointed to by another data record so as to create a sequence of data records that defines the sequence of access of corresponding processes to the shared resource" |

#### 1.   Sound View's Opening Position

Facebook's proposed construction does not provide any additional clarity, and would unnecessarily confuse the jury.  It does not seek to define the majority of terms in the phrase and instead re-uses the terms "structure," "data records," "corresponding," and "processes." Accordingly, the Court should adopt the plain meaning of the term, which is more straightforward than Facebook's construction.

#### 2.   Facebook's Answering Position

Facebook's proposed construction is based on the intrinsic record, including the specification and statements that the applicants made during prosecution.

The '845 patent states that "FIG. 4B [shown at right] is a diagram illustrating a linked list queue structure of processor nodes spinning on the lock in the recovering spin-lock algorithm of the invention."



FIG. 4B

(Ex. A, 4:61-63.)  The queue structure **130** is a linked list of "modified Qnode structures **155**$_1$,

**155**$_2$, . . . etc."   (Ex. A, 6:6-9.)  As shown in Figure 4B above, Qnode structure **155**$_1$ (a data

record) includes a "next pointer" **23** that points to Qnode structure **155**$_2$ (a second data record).

(*See also* Ex. A, 5:50-58.)

> During prosecution, the applicants repeatedly emphasized that the claimed linked queue
>
> was formed using pointers in the data records and that ordering of the data records defined the
>
> order in which processes associated with the data records accessed the shared resource:

> But in the context of the instant application, a *dynamic* queue structure is
> generated from *flags and pointers* allowing sequential access to the shared
> resource.  It is not even a queue of *computer code*, but of relatively small data
> records.  The data records do not necessarily follow each other in the computer
> memory, but they are sequentially linked together (by pointers within the
> records), and the sequence of the records defines the sequence of access to the
> shared resource.

(Ex. 5, '845 file wrapper, 06/01/1999 Amendment, p.6.)

> Therefore, the main difference between the instant invention and Rakity is that
> applicants' invention identifies when a process is terminated, removes the
> terminated process from the linked list of processes waiting for the lock and then
> restores the linked list so that the shared resources can continue to become
> available in accordance with the order set forth in the linked list.

(Ex. 4, '845 file wrapper, 11/17/1998 Amendment, p.6.)

> The applicants must be held to these assertions.  *See, e.g.*, *Gillespie v. Dywidag Sys. Int'l,*

*USA*, 501 F.3d 1285, 1291 (Fed. Cir. 2007) ("The patentee is held to what he declares during the

prosecution of his patent."); *see also Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1358 (Fed.

Cir. 2016) ("[T]he interested public has the right to rely on the inventor's statements made

during prosecution . . . .") (internal quotes and citation omitted).

### 3.    Sound View's Reply Position

Facebook cites two amendments submitted by the patentees during prosecution of the

'845 patent but has identified no clear disavowal of the scope of claim 13.  The first statement was made in response to the Examiner's rejection of a different claim—not asserted in this case—that required "***generating*** a queue structure" and addresses the process of "generat[ing a queue structure] from flags and pointers."  (Ex. 5 at p. 6.)  The claim at issue has no such requirement.  *See Serrano v. Telular Corp.*, 111 F.3d 1578, 1584 (Fed. Cir. 1997) (citing *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 n.2 (Fed. Cir. 1985)).  With respect to the second statement, claim 13 already requires "transferring the lock from the process possessing the lock to a process next in the queue" and Facebook's proposed construction does not even use the phrase from the statement that Facebook emphasizes—"in accordance with the order set forth in the linked list."

### 4.    Facebook's Sur-Reply Position

The prosecution history directly speaks to the meaning of this term.  The fact that those statements focused on other claims is irrelevant because "a claim term should be construed consistently with its appearance in other places in the same claim or in other claims in the same patent."  *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).  Moreover, these statements were expressly made in the broader context of the "instant invention" or the "instant application."  *See Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) ("For example, we have held that disclaimer applies when the patentee makes statements such as 'the present invention requires ...' or 'the present invention is ...' or 'all embodiments of the present invention are....'").  As such they must be used to construe the claim.

## II.    DISPUTED CONSTRUCTIONS RELATING TO THE '371 PATENT

### Sound View's Summary of the '371 Patent:

The '371 patent provides a solution to prior art systems lacking an efficient way to

reclaim memory space no longer used by multi-version database techniques, logically and economically aging data record versions in the database. (D.I. 64, Ex. B at 2:48-52.) The '371 patent generally relates to an improved, multi-versioned database management system and method that creates multiple versions of data records affected by update transactions and increases capacity of a memory by deleting versions of data records in response to associated time stamps and a measurable characteristic of the memory. (*Id.* at 2:55-3:14.)

### A.   "measurable characteristic of said memory" (terms 5, 9)

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 5 | "measurable characteristic of said memory" | "a current utilization or capacity of memory, a trend analysis of a utilization or capacity of memory over a time period (t), or any other applied mathematics- or statistics-based analysis, including a comparison of any of the same with a threshold, ceiling/floor, limit, set point or the like" | "a measured value of the current utilization or capacity of said memory" |
| 6 | "a measurable characteristic of said memory" | See above. | See above. |

### 1.      Sound View's Opening Position

The term "measurable characteristic of said memory" should be construed as "a current utilization or capacity of memory, a trend analysis of a utilization or capacity of memory over a time period (t), or any other applied mathematics- or statistics-based analysis, including a comparison of any of the same with a threshold, ceiling/floor, limit, set point or the like." That definition is a direct quote from the specification that describes examples of "one or more measurable main memory characteristics." (D.I. 64, Ex. B at 6:46-53.) Facebook's proposed

construction seeks to limit the term to the first two examples listed above, namely "current utilization or capacity of memory."  Therefore, the Court should reject Facebook's proposed construction.  *See Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("[A] patentee is entitled to the full scope of his claims, and [a Court] will not limit him to his preferred embodiment or import a limitation from the specification into the claims."); *see also Chanbond LLC v. Atlantic Broadband Grp., LLC*, C.A. No. 1-15:cv-00842-RGA through 00854, 2016 WL 7177612, at *6 (D. Del. Dec. 9, 2016) ("I will not adopt a construction that imports a limitation from one embodiment and also reads out another embodiment."); *Immersion Corp. v. HTC Corp.*, C.A. No. 12-259-RGA, 2015 WL 581572, at *6 (D. Del. Feb. 11, 2015) ("The Court finds that no construction is necessary.  Defendants' construction inserts a limitation where there was no clear disavowal or other evidence to suggest that the applicants intended to surrender the full scope of the claim language.").

## 2.  Facebook's Answering Position

Facebook's proposal, "a measured value of the current utilization or capacity of said memory," is straightforward and consistent with the intrinsic evidence.  In fact, Facebook's proposal tracks the specific instances the specification uses to describe the claimed "measurable characteristic."  (Ex. B, '371, 3:9-10, 5:41-43, 6:47-49.)

Sound View's proposal is largely incomprehensible to a lay jury.  It adopts an eight-line sentence that lists "any other applied mathematics- or statistics-based analysis," which does not describe a measurement, or state what the "analysis" is of, or appear to be to the claimed "measurable characteristic," and later ambiguously lists "a comparison of any of the same."

## 3.  Sound View's Reply Position

Facebook seeks to read out disclosed embodiments based on its assertion that the portion

11

of the specification quoted by Sound View's construction is "largely incomprehensible to a lay jury." Rather than proposing clarifying language, Facebook's solution is to impermissibly read out those embodiments altogether. Thus, the Court should reject Facebook's construction.

### 4. Facebook's Sur-Reply Position

Sound View's arguments do not remedy the deficiencies with this term.

### B. "controller" terms (terms 6-8)

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 7 | "a time stamping controller that assigns a time stamp to transactions to be performed on said database" | No construction necessary. | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6).<br><br>Function: Assign a time stamp to transactions to be performed on said database.<br><br>Structure: The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g., Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc); *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366 (Fed. Cir. 2015). |
| 8 | "a versioning controller that creates multiple versions of ones of said data records affected by said transactions that are update transactions" | No construction necessary. | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6).<br><br>Function: Create multiple versions of ones of said data records affected by said transactions that are update transactions.<br><br>Structure: The |

| | | | |
|---|---|---|---|
| | | | specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g., Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc); *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366 (Fed. Cir. 2015). |
| 9 | "an aging controller that monitors a measurable characteristic of said memory and deletes ones of said multiple versions of said ones of said data records in response to said time stamp and said measurable characteristic thereby to increase a capacity of said memory" | No construction necessary. | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6).<br><br>Function:  Monitor a measurable characteristic of said memory and delete ones of said multiple versions of said ones of said data records in response to said time stamp and said measurable characteristic thereby to increase a capacity of said memory.<br><br>Structure:  The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g., Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc); *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366 (Fed. Cir. 2015). |

13

### 1.      Sound View's Opening Position

The Court should reject Facebook's argument that these terms are subject to 35 U.S.C. § 112(f).   As an initial matter, these claim terms do not use the word "means," creating a presumption that they are not means-plus-function.   *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (en banc); *Blackbird Tech LLC v. ELB Elecs.*, Nos. 15-cv-56 (RGA), 15-cv-57 (RGA), 15-cv-58 (RGA), 15-cv-62 (RGA), 2016 WL 7451622, at *4-5 (D. Del. Dec. 28, 2016); *M2M Sols. LLC v. Sierra Wireless America, Inc.*, C.A. Nos. 10-30-RGA, 10-32-RGA, 10-33-RGA, 2015 WL 5826816, at *1-5 (D. Del. Oct. 2, 2015).   Thus, Facebook bears the burden of showing that the terms invoke means-plus-function treatment by a preponderance of the evidence.   *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1372 (Fed. Cir. 2003).   Facebook cannot meet that burden because claim 1 does not merely replace the word "means" with a "well-known nonce word that can operate as a substitute for 'means' in the context of § 112, para. 6."   *See Williamson*, 792 F.3d at 1350; *see also Subotincic v. 1274274 Ontario Inc.*, No. SACV 10-1946 AG (PJWx), 2012 WL 3112005, at *16 (C.D. Cal. June 14, 2012) ("controller" is not a "nonce word[]" or "verbal construct[]" that merely "substitutes for the term 'means for.'").   As the specification explicitly recognizes, a "controller"—found in all three of the disputed terms—was well known by persons of ordinary skill in the art:

> Versioning manager 100 includes three controllers, namely, a time stamping controller 110, a versioning controller 115, and an aging controller 115.   ***Those skilled in the art should be familiar with the use of controllers*** in processing environments generally, and more specifically, with main memory databases.   Controllers may be implemented in software, firmware, hardware, or some suitable combination of at least two of the three.

(D.I. 64, Ex. B at 4:49-55 (emphasis added).)   Because one of ordinary skill in the art would readily be able to discern the structural meaning of "time stamping controller," "versioning

controller," and "aging controller," the Court should find that they are not means-plus-function terms, and instead, that the plain meanings of the terms govern.

### 2. Facebook's Answering Position

Claim 1 of the '371 patent recites a "time stamping controller," a "versioning controller," and an "aging controller" that perform various functions. Like the terms "device" and "module," the term "controller" is precisely the type of generic and functional nonce word that triggers § 112(f) (formerly § 112(6)). *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir. 2015) (en banc); *see also* Ex. 15 ¶¶ 52-54. For example, computer dictionaries provide functional definitions for "controller," such as "something that controls something else" (Ex. 11, p.89) and "[a] subsystem that governs functions of attached devices but generally does not change the meaning of the data that may pass through it" (Ex. 12, p.106). The description of a controller from the patent states that the concept of a "controller" is familiar to one of ordinary skill in the art, but acknowledges that a controller is not associated with any particular structure: "[c]ontrollers may be implemented in software, firmware, hardware, or some suitable combination of at least two of the three." (Ex. B, 4:55-57.) Thus, a "controller" is not meaningfully different from the 112(f) term "module" in *Williamson*, which the Federal Circuit observed was "a generic description for software or hardware that performs a specified function." 792 F.3d at 1350 (internal quotes and citation omitted).

The terms "time stamping," "versioning," and "aging" merely add functional language to the term "controller" and do not impart any structural significance to the term. *Williamson*, 792 F.3d at 1351 ("The prefix 'distributed learning control' does not impart structure into the term 'module.'"); Ex. 15 ¶ 54. Nor do any other limitations in the claim inform the structural character of each claimed controller. *Id.* at 1344 (full language of "distributed learning control

module" computer-based system claim at issue), 1351; Ex. 15 ¶ 54.  Therefore, each controller

recited in claim 1 of the '371 patent triggers § 112(f).

The functions of each of the recited controllers come from the language claim 1 itself:

- Time stamping controller:  Assign a time stamp to transactions to be performed on said database.
- Versioning controller:  Create multiple versions of ones of said data records affected by said transactions that are update transactions.
- Aging controller:  Monitor a measurable characteristic of said memory and delete ones of said multiple versions of said ones of said data records in response to said time stamp and said measurable characteristic thereby to increase a capacity of said memory.

(Ex. B, 9:12-22 (claim 1); Ex. 15 ¶ 55.)  As Dr. Chatterjee explains, the specification discloses

no corresponding structure and algorithm for the recited functions.  (Ex. 15 ¶¶ 56-58.)

In particular, the patent makes clear that claim 1 concerns an alleged invention carried

out by a computer.  For example, claim 1 recites a "processing system," and the specification

identifies a "computer" as an example of a processing system.  (Ex. B, 4:47-49 ("processing

system **105** (e.g., a computer, communications switch,

etc.)").)  Therefore, the '371 patent must include an _algorithm_

for performing each claimed function.  *See, e.g., Williamson*,

792 F.3d at 1352; *Media Rights Techs., Inc. v. Capital

One Fin. Corp.*, 800 F.3d 1366, 1374 (Fed. Cir. 2015),

*cert. denied*, 136 S. Ct.  1173 (2016).    But the

specification discloses no such algorithms.  (Ex. 15 ¶ 56.)  For example, Figure 1 of the '371

(excerpts at right) sets forth a "flow diagram of an exemplary method for controlling multi-

versioned data records according to the present invention," but steps corresponding to the

claimed functions are simply single black boxes that largely paraphrase the claim language.

While Figure 2 of the '371 provides a more detailed flow diagram for operations of an exemplary



16

aging controller, the figure still fails to set forth algorithms for setting forth how the specific steps of monitoring and deleting are carried out.  (Ex. 15 ¶ 57.)  The specification accordingly provides "nothing more than a restatement of the function[s], as recited in the claim," which is not enough.  *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340-41 (Fed. Cir. 2008) (internal quotes and citation omitted).

Because the "controller" terms are subject to § 112(f) the required corresponding algorithms are not disclosed, claim 1 and its dependents are indefinite.  *See, e.g., Net MoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008); *Williamson*, 792 F.3d at 1351-52.

### 3.      Sound View's Reply Position

Facebook does not even acknowledge the presumption that "controller" does not trigger §112(f), let alone satisfy its burden of overcoming that presumption.  Facebook seeks to liken "controller" to "nonce words" listed in *Williamson*, but does not provide any cases to support its position.  Indeed, numerous courts have rejected the notion that "controller" triggers § 112(f). *See, e.g.*, *Markem-Imaje Corp. v. Zipher Ltd.*, No. 10-cv-112-PB, 2011 WL 5837087, at *4-5 (D.N.H. Nov. 21, 2011) (finding "controller" was not a "nonce word[]" that triggered § 112(f)); *Milwaukee Elec. Tool Corp. v. Hitachi Koki Co.,* No. 09-C-948, 2012 WL 10161527, at *10 (E.D. Wis. Dec. 11, 2012) (same).

Facebook agrees that those of ordinary skill in the art would have understood the meaning of "controller," but asserts it is a nonce word because they would have understood the term by its function.  *Williamson* did not hold that terms defined by function cannot provide sufficient structure or are nonce words.  *See Blackbird Tech*, 2016 WL 7451622, at *4-5 ("fastening mechanism" provides sufficient structure to avoid application of § 112 ¶ 6).  Rather, *Williamson* explained that "[g]eneric terms . . . that reflect nothing more than verbal constructs

may be used in a claim in a manner that is tantamount to using the word 'means' because they typically do not connote sufficiently definite structure and therefore may invoke § 112 para. 6." 792 F.3d at 1350.

Facebook also argues that "controller is not associated with any particular structure" because the specification explains that "[c]ontrollers may be implemented in software, firmware, hardware, or some suitable combination of at least two of the three."   But "controller" is generally accepted as providing sufficient structure to a person of ordinary skill in the art.  *See Subotincic*, 2012 WL 3112005, at *16  ("[E]ven if the specification was completely silent as to the structure of the controller, the plain meaning of the term itself connotes sufficient structure to a person of ordinary skill in the art to avoid means plus function treatment."); *Goss Int'l Americas, Inc. v. Graphic Mgmt. Assoc.*, 739 F. Supp. 2d 1089, 1100 (N.D. Ill. 2010) ("[A] controller is a known structure that is a type of special purpose computer."). Indeed, Professor Su explains that while controllers could be implemented using different techniques, they have an inherent structure familiar to one of ordinary skill in the art.  (Ex. X, Su Decl. at ¶¶ 35-36, 39.)

Facebook further contends that "[t]he terms 'time stamping,' 'versioning,' and 'aging' merely add functional language to the term 'controller' and thus do not impart any structural significance to the term," but courts have found that the addition of such modifiers to terms sufficiently definite themselves to avoid means-plus-function treatment in fact made the term more definite.  *See Blackbird Tech*, 2016 WL 7451622, at *4-5.  Moreover, in *Greenberg v. Ethicon Endo-Surgery, Inc.*, relied on by *Williamson*, the Federal Circuit confirmed that a functionally-understood prefix alone can provide sufficient structure under § 112 ¶ 6:

> [T]he fact that a particular mechanism—here "detent mechanism"—
> is defined in functional terms is not sufficient to convert a claim
> element containing that term into a "means for performing a
> specified function" within the meaning of section 112(6). Many

> devices take their names from the functions they perform. The examples are innumerable, such as "filter," "brake," "clamp," "screwdriver," or "lock." Indeed, several of the devices at issue in this case have names that describe their functions, such as "graspers," "cutters," and "suture applicators."

91 F.3d 1580, 1583 (Fed. Cir. 1996).  As explained by Professor Su, to the extent "controller" does not provide sufficient structure, the addition of "time stamping," "versioning," and "aging" provides such structure.  (Ex. X at ¶¶ 37, 39.)

Finally, even under a § 112(f) analysis, the specification contains more than sufficient structure for a person of ordinary skill in the art to provide an operative software program for the alleged "means for" function.  *See M2M Sols.*, 2015 WL 5826816, at *3 ("In the software context, 'the patentee need only disclose sufficient structure for a person of skill in the field to provide an operative software program for the specified function.'" (quoting *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011))).  Facebook argues that the "controller" terms are indefinite because "the specification discloses no corresponding structure and algorithm for the recited functions." That bare assertion is insufficient to meet Facebook's burden of proof.  *See*, *e.g.*, *TecSec. Inc. v. Int'l. Bus. Machines Corp.*, 731 F.3d 1336, 1349 (Fed. Cir. 2013) ("[t]he party alleging that the specification fails to disclose sufficient corresponding structure must make that showing by clear and convincing evidence.").  Facebook's expert acknowledges that the '371 patent's diagrams relate to Facebook's alleged functions, but does not explain why those diagrams are insufficient.  (Ex. 15 at ¶¶ 56-57.)  "'In software cases, . . . algorithms in the specification need only disclose adequate defining structure to render the bounds of the claim understandable to one of ordinary skill in the art.'" *Strikeforce Techs. Inc. v. PhoneFactor Inc.*, No. 13-490-RGA, 2015 WL 5708577, at *1 (D. Del. Sept. 29, 2015) (citing *AllVoice Computing PLC v. Nuance Commc'ns, Inc.*, 504 F.3d 1236, 1245 (Fed. Cir. 2007)).  "A

patentee can express an algorithm 'in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure.'" *M2M Sols.*, 2015 WL 5826816, at *3 (quoting *Typhoon Touch*, 659 F.3d at 1385); *EON*, 785 F.3d at 623-24 (When the adequacy of the algorithm is at issue, the disclosure's sufficiency is judged "based on the skilled artisan's perspective."); *see also Chicago Bd. Options Exch., Inc. v. Int'l. Sec. Exch., LLC*, 748 F.3d 1134, 1141 (Fed. Cir. 2014) ("the question is whether the disclosed algorithm, from the viewpoint of a person of ordinary skill, is sufficient to define the structure and make the bounds of the claim understandable") (citation omitted); *StrikeForce Techs.,* 2015 WL 5708577, at *1 (algorithms do not need to "be complicated").   The specification describes detailed algorithms for Facebook's alleged functions. (*See* Ex. X at ¶¶ 40-50; Ex. B at Fig.1, 2:65-3:1, 3:4-6, 4:49-66, 5:19-34 (regarding "assigning a time stamp to transactions to be performed on said database"); *id.* at Fig. 1, 3:1-6, 4:49-57, 4:66-5:1, 5:5-34 (regarding "creating multiple versions of ones of said data records affected by said transactions that are update transactions"); *id.* at Figs. 1-2, 3:6-14, 4:49-57, 5:35-47, 5:59-6:17, 6:32-7:55 (regarding "monitoring a measurable characteristic of said memory and delete ones of said multiple versions of said ones of said data records in response to said time stamp and said measurable characteristic thereby to increase a capacity of said memory.").

### 4.    Facebook's Sur-Reply Position

Sound View's pre-*Williamson* caselaw finding that the word "controller" was not means-plus-function relies on the line of cases that *Williamson* expressly overruled.  In fact, *Williamson* found the term "*control* module" triggered means-plus-function treatment.  The court explained that the word "module" was "simply a generic description for software or hardware that performs a specified function," and that the prefix word "control" did not "describe a sufficiently definite

structure."  *Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1350-51 (Fed. Cir. 2015) (en banc).

The '371 patent provides an almost identical description of the claimed "controller."  ('371,

4:55-57.)

Sound View and its expert assert that "controller" has sufficiently definite structure, but

they conspicuously fail to identify what that structure actually is.  Instead, they make the almost

humorous statement that "a person of ordinary skill in the art would easily recognize a controller

if he or she were confronting a controller" (Ex. X, ¶ 36), bringing to mind Justice Potter

Stewart's famous line, "I know it when I see it."  But Dr. Su does not say what "it" is.  The truth

is that if "controller" connoted a definite structure, Sound View would have identified it.  But it

did not, because Sound View would have been forced to admit, as its own specification does,

that "controller" is another word for hardware and/or software like "module" in *Williamson*.

Sound View next asserts in conclusory fashion that even if § 112(f) applies, "the

specification describes detailed algorithms for Facebook's alleged functions," which Sound

View supports with a string citation lacking any analysis.  The specification discloses no such

"detailed algorithms."  Much of the passages of the specification cited by Sound View merely

repeats the function already in the claim.  ('371, *e.g.*, 2:65-3:1, 3:1-4, 3:6-14, 4:62-64, 5:23-25,

5:35-47.)  With respect to the remaining passages, they are off-point, do not describe algorithms

for performing the <u>actual</u> functions recited in the claim, and are not clearly linked to those

functions.  They plainly fail the Federal Circuit's requirement that "structure disclosed in the

specification must be clearly linked to and capable of performing the function" recited in the

claim.  *Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1299

(Fed. Cir. 2005).  The Court should find the "controller" terms indefinite.

C.   **"[said time stamp is generated as a function of a] time stamp counter"  (term 10)**

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 10 | "[said time stamp is generated as a function of a] time stamp counter" | No construction necessary. | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6).<br><br>Function:  Generate a time stamp.<br><br>Structure:  The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g., Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc); *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366 (Fed. Cir. 2015). |

### 1.      Sound View's Opening Position

The Court should reject Facebook's argument that the term "time stamp counter" is subject to 35 U.S.C. § 112(f).  As with the terms above, Facebook bears the burden of demonstrating this is a means-plus-function term, and cannot meet that burden.  The term "counter" is a well-known computer term that a person of ordinary skill in the art would be able to discern.  (*See, e.g.*, Ex. R at 228 (defining counter as a "variable used to record the number of occurrences of a given event during the execution of a computer program").)   As the specification explains here, "[a]ccording to an advantageous embodiment, time stamp counter **145** is associated with a conventional system clock (not shown) of processing system **100**." (*See, e.g.*, D.I. 64, Ex. B at 4:64-5:4, Fig. 1.)

22

### 2.      Facebook's Answering Position

For the same reasons discussed above for the "controller" limitations, this limitation (of claims 2 and 9) also triggers § 112(f) and is indefinite.

In particular, the specification states that a "time stamp counter" is "also a controller." (Ex. B, 4:64-5:4.)   As explained above, the term "controller" is a nonce word that triggers § 112(f).   While the concept of a "time stamp counter" may have been known to one of ordinary skill in the art, it is a functional concept that is not associated with any particular structure and algorithm.  (Ex. 15 ¶¶ 60-61.)   The understanding of a "time stamp counter" being functional in nature is further confirmed by the language of the claim itself, which states that the time stamp is a generated <u>as a function</u> of a time stamp counter and by the depiction of the time stamp counter **145** in Figure 1 (excerpted at right) as simply a single labeled box.  Sound View's own extrinsic dictionary supports the functional nature of the time stamp counter, defining a "counter" as some sort of "variable" that is "used to record the number of occurrences of a given event during the execution of a computer program."  (Pl. Br., Ex. R, p.228.)  Thus, the term "time stamp counter" triggers § 112(f).

The specification fails to disclose a corresponding structure and algorithm for the function of the time stamp counter.  The function of time stamp counter—i.e., generate a time stamp—comes from the claim language itself.  (Ex. B, 9:23-25 & 9:59-60 (claims 2 & 9); Ex. 15 ¶ 61.)  No algorithm  to generate a time stamp is disclosed.  (Ex. 15 ¶ 61.)  While the specification states that "an advantageous embodiment, time stamp counter **145** is associated with a conventional system clock (not shown) of processing system **100**" (Ex. B, 5:1-4), the specification fails to set forth how the time stamp counter is "associated" with the system clock or the algorithm that a time stamp counter might use to generate a time stamp.  (Ex. 15 ¶ 61.)

Thus, claims 2 and 9 and their dependents are indefinite. *See, e.g., Net MoneyIN, Inc.*, 545 F.3d at 1367; *Williamson*, 792 F.3d at 1351-52.

### 3.    Sound View's Reply Position

Here too, Facebook's expert acknowledges that that "the concept of a 'time stamp counter' is generally known to one of ordinary skill in the art." (Ex. 15 at ¶ 60.)  Moreover, courts have found that the plain meaning of the terms "controller" and "time stamp counter" connote sufficient structure to avoid application of means-plus-function treatment. *Subotincic*, 2012 WL 3112005, at *16 ("plain meaning of the term ["controller"] connotes sufficient structure . . . to avoid means plus function treatment"); *Sprint Commc'ns Co. v. Comcast IP Holdings, I, LLC*, No. 12-1013-RGA, 2014 WL 309432, at *2-3 (D. Del. Jan. 28, 2014) ("counter device" provided a structural limitation).  Furthermore, Professor Su confirms that one of ordinary skill in the art would have understood that time stamp counter to connote a particular structure.  (*See* Ex. X at ¶¶ 53-56.)

### 4.    Facebook's Sur-Reply Position

Sound View's arguments about this term repeat its previous arguments about "controller," addressed above.  They fail for the same reasons.

## III.   DISPUTED CONSTRUCTIONS RELATING TO THE '181 PATENT

## Sound View's Summary of the '181 Patent:

The '181 patent generally relates to a system that allows a user to log in to an Internet-based service and access multiple accounts, using a single login event and a single set of credentials (e.g., username and password).  Whereas prior art systems were unable to meet demands for increased visibility and control relating to Internet-based access, the '181 patent discloses the use of user access types along with CGI scripts, a user database, various APIs, and

a drop box selection menu, in order to accommodate additional access to other users from a single login event.  (D.I. 64, Ex. C at Figs. 3, 13, 15, 1:55-65, 2:9-14, 4:34-42.)

### A. "means to store a list of users including …" (term 11)

|    | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|----|----------------------|------------------------------------|----------------------------------|
| 11 | "means to store a list of users including user access type, identification, password and name" | Function:  storing a list of users including user access type, identification, password and name<br><br>Structure:  shared memory in RAM, a hard drive | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6).<br><br>Function:  Store a list of users including user access type, identification, password and name.<br><br>Structure:  The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g., Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328 (Fed. Cir. 2008); *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999). |

#### 1.    Sound View's Opening Position

The parties agree that this term is subject to 35 U.S.C. § 112(f) and that the function is "storing a list of users including user access type, identification, password and name."  (D.I. 64 at 5.)  The corresponding structures are "shared memory in RAM, a hard drive."

The specification describes how "shared memory in RAM" and/or a "hard drive" achieve the function of storing a list of users.  For example, the specification discloses that, "[f]or each user[,] the application stores a user Id, a user password, a user type, and customer name."  (D.I.

64, Ex. C at 19:6-7.)  The specification further discloses that "[u]ser, customer, service provider, and system information," such as the information discussed above, is "stored in a shared memory segment, specifically the System Information Cache," (*id.* at 8:51-52), which "constitutes shared memory in RAM."  (*Id.* at 5:47-48.)  In addition to the copy in shared memory in RAM, the patent discloses that "the information related to the customer, user, service provider, and system in general will also be backed up on the hard drive."  (*Id.* at 8:60-62; *see also id.* at 19:57-20:22.)

As can be seen in Figure 3 of the '181 patent (to the right), the System API, User API, and Customer API (in blue) are connected to the System Information Cache (in red), which is in turn linked to Mem. Sys. Info (in green), which is used as an in-memory cache for system information files.  (*See id.* at 7:46-49.)  The User API (in the blue box) provides a service level interface to access user account data including, e.g., a list of



user accounts.  (*Id.* at 7:22-28.)  The System API (in the blue box) provides a service level interface to access, e.g., all system management information and related service provider information.  (*Id.* at 6:43-48.)  And the Customer API (in the blue box) provides a service level interface to access customer and service provider data including, e.g., a list of customers.  (*Id.* at 7:9-17.)  The data provided through those three APIs is retrieved from the System Information Cache (in red).  (*Id.* at 7:1-8, 7:46-57.)  As mentioned above, the System Information Cache illustrated in Figure 3 is shared memory in RAM.  (*Id.* at 5:47-48, 8:50-53.)

Also, "[t]o optimize performance, instead of storing the information onto the disk directly, Service Director writes the information into shared memory, and then updates the information to the disk periodically." (*Id*. at 57-60.) "A flow chart showing the backup procedure is given in FIG. 16." (*Id*. at 20:21-22.) "A separate background process is responsible for backing up the content of the shared memory" to disk based on a "user-defined interval." (*Id*. at 20:5-8.) "The backup file is used in system recovery and restart," and is also "updated right before system shutdown." (*Id*. at 20:7-9.)

### 2.    Facebook's Answering Position

The "means to store" limitation appears in claim 5. The parties agree that this phrase is subject to § 112(f) and that the function is "storing a list of users including user access type, identification, password and name." Because the asserted claims concern an alleged invention carried out by a computer (claim 5 recites an "Internet-based communication system" that includes a "server"), the '181 patent (Ex. C) must include an algorithm for performing the claimed function. *See, e.g., Williamson*, 792 F.3d at 1352.

The "means to store" limitation here does not fall into the "narrow" exception under *Katz* for rudimentary computational functions that a general purpose computer can perform without special programming. *See EON Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 621-22 (Fed. Cir. 2015). The limitation here does not merely recite generic storage of data, but the storage of specific types and categories of information for later retrieval, as recited in subsequent limitations of the claim. A generic computer without special programming could not store the specific categories of information recited in the claim. (Ex. 15 ¶ 66.)

Dr. Chatterjee was unable to identify an algorithm associated with the claimed function disclosed in the '181 patent. (Ex. 15 ¶ 67.) The '181 patent states that "the application

maintains a list of users" and that "[f]or each user the application stores a user Id, a user password, a user type, and customer name" (Ex. C, 19:6-7), but it fails to set forth any algorithm—whether it be as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure.  (Ex. 15 ¶ 67.)

Sound View's proposal that the corresponding structures are "shared memory in RAM, a hard drive" has from two flaws:  (1) the recited structures are not "clearly linked" to the claimed function; and (2) Sound View did not identify any algorithm for carrying out the functions.

As to the first problem, Sound View appears to assert that the "System API, User API and Customer API" are associated with the System Information Cache, which Sound View contends is the "shared memory in RAM."  As to the "hard drive," Sound View points to a "backup procedure."  But the specification does not provide any clear link between these structures and the claimed function.  *See, e.g.*, *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1219 (Fed. Cir. 2003) ("The requirement that structure must be clearly linked or associated with the claimed function is the quid pro quo for the convenience of claiming in functional terms.")  For example, the "User API" that Sound View points to simply "provides" a list of user accounts, it does not mention storing them, nor does it expressly state that the list includes user access type, identification, password and name as required by the claim.  (Ex. C, 7:22-25; Ex. 15 ¶ 69.)  Similarly, the '181 patent states simply that the "system information cache" stores "user profile data," and does not state that the data is stored as a list or that the data includes user access type, identification, password and name, as the claim function requires.   (Ex. C, 5:47-49; Ex. 15 ¶ 69.)  The "hard drive" suffers from the same problems.  It is not clear that the hard drive stores user access type, identification, password and name and that the data is stored as a list.  (Ex. 15 ¶ 69.)  Far from being clearly linked to the claimed function,

Sound View simply attempts to cobble together various snippets throughout the specification.

The second flaw with Sound View's argument is that it has identified no algorithms associated with the "shared memory in RAM" or the "hard drive" for carrying out the claimed function. The various APIs identified by Sound View provide functionality for accessing the "shared memory in RAM," but no specifics are disclosed. (Ex. 15 ¶ 70.) Similarly, the "backup process" that Sound View points to in connection with the "hard drive" provides only an uninformative box (Ex. C, Fig. 16 (excerpted at right)) possibly related to the claimed storing function. Whether one of ordinary skill in the art could devise such an algorithm is not relevant. *See, e.g.*, *Blackboard Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009).

### 3.      Sound View's Reply Position

Based on its assertion that the identified structure here is merely a computer, Facebook argues that the specification must disclose a corresponding algorithm. But the disclosed structure is not merely a general purpose computer; instead it is a "shared memory in RAM" and a "hard drive." Even if the Court were to agree that the structure is merely a general purpose computer—and it is not—an algorithm is not required because storing data is exactly the type of rudimentary computer function to which *In re Katz* applies. *See In re Katz*, 639 F.3d at 1316; *see also* E-*Contact Techs., LLC v. Apple, Inc.*, 11-cv-426, 2013 WL 12136607, at *5 (E.D. Tex. Apr. 16, 2013) (construing "means for storing…" and noting that "[n]o algorithms are required to perform that functionality"); *see also Optimize Tech. Solutions, LLC v. Staples, Inc.,* 11-cv-419, 2013 WL 6170624, at *42 (E. D. Tex. Nov. 20, 2013) (applying the *Katz* exception to a "means for storing…" limitation). Facebook incorrectly asserts that because the claim specifies the types of data to be stored, the law requires that the structure include an algorithm. Indeed,

29

the claim at issue in *Katz* specified the data to be stored.  (*See, e.g.,* Ex. Y at cl. 11 ("An analysis control system . . . comprising: . . . storage structure for storing certain of said data provided by said individual callers including item data for ordering particular items . . . .").)  As explained by Professor Su, storing as required by the '181 patent was a function of general purpose computers at the time without special programming.  (Ex. X at ¶¶ 65, 69.)  Moreover, Professor Su confirms that the specification does disclose to one of ordinary skill in the art how the data is stored.[5]  (Ex. X at ¶¶ 66-68, 70-72.)

Facebook and its expert concede that "'system information cache' stores 'user profile data'," (Ex. 15 at ¶ 69), and they do not contest that the hard drive similarly stores data. Nonetheless Facebook argues that the structure identified by Sound View is not specifically linked to storing the data claimed.  But as Sound View explained above, the identified APIs provide the claimed data from those storage solutions.  Indeed, Facebook and its expert concede that the APIs identified by Sound View provide interfaces to the "shared memory in RAM."  (*Id.* at ¶ 70.)  As such, the data they provide is from the shared memory in RAM; and the same data is backed up (i.e., stored) on a hard drive.  Professor Su confirms that one of ordinary skill in the art would understand those structures to be linked to the required function.  (Ex. X at ¶ 72; Ex. C at Fig. 3, 16; *id.* at 5:47-49, 7:1-16, 8:50-52, 8:50-63, 19:6-15, 19:57-20:10.)

### 4.   Facebook's Sur-Reply Position

The Federal Circuit has made clear that the *Katz* exception applies "only in the rare circumstances where any general-purpose computer without any special programming can

---

[5] Facebook contends that "whether one of ordinary skill in the art could devise such an algorithm is not relevant" based on a misinterpretation of *Blackboard Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371 (Fed. Cir. 2009). Courts regularly look to whether one of ordinary skill in the art would have understood the specification to disclose the algorithm and been able to implement such a program. *See M2M Solutions LLC v. Sierra Wireless Am., Inc.*, No. 12-30-RGA (D. Del. Oct. 2, 2015); *see also Blackboard*, 574 F.3d at 1385.

perform the function that an algorithm need not be disclosed." *EON Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 621 (Fed. Cir. 2015) (quoting *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1365 (Fed. Cir. 2012)).   *Katz* does not stand for the proposition that a "means to store" limitation never requires an algorithm.  *See Dreissen v. Sony Music Enter.*, 2015 WL 1057845, at *10 (D. Utah 2015) (". . . general use of ['storing' and 'retrieving'] terms as in *In re Katz* and is not 'coextensive' with a general purpose computer."). Here, the "means to store" requires a specific "list of users" with three categories of information, such that the information can be "compar[ed]," as recited in a subsequent claim limitation.  *Katz* therefore does not apply; this term is indefinite.

**B.   "means for a user to input identification and password information" (term 12)**

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 12 | "means for a user to input identification and password information" | Function:  enabling a user to input identification and password information<br><br>Structure:  a composed page within a WWW browser | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6).<br><br>Function:  Input identification and password information by a user.<br><br>Structure:  The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g., Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328 (Fed. Cir. 2008); *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999). |

### 1.     Sound View's Opening Position

The parties agree that this term is subject to 35 U.S.C. § 112(f).  The parties also appear to agree that the function is "enabling a user to input identification and password information." (D.I. 64 at 5-6.)  The corresponding structure is "a composed page within a WWW browser."

The specification describes how a composed page within a WWW browser achieves the function of enabling a user to input identification and password information.  For example, the specification discloses that the "CSM Service Director client interface is a WWW browser." (D.I. 64, Ex. C at 4:16-17.)   In other words, for each request made by the user, the SD application generates a graphical-based response which is returned to clients for display by their browsers, (*id.* at 3:40-



45), such that each user request "returns a composed page to the client via the Web server."  (*Id.* at 4:23-27.)  The specification further provides that "[w]hen a user requests access to the SD application, the application requires the user to enter a user Id and a user password."  (*Id.* at 12:47-49.)  As with other Internet applications, that is done through browsers over the world wide web.  (*See id.* at 3:38-45; *see also id.* at 5:1-12.)  Figure 4 further illustrates that the browser on the client is the interface through which the ID and PW (password) are input.

### 2.     Facebook's Answering Position

The parties agree that this phrase, also from claim 5, is subject to § 112(f), and that the function is "enabling a user to input identification and password information."   But the specification discloses no algorithm for performing this function.  (Ex. 15 ¶ 73.)  For example, the '181 patent states that "[w]hen a user requests access to the SD application, the application

requires the user to enter a user Id and a user password" (Ex. C, 12:47-49), and further provides the unhelpful figure reproduced at right (*id.*, Fig. 5 (excerpt)). Neither these disclosures nor the rest of the patent, set forth any algorithm for carrying out the claimed function.  (Ex. 15 ¶ 73.)

USER ENTERS USER ID AND PASSWORD

VERIFY USER ID AND PASSWORD
AGAINST USER LIST

Sound View's identification of "a composed page within a WWW browser" is neither sufficiently linked to the claimed function nor discloses the required algorithm.  (Ex. 15 ¶ 74.) The '181 patent simply states that the application requires a user to enter a user ID and password and that a TCP/IP message is sent with the user ID and password from the client to the server. (Ex. C, 12:47-49, 13:22-23.)  The patent does not state that a user enters a user ID and password using a "composed page within a WWW browser."  (Ex. 15 ¶ 74.)  Moreover, the patent does not disclose any algorithm for how the "composed page within a WWW browser" might allow a user to input identification and password information (*id.*), and whether one of ordinary skill in the art could devise such an algorithm is not relevant.  This term is therefore also indefinite.

### 3.    Sound View's Reply Position

Facebook complains that "a composed page within a WWW browser" is not sufficiently linked to the claimed function.  But Facebook's expert does not contest that one of ordinary skill in the art would readily understand that the user input is performed through a composed webpage.  Rather than providing an explanation, Facebook's expert provides legal conclusions and states simply that "[t]he patent does not state that a user enters a user ID and password using a 'composed page within a WWW browser.'"  (Ex. 15 at ¶ 74.)  Professor Su, on the other hand, explains that one of ordinary skill in the art would understand the '181 patent's specification as linking a composed page within a WWW browser with the claimed function.  (Ex. X at ¶¶ 76-83; Ex. C at Figs. 2-5; *id.* at 2:43-48, 3:35-45, 4:16-34, 4:56-5:11, 12:45-55, 17:42-43, 18:24-26.)

33

Facebook does not provide any authority for its proposition that an additional algorithm is required.  In fact, courts regularly find web browsers and pages in browsers to be sufficient structure under §112(f).  *See, e.g., Oracle Corp. v. Parallel Networks, LLP*, No. 06-cv-414, 2008 WL 5156117, at *2 (D. Del. Dec. 4, 2008).

### 4. Facebook's Sur-Reply Position

Sound View's arguments sidestep the issue of whether the specification discloses an algorithm for performing the claimed function.  Sound View does not contend that the *Katz* exception applies, and it does not.  As such, an algorithm is required, but Sound View identifies none.

Sound View asserts that "courts regularly find web browsers and pages in browsers to be a sufficient structure under §112(f)."  Sound View cites only one case to support this supposedly "regular" finding, *Oracle Corp. v. Parallel Networks, LLP*, 2008 WL 5156117, at *2 (D. Del. Dec. 4, 2008) (Robinson, J.), but that pre-*Williamson* case is simply a list of adopted constructions with no analysis.  Moreover, neither party argued that the means-plus-function term required an algorithm.  (Ex. 16, at 5-6.)

### C. "means at said server to compare …" (term 13)

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 13 | "means at said server to compare said user input information with stored information and based on user verification and user access type provide said user with a list of other users for which said user has access" | Function:  comparing said user input information with stored information and based on user verification and user access type providing said user with a list of other users for which said user has access<br><br>Structure:  a login CGI, the system shared memory's simple user database, Web | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6).<br><br>Function:  Compare, at said server, said user input information with stored information and based on user verification and user access type provide said user with a list of other users for which said user |

| | | API, System API, and a drop box selection menu as described in col. 9:34-36 or depicted in Figure 13 | has access.<br><br>Structure:  The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g.*, *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328 (Fed. Cir. 2008); *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999). |
|---|---|---|---|

### 1.      Sound View's Opening Position

The parties agree that this term is subject to 35 U.S.C. § 112(f) and that the function is "comparing said user input information with stored information and based on user verification and user access type providing said user with a list of other users for which said user has access." (D.I. 64 at 6.)  The corresponding structure is "a login CGI, the system shared memory's simple user database, Web API, System API, and a drop box selection menu."

The specification discloses that "[t]he **Login [C]GI** uses the **system shared memory's simple user database** for access authorization."  (D.I. 64, Ex. C at 9:60-62.)  It describes that authorization as "validat[ing] the information provided [by the user] against the list of users stored in the application."  (*Id.* at 12:49-51, Fig. 5.)  Then, "[i]f login is successful, the **CGI program** calls **Web API**, which again calls **System API**, to construct the users welcome screen," (*id.* at 9:60-64), which contains a "**drop box selection menu**."  (*Id.* at 9:34-36, Fig. 13).

### 2.      Facebook's Answering Position

The parties agree that this phrase, yet another from claim 5, is subject to § 112(f) and that the function is "comparing said user input information with stored information and based on user

verification and user access type providing said user with a list of other users for which said user has access."   The specification discloses no algorithm for performing this function. (Ex. 15 ¶ 77.)



For example, the '181 patent states that "[t]he application validates the information provided against the list of users stored in the application," (Ex. C, 12:49-51), which is largely repeated in the unhelpful black boxes from Figure 5 (shown excerpted at right).   No details of the claimed comparison step are provided.

The patent further states that "[i]f the user type is 'internal' then it returns a HTML page that displays a 'Switch Customer Account' presenting the list of customers for the user that are of user type as 'internal' else it returns a HTML page without this 'Switch Customer Account' capability."   (Ex. C, 19:16-23.)   The "Switch Customer Account" feature, however, at best pertains to the latter part of the claimed function; it does not disclose any algorithm for performing the comparison and user verification functions.  (Ex. 15 ¶ 77.)

Sound View's proposal attempts to paste together a number of disparate components:  "a login CGI, the system shared memory's simple user database, Web API, System API, and a drop box selection menu."   But Sound View's proposal is just a listing of functional components.  It provides no description – let alone an algorithm – for how those components work together to perform the claimed function.  (Ex. 15 ¶ 78.)  For example, with respect to the "login CGI," the patent explains that "CGI" is a "standard for interfacing external applications with information servers, such as HTTP or Web servers," and makes clear that a "CGI program"—such as the "login CGI"—is essentially another way of generically describing "software for logging in." (Ex. C, 20:57-60; Ex. 15 ¶ 78.)  The term "API" similarly refers generically to an "application program interface," which is simply a way of providing software routines for accessing certain

36

information.  (Ex. C, 4:52-54.)  The recitation of a "Web API" and a "System API" in Sound View's construction provides no clue as to how those APIs are employed to perform the claimed function.  Finally, the "drop box selection menu" in Sound View's proposal is merely a disembodied user interface component that is not linked to the login CGI, Web API, System API, or other component in Sound View's proposal.  (Ex. 15 ¶ 78.)

### 3.     Sound View's Reply Position

Facebook contends that Sound View's identified structural components are merely functional, and that the specification does not describe how those components work together. Facebook is incorrect.  Both CGIs and APIs are structural components.  (Ex. X at ¶¶ 89-91.) Moreover, as described above and confirmed by Professor Su, the specification discloses that the login CGI uses the system shared memory's simple user database for access authorization by validating or matching the information provided against that database, and then calls Web API, which calls System API, to construct the user's welcome screen, which includes a drop box selection menu.  (Ex. C at 9:31-34, 9:57-65; Ex. X at ¶¶ 89, 92-94.)

Facebook further faults Sound View for not identifying an algorithm. But Sound View identified specific structural components for performing the disclosed function, and thus no algorithm is required.  Moreover, even if the disclosed structure were merely a general purpose computer, no algorithm would be required because the function of comparing was a common function achievable by a general purpose computer without special programming at the time. (Ex. X at ¶ 87).  To the extent the Court finds Sound View's proposed structure insufficient, it should incorporate further figures and text from the specification as structure; the term should not be rendered indefinite because the specification contains ample disclosure for performing the claimed function.  (Ex. X at ¶¶ 95-96; Ex. C at Figs. 5, 13, 15; *id.* at 2:47-48, 4:34-35, 4:55-5:

28,  8:64-9:7,  9:30-37,  9:57-10:5,  12:46-13:11,  18:44-19:34;  *see also TSI, Inc., v. Azbil BioVigilant, Inc.*, No. 12-cv-0083, 2013 WL 1149606, at *4-5 (D. Ariz. Mar. 19, 2013) (noting that "comparing" is "not a complicated process" and that "[a] person of ordinary learning in the field could readily write computer code to accomplish this function.").)

### 4.  Facebook's Sur-Reply Position

Sound View all but concedes that the specification does not disclose an algorithm to perform the recited function.  Sound View instead argues again that no algorithm is required, asserting that the "function of comparing was a common function achievable by a general purpose computer without special programming at the time."  Even if this statement were true, Sound View's argument ignores the actual claimed function.  The claim requires "compar[ing] said user input information with stored information and based on user verification and user access provide said user with a list of other users for which said user has access."  Sound View does not dispute that this specialized comparison requires special programming, but instead urges the Court to eschew the requirement of an algorithm and simply cite "figures and text from the specification as structure" (*id.*, at 9).  But Sound View's citation to off-point passages and vacuous black box figures do not make up for the absence of the required algorithm.

### D.  "user" (term 14)

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 14 | "user" | No construction necessary. | "an individual, who is within an organization that owns a partitioned network or within an organization that purchases network services in the form of a partition from a service provider, and who owns a user account of CSM Service Director" |

38

1.      **Sound View's Opening Position**

Because one of ordinary skill in the art would readily understand that a "user" is merely a customer who uses the claimed computer system, the Court should adopt its plain and ordinary meaning.  (*See, e.g.,* D.I. 64, Ex. C at cl. 5 ("[a] system for providing a ***user*** of an Internet-based communication system selective access to information …").)

2.      **Facebook's Answering Position**

Although this term may seem simple and straightforward, it is subject to various express definitions in the patent.  The '181 patent expressly defines a "service <u>user</u>" as "[a]n owner of a user account within a customer or service provider organization." (Ex. C, 21:38-39.)  The patent in turn defines a "user account" as "[a] Web access account of CSM Service Director. A user account is associated with an individual within a customer or service provider organization." (*Id.*, 21:45-48.)  A "customer" is "[a]n organization that purchases network services in the form of a partition from a service provider" and a "service provider" is "[t]he owner of a partitioned network."  (*Id.*, 21:3-4, 21:37.)  In light of these interlocking definitions, a user within the meaning of the '181 patent is "an individual who is within an organization that (a) owns a partitioned network or purchases network services in the form of a partition from a service provider, and that (b) owns a user account of CSM Service Director."

The patent is clear that the term "service user" and "user" refer to the same thing.  For example, the patent provides the following description of "the invention":

> <u>According to the invention</u> the application maintains a list of <u>users</u>. For each <u>user</u> the application stores a user Id, a user password, a <u>user type</u>, and customer name. <u>The value of User Type in the SD application is one of "internal", "external" or "System Admin"</u>.

(Ex. C, 19:6-10.)  This discussion of "the invention" limits the scope of the term "user"—each user has an associated user type of "internal," "external," or "System Admin."  *See, e.g.,*

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (limiting scope of "fuel injection system component" to a "fuel filter" where written description referred to the fuel filter as "this invention" or "the present invention").)

The patent makes clear that the user types identified above correspond to "service users" as defined by the patent.  The patent discloses that the "external" user is the "<u>customer</u> end user," while "internal" and "system administrator" users are "<u>service provider</u> end-users."   (Ex. C, 18:52-57.)  In addition, the patent states that "a user logs in either as an <u>internal/external</u> service user, or an <u>administrator</u> (i.e., an admin account)."   (Ex. C, 9:55-57.)   It is clear from these disclosures that the "user" as claimed is the "service user" as defined by the patent:  "[a]n owner of a user account within a <u>customer</u> or <u>service provider</u> organization." (Ex. C,  21:38-39.)

### 3.     Sound View's Reply Position

Rather than relying on a clear disavowal or an express definition of "user" to justify a departure from the plain meaning of "user," Facebook's argument is rooted in the term "***service*** user"—one not used in the claims.  Facebook's construction hinges on its incorrect assertion that "'service user' and 'user' refer to the same thing." In fact, the patent explains that "service user" is a ***subset*** of "user" that does not include, e.g., administrators.  (*See, e.g.*, Ex. C at 9:55-56 ("a ***user*** logs in as ***either*** an <u>internal/external service user</u> ***or*** an <u>administrator</u>"); *see also id* at 5:1-3 ("[e]ach ***user request*** from ***either*** a <u>service user</u> ***or*** the system <u>administrator</u> invokes a CGI program") (emphasis added).)  Accordingly, the Court should reject Facebook's construction.

In addition, Facebook's assertion that the invention requires certain user type values is incorrect.  The statement on which Facebook relies merely provides examples of user types "in the SD application" and does ***not*** limit the invention.  (Ex. C at 19:6-10.)  Claim differentiation also shows that "access type" is not limited to the three access types identified by Facebook:

dependent claim 6 specifies "[a] system as defined in claim 5 wherein said access type is one of internal, external or system administration."  (Ex. C at cl. 6.)

### 4. Facebook's Sur-Reply Position

The specification makes clear that a "system administrator" is a service user who "has authority to configure the system."  (Ex. C, '181, 18:52-57.)  Sound View fails to point to any use of "user" that is broader than the patent's definition of "service user."  Sound View also relies on a claim differentiation argument, but claim differentiation "can not broaden claims beyond their correct scope."  *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 918 (Fed. Cir. 2012) (internal quotations omitted).

## IV. DISPUTED CONSTRUCTIONS RELATING TO THE '786 PATENT

### Sound View's Summary of the '786 Patent:

The '786 patent is a continuation of, and shares a specification with, the '181 patent. Accordingly, for the Court's convenience, Sound View cites the specification of the '181 patent. The '786 patent generally relates to a system that allows a user to log in to an Internet-based service based on that user's dynamic status information.  In the context of the '786 patent, dynamic status information relates to whether that user's account is active, enabled, or disabled. (D.I. 64, Ex. C at 9:60-65, 12:51-61.)  Prior art systems did not allow multiple logins of identical user IDs, which presented a problem when the user's Internet browser crashed while logged in, and the user wished to then log in from a different browser.  (*Id*. at 12:17-33.)  The '786 patent includes dynamic status to accommodate a subsequent log in when a user's web browser has crashed or the user is operating from another workstation.  (*Id*. at 12:34-38.)

### A. "means in said client for inputting ..." (term 16)

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 15 | "means in said client for inputting a user identification (ID) and user password" | Function: inputting a user identification (ID) and user password<br><br>Structure: a composed page within a WWW browser | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6).<br><br>Function: Input, in said client, a user identification (ID) and user password.<br><br>Structure: The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g.*, *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328 (Fed. Cir. 2008); *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999). |

### 1. Sound View's Opening Position

This term is nearly identical to "means for a user to input identification and password information" (term 12). Because the function is the same, the corresponding structure is "a composed page within a WWW browser" for the reasons explained in term 12.

### 2. Facebook's Answering Position

Like the '181 patent, the asserted claims of the '786 patent concern an alleged invention carried out by a computer (claim 1 relates to accessing a "server" via the "Internet"). Because this term is nearly identical to term 12, it is indefinite for the reasons explained for term 12.

### 3. Sound View's Reply Position

This term is not indefinite for the reasons explained with respect to term 12.

### 4.    Facebook's Sur-Reply Position

This term is indefinite for the reasons expressed with respect to term 12.

### B.   "means in said client for storing a unique client address" (term 17)

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 16 | "means in said client for storing a unique client address" | Function:  storing a unique client address<br><br>Structure:  address field of a TCP/IP message | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6).<br><br>Function:  Store, in said client, a unique client address.<br><br>Structure:  The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g., Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328 (Fed. Cir. 2008); *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999). |

### 1.    Sound View's Opening Position

The parties agree that this claim term is subject to 35 U.S.C. § 112(f).  The parties also appear to agree that the function is "storing a unique client address."  (D.I. 64 at 7.)  The corresponding structure is an "address field of a TCP/IP message."

The specification describes how an "address field" of a "TCP/IP message" achieves the function of storing an IP Address, which is the example of a unique client address given by the specification.  (*See, e.g.*, D.I. 64, Ex. C at Figs. 4-5, 5:20, 9:13-17, 12:45-67.)  It discloses that "[u]ser access authorization is achieved via user account ID and IP address," which are

43

"transferred within HTTP protocol request and response headers for each request and response." (*Id*. at 8:60-64.)   For example, Figure 4 "illustrates the flow of information between the client and server.   The client sends a TCP/IP message containing user Id and password to the server. The ***IP address of the client is included in the TCP/IP message***."   (*Id*. at 13:21-23.)

As persons of ordinary skill in the art would have known, TCP/IP, short for Transmission Control Protocol/Internet Protocol, was developed by the Department of Defense and had become the "de facto standard for data transmission over networks, including the Internet."   (Ex. S at 462.)   The protocol specification, prepared in September 1981 for the "DARPA Internet Program," shows that TCP/IP packets have a defined structure, including a segment called "Source Address and Destination Address," which is used to store and send the "source and destination host [IP] addresses."   (Ex. T at 17, 84 (available at https://tools.ietf.org/pdf/rfc793.pdf).)   Thus, as explained above, a person having ordinary skill in the art would have recognized that each TCP/IP packet sent from the client to the server contains the client's IP address in an address field.   The specification also states that "[t]his IP address [that of the user's work station] is saved in the user's IP address field."   (*Id*. at 12:57-58.)

### 2.      Facebook's Answering Position

The parties agree that this phrase is subject to § 112(f) and agree on the function, "storing a unique client address."   Like the "means to store" limitation in the '181 patent, the limitation here does not merely recite generic storage of data, but the storage of specific client address information.   The patent discloses no algorithm for performing this function.   (Ex. 15 ¶ 86.)

The '786 patent discusses IP addresses, which can be (but are not necessarily) unique, stating that "[u]ser Ids and IP address are transferred within HTTP protocol request and response header for each request and response" and that "[t]he client sends a TCP/IP message containing

44

user Id and password to the server. The IP address of the client is included in the TCP/IP message." (Ex. D, 9:35-37, 13:49-51; Ex. 15 ¶ 86.)  However, it fails to set forth where or how the IP address is stored in the client. (Ex. 15 ¶ 86.)  It further fails to disclose any algorithm for performing the storage of the unique client address. (*Id.*)  In fact, the '786 patent does not disclose any sort of memory or other storage device associated with the client that could store the claimed unique client address. (*Id.*)

Sound View asserts that the corresponding structure is the "address field of a TCP/IP message."  However, as noted above, the patent simply states that the client sends a TCP/IP message and that the message includes the client's IP address.  The patent does not state that the TCP/IP message (or the address field) is stored in the client, nor does it identify where or how. (Ex. 15 ¶ 87.)  Moreover, a TCP/IP message itself is simply data, it cannot "store" anything; storing a TCP/IP message, as with any other data, requires some sort of storage medium, such as computer memory. (Ex. 15 ¶ 87.)  RFC 793, the TCP/IP protocol specification on which Sound View relies, similarly fails to disclose any sort of storage medium at a client for a TCP/IP message. (Ex. 15 ¶ 87.)  Moreover, even if it did, it would be improper to identify that medium as the corresponding structure as RFC 793 is not part of the specification of the '786 patent. *Triton Tech of Tex., LLC v. Nintendo of Am., Inc*., 753 F.3d 1375, 1378 (Fed. Cir. 2014) ("[T]he <u>patent specification</u> must disclose with sufficient particularity the corresponding structure for performing the claimed function and clearly link that structure to the function.").)  Therefore, this term renders the claims indefinite.

### 3.     Sound View's Reply Position

One of ordinary skill in the art would understand the claimed function to be performed by the "address field of a TCP/IP message."  Indeed, Facebook concedes that the IP address in the

TCP/IP message satisfies the claimed unique client address.  Based on this disclosure linking the

IP address with the place where it is stored (in the TCP/IP message), one of ordinary skill would

understand the address field of the TCP/IP to perform the claimed function.  (Ex. X at ¶¶ 114-

122; Ex. D at Figs. 2-5; *id*. at 9:34-38, 13:4-27, 13:48-61.)  Notably, Facebook's expert does not

assert that those of ordinary skill are unfamiliar with TCP/IP messages or that their address fields

do not contain the claimed address.  To the extent Facebook asserts that the storing is performed

by the storage medium of a general purpose computer, that is a basic function of any general

purpose computer and storing of IP addresses (in a TCP/IP address field or otherwise) is

performed without special programming.   (Ex. X at ¶¶ 113, 122-124.)   Accordingly, no

algorithm is required for the reasons explained for term 11.

### 4.        Facebook's Sur-Reply Position

Sound View's assertion that an "address field of a TCP/IP message" is corresponding

structure is untenable.  Sound View has failed to identify an algorithm for this function.  And

even if no algorithm were required, the specification contains no corresponding structure clearly

linked to the claimed function.  The only mention of actual <u>storage</u> of a TCP/IP address field in

the specification is the following statement:  "This IP address is saved in the user's IP address

field."  (Ex. D, '786, 13:16-17.)  But this statement describes storage of an IP address field by

the "application" running on the <u>server</u>, not on the <u>client</u>.  (*Id.*, 13:4-6, 4:43-46.)  Sound View

does not identify any disclosure of storage of a TCP/IP address field on the <u>client</u>, let alone a

structure for performing that function.

The other passages cited by Sound View ('786, 13:48-61, 9:34-38) do not relate to

storage but to transmission of the IP address, which is addressed by the separately-recited

"communications means" limitation (term 18), that immediately follows in the claim.  Those

passages are not clearly linked to the claimed storage function, and thus, cannot provide the requisite corresponding structure.

### C. "communication means at said client for passing …" (term 18)

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 17 | "communication means at said client for passing said ID, password and address to said server via said Internet in response to a request therefrom" | Function:  passing said ID, password and address to said server via said Internet in response to a request therefrom<br><br>Structure:  TCP/IP message | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6).<br><br>Function:  At said client, pass said ID, password and address to said server via said Internet in response to a request therefrom.<br><br>Structure:  The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g., Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328 (Fed. Cir. 2008); *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999). |

#### 1.    Sound View's Opening Position

The parties agree that this term is subject to 35 U.S.C. § 112(f) and appear to agree that the function is "passing said ID, password and address to said server via said Internet in response to a request therefrom."  (D.I. 64 at 7-8.)  The corresponding structure is a "TCP/IP message."

As discussed above, the specification explains that the client sends TCP/IP messages to the server containing an ID, password, and address.  (D.I. 64, Ex. C at 9:14-16 ("[u]ser Ids and

IP address[es] are transferred within HTTP protocol request and response header[s] for each request and response.").)   Figure 4 (included in term 12) further "illustrates the flow of information between the client and server."  (*Id*. at 13:21-23, Fig. 4.)  As is discussed in more detail above, "[w]hen a user requests access to the SD application, the application requires the user to enter a user Id and user password."  (*Id*. at 12:47-49.)  In response, "[t]he client sends a TCP/IP message containing user Id and password to the server."  (*Id*. at 13:22-23.)  "The IP address of the client is included in the TCP/IP message."  (*Id*. at 13:23-24.)

### 2.      Facebook's Answering Position

The parties agree that this phrase is subject to § 112(f) and that the function is "passing said ID, password and address to said server via said Internet in response to a request therefrom." The specification discloses no algorithm for performing this function.  (Ex. 15 ¶ 90.)   The '786 patent does discuss sending a user ID, password and IP address from a client to a server, stating that "[u]ser Ids and IP address are transferred within HTTP protocol request and response header for each request and response" and that "[t]he client sends a TCP/IP message containing user Id and password to the server. The IP address of the client is included in the TCP/IP message." (Ex. D, 9:35-37, 13:49-51; Ex. 15 ¶ 90.)  However, the patent fails to set forth any structure and algorithm at the client for communicating that information.  (Ex. 15 ¶ 90.)  In fact, the '786 patent does not disclose any sort of communication device associated with the client that could carry out the claimed "passing" function.  (Ex. 15 ¶ 90.)  While the patent states that a client can include a web browser (Ex. D, '786, 3:46-53), web browser software alone is not enough to pass information over a network—networking hardware (such as a network interface card) and software (such a device drivers) are necessary.  (Ex. 15 ¶ 90.)

Sound View proposes that the corresponding structure is a "TCP/IP message."  As noted

48

above, a TCP/IP message is simply data and TCP/IP itself specifies how various pieces of data should be formatted.   Other means are required to actually transmit a TCP/IP message over a network such as the Internet.  (Ex. 15 ¶ 91.)   These other means, as well as the algorithm they might use, are not disclosed in the patent.  Therefore, this term renders the claims indefinite.

### 3.      Sound View's Reply Position

Facebook agrees that the claimed ID, password and address are sent to the server using a TCP/IP message.  That is the structure that corresponds to the claimed "passing."  But Facebook incorrectly asserts that the TCP/IP message is insufficient because a general purpose computer (containing e.g., a network interface card) and algorithm is required to satisfy the "passing" function.  *See Fortinet, Inc. v. Sophos, Inc.*, 2015 WL 6513655, at *8 (N.D. Cal. Oct. 28, 2015) ("[a]s *Katz* indicates, copying and sending are arguably functions that can be accomplished by a general purpose computer."); *see also Fitbit, Inc. v. AliphCom,* 2017 WL 386257, at *12 (N.D. Cal. Jan. 27, 2017) ("cell phones, laptop computers, and desktop computers all transmit data"); s*ee also* Ex. X at ¶¶ 128-129, 131 (explaining that passing data over networks from one computer to another was a core function of general purpose computers.)  Moreover, if the Court finds a TCP/IP message to be insufficient, it should incorporate additional disclosures from the specification rather than finding the element indefinite.  (Ex. X at ¶¶ 130-134; Ex. D at Figs. 2-5; *id*. at 3:43-53, 4:24-42, 9:34-38, 13:4-27, 13: 34-38, 13:48-61.)

### 4.      Facebook's Sur-Reply Position

Sound View's assertion that no algorithm is required misreads the claimed function, which requires "passing said ID, password and address to said server via said Internet <u>in response to a request therefrom</u>."  The "in response to" phrase clearly connotes conditional logic that takes this limitation beyond a simple "transmitting" step under *Katz.* An algorithm is thus

required, but Sound View identifies none.   And even if no algorithm were required, Sound

View's proposed construction of a "TCP/IP message" is untenable.  A TCP/IP message is simply

a packet of information that is formed and transmitted <u>after</u> the server request has been detected.

It cannot perform the conditional logic recited in the claimed function.

### D.   "means at said server to store information …" (term 19)

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 18 | "means at said server to store information respecting said client and to compare said stored information with said user ID and user password" | Function:  storing information respecting said client and comparing said stored information with said user ID and user password<br><br>Structure:  a login CGI, the system shared memory's simple user database | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6).<br><br>Function:  At said server, store information respecting said client and compare said stored information with said user ID and user password.<br><br>Structure:  The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g., Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328 (Fed. Cir. 2008); *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999). |

### 1.     Sound View's Opening Position

The parties agree that this claim term is subject to 35 U.S.C. § 112(f).  The parties also

appear to agree that the function is "storing information respecting said client and comparing

said stored information with said user ID and user password." (D.I. 64 at 8.) The corresponding structure is a "login CGI, the system shared memory's simple user database."

As the specification describes, each action taken by an end-user triggers a CGI process which retrieves, filters, and sorts data, (D.I. 64, Ex. C at 4:56-58), and each CGI program corresponds to a specific user request action. (*Id*. at 4:65-5:9.) "Each user request from either a service user or the system administrator invokes a CGI program on the Web server," (*id*. at 5:1-3), and "[e]ach CGI program returns the next HTML screen page of the user request," (*id*. at 5:9-10). The Login CGI handles user login. (*See id*. at 9:60.) The application may maintain a list of users whereby "[f]or each user the application stores a user Id, a user password, status, and an IP address." (*Id*. at 12:45-47.) The patent goes on to describe that authorization as "validat[ing] the information provided [by the user] against the list of users stored in the application." (*Id*. at 12:49-51, Fig. 5; *see also id*. at 13:7-9 ("check[ing] the user Id and password against the list stored in the application.").) The specification discloses that "[t]he ***Login CGI*** uses the ***system shared memory's simple user database*** for access authorization." (*Id*. at 9:60-62.)

## 2. Facebook's Answering Position

The parties agree that this phrase is subject to § 112(f) and that the function is "storing information respecting said client and comparing said stored information with said user ID and user password." The specification discloses no algorithm for performing this function. (Ex. 15 ¶ 94.) The '786 patent generally discusses storing information and validating information:

- For each user the application stores a user Id, a user password, status, and an IP address. When a user requests access to the SD application, the application requires the user to enter a user Id and a user password. The application validates the information provided against the list of users stored in the application.
- The Login CGI uses the system shared memory's simple user database for user access authorization.

51

(Ex. D, 13:4-10, 10:15-17; Ex. 15 ¶ 94.)  However, as Dr. Chatterjee explained above for the '181 patent (which shares substantially the same specification), there is no algorithm disclosed detailing how the "shared memory" carries out a "storing" function.  (Ex. 15 ¶ 95.)  As to the "comparing" function, the patent provides an unhelpful block diagram that paraphrases what is already recited in the claim.  (Ex. D, Fig. 5.)  Moreover, as noted, a "login CGI" is essentially another way of generically describing "software for logging in," and the patent fails to disclose the implementation of the "login CGI."  (Ex. 15 ¶ 95.)  This term renders the claims indefinite.

### 3.     Sound View's Reply Position

Facebook does not contest that the login CGI and the system shared memory's simple user database perform the claimed function, but asserts that those structural limitations are insufficient because the login CGI is not structural and because the specification must also disclose an algorithm.  But as explained earlier, the login CGI is structure.  (*See also* Ex. X at ¶¶ 151-152.)  Even if the structure were merely a general purpose computer—and it is more specific here—that would be sufficient to avoid indefiniteness because storing and comparing are exactly the type of rudimentary computer function to which *Katz* applies.  *See In re Katz*, 639 F.3d at 1316.  Moreover, as Professor Su explains, the '786 patent provides detail about how the login CGI and system shared memory's simple user database perform the claimed function.  (Ex. X at ¶¶ 139-155; Ex. D at Figs. 2-5, 16; *id*. at 4:43-50, 4:63-5:36, 5:47-62, 7:59-63, 8:66- 9:16, 10:12-20, 12:16-20, 12:49-51, 13:4-38, 13:60-61, 20:1-33.)

### 4.     Facebook's Sur-Reply Position

This term is indefinite for the same reasons as the closely-related "means at said server to compare" (term 13), discussed above.  This term does not merely require storage; it goes on to require "compar[ing] said stored information with said user ID and user password."  Sound View

does not dispute that the specification does not disclose any algorithm for performing the comparison function.  For the reasons discussed for term 13, the absence of such an algorithm renders this term indefinite.

### E.  "means at said server to store dynamic status information …" (term 20)

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 19 | "means at said server to store dynamic status information respecting said user, said dynamic status information being one of enabled, disabled or active" | Function:  storing dynamic status information respecting said user<br><br>Structure:  shared memory in RAM, a hard drive | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6).<br><br>Function:  At said server, store dynamic status information respecting said user, said dynamic status information being one of enabled, disabled or active.<br><br>Structure:  The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g., Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328 (Fed. Cir. 2008); *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999). |

### 1.    Sound View's Opening Position

The parties agree that this term is subject to 35 U.S.C. § 112(f).  The parties also appear to agree that the function is "storing dynamic status information respecting said user."  (D.I. 64 at 9.)  The corresponding structure is "shared memory in RAM, a hard drive."

The specification discloses that, "[f]or each user the application stores a user Id, a user password, *status*, and an IP address." (D.I. 64, Ex. C at 12:46-47; *see also id.* at 12:45-59 ("the application checks the user's status in the application.  If the user's status is 'enabled' then the user is logged onto the system and user's status is changed to 'active'."  And "[i]f the user's status is 'disabled' then the user is rejected.").)  According to the patent, this dynamic status information is "*stored in a shared memory segment, specifically the System Information Cache,* (*id*. at 8:50-52), which "*constitutes shared memory in RAM*" and is where "customer and user profile data together with the system data are stored."  (*Id.* at 5:47-49.)  The specification also discloses that "the information related to the customer, user, service provider, and system in general will also be backed up on the *hard drive*."  (*Id.* at 8:60-62.)  Indeed, the specification discloses that storing information in shared memory and then updating that information to disk periodically can optimize performance.  (*See id.* at 19:57-20:22.)

## 2. Facebook's Answering Position

The parties agree that this phrase is subject to § 112(f) and that the function is "storing dynamic status information respecting said user."  The specification discloses no algorithm for performing this function.  (Ex. 15 ¶ 98.)  The specification of the '786 patent does not use the phrase "dynamic status information."  However, the patent does disclose a "status" associated with a user, that "user profile data" is stored in shared memory, and that information related to a user is backed up on a hard drive.  (Ex. D, 5:57-59, 9:13-15, 13:5-6; Ex. 15 ¶ 98.)  Sound View claims the shared memory and hard drive are the corresponding structure for the claimed function.  As discussed above for a similar claim limitation from the '181 patent, however, the '786 patent fails to set forth any associated algorithm for carrying out a storing function.  (Ex. 15 ¶ 98.)  Therefore, this term renders the claims indefinite.

### 3.    Sound View's Reply Position

Facebook concedes that the patent discloses a status associated with a user, that user profile data is stored in shared memory, and that information related to a user is backed up on a hard disk.  That ends the inquiry; the storing function is performed by shared memory in RAM, or a hard drive.  For the reasons discussed for the other "storing" terms, an algorithm is not required.  (*See supra* term 11; *see also* Ex. X at ¶¶ 160, 166.)  Moreover, Professor Su confirms that the specification does disclose to one of ordinary skill in the art how the data is stored. (Ex. X at ¶¶ 159, 161-170; Ex. D at Figs. 2-6, 16; *id*. at 2:48-49, 4:43-50, 5:47-62, 7:59-63, 8:66-9:16, 10:15-24, 13:4-27, 20:1-33.)

### 4.    Facebook's Sur-Reply Position

This term is definite for the same reasons as term 11 above.

### F.   "means to authorize log in …" (term 21)

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 20 | "means to authorize log in of said user if said ID and password agree with said stored information and if said user status is enabled" | Function:  authorizing log in of said user if said ID and password agree with said stored information and if said user status is enabled<br><br>Structure:  a JavaScript cookie | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6).<br><br>Function:  Authorize log in of said user if said ID and password agree with said stored information and if said user status is enabled.<br><br>Structure:  The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g., Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d |

| | | | 1328 (Fed. Cir. 2008); *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999). |
|---|---|---|---|

### 1.    Sound View's Opening Position

The parties agree that this claim term is subject to 35 U.S.C. § 112(f) and also appear to agree that the function is "authorizing log in of said user if said ID and password agree with said stored information and if said user status is enabled." (D.I. 64 at 9-10.)  The corresponding structure in the specification is "a Javascript cookie."

The specification describes how a "Javascript cookie" is used to authorize login if said ID and password agree with said stored information and if said user status is enabled. (D.I. 64, Ex. C at Fig. 4.)  For example, the specification discloses that if the user ID and password entered by the user match those stored in the application, and if the user's status is "enabled," the user is logged onto the system." (*Id*. at 12:51-55.)  The login function "checks the user Id and password against the list stored in the application" and then "sends out a Javascript cookie to the client after the user Id and password are validated." (*Id*. at 13:7-10, 13:12-14 ("the



**FIG. 4**

user is logged onto the system" if "the user's status is 'enabled'"); *see also id.* at Fig. 5.)  As the specification discloses when discussing Figure 4 (shown above), "[i]f the client is authorized the server returns a welcome page together with a Javascript cookie, which contains the user Id, to the client." (*Id*. at 13:24-26.)  The server then verifies the Javascript cookie to "see if the server will go on to service the request." (*Id*. at 13:19-20.)

### 2. Facebook's Answering Position

The parties agree that this phrase is subject to § 112(f) and that the function is "authorizing log in of said user if said ID and password agree with said stored information and if said user status is enabled." The specification discloses no algorithm for performing this function. (Ex. 15 ¶ 101.) For example, Figure 5 provides only unhelpful flow diagram boxes, such as the two shown at right, that largely repeat the claim language. (Ex. D, Fig. 5 (excerpts).) The written description largely repeat claim language: "If the user name and password matches, the application checks the user's status in the application. If the user's status is 'enabled' then the user is logged onto the system and the user's status is changed to 'active'." (Ex. D, 13:6-14.)

Sound View's proposal that the corresponding structure is "a Javascript cookie" should be rejected for numerous reasons. To begin with, a "cookie" is simply a piece of data; other means are required to actually perform functions involving that data. (Ex. 13, p.113 (defining "cookie" as "[a] block of data"); Ex. 15 ¶ 102.) But the '786 patent does not disclose any algorithm for how the "Javascript cookie" is created or used—for an authorization function or otherwise. (Ex. 15 ¶ 102.) In addition, while the patent states that the system may "verify the JavaScript cookie to see if the server will go on to service [a] request at all" (Ex. D, 13:46-47), the patent makes clear that the cookie is only used *after* a user's status is changed from enabled to active (*id.*, 13:12-14). Therefore, there is a fundamental sequencing problem with Sound View's proposal: a Javascript cookie cannot be the claimed "means to authorize login" because by the time the cookie may be used, a user's status is no longer "enabled." (Ex. 15 ¶ 102.) Moreover, there is no disclosure that a Javascript cookie is used in the first instance to perform

authorization using a user ID and password when a user's status is only "enabled" and not "active."   For example, the patent nowhere states that a cookie contains both a user ID and password.   (*Id.*)   Therefore, this term renders the claims indefinite.

### 3.      Sound View's Reply Position

Facebook argues that a cookie is "simply a piece of data" and that "other means are required," but as explained by Professor Su, a cookie denotes structure and is not just data.   (Ex. X at ¶¶ 177-179.)   For example, a person having ordinary skill in the art would have understood the specification to disclose how a JavaScript cookie is used to achieve authorization.   (Ex. X at ¶¶ 176, 179-181; Ex. D at Figs. 5, 13; *id.* at 5:20-36, 10:15-20, 13:4-38, 13:48-62.)   Moreover, there is no "fundamental sequencing problem," as Facebook suggests.   (Ex. X at ¶ 182.)   The patent explains that the user is logged onto the system "if the user's status is '***enabled***,'" (Ex. C at 13:12-14), and that "if the client is authorized the server returns a welcome page together with a ***Javascript cookie***."   (*Id.* at 13:52-54.)

### 4.      Facebook's Sur-Reply Position

A general purpose computer cannot by itself "authorize log in of said user if said ID and password agree with said stored information and if said user status is enabled," as claimed.   The two "if" statements in this limitation clearly connote conditional logic, a function that requires special programming and an algorithm.   Sound View identifies none and does not dispute that a "JavaScript cookie" is just a piece of data, not an algorithm.   This term is therefore indefinite.

And even if no algorithm were required, the "JavaScript cookie" is simply what gets created and sent <u>after</u> the authorization process is complete.   ('786, 13:36-38 ("It sends out a JavaScript cookie to the client <u>after</u> the user Id and password are validated.").)   The cookie itself does not perform the authorization and cannot perform the conditional logic in the claim.   These

functions must be performed by software executing <u>before</u> the JavaScript cookie is created.  (*Id.*)

### G.   "dynamic status information" (term 22)

|    | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|----|----------------------|-----------------------------------|----------------------------------|
| 21 | "dynamic status information" | No construction necessary. | "a value for a user that indicates the user's status in the system and that is and capable of changing upon log in, attempted log in or log out" |

#### 1.      Sound View's Opening Position

Both "dynamic" and "status information" are terms that would be readily understood by persons of ordinary skill in the art, and therefore the term's plain and ordinary meaning should apply.  Sound View agrees with Facebook that "dynamic" means "capable of changing," so to the extent the Court finds it helpful, Sound View is amenable to construing "dynamic status information" as "status information that is capable of changing."

#### 2.      Facebook's Answering Position

The term "dynamic status information" does not have an accepted meaning to one of ordinary skill in the art.  Facebook's proposal tracks the teachings of the patent.  *See Indacon*, 824 F.3d at 1357 (terms that have no plain or established meaning to one of ordinary skill in the art "ordinarily cannot be construed broader than the disclosure in the specification.") (quoting *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004)).  This term should be construed as "a value for a user that indicates the user's status in the system and that is capable of changing upon login, attempted login or logout."

The patent instead describes a "status" that is stored for a user that is one of enabled, disabled or active.  (Ex. D, 13:5-6 ("<u>For each user the application stores</u> a user Id, a user

password, status, and an IP address."); 13:10-21.)  The stored status information is checked to determine whether it "is" "enabled," "disabled" or "active."  (Ex. D, 13:10-21 ("If the user's status is 'enabled' . . .").)  The system can change the status upon login, attempted login or logout.  (Ex. D, 10:17-20, 13:12-14, Fig. 6.)

Dynamic status information is simply a changeable value and not a collection of information that is used to derive a user's status.  The patent is clear that dynamic status information is stored.  It cannot, therefore, be a collection of various pieces of stored information because those pieces of information alone would not convey sufficient meaning; they would need to be analyzed in order to actually make a status determination.  Similarly, the patent states that the system changes status from, e.g., "enabled" to "active."  (Ex. D, e.g., Fig. 5.)  If the stored information was only a collection of pieces of information from which status was derived, changing that information would require analysis to determine that the status has changed.

Sound View's proposal—plain and ordinary meaning—should be rejected.  As noted above, the term "dynamic status information" does not have an accepted meaning in the art, and Sound View ignores the limiting disclosures of the patent.

### 3.  Sound View's Reply Position

Dynamic status information is simply information regarding status that can change.  The parties' dispute here is not focused on dynamic.  Instead, Facebook asserts that the Court should construe "information" as "a value," without any support from the specification.  Nor would one of skill in the art have understood "status information" to mean "a status value."  (Ex. X at ¶ 171.)  If the inventors sought to claim only "a status value," they could have chosen those words, but they instead chose the broader term "status information."  Facebook itself demonstrates its radical departure from the plain meaning, arguing that "[d]ynamic status *information* is simply *a*

changeable *value* and ***not*** a collection of ***information*** . . . ."

The specification does not limit information to a particular value.  Indeed, the sentence quoted by Facebook recites "[f]or each user the application stores **a** user Id, **a** user password, **status**, and **an** IP address."  (Ex. D at 13:5-6 (emphasis added).)  Here, "a" and "an" are indefinite articles and correspond to singular nouns.  The choice to omit such an article with respect to "status" implies that the patentee did not intend to limit "status" to a singular value.  The rest of the specification refers to "dynamic status information" as "said status," (*id*. at cls. 2-4, 7, 8), or "the [user's] status," (*id*. at 10:20; 13:11-19), neither of which limit "information" to "a value."  Likewise, when the application "checks the user's status," (*id*. at 13:11), or when it "change[s]" the user's status, (*id*. at 13:13-14), there is no requirement—explicit or otherwise—that only a single value can be 'checked' or 'changed,' respectively.  (Ex. X at ¶ 171.)

### 4.    Facebook's Sur-Reply Position

Sound View's own position is that claimed "dynamic status information" must be capable of changing.  That functionality requires a value, not a disembodied collection of information.

## V.    DISPUTED CONSTRUCTIONS RELATING TO THE '486 PATENT

### Sound View's Summary of the '486 Patent:

The '486 patent provides a solution to prior art instant messaging systems that suffered from a variety of deficiencies.  For example, those conventional messaging systems required developers to write different versions of client applications for each device platform, and also required users to perform complex processes to configure their client computer systems to support instant messaging by downloading and installing corresponding software.  (*See, e.g.*, D.I. 64, Ex. E at 2:25-32, 2:45-52, 3:4-10.)  The '486 patent generally relates to a system and method for sending and receiving messages between computers—through the use of standard web

browser functionality, HTML, HTTP, JavaScript, and other communications technologies widely available within almost all data-connected devices—that is independent of the operating system of the messaging client and exclusive of proprietary messaging software residing and previously stored on the messaging client.  (*See*, *e.g.*, *id.* at 3:50-58, 31:12-23.)

### A.   "messaging client" and "messaging client configured to…" (terms 23, 27-31)

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 22 | "messaging client" | "a web browser operating on a computing platform" | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6) for reasons discussed below for "messaging client configured to . . ." terms. |
| 23 | "messaging client configured to: establish a message connection with the messaging server over the computer network using only hypertext-related protocols and a simple scripting language" | No construction necessary. | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6).<br><br>Function:  Establish a message connection with the messaging server over the computer network using only hypertext-related protocols and a simple scripting language.<br><br>Structure:  The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g., Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc); *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366 (Fed. Cir. 2015). |
| 24 | "messaging client configured to: . . . receive a message | No construction necessary. | This term is subject to 35 U.S.C. § 112(f) (formerly |

| | | |
|---|---|---|
| connection response from the server indicating that the message connection is an open message connection" | | § 112, ¶ 6). |
| | | Function: Receive a message connection response from the server indicating that the message connection is an open message connection. |
| | | Structure: The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g.*, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc); *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366 (Fed. Cir. 2015). |
| 25 | "messaging client configured to: . . . receiving message data of a first type containing the contents of a first message over the open message connection" | No construction necessary. | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6). |
| | | | Function: Receive message data of a first type containing the contents of a first message over the open message connection. |
| | | | Structure: The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g.*, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc); *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 |

| | | F.3d 1366 (Fed. Cir. 2015). |
|---|---|---|
| 26 | "messaging client configured to: . . . receiving message data of a second type containing the contents of a second message over the open message connection" | No construction necessary. | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6). Function:  Receiving message data of a second type containing the contents of a second message over the open message connection. Structure:  The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g.*, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc); *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366 (Fed. Cir. 2015). |
| 27 | "messaging client configured to: . . . repeating the steps of receiving message data while maintaining the open message connection and while awaiting delivery of a message termination indicator indicating that a message associated with the message connection has been completely received by the messaging client" | No construction necessary. | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6). Function:  Repeat the steps of receiving message data while maintaining the open message connection and while awaiting delivery of a message termination indicator indicating that a message associated with the message connection has been completely received by the messaging client. Structure:  The specification fails to |

| | | | disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g.*, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc); *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366 (Fed. Cir. 2015). |
|---|---|---|---|

### 1.    Sound View's Opening Position

The term "messaging client" should be construed to mean "a web browser operating on a computing platform."  "Client" is a well-known term, and a person of ordinary skill in the art would have understood that a "messaging client" is a client used for sending and receiving messages.  (*See, e.g.*, Ex. U at 73 (defining client as a "node or software program (front-end device) that requests services from a server").)  Moreover, the '486 specification notes that "messaging client applications can operate on a wide variety of computing platforms," and identifies "a web browser operating in the client computer system" as a representative messaging client.  (D.I. 64, Ex. E at 1:40-43, 9:11-12 ("messaging client such as a web browser operating in the client computer system"), 8:55-56 ("messaging client such as a web browser"), 9:14-15 ("to the messaging client (i.e., to the web browser)").)

The Court should reject Facebook's argument that this term is subject to 35 U.S.C. § 112(f).  As an initial matter, the claim term does not use the word "means," creating a presumption that the term is not means-plus-function.  *Williamson*, 792 F.3d at 1348; *Blackbird Tech*, 2016 WL 7451622, at *4; *M2M Sols.*, 2015 WL 5826816, at *2.  Facebook cannot meet its burden of showing that the term is means-plus-function because a person of ordinary skill in the

art readily would have understood "messaging client," and the specification provides a specific example of a messaging client—a web browser operating on a client computer system.

### 2.    Facebook's Answering Position

The term "client" is the type of generic and functional nonce word that triggers § 112(f). *Williamson*, 792 F.3d at 1350; Ex. 15 ¶¶ 107-112.  For example, computer dictionaries provide functional definitions for "client," such as "[a] functional unit that receives shared services from a server" (Ex. 14, p.107), and "[i]n general, someone or something receiving a service of some kind" (Ex. 12, p.76).  In fact, even the dictionary definition offered by Sound View describes a "client" in functional, generic terms.  (Pl. Br., Ex. U, p.73 (defining client as a "[n]ode or software program (front-end device) that requests services from a server").)

The description of a "messaging client" in the '486 patent itself is consistent with these definitions, describing it generally as a something that receives messaging services from a server. (Ex. E, 10:28-31 ("A plurality of messaging client computer systems **130-1** and **130-2** are coupled to the computer network **101** and are in communication with the message server computer system **110** ....").)  Although the messaging client is limited to a computing context, it is shown and described as a generic computer.  (*See, e.g.*, Ex. E, Fig. 1 (excerpt at right), 7:15-22 (discussing components such as input output interface, communications interface, and processor);



Ex. 15 ¶ 108.)  The '486 patent, moreover, further states that "the system of the invention can be embodied strictly as a software program, as software and hardware, or as hardware alone."  (Ex. E, 7:55-57.)  Thus, the "messaging client" is not meaningfully different from the term "module" that triggered § 112(f) in *Williamson*, which was "a generic description for software or hardware that performs a specified function."  792 F.3d at 1350.  Here, the "messaging client" is a generic

description of hardware or software that performs messaging functions.  (Ex. 15 ¶ 108.)

Even if the "messaging client" may be a computer, it remains a nonce word.  Numerous district courts have found that the term "computer" and similar terms are nonces.[6]  As Dr. Chatterjee explains, the term "computer" is a generic description of a large number of devices that can perform a computing function.  (Ex. 15 ¶ 109.)  This generic description is confirmed by technical dictionaries.  (Ex. 15 ¶ 110.)  The fact that "computer" lacks definite structure is also clear from the nature of computers themselves.  Some types of electronic devices such as radios, alarm clocks and cameras, can perform useful functions out-of-the-box, without additional components or modifications.  But a generic computer is different.  (Ex. 15 ¶ 111.)  For a "computer" to do something useful, it must include additional software or other programming.  And unlike more specialized electronic devices such as radios, alarm clocks, and cameras, a computer can be programmed to perform a potentially limitless number and types of tasks.  This flexibility also means, conversely, that a computer without any such special programming or software will generally perform no useful function.  (Ex. 15 ¶ 111.)

For these reasons, the unadorned word "computer" (and "client") does not connote sufficiently definite structure.  It is the additional software and/or programming that transforms a generic "computer" into something concrete that is actually capable of carrying out the operations in the claim.  *See also Soque Holdings*, 2010 WL 2292316, at *12 ("A reference to a 'computer' provides no basis to distinguish the structure from any other general purpose

---

[6] *See, e.g.*, *Soque Holdings (Berm.) Ltd. v. Keyscan, Inc.*, No. C 09-2651 MHP, 2010 WL 2292316, at *12-13 (N.D. Cal. June 7, 2010) ("computer" subject to § 112, ¶ 6 (now § 112(f)); *Pi-Net Int'l Inc. v. JPMorgan Chase & Co.*, No. Civ. 12-282-SLR, 2014 WL 1997039, at *12-13 (D. Del. May 14, 2014) (same; "computer system"); *Verint Sys. Inc. v. Red Box Recorders Ltd.*, 166 F. Supp. 3d 364, 379-80 (S.D.N.Y. 2016) (same; "computer application"); *Advanced Ground Info. Sys., Inc. v. Life360, Inc.*, 830 F.3d 1341, 1346 (Fed. Cir. 2016) (same; "CPU software").

computer; thus, 'computer' does not adequately describe a specific structure.") (citation omitted); *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) (simply disclosing a computer as the structure designated to perform a particular function is insufficient for 112(6)).

While the claim recites a "messaging client," the term "messaging" merely adds functional language to the term "client" and does not impart any structural significance to the term. *Williamson*, 792 F.3d at 1351; Ex. 15 ¶ 113. Nor do any other limitations in the claim inform the structural character of each claimed controller. 792 F.3d at 1344, 1351; Ex. 15 ¶ 113. Therefore, the term "messaging client" recited in claim 19 of the triggers § 112(f).

The functions of messaging client come from the claim language itself:

- establish a message connection with the messaging server . . .
- receive a message connection response from the server . . .
- receiving message data of a first type . . .
- receiving message data of a second type . . .
- repeating the steps of receiving message data . . .

(Ex. E, 35:33-53 (claim 19); Ex. 15 ¶ 114.)

Based on Dr. Chatterjee's review of the '486 patent, the specification fails to disclose corresponding structure and algorithm for the recited functions. (Ex. 15 ¶ 115.) The specification discusses a "client message handler application" "operating within the messaging client **130-1**" (Ex. E, e.g., 11:9-13, Fig. 4 (excerpt at right)), but it does not set forth an algorithm for how the client, alone or with the client message handler application, carries out the recited functions. The specification further discusses using some combination of HTTP, HTML and JavaScript in the system, but omits configuration details. (Ex. E, 8:30-37 ("[W]eb clients can be configured to properly operate to exchange messages using HTML/HTTP and JavaScript ....").)



130-1 MESSAGING CLIENT (E.G., USER'S COMPUTER SYSTEM)
145-1 CLIENT MESSAGE HANDLER (E.G., WEB BROWSER)

Sound View's proposal that "messaging client" means "a web browser operating on a computing platform" should be rejected. The patent describes a web browser as "client message handler **145**." (Ex. E, e.g., 11:8-13 ("client message handler application **145-1** (e.g., the web browser)"), 12:53-60 ("to the continually awaiting client message handler **145** (i.e., to the web browser)"), Fig. 4 (excerpt above right).) The computing device is identified as the "messaging client." And as explained above, such a generic device is a nonce word triggering § 112(f).

### 3.     Sound View's Reply Position

Facebook's argument that "client" is a nonce word mirrors its argument with respect to "controller" and is incorrect for the same reasons. The term "client" has a well-known structural meaning to those of skill in the art—it is not a generic term that reflects nothing more than verbal construct. (Ex. X at ¶¶ 186-187, 191-192); *see also Int'l. Bus. Machines Corp. v. Priceline Grp. Inc.*, No. 15-137-LPS, 2016 WL 6405824, at *13 (D. Del. Oct. 28, 2016) ("corresponding structure for the 'search means' term is either a client or a server"); *Minton v. Nat'l Ass'n of Sec. Dealers*, 197 F. Supp. 2d 699, 708 n.15 (E.D. Tex. 2001) ("[C]lient-server technology and many networking technologies are well known in the art and thus detailed description of these structures is unnecessary as the POOSA will be able to practice the invention without such references. . . . [T]he term 'server', standing alone, is sufficient to conjure the image of a family of computer systems capable of performing high-speed or complex tasks."). Moreover, although there are references in the specification to a user's computer system as a messaging client (as Facebook highlights), in any such instance that computer system includes a web browser. Moreover, as Sound View points out—and Facebook does not address—the specification repeatedly equates the messaging client with the web browser. Sound View's proposed construction—"a web browser operating on a computing platform"—accounts for the disclosure

in the specification as a whole and does not seek to broadly construe "messaging client" as a computer.

Facebook further contends that "[t]he term 'messaging' merely adds functional language to the term 'client' and does not impart any structural significance to the term," but courts have found that the addition of such modifiers to terms sufficiently definite themselves to avoid means-plus-function treatment in fact made the term more definite. *See, e.g.*, *Blackbird Tech*, 2016 WL 7451622, at \*4-5; *Greenberg*, 91 F.3d at 1583. Here, as explained by Professor Su, a "messaging" client denotes a subset of clients and provides additional structure in the understanding of one of ordinary skill in the art. (Ex. X at ¶¶ 190-192.)

Finally, even if the Court were to reject Sound View's proposed construction and apply § 112(f), the corresponding structure in the specification would be a web browser operating on a computing platform. Facebook makes the conclusory assertion that the claim is indefinite because the specification fails to disclose corresponding structure and algorithm for the recited functions. But in the specification, the "web browser" is the structure that performs the functions, which provides sufficient structure without the need for an algorithm. (*See supra* term 12; *see also* Ex. X at ¶¶ 187-189.) Moreover, the specification describes in detail the algorithms used to perform the claimed elements: "establish a message connection with the messaging server …," (Ex. E at Figs. 4, 7, 1:40-43, 28:36-42, 28:43-55, 28:56-59, 30:61-31:2); "receive a message connection response from the server," (*id.* at Figs. 4, 7, 1:40-43, 28:36-42, 28:56-59, 30:61-31:2); "receiving message data of a first type," (*id.* at Figs. 4, 7, 1:40-43, 28:36-42, 28:60-29:2, 30:61-31:2); "receiving message data of a second type," (*id.* at Figs. 4, 7, 1:40-43, 28:36-42, 29:3-13, 30:61-31:2); and "repeating the steps of receiving message data …," (*id.* at Figs. 4, 7, 1:40-43, 28:36-42, 29:14-31, 30:61-31:2). (*See* Ex. X at 192-196; Ex. AA.)

70

####    4.      Facebook's Sur-Reply Position

Sound View's arguments focus on the mechanical inquiry of whether the word "client" connotes sufficient structure.   As Facebook explained, the term "client" is simply a linguistic placeholder, like "computer," a nonce word to describe something entirely functional.

Sound View's analysis improperly focuses on the word "client" in isolation, ignoring the context in which it appears in the claim.  For example, in the informative decision in *Ex Parte Lakkala*, Appeal 2011-001526 (P.T.A.B. 2013) (Ex. 17), the Patent Office confronted the question of whether the term "processor" connoted sufficient structure.  The patent owner made substantially the same arguments Sound View makes here, and in that case, the PTO acknowledged that the word "processor" alone does refer to some kind of structure.  But the PTO concluded that to avoid the prohibition against functional claiming, a deeper inquiry was required.  Citing *Katz*, the PTO found that the inquiry turned on whether the claim recited "functions typically found in a commercially available off-the-shelf processor."  (Ex. 17, at 11.) In that case, the claim recited functions for the processor that were "not typical functions found in a general purpose processor and would require additional programming of the processor to implement," and thus, the term triggered means-plus-function treatment.  (Ex. 17, at 10-12.)

In this case, there can be no dispute that the "messaging client," even if one assumes Sound View's argument that it refers to "a web browser on a computing platform," cannot perform the claimed functions without special programming.  Claim 19 requires the "messaging client" be "configured to" perform six detailed operations.  Because an off-the-shelf web browser cannot perform these operations without additional programming, § 112(f) applies, and an algorithm is required that performs the recited function.   Sound View's citations to the specification do not disclose any algorithms clearly linked to the claimed functions.

B.   "messaging server" and "messaging server configured to…" (term 24, 32-36)

| Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|
| 28   "messaging server" | "a computer system that handles messages and responds to commands from a client" | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6) for reasons discussed below for "messaging server configured to . . ." terms. |
| 29   "messaging server configured to: . . . establish a message connection with the messaging client over the computer network using only hypertext-related protocols and a simple scripting language" | No construction necessary. | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6).<br><br>Function:  Establish a message connection with the messaging client over the computer network using only hypertext-related protocols and a simple scripting language.<br><br>Structure:  The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g., Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc); *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366 (Fed. Cir. 2015). |
| 30   "messaging server configured to: . . . transmit a message connection response to the messaging client identifying the message connection has an open message connection" | No construction necessary. | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6).<br><br>Function:  Transmit a message connection response to the messaging client identifying the message connection has an open message |

| | | |
|---|---|---|
| | | connection.<br><br>Structure:  The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g.*, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc); *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366 (Fed. Cir. 2015). |
| 31 | "messaging server configured to: . . . transmitting message data of a first type containing the contents of a first message from the messaging server over the open message connection to the messaging client" | No construction necessary. | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6).<br><br>Function:  Transmit message data of a first type containing the contents of a first message from the messaging server over the open message connection to the messaging client.<br><br>Structure:  The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g.*, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc); *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366 (Fed. Cir. 2015). |
| 32 | "messaging server configured to: . . . transmitting message data of a second type | No construction necessary. | This term is subject to 35 U.S.C. § 112(f) (formerly |

| | | |
|---|---|---|
| containing the contents of a second message over the open message connection to the messaging client" | | § 112, ¶ 6).<br><br>Function:  Transmitting message data of a second type containing the contents of a second message over the open message connection to the messaging client.<br><br>Structure:  The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g.*, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc); *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366 (Fed. Cir. 2015). |
| 33 | "messaging server configured to: . . . repeating the steps of transmitting in order to provide a continuous stream of message data over the open message connection, the continuous stream of message data comprising a plurality of messages perceived by the messaging client as a single continuous message received over the open message connection for display on the messaging client independent of the operating system thereof and exclusive of proprietary messaging software residing and previously stored on the messaging client" | No construction necessary. | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6).<br><br>Function:  Repeating the steps of transmitting in order to provide a continuous stream of message data over the open message connection, the continuous stream of message data comprising a plurality of messages perceived by the messaging client as a single continuous message received over the open message connection for display on the messaging client independent of the operating system thereof and exclusive of proprietary messaging |

| | | | software residing and previously stored on the messaging client. |
| | | | <u>Structure</u>:  The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g.*, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc); *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366 (Fed. Cir. 2015). |

1.      **Sound View's Opening Position**

The term "messaging server" should be construed to mean "a computer system that handles messages and responds to commands from a client."  "Server" is a well-known term, and one of ordinary skill in the art would have understood that a "server" is "a computer or program that responds to commands from a client."  (*See*, *e.g.*, Ex. V at 474.)  The "messaging server" described by the '486 patent is a particular type of server.  The specification explains that the messaging server includes a "server message handler" to handle messages; i.e., to send messages to, and receive messages from, a messaging client.  For example, the "message server operat[es] a server message handler," which both "transmits or otherwise forwards an [sic] messaging page over the long-lived HTTP connection to the messaging client (i.e., to the web browser)" and "operates within the message server computer system **110** to receive messages **215-1** through **215-N** (received in this example from the messaging client computer system) . . . ."  (D.I. 64, Ex. E at 9:4-15, 10:48-51, Fig. 1.)  Figure 4 further provides a detailed layout of an embodiment of a

messaging server. (*Id.* at Fig. 4.) Accordingly, the Court should find that Facebook has not met its burden of showing that "messaging server" is subject to 35 U.S.C. § 112(f).

### 2. Facebook's Answering Position

The term "server," for substantially the same reasons discussed above for "client," is a nonce word that triggers § 112(f). (Ex. 15 ¶¶ 118-19.) For example, computer dictionaries provide functional definitions for "client," such as "[a] functional unit that provides shared services to workstations over a network; for example, a file server, a print server, a mail server" (Ex. 14, p.612), and "[a] system on a network that provides a service to other systems connected to the network." (Ex. 12, p.444-45). In fact, even the dictionary definition offered by Sound View describes a "server" in functional, generic terms. (Pl. Br., Ex. V, p.474 (defining client as a "a computer or program that responds to commands from a client").)

The description of a "messaging server" in the '486 patent itself is consistent with these definitions, describing it generally as a something provides messaging services to clients. (Ex. E, 10:28-31 ("A plurality of messaging client computer systems **130-1** and **130-2** are coupled to the computer network  **101** and are in communication with the message server computer system **110** ....").) While the messaging server of the '486 patent is limited to a computing context, it is described as a generic computer and depicted as a simple box. (*See, e.g.*, Ex. E, Fig. 1 (excerpt at right), 7:15-22 (discussing components such as input output interface, communications interface, and processor); Ex. 15 ¶ 119.) The '486 patent further states that "the system of the invention can be embodied strictly as a software program, as software and hardware, or as hardware alone." (Ex. E, 7:55-57.) Therefore, the "messaging server" is not meaningfully different from the term "module" in *Williamson*. 792 F.3d at 1350. Here, the "messaging server" is a generic

76

description of hardware or software that performs messaging functions.  (Ex. 15 ¶ 119.)  Even if

the "messaging server" may be a computer, it remains a nonce word for the reasons discussed

above for the term "client."  (*Id.*)  Likewise, the term "messaging" does not impart any structural

significance to the term "server," nor do any other limitations in the claim.  (*Id.*)  Thus, the term

"messaging server" recited in claim 19 of the triggers § 112(f).

The functions of messaging server come from the claim language itself:

- establish a message connection with the messaging client . . .
- transmit a message connection response to the messaging client . . .
- transmitting message data of a first type . . .
- transmitting message data of a second type . . .
- repeating the steps of transmitting . . .

(Ex. E, 35:55-36:10 (claim 19); Ex. 15 ¶ 120.)  Based on Dr. Chatterjee's review of the '486

patent, the specification fails to disclose corresponding structure and algorithm for the recited

functions.  (Ex. 15 ¶ 120.)  The patent discusses a "message handler process" "that operates in

the message server **110**" (Ex. E, e.g., 22:51-52, Fig. 4), but it does not set forth an algorithm for

how the server, alone or with the message handler process, carries out the functions.  (Ex. 15 ¶

120.)  Thus, claim 19 is invalid for indefiniteness.  *See, e.g., Williamson*, 792 F.3d at 1351-52.

Sound View's proposal that "messaging server" means "a computer system that handles

messages and responds to commands from a client" should be rejected.  Sound View's proposal

is simply a generic description of a computing device that triggers § 112(f).  While the concept

of a server is known, dictionary definitions do not indicate that one of ordinary skill would

understand there to be sufficiently concrete structure associated with that concept.

### 3.   Sound View's Reply Position

Facebook does not assert that Sound View's proposed construction for messaging server

is wrong, or that one of ordinary skill in the art would not be familiar with a server.  Sound

View's proposed construction for messaging server thus undisputedly captures the term's plain meaning and should be adopted by the Court.

Facebook's means plus function arguments with respect to "server" mirror its arguments regarding "client" above, and Facebook is mistaken for the same reasons.  As with "client," Facebook does not cite a single instance in which "server" was determined to be a nonce word. Facebook concedes that "the concept of a server is known," but argues that "server" is understood based on function. That is not the inquiry set forth by the Federal Circuit.  *See Blackbird Tech*, 2016 WL 7451622, at *4-5.  The plain meaning of the term "server" connotes sufficient structure to avoid application of means-plus-function treatment.  *See, e.g.*, *Perdiem Co, v. IndusTrack LLC*, No. 2:15-cv-727, 2016 WL 3633627, at *40 (E.D. Tex. July 7, 2016) (finding defendants failed to demonstrate term "server" lacked sufficient structural meaning); *Nomadix, Inc. v. Hospitality Core Servs. LLC*, No. CV 14-08256, 2016 WL 344461, at *7-8 (C.D. Cal. Jan. 27, 2016) (stating "'server' is also a well-known structural term" and holding "redirection server" was not a means-plus-function claim); *Atser Research Techs., Inc. v. Raba-Kistner Consultants Inc.*, No. SA-07-CA-93-H, 2009 WL 691118, at *13 (W.D. Tex. Mar. 2, 2009) ("server is a noun that denotes a type of structure"); *see also Int'l Bus. Machines*, 2016 WL 6405824, at *13 ("corresponding structure for the 'search means' term is either a client or a server"); *Minton*, 197 F. Supp. 2d at 708 n.15 ("[C]lient-server technology and many networking technologies are well known in the art and thus detailed description of these structures is unnecessary as the POOSA will be able to practice the invention without such references. . . . [T]he term 'server', standing alone, is sufficient to conjure the image of a family of computer systems capable of performing high-speed or complex tasks."); (Ex. X at ¶¶ 201-202, 205).

Finally, even under a § 112(f) analysis, the specification describes the claimed elements

in detail:  "establish a message connection with the messaging client …," (Ex. E at Figs. 2, 4, 13:1-5, 13:6-9, 13:10-13, 30:61-31:2); "transmit a message connection response to the messaging client," (*id.* at Figs. 2, 4, 13:1-5, 13:10-13, 30:61-31:2); "transmitting message data of a first type," (*id.* at Figs. 2, 4, 13:1-5, 13:14-36, 30:61-31:2); "transmitting message data of a second type," (*id.* at Figs. 2, 4, 13:1-5, 13:37-14:5, 30:61-31:2); "repeating the steps of transmitting …," (*id.* at Figs. 2, 4, 13:1-5, 14:6-32, 30:61-31:2).   (*See* Ex. X at ¶¶ 205-209; Ex. AA.)

### 4.    Facebook's Sur-Reply Position

Facebook incorporates its arguments about the "messaging client" for terms 23 and 27-31.  The term "server" is not structural, and even if it were, it cannot be disputed that an off-the-shelf server computer could not carry out the detailed functions the claim requires it be "configured" to perform.  Because an off-the-shelf server cannot perform those operations without additional programming, § 112(f) applies, and an algorithm is required.  Sound View's citations to the specification do not disclose algorithms clearly linked to the claimed functions.

### C.  "simple scripting language" (term 26)

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 34 | "simple scripting language" | No construction necessary. | Indefinite. The claim fails to inform with reasonable certainty those skilled in the art about the scope of the invention and is therefore indefinite. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014). |

### 1.      Sound View's Opening Position

"Simple scripting language" does not require the Court's construction because it would have been well understood by one of ordinary skill.  The patent specification expressly gives one such example: "JavaScript is a simple scripting language . . . ."  (D.I. 64, Ex. E at 3:15-16.)  One of skill in the art would have understood "simple scripting language" to be just that—a simple scripting language such as JavaScript.  (*See*, *e.g.*, *id.* at 3:14-19.)  Therefore, the Court should reject Facebook's assertion that the claim term is indefinite, and instead adopt its plain meaning.

### 2.      Facebook's Answering Position

Federal Circuit law is clear that "subjective" claim limitations render claims indefinite where, as here, their meaning turns on the particular individual practicing the invention.  *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371-73 (Fed. Cir. 2014) (claim reciting display of information "in an unobtrusive manner" was subjective and indefinite); *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005), *abrogated on other grounds by Nautilus*, 134 S. Ct. 2120 (finding "aesthetically pleasing" indefinite because the specification lacked objective definition of the term).

In this case, the term "simple" is inherently subjective.  Although the '486 patent identifies JavaScript as a purported example of a "simple scripting language" (Ex. E, 3:15-17), it fails to offer any objective criteria for one of ordinary skill in the art to determine whether any other scripting language is "simple."  Therefore, whether a particular scripting language is "simple" will vary from one person to another.  (Ex. 15 ¶ 129.)  Computer programmers and scientists can have different opinions on whether a scripting language is viewed as "simple" based on a multitude of factors including differences in the person's roles, responsibilities and experience.  (*Id.*)  Because the term "simple" lacks any objective definition to one skilled in the

art, the claim is indefinite.  *See, e.g.*, *Interval Licensing*, 766 F.3d at 1371 (claim indefinite where

it "might mean several different things and no informed and confident choice is available among

the contending definitions.") (internal quotes and citation omitted); *Nautilus*, 134 S. Ct. at 2123.

### 3.      Sound View's Reply Position

The court in *Interval Licensing* explained that "[i]t d[id] not hold . . . that terms of degree

are inherently indefinite."  766 F.3d at 1370  ("Claim language employing terms of degree has

long been found definite where it provided enough certainty to one of skill in the art when read

in the context of the invention.").  And Facebook does not provide a single instance in which

"simple scripting language" or even "simple" was held to be a purely subjective claim phrase.

When a court is faced with a term of degree, regardless of whether it is a "purely

subjective" claim phrase, it "must look to the written description for guidance."  *Id.* at 1371; *see

also Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1378 (Fed. Cir. 2017) (finding

that term was a term of degree, but not "purely subjective," before turning to the written

description to discern some standard of measurement).  Courts looking to the written description

for guidance have "reasoned that the examples and procedures provided guidance and points of

comparison for skilled artisans."  *Sonix Tech.*, 844 F.3d at 1378.  Like the patent at issue in

*Sonix*, the '486 patent "contains considerably more detail than *Datamize* or *Interval Licensing*."

*Id.* at 1379.  The '486 patent includes specific examples that provide guidance and points of

comparison for discerning what constitutes a "simple" scripting language in the context of the

patent.  (Ex. X at ¶¶ 221-228.)  For example, the patent explains that "JavaScript is a ***simple

scripting language that conventional Web browsers support natively***, whereas Java is a full-

blown programming language that requires installation and operation of a Java virtual machine

in order to operate."  (*Id.* at 3:15-19 (emphasis added).)  Accordingly, the '486 patent provides

"an objective baseline through which to interpret the claims." *Sonix Tech.*, 844 F.3d at 1378.

### 4.    Facebook's Sur-Reply Position

Sound View fails to address the key issue:  what is a "simple" scripting language?  The patent's comparison of JavaScript ("a simple scripting language") with Java ("a full-blown programming language"), provides no guidance because the patent does not assert that Java is a "scripting language."   And providing an example of something that is a "simple scripting language" does not suffice; the public is also entitled to know with reasonable clarity what does not fall within this term.  What makes a scripting language "simple" is unanswered.

### D.   Alleged *IPXL* terms (terms 37-42)

| Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|
| 35 | "receiving message data of a first type containing the contents of a first message over the open message connection" | No construction necessary. | Indefinite.<br><br>The claim recites a method step within a system claim. *See, e.g., IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F. 3d 1377 (Fed. Cir. 2005).<br><br>To the extent this term is not deemed to be indefinite under *IPXL* and its progeny, this term is subject to 35 U.S.C. § 112(f), and is indefinite for the reasons expressed above for "messaging client" terms. |
| 36 | "receiving message data of a second type containing the contents of a second message over the open message connection" | No construction necessary. | Indefinite.<br><br>The claim recites a method step within a system claim. *See, e.g., IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F. 3d 1377 (Fed. Cir. 2005).<br><br>To the extent this term is |

| | | not deemed to be indefinite under *IPXL* and its progeny, this term is subject to 35 U.S.C. § 112(f), and is indefinite for the reasons expressed above for "messaging client" terms. |
|---|---|---|
| 37 | "repeating the steps of receiving message data while maintaining the open message connection and while awaiting delivery of a message termination indicator indicating that a message associated with the message connection has been completely received by the messaging client" | No construction necessary. | Indefinite.<br><br>The claim recites a method step within a system claim. *See, e.g., IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F. 3d 1377 (Fed. Cir. 2005).<br><br>To the extent this term is not deemed to be indefinite under *IPXL* and its progeny, this term is subject to 35 U.S.C. § 112(f), and is indefinite for the reasons expressed above for "messaging client" terms. |
| 38 | "transmitting message data of a first type containing the contents of a first message from the messaging server over the open message connection to the messaging client" | No construction necessary. | Indefinite.<br><br>The claim recites a method step within a system claim. *See, e.g., IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F. 3d 1377 (Fed. Cir. 2005).<br><br>To the extent this term is not deemed to be indefinite under *IPXL* and its progeny, this term is subject to 35 U.S.C. § 112(f), and is indefinite for the reasons expressed above for "messaging server" terms. |
| 39 | "transmitting message data of a second type containing the contents of a second message over the open message | No construction necessary. | Indefinite.<br><br>The claim recites a method step within a system claim. *See, e.g.,* |

| | | |
|---|---|---|
| | connection to the messaging client" | | *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F. 3d 1377 (Fed. Cir. 2005).<br><br>To the extent this term is not deemed to be indefinite under *IPXL* and its progeny, this term is subject to 35 U.S.C. § 112(f), and is indefinite for the reasons expressed above for "messaging server" terms. |
| 40 | "repeating the steps of transmitting in order to provide a continuous stream of message data over the open message connection, the continuous stream of message data comprising a plurality of messages perceived by the messaging client as a single continuous message received over the open message connection for display on the messaging client independent of the operating system thereof and exclusive of proprietary messaging software residing and previously stored on the messaging client" | No construction necessary. | Indefinite.<br><br>The claim recites a method step within a system claim. *See, e.g., IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F. 3d 1377 (Fed. Cir. 2005).<br><br>To the extent this term is not deemed to be indefinite under *IPXL* and its progeny, this term is subject to 35 U.S.C. § 112(f), and is indefinite for the reasons expressed above for "messaging server" terms. |

### 1.    Sound View's Opening Position

Facebook asserts that claim 19 of the '486 patent is indefinite for reciting method steps within a system claim under *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005).  (*See* D.I. 64 at 17-19.)  Facebook bears the burden of showing that the claim is invalid for indefiniteness by clear and convincing evidence.  *See Leader Techs. v. Facebook, Inc.*, 770 F. Supp. 2d 686, 707 (D. Del. 2011).  Facebook cannot meet that burden, as it relies on a narrow rule that recognizes that "[t]he use of functional language—generally the gerund form of a

verb—does not automatically convert the claims into method claims." *Radware, Ltd. v. A10 Networks, Inc.*, Nos. C-13-02021, C-13 02024 RMW, 2014 WL 2738538, at *4 (N.D. Cal. June 11, 2014); *see also Bayer Pharm. AG v. Watson Labs, Inc.*, C.A. No. 12-1726-LPS-CJB, 2014 WL 4954617, at *6 (D. Del. Sept. 30, 2014) (listing cases). Moreover, the functional language here follows the phrases "messaging server configured to" and "messaging client configured to," which Facebook asserts are means-plus-function terms. (*See* terms 27-36.) Therefore as demonstrated by the parties' positions on terms 27-36, "there is no confusion [to the public] over when infringement of the system or device claims occurs: when one makes, uses, offers to sell, or sells the claimed apparatus capable of performing the claimed functions." *Radware*, 2014 WL 2738538, at *6. Accordingly, the Court should reject Facebook's *IPXL* argument.

## 2.      Facebook's Answering Position

When a claim recites both an apparatus and a method of using that apparatus, it is indefinite under § 112(b). *IPXL Holdings, L.L.C. v. Amazon.com, Inc.,* 430 F.3d 1377, 1384 (Fed. Cir. 2005). Here, apparatus claim 19 of the '486 patent recites numerous method steps:

- "receiving message data of a first type . . ."
- "receiving message data of a second type . . ."
- "repeating the steps of receiving message data . . ."
- "transmitting message data of a first type . . ."
- "transmitting message data of a second type . . ."
- "repeating the steps of transmitting . . ."

(Ex. E, 35:42-36:10 (claim 19).) In *Rembrandt Data Technologies, LP v. AOL, LLC*, 641 F.3d 1331 (Fed. Cir. 2011), an apparatus claim that similarly recited "<u>transmitting</u> the trellis encoded frames" was found indefinite under *IPXL*. 641 F.3d at 1339. Here, the affirmative method steps of claim 19 similarly render the claim invalid.

Moreover, claim 19 is indistinguishable, for *IPXL* purposes, from a claim found indefinite by this Court in *InterDigital Communications, Inc. v. ZTE Corp.*, No. 1:13-cv-00009-

RGA, 2014 WL 1620733 (D. Del. Apr. 22, 2014).  Like claim 19, which recites a "messaging server configured to . . ." and a "messaging server configured to . . . ," the claim at issue in *InterDigital* recited a "<u>controller configured to</u> . . . *utilizing the radio resources for the uplink shared channel or the downlink shared channel*."  2014 WL 1620733, at *2-3 (identifying U.S. Patent No. 7,941,151); *see also id.*, *4-5; '151 patent, 6:61-7:10 (claim 16).  This Court found the claim indefinite because it was not clear whether the claim "require[d] utilizing the radio resources (a method step) or having a controller configured to utilize the radio resources (a device capability)."  2014 WL 1620733, at *4-5 (internal quotes and citation omitted).  The Court's reasoning and conclusion equally apply here to claim 19 of the '486 patent.

### 3. Sound View's Reply Position

Facebook misapplies the narrow rule established by *IPXL Holdings* to argue that terms 37-42 are indefinite.  "Apparatus claims are not necessarily indefinite because they include functional language." *August Tech. Corp. v. Camtek, LTD*, No. 05-1396, 2008 WL 2774696, at *4 (D. Minn. July 14, 2008) (citing *Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008)); *see also Bayer Pharm.*, 2014 WL 4954617, at *6.  Indeed, "[l]anguage that describes the capabilities of a system component is a functional limitation, not a method limitation."  *August Tech.*, 2008 WL 2774696, at *4 (citing *Collaboration Props., Inc. v. Tandberg ASA*, No. C 05-01940, 2006 WL 1752140, at *6 (N.D. Cal. June 23, 2006)).  The holding in *IPXL* turned on "the lack of clarity as to when the mixed subject matter claims would be infringed," and that "[w]here no such ambiguity exists in the claims at issue, the claim is not invalid."  *August Tech.*, 2008 WL 2774696, at *4 (quoting *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1374 (Fed. Cir. 2008)).  Here, there is no such ambiguity.  The "configured to" language in the claim is followed by a colon and indented

qualifications separated by semicolons, demonstrating that the "receiving," "repeating," and "transmitting" terms describe the claimed apparatus's functionality, and not its use. (Ex. X at ¶¶ 199, 210.) Indeed, Facebook relies on that structure to argue that the elements at issue here are functions of the "messaging client" and "messaging server" when it contends this claim is indefinite under § 112(f). That link between the terms at issue and the "messaging client" and "messaging server" precludes the application of *IPXL Holdings* here.

Instead of addressing Sound View's cases, Facebook contends that claim 19 is similar to the claims at issue in *Rembrandt* and *InterDigital*. In *Rembrandt*, however, the claim did not state that a particular device (e.g., client or server) was configured to transmit; instead, that claim required three buffer means, a trellis encoding means, and then the step of transmitting. *Rembrandt*, 641 F.3d at 1339. Although the claim at issue in *InterDigital* includes the term "configured to," it also required an action, which was not modified by "configured to." (Ex. Z at cl. 16 ("a controller configured to determine . . .*, and utilizing* the radio resources for the uplink shared channel or the downlink shared channel.").) The structure of claim 19 contains no such ambiguity; each of the terms at issue is a functional description of a capability of the messaging client or messaging server. (Ex. E at 35:28-36:10; Ex. X at ¶¶ 199, 210; *Collaboration Props.*, 2006 WL 1752140, at *6-7 (claim language modified by a "configured to" term "recites the functionality of the claimed system rather than the act of using the system.").)

### 4.    Facebook's Sur-Reply Position

The "receiv*ing*," "repeat*ing*" and "transmitt*ing*" recite present-tense steps, not mere capabilities. If they did recite mere capabilities, one would expect the claim to instead recite "receive," "repeat" and "transmit," which is the type of language the claim uses for other limitations. Because these terms are written as present tense activities, the claim is indefinite

under *IPXL* and these terms cannot be rewritten through claim construction.

## VI.   DISPUTED CONSTRUCTIONS RELATING TO THE '860 PATENT

**Sound View's Summary of the '860 Patent:**

The '860 patent generally relates to the customization of web content based on the client device seeking to access the content. The '860 patent's solution is able to interpolate web content and provide customized web pages to a wide variety of clients in an efficient manner without requiring the content provider to control a web proxy server. (D.I. 64, Ex. F at 1:45-49.)

### A.   "augmentation file" (term 43)

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 41 | "augmentation file" | "an interpolation script, auxiliary content file, patch file or any other type of information which defines a translation, alteration or other type of interpolation for at least a portion of a requested piece of web content" | "any type of information that defines a translation, alteration or other type of interpolation for at least a portion of a requested piece of web content" |

### 1.   Sound View's Opening Position

The patentee elected to specifically define "augmentation file" in the specification, and thus that definition should apply. *Vitronics Corp.*, 90 F.3d at 1584; *see also Phillips*, 415 F.3d at 1316. The specification provides:

> The term 'augmentation file' *as used herein is intended to include* an interpolation script, auxiliary content file, patch file or any other type of information which defines a translation, alternation or other type of interpolation for at least a portion of a requested piece of web content.

(D.I. 64, Ex. F at 4:20-24.)   Sound View's proposed construction merely quotes the explicit definition above and, accordingly the Court should adopt it in full.

## 2.    Facebook's Answering Position

Facebook's proposed construction tracks definitional language in the specification:

The term "augmentation file" as used herein is intended to include an interpolation script, auxiliary content file, patch file or <u>any</u> other <u>type of information</u> which [that[7]] <u>defines a translation, alteration or other type of interpolation for at least a portion of a requested piece of web content</u>.

(Ex. F, 4:20-24.)   Because Facebook's proposed construction is simpler to understand and

maintains the intended scope of the express definition, it should be adopted.

### B.   "server" and "the server being operative to…"  (terms 44-45)

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 42 | "server" | "a single server device or system as well as sets or other groupings or arrangements of multiple server devices or systems" | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6) for reasons discussed below for "server being operative to . . ." terms. |
| 43 | "the server being operative to process a client request generated by a client device to determine a particular client type associated with the client device, to retrieve web content identified in the client request, to retrieve one or more augmentation files associated with at least one of the web content and the particular client type, and to alter the retrieved web content in accordance with the one or more augmentation files, wherein the altered web content is delivered to the client device" | No construction necessary. | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6). <br><br> Function:  Process a client request generated by a client device to determine a particular client type associated with the client device, to retrieve web content identified in the client request, to retrieve one or more augmentation files associated with at least one of the web content and the particular client type, and to alter the retrieved web content in accordance with the one or more augmentation |

---

[7] Facebook's proposed construction replaces "which" with "that" to make the sentence grammatically correct.

| | | | files, wherein the altered web content is delivered to the client device. |
| | | | <u>Structure</u>: The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g.*, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc); *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366 (Fed. Cir. 2015). |

### 1.     Sound View's Opening Position

The term "server" is a common word that would have been readily understood by a person of skill in the art, particularly in view of the specification.  The preamble of claim 1 provides that the claimed apparatus is "for use in a computer network," and the claim language refers to "at least one server within the network."  (D.I. 64, Ex. F at cl. 1.)  A common definition of "server" is "[o]n the Internet or other network, a computer or program that responds to commands from a client."  (Ex. S at 430.)  That definition is consistent with the usage in the specification which gives examples of clients that can communicate with the server.  (*See*, *e.g.*, D.I. 64, Ex. F at Fig. 1, 3:11-27 ("The set of client devices **104** in this embodiment include a personal digital assistant (PDA) **110**, a wireless telephone **112** and a personal computer **114.**").)  The specification further explains that "[t]he term 'server' as used herein is intended to include both a single server device or system as well as sets or other groupings or arrangements of

multiple server devices or systems." (*Id.* at 3:7-10.)  The Court should adopt Sound View's proposed construction because it directly quotes the explicit definition in the specification.

The Court should reject Facebook's argument that these terms invoke "means-plus-function" treatment under 35 U.S.C. § 112(f).  The claim terms do not use the word "means," and Facebook cannot overcome the presumption that these terms are not means-plus-function. *Williamson*, 792 F.3d at 1348-50; *see also Apex*, 325 F.3d at 1372.  As the specification recognizes, "servers" were well known by persons of ordinary skill in the art.  (D.I. 64, Ex. F at 3:7-10.)  Because one of ordinary skill in the art would readily be able to discern the structural meaning of "server," the Court should find that the server terms are not means-plus-function.

### 2.     Facebook's Answering Position

As explained above for the term "messaging server" for the '486 patent, the term "server" is a nonce word.  The '860 patent's use of that term appears consistent with the functional dictionary definitions cited earlier, describing simply a "server device or system."  (Ex. F, 3:7-10.)  Therefore, the term "server" recited in independent claims 1 and 13 of the triggers § 112(f). The "interpolating proxy server" is addressed separately below.

The functions of server come from the claim language itself:  "process a client request generated by a client device to determine a particular client type associated with the client device, to retrieve web content identified in the client request, to retrieve one or more augmentation files associated with at least one of the web content and the particular client type, and to alter the retrieved web content in accordance with the one or more augmentation files, wherein the altered web content is delivered to the client device."  (Ex. F, 9:15-24 (claim 1), 10:12-21 (claim 13); Ex. 15 ¶ 137.)

The specification fails to disclose corresponding structure for the recited functions.  (Ex.

91

15 ¶ 138.)  Instead, it essentially repeats the recited functions with result-oriented statements that fail to offer additional detail that could provide sufficient structure.   (Ex. F, e.g., 3:53-4:3 (determine client type), 4:10-13 & 7:43-47 (retrieve web content and retrieve augmentation file).)   Although the patent purports to identify various ways that a client type could be determined (Ex. F, 3:65-4:15) or web content altered (Ex. F, 4:31-5:51), it fails to disclose how to implement them.   (Ex. 15 ¶ 138.)   Thus, because the term "messaging server" is subject to § 112(f) and the specification fails to disclose the required corresponding structure, claim 19 is indefinite.  *See, e.g., Net MoneyIN, Inc.*, 545 F.3d at 1367; *Williamson*, 792 F.3d at 1351-52.

Sound View's proposal should be rejected because it simply states that a server can be a single server or multiple servers, without explaining what a "server" actually is.

### 3.    Sound View's Reply Position

Facebook relies on the same arguments it sets forth for "messaging server" above and is mistaken that "server" triggers § 112(f) for the same reasons.  Additionally, the '860 patent provides an express definition for "server," which builds on the well-understood definition of that term.   Accordingly, § 112(f) is not triggered, and no additional structure is required. Moreover, Facebook's threadbare assertion that these "server" terms are indefinite is insufficient to meet its burden.  *See*, *e.g.*, *TecSec*, 731 F.3d at 1349.  Even if server triggered § 112(f), as Professor Su explains, the '860 patent provides detailed structure for the alleged functions.  (Ex. X at ¶¶ 235-245; Ex. F at 3:7-10, 3:65-4:3, 6:34-44, 4:31-42, 4:43-51, 4:52-64, 5:12-25.)

### 4.    Facebook's Sur-Reply Position

Sound View's proposal should be rejected because it simply states that a server can be a single server or multiple servers, without explaining what a "server" actually is.  As explained in Facebook's discussion of terms 23 and 24 (for the '486 patent), the word "server" in this context

does not connote sufficient structure. Moreover, as noted above, because an off-the-shelf server cannot perform the detailed operations in the claim without additional programming, § 112(f) applies, and an algorithm is required. Sound View's citations to the specification do not disclose algorithms clearly linked to the claimed functions.

### C.   "web content" (term 46)

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 44 | "web content" | No construction necessary. | "any type or arrangement of information accessible over a communications network" |

#### 1.   Sound View's Opening Position

No construction is necessary for this term, and its plain and ordinary meaning should apply, because "web content" is a commonly understood English word that would have been readily understood by a person of skill in the art at the time of the invention, particularly in view of the specification. (D.I. 64, Ex. F at 2:65-3:3.) Alternatively, if the Court construes this term, it should reject Facebook's proposed construction as incomplete. Facebook's construction is cherry-picked from a more complete definition found in the specification:

> The term "web content" as used herein is intended to include *one or more documents, files, web pages* or any other type or arrangement of information accessible *over the World Wide Web, over other portions of the Internet*, or over other types of communication networks."

(*Id.*) (emphasis added to reflect portions omitted by Facebook).

#### 2.   Facebook's Answering Position

As with the term "augmentation file," Facebook's proposed construction tracks definitional language in the specification:

The term "web content" as used herein is intended to include one or more documents, files, web pages or <u>any</u> other <u>type or arrangement of information accessible over</u> the World Wide Web, over other portions of the Internet, or over other types of [a] <u>communication network</u>s.

(Ex. F, 2:65-3:3.)  Because Facebook's proposed construction is simpler to understand while properly maintaining the intended scope of the express definition, it should be adopted.

### 3. Sound View's Reply Position

Because the parties agree on the patent's express definition for "web content," the Court should adopt that definition without modification. *See Robocast*, 2013 WL 3294862, at *3.

### D. "virtual client device" (term 51)

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 45 | "virtual client device" | No construction necessary. | Indefinite.<br><br>The claim fails to inform with reasonable certainty those skilled in the art about the scope of the invention and is therefore indefinite. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014).<br><br>In the event the term is not deemed to be indefinite: "a simulated, non-physical client device incorporating a combination of different sets of features provided by multiple distinct physical client devices" |

### 1. Sound View's Opening Position

No construction is necessary for the term "virtual client device"; its plain and ordinary meaning should apply.  This is particularly true in view of the intrinsic record, wherein the

patentee indicated that "virtual client device" is "something other than a physical client device . . . that is simulated *or artificially created*, in accordance with the *standard and well-understood meaning of the word 'virtual'.*"  (D.I. 64, Ex. M at 8-9.)  Given the patentee's explanation—and the examiner's acceptance—of the term "virtual client device," the Court should reject Facebook's indefiniteness assertion.  The Court also should reject Facebook's alternate proposed construction at least because it omits the phrase "artificially created" used by the applicant.

### 2.      Facebook's Answering Position

This terms fails to inform with reasonable certainty those skilled in the art about the scope of the invention and therefore renders the claim indefinite.  *Nautilus*, 134 S. Ct. at 2123. This term has no accepted meaning to one of ordinary skill in the art, and although the meaning of the phrase "client device" is generally known, one of ordinary skill in the art would have to speculate as to the meaning of a "virtual client device."  (Ex. 15 ¶ 144.)  For example, the term might refer to a simulated, non-physical device that has the functionality of a client but that resides on the server that it communicates with; or it might refer to two or more physically-distinct devices that together have the functionality of a client and are regarded conceptually as a single device; or it might refer to something else entirely.  (Ex. 15 ¶ 144.)

The intrinsic record does little to clear up the confusion.  During prosecution, the applicants stated that the "virtual client device" "is not a device that can perform many features that separate physical devices can perform" (Ex. 9, 6/27/2005 Amendment and Response to Office Action, pp.8-9 (inner quotes removed)) nor is it "an actual client device at all, but rather something that is simulated or artificially created" (*id.*).  However, the specification seems to teach that a "virtual client device" is at least composed of multiple physical devices.  (Ex. F, 7:66-8:4 ("'virtual client' type" "may be a combination of different sets of features provided by

multiple distinct physical client devices, such as the PhoneBrowser **204** and the WAP telephone **210** in the example of FIG. **2**.").)  One of ordinary skill in the art, in view of these conflicting teachings, would be unable to discern the meaning of "virtual client device."  (Ex. 15 ¶ 145.)

### 3.    Sound View's Reply Position

Facebook admits that "client device" is well-known.  And the patentee specifically explained in prosecution that the patent uses "virtual" in accordance with its plain meaning—"simulated or artificially created." (Ex. M at 8-9; *see also* Ex. X at ¶¶ 259-260.)  The specification's description of the use of a virtual client device is consistent with that plain meaning. (Ex. F at 7:51-8:4; Ex. X at ¶¶ 261.) Thus, one of ordinary skill in the art would readily understand "virtual client device" to be a simulated or artificially created client device.

### 4.    Facebook's Sur-Reply Position

Sound View's arguments do not remedy the deficiencies with this term.

### E.  "interpolating proxy server" terms  (terms 52-54)

| | Term/Phrase at Issue | Sound View's Proposed Construction | Facebook's Proposed Construction |
|---|---|---|---|
| 46 | "interpolating proxy server" | No construction necessary. | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6) for reasons discussed below for "interpolating proxy server . . . operative to . . . ." <br><br> In the event the term is not deemed to be indefinite:  "one or more server devices or systems used for transcoding, translation, or other processing operations involving web content." |
| 47 | "an interpolating proxy server . . . operative to process a client request generated by a client | No construction necessary. | This term is subject to 35 U.S.C. § 112(f) (formerly |

96

| | | |
|---|---|---|
| device to determine a particular client type associated with the client device, to retrieve web content identified in the client request and stored on the web server, to retrieve one or more augmentation files associated with the web content and the particular client type, and to alter the retrieved web content in accordance with the one or more augmentation files, wherein the altered web content is delivered to the client device" | | § 112, ¶ 6).<br><br>Function:  Process a client request generated by a client device to determine a particular client type associated with the client device, to retrieve web content identified in the client request and stored on the web server, to retrieve one or more augmentation files associated with the web content and the particular client type, and to alter the retrieved web content in accordance with the one or more augmentation files, wherein the altered web content is delivered to the client device.<br><br>Structure:  The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g.*, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc); *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366 (Fed. Cir. 2015). |
| 48 | "the interpolating proxy server being further operative to parse the retrieved web content into one or more component structures, and subsequently to apply a pattern matching process to recognize designated component structure subject to alteration in accordance with | No construction necessary. | This term is subject to 35 U.S.C. § 112(f) (formerly § 112, ¶ 6).<br><br>Function:  Parse the retrieved web content into one or more component structures, and subsequently to apply a pattern matching process |

| the one or more augmentation files" | | to recognize designated component structure subject to alteration in accordance with the one or more augmentation files. <br><br> Structure:  The specification fails to disclose a corresponding structure and algorithm for performing the recited function, rendering this phrase indefinite. *See, e.g.*, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc); *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366 (Fed. Cir. 2015). |
|---|---|---|

### 1.      Sound View's Opening Position

Proxy servers were readily understood by persons of skill in the art at the time of the invention.  For example, a proxy server was commonly defined as "an intermediate server on the communications path between server applications and data entities, and the client systems and software."  (Ex. W at 241.)  That definition is fully consistent with the use of the term in the specification, which gives examples of well-known proxy servers such as the NetBlitz proxy server, and the Spyglass Prism proxy server.  (*See, e.g.*, D.I. 64, Ex. F at 1:20-43, Fig. 1, 3:13-15 (explaining that the interpolating proxy server "is configured to support communications between a set of client devices **104** and a web server **106**.").)  The specification specifically explains the "interpolating" proxy server:

> The proxy server 102 is referred to in conjunction with the illustrative embodiments as an "interpolating" proxy server. It should be understood that the term "interpolating" as used herein is

> intended to include operations such as transcoding or translation, as well as other types of processing operations involving web content.

(*Id.* at 3:28-33.)  Since a person of ordinary skill in the art readily would have understood the term interpolating proxy server, particularly in light of the specification, its plain meaning should apply and no construction is necessary.

The Court also should reject Facebook's argument that this term invokes "means-plus-function" treatment under 35 U.S.C. § 112(f).  The term does not use the word "means," and Facebook cannot overcome the presumption that it is not means-plus-function.  *Williamson*, 792 F.3d at 1348-50; *see also Apex*, 325 F.3d at 1372.  As shown above, the specification recognizes an "interpolating proxy server" as the name of a device well known by persons of ordinary skill in the art.  (D.I. 64, Ex. F at Figs. 1-3, 3:7-15, 3:25-33, 3:65-4:3, 4:52-55.)  Because one of ordinary skill in the art would readily be able to discern the structural meaning of "interpolating proxy server," the Court should reject Facebook's assertion that it is a means-plus-function term.

## 2.     Facebook's Answering Position

As explained above for the term "messaging server" for the '486 patent and the term "server" for the '860 patent, the term "server" triggers § 112(f).  The terms "interpolating" and "proxy" are functional concepts that do not add structural limitations.  (Ex. 15 ¶ 148.)  The patent states that "interpolating" is "include[s] operations such as transcoding or translation, as well as other types of processing operations involving web content."   (Ex. F, 3:30-33.)   As Sound View's own dictionary definition notes, a "proxy" simply describes something that provides an intermediary function.  (Pl. Br., Ex. W, p.241.)

The functions of the "interpolating proxy server" come from the claim language.  (Ex. F, 12:10-26 (claim 18); Ex. 15 ¶ 149.)  These functions are substantially identical, for purposes of

§ 112(f) analysis, to the functions of the "server" recited in claims 1 and 13.  Therefore, for the same reasons discussed above for the term "server," the specification fails to disclose the required corresponding structure, rendering claim 18 is invalid for indefiniteness.

### 3.      Sound View's Reply Position

Facebook admits that "interpolating," "proxy," and "server" are all known terms and does little to address the explanation Sound View provided in its opening position, despite Facebook's burden of proof on §112(f) and additional burden on indefiniteness. Moreover, as detailed above and confirmed by Professor Su, one of ordinary skill in the art would readily be able to discern the structural meaning of "interpolating proxy server."  (Ex. X at ¶¶ 265-268.)  Even if the Court were to apply § 112(f) to this term, the specification discloses algorithms for the alleged function. (Ex. X at ¶¶ 269-270; Ex. F at Abstract, Figs. 2-3; *id.* at 8:18-28, 8:30-41.)

### 4.      Facebook's Sur-Reply Position

Sound View's arguments do not remedy the deficiencies with this term.

## VII.   AGREED NO CONSTRUCTION NECESSARY

| Term No. | Term: | |
|---|---|---|
| 15 | "user access type" | No construction necessary. |
| 25 | "hyper-text related protocols" | No construction necessary. |
| 47 | "token" | No construction necessary. |
| 48 | "context element" | No construction necessary. |
| 49 | "pattern element" | No construction necessary. |
| 50 | "replacement element" | No construction necessary. |

Dated:  March 9, 2017

*/s/  John C. Phillips, Jr.*      .
John C. Phillips, Jr. (No. 110)
Megan C. Haney (No. 5016)
PHILLIPS, GOLDMAN, MCLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington, Delaware 19806-4204
Telephone:  (302) 655-4200
Facsimile:  (302) 655-4210
jcp@pgmhlaw.com
mch@pgmhlaw.com

*Of Counsel:*
Alan S. Kellman
Tamir Packin
Richard M. Cowell
Jason Berrebi
Edward B. Geist
Tom BenGera
Wesley L. White
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Telephone:  (212) 351-3400
Facsimile:  (212) 351-3401
akellman@desmaraisllp.com
tpackin@desmaraisllp.com
rcowell@desmaraisllp.com
jberrebi@desmaraisllp.com
egeist@desmaraisllp.com
tbengera@desmaraisllp.com
wwhite@desmaraisllp.com

*Attorneys for Plaintiff*
*Sound View Innovations, LLC*

OF COUNSEL:

Heidi L. Keefe
Sarah Whitney
Elizabeth Stameshkin
COOLEY LLP
3175 Hanover Street

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/  Jennifer Ying*      
Jack B. Blumenfeld (#1014)
Karen Jacobs (#2881)
Jennifer Ying (#5550)

Palo Alto, CA 94304-1130
(650) 843-5000

Phillip E. Morton
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC  20004
(202) 842-7800

Michael G. Rhodes
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA  94111-5800

1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
kjacobs@mnat.com
jying@mnat.com

*Attorneys for Defendant Facebook, Inc.*