# EXHIBIT Q

Case 1:16-cv-00116-RGA   Document 83-1   Filed 03/09/17   Page 2 of 464 PageID #: 1797

OXFORD
PAPERBACK REFERENCE



DICTIONARY OF
COMPUTING

FOURTH EDITION

A Dictionary of

# Computing

**FOURTH EDITION**

and up-to-date reference books for
general reader.

Linguistics*
Literary Terms
Mathematics
Medical Dictionary
Medicines*
Modern Quotations
Modern Slang
Music
Nursing
Opera
Operatic Characters*
Philosophy
Plant-Lore
Political Biography*
Politics
Popes
Proverbs
Psychology*
Quotations
Sailing Terms
Saints
Science
Shakespeare*
Ships and the Sea
Sociology
Superstitions
Theatre
Twentieth-Century Art*
Twentieth-Century History
Twentieth-Century Poetry
Weather Facts
Women Writers
Word Games
World Mythology
Usage      Writers' Dictionary
Zoology

*forthcoming

Oxford     New York

**OXFORD UNIVERSITY PRESS**

1997

d University Press, Great Clarendon Street, Oxford OX2 6DP

Oxford New York

ens Auckland Bangkok Bogota Bombay Buenos Aires
tta Cape Town Dar es Salaam Delhi Florence Hong Kong
bul Karachi Kuala Lumpur Madras Madrid Melbourne
ity Nairobi Paris Singapore Taipei Tokyo Toronto Warsaw
and associated companies in
Berlin Ibadan

Oxford is a trade mark of Oxford University Press

© Market House Books Ltd. 1983, 1986, 1990, 1996

First published 1983
Second edition 1986
Third edition 1990
Fourth edition 1996

(with corrections) as an Oxford University Press paperback 1997

hts reserved. No part of this publication may be reproduced,
n retrieval system, or transmitted, in any form or by any means,
t the prior permission in writing of Oxford University Press.
UK, exceptions are allowed in respect of any fair dealing for the
of research or private study, or criticism or review, as permitted
he Copyright, Designs and Patents Act, 1988, or in the case of
phic reproduction in accordance with the terms of the licences
d by the Copyright Licensing Agency. Enquiries concerning
uction outside these terms and in other countries should be
ent to the Rights Department, Oxford University Press,
at the address above

ook is sold subject to the condition that it shall not, by way
or otherwise, be lent, re-sold, hired out or otherwise circulated
the publisher's prior consent in any form of binding or cover
n that in which it is published and without a similar condition
g this condition being imposed on the subsequent purchaser

British Library Cataloguing in Publication Data
Data available

Library of Congress Cataloging in Publication Data
Data available
ISBN 0–19–280046–9

1 3 5 7 9 10 8 6 4 2

Printed in Great Britain by
Biddles Ltd
Guildford and King's Lynn

# Preface

The world of computing continues to expand and to cross new frontiers of public awareness. Jargon grows apace, and confusion abounds as the field moves from the domain of specialists into general knowledge. In preparing the Dictionary of Computing, we have recognized the need for clear explanations of the concepts that affect more and more aspects of life and the terminology that accompanies them. The dictionary is aimed mainly at students and teachers of computing but should also be of value to professional and amateur computer users.

The fourth edition of the dictionary contains nearly 6000 entries and a comprehensive cross-reference system. Almost 1700 new entries have been added and many of the existing entries have been extensively updated. This reflects recent advances in all aspects of computing, especially in personal computing, multimedia, and graphics, networking and the Internet, artificial intelligence, and computer security.

The principal areas of interest include:

· computer applications, for example in industry, the office, science, education, and the home;
· the means of achieving these applications in terms of hardware, software, computer organization, telecommunications, and user interaction;
· security, safety, and legal aspects of computing;
· the world of computing – the major computer manufacturers and organizations;
· underlying concepts and theories of computing and where appropriate of electronics, mathematics, and logic.

We would like to express our thanks and appreciation to all those involved in the preparation of the new edition. Over thirty-five practitioners in diverse branches of computing and associated fields produced the new and updated entries. The dictionary has been compiled and prepared for computer typesetting by Market House Books Ltd.

*February 1996*                    *Valerie Illingworth*
                                              *Ian Pyle*

probability, Bayes's theorems.

...nber between 0 and 1 associ-...ent (*see* relative frequency) ...et of possible events: an event ...n occur has probability 1. The ...n event is the limiting value ...the relative frequency of the ...number of observations is ...f that the event will occur. ...nitely. Alternatively it is the ...t of probability is applied to a ...events in different contexts. ...rest was in the study of games ...ere correct knowledge of prob-...allowed profitable wagers to be ...ne subject was studied by insur-...es anxious to predict probable ...s on the basis of previously ...ative frequencies. Today prob-...is the basis of statistical analysis ...l methods).

...*ility calculus* is the set of rules ...g probabilities for combinations ...sing the methods of symbolic ...l to sets.

...robability distributions.

...**alculus** *See* probability.

...**distributions** Theoretical formu-...*probability that an observation ...cular value, or lies within a given ...lues.

...*probability distributions* apply to ...as that can take only certain dis-...s, such as the integers 0, 1, 2,... or ...med faces of a die. A probability, ...igned to each event such that the ...nity. Important discrete distribu-...he *binomial distribution and the ...distribution.

...*ous probability distributions* apply to ...ons, such as physical measure-...here no two observations are likely ...ctly the same. Since the probability ...iving exactly a given value is about ...mathematical function, the *cumulative ...n function*, $F(x)$, is used instead. ...ion does not exceed $x$. $F(x)$ increases ...nically with $x$ from 0 to 1, and the

probability of observing any value between two limits, $x_1$ and $x_2$, is

$$F(x_2) - F(x_1)$$

This definition leads, by differential calculus, to the *frequency function*, $f(x)$, which is the limiting ratio of

$$F(x + h) - F(x) \text{ to } h$$

as $h$ becomes small, so that the probability of an observation between $x$ and $(x + h)$ is $h.f(x)$. The most important continuous distribution is the *normal (or Gaussian) distribution.

Probability distributions are defined in terms of *parameters, whose values determine the numerical values of the probabilities.

**probit analysis** A statistical technique used to relate the proportion of subjects responding to the strength of an applied stimulus. The stimulus is often applied in a series of increasing amounts in geometrical progression, and the proportion responding is modeled by the cumulative normal frequency distribution (*see* probability distributions). The method estimates the *median effective stimulus* or *LD50* and the *slope* of the response. It is widely used in pharmacology, biology, and in testing the safety of products.

**problem definition** A precise statement of some problem to be solved, with the emphasis on providing a complete and unambiguous definition of the problem rather than an easy introduction to it.

**problem description** A self-contained overview of some problem to be solved, perhaps with accompanying information on constraints that the solution must respect, possible approaches to the solution, etc.

**problem-oriented language** A programming language whose control structures and (in particular) data structures reflect in some measure the characteristics of a class of problems, e.g. commercial data processing or scientific computation. By contrast, the structures of a machine-oriented language reflect the internal structure of the underlying machine.

**procedural abstraction** The principle that any operation that achieves a well-defined effect can be treated by its users as a single

entity, despite the fact that the operation may actually be achieved by some sequence of lower-level operations (*see also* abstraction). Procedural abstraction has been extensively employed since the early days of computing, and virtually all programming languages provide support for the concept (e.g. the SUBROUTINE of Fortran, the **procedure** of Algol, Pascal, Ada, etc.).

**procedural cohesion** *See* cohesion.

**procedural language** An *imperative *procedure-oriented language.

**procedure** A section of a program that carries out some well-defined operation on data specified by *parameters. It can be *called from anywhere in a program, and different parameters can be provided for each call.

The term procedure is generally used in the context of high-level languages; in assembly language the word *subroutine is more commonly employed.

**procedure-oriented language** A programming language that enables a program to be specified by defining a collection of *procedures. These procedures may call each other, and are called by the main program (which can itself be regarded as a procedure).

**process 1. (task)** A stream of activity. A process is defined by its code, i.e. the ordered set of machine instructions defining the actions that the process is to take, the contents of its *process descriptor, which defines the current status of any resources that are allocated to the process.
**2.** To carry out the actions defined by the sequence of instructions that make up the code of a program.

**process algebra** The algebraic study of abstract computing processes. Suppose that there is a set *A* of basic computational actions (such as assignments, tests, sends, requests), and that these actions can be combined to form finite and infinite processes. There are a number of operations that, given two processes $p_1$ and $p_2$, can form new processes; examples are the *sequential composition* $p_1 \cdot p_2$ and *parallel composition* $p_1 \| p_2$ of the

processes. There is a great deal of freedom to define and interpret such operations and the processes they create, especially if the actions and processes may exist concurrently and communicate in various ways. Methods of communication and cooperation between processes are at the heart of process algebra. Process algebra studies semantic ideas using mainly standard algebraic methods, including: axiomatic theories whose axioms are often equations; equivalence relations (e.g. several kinds of bisimulation); algebraic constructions; and computable algebras. An example of a set of axioms for process algebra is the set ACP of J. A. Bergstra and J. W. Klop; this was developed from earlier work on *process calculuses by R. Milner and others, and has subsequently been extended and adapted to express the huge range of semantic phenomena exhibited in modern concurrent communicating systems.

The motivation behind process algebra is to model computing systems using processes and to specify the systems by equations based on appropriate operators on processes. Thus concurrent computing systems are specified by equations and their semantics are obtained by solving fixed-point equations. Various related semantic and logical methods are used, including: *initial algebra semantics; *operational semantics based on transition systems; metric space and topological methods; and *modal and *temporal logics for reasoning about processes.

Process algebra has the potential to become a general theory of computing, relevant to system modeling and parallel-program development. There is much research needed to develop its foundations, tools, and applications.

**process calculus** The study of abstract computing processes by means of various formal systems and calculuses. An early influential calculus was the calculus of communicating systems (CCS) of R. Milner. This has given rise to many adaptations and new approaches to a theory of processes. For example, it led to the systematic development of *process algebra to which many process calculuses may be said to belong, and it inspired an influential

# EXHIBIT R



IEEE Std 100-1996

# The IEEE Standard Dictionary of Electrical and Electronics Terms

Sixth Edition

Published by the
Institute of Electrical and
Electronics Engineers, Inc.

IEEE Std 100-1996

# The IEEE Standard Dictionary of Electrical and Electronics Terms

## Sixth Edition

### Standards Coordinating Committee 10, Terms and Definitions
### Jane Radatz, Chair

This standard is one of a number of information technology dictionaries being developed by standards organizations accredited by the American National Standards Institute. This dictionary was developed under the sponsorship of voluntary standards organizations, using a consensus-based process.

REFERENCE

ISBN 1-55937-833-6

9 781559 378338

90000


Maysville Community College Library

# Introduction

Since the first edition in 1941 of the American Standard Definitions of Electrical Terms, the work now known as IEEE Std 100, The IEEE Standard Dictionary of Electrical and Electronics Terms, has evolved into the unique compendium of terms that it is today.

The current edition includes all terms defined in approved IEEE standards through December 1996. Terms are categorized by their technical subject area. They are also associated with the standards or publications in which they currently appear. In some cases, terms from withdrawn standards are included when no current source can be found. Earlier editions of IEEE Std 100 included terms from sources other than IEEE standards, such as technical journals, books, or conference proceedings. These terms have been maintained for the sake of consistency and their sources are listed with the standards in the back of the book.

The practice of defining terms varies from standard to standard. Many working groups that write standards prefer to work with existing definitions, while others choose to write their own. Thus terms may have several similar, although not identical, definitions. Definitions have been combined wherever it has been possible to do so by making only minor editorial changes. Otherwise, they have been left as written in the original standard.

Users of IEEE Std 100 occasionally comment on the surprising omission of a particular term commonly used in an electrical or electronics field. This occurs because the terms in IEEE Std 100 represent only those defined in the existing or past body of IEEE standards. To respond to this, some working groups obtain authorization to create a glossary of terms used in their field. All existing, approved standard glossaries have been incorporated into this edition of IEEE Std 100, including the most current glossaries of terms for computers and power engineering.

IEEE working groups are encouraged to refer to IEEE Std 100 when developing new or revised standards to avoid redundancy. They are also encouraged to investigate deficiencies in standard terms and create standard glossaries to alleviate them.

The sponsoring body for this document was Standards Coordinating Committee 10 on Definitions (SCC10), which consisted of the following members:

**Jane Radatz,** *Chair*

| | | |
|---|---|---|
| John W. Balde | Chris Heegard | F. A. Saal |
| Arthur Ballato | John Horch | Ralph M. Showers |
| Bruce Barrow | J. L. Koepfinger | Edward N. Skomal |
| William Carey | Allen H. Meitzler | Kenneth L. Swinth |
| Frank A. Denbrock | Frank D. Myers | Raymond S. Turgel |
| Jay Forster | David E. Roberts | Edward F. Vance |

When the IEEE Standards Board approved this standard on 10 December 1996, it had the following membership.

**Donald C. Loughry,** *Chair*      **Richard J. Holleman,** *Vice Chair*

**Andrew G. Salem,** *Secretary*

Gilles A. Baril
Clyde R. Camp
Joseph A. Cannatelli
Stephen L. Diamond
Harold E. Epstein
Donald C. Fleckenstein
Jay Forster*
Donald N. Heirman
Ben C. Johnson

E. G. "Al" Kiener
Joseph L. Koepfinger*
Stephen R. Lambert
Lawrence V. McCall
L. Bruce McClung
Marco W. Migliaro
Mary Lou Padgett
John W. Pope

Jose R. Ramos
Arthur K. Reilly
Ronald H. Reimer
Gary S. Robinson
Ingo Rüsch
John S. Ryan
Chee Kiow Tan
Leonard L. Tripp
Howard L. Wolfman

*Member Emeritus

Also included are the following nonvoting IEEE Standards Board liaisons:

Satish K. Aggarwal
Alan H. Cookson
Chester C. Taylor

Kim Breitfelder (1995-present), *IEEE Std 100 Editor*
Stephen Huffman (1993-1995), *IEEE Std 100 Editor*

Assistance was provided by the IEEE Standards editorial staff.

## How to use this dictionary

The terms defined in this dictionary are listed in *letter-by-letter* alphabetical order. Spaces are ignored in this style of alphabetization, so *cable value* will come before *cab signal.* Descriptive categories associated with the term in earlier editions of IEEE Std 100 will follow the term in parentheses. New categories appear after the definitions (see Categories, below), followed by the designation of the standard or standards that include the definition. If a standard designation is followed by the letter s, it means that edition of the standard was superseded by a newer revision and the term was not included in the revision. If a designation is followed by the letter w, it means that edition of the standard was withdrawn and not replaced by a revision. A bracketed number refers to the non-IEEE standard sources given in the back of the book.

Acronyms and abbreviations are no longer listed in a separate section in the dictionary; rather, they are incorporated alphabetically with other terms. Each acronym or abbreviation refers to its expanded term, where it is defined. Acronyms and abbreviations for which no definition was included in past editions have been deleted from this edition of IEEE Std 100.

Abstracts of the current set of approved IEEE standards are provided in the back of the book. It should be noted that updated information about IEEE standards can be obtained at any time from the IEEE Standards World Wide Web site at http://standards.ieee.org/.

## Categories

The category abbreviations that are used in this edition of IEEE Std 100 are defined below. This information is provided to help elucidate the context of the definition. Older terms for which no category could be found have had the category "Std100" assigned to them. Note that terms from sources other than IEEE standards, such as the National Electrical Code® (NEC®) or the National Fire Protection Association, may not be from the most recent editions; the reader is cautioned to check the latest editions of all sources for the most up-to-date terminology.

**cosecant-squared pattern** A vertical-plane antenna pattern in which the power varies as the square of the cosecant of the elevation angle. The unique property of this pattern is that it causes the echo strength of a target having constant radar cross section, moving at constant altitude, to be independent of range.                    (AE) 686-1990w

**cosine-cubed law (illuminating engineering)** An extension of the cosine law in which the distance $d$ between the source and surface is replaced by $h/\cos\theta$, where $h$ is the perpendicular distance of the source from the plane in which the point is located. It is expressed by $E=(I\cos^3\theta)/h^2$. (See figure below.) *See also:* cosine law.



**cosine-cubed law**

(EEC/IE) [126]

**cosine emission law** *See:* Lambert's cosine law.

**cosine law (illuminating engineering)** A law stating that the illuminance on any surface varies as the cosine of the angle of incidence. The angle of incidence θ is the angle between the normal to the surface and the direction of the incident light. The inverse-square law and the cosine law can be combined as $E=(I\cos\theta)/d_2$. *See also:* inverse-square law.
(EEC/IE) [126]

**cosmic noise (radio-wave propagation)** Noise-like radio waves originating from extragalactic sources.
(AP) 211-1990

**cosmic radio waves** *See:* cosmic noise.

**COSRO** *See:* conical-scan-on-receive-only.

**costate** The state of the adjoint system. *See also:* control system.
(CS/IM) [120]

**cost of incremental fuel (electric power system)** The ultimate replacement cost of the fuel that would be consumed to supply an additional increment of generation (usually expressed in cents per million British thermal units).    (PE) 94-1970w

**costs (power operations)** Monies associated with investment or use of electrical plant. *See also:* fixed investment costs.
(PE) 858-1987s

**COSU** *See:* central office service unit.

**COTS** *See:* commercial-off-the-shelf.

**coulomb** The unit of electric charge in SI units (International System of Units). The coulomb is the quantity of electric charge that passes any cross section of a conductor in one second when the current is maintained constant at one ampere.    (Std100) 270-1966w

**Coulomb's law (electrostatic attraction)** The force of repulsion between two like charges of electricity concentrated at two points in an isotropic medium is proportional to the product of their magnitudes and inversely proportional to the square of the distance between them and to the dielectric constant of the medium. *Note:* The force between unlike charges is an attraction.    (Std100) 270-1966w

**coulometer (voltameter)** An electrolytic cell arranged for the measurement of a quantity of electricity by the chemical action produced. *See also:* electricity meter.
(EEC/PE) [119]

**count (radiation counters)** A single response of the counting system. *See also:* scintillation counter; tube count.
(ED/NPS) 161-1971w, 309-1970r, 398-1972r

**count-down (transponder)** The ratio of the number of interrogation pulses not answered to the total number of interrogation pulses received.    (AE) [42], 686-1982s

**counter (1) (test, measurement, and diagnostic equipment)**
**(A)** A device such as a register or storage location used to represent the number of occurrences of an event. **(B)** An instrument for storing integers, permitting these integers to be increased or decreased sequentially by unity or by an arbitrary integer, and capable of being reset to zero or to an arbitrary integer.    (MIL) [2]
**(2) (software)** A variable used to record the number of occurrences of a given event during the execution of a computer program; for example, a variable that records the number of times a loop is executed.    (C) 610.12-1990
**(3) (A)** A device with a finite number of states each of which represents a number which, upon receipt of an appropriate signal, can be incremented or decremented by a given constant. *Note:* The device may be capable of being set to a particular state such as zero. *See also:* keystroke counter; line counter; modulo-n counter; reversible counter. **(B)** A register or storage location used to accumulate the number of occurrences of some event. *See also:* program counter.
(C) 610.10-1994

**counter beam system** Tunnel lighting system or luminaires having a light distribution that is greater in the opposite direction of travel.    (RL) C136.27-1996

**counter cells** *See:* counter-electromotive-force cells.

**counter electromotive force (any system)** The effective counter electromotive force within the system that opposes the passage of current in a specified direction.    (EEC/PE) [119]

**counter-electromotive-force cells (counter cells)** Cells of practically no ampere-hour capability used to oppose the battery voltage. *See also:* battery.    (EEC/PE) [119]

**counter-mounted cooking unit** A cooking appliance designed for mounting in or on a counter and consisting of one or more heating elements, internal wiring, and build-in or separately mountable controls. *See also:* wall-mounted oven.
(NEC/NESC) [86]

**counterpoise (1)** A system of conductors, elevated above and insulated from the ground, forming a lower system of conductors of an antenna. *Note:* The purpose of a counterpoise is to provide a relatively high capacitance and thus a relatively low impedance path to earth. The counterpoise is sometimes used in medium- and low-frequency applications where it would be more difficult to provide an effective ground connection.    (AP) 145-1993
**(2)** A conductor or system of conductors arranged beneath the line; located on, above, or most frequently below the surface of the earth; and connected to the grounding system of the towers or poles supporting the line
(PE/PSPD) 81-1983, C62.23-1995
**(3)** *See also:* ground grid.    (PE/T&D) 524-1992

**counter, radiation** *See:* radiation counter.

**counter tube (radiation counters)** A device that reacts to individual ionizing events, thus enabling them to be counted.
(A) (externally quenched). A radiation-counter tube that requires the use of an external quenching circuit to inhibit reignition. (B) (gas-filled, radiation). A gas tube used for detection of radiation by means of gas ionization. (C) (gas-flow). A radiation-counter tube in which an appropriate atmosphere is maintained by a flow of gas through the tube. (D) (Geiger-Mueller). A radiation-counter tube operated in the Geiger-Mueller region. (E) (proportional). A radiation-counter tube operated in the proportional region. (F) (self-quenched). A radiation-counter tube in which reignition of the discharge is inhibited by internal processes. *See also:* anticoincidence.
(ED/NPS) 161-1971w, 309-1970r

**counting channel (liquid-scintillation counting)** A region of the pulse-height spectrum that is defined by upper and lower boundaries set by discriminators.    (NI) N42.15-1990

**counting efficiency (1) (radiation counter tubes)** The average fraction of the number of ionizing particles or quanta incident

# EXHIBIT S

Designed for
Microsoft®
Windows NT®
Windows®95

**The Ultimate Computer Reference**

*The Comprehensive Standard for Business,
School, Library, and Home*



**Over 2,300 New Terms**
With Online Updates
Available Quarterly

# Microsoft Press®
# Computer
# Dictionary
## Third
## Edition

- *Over 7,600 terms and definitions*
- *345 illustrations and diagrams*
- *Extensive Internet and Web coverage*
- *Featured in Microsoft® Bookshelf® 97*

**Microsoft** Press

# Microsoft Press
# Computer
# Dictionary

## Third Edition

**Microsoft** Press

PUBLISHED BY
Microsoft Press
A Division of Microsoft Corporation
One Microsoft Way
Redmond, Washington 98052-6399

Copyright © 1997 by Microsoft Corporation

All rights reserved. No part of the contents of this book may be reproduced or transmitted in any form or by any means without the written permission of the publisher.

Library of Congress Cataloging-in-Publication Data pending.

ISBN 1-57231-743-4

Printed and bound in the United States of America.

1 2 3 4 5 6 7 8 9   QMQM   2 1 0 9 8 7

Distributed to the book trade in Canada by Macmillan of Canada, a division of Canada Publishing Corporation.

A CIP catalogue record for this book is available from the British Library.

Microsoft Press books are available through booksellers and distributors worldwide. For further information about international editions, contact your local Microsoft Corporation office. Or contact Microsoft Press International directly at fax (425) 936-7329. Visit our Web site at mspress.microsoft.com.

Macintosh, Power Macintosh, QuickTime, and TrueType fonts are registered trademarks of Apple Computer, Inc. Intel is a registered trademark of Intel Corporation. DirectInput, DirectX, Microsoft, Microsoft Press, MS-DOS, Visual Basic, Visual C++, Win32, Win32s, Windows, Windows NT, and XENIX are registered trademarks and ActiveMovie, ActiveX, and Visual J++ are trademarks of Microsoft Corporation. Java is a trademark of Sun Microsystems, Inc. Other product and company names mentioned herein may be the trademarks of their respective owners.

**Acquisitions Editor:** Kim Fryer
**Project Editors:** Maureen Williams Zimmerman, Anne Taussig
**Technical Editors:** Dail Magee Jr., Gary Nelson, Jean Ross, Jim Fuchs, John Conrow, Kurt Meyer, Robert Lyon, Roslyn Lutsch

# ABC
Serifs

# ABC

*Serif. A serif typeface (top) and a sans serif typeface (bottom).*

**serif**[2] \sār´if\ *n.* Any of the short lines or ornaments at the ends of the strokes that form a typeface character.

**server** \sər´vər\ *n.* **1.** On a local area network (LAN), a computer running administrative software that controls access to the network and its resources, such as printers and disk drives, and provides resources to computers functioning as workstations on the network. **2.** On the Internet or other network, a computer or program that responds to commands from a client. For example, a file server may contain an archive of data or program files; when a client submits a request for a file, the server transfers a copy of the file to the client. *See also* client/server architecture. *Compare* client (definition 3).

**server-based application** \sər´vər-bāsd a-plə-kā´-shən\ *n.* A program that is shared over a network. The program is stored on the network server and can be used at more than one client machine at a time.

**server cluster** \sər´vər klu`stər\ *n.* A group of independent computers that work together as a single system. A server cluster presents the appearance of a single server to a client.

**server error** \sər´vər âr`ər\ *n.* A failure to complete a request for information through HTTP that results from an error at the server rather than an error by the client or the user. Server errors are indicated by HTTP status codes beginning with 5. *See also* HTTP, HTTP status codes.

**server push-pull** \sər´vər pŏŏsh`pul´, pŏŏl´\ *n.* A combination of Web client/server techniques individually called "server push" and "client pull." In server push, the server loads data to the client, but

the data connection stays open. This allows the server to continue sending data to the browser as necessary. In client pull, the server loads data to the client, but the data connection does not stay open. The server sends an HTML directive to the browser telling it to reopen the connection after a certain interval to get more data or possibly to open a new URL. See the illustration. *See also* HTML, server (definition 2), URL.



**Server push** **Client pull**

*Server push-pull.*

**server-side includes** \sər-vər-sīd in-klōōdz´\ *n.* A mechanism for including dynamic text in World Wide Web documents. Server-side includes are special command codes that are recognized and interpreted by the server; their output is placed in the document body before the document is sent to the browser. Server-side includes can be used, for example, to include the date/time stamp in the text of the file. *See also* server (definition 2).

**service** \sər´vəs\ *n.* **1.** A customer-based or user-oriented function, such as technical support or network provision. **2.** In reference to programming and software, a program or routine that provides support to other programs, particularly at a low (close to the hardware) level. *See also* utility.

**Service Advertising Protocol** \sər´vəs ad´vər-tī-zēng prō´tə-kol\ *n.* A method used by a service-providing node in a network (such as a file server or application server) to notify other nodes on the network that it is available for access. When a server boots, it uses the protocol to advertise its service; when the same server goes offline, it uses the protocol to announce that it is no longer available. *Acronym:* SAP (S`A-P´). *See also* server (definition 1).

**service bureau** \sər´vis byər`ō\ *n.* **1.** A company that provides various services related to publishing, such as prepress production, desktop pub-

lishing, typesett… scanning of grap… vides data proce… ware packages fo…

**service provider** …

**servo**[1] \sər´vō\ *n*… controlled by the … cuit, that produ… *Also called* servo…

**servomechanism** … control system in… ical movement. … to control the po… a mechanical co…

**servomotor** \sər… **servo system** \s… nism.

**session** \sesh´ən… program is runn… a session is the … accepts input … communication… puters maintain… col layer in the … manages comm… processes. *See a…*

**session layer** \… seven layers in… The session lay… agreed on by th… *also* ISO/OSI mo…

**set**[1] \set\ *n.* In… related charact… character set.

**set**[2] \set\ *vb.* **1**… **2.** To establish… ting tab stops, … breakpoint. *Se…*

**SET protocol** \… Electronics Tra…

**settling time** \… time required … stabilize over … being moved.

**set-top box** \s… verts a cable T… set. Set-top bo… Wide Web.

and forth between two or more programs. *See also* task, task swapping. *Compare* multitasking.

**TB** \T-B´\ *n. See* terabyte.

**.tc** \dot`T-C´\ *n.* On the Internet, the major geographic domain specifying that an address is located on the Turks and Caicos Islands.

**T-carrier** \T´kår`ē-ər\ *n.* A long-distance, digital communications line provided by a common carrier. Multiplexers at either end merge several voice channels and digital data streams for transmission and separate them when received. T-carrier service, introduced by AT&T in 1993, is defined at several capacity levels: T1, T2, T3, T4. In addition to voice communication, T-carriers are used for Internet connectivity. *See also* T1, T2, T3, T4.

**Tcl/Tk** \tik´l-T-K´\ *n.* Acronym for **T**ool **C**ommand **L**anguage/**T**ool **K**it. A programming system that includes a scripting language (Tcl) and a graphical user interface toolkit (Tk). The Tcl language issues commands to interactive programs, such as text editors, debuggers, and shells, which tie together complex data structures into scripts. *See also* graphical user interface, script, scripting language.

**TCM** \T`C-M´\ *n. See* trellis-coded modulation.

**TCP** \T`C-P´\ *n.* Acronym for **T**ransmission **C**ontrol **P**rotocol. The protocol within TCP/IP that governs the breakup of data messages into packets to be sent via IP, and the reassembly and verification of the complete messages from packets received by IP. TCP corresponds to the transport layer in the ISO/OSI model. *See also* ISO/OSI model, packet, TCP/IP. *Compare* IP.

**TCP/IP** \T`C-P`I-P´\ *n.* Acronym for **T**ransmission **C**ontrol **P**rotocol/**I**nternet **P**rotocol. A protocol developed by the Department of Defense for communications between computers. It is built into the UNIX system and has become the de facto standard for data transmission over networks, including the Internet.

**TCP/IP stack** \T`C-P-I-P´ stak`\ *n.* The set of TCP/IP protocols. *See also* protocol stack, TCP/IP.

**.td** \dot`T-D´\ *n.* On the Internet, the major geographic domain specifying that an address is located in Chad.

**TDM** \T`D-M´\ *n. See* time-division multiplexing.

**tear-off** \ter´of\ *adj.* Capable of being dragged from an original position in a graphical user interface and placed where the user desires. For example, many graphics applications feature tear-off menus of tool palettes that can be dragged to locations other than the menu bar.

**techie** \tek´ē\ *n.* A technically oriented person. Typically, a techie is the person on whom a user calls when something breaks or the user cannot understand a technical problem. A techie may be an engineer or a technician, but not all engineers are techies. *See also* guru.

**technical author** \tek´ni-kəl ä`thər, ô`thər\ *n. See* tech writer.

**technology** \tek-nol´ə-jē`\ *n.* The application of science and engineering to the development of machines and procedures in order to enhance or improve human conditions, or at least to improve human efficiency in some respect. *See also* high tech.

**technophile** \tek´nə-fīl`\ *n.* Someone who is enthusiastic about emerging technology. *Compare* computerphile.

**tech writer** \tek´ rī`tər\ *n.* Short for technical writer. One who writes the documentation material for a hardware or software product. *Also called* technical author. *See also* documentation.

**telco** \tel´kō\ *n.* Short for **tel**ephone **co**mpany. A term generally used in reference to a telephone company's provision of Internet services.

**telecommunications** \tel`ə-kə-myōō`nə-kā´-shənz\ *n.* The transmission and reception of information of any type, including data, television pictures, sound, and facsimiles, using electrical or optical signals sent over wires or fibers or through the air.

**telecommute** \tel`ə-kə-myōōt´\ *vb.* To work in one location (often at home) and communicate with a main office at a different location through a personal computer equipped with a modem and communications software.

**teleconferencing** \tel`ə-kon´frən-sēng\ *n.* The use of audio, video, or computer equipment linked through a communications system to enable geographically separated individuals to participate in a meeting or discussion. *See also* video conferencing.

**telecopy** \tel´ə-kop`ē\ *vb. See* fax.

**telematics** \tel`ə-mat´iks\ *n.* In communications technology, the linking of computers and telecommunications.

**telephony**
technolog
signals, its
reconvers
connectin

**Telephony**

**telephony**
anism de
signals, t
back to so

**teleproces**
or compu
access con
where. *Te*
*also* distri

**Telescript**
oriented p
by Gener
the need f
messaging
protocols.

**teletext** \te
cast by a
sion set.

**Teletype** \
developer
other prin
cations sy

**teletype m**
ation in w
its actions
(TTY). Or
means tha
shown, an
one letter
any desire

**teletypewr**

**telnet**[1] \te
ments the

**telnet**[2] \te
over the
*also* telnet

**Telnet** \tel
Internet u
a remote c
user were
attached t
TCP/IP su

# EXHIBIT T

RFC: 793

TRANSMISSION CONTROL PROTOCOL

DARPA INTERNET PROGRAM

PROTOCOL SPECIFICATION

September 1981

prepared for

Defense Advanced Research Projects Agency
Information Processing Techniques Office
1400 Wilson Boulevard
Arlington, Virginia  22209

by

Information Sciences Institute
University of Southern California
4676 Admiralty Way
Marina del Rey, California  90291

RFC:  793
Replaces: RFC 761
IENs:  129, 124, 112, 81,
55, 44, 40, 27, 21, 5

TRANSMISSION CONTROL PROTOCOL

DARPA INTERNET PROGRAM
PROTOCOL SPECIFICATION


1.  INTRODUCTION

The Transmission Control Protocol (TCP) is intended for use as a highly
reliable host-to-host protocol between hosts in packet-switched computer
communication networks, and in interconnected systems of such networks.

This document describes the functions to be performed by the
Transmission Control Protocol, the program that implements it, and its
interface to programs or users that require its services.

1.1.  Motivation

  Computer communication systems are playing an increasingly important
  role in military, government, and civilian environments.  This
  document focuses its attention primarily on military computer
  communication requirements, especially robustness in the presence of
  communication unreliability and availability in the presence of
  congestion, but many of these problems are found in the civilian and
  government sector as well.

  As strategic and tactical computer communication networks are
  developed and deployed, it is essential to provide means of
  interconnecting them and to provide standard interprocess
  communication protocols which can support a broad range of
  applications.  In anticipation of the need for such standards, the
  Deputy Undersecretary of Defense for Research and Engineering has
  declared the Transmission Control Protocol (TCP) described herein to
  be a basis for DoD-wide inter-process communication protocol
  standardization.

  TCP is a connection-oriented, end-to-end reliable protocol designed to
  fit into a layered hierarchy of protocols which support multi-network
  applications.  The TCP provides for reliable inter-process
  communication between pairs of processes in host computers attached to
  distinct but interconnected computer communication networks.  Very few
  assumptions are made as to the reliability of the communication
  protocols below the TCP layer.  TCP assumes it can obtain a simple,
  potentially unreliable datagram service from the lower level
  protocols.  In principle, the TCP should be able to operate above a
  wide spectrum of communication systems ranging from hard-wired
  connections to packet-switched or circuit-switched networks.

September 1981

Transmission Control Protocol
Functional Specification

prefixed to the TCP header.  This pseudo header contains the Source
Address, the Destination Address, the Protocol, and TCP length.
This gives the TCP protection against misrouted segments.  This
information is carried in the Internet Protocol and is transferred
across the TCP/Network interface in the arguments or results of
calls by the TCP on the IP.

```
+--------+--------+--------+--------+
|           Source Address          |
+--------+--------+--------+--------+
|         Destination Address       |
+--------+--------+--------+--------+
|  zero  |  PTCL  |    TCP Length   |
+--------+--------+--------+--------+
```

The TCP Length is the TCP header length plus the data length in
octets (this is not an explicitly transmitted quantity, but is
computed), and it does not count the 12 octets of the pseudo
header.

Urgent Pointer:  16 bits

This field communicates the current value of the urgent pointer as a
positive offset from the sequence number in this segment.  The
urgent pointer points to the sequence number of the octet following
the urgent data.  This field is only be interpreted in segments with
the URG control bit set.

Options:  variable

Options may occupy space at the end of the TCP header and are a
multiple of 8 bits in length.  All options are included in the
checksum.  An option may begin on any octet boundary.  There are two
cases for the format of an option:

    Case 1:  A single octet of option-kind.

    Case 2:  An octet of option-kind, an octet of option-length, and
             the actual option-data octets.

The option-length counts the two octets of option-kind and
option-length as well as the option-data octets.

Note that the list of options may be shorter than the data offset
field might imply.  The content of the header beyond the
End-of-Option option must be header padding (i.e., zero).

A TCP must implement all options.

[Page 17]

_____

September 1981

Transmission Control Protocol
Glossary

SND.WND
        send window

socket
        An address which specifically includes a port identifier, that
        is, the concatenation of an Internet Address with a TCP port.

Source Address
        The source address, usually the network and host identifiers.

SYN
        A control bit in the incoming segment, occupying one sequence
        number, used at the initiation of a connection, to indicate
        where the sequence numbering will start.

TCB
        Transmission control block, the data structure that records
        the state of a connection.

TCB.PRC
        The precedence of the connection.

TCP
        Transmission Control Protocol:  A host-to-host protocol for
        reliable communication in internetwork environments.

TOS
        Type of Service, an Internet Protocol field.

Type of Service
        An Internet Protocol field which indicates the type of service
        for this internet fragment.

URG
        A control bit (urgent), occupying no sequence space, used to
        indicate that the receiving user should be notified to do
        urgent processing as long as there is data to be consumed with
        sequence numbers less than the value indicated in the urgent
        pointer.

urgent pointer
        A control field meaningful only when the URG bit is on.  This
        field communicates the value of the urgent pointer which
        indicates the data octet associated with the sending user's
        urgent call.

[Page 84]

A-22

September 1981

Transmission Control Protocol

REFERENCES

[1]  Cerf, V., and R. Kahn, "A Protocol for Packet Network
     Intercommunication", IEEE Transactions on Communications,
     Vol. COM-22, No. 5, pp 637-648, May 1974.

[2]  Postel, J. (ed.), "Internet Protocol - DARPA Internet Program
     Protocol Specification", RFC 791, USC/Information Sciences
     Institute, September 1981.

[3]  Dalal, Y. and C. Sunshine, "Connection Management in Transport
     Protocols", Computer Networks, Vol. 2, No. 6, pp. 454-473,
     December 1978.

[4]  Postel, J., "Assigned Numbers", RFC 790, USC/Information Sciences
     Institute, September 1981.

# EXHIBIT U



**CISCO SYSTEMS**



# Dictionary of Internetworking Terms and Acronyms

Cisco Systems®' Official Internetworking Dictionary

ciscopress.com



# Dictionary of Internetworking Terms and Acronyms

January 2001

**Corporate Headquarters**
Cisco Systems, Inc.
170 West Tasman Drive
San Jose, CA 95134-1706
USA

http://www.cisco.com

Tel:  408 526-4000
        800 553-NETS (6387)
Fax: 408 526-4100

# Dictionary of Internetworking Terms and Acronyms

Cisco Systems, Inc.

Copyright © 2001 Cisco Systems, Inc.

Cisco Press logo is a trademark of Cisco Systems, Inc.

Published by:
Cisco Press
201 West 103rd Street
Indianapolis, IN 46290 USA

All rights reserved. No part of this book may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without written permission from the publisher, except for the inclusion of brief quotations in a review.

Printed in the United States of America  2 3 4 5 6 7 8 9 0

ISBN: 1-58720-045-7

Library of Congress Cataloging-in-Publication Number: 20-01086612

2nd Printing January 2001

**CLID**

calling line ID. Information about the billing telephone number from which a call originated. The CLID value might be the entire phone number, the area code, or the area code plus the local exchange. Also known as Caller ID.

**client**

Node or software program (front-end device) that requests services from a server. See also *back end*, *FRF.11*, and *server*.

**client/server computing**

Term used to describe distributed computing (processing) network systems in which transaction responsibilities are divided into two parts: client (front end) and server (back end). Both terms (client and server) can be applied to software programs or actual computing devices. Also called distributed computing (processing). Compare with *peer-to-peer computing*. See also *RFC*.

**client/server model**

Common way to describe network services and the model user processes (programs) of those services. Examples include the nameserver/nameresolver paradigm of the DNS and fileserver/file-client relationships, such as NFS and diskless hosts.

**CLNP**

Connectionless Network Protocol. The OSI network layer protocol that does not require a circuit to be established before data is transmitted. See also *CLNS*.

**CLNS**

Connectionless Network Service. The OSI network layer service that does not require a circuit to be established before data is transmitted. CLNS routes messages to their destinations independently of any other messages. See also *CLNP*.

**cloning**

Creating and configuring a virtual access interface by applying a specific virtual template interface. The template is the source of the generic user information and the router-dependent information. The result of cloning is a virtual access interface configured with all the commands in the template.

**CLP**

cell loss priority. Field in the ATM cell header that determines the probability of a cell being dropped if the network becomes congested. Cells with CLP = 0 are insured traffic, which is unlikely to be dropped. Cells with CLP = 1 are best-effort traffic, which might be dropped in congested conditions to free up resources to handle insured traffic.

# EXHIBIT V

PUBLISHED BY
Microsoft Press
A Division of Microsoft Corporation  One Microsoft Way
Redmond, Washington 98052-6399  Copyright © 2002 by

Microsoft Corporation

All rights reserved. No part of the contents of this book may be reproduced or transmitted in any form    or by any means without the written permission of the publisher.

Library of Congress Cataloging-in-Publication Data   Microsoft Computer
Dictionary.--5th ed.
        p.  cm.
    ISBN 0-7356-1495-4
    1.  Computers--Dictionaries.    2.  Microcomputers--Dictionaries.

   AQ76.5. M52267   2002
   004'.03--dc21                                        200219714

Printed and bound in the United States of America.  2  3  4  5  6  7  8

9     QWT     7  6  5  4  3  2

Distributed in Canada by H.B. Fenn and Company Ltd.

A CIP catalogue record for this book is available from the British Library.

Microsoft Press books are available through booksellers and distributors worldwide. For further informa-    tion about international editions, contact your local Microsoft Corporation office or contact Microsoft    Press International directly at fax (425) 936-7329. Visit our Web site at www.microsoft.com/mspress.   Send comments to *mspinput@microsoft.com*.

Active Desktop, Active Directory, ActiveMovie, ActiveStore, ActiveSync, ActiveX, Authenticode,   BackOffice, BizTalk, ClearType, Direct3D, DirectAnimation, DirectDraw, DirectInput, DirectMusic,   DirectPlay, DirectShow, DirectSound, DirectX, Entourage, FoxPro, FrontPage, Hotmail, IntelliEye,   IntelliMouse, IntelliSense, JScript, MapPoint, Microsoft, Microsoft Press, Mobile Explorer, MS-DOS,    MSN, Music Central, NetMeeting, Outlook, PhotoDraw, PowerPoint, SharePoint, UltimateTV, Visio,    Visual Basic, Visual C++, Visual FoxPro, Visual InterDev, Visual J++, Visual SourceSafe, Visual Studio,    Win32, Win32s, Windows, Windows Media, Windows NT, Xbox are either registered trademarks or    trademarks of Microsoft Corporation in the United States and/or other countries. Other product and company names mentioned herein may be the trademarks of their respective owners.

The example companies, organizations, products, domain names, e-mail addresses, logos, people, places,    and events depicted herein are fictitious. No association with any real company, organization, product,    domain name, e-mail address, logo, person, place, or event is intended or should be inferred.

**Acquisitions Editor:** Alex Blanton
**Project Editor:** Sandra Haynes  Body Part No.

X08-41929

**serial port adapter** *n.* An interface card or device that either provides a serial port or converts a serial port to another use. *See also* adapter, serial port.

**serial printer** *n.* A printer connected to the computer via a serial interface (commonly RS-232-C or compatible). Connectors for this type of printer vary widely, which is one reason they are less popular than parallel printers among those who use IBM and IBM-compatible PCs. Serial printers are standard for Apple computers. *See also* DB connector, serial, serial transmission. *Compare* parallel printer.

**serial processing** *n.* *See* sequential processing (definition 2).

**Serial Storage Architecture** *n.* *See* SSA.

**serial transmission** *n.* The transfer of discrete signals one after another. In communications and data transfer, serial transmission involves sending information over a single line one bit at a time, as in modem-to-modem connections. *Compare* parallel transmission.

**series circuit** *n.* A circuit in which two or more components are linked in series. All the current passes through each component in a series circuit, but the voltage is divided among the components. See the illustration. *Compare* parallel circuit.



*Series circuit.*

**serif¹** *adj.* Marked by the use of serifs. For example, Goudy is a serif typeface, whereas Helvetica is a sans serif typeface. See the illustration. *See also* serif². *Compare* sans serif.



*Serif. A serif typeface (top) and a sans serif typeface (bottom).*

**serif²** *n.* Any of the short lines or ornaments at the ends of the strokes that form a typeface character.

**server** *n.* **1.** On a local area network (LAN), a computer running administrative software that controls access to the network and its resources, such as printers and disk drives, and provides resources to computers functioning as workstations on the network. **2.** On the Internet or other network, a computer or program that responds to commands from a client. For example, a file server may contain an archive of data or program files; when a client submits a request for a file, the server transfers a copy of the file to the client. *See also* application server (definitions 1 and 2), client/server architecture. *Compare* client (definition 3).

**server appliance** *n.* A device designed to deliver one or more specific network services in a single turnkey package that includes both hardware and software. All necessary programs are preinstalled on a server appliance, which has minimal, simplified options and controls. Server appliances can be used to complement or replace traditional servers on a network and can provide such services as file and printer sharing and Internet connectivity. *Also called:* appliance. *See also* information appliance.

**server-based application** *n.* A program that is shared over a network. The program is stored on the network server and can be used at more than one client machine at a time.

**server cluster** *n.* A group of independent computer systems, known as nodes, working together as a single system to ensure that mission-critical applications and resources remain available to clients. A server cluster is the type of cluster that Cluster service implements. *See also* cluster.

**server control** *n.* *See* ASP.NET server control.

**server error** *n.* A failure to complete a request for information through HTTP that results from an error at the server rather than an error by the client or the user. Server errors are indicated by HTTP status codes beginning with 5. *See also* HTTP, HTTP status codes.

**server farm** *n.* A centralized grouping of network servers maintained by an enterprise or, often, an Internet service provider (ISP). A server farm provides a network with load balancing, scalability, and fault tolerance. Individual servers may be connected in such a way that they appear to represent a single resource.

**serverlet** *n.* *See* servlet.

**Server Message Block** *n.* *See* SMB.

474

# EXHIBIT W

Page iii

# Dictionary of E-Business

### A Definitive Guide to Technology and Business Terms

Francis Botto

**JOHN WILEY & SONS, LTD**
Chichester • New York • Weinheim • Brisbane • Singapore • Toronto



Copyright © 2000. John Wiley and Sons, Inc. All rights reserved. May not be reproduced in any form without permission from the publisher, except fair uses permitted under U.S. or applicable copyright law.

Copyright © 2000. John Wiley and Sons, Inc. All rights reserved. May not be reproduced in any form without permission from the publisher, except fair uses permitted under U.S. or applicable copyright law.

Page iv

Copyright © 2000 by John Wiley & Sons, Ltd
Baffins Lane, Chichester,
West Sussex PO19 1UD, England

National        01243 779777
International  (+44) 1243 779777
e-mail (for orders and customer service enquiries): cs-books@wiley.co.uk
Visit our Home Page on http://www.wiley.co.uk or http://www.wiley.com

Reprinted December 2000

All Rights Reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, scanning or otherwise, except under the terms of the Copyright, Designs and Patents Act 1988 or under the terms of a licence issued by the Copyright Licensing Agency, 90 Tottenham Court Road, London W1P 9HE, UK, without the permission in writing of the Publisher, with the exception of any material supplied specifically for the purpose of being entered and executed on a computer system, for exclusive use by the purchaser of the publication.

Neither the author nor John Wiley & Sons Ltd accept any responsibility or liability for loss or damage occasioned to any person or property through using the material, instructions, methods or ideas contained herein, or acting or refraining from acting as a result of such use. The author and Publisher expressly disclaim all implied warranties, including merchantability of fitness for any particular purpose. There will be no duty on the author of Publisher to correct any errors or defects in the software.

Designations used by companies to distinguish their products are often claimed as trademarks. In all instances where John Wiley & Sons is aware of a claim, the product names appear in initial capital or capital letters. Readers, however, should contact the appropriate companies for more complete information regarding trademarks and registration.

*Other Wiley Editorial Offices*

John Wiley & Sons Inc., 605 Third Avenue,
New York, NY 10158-0012, USA

WILEY-VCH Verlag GmbH
Pappelallee 3, D-69469 Weinheim, Germany

Jacaranda Wiley Ltd, 33 Park Road, Milton,
Queensland 4064, Australia

John Wiley & Sons (Asia) Pte Ltd, 2 Clementi Loop #02-01,
Jin Xing Distripark, Singapore 129809

John Wiley & Sons (Canada) Ltd, 22 Worcester Road,
Rexdale, Ontario M9W 1L1, Canada

*Library of Congress Cataloging-in-Publication Data*

Botto, Francis.
Dictionary of E-commerce: a definitive guide to technology
and business terms/ Francis Botto.
p.        cm.
ISBN 0-471-88145-7 (alk. paper)
1. Electronic commerce—Dictionaries. I. Title.
HF5548.32. B67 2000
658.8'4—dc21
                                            99-089915
                                            CIP

*British Library Cataloguing in Publication Data*
A catalogue record for this book is available from the British Library

ISBN 0471 88145 7

Typeset in 10/12pt Times by Footnote Graphics, Warminster, Wilts.
Printed and bound in Great Britain by Antony Rowe Ltd, Chippenham, Wiltshire
This book is printed on acid-free paper responsibly manufactured from sustainable forestry, in which at least two trees are planted for each one used for paper production.

EBSCO Publishing : eBook Collection (EBSCOhost) - printed on 1/4/2017 11:21 AM via NHTI - CONCORDS COMMUNITY COLLEGE
AN: 56762 ; Botto, Francis.; Dictionary of E-business : A Definitive Guide to Technology and Business Terms
Account: s8356098

Copyright © 2008. John Wiley and Sons, Inc. All rights reserved. May not be reproduced in any form without permission from the publisher, except fair uses permitted under U.S. or applicable copyright law.

- an information field for data

- the destination address

- error detection and correction codes

- originating address

All of this information is held together in a single unit that might be a *packet, cell* or *frame*. In IP networks, such as the Internet and intranets, they are called packets, but it is just a new term; really they are all the same thing. The packets are assembled at the point of transmission and sent over various different paths to their destination. Once received they are checked for errors and then appropriately assembled. Network protocols are analogous to the Royal Mail: the packets are comparable to envelopes, and they have destination and originating addresses etc.

**Proxy object**

An object that may be passed to a client to provide access to remote objects via an interface. Jini has consumer services in this area, where a proxy object is passed to a JVM.

**Proxy server**

A intermediate server on the communications path between server applications and data entities, and the client systems and software.

**Pseudo-conversational communication**

A communication regime between two software components or objects that exists only for the duration of interaction.

**Psion**

A manufacturer of portable devices that include organisers.

**PSTN (Public Switched Telephone Network)**

A voice-grade, public telephone network.

*(See Packet-switched network.)*

**Public domain CGI script**

A script that is freely available from a Web site and requires no payment.

*(See www.eff.org.)*

**Public key**

*(See Cryptography.)*

**Public key encryption**

An encryption technique that requires both private and public keys. A public key is used to encrypt sent data.

*(See Encryption.)*

**Publishing medium**

A medium that may be used to publish information. The Internet, CD-ROM and DVD-ROM are publishing media.

EBSCO Publishing : eBook Collection (EBSCOhost) - printed on 1/4/2017 11:29 AM via NHTI - CONCORDS COMMUNITY COLLEGE
AN: 56762 ; Botto, Francis.; Dictionary of E-business : A Definitive Guide to Technology and Business Terms
Account: ns136607

# **EXHIBIT X**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SOUND VIEW INNOVATIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:16-cv-116-RGA |
| | ) | |
| FACEBOOK, INC., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## <u>DECLARATION OF XIAO SU, PH.D.</u>

1

I, Xiao Su, declare as follows:

## I.    Introduction

1.    My name is Xiao Su. I am a professor in the Computer Engineering Department at San Jose State University. I have been retained by Plaintiff Sound View Innovations, LLC ("Sound View") to analyze U.S. Patent Nos. 5,991,845 ("the '845 patent"), 6,125,371 ("the '371 patent"), 6,732,181 ("the '181 patent"), 7,366,786 ("the '786 patent"), 7,412,486 ("the '486 patent"), and 8,135,860 ("the '860 patent"), and certain of defendant Facebook, Inc.'s claim construction arguments, and to comment on technological matters implicated therein.

2.    I have personal knowledge of the facts stated in this declaration.

3.    I am being compensated for my work in this matter at my standard consulting rate. I am also being reimbursed for incurred expenses. No part of my compensation is contingent upon the outcome of this action or my opinions. I have no other interests in this action or with any of the parties.

4.    I reserve the right to revise, supplement, and/or amend my opinions in this declaration based on future positions taken by Facebook and/or its experts; additional documents, testimony, or other information provided by Facebook or its witnesses; any orders from the Court; or as I may otherwise find necessary.

## II.    Qualifications

5.    In 1994 I received a B.S. in Computer Science and Engineering from Zhejiang University. In 1997 I received a M.S. in Computer Science from the University of Illinois at Urbana-Champaign. Then in 2001 I received a Ph.D. in Computer Science from the University of Illinois at Urbana-Champaign.

6.    From 2001 to 2002 I was a Senior Software Engineer in the Media-IXT group at Inktomi Corporation. Inktomi was a company based in California that provided software for

2

Internet service providers, or ISPs. It was founded in 1996 by UC Berkeley professor Eric Brewer and Paul Gauthier. Inktomi was acquired by Yahoo! in 2002.

7.    I joined the faculty of the Computer Engineering Department at San Jose State University in 2002 as an assistant professor. I became an associate professor in 2007. In 2010 I received the College of Engineering Faculty Award for Excellence in Scholarship and then became a full professor in 2011. I received the Applied Materials Faculty Award for Excellence in Teaching in 2012. I was later appointed Chair of my department in 2014. The courses I have taught include Algorithms and Data Structure Design, Computer Networks I, Multimedia Networking: Applications and Protocols, Network Security, Network Programming and Application, Network Architecture and Protocols I, and Mobile Software Development.

8.    Since 2011 I have been an Editorial Board Member for the Journal of Computers. I have also been a Chair, co-Chair, or technical program committee member for various symposia, conferences, and committees. And I have been a reviewer for various journals.

9.    Additional details of my education and work experience, awards and honors, and publications that may be relevant to the declaration testimony herein are set forth in my curriculum vitae (Exhibit 1).

## III.    Information Reviewed Or Considered

10.    In preparing this declaration I have relied upon my education, knowledge of computer science and engineering, and related experience.

11.    In preparing this declaration I have also considered the parties' briefing on claim construction and supporting exhibits, including the declaration of Sandeep Chatterjee, as well as the patents-in-suit and their file histories, and the parties' Joint Claim Construction Chart, including exhibits and appendices thereto.

## IV.    Level of Skill in the Art

12.    It is my understanding that claims terms are generally given the meaning they would have to a person of ordinary skill in the art in question as of the priority date of the patent in which they appear.

13.    I understand that Dr. Chatterjee contends that a person of ordinary skill in the art as of the filing date of the '845 patent (October 21, 1996) would have possessed a Bachelor of Science Degree in Electrical/Computer Engineering or Computer Science (or related subjects), plus two years of related technical experience with computer systems involving multi processing and interprocess communication or synchronization, or a person with both Bachelor and Master Degrees in Electrical/Computer Engineering or Computer Science (or related subjects) and somewhat less technical experience.

14.    I understand that Dr. Chatterjee contends that a person of ordinary skill in the art as of the filing date of the '371 patent (August 19, 1997) would have possessed a Bachelor of Science Degree in Electrical/Computer Engineering or Computer Science (or related subjects), plus two years of related technical experience with computer systems involving databases and record management, including multi version databases, or a person with both Bachelor and Master Degrees in Electrical/Computer Engineering or Computer Science (or related subjects) and somewhat less technical experience.

15.    I understand that Dr. Chatterjee contends that a person of ordinary skill in the art as of the filing date of the provisional application to which the '181 and '786 patents claim priority (April 29, 1998) would have possessed a Bachelor of Science Degree in Electrical/Computer Engineering or Computer Science (or related subjects), plus two years of related technical experience with distributed computer systems and access control, or a person

with both Bachelor and Master Degrees in Electrical/Computer Engineering or Computer Science (or related subjects) and somewhat less professional experience.

16.    I understand that Dr. Chatterjee contends that a person of ordinary skill in the art as of the filing date of the provisional application to which the '486 patent claims priority (December 14, 2001) would have possessed a Bachelor of Science Degree in Electrical/Computer Engineering or Computer Science (or related subjects), plus two years of related technical experience with distributed computer systems involving Web technologies such as Hypertext Transfer Protocol ("HTTP"), Hypertext Markup Language ("HTML") and JavaScript, or a person with both Bachelor and Master Degrees in Electrical/Computer Engineering or Computer Science (or related subjects) and somewhat less technical experience.

17.    I understand that Dr. Chatterjee contends that a person of ordinary skill in the art as of the filing date of the '860 patent (July 20, 2000) would have possessed a Bachelor of Science Degree in Electrical/Computer Engineering or Computer Science (or related subjects), plus two years of related technical experience with distributed computer systems involving Web technologies such as Web servers, HTML and Extensible Markup Language ("XML"), or a person with both Bachelor and Master Degrees in Electrical/Computer Engineering or Computer Science (or related subjects) and somewhat less technical experience.

18.    I understand that Dr. Chatterjee contends that sufficient relevant professional or practical experience may substitute for academic experience for each of the above.

19.    For the purposes of the claim construction analysis below, I have assumed these levels of skill. My opinions would not change if the level of skill in the art were slightly different than those identified above.

## V.    The '845 Patent

20.    I understand that claim 13 of the '845 patent is asserted in this litigation.

21.    Independent claim 13 recites as follows:

13. A method for providing multiple processes with mutually exclusive access to a shared resource in a system having a lock associated with the shared resource, possession of the lock signifying exclusive access to the shared resource, wherein processes desiring access to the shared resource spin on the lock until the lock is acquired, the method comprising the steps of:

maintaining a linked queue structure of data records corresponding to a queue of processes including processes spinning on the lock and a process possessing the lock, one data record per process;

transferring the lock from the process possessing the lock to a process next in the queue;

conducting a cleanup process if one or more processes in the queue have terminated, said cleanup process removing said one or more terminated processes from the queue and reassembling the linked queue structure.

### A.    "spin" / "spinning" / "spinning on the lock"

22.    These terms appear in asserted claim 13 of the '845 patent.

23.    I understand that Facebook proposes "spinning on the lock" be construed as "repeatedly trying to acquire a lock in a tight loop; i.e., busy waiting" while Sound View proposes that "spinning" be construed as "waiting."

24.    In my opinion, Sound View's proposed construction is consistent with both the specification and the understanding of one of ordinary skill in the art.

25.    Dr. Chatterjee's analysis focuses on different ways in which a process can wait on a lock, claiming that the '845 patent distinguishes between "blocking" and "spinning." However, the '845 patent's specification does not use the term "blocking" and consistently equates spin or spinning and wait or waiting. (D.I. 64, Ex. A at 1:54 ("wait or 'spin'"), 3:3 ("spinning (WAITING)"), 3:15 ("spinning (waiting) on a lock"), 8:20 ("wait (spin)"); *see also* 5:34-38 ("Alternatively, or in addition to polling, the cleanup server 150 may be informed of a process

6

death or time-out by one of the processes P1, . . . , Pn that have to wait an excessively long time for a semaphore. Thus, the cleanup server 150 will be informed when a process in the system finds that it has been waiting much longer for a lock than it ought to have waited."), 6:61-64 ("Thus, at steps 318 and 320 the process waits until the cleanup routine is finished before returning failure to the caller at step 322 and prompting the calling process to try again.").) Accordingly, one of ordinary skill in the art would understand that in the context of the '845 patent, spinning is waiting. I agree with Dr. Chatterjee that waiting/spinning encompasses "busy waiting," but I believe that it also encompasses other types of waiting. In my view, there is nothing in the specification that would lead one of ordinary skill in the art to believe that the patentees sought to limit their invention to one particular type of waiting. One of ordinary skill in the art would understand spinning to encompass "busy waiting," but also covers other types of waiting.

**B.    "process"**

26.    This term appears in asserted claim 13 of the '845 patent.

27.    I understand that Facebook proposes "process" be construed as "an address space (range of available addresses) and one or more threads of control that execute within that address space and its required system resources" while Sound View believes that no construction is necessary as the term "process" would have been readily understood by a person of skill in the art at the time of the invention.

28.    Dr. Chatterjee acknowledges that "process" has an understood meaning to those of ordinary skill in the art. (*See* Chatterjee Decl. at 16-17.) I agree with Dr. Chatterjee in that regard. I believe that anyone of ordinary skill in the art, including myself, would understand the term "process" as used in the field of computers without the need for an additional explanation or

definition. Dr. Chatterjee takes issue with a dictionary definition including "task" or "stream of activity," but those terms are consistent with my understanding, and what I believe would be the understanding of one of ordinary skill in the art. Dr. Chatterjee provides multiple examples of actions potentially performed by a computer implying that those actions are not processes. I find that Dr. Chatterjee's explanation unnecessarily complicates the meaning of "process," which has been and continues to be, widely known and easily understood. I agree with Dr. Chatterjee that a process is what carries out instructions on a computer. Accordingly, each act he lists is carried out by a process as anyone of ordinary skill in the art would know.

29.    Additionally, the specification as understood by one of ordinary skill in the art provides no reason to believe that the patentees intended to adopt any definition other than the plain and ordinary meaning, which was well known.

## VI.    The '371 Patent

30.    I understand that claims 1-3 and 8-10 of the '371 patent are asserted in this litigation.

31.    Independent claim 1 recites as follows:

1. A processing system for use with a database of data records, said database stored in a memory, comprising:
   a time stamping controller that assigns a time stamp to transactions to be performed on said database;
   a versioning controller that creates multiple versions of ones of said data records affected by said transactions that are update transactions; and
   an aging controller that monitors a measurable characteristic of said memory and deletes ones of said multiple versions of said ones of said data records in response to said time stamp and said measurable characteristic thereby to increase a capacity of said memory.

32.    Independent claim 8 recites as follows:

8. A method of operating a processing system for use with a database of data records, said database stored in a memory, comprising the steps of:

8

assigning a time stamp to transactions to be performed on said database;

creating multiple versions of ones of said data records affected by said transactions that are update transactions;

monitoring a measurable characteristic of said memory; and

deleting ones of said multiple versions of said ones of said data records in response to said time stamp and said measurable characteristic thereby to increase a capacity of said memory.

## A.    "controller"

33.    This term appears in asserted claim 1 of the '371 patent.

34.    I understand that Facebook alleges that the term "controller" triggers 35 U.S.C. § 112(f) while Sound View states that the term "controller" was well known by persons of ordinary skill in the art.

35.    Dr. Chatterjee appears to concede that one of ordinary skill in the art understands the term "controller." (*See* Chatterjee Decl. at 19.) I agree. I, and even most of my students, would readily understand the term controller. As the '371 patent's specification acknowledges, those of ordinary skill in the art would have known and understood the term "controller": "Those skilled in the art should be familiar with the use of controllers in processing environments generally and, more specifically, with main memory databases. Controllers may be implemented in software, firmware, hardware, or some suitable combination of at least two of the three." ('371 patent at 4:52-57.) I agree with the statements in the specification, and do not believe that one of ordinary skill in the art would interpret this statement as changing the meaning of controller. Those of ordinary skill in the art did understand the term "controller" and its structure. A controller is not just a general purpose computer. Although a general purpose computer can be configured to act as a controller, a general purpose computer without any programming generally would not be considered a control. And although controllers may be implemented in software, firmware, hardware, or a combination of those elements, a controller is

9

not *any* combination of those elements alone—it is a specific structural thing and there are different types of controllers that persons of ordinary skill in the art would readily understand. For example, there are feedback controllers, such as PID controllers (proportional-integral-derivative controllers), which examine particular inputs and use feedback loops to allow control of a particular outputs. Furthermore a person of ordinary skill in the art would easily recognize a controller if he or she were confronting a controller. There are many well-known controllers used in industry, and this has been the case since before 1997 when the '371 patent was filed. In 1997, I was a computer science Masters student and had learned about different types of controllers.

36.    Dr. Chatterjee claims that "[j]ust because one of ordinary skill may be familiar with the use of controllers does not mean that one of ordinary skill would know or be able to discern the structure(s) and/or algorithm(s) of a specific type of controller or a controller capable of performing a specific function." I disagree. One of ordinary skill in the art would have known and understood the term "controller," and therefore the relevant structure. When confronted with a particular piece of software or hardware, I could easily determine whether it is a "controller" or not a "controller." And based on the explanation provided in the '371 patent, one of ordinary skill in the art could implement the claimed systems and methods.

37.    The terms used in claim 1 further that understanding by specifying that the relevant controllers are "a time stamping controller," "a versioning controller," and "an aging controller." A person of ordinary skill in the art would additionally have understood the terms "time stamping," "versioning," and "aging." Time stamps, versions and age are well known concepts. And the use of those terms before controller further limits the structural meaning of the controller to control the output of those particular variables based on some other variable or function. Just as one of ordinary skill in the art would readily be able to identify a "controller," I

10

believe that one of ordinary skill in the art would readily be able to distinguish between a "time stamping" controller, a "versioning" controller, an "aging" controller, and another type of controller.

38.     Dr. Chatterjee makes no direct contention that "controller" is a "nonce word" as he does for many other terms. (*See* Chatterjee Decl. at 19-21.) I believe that any assertion that "controller" does not have a well-recognized meaning would be wrong. My understanding is that Courts have found terms such as "module," "mechanism," "element," and "device" to be generic and nothing more than verbal constructs, and therefore nonce words. For the reasons, I explain above, the term "controller," is nothing like "module", "mechanism", "element", "device", which could be used to describe practically anything. Instead, "controller" describes a specific type of thing as I explain in more detail above.

39.     I understand that Dr. Chatterjee contends that the '371 patent "fails to disclose a corresponding structure and algorithm for the recited functions." (Chatterjee Decl. at 20.) As an initial matter, Dr. Chatterjee appears to assume that these terms are subject to 35 U.S.C § 112(f) because of his assertion that the term "controller" essentially has no meaning, and would not be readily understood (i.e., that it is a nonce word). I disagree. It is my understanding that because these terms do not recite a "means," they are presumed not to be subject to 35 U.S.C § 112(f). I further understand that Facebook bears the burden of proving that the claim terms fail to recite sufficiently definite structure or else recite function without reciting sufficient structure for performing that function. The term controller has a well understood meaning to one of ordinary skill in the art. The prefixes "time stamping," "versioning," and "aging" provide additional meaning here, as the controllers of the '371 patent are particular types of controllers as discussed

throughout the specification. I do not think that Dr. Chatterjee has proven that controller has no meaning, and I do not think it would be possible to do so.

40.     In addition, the '371 patent specification provides further algorithms for the functioning of the controller. For example, the '371 patent specification explains that maintaining multiple versions of data records in order to reduce the conflicts between read and write transactions is called multi-versioning, and that multi-versions database management systems use time stamps to order read and update transactions. (*See* '371 patent at 2:23-32 ("Contemporary control methodologies reduce conflicts between update and read-only transactions, giving the latter consistent, but 'old' or out-of-date, views of certain data records or data record types. This is commonly referred to as multi-versioning, in which DBMs retain or archive multiple versions of recently updated data records for use by read-only transactions. Multi-version DBMs use time stamps to serialize read-only and update transactions, and, more recently, to serialize read-only transactions with respect to update transactions.").) The '371 patent uses versioning and multi-versioning interchangeably. ('371 patent at 3:52-56 ("Before undertaking a detailed description of an advantageous embodiment of the present invention, it may be beneficial to discuss the general concept of creating and maintaining multiple versions of data records, known in the art as multi-versioning or, simply, 'versioning.'").) The concept of versions is an important concept in the area of computer science, and persons of ordinary skill in the art would have known of the benefits of versioning and the tradeoffs related to implementing versioning. A "versioning controller" is one that controls the versions that are used in these types of multi-versioned databases. The "time stamping controller" is the component that controls the timestamps that are associated with the transactions. In sum, one of ordinary skill the art would

12

understand "time stamping controller" and "versioning controller" in that context and accordingly understand those terms to be specific types of "controllers."

41.    The '371 also provides Figure 1, which "illustrates a flow diagram of an exemplary method for controlling multi-versioned data records according to the present invention." ('371 patent at 3:36-38.)

42.    The top of Figure 1 illustrates a time stamping controller:



43.    As the '371 patent explains, "transactions are commonly classified as one of read-only (e.g., a transaction that 'reads' data records) or update (e.g., a transaction that 'updates' data records or, more broadly, wants access to a current version of a particular data record)." ('371 patent at 4:11-14.) The distinction between different types of transactions is relevant to the "versioning controller" described below.

44.    As illustrated, the time stamping controller assigns time stamps to the received transactions. The '371 patent provides an exemplary method for doing so in its discussion of Figure 1:  "To begin, exemplary time stamping controller 110 receives update and read-only transactions for a main memory database 125, step 130; exemplary main memory database 125 is stored in a volatile memory 135, which is suitably associated with processing system 105. In response, time stamping controller 110 assigns a time stamp to each received transaction, step 140. Time stamps are assigned to read-only transactions as a function of a time stamp counter 145, that is also a controller. Versioning manager 100 may advantageously use the time stamps

13

to preserve an order of such received transactions. According to an advantageous embodiment, time stamp counter 145 is associated with a conventional system clock (not shown) of processing system 100." ('371 patent at 4:58-5:4.) As the '371 patent explains, the time stamping controller is associated with a database, receives transactions, and assigns time stamps to those transactions. Retrieving time from a conventional system clock is basic functionality for general purpose computers and that functionality is generally provided to programmers through libraries—application programmers are not required to implement the ability to access the system clock. Consequently, one of ordinary skill in the art would be able to provide an operative program implementing this function based on the '371 patent's disclosure.

45.     Just below the time stamping controller in Figure 1 is an exemplary versioning controller:



46.     The '371 patent provides an exemplary method of versioning when discussing Figure 1:  "For each transaction, exemplary versioning controller 115 determines whether a given transaction is an update transaction, decisional step 150. If the transaction is an update transaction, YES branch of decisional step 150, then versioning controller 115 (1) obtains an 'X' lock on one or more data records to be modified (or otherwise changed), step 155, (2) modifies a

14

copy of the most recent 'past' version of the data record in response to the update transaction, creating a new 'current' or 'successor' version, step 165 and (3) commits the transaction, at which time it increments time stamp counter 145, assigns a time stamp therefrom to the new 'successor' versions of the updated data records and releases the 'X' lock held by the update transaction, step 170." ('371 patent at 5:5-18.) The exemplary method includes acquiring and releasing locks, which synchronize access for updates. Figure 1 additionally shows a connection between the versioning controller and the database, indicated by an arrow. Based on the above, one of ordinary skill in the art would understand that the versioning controller interacts with the stored information to create additional versions of data records and would additionally understand the steps for creating those additional versions in this exemplary embodiment. Consequently, one of ordinary skill in the art would be able to provide an operative program implementing this function based on the '371 patent's disclosure.

47.    Finally, Figure 1 also illustrates an exemplary aging controller below the versioning controller:



48.    The '371 patent provides an exemplary method of aging when discussing Figure 1, as well: "Exemplary aging controller 120, which is associated with each of time stamping and versioning controllers 110 and 115, monitors main memory database 125 to (1) continuously

15

order (e.g., sort, arrange, etc.) multiple versions of ones of the data records according to their associated time stamps, step 180 and (2) monitor one or more measurable characteristics describing, relating to, or otherwise associated with a utilization or capacity of main memory 135, step 185. Exemplary aging controller 120 deletes prior ones of the multiple versions of the data records in response to the time stamp associated with the ones of multiple versions and at least one measurable main memory characteristic, step 190." ('371 patent at 5:36-48.) That is, it describes a process for deleting old versions of data records based on a time stamp and a measurable characteristic of memory.

49.    The '371 patent provides further detail regarding an exemplary aging controller in Figure 2. (*See* '371 patent at 5:59-63 ("Turning now to FIG. 2, illustrated is a flow diagram of an exemplary method of an embodiment of the aging controller (generally designated 120) of FIG. 1 for logically aging multiversioned data records according to the principles of the present invention."). It additionally provides one of ordinary skill in the art with the requirements for performing the steps illustrated in Figure 2, (*see*, *e.g.*, '371 patent at 5:65-6:4), describes how that exemplary aging controller utilizes information created by the versioning controller in order to age data records, (*see*, *e.g.*, '371 patent at 6:5-17, 6:32-60, 7:11-29), and provides an exemplary method for identifying data records to be aged, (*see* '371 patent at 6:61-67, 7:1-10). The specification goes on to describe potential optimizations to those methods, (*see* '371 patent at 7:30-38), and the trade-offs associated with more aggressively reclaiming memory, (*see* '371 patent at 7:39-55. Based on those disclosures, including the detailed descriptions on implementation of the required steps and the interactions between the controllers, one of ordinary skill in the art would be able to provide an operative program implementing this function.

16

50.     In light of the above, a person of ordinary skill in the art would able to write a software program for implementing each of the controllers of the '371 patent. Indeed, the surrounding claim language in the elements of this claim explain how the time stamping, versioning, and aging occur in sufficient detail for implementation by one of ordinary skill in the art.

**B.     "[said time stamp is generated as a function of a] time stamp counter"**

51.     These terms appear in asserted claims 2-3 and 9-10 of the '371 patent.

52.     I understand that Facebook alleges that the term "time stamp counter" triggers 35 U.S.C. § 112(f) while Sound View states that the term "counter" was well known by persons of ordinary skill in the art.

53.     Dr. Chatterjee acknowledges that "[t]he concept of a 'time stamp counter' is generally known to one of ordinary skill in the art." (Chatterjee Decl. at 22.) I agree with him in that regard. Dr. Chatterjee also acknowledges that "[t]he specification does state that 'an advantageous embodiment, time stamp counter **145** is associated with a conventional system clock (not shown) of processing system **100**'." (Chatterjee Decl. at 22.) Based on the generally accepted meaning of "time stamp counter," one of ordinary skill in the art would have understood that time stamp counter identifies a particular structure beyond just a general purpose computer. Indeed, when examining a particular piece of software or hardware, I believe that one of ordinary skill in the art would be able to easily ascertain whether or not it is a time stamp counter. And as Dr. Chatterjee acknowledges, the '371 patent expressly discloses that the time stamp counter can be associated with a conventional system clock, which is consistent with what first comes to mind when I, or in my view, a person of ordinary skill in the art thinks of implementations of a time stamp counter.

17

54.    Dr. Chatterjee, however, still contends that "time stamp counter" is "a purely functional concept that is not implemented with any particular structure and algorithm." (Chatterjee Decl. at 22.) I disagree.

55.    Dr. Chatterjee contends that "[f]or the same reasons discussed above for the 'controller' terms, the term 'time stamp counter' is also a nonce word." (Chatterjee Decl. at 22.) Dr. Chatterjee did not, however, contend that "controller" is a nonce word. To the extent Dr. Chatterjee does have that opinion, I disagree. The term "counter" has, and has had, a well understood meaning in the art; it is not merely a generic term, but indicates a particular structural concept that is well known to computer programmers, and in fact is a term that is regularly used by computer programmers to connote a particular structure. (*See*, *e.g.*, Ex. R at 228.) The prefix "time stamp" provides additional structure here as it informs one of ordinary skill in the art that the particular counter claimed relates to time stamps, which were well-known in the art. As such, one of ordinary skill in the art would be able to readily understand the meaning of time stamp counters, and identify implementations of time stamp counters. The specification's reference to the time stamp counter being a "controller" (4:64-5:4.) provides even further specificity with respect to the time stamp counter at issue here, not less for the reasons I explained above with respect to my discussion of controllers.

56.    I understand that Dr. Chatterjee contends that the '371 patent "fails to disclose a corresponding structure and algorithm for the function of the time stamp counter." (Chatterjee Decl. at 20.) As an initial matter, Dr. Chatterjee appears to assume that these terms are subject to 35 U.S.C § 112(f). I disagree. It is my understanding that because these terms do not recite a "means," they are presumed not to be subject to 35 U.S.C § 112(f). I further understand that Facebook bears the burden of proving that the claim terms fail to recite sufficiently definite

18

structure or else recite function without reciting sufficient structure for performing that function. The term "counter" has a well understood meaning to one of ordinary skill in the art and "time stamp" provides additional structure here. As I discussed above, far from being an ambiguous "nonce" term, time stamp counter is a specific thing that a person of ordinary skill in the art would recognize.

57.    In addition, the specification sets forth algorithms for the functioning of the time stamp counters. For example, Figure 1 shows that the time stamp counter (145) is connected to the time stamping controller (110):



58.    As described by the '371 patent, the time stamp counter can be associated with a conventional system clock. ('371 patent at 4:64-5:4 ("Time stamps are assigned to read-only transactions as a function of a time stamp counter 145, that is also a controller. Versioning manager 100 may advantageously use the time stamps to preserve an order of such received transactions. According to an advantageous embodiment, time stamp counter 145 is associated with a conventional system clock (not shown) of processing system 100.").)

59.    A conventional system clock provides the current time, as would be understood by one of ordinary skill in the art. Consequently, one of ordinary skill in the art would be able to provide an operative program implementing a time stamping counter based on the '371 patent's disclosure.

## VII.    The '181 Patent

60.    I understand that claims 5-9 of the '181 patent are asserted in this litigation.

19

61.    Independent claim 5 recites as follows:

5. A system for providing a user of an Internet-based communication system selective access to information relating to other users comprising: a server having means to store a list of users including user access type, identification, password and name; a user client having means for a user to input identification and password information; and means at said server to compare said user input information with stored information and based on user verification and user access type provide said user with a list of other users for which said user has access.

**A.    "means to store a list of users including user access type, identification, password and name"**

62.    This phrase appears in asserted claim 5 of the '181 patent.

63.    I understand that the parties agree that this term is subject to 35 U.S.C. § 112(f) and that the function is "storing a list of users including user access type, identification, password and name."[1]

64.    I understand that Dr. Chatterjee professes to be unable to identify an algorithm associated with this function disclosed in the '181 patent.

65.    At the time of the invention, and continuing through today, storing data was a function available on general purpose computers. Storing has been a fundamental function of general purpose computers since their inception. Indeed, without the function of storing, other processing is not possible, as a computer must process data that has been stored. The storing is typically achieved by components such as RAM (or random-access memory) or a hard disk as persons of ordinary skill in the art would recognize.

66.    The '181 patent specification describes the content of particular data that is stored:    "According to the invention the application maintains a list of users. For each user the

---

[1] I note that Dr. Chatterjee recites that the parties agree on the function, but lists a function that differs from the function proposed by Sound View.

application stores a user Id, a user password, a user type, and customer name." ('181 patent at 19:6-8.)It also describes the memory in which relevant data is stored: "The system information cache constitutes shared memory in RAM, in which the customer and user profile data together with the system data are stored." ('181 patent at 5:47-49.) And it describes how relevant portions of the application access that storage: "User, customer, service provider, and system information are stored in a shared memory segment, specifically the System Information Cache, accessible from the dynamically linked libraries." ('181 patent at 8:50-53.)

67.    Accordingly, one of ordinary skill in the art would understand that user access type, identification, password and name are stored in RAM and accessible through dynamically linked libraries. The '181 patent explains that dynamically linked library refers to the APIs, which are illustrated in Figure 3. ('181 patent at 5:16-18.)

68.    The '181 patent specification also describes a method for storing data to a hard disk in addition to storing data in RAM: "The information related to the customer, user, service provider, and system in general will also be backed up on the hard drive. The cron job will trigger the backup process periodically. The default interval is 15 minutes." ('181 patent at 8:60-63; *see also* 20:5-10 ("A separate background process is responsible for backing up the content of the shared memory. The process periodically updates the content to a backup file at a user-defined time interval. The backup file is used in system recovery and restart. The backup file is also updated right before system shutdown.").) A cron job is known to those of ordinary skill in the art as a task that is set to occur at a specific time or after a specific interval. Accordingly, one of ordinary skill in the art would understand that the above disclosures relate to a separate process that writes data from RAM (which is volatile, meaning it is erased on power-down) to hard disk (which is persistent) in order to create a backup of the information in RAM. As

21

described, that process initiates a backup every 15 minutes by default, but allows the user to define that interval, and is also initiated on shutdown.

69.    Both storing to hard disk and storing to RAM were well-known functions available on general purpose computers at the time. Indeed, programmers do not write their own methods for writing data to hard disk because that functionality is already provided for them. Similarly, programmers do not need to write their own methods for writing to RAM because that functionality is already provided.

70.    The '181 patent specification goes on to describe an exemplary method for optimizing access speed: "To optimize the performance, instead of storing the information onto the disk directly, Service Director writes the information into shared memory, and then updates the information to the disk periodically using a background control process." ('181 patent at 19:57-61.) Because accessing RAM for a read or a write is quicker than accessing a hard disk, creating a scenario in which normal access is to RAM rather than a hard disk will improve overall performance. (*See* '181 patent at 20:16-20 ("The shared memory is simply RAM that is used because access to a non-volatile storage device such as a hard drive is relatively slow. The fundamental idea is to read, in snapshot format from archive, into the shared memory and to write back again periodically.").)

71.    The specification additionally provides a flow chart showing exemplary steps for implementing the described backup: "A flow chart showing the backup procedure is given in FIG. 16." ('181 patent at 20:21-22.)



## FIG. 16

72.    Thus it is my opinion that the '181 patent discloses sufficient corresponding structure for this phrase. One of ordinary skill in the art would be able to provide not just an operative program implementing a means for storing, but a means for storing that includes enhancements for performance, based on the '181 patent's disclosure.

**B.    "means for a user to input identification and password information"**

73.    This term appears in asserted claim 5 of the '181 patent.

74.    I understand that the parties agree that this term is subject to 35 U.S.C. § 112(f) and that the function is "enabling a user to input identification and password information."

75.    I understand that Dr. Chatterjee professes to be unable to identify an algorithm associated with this function disclosed in the '181 patent.

76.     As described by the '181 patent, "the client interface is a WWW browser." ('181 patent at 4:16-19.) The '181 patent specification further describes the interactions between the web browser and web servers, which proceed similarly to other web-based services, which were well known in the art at the time. For example, the specification describes how "[a] request from the WWW browser" would be sent to the "back end server via the Web server." ('181 patent at 4:23-24.) The specification further mentions that the "back end server processes the web client's request and returns a composed page to the client via the Web server." ('181 patent at 4:26-28.) "HTML is used to compose Web pages." ('181 patent at 4:29.) HTML, or hyper-text markup language, is a standard language used to create web pages. The elements in an HTML file describe to the web browser how the web page should be rendered to the user. One of ordinary skill in the art was well-familiar with HTML and the ability to view web pages retrieved from web servers in a web browser.

77.     Figure 3 illustrates "the make up of the HTML-CGI based software architecture." ('181 patent at 2:43-44.)

24



FIG. 3

78.    As described in the specification "[e]ach action taken by a service end-user triggers a lightweight CGI process . . . . A corresponding HTML page is then generated as the response." ('181 patent at 4:56-61.) "The CGI parser provides a lightweight CGI program to parse incoming parameters and invoke the corresponding WEB Services API. It consists of a set of CGI programs wherein each corresponds to a user request action. Each user request from either a service user or the system administrator invokes a CGI program on the Web server. Each CGI program does the following: parses the web CGI parameters; invokes a WEB Services API routine using the parsed CGI parameters as arguments; and returns the result to the Web browser. Each CGI program returns the next HTML screen page of the user request." ('181 patent at 4:65-5:11.) That is, that CGI parser invokes CGI programs for each user request. CGI is the common gateway interface. ('181 patent at 4:34-35 ("common gateway interface (CGI)").) It is a specific interface that allows web servers to pass client requests to programs that dynamically generate

25

web pages, for example, by processing input from forms. It specifies parameters for the server to make available to CGI scripts and allows for a common understanding of where information will be available (e.g., the variables the script can access to determine aspects of the request) and what it denotes. As described, those CGI programs return composed web pages to the client, or web browser. It is through the composed webpage that a user interacts with the application.

79.      Figures 4 and 5 "depict[] information flow between client and server in the multiple login process" and show "a flow diagram illustrating the multiple login process," respectively. ('181 patent at 2:45-48.)

80.      The flow diagram of Figure 5 begins by showing that the Web server "prompts for user ID and password." ('181 patent at Fig. 5.) The '181 patent specifies that the prompt for user ID and password is done in response to a request for access. (*See* '181 patent at 12:47-49 ("When a user requests access to the SD application, the application requires the user to enter a user Id and a user password.").) As discussed above, the '181 patent specifies that communications take place over the World Wide Web between a Web browser and a Web server, and that the Web server returns composed web pages to the browser. This is illustrated in Figures 3 and 4. Accordingly, one of ordinary skill in the art at the time would have understood that prompting for user ID and password as shown in Figure 5 was accomplished using a composed web page, which provides the structure for the user to input a user ID and password.

81.      As one of ordinary skill in the art would have understood, web pages prompt users for input to submit to web servers using, for example, forms. For example, the '181 patent's specification discusses the use of forms to submit data such as "user log on id" and "user name." ('181 patent at 17:42-43.) As the specification mentions, "a 'form' is a standard feature in HTML 3.0 and later." ('181 patent at 18:24-26.)

26

82.    Thus, it is my opinion that the '181 patent discloses sufficient corresponding structure for this phrase.

83.    Additionally, one of ordinary skill in the art would be able to provide an operative program implementing a means for inputting based on the '181 patent's disclosure. As discussed above, the '181 patent discusses providing HTML pages to a web browser via CGI scripts, and structures for receiving user input in HTML pages, such as forms, are disclosed by the '181 patent and one of ordinary skill in the art reading that disclosure would be able to provide a program implementing the claimed means.

**C.    "means at said server to compare said user input information with stored information and based on user verification and user access type provide said user with a list of other users for which said user has access"**

84.    This term appears in asserted claim 5 of the '181 patent.

85.    I understand that the parties agree that this term is subject to 35 U.S.C. § 112(f) and that the function is "comparing said user input information with stored information and based on user verification and user access type providing said user with a list of other users for which said user has access." [2]

86.    I understand that Dr. Chatterjee professes to be unable to identify an algorithm associated with this function disclosed in the '181 patent.

87.    However, at the time of the invention comparing data was a function available on general purpose computers. Additionally, as Dr. Chatterjee acknowledges, the '181 patent states that "[t]he application validates the information provided against the list of users stored in the

---

[2] I note that Dr. Chatterjee recites that the parties agree on the function, but lists a function that differs from the function proposed by Sound View.

application," ('181 patent at 12:49-51), and provides a figure outlining steps of an exemplary log

in process, ('181 patent at Fig. 5). (Chatterjee Decl. at 26.)

88.     As discussed in the '181 patent specification, "FIG. 5 is a flow diagram

illustrating the multiple login process of FIG. 4." ('181 patent at 2:47-48.)



89.     The '181 patent further describes this process and the related structures:  "Login

may succeed or fail. Failure reasons are invalid password, disabled account, non-existent

account, multiple logins, server status locked, or unavailable service. Upon user login, a login

CGI program is fired up. The Login [CGI] uses the system shared memory's simple user

database for user access authorization. If login is successful, the CGI program calls Web API,

28

which again calls System API, to construct the users welcome screen. System then changes the status of the user account to active." ('181 patent at 9:57-65.) That is, the Login CGI as described, is the structure that compares user input information with stored information and based on user verification and user access type provides the user with a list of other users for which the user has access. It performs a comparison to verify authorization using the system shared memory's simple user database. Then, if authorization is successful, the Login CGI calls Web API, which again calls System API, to construct the user's welcome screen.

90.    A described above, the '181 patent explains that CGI is the common gateway interface. ('181 patent at 4:34-35 ("common gateway interface (CGI)").) It is a specific interface that allows web servers to pass client requests to programs that dynamically generate web pages, for example, by processing input from forms. It specifies parameters for the server to make available to CGI scripts and allows for a common understanding of where information will be available (e.g., the variables the script can access to determine aspects of the request) and what it denotes. CGI scripts were well known by those of ordinary skill in the art.

91.    APIs, or application programming interfaces are interfaces that specify the method of communication between different components of a software system. For example, the '181 patent discusses APIs that allow CGI scripts to access information stored by the application.

92.    The '181 patent further describes the process of comparison. As described, the application stores a user ID and password so that when a user requests access, the input user ID and password may be validated against the stored values to determine if they match. (*See* '181 patent at 12:46-47 ("For each user the application stores a user Id, a user password, status, and an IP address. When a user requests access to the SD application, the application requires the user to enter a user Id and a user password. The application validates the information provided against

the list of users stored in the application. If the user name and password matches, the application checks the user's status in the application. If the user's status is 'enabled' then the user is logged onto the system and the user's status is changed to 'active'.".) One of ordinary skill in the art would understand that validating and matching are methods of comparing.

93.    As described by the '181 patent, the list of other users for which said user has access is displayed on the welcome page as a drop box selection menu. (*See* '181 patent at 9:34-36 ("There is a drop box selection menu that allows the user to switch to another customer portfolio and act as a user from that customer.").) That drop box selection menu is also shown in Figure 13:



**FIG. 13**

94.    The Login CGI constructs the welcome page, and the drop box selection menu is one aspect of that welcome page. In one embodiment the Login CGI produces a drop box selection menu as shown above.

95.    Thus it is my opinion that the '181 patent discloses sufficient corresponding structure for this phrase.

30

96.    Additionally, one of ordinary skill in the art would be able to provide an operative program implementing a means for comparing and providing as described based on the '181 patent's disclosure. As discussed above, CGI provides a specification allowing CGI scripts to access request information, such as user input passed from a web browser to the web server via a form. The '181 patent also specifies user information to store and to compare user input to that information by, for example, matching. Finally, the login CGI constructs a login page that provides users with a list of other uses, such as in the form of drop box selection menus described by the '181 patent.

## VIII.    The '786 Patent

97.    I understand that claims 1-4 and 7 of the '786 patent is asserted in this litigation.

98.    Independent claim 1 recites as follows:

1. A system for authorizing a user of a client to have access to a server via the Internet comprising:
    means in said client for inputting a user identification (ID) and user password;
    means in said client for storing a unique client address;
    communication means at said client for passing said ID, password and address to said server via said Internet in response to a request therefrom;
    means at said server to store information respecting said client and to compare said stored information with said user ID and user password;
    means at said server to store dynamic status information respecting said user, said dynamic status information being one of enabled, disabled or active; and
    means to authorize log in of said user if said ID and password agree with said stored information and if said user status is enabled.

## A.    "means in said server for inputting a user identification (ID) and user password"

99.    This term appears in asserted claim 1 of the '786 patent.

100.    I understand that the parties agree that this term is subject to 35 U.S.C. § 112(f) and that the function is "enabling a user to input identification and password information."

31

101.    I understand that Dr. Chatterjee professes to be unable to identify an algorithm associated with this function disclosed in the '786 patent.

102.    As described by the '786 patent, "the CSM Service Director client interface is a WWW browser." ('786 patent at 4:24-27.) The '786 patent specification further describes the interactions between the web browser and web servers, which proceed similarly to other web-based services, which were well known in the art at the time. For example, the specification describes how "[a] request from the WWW browser" would be sent to the "back end server via the Web server." ('786 patent at 4:31-32.) This disclosure mirrors the disclosure in the '181 patent explained above.

103.    Figure 3 illustrates "the make up of the HTML-CGI based software architecture." ('786 patent at 2:53-54.)



104.    As described in the specification "[e]ach action taken by a service end-user triggers a lightweight CGI process . . . . A corresponding HTML page is then generated as the

32

response." ('181 patent at 4:56-61.) "The CGI parser provides a lightweight CGI program to parse incoming parameters and invoke the corresponding WEB Services API. It consists of a set of CGI programs wherein each corresponds to a user request action. Each user request from either a service user or the system administrator invokes a CGI program on the Web server. Each CGI program does the following: parses the web CGI parameters; invokes a WEB Services API routine using the parsed CGI parameters as arguments; and returns the result to the Web browser. Each CGI program returns the next HTML screen page of the user request." ('181 patent at 4:65-5:11.) That is, that CGI parser invokes CGI programs for each user request, which return composed web pages to the client, or web browser. The specifics of this process are described in more detail above in my treatment of the '181 patent.

105.    Figures 4 and 5 "depict[] information flow between client and server in the multiple login process" and show "a flow diagram illustrating the multiple login process," respectively. ('786 patent at 2:45-48.)[3]



**FIG. 4**

---

[3] I have used Figures 4 and 5 from the '181 patent here as those figures show the same content but are more legible.



FIG. 5

106.    The flow diagram of Figure 5 begins by showing that the Web server "prompts for user ID and password." ('786 patent at Fig. 5.) The '786 patent specifies that the prompt for user ID and password is done in response to a request for access. (*See* '786 patent at 13:6-8 ("When a user requests access to the SD application, the application requires the user to enter a user Id and a user password.").) As discussed above, the '786 patent specifies that communications take place over the World Wide Web between a Web browser and a Web server, and that the Web server returns composed web pages to the browser. This is illustrated in Figures 3 and 4. Accordingly, one of ordinary skill in the art at the time would have understood

34

that prompting for user ID and password as shown in Figure 5 was accomplished using a composed web page, which provides the structure for the user to input a user ID and password.

107.    The '786 patent's specification discusses the use of forms to submit data such as "user log on id" and "user name." ('786 patent at 18:30-39.) As the specification mentions, "a 'form' is a standard feature in HTML 3.0 and later." ('786 patent at 18:37.) This further supports the fact that one of ordinary skill in the art would have understood that web pages prompt users for input to submit to web servers using, for example, forms.

108.    Thus, it is my opinion that the '786 patent discloses sufficient corresponding structure for this phrase.

109.    Additionally, one of ordinary skill in the art would be able to provide an operative program implementing a means for inputting as described based on the '786 patent's disclosure. As discussed above, the '786 patent discusses providing HTML pages to a web browser via CGI scripts and structures for receiving user input in HTML pages, such as form, were both disclosed by the '181 patent and well-known to those of ordinary skill in the art.

**B.      "means in said client for storing a unique client address"**

110.    This term appears in asserted claim 1 of the '786 patent.

111.    I understand that the parties agree that this term is subject to 35 U.S.C. § 112(f) and that the function is "storing a unique client address."

112.    I understand that Dr. Chatterjee professes to be unable to identify an algorithm associated with this function disclosed in the '786 patent.

113.    At the time of the invention storing data was a function available on general purpose computers. Storing has been a fundamental function of general purpose computers since their inception. Indeed, without the function of storing other processing is not possible, as a

35

computer must process data that has been stored. The storing is typically achieved by components such as RAM (or random-access memory) or a hard disk as persons of ordinary skill in the art would recognize.

114.   Figure 4 "illustrates the flow of information between the client and server." ('786 patent at 13:49-50.)



**FIG. 4**

115.   As described by the '786 patent, "[t]he client sends a TCP/IP message containing user Id and password to the server. The IP address of the client is included in the TCP/IP message." ('786 patent at 13:50-52.) This is shown in "1" of Figure 4, above.

116.   TCP/IP stands for Transmission Control Protocol/Internet Protocol. Together, the Transmission Control Protocol and Internet Protocol specify how the majority of data sent over the Internet is packetized, addressed, transmitted, and received.

117.   Internet Protocol version 4 ("IPv4"), published in 1981, is the predominant solution used for Internet communications to this day.[4] IPv4 covers two basic functions, 1) addressing information to be sent from one computer to another and 2) fragmenting and then

---

[4] Internet Protocol version 6 was developed and published as RFC 2460, but has not yet been adopted by a majority of users. To avoid confusion, IPv6 is not substantially different for the purposes of my discussion, though the particulars of implementation differ.

reassembling the data sent, for example when a datagram is transmitted over networks with varying maximum sizes. (*See* RFC 791 at 1-2.)

118.    IPv4 specifies a header containing information used to route IP packets or datagrams over, for example, the Internet:

```
 0                   1                   2                   3
 0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7 8 9 0 1
+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+
|Version|  IHL  |Type of Service|          Total Length         |
+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+
|         Identification        |Flags|      Fragment Offset    |
+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+
|  Time to Live |    Protocol   |         Header Checksum        |
+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+
|                       Source Address                          |
+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+
|                    Destination Address                        |
+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+
|                    Options                    |    Padding     |
+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+-+
```

119.    The "Source Address" and "Destination Address" specify the source of the communication and the destination of the communication. They are frequently analogized as the return address and recipient address of a common envelope sent through the postal service. The source address is the IP address of the computer sending the communication and the destination address is the IP address of the target. In the communication shown in Figure 4 above and discussed in the '786 patent, the source address is the client's IP address and the destination address is the web server's IP address.

120.    As the name of this protocol suggests, the Internet is an IP network and communications over the Internet consist of IP packets.

121.    The Transmission Control Protocol sits above the Internet Protocol in what is commonly referred to as the "stack" and ensures the reliable, orderly delivery of IP packets for applications. (*See* RFC 793 at 1-2.)

37

122.    Those of ordinary skill in the art were well familiar with TCP/IP communications and the basic requirements of a source address and a destination address. Application programmers do not specify the details of TCP/IP communications (other than addressing). Instead implementation of TCP/IP is provided by the operating systems required to run applications (e.g., Windows, Mac, Unix, and Linux).

123.    Thus it is my opinion that the '786 patent discloses sufficient corresponding structure for this phrase.

124.    Additionally, one of ordinary skill in the art would be able to provide an operative program implementing a means for storing as described based on the '786 patent's disclosure.

**C.    "communication means at said client for passing said ID, password and address to said server via said Internet in response to a request therefrom"**

125.    This term appears in asserted claim 1 of the '786 patent.

126.    I understand that the parties agree that this term is subject to 35 U.S.C. § 112(f) and that the function is "passing said ID, password and address to said server via said Internet in response to a request therefrom."

127.    I understand that Dr. Chatterjee acknowledges that "[t]he '786 patent does discuss storing information and comparing information," (Chatterjee Decl. at 31), but professes to be unable to identify an algorithm associated with this function disclosed in the '786 patent.

128.    As I discuss above in paragraphs 116 through 123, the Transmission Control Protocol and Internet Protocol were well known by those of ordinary skill in the art. And the specification specifically identifies TCP messages as the mechanism for passing certain types of information to the server, including specifically the ID, password and address.

129.    Communicating data via the Internet was a basic function of general purpose computers at the time. Indeed, unless the general purpose computer provides for communicating data via the Internet it will not be possible, as network hardware (a basic component of a computer) is physically connected to a network or provides for transmission wirelessly. However, the mechanism for passing data could vary. Using TCP/IP messages is one way to pass such information in the server, and it is the way that is described in the patent.

130.    Figure 4 "illustrates the flow of information between the client and server." ('786 patent at 13:49-50.)



**FIG. 4**

131.    The connection between the client and server above implies the presence of networking hardware on the computer, as discussed above. Motherboards generally provide an onboard network port, though networking hardware exists as independent cards connected to the system via a bus, as well.

132.    As stated by the '786 patent:  "The client sends a TCP/IP message containing user Id and password to the server. The IP address of the client is included in the TCP/IP message." ('786 patent at 13:50-52.) That is, the means by which the user ID, password, and address are communicated from the client to the server is a TCP/IP message. As shown in Figure 4, that communication is sent over the "WWW INTERNET" to the server. As discussed above, the

39

Internet is based on the Internet Protocol, and transmissions over the Internet are made using that protocol. Indeed, it is the Internet Protocol that allows messages to reach their intended recipients on the Internet—the messages are passed from one server to another in order to reach the destination specified in the IP header.

133.    Thus it is my opinion that the '786 patent discloses sufficient corresponding structure for this phrase.

134.    Additionally, one of ordinary skill in the art would be able to provide an operative program implementing a communication means as described based on the '786 patent's disclosure. As discussed above with respect to the means in said client for storing a unique client address, a person of ordinary skill in the art understood how to cause a TCP/IP message to be created and then communicated across a network such as the Internet. Indeed, common programming languages provide this functionality. Accordingly, the disclosure above explains how to implement this function to a person of ordinary skill in the art.

**D.    "means at said server to store information respecting said client and to compare said stored information with said user ID and user password"**

135.    This term appears in asserted claim 1 of the '786 patent.

136.    I understand that the parties agree that this term is subject to 35 U.S.C. § 112(f) and that the function is "storing information respecting said client and comparing said stored information with said user ID and user password."

137.    I understand that Dr. Chatterjee professes to be unable to identify an algorithm associated with this function disclosed in the '786 patent.

138.    At the time of the invention storing data was a function available on general purpose computers. As I discuss above with respect to the '181 patent, which shares an almost

40

identical specification, storing has been a fundamental function of general purpose computers since their inception. Indeed, without the function of storing other processing is not possible, as a computer must process data that has been stored.

139.    Just like the '181 patent specification, the '786 patent specification describes the content of particular data that is stored:  "According to the invention the application maintains a list of users. For each user the application stores a user Id, a user password, a user type, and customer name." ('786 patent at 13:4-6.)

140.    It also describes the memory in which relevant data is stored:  "The system information cache constitutes shared memory in RAM, in which the customer and user profile data together with the system data are stored." ('786 patent at 5:57-59.)

141.    And it describes how relevant portions of the application access that storage: "User, customer, service provider, and system information are stored in a shared memory segment, specifically the System Information Cache, accessible from the dynamically linked libraries." ('786 patent at 9:2-5.) As described above, the dynamically linked libraries refers to the APIs illustrated in, for example, Figure 3.

142.    The '786 patent specification also describes a method for storing data to a hard disk in addition to storing data in RAM:  "The information related to the customer, user, service provider, and system in general will also be backed up on the hard drive. The cron job will trigger the backup process periodically. The default interval is 15 minutes." ('786 patent at 9:13-16; *see also id.* at 20:16-20 ("A separate background process is responsible for backing up the content of the shared memory. The process periodically updates the content to a backup file at a user-defined time interval. The backup file is used in system recovery and restart. The backup

41

file is also updated right before system shutdown.").) I describe this process in detail above with respect to the '181 patent.

143.    Both storing to hard disk and storing to RAM were well-known functions available on general purpose computers at the time. Indeed, programmers do not write their own methods for writing data to hard disk because that functionality is already provided. Similarly, programmers do not need to write their own methods for writing to RAM because that functionality is already provided.

144.    Just like the '181 patent, the '786 patent specification goes on to describe an exemplary method for optimizing access speed:  "To optimize the performance, instead of storing the information onto the disk directly, Service Director writes the information into shared memory, and then updates the information to the disk periodically using a background control process." ('786 patent at 20:1-5; *see also id.* at 20:29-33 ("The shared memory is simply RAM that is used because access to a non-volatile storage device such as a hard drive is relatively slow. The fundamental idea is to read, in snapshot format from archive, into the shared memory and to write back again periodically.").)

145.    The specification additionally provides a flow chart showing exemplary steps for implementing the described backup:  "A flow chart showing the backup procedure is given in FIG. 16." ('786 patent at 20:34-35.)



# FIG. 16

146.    Accordingly, the corresponding structure for a means at said server to store information respecting said client is sufficiently disclosed in the '786 patent. Additionally, one of ordinary skill in the art would be able to provide an operative program implementing storing as described based on the '786 patent's disclosure, which describes storing in RAM as well as on hard disk and an exemplary method for duplicating information from RAM to hard disk.

147.    My opinions regarding the corresponding structure for comparing said stored information with said user ID and user password are similar to my opinions regarding the '181 patent.

148.    As I discuss above, at the time of the invention comparing data was a function available on general purpose computers.

43

149.    Additionally, as Dr. Chatterjee acknowledges, the '181 patent states that "[t]he application validates the information provided against the list of users stored in the application," ('181 patent at 12:49-51), and provides a figure outlining steps of an exemplary log in process, ('181 patent at Fig. 5). (Chatterjee Decl. at 26.) The '786 patent makes the same disclosures.

150.    As discussed in the '786 patent specification, "FIG. 5 is a flow diagram illustrating the multiple login process" of FIG. 4. ('786 patent at 13:60-61.)



151.    The '786 patent further describes this process and the related structures: "Login may succeed or fail. Failure reasons are invalid password, disabled account, non-existent account, multiple logins, server status locked, or unavailable service. Upon user login, a login

44

CGI program is fired up. The Login [CGI] uses the system shared memory's simple user database for user access authorization. If login is successful, the CGI program calls Web API, which again calls System API, to construct the users welcome screen. System then changes the status of the user account to active." ('786 patent at 10:12-20.) That is, the Login CGI as described is the structure that compares user input information with stored information and based on user verification and user access type provides said user with a list of other users for which said user has access. It performs a comparison to verify authorization using the system shared memory's simple user database. Then, if authorization is successful, the Login CGI calls Web API, which again calls System API, to construct the users welcome screen.

152.    As the '786 patent explains, CGI is the common gateway interface. ('786 patent at 4:44 ("common gateway interface (CGI)").) It is a specific interface that allows web servers to pass client requests to programs that dynamically generate web pages, for example, by processing input from forms. It specifies parameters for the server to make available to CGI scripts and allows for a common understand of where information will be available (e.g., the variables the script can access to determine aspects of the request) and what it denotes. CGI scripts were well known by those of ordinary skill in the art.

153.    The '786 patent further describes the process of comparison. As described, the application stores a user ID and password so that when a user requests access, the input user ID and password may be validated against the stored values to determine if they match. (*See* '786 patent at 13:5-14 ("For each user the application stores a user Id, a user password, status, and an IP address. When a user requests access to the SD application, the application requires the user to enter a user Id and a user password. The application validates the information provided against the list of users stored in the application. If the user name and password matches, the application

checks the user's status in the application. If the user's status is 'enabled' then the user is logged onto the system and the user's status is changed to 'active'.").) One of ordinary skill in the art would understand that validating and matching are methods of comparison.

154.     Thus it is my opinion that the '786 patent discloses sufficient corresponding structure for this phrase.

155.     Additionally, one of ordinary skill in the art would be able to provide an operative program implementing a means for storing and comparing as described based on the '786 patent's disclosure. As I discuss above, the '786 patent describes storing information to both RAM and hard disk, as well as a method for duplicating information from RAM to hard disk. It additionally describes methods for comparing information received from a user against that stored information in order to, for example, authenticate a user for login. Accordingly, the disclosure above explains how to implement this function to a person of ordinary skill in the art.

**E.     "means at said server to store dynamic status information respecting said user, said dynamic status information being one of enabled, disabled or active"**

156.     This term appears in asserted claim 1 of the '786 patent.

157.     I understand that the parties agree that this term is subject to 35 U.S.C. § 112(f) and that the function is "storing dynamic status information respecting said user."

158.     I understand that Dr. Chatterjee admits that "the patent does disclose a 'status' associated with a user, that 'user profile data' is stored in shared memory, and that information related to a user is backed up on a hard drive," (Chatterjee Decl. at 32 (citing '786 patent at 5:57-59, 9:13-15, 13:5-6)), but professes to be unable to identify an algorithm associated with this function disclosed in the '786 patent.

159.    It is undisputed that the '786 patent discusses storing status information. (*See*, *e.g.*, '786 patent at 13:4-6 ("In accordance with this aspect the application maintains a list of users. For each user the application stores a user Id, a user password, status, and an IP address.").) One of ordinary skill in the art would have readily understood status information to be information regarding status. Dynamic status information would be understood by a person of ordinary skill in the art as changeable status information, based on the fact that dynamic in this context simply means something that can change.

160.    At the time of the invention storing data was a function available on general purpose computers. As I discuss above, storing has been a fundamental function of general purpose computers since their inception. Indeed, without the function of storing other processing is not possible, as a computer must process data that has been stored.

161.    As the '786 patent describes in its specification, a login CGI uses the system shared memory's simple user database, Web API, and System API to handle login requests: "Upon user login, a login CGI program is fired up. The Login CGI uses the system shared memory's simple user database for user access authorization. If login is successful, the CGI program calls Web API, which again calls *System API*, to construct the users welcome screen. *System* then changes the status of the user account to active." ('786 patent at 10:15-20 (emphasis added).) As described by the specification, it is the System API that initiates the storing of status information to the RAM or hard disk.

162.    Figure 3 illustrates "the make up of the HTML-CGI based software architecture." ('786 patent at 2:48-49.)



FIG. 3

163.    As shown in Figure 3, the System API accesses the "System Information Cache" and the "Database Utility API." (*See also* '786 patent at 9:2-5 ("User, customer, service provider, and system information are stored in a shared memory segment, specifically the System Information Cache, accessible from the dynamically linked libraries.").) And as illustrated in Figure 3, the Database Utility API is between the System API and the Database.

164.    The '786 patent also describes the memory in which relevant data is stored: "The system information cache constitutes shared memory ***in RAM***, in which the customer and user profile data together with the system data are stored." ('786 patent at 5:57-59 (emphasis added).)

165.    The '786 patent specification also describes a method for storing data to a hard disk in addition to storing data in RAM: "The information related to the customer, user, service provider, and system in general will also be backed up on the hard drive. The cron job will trigger the backup process periodically. The default interval is 15 minutes." ('786 patent at 9:13-

48

16; *see also id.* 20:16-20 ("A separate background process is responsible for backing up the content of the shared memory. The process periodically updates the content to a backup file at a user-defined time interval. The backup file is used in system recovery and restart. The backup file is also updated right before system shutdown.").) This process is described in detail above.

166.    Both storing to hard disk and storing to RAM were well-known functions available on general purpose computers at the time. Indeed, programmers do not write their own methods for writing data to hard disk because that functionality is already provided. Similarly, programmers do not need to write their own methods for writing to RAM because that functionality is already provided.

167.    The '786 patent specification goes on to describe an exemplary method for optimizing access speed:  "To optimize the performance, instead of storing the information onto the disk directly, Service Director writes the information into shared memory, and then updates the information to the disk periodically using a background control process." ('786 patent at 20:1-5; *see also id.* at 20:29-33 ("The shared memory is simply RAM that is used because access to a non-volatile storage device such as a hard drive is relatively slow. The fundamental idea is to read, in snapshot format from archive, into the shared memory and to write back again periodically.").)

168.    The specification additionally provides a flow chart showing exemplary steps for implementing the described backup:  "A flow chart showing the backup procedure is given in FIG. 16." ('786 patent at 20:34-35.)



# FIG. 16

169.    Thus it is my opinion that the '786 patent discloses sufficient corresponding structure for this phrase.

170.    Additionally, one of ordinary skill in the art would be able to provide an operative program implementing a means to store as described based on the '786 patent's disclosure. As discussed above, the '786 patent discloses storing information such as dynamic status information in RAM and additionally discloses storing that data on hard disk. As discussed above, storing data to RAM or to hard disk is a function provided by a general purpose computer for application programmers. Accordingly, one of ordinary skill in the art would understand how to implement the storing of dynamic status information based on the '786 patent's disclosure.

171.    I understand that Facebook contends that the dynamic status information stored cannot be more than a single value *because* it is stored. That would not be the understanding of

50

one of ordinary skill in the art. One of ordinary skill in the art would understand storing information to encompass storing data in many different forms, including, but not limited to, one or multiple values. To a general purpose computer, the data stored is just data: it is represented by bits and can be formatted in various ways. Nothing in the '786 patent would lead one of ordinary skill in the art to believe that the stored data must be stored in a particular form. Regardless of the format of the data, a computer must interpret the data to understand the information it represents. Neither does the '786 patent suggest that information that is checked or changed must only correspond to a single value.

**F.    "means to authorize log in of said user if said ID and password agree with said stored information and if said user status is enabled"**

172.    This term appears in asserted claim 1 of the '786 patent.

173.    I understand that the parties agree that this term is subject to 35 U.S.C. § 112(f) and that the function is "authorizing log in of said user if said ID and password agree with said stored information and if said user status is enabled."

174.    I understand that Dr. Chatterjee professes to be unable to identify an algorithm associated with this function disclosed in the '786 patent.

175.    As discussed above, the '786 patent describes how a login CGI uses the system shared memory's simple user database, Web API, and System API to handle login requests: "Upon user login, a login CGI program is fired up. The Login CGI uses the system shared memory's simple user database for user access authorization. If login is successful, the CGI program calls Web API, which again calls System API, to construct the users welcome screen." ('786 patent at 10:15-19.) I provided a discussion of CGI scripts above.

51

176.    As further detailed by the '786 patent, "[i]f the client is authorized the server returns a welcome page together with a JavaScript cookie, which contains the user Id, to the client." ('786 patent at 13:52-54; see also '786 patent at 13:34-37 ("It checks the user Id and password against the list stored in the application. It sends out a JavaScript cookie to the client after the user Id and password are validated.").) That cookie passed from the server to the client shows that authorization was successful and is passed in with future requests from the client to the server as authentication. ('786 patent at 13:55-57 ("The client browser matches the URL destination (domain) address to that of the cookie. It then sends the cookie together with the query to the server.").)

177.    Dr. Chatterjee claims that "a 'cookie' is simply a piece of data," but that is incorrect. The Microsoft Computer Dictionary (4th ed. 1999), which Dr. Chatterjee relies upon, provides additional detail regarding cookies:

> cookie  *n.* **1.** A block of data that a server returns to a client in response to a request from the client. **2.** On the World Wide Web, a block of data that a Web server stores on a client system. When a user returns to the same Web site, the browser sends a copy of the cookie back to the server. Cookies are used to identify users, to instruct the server to send a customized version of the requested Web page, to submit account information for the user, and for other administrative purposes. **3.** Originally an allusion to "fortune cookie," a UNIX program that outputs a different message, or "fortune," each time it is used. On some systems, the cookie program is run during user logon.

(Ex. 13, p. 113.)

178.    That definition is consistent with the discussion of cookies in the '786 patent. On the World Wide Web, over which the described system communicates, a cookie is data that a Web server stores on a client system so that subsequent requests from the browser on that client

52

system can pass back the cookie, for example, in order to identify the user as described in the '786 patent.

179.    One of ordinary skill in the art at the time was very familiar with the use of cookies, and specifically the use of cookies as a form of authorization. Indeed, authentication is one of the primary functions of cookies.

180.    Thus it is my opinion that the '786 patent discloses sufficient corresponding structure for this phrase.

181.    Additionally, one of ordinary skill in the art would be able to provide an operative program implementing a means to authorize as described based on the '786 patent's disclosure. As discussed above, the '786 patent discloses verifying or matching user input against stored information. The '786 patent discloses that a Login CGI performs that comparison a welcome page if login is successful. Accordingly, based on the '786 patent's disclosure, one of ordinary skill in the art could implement a CGI script for comparing a user name and password against stored information, as described, and provide a cookie authorizing access to the web site.

182.    I further understand that Facebook contends there is a "sequencing problem" with using a cookie for authorization. I disagree. Indeed, cookies are commonly used for authorization. As the '786 patent describes, the cookie is passed to the web browser with the welcome page if the user status is enabled, and then passed by the web browser to the web server with subsequent requests. As such, the cookie is the mechanism used to authorize the login if the user ID and password are verified and if the user status is enabled. If the user status is disabled, for example, the cookie will not be returned, even if the user ID and password are verified. The fact that the cookie passed back with subsequent requests from the web browser server as authorization is not a "problem" it shows that the cookie is the thing that shows that the user's

53

login is authorized. One of ordinary skill in the art would understand that the cookie is what authorizes the login based on the disclosure in the specification.

## IX.    The '486 Patent

183.    I understand that claim 19 of the '486 patent is asserted in this litigation.

184.    Independent claim 19 recites as follows:

19. A messaging system comprising:
    a messaging client;
    a messaging server;
    a computer network coupling the messaging client and the messaging server;
        the messaging client configured to:
            establish a message connection with the messaging server over the computer network using only hypertext-related protocols and a simple scripting language;
            receive a message connection response from the server indicating that the message connection is an open message connection;
            receiving message data of a first type containing the contents of a first message over the open message connection;
            receiving message data of a second type containing the contents of a second message over the open message connection;
            repeating the steps of receiving message data while maintaining the open message connection and while awaiting delivery of a message termination indicator indicating that a message associated with the message connection has been completely received by the messaging client;
        the messaging server configured to:
            establish a message connection with the messaging client over the computer network using only hypertext-related protocols and a simple scripting language;
            transmit a message connection response to the messaging client identifying the message connection has an open message connection;
            transmitting message data of a first type containing the contents of a first message from the messaging server over the open message connection to the messaging client;
            transmitting message data of a second type containing the contents of a second message over the open message connection to the messaging client;

54

repeating the steps of transmitting in order to provide a continuous stream of message data over the open message connection, the continuous stream of message data comprising a plurality of messages perceived by the messaging client as a single continuous message received over the open message connection for display on the messaging client independent of the operating system thereof and exclusive of proprietary messaging software residing and previously stored on the messaging client.

A.    **"messaging client" and "messaging client configured to . . ."**

185.    This term appears in asserted claim 19 of the '486 patent.

186.    I understand that Dr. Chatterjee acknowledges that one of ordinary skill in the art would know what a "client" is. (Chatterjee Decl. at 36.) Dr. Chaterjee, however, appears to equate the term "messaging client" with "computer," and based on that assumption concludes that "messaging client" does not "impart any structural significance."[5] (Chatterjee Decl. at 36-38.) I disagree.

187.    As would be understood by one of ordinary skill in the art, rather than meaning only a "computer," in order to be a "messaging client" a computer system must additionally include a message handler application (i.e., a web browser). (*See* '486 patent at 7:10-28 ("Other embodiments of the invention include a computer system, such as a computerized device, workstation, handheld or laptop computer, client, server or other device configured with software and/or circuitry to process all of the method operations disclosed herein as embodiments of the invention. In such embodiments, the client and/or server computer system includes a display (not

---

[5] Dr. Chatterjee compares computers to cameras, claiming that cameras come with functionality out-of-the-box. This statement should not be relevant as "messaging client" does not equate a only a "computer," but it is misleading. Both computers and cameras come with an operating system out of the box that enables operation—it does not require additional software or programming to do something useful. Indeed, while the operating systems for cameras are updated less frequently, they are still updated. A more generally accessible comparison might be a modern television or phone. Both come with an operating system and functionality out of the box, but those operating systems are occasionally updated, and users may add additional applications.

required, but typically present on the client), an input output interface (e.g., for receiving messages), a communications interface (e.g., a network interface), a memory (e.g., any type of computer readable medium), a processor and an interconnection mechanism connecting the display, the interface(s), the processor and the memory. In such embodiments, the memory system is encoded with a message handler application configured to perform either the client or server methods, that when performed on the processor, produces a message handler process that causes the computer system to perform any and/or all of the server or client method embodiments, steps and operations explained herein as embodiments of the invention.").) In other words, a messaging client computer system must operate a web browser; otherwise, it is only a computer system. (*See* '486 patent at 10:32-38 ("Each messaging client computer system 130 operates a client message handler 145 such as a web browser upon or within which (i.e., upon the display 140) is rendered an output area 135 within which messaging data or information can be displayed for a user of the messaging client computer systems 130."); *see also* '486 patent at 7:35-38 ("As an example, a web browser software application configured to operate as explained herein to receive the message page and display messages is considered an embodiment of the invention.").)

188. As Dr. Chatterjee acknowledges, "[t]he '486 patent relates generally to a messaging system, and more specifically to a messaging system in which messages are received by a computer system using only an ordinary web browser, HTTP, HTML and JavaScript and without using specialized messaging software, Java applets or ActiveX software." (Chatterjee Decl. at 34; *see also* '486 patent at 3:50-58 ("The present invention is based in part of the observation that baseline off-the-shelf communications technologies such as standard web browser functionality, HTML, HTTP and the JavaScript are provided within almost all 'data-

56

connected' devices now being built, ranging from cell phones and small PDAs up to personal computers and powerful workstations. Because of this, embodiments of the invention provide an [sic] messaging system developed using these or equivalent core or baseline technologies.").) The specification further states that "[e]mbodiments of the invention provide a web-based multi-party near-real-time or 'instant' messaging system in which web clients can be configured to properly operate to exchange messages using HTML/HTTP and JavaScript, without requiring users of the system to download and install proprietary or customized messaging software applications or applets which operate using proprietary messaging protocols or Java." ('486 patent at 8:30-37.) That is, web clients (i.e., web browsers) are configured to exchange messages using HTML/HTTP and JavaScript. (*See* '486 patent at 21:10-15 ("This message programming script configures the client message handler 145 (i.e., resides within the web browser) to be able to display (i.e., when called upon to do so) message data contained within messages 221 once such messages 221 are received by the client message handler 145-1.").)

189. As is apparent from Mr. Chatterjee's statement, the client message handler that is required for a messaging client is a web browser throughout the '486 patent's specification. (*See, e.g.*, '486 patent at 11:11-13 ("the client message handler application 145-1 (e.g., the web browser) operating within the messaging client 130-1."), 12:1-2 ("the web browser client message handler 145-1 operating within the messaging client 130-1"), 13:44-45 ("messaging client 130-1 (i.e., to the client message handler web browser 145-1)"), 14:38-41 ("Generally, the message processing script 235 enables the messaging client web browser 145 to define an output area 135 for display of the contents of messages 221."), 12:64, 13:44-45, 14:45 ("the client message handler web browser 145"), 14:49-52 ("This message processing logic is embedded within the messaging page 220 and allows the web browser to define an output area 135 for the

57

display of the message data contents of an message 221."), 28:37-41 ("In particular, the processing illustrated in FIG. 7 is typically performed by a client message handler 145 such as a web browser operating within a messaging client computer system 130 controlled by a user 250.").)

190.    I understand that Dr. Chatterjee contends a "'messaging client' is a generic description of hardware or software that performs messaging functions" in part because the '486 patent states:  "It is to be understood that the system of the invention can be embodied strictly as a software program, as software and hardware, or as hardware alone." ('486 patent at 7:55-56.) As would have been understood by one of ordinary skill in the art, this statement in the specification is about the techniques discussed in the '486 patent generally, which can be embodied in for example a computer-readable medium, as discussed immediately before the statement Dr. Chatterjee cites. (*See* '486 patent at 7:32-54.) So claim 38, which is directed to "a computer-readable medium," may claim software while claim 19 requires devices. (*Compare* '486 patent at cl. 19 *with* '486 patent at cl. 38.)

191.    Dr. Chatterjee makes no direct contention that "messaging client" is a "nonce word," but later states that "[e]ven if the 'messaging client' may be a computer, it remains a nonce word" (Chatterjee Decl. at 37.) To the extent Dr. Chatterjee believes he has stated that opinion, I disagree. The term "client" has, and has had, a well understood meaning in the art; it is not merely a generic term, but indicates a particular structural concept that is well known to computer programmers, and in fact is a term that is regularly used by computer programmers to connote a particular structure. It is nothing like "module", "mechanism", "element", "device", which could be used to describe practically anything. The client-server architecture is a fundamental aspect of networked applications and those of ordinary skill in the art are familiar

58

with the meaning of client. For example, as discussed above, commonly-user web browsers are clients and web servers, from which web browsers request web pages, are servers. The term "messaging client" denotes a particular type of "client" as described in the '486 patent.

192.    I understand that Dr. Chatterjee also contends that the '486 patent "does not set forth an algorithm for how the client, alone or with the client message handler application, carries out the recited functions." (Chatterjee Decl. at 39.) As an initial matter, Dr. Chatterjee appears to assume that these terms are subject to 35 U.S.C § 112(f) because of his assertion that the term "client" essentially has no meaning, and would not be readily understood (i.e., that it is a nonce word). I disagree. It is my understanding that because these terms do not recite a "means," they are presumed not to be subject to 35 U.S.C § 112(f). I further understand that Facebook bears the burden of proving that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function. The term "client" has a well understood meaning to one of ordinary skill in the art. The prefix "messaging" provides additional meaning and structure here, as the "messaging client" of the '486 patent is a particular type of client and is discussed throughout the specification.  I do not think that Dr. Chatterjee has proven that client has no meaning and I do not think it would be possible to do so.

193.    In addition, the '486 patent specification provides examples of how a messaging client might be configured. For example, the specification describes a fully working example embodiment that was submitted to the patent office during prosecution. ('486 patent at 30:61-31:2 ("A fully working example embodiment of the invention including the aforementioned client and server system elements is disclosed in the Appendix submitted as part of the formerly referenced Provisional Application for patent referenced above. It is to be understood that

although the example system described in the Appendix implements only messaging, the same system can be configured to pass messages in real-time between any user interface within a web-browser and a server.").) The specification additionally recites JavaScript code for an example message processing script. (*See* '486 patent at 14:53-21:1.)

194.    Figure 4 illustrates an exemplary architecture of messaging clients interoperating with an exemplary messaging server:



FIG. 4

195.    The '486 patent provides further detail regarding an exemplary messaging client in Figure 7 and the corresponding discussion. (*See* '486 patent at 28:36-42.) For example, it goes through exemplary steps in which a web browser visits a web page and receives a message

processing script, which can process received messages and display those messages. (*See* '486 patent at 28:43-55, 28:56-59, 28:60-29:2, 29:3-13, 29:14-31).

196.    Thus it is my opinion that the '486 patent discloses sufficient corresponding structure, to the extent it is required. One of ordinary skill in the art would be able to provide an operative program implementing a configured messaging client based on the '486 patent's disclosure.

197.    I understand that Dr. Chaterjee contends the '486 patent "discusses using some combination of HTTP, HTML, and JavaScript in the system, but omits configuration details." (Chatterjee Decl. at 39.) I disagree. In making this contention, Dr. Chaterjee relies upon a portion of the '486 patent's specification:  "Embodiments of the invention provide a web-based multi-party near-real-time or 'instant' messaging system in which web clients can be configured to properly operate to exchange messages using HTML/HTTP and JavaScript, without requiring users of the system to download and install proprietary or customized messaging software applications or applets which operate using proprietary messaging protocols or Java. According to embodiments of the invention, no Java or ActiveX of any kind is required for implementation of the messaging system as explained herein." ('486 patent at 8:30-39.) As would have been understood by one of ordinary skill in the art, this statement does not connote that the patent specification omits configuration details, but rather is a statement that the patent specification provides the configuration required in order to allow web clients to "properly operate to exchange messages using HTML/HTTP and JavaScript, without requiring users of the system to download and install proprietary or customized messaging software applications or applets which operate using proprietary messaging protocols or Java." ('486 patent at 8:32-37.)

61

198.    As the specification later discusses, "the user desiring to engage in an [sic] messaging session with a messaging server 110 can do so from virtually any Web browser coupled to a computer network 101 such as the Internet. Accordingly, the user, for example, visiting a remote location such as a hotel in a remote city can simply obtain access to the Internet to a standard conventional web browser and can obtain access to messaging capabilities in order to communicate with other users or, as illustrated examples above, in order to receive signaling information regarding such things as telephone call status or states. The user does not need to be concerned with whether or not the browser application that he or she is using is equipped with a Java virtual machine (many are not equipped with such technology) **nor does the user need to be concerned with downloading and/or configuring the Web browser** that he or she is using with any other specific messaging technology (e.g., a plug-in) since conventional Web browsers support basic message display and processing script logic such as JavaScript functionality." ('486 patent at 26:18-36.)

199.    I understand that Facebook additionally contends that one of ordinary skill in the art would be confused as to whether the configuration capability elements beginning with receiving and repeating are infringed by capability or by configuration. I disagree. Claim 19 of the '486 patent clearly claims a "messaging client configured to" perform certain actions outlined in the claim. Based on that, one of ordinary skill in the art would understand that infringement does not require one to perform a method. Whether it is configured to receive or configured to receiving, configured to indicates that it must have that capability.

**B.    "messaging server" and "messaging server configured to . . ."**

200.    This term appears in asserted claim 19 of the '486 patent.

201.    I understand that Dr. Chatterjee acknowledges that one of ordinary skill in the art would know what a "server" is. (Chatterjee Decl. at 40, 42.)

202.    Dr. Chatterjee contends that "messaging server" is "a nonce word as used in the patent for all of the reasons discussed above for the term 'client.'" (Chatterjee Decl. at 40-41.) I disagree for the reasons stated above. The term "server" has, and has had, a well understood meaning in the art; it is not merely a generic term, but indicates a particular structural concept that is well known to computer programmers, and in fact is a term that is regularly used by computer programmers to connote a particular structure. It is nothing like "module", "mechanism", "element", "device", which could be used to describe practically anything. As I mention above with respect to client, the client-server architecture is a fundamental aspect of networked applications and those of ordinary skill in the art are familiar with the meaning of server. For example, as discussed above, commonly-user web browsers are clients and web servers, from which web browsers request web pages, are servers. The term "messaging server" denotes a particular type of "server" as described in the '486 patent.

203.    Additionally, as would be understood by one of ordinary skill in the art, rather than meaning only a "computer," in order to be a "messaging server" a computer system must additionally include a message handler application. (*See* '486 patent at 7:10-28 ("Other embodiments of the invention include a computer system, such as a computerized device, workstation, handheld or laptop computer, client, server or other device configured with software and/or circuitry to process all of the method operations disclosed herein as embodiments of the invention. In such embodiments, the client and/or server computer system includes a display (not required, but typically present on the client), an input output interface (e.g., for receiving messages), a communications interface (e.g., a network interface), a memory (e.g., any type of

computer readable medium), a processor and an interconnection mechanism connecting the display, the interface(s), the processor and the memory. In such embodiments, the memory system is encoded with a message handler application configured to perform either the client or server methods, that when performed on the processor, produces a message handler process that causes the computer system to perform any and/or all of the server or client method embodiments, steps and operations explained herein as embodiments of the invention.").) This is also illustrated in figures 1 and 4. (*See* '486 patent at Figs. 1, 4.)

204.    I understand that Dr. Chatterjee contends a "'messaging server' is a generic description of hardware or software that performs messaging functions" in part because the '486 patent states: "It is to be understood that the system of the invention can be embodied strictly as a software program, as software and hardware, or as hardware alone." ('486 patent at 7:55-56.) As I discuss above, one of ordinary skill in the art would understand that this statement in the specification is about the techniques discussed in the '486 patent generally, which can be embodied in for example a computer-readable medium, as discussed immediately before the statement Dr. Chatterjee cites. (*See* '486 patent at 7:32-54.) So claim 38, which is directed to "a computer-readable medium," may claim software while claim 19 requires devices. (*Compare* '486 patent at cl. 19 *with* '486 patent at cl. 38.)

205.    I understand that Dr. Chatterjee also contends that the '486 patent "does not set forth an algorithm for how the server, alone or with the server message handler application, carries out the recited functions." (Chatterjee Decl. at 42.) As an initial matter, Dr. Chatterjee appears to assume that these terms are subject to 35 U.S.C § 112(f) because of his assertion that the term "server" essentially has no meaning, and would not be readily understood (i.e., that it is a nonce word). I disagree. It is my understanding that because these terms do not recite a

"means," they are presumed not to be subject to 35 U.S.C § 112(f). I further understand that Facebook bears the burden of proving that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function. The term "server" has a well understood meaning to one of ordinary skill in the art. The prefix "messaging" provides additional meaning here, as the "messaging server" of the '486 patent is a particular type of server, as would be understood by one of ordinary skill in the art, and that type of server discussed throughout the specification. I do not think that Dr. Chatterjee has proven that server has no meaning and I do not think it would be possible to do so.

206.    In addition, the '486 patent specification explains how one of ordinary skill in the art might configured a messaging server. For example, the specification describes a fully working example embodiment that was submitted to the patent office during prosecution. ('486 patent at 30:61-31:2 ("A fully working example embodiment of the invention including the aforementioned client and server system elements is disclosed in the Appendix submitted as part of the formerly referenced Provisional Application for patent referenced above. It is to be understood that although the example system described in the Appendix implements only messaging, the same system can be configured to pass messages in real-time between any user interface within a web-browser and a server.").)

207.    Figure 4 illustrates an exemplary architecture of a messaging server interoperating with exemplary messaging clients:



FIG. 4

208.    The '486 patent provides further detail regarding an exemplary messaging server in Figure 2 and the corresponding discussion, just as in does with the exemplary messaging client discussed above. (*See* '486 patent at 13:1-5.) For example, it provides exemplary steps for interacting with a web browser to provide a message processing script and transmit messages to be processed by that script. (*See* '486 patent at 13:6-9, 13:10-13, 13:14-31, 13:37-41, 13:42-14:5, 14:6-32.)

66

209.    Thus it is my opinion that the '486 patent discloses sufficient corresponding structure, to the extent it is required. One of ordinary skill in the art would be able to provide an operative program implementing a configured messaging server based on the '486 patent's disclosure.

210.    I understand that Facebook additionally contends that one of ordinary skill in the art would be confused as to whether the configuration capability elements beginning with receiving and repeating are infringed by capability or by configuration. I disagree. Claim 19 of the '486 patent clearly claims a "messaging server configured to" perform certain actions outlined in the claim. Based on that, one of ordinary skill in the art would understand that infringement does not require one to perform a method.

### C.    "hyper-text related protocols"

211.    This term appears in asserted claim 19 of the '486 patent.

212.    Dr. Chatterjee contends that this term does not have an ordinary or customary meaning in the field of computer science, nor to one of skill in the art of the '486 patent, and further that the '486 patent provides no indication of its meaning. (*See* Chatterjee Decl. at 42.) I disagree.

213.    One of ordinary skill in the art understood the terms "hyper-text" and "protocol." Hypertext is text that includes hyperlinks, which those of skill in the art were well-familiar with. Indeed, web pages on the Internet make use of HTML, Hypertext Markup Language. Additionally, protocols are often used in the art as they set forth a common understanding that can be used to allow applications to interoperate. Moreover, the Hypertext Transport Protocol, used to enable access to web sites on the Internet, was very familiar to those of ordinary skill in the art.

214.    While describing the motivations for the inventions of the '486 patent, the specification states: "Conventional out-of-the-box or off-the shelf communications technologies such a web browser that can transfer and render Hypertext Markup Language (HTML) pages using the Hypertext Transport Protocol (HTTP) and that can support basic JavaScript functionality are thought by conventional messaging system designers to be generally insufficient on their own for development and support of advanced messaging features." ('486 patent at 3:41-49.)

215.    The specification goes on to describe how the "[t]he present invention is based in part of the observation that baseline off-the-shelf communications technologies such as standard web browser functionality, HTML, HTTP and the JavaScript are provided within almost all 'data-connected' devices now being built, ranging from cell phones and small PDAs up to personal computers and powerful workstations." ('486 patent at 3:50-55.) Because standard web browsers include HTML, HTTP, and JavaScript, the specification describes a "messaging system developed using these or equivalent core or baseline technologies." ('486 patent at 3:57-58.)

216.    Later, when describing its benefits, the specification goes on to state: "Embodiments of the system described herein thus make it possible to replace a proprietary message protocol between client and server by a **standard web protocol such as HTTP**. The benefits to the makers of such a system can include (but are not limited to) the ability to write a purely web-based rich UI which incorporates real-time server feedback, the ease of deploying/managing/upgrading such UI clients (only a URL needs to be distributed), and the simplicity gained by utilizing **standardized web protocols (HTTP over TCP and SSL)** which allow operation of embodiments of the invention to pass messages between firewalls which might otherwise exclude proprietary messaging protocols." ('486 patent at 31:24-35.)

217.    Dr. Chatterjee acknowledges that "[t]he '486 patent relates generally to a messaging system, and more specifically to a messaging system in which messages are received by a computer system using only an ordinary web browser, HTTP, HTML and JavaScript and without using specialized messaging software, Java applets or ActiveX software." (Chatterjee Decl. at 34; *see also* '486 patent at 8:30-37 ("Embodiments of the invention provide a web-based multi-party near-real-time or 'instant' messaging system in which web clients can be configured to properly operate to exchange messages using HTML/HTTP and JavaScript, without requiring users of the system to download and install proprietary or customized messaging software applications or applets which operate using proprietary messaging protocols or Java."), 29:53-58 ("Embodiments of the invention provide a messaging system that is capable of true multi-way communication in real-time (limited only by communication bandwidth between devices within the system), where the endpoint devices need ONLY be capable of supporting standard simple HTML and JavaScript.").)

218.    Additionally, one of skill in the art would understand that the Hypertext Transfer Protocol (HTTP) is used to request web pages on the Internet. A client (web browser) sends an HTTP request message to a web server. As described above, in order to send that request a connection must be made between the client and the server using TCP/IP. SSL may also be used to secure that connection, for example in the case of HTTPS (also known as HTTP over TLS, HTTP over SSL, and HTTP Secure). After the HTTP request is received, the server can then provide a response. In the case of a web page, that response will contain HyperText Markup Language (HTML). The web browser can then display the returned web page.

219.    Accordingly, one of ordinary skill in the art would understand this term in relation to the '486 patent.

D.    "simple scripting language"

220.    This term appears in asserted claim 19 of the '486 patent.

221.    Dr. Chatterjee contends that this term does not have an ordinary or customary meaning in the field of computer science, nor to one of skill in the art of the '486 patent, and further that the '486 patent provides no indication of its meaning. (*See* Chatterjee Decl. at 43-44.) I disagree.

222.    As discussed above, while describing the motivations for the inventions of the '486 patent, the specification states:    "Conventional out-of-the-box or off-the shelf communications technologies such a **web browser** that can transfer and render Hypertext Markup Language (HTML) pages using the Hypertext Transport Protocol (HTTP) and that can support **basic JavaScript** functionality are thought by conventional messaging system designers to be generally insufficient on their own for development and support of advanced messaging features." ('486 patent at 3:41-49.)

223.    The specification goes on to describe how the "[t]he present invention is based in part of the observation that baseline off-the-shelf communications technologies such as standard **web browser** functionality, HTML, HTTP and the **JavaScript** are provided within almost all 'data-connected' devices now being built, ranging from cell phones and small PDAs up to personal computers and powerful workstations." ('486 patent at 3:50-55.) Because standard web browsers include HTML, HTTP, and JavaScript, the specification describes a "messaging system developed using these or equivalent core or baseline technologies." ('486 patent at 3:57-58.)

224.    Again, Dr. Chatterjee acknowledges that "[t]he '486 patent relates generally to a messaging system, and more specifically to a messaging system in which messages are received by a computer system using only an ordinary web browser, HTTP, HTML and **JavaScript** and

without using specialized messaging software, Java applets or ActiveX software." (Chatterjee Decl. at 34; *see also* '486 patent at 8:30-37 ("Embodiments of the invention provide a web-based multi-party near-real-time or 'instant' messaging system in which web clients can be configured to properly operate to exchange messages using HTML/HTTP and **JavaScript**, without requiring users of the system to download and install proprietary or customized messaging software applications or applets which operate using proprietary messaging protocols or Java."), 29:53-58 ("Embodiments of the invention provide a messaging system that is capable of true multi-way communication in real-time (limited only by communication bandwidth between devices within the system), where the endpoint devices need ONLY be capable of supporting standard simple HTML and **JavaScript**.").)

225.    Though Dr. Chatterjee admits that the meaning of "scripting language" would be understood by those of ordinary skill in the art and that the specification identifies JavaScript as a simple scripting language, Dr. Chatterjee contends that this term "fails to inform with reasonable certainty those skilled in the art about the scope of the invention." (*See* Chatterjee Decl. at 44.) I disagree.

226.    As the '486 patent explains:  "JavaScript is a simple scripting language that conventional Web browsers support natively, whereas Java is a full-blown programming language that requires installation and operation of a Java virtual machine in order to operate." ('486 patent at 3:15-19.)

227.    The '486 patent goes on to state that "conventional messaging systems are implemented using more advanced technologies other than the simple baseline capabilities available to most all devices." ('486 patent at 3:32-35.)

228.    Accordingly, one of ordinary skill in the art would understand that simple scripting languages are those conventional Web browsers support natively, and that are part of the baseline capabilities available to most all devices. As opposed to those that require more advanced technologies, such as languages that require the installation and operation of a Java virtual machine.

## X.    The '860 Patent

229.    I understand that claims 1-3, 5, 7-10, 13, and 18 of the '860 patent are asserted in this litigation.

230.    Independent claim 1 recites as follows:

1. An apparatus for use in a computer network, the apparatus comprising:

at least one server within the network, the server being operative to process a client request generated by a client device to determine a particular client type associated with the client device, to retrieve web content identified in the client request, to retrieve one or more augmentation files associated with at least one of the web content and the particular client type, and to alter the retrieved web content in accordance with the one or more augmentation files, wherein the altered web content is delivered to the client device;

wherein the server parses the retrieved web content into one or more component structures, and subsequently applies a pattern matching process to recognize designated component structure subject to alteration in accordance with the one or more augmentation files; and

wherein the pattern matching process comprises comparing a given one of the component structures of the retrieved web content to predetermined component structures represented by respective tokens in the one or more augmentation files.

231.    Independent claim 13 recites as follows:

13. An apparatus for use in a computer network, the apparatus comprising:

at least one server within the network, the server being operative to process a client request generated by a client device to determine a particular client type associated with the client device, to retrieve web content identified in the client request, to retrieve one or more augmentation files associated with at least one of the web content and the particular client type, and to alter the

72

retrieved web content in accordance with the one or more augmentation files, wherein the altered web content is delivered to the client device;

wherein the client device comprises a virtual client device having a combination of a plurality of different sets of features provided by multiple distinct physical client devices.

232.    Independent claim 18 recites as follows:

18. A processing system comprising:

a web server operative to store web content; and

an interpolating proxy server at least temporarily coupled to the web server and operative to process a client request generated by a client device to determine a particular client type associated with the client device, to retrieve web content identified in the client request and stored on the web server, to retrieve one or more augmentation files associated with the web content and the particular client type, and to alter the retrieved web content in accordance with the one or more augmentation files, wherein the altered web content is delivered to the client device;

the interpolating proxy server being further operative to parse the retrieved web content into one or more component structures, and subsequently to apply a pattern matching process to recognize designated component structure subject to alteration in accordance with the one or more augmentation files;

wherein the pattern matching process comprises comparing a given one of the component structures of the retrieved web content to predetermined component structures represented by respective tokens in the one or more augmentation files.

**A.    "server" and "the server being operative to . . ."**

233.     This term appears in asserted claims 1, 13, and 18 of the '860 patent.

234.    I understand that Dr. Chatterjee acknowledges that one of ordinary skill in the art would know what a "server" is. (Chatterjee Decl. at 40, 42.)

235.    Additionally, the '860 patent specification makes clear that as used by the '860 patent, "[t]he term 'server' . . . is intended to include both a single server device or system as well as sets or other groupings or arrangements of multiple server devices or systems." ('860 patent at 3:8-10.)

73

236. Dr. Chatterjee contends that "server" is "a nonce word." (Chatterjee Decl. at 47.) I disagree for the reasons stated above, for example, with respect to "messaging server." The term "server" has, and has had, a well understood meaning in the art; it is not merely a generic term, but indicates a particular structural concept that is well known to computer programmers, and in fact is a term that is regularly used by computer programmers to connote a particular structure.

237. I understand that Dr. Chatterjee also contends that the '860 patent "fails to disclose corresponding structure for the recited functions." (Chatterjee Decl. at 47.) As an initial matter, Dr. Chatterjee appears to assume that these terms are subject to 35 U.S.C § 112(f) because of his assertion that the term "server" essentially has no meaning, and would not be readily understood (i.e., that it is a nonce word). I disagree. It is my understanding that because these terms do not recite a "means," they are presumed not to be subject to 35 U.S.C § 112(f). I further understand that Facebook bears the burden of proving that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function. The term "server" has a well understood meaning to one of ordinary skill in the art. I do not think that Dr. Chatterjee has proven that server has no meaning and I do not think it would be possible to do so.

238. In addition, the '860 patent specification explains how one of ordinary skill in the art might configure a server. For example, the '860 patent describes multiple methods for determining a particular client type associated with a client device. (*See* '860 patent at 3:65-4:3 ("The interpolating proxy server 102 can identify the client device type using any of a number of different techniques, such as, e.g., HyperText Transfer Protocol (HTTP) User_Agent and Content_Type protocol headers, client-identifying "cookies," or HTTP GET request QUERY_STRING attributes.").) The HTTP User-Agent header contains a string that identifies

74

A-111

the application type, operating system, software vendor or software version of the requesting software user agent. Two examples of such a string are 'Mozilla/5.0 (Windows NT 6.1; Win64; x64; rv:47.0) Gecko/20100101 Firefox/47.0' and 'Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/51.0.2704.103 Safari/537.36'. One of ordinary skill in the art understood how to use the HTTP User-Agent header to identify the client device type. (*See* https://tools.ietf.org/html/rfc7231#section-5.5.3.) Similarly, as discussed above, cookies can be passed from the client to the server with an HTTP request and were well known to those of ordinary skill in the art.

239. The '860 patent specification also provides detail on the HTTP GET request QUERY_STRING. (*See* '860 patent at 6:35-44 ("URI encoding is achieved by appending QUERY_STRING parameters to the URI, which normally comprises five parts: protocol://host/path/PATH_INFO?QUERY_STRING. If the QUERY_STRING already exists, as in the case of a forms request, then the client parameters can be appended to the QUERY_STRING as an additional parameter string using the '&' operator. If the QUERY_STRING is not already present then the client parameters are added using the '?' operator to add a new QUERY_STRING.").) Forms in HTML for submission by the client to the server come in two general types, GET and POST. The HTTP GET method supplies parameters as part of the QUERY_STING as described by the '860 patent while the POST method submits data in the body of the message. As is apparent from the '860 patent's description, the QUERY_STRING is delimited from the path of a GET request by the '?' character. Different parameters in the QUERY_STRING itself are delimited by the '&' character. One of ordinary skill in the art was well familiar with the HTTP GET request QUERY_STRING.

75

240.    The '860 patent specification additionally provides detail regarding the altering of web content based on augmentation files. For example, the '860 patent explains that altering may be achieved in a manner similar to the patch facility commonly used in updating UNIX source code. ('860 patent at 4:32-36 ("Server-side editing and other interpolation processes implemented by the interpolating proxy server 102 may be performed in a manner similar to the patch facility commonly used in updating UNIX source code, for which many supporting tools are known in the art.").) The '860 patent goes on to explain the steps for performing the well known patch process. ('860 patent at 4:36-42 ("The basic patch facility operates by identifying target file line numbers and input patterns to be searched. When an input pattern matches a character string, a corresponding output script is inserted as replacement. This approach is suitable for source code patching, and could be used for an editing process implemented in the interpolating proxy server.").)

241.    Other examples provided by the '860 patent include fragmenting a single web page into several virtual pages that can then be aggregated with other web pages, and employing a pattern matcher to recognize known ML structures. (*See* '860 patent at 4:43-51 ("In addition to the above-described patching capability that replaces a pattern with a new string, transformations on the text can be computed using any one of variety of suitable programming languages to create patching functions. Such patching functions can modify a target web page and aggregate content from several other pages of HTML or other web content to produce a single virtual page. Possible uses of the patching functions include summarization of a web site, or subset of a web site, into a single summary page."), *id.* at 4:52-64 ("The interpolating proxy server 102 can also fragment a single web page into several virtual pages that can then be aggregated with other web pages, in whole or in part, to produce a constructed virtual web page or pages. This can be

76

A-113

accomplished by configuring the interpolating proxy server to intercept QUERY_STRING parameters that specify the virtual page contents. The interpolating proxy server then constructs a virtual page based on the instructions from the QUERY_STRING by aggregation or fragmentation of the set of web pages from one or more web sites. The instructions can make reference to one or more program files on a local or remote server to be executed for actual construction of the virtual page or pages."), *id.* at 5:12-25 ("The above-described simple constrained string match and replace mechanism can be modified for improved processing of HTML, XML or other types of Mark-up Language (ML) documents, in the following manner. Initially, an original ML document is fully parsed into component structures. A pattern matcher is then used to recognize known ML structures that are represented concisely in augmentation scripts with special tokens. This approach is particularly well suited to searching through XML structures for information that may not always appear at the same position on a web page. Since ML is not record-oriented, parsed ML structure may be used for constraints in place of line number constraints. Embedded substructures may be handled in a recursive manner. Such structures establish the scope of pattern matching.").)

242.    At the time of the invention retrieving files was a function available on general purpose computers. Without the function of retrieving other processing is not possible, as a computer must retrieve before it may process. This functionality is provided for the programmer. Accordingly, one of ordinary skill in the art would need no algorithm to achieve this function.

243.    The '860 patent additionally discloses a web server with associated content files and augmentation files. (*See*, *e.g.*, '860 patent at 7:29-31, 7:58-63.) It also discloses that the system will look for content files requested by an HTTP request, as well as associated augmentation files. (*See*, *e.g.*, '860 patent at 7:39-47.) Web servers were well known to those of

ordinary skill in the art. A web server could retrieve content based on client requests and would subsequently provide responses to those client requests. For example, the operation of CGI scripts is discussed above.

244.    Thus it is my opinion that the '860 patent discloses sufficient corresponding structure, to the extent it is required.

245.    Additionally, one of ordinary skill in the art would be able to provide an operative program implementing a server as described based on the '860 patent's disclosure. The '860 patent discloses multiple methods for processing a client request to determine a particular client type associated with the request. It additionally discloses multiple methods for altering web content in accordance with augmentation files. One of ordinary skill in the art would additionally understand that a general purpose computer provides for retrieving files such as web content and augmentation files. But would also understand that a web server, such as the web server disclosed in the '860 patent, performs those actions. Accordingly, one of ordinary skill in the art would understand how to implement the server described based on the '860 patent's disclosure.

**B.    "context element," "pattern element," and "replacement element"**

246.    These terms appear in asserted claims 8, 9, and 10 of the '860 patent.

247.    Dr. Chatterjee admits that the terms "context," "pattern," "replacement," and "element" are all understood by one of ordinary skill in the art. (Chatterjee Decl. at 48.)

248.    Dr. Chatterjee contends, however, that when any of the others known terms are combined with "element" "one of ordinary skill in the art can only speculate as to the meaning." (Chatterjee Decl. at 48.) I disagree. Adding a prefix of "context," "pattern," or "replacement" to the term "element" does not call its meaning into questions, it only narrows that meaning. And in the pattern matching context, elements are understood to be tokens indicating, for example, the

78

pattern to be match, the replacement for a pattern, or a context within the pattern matching process. The '860 patent confirms that meaning in its specification.

249.    As the '860 patent explains, a pattern matching expression can include context, pattern, precedence, and replacement elements. (*See* '860 patent at 5:33-34 ("An example pattern matching expression includes context, pattern, precedence and replacement elements.").)

250.    The '860 patent then specifies that "[t]he context element is a structure scope constraining expression that can contain one or more pattern:replacement instructions." ('860 patent at 5:33-34.)

251.    The '860 patent goes on to explain the default order of precedence or order of application. (*See* '860 patent at 5:36-44 ("The order of the pattern:replacement instructions dictates the precedence or order of application. Typically, the most specific, i.e., longest, pattern matches take highest precedence. Instructions can be contained within specified delimiters (e.g., curly brackets) with designated prefix symbols (e.g., '?') to indicate a limit of zero or one instruction application per pattern match within the instruction scope. Otherwise, all matching instructions are applied in precedence order.").) One of ordinary skill in the art would understand that a precedence element is an element that specifies the precedence of instructions.

252.    The '860 patent then describes context and provides the example of the body of an HTML document. (*See* '860 patent at 5:45-51 ("The context can be as simple as an HTML context such as <BODY> and </BODY> constructs. Convenient notation for specifying contexts can be provided by an interpreter that has knowledge of the scoping characteristics of all HTML tags. Contexts, as well as pattern instructions, can be embedded within other contexts, thereby providing a compact expression for an entire document.").) As was understood by those of

ordinary skill in the art, an HTML document includes a variety of tags. An example of a simple HTML document is:

```
<html>
<head>
<title>Title here</title>
</head>
<body>
Content here
</body>
</html>
```

253.    As described by the '860 patent, the body context can be identified by the <body> and </body> tags. The content between those tags ("Content here" above) is within the scope of the body. That content could include, for example, a form. Expanding the example above to include a form in the body context would look like, for example, the following:

```
<html>
<head>
<title>Title here</title>
</head>
<body>
<form action="form.php" method="get">
First Name: <input type="text" name= "fname">
<input type="submit" value="Submit">
</form>
</body>
</html>
```

254.    In the above there is a form within the body context and two inputs within that form context.

255.    The '860 patent further explains that replacement elements are expressed using tokens. ('860 patent at 5:26-32 ("Within a given parsed structure, tag patterns and string patterns can be matched by regular expressions of tokens within a structured context. A token can be a character string, HTML tag, XML tag, tag sequence, etc. Replacement patterns are expressed using similar tokens. Details of the replacement pattern matching syntax will depend upon the specification of the particular markup language being used.").) As shown above, one of ordinary

80

skill in the art would understand that the replacement element identifies the replacement for a pattern.

256.    Accordingly, one of ordinary skill in the art would understand the scope of the invention as claimed.

### C.    "virtual client device"

257.    This term appears in asserted claim 13 of the '860 patent.

258.    Dr. Chatterjee admits "client device" has a generally accepted meaning to one of ordinary skill in the art. (*See* Chatterjee Decl. at 49.)

259.    As the prosecution of the '860 patent makes clear, "virtual" also has a generally accepted meaning to one of ordinary skill in the art. For example, as the patentees explained, "'virtual' in this context means something other than a physical device." (Ex. K at 7.) The patentees later explained that "a virtual client device is something other than a physical client device" and "a virtual client is not 'a device that can perform many features that separate physical devices can perform'"; "[i]nstead, it is not an actual client device at all, but rather something that is simulated or artificially created, in accordance with the standard and well-understood meaning of the word 'virtual'." (Ex. M at 11.)

260.    The applicants provided additional explanation in their appeal brief:  "An illustrative embodiment of the claimed arrangement is shown as proxy server 102 in system 100 of FIG. 1. The proxy server 102 can interact with a client device 110 that is designated as a virtual client device. Such a client device may be a device which is designated as having a device type representative of a combination of different sets of features provided by multiple distinct physical devices." (Ex. N at 5.) Also:  "the claim at issue refers to a single virtual device that has features provided by different distinct physical devices." (Ex. N at 14.) After reviewing the

arguments, the Board of Patent Appeals and Interferences faulted the Examiner for "fail[ing] to give patentable weight to the term 'virtual'." (Ex. P at 7.)

261.    The '860 patent's specification uses the term consistently with the above. (*See* '860 patent at 8:42-48 ("Although this example utilizes a virtual client mode, i.e., a mode in which the client request is treated by the proxy as originating in a single virtual device incorporating features of multiple distinct physical devices, the processing operations can be altered in a straightforward manner to process requests treated as originating directly from single or multiple physical clients."), *id.* at 7:66-8:4 ("The present invention thus provides the user with an ability to control the designation of a "virtual client" type that may be a combination of different sets of features provided by multiple distinct physical client devices, such as the PhoneBrowser 204 and the WAP telephone 210 in the example of FIG. 2.").) Dr. Chatterjee appears to disagree because, in his opinion, the specification "teach[es] that 'virtual client device' is at least composed of multiple client devices." (Chatterjee Decl. at 49.) However, one of ordinary skill in the art would understand that it "incorporate[s] *features* of multiple distinct physical devices," not the devices themselves.

262.    Accordingly, one of ordinary skill in the art would understand the scope of the invention as claimed.

**D.    "interpolating proxy server," and "an interpolating proxy server . . . operative to . . ."**

263.    These terms appear in asserted claim 18 of the '860 patent.

264.    I understand that Dr. Chatterjee acknowledges that one of ordinary skill in the art would know what a "server" is. (Chatterjee Decl. at 40, 42.)

265.    Additionally, the '860 patent specification makes clear that as used by the '860 patent, "[t]he term 'server' . . . is intended to include both a single server device or system as well as sets or other groupings or arrangements of multiple server devices or systems." ('860 patent at 3:7-10.)

266.    Dr. Chatterjee contends that "server" is "a nonce word that is devoid of structure." (Chatterjee Decl. at 50.) I disagree for the reasons stated above, for example, with respect to "messaging server" and "server." The term "server" has, and has had, a well understood meaning in the art; it is not merely a generic term, but indicates a particular structural concept that is well known to computer programmers, and in fact is a term that is regularly used by computer programmers to connote a particular structure.

267.    Dr. Chatterjee acknowledges that "interpolating" is explained in the '860 patent's specification and that "proxy" has a definition, but contends that those terms "do not add structural limitations." I disagree.

268.    The term "proxy server," like "server," has a well understood meaning in the art. Indeed, proxy servers are a subset of servers and are well-known by those of ordinary skill in the art because of their use on the Internet. The term "interpolating" further narrows the field to those proxy servers that interpolate as explained by the '860 patent. (*See* '860 patent at Abstract ("A content interpolating web proxy server is configured in a computer network for processing retrieved web content so as to place it in a format suitable for presentation on a particular client device such as, e.g., a computer, personal digital assistant (PDA), wireless telephone or voice browser-equipped device."), *id.* at 1:13-19 ("Conventional web proxy servers may be configured to provide transformation of web pages or other types of web content for delivery over the Internet or other computer networks. For example, a number of so-called transcoding web proxy

83

servers currently exist as products to transform web content by the application of appropriately-designed filtering mechanisms.").)

269.    I understand that Dr. Chatterjee also contends that the '860 patent "fails to disclose the required corresponding structure." (Chatterjee Decl. at 47.) As an initial matter, Dr. Chatterjee appears to assume that these terms are subject to 35 U.S.C § 112(f). I disagree. It is my understanding that because these terms do not recite a "means," they are presumed not to be subject to 35 U.S.C § 112(f) because of his assertion that the terms "server" and "proxy server" essentially have no meaning, and would not be readily understood (i.e., that they are nonce words). I further understand that Facebook bears the burden of proving that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function. The term "interpolating proxy server" has a readily understood meaning to one of ordinary skill in the art as I discuss above.  I do not think that Dr. Chatterjee has proven that the terms "server" and "proxy server" have no meaning and I do not think it would be possible to do so.

270.    In addition, the '860 patent specification explains how one of ordinary skill in the art might configured an interpolating proxy server. Dr. Chaterjee contends that the "functions [of an interpolating proxy server] are substantially identical, for purposes of § 112 (f) analysis, to the functions of the 'server' recited in claims 1 and 13" and therefore provides no additional analysis. Accordingly, I disagree for the reasons stated above with respect to the term "server."

I declare under penalty of perjury that the foregoing is true and correct.


Date:  February 14, 2017

_____

Dr. Xiao Su

# EXHIBIT Y

US006292547B1

(12) **United States Patent** (10) Patent No.: **US 6,292,547 B1**

Katz (45) Date of Patent: **\*Sep. 18, 2001**

(54) **TELEPHONIC-INTERFACE STATISTICAL ANALYSIS SYSTEM**

(75) Inventor: **Ronald A. Katz**, Los Angeles, CA (US)

(73) Assignee: **Ronald A. Katz Technology Licensing, L.P.**, Los Angeles, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/270,241**

(22) Filed: **Mar. 15, 1999**

**Related U.S. Application Data**

(60) Continuation of application No. 08/475,425, filed on Jun. 7, 1995, which is a division of application No. 07/335,923, filed on Apr. 10, 1989, which is a continuation of application No. 07/194,258, filed on May 16, 1988, now Pat. No. 4,845,739, which is a continuation-in-part of application No. 07/018,244, filed on Feb. 24, 1987, now Pat. No. 4,792,968, which is a continuation-in-part of application No. 06/753, 299, filed on Jul. 10, 1985, now abandoned.

(51) **Int. Cl.**[7] .................................... **H04M 11/00**

(52) **U.S. Cl.** ..................................... **379/93.12**; 379/91.02

(58) **Field of Search** ............................. 379/91.01, 91.02, 379/92.01, 92.03, 93.02, 93.03, 93.12, 93.13, 93.14

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2,902,541 | 9/1959 | Singleton . |
| 2,941,161 | 6/1960 | Scantlin . |
| 3,060,275 | 10/1962 | Meacham et al. . |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 66113/81 | 7/1981 | (AU) . |
| 1022674 | 12/1977 | (CA) . |
| 1025118 | 1/1978 | (CA) . |

(List continued on next page.)

OTHER PUBLICATIONS

Lexis Search Results (Great American Potato–Chip give-away/Raisin Bran Game/Giants Baseball Trivia—Dial Info): "In The Chips" AdWeek, Jul. 22, 1985.

"San–Fran–Police–League", Business Wire, Aug. 2, 1985.

"Similar Campaigns", DM News, Dec. 15, 1985.

"Phone Offers Action at Push of Button", Advertising Age, Feb. 6, 1986.

Boies, Stephen J., "A Computer Based Audio Communication System", *Computer Sciences Department*, Thomas J. Watson Research Center, Yorktown Heights, New York, USA, pp. 701–704—(Article) (Undated).

(List continued on next page.)

*Primary Examiner*—Stella Woo

(74) *Attorney, Agent, or Firm*—Lyon & Lyon LLP

(57) **ABSTRACT**

A system D interfaces with a multiplicity of individual terminals T1–Tn of a telephone network facility C, at the terminals callers are prompted by voice-generated instructions to provide digital data that is identified for positive association with a caller and is stored for processing. The caller's identification data is confirmed using various techniques and callers may be ranked and accounted for on the basis of entitlement, sequence or demographics. Callers are assigned random designations that are stored along with statistical and identification data. A break-off control circuit may terminate the computer interface aborting to a terminal for direct communication with an operator. Real-time operation processing is an alternative to stored data. The accumulation of stored data (statistical, calling order sequence, etc.) is variously processed and correlated as with developed or established data to isolate a select group or subset of callers who can be readily identified and reliably confirmed. Different program formats variously control the processing of statistical data as for auction sales, contests, lotteries, polls, commercials and so on.

**50 Claims, 6 Drawing Sheets**



## US 6,292,547 B1
Page 2

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,076,059 | 1/1963 | Meacham et al. . |
| 3,082,402 | 3/1963 | Scantlin . |
| 3,128,349 | 4/1964 | Boesch et al. . |
| 3,159,818 | 12/1964 | Scantlin . |
| 3,246,082 | 4/1966 | Levy . |
| 3,249,919 | 5/1966 | Scantlin . |
| 3,299,210 | 1/1967 | Bandy . |
| 3,337,847 | 8/1967 | Olsson et al. . |
| 3,347,988 | 10/1967 | Marill et al. . |
| 3,371,162 | 2/1968 | Scantlin . |
| 3,381,276 | 4/1968 | James . |
| 3,393,272 | 7/1968 | Hanson . |
| 3,394,246 | 7/1968 | Goldman . |
| 3,482,057 | 12/1969 | Abbott et al. . |
| 3,515,814 | 6/1970 | Morgan . |
| 3,544,769 | 12/1970 | Hedin . |
| 3,556,530 | 1/1971 | Barr . |
| 3,557,311 | 1/1971 | Goldstein . |
| 3,568,157 | 3/1971 | Downing et al. . |
| 3,569,939 | 3/1971 | Doblmaier et al. . |
| 3,571,799 | 3/1971 | Coker, Jr. et al. . |
| 3,573,747 | 4/1971 | Adams et al. . |
| 3,581,072 | 5/1971 | Nymeyer . |
| 3,594,004 | 7/1971 | Barr . |
| 3,617,638 | 11/1971 | Jochimsen et al. . |
| 3,618,038 | 11/1971 | Stein . |
| 3,624,292 | 11/1971 | Guzak, Jr. . |
| 3,644,675 | 2/1972 | Waltington . |
| 3,647,973 | 3/1972 | James et al. . |
| 3,651,480 | 3/1972 | Downing et al. . |
| 3,656,113 | 4/1972 | Lince . |
| 3,665,107 | 5/1972 | Kopec et al. . |
| 3,675,513 | 7/1972 | Flanagan et al. . |
| 3,688,126 | 8/1972 | Klein . |
| 3,696,335 | 10/1972 | Lemelson . |
| 3,697,702 | 10/1972 | Buonsante et al. . |
| 3,781,810 | 12/1973 | Downing . |
| 3,792,446 | 2/1974 | McFiggins et al. . |
| 3,794,219 | 2/1974 | Kemmerly et al. . |
| 3,800,283 | 3/1974 | Gropper . |
| 3,858,032 | 12/1974 | Scantlin . |
| 3,870,821 | 3/1975 | Steury . |
| 3,881,160 | 4/1975 | Ross . |
| 3,889,050 | 6/1975 | Thompson . |
| 3,909,553 | 9/1975 | Marshall . |
| 3,912,874 | 10/1975 | Botterell et al. . |
| 3,914,747 | 10/1975 | Barnes et al. . |
| 3,918,174 | 11/1975 | Miller et al. . |
| 3,920,908 | 11/1975 | Kraus . |
| 3,928,724 | 12/1975 | Byram et al. . |
| 3,934,095 | 1/1976 | Matthews et al. . |
| 3,947,972 | 4/1976 | Freeman . |
| 3,950,618 | 4/1976 | Bloisi . |
| 3,974,338 | 8/1976 | Luzier et al. . |
| 3,982,103 | 9/1976 | Goldman . |
| 3,989,899 | 11/1976 | Norwich . |
| 3,991,406 | 11/1976 | Downing et al. . |
| 3,998,465 | 12/1976 | Mascola . |
| 4,009,342 | 2/1977 | Fahrenschon et al. . |
| 4,012,599 | 3/1977 | Meyer . |
| 4,017,835 | 4/1977 | Randolph . |
| 4,024,345 | 5/1977 | Kochem . |
| 4,054,756 | 10/1977 | Comella et al. . |
| 4,071,698 * | 1/1978 | Barger, Jr. et al. .................. 379/92 |
| 4,078,316 | 3/1978 | Freeman . |
| 4,088,838 | 5/1978 | Nakata et al. . |
| 4,090,038 | 5/1978 | Biggs . |
| 4,108,361 | 8/1978 | Krause . |
| 4,117,278 | 9/1978 | Ehrlich et al. . |
| 4,121,052 | 10/1978 | Richard . |

| | | |
|---|---|---|
| 4,145,578 | 3/1979 | Orriss . |
| 4,150,255 | 4/1979 | Theis et al. . |
| 4,152,547 | 5/1979 | Theis . |
| 4,160,125 | 7/1979 | Bower et al. . |
| 4,162,377 | 7/1979 | Mearns . |
| 4,187,498 | 2/1980 | Creekmore . |
| 4,191,376 | 3/1980 | Goldman . |
| 4,191,860 | 3/1980 | Weber . |
| 4,194,089 | 3/1980 | Hashimoto . |
| 4,200,770 | 4/1980 | Hellman et al. . |
| 4,201,887 | 5/1980 | Burns . |
| 4,223,183 | 9/1980 | Peters, Jr. . |
| 4,232,199 | 11/1980 | Boatwright et al. . |
| 4,241,942 | 12/1980 | Bachman . |
| 4,242,539 | 12/1980 | Hashimoto . |
| 4,243,844 | 1/1981 | Waldman . |
| 4,255,618 | 3/1981 | Danner et al. . |
| 4,260,854 | 4/1981 | Kolodny et al. . |
| 4,264,924 | 4/1981 | Freeman . |
| 4,264,925 | 4/1981 | Freeman et al. . |
| 4,270,024 | 5/1981 | Theis et al. . |
| 4,277,649 | 7/1981 | Sheinbein . |
| 4,290,141 | 9/1981 | Anderson et al. . |
| 4,299,637 | 11/1981 | Oberdeck et al. . |
| 4,302,810 | 11/1981 | Bouricius et al. . |
| 4,303,804 | 12/1981 | Johnson et al. . |
| 4,307,266 | 12/1981 | Messina . |
| 4,314,103 | 2/1982 | Wilson . |
| 4,317,961 | 3/1982 | Johnson . |
| 4,320,256 * | 3/1982 | Freeman .................................. 379/92 |
| 4,323,770 | 4/1982 | Dieulot et al. . |
| 4,328,396 | 5/1982 | Theis . |
| 4,338,494 | 7/1982 | Theis . |
| 4,339,798 | 7/1982 | Hedges et al. . |
| 4,345,315 | 8/1982 | Cadotte et al. . |
| 4,348,554 | 9/1982 | Asmuth . |
| 4,355,207 | 10/1982 | Curtin . |
| 4,355,372 | 10/1982 | Johnson et al. . |
| 4,360,827 | 11/1982 | Braun . |
| 4,371,752 | 2/1983 | Matthews et al. . |
| 4,376,875 | 3/1983 | Beirne . |
| 4,389,546 | 6/1983 | Glisson et al. . |
| 4,393,277 | 7/1983 | Besen et al. . |
| 4,398,708 | 8/1983 | Goldman et al. . |
| 4,405,829 | 9/1983 | Rivest et al. . |
| 4,420,656 | 12/1983 | Freeman . |
| 4,427,848 | 1/1984 | Tsakanikas . |
| 4,439,635 | 3/1984 | Theis et al. . |
| 4,439,636 | 3/1984 | Newkirk et al. . |
| 4,451,087 | 5/1984 | Comstock . |
| 4,451,700 * | 5/1984 | Kempner et al. ...................... 379/92 |
| 4,468,528 | 8/1984 | Reece et al. . |
| 4,475,189 | 10/1984 | Herr et al. . |
| 4,489,439 | 12/1984 | Hughes . |
| 4,490,583 | 12/1984 | Bednarz et al. . |
| 4,494,197 | 1/1985 | Troy et al. . |
| 4,511,764 | 4/1985 | Nakayama et al. . |
| 4,517,410 | 5/1985 | Williams et al. . |
| 4,518,827 | 5/1985 | Sagara . |
| 4,521,643 | 6/1985 | Dupuis et al. . |
| 4,523,055 | 6/1985 | Hohl et al. . |
| 4,532,378 | 7/1985 | Nakayama et al. . |
| 4,539,435 | 9/1985 | Eckmann . |
| 4,539,436 | 9/1985 | Theis . |
| 4,544,804 | 10/1985 | Herr et al. . |
| 4,547,851 | 10/1985 | Kurland . |
| 4,549,047 | 10/1985 | Brian et al. . |
| 4,555,594 | 11/1985 | Friedes et al. . |
| 4,559,415 | 12/1985 | Bernard et al. . |
| 4,559,416 | 12/1985 | Theis et al. . |
| 4,562,342 | 12/1985 | Solo . |

## US 6,292,547 B1

Page 3

| | | | |
|---|---|---|---|
| 4,566,030 | 1/1986 | Nickerson et al. . | |
| 4,567,359 | 1/1986 | Lockwood . | |
| 4,570,930 | 2/1986 | Matheson . | |
| 4,577,062 | 3/1986 | Hilleary et al. . | |
| 4,577,067 | 3/1986 | Levy et al. . | |
| 4,578,700 | 3/1986 | Roberts et al. . | |
| 4,580,012 | 4/1986 | Matthews et al. . | |
| 4,582,956 | 4/1986 | Doughty . | |
| 4,584,602 | 4/1986 | Nakagawa . | |
| 4,585,906 | 4/1986 | Matthews et al. . | |
| 4,586,707 | 5/1986 | McNeight et al. . | |
| 4,587,379 | 5/1986 | Masuda . | |
| 4,591,190 | 5/1986 | Clark . | |
| 4,591,664 | 5/1986 | Freeman . | |
| 4,592,546 | 6/1986 | Fascenda et al. . | |
| 4,594,476 | 6/1986 | Freeman . | |
| 4,598,367 | 7/1986 | DeFrancesco et al. . | |
| 4,603,232 | 7/1986 | Kurland et al. . | |
| 4,611,094 | 9/1986 | Asmuth et al. . | |
| 4,614,367 | 9/1986 | Breen . | |
| 4,625,079 | 11/1986 | Castro et al. . | |
| 4,625,276 | 11/1986 | Benton et al. . | |
| 4,630,200 | 12/1986 | Ohmae et al. . | |
| 4,630,201 | 12/1986 | White . | |
| 4,634,809 | 1/1987 | Paulsson et al. . | |
| 4,635,251 | 1/1987 | Stanley et al. . | |
| 4,645,873 | 2/1987 | Chomet . | |
| 4,649,563 | 3/1987 | Riskin . | |
| 4,652,998 | 3/1987 | Koza . | |
| 4,654,482 | 3/1987 | DeAngelis . | |
| 4,658,417 | 4/1987 | Hashimoto et al. . | |
| 4,663,777 | 5/1987 | Szeto . | |
| 4,665,502 | 5/1987 | Kreisner . | |
| 4,669,730 | 6/1987 | Small . | |
| 4,671,512 | 6/1987 | Bachman et al. . | |
| 4,674,044 | 6/1987 | Kalmus et al. . | |
| 4,677,552 | 6/1987 | Sibley, Jr. . | |
| 4,677,553 | 6/1987 | Roberts et al. . | |
| 4,685,123 | 8/1987 | Hsia et al. . | |
| 4,688,170 | 8/1987 | Waite et al. . | |
| 4,689,742 * | 8/1987 | Troy et al. ........................... 364/412 | |
| 4,692,817 | 9/1987 | Theis . | |
| 4,694,490 | 9/1987 | Harvey et al. . | |
| 4,696,028 | 9/1987 | Morganstein et al. . | |
| 4,696,029 | 9/1987 | Cohen . | |
| 4,697,282 | 9/1987 | Winter et al. . | |
| 4,704,725 | 11/1987 | Harvey et al. . | |
| 4,706,275 | 11/1987 | Kamil . | |
| 4,710,955 * | 12/1987 | Kauffmann ........................... 379/92 | |
| 4,715,061 | 12/1987 | Norwich . | |
| 4,716,583 | 12/1987 | Groner et al. . | |
| 4,719,647 | 1/1988 | Theis et al. . | |
| 4,722,526 | 2/1988 | Tovar et al. . | |
| 4,745,468 | 5/1988 | Von Kohorn . | |
| 4,748,668 | 5/1988 | Shamir et al. . | |
| 4,756,020 * | 7/1988 | Fodale ........................... 379/112 | |
| 4,757,267 | 7/1988 | Riskin . | |
| 4,761,684 | 8/1988 | Clark et al. . | |
| 4,763,191 * | 8/1988 | Gordon et al. ........................... 379/91 | |
| 4,764,666 | 8/1988 | Bergeron . | |
| 4,766,604 | 8/1988 | Axberg . | |
| 4,774,655 | 9/1988 | Kollin et al. . | |
| 4,781,377 | 11/1988 | McVean et al. . | |
| 4,782,510 | 11/1988 | Szlam . | |
| 4,783,796 | 11/1988 | Ladd . | |
| 4,783,800 | 11/1988 | Levine . | |
| 4,785,408 * | 11/1988 | Britton et al. ........................... 379/88 | |
| 4,788,682 | 11/1988 | Vij et al. . | |
| 4,788,715 | 11/1988 | Lee . | |
| 4,788,716 | 11/1988 | Zebe . | |
| 4,788,718 | 11/1988 | McNabb et al. . | |
| 4,789,928 | 12/1988 | Fujisaki . | |
| 4,791,664 | 12/1988 | Lutz et al. . | |
| 4,792,968 * | 12/1988 | Katz ........................... 379/97 | |
| 4,796,293 | 1/1989 | Blinken et al. . | |
| 4,797,910 | 1/1989 | Daudelin . | |
| 4,797,911 * | 1/1989 | Szlam et al. ........................... 379/92 | |
| 4,797,913 | 1/1989 | Kaplan et al. . | |
| 4,799,156 | 1/1989 | Shavit et al. . | |
| 4,800,583 | 1/1989 | Theis . | |
| 4,805,209 | 2/1989 | Baker, Jr. et al. . | |
| 4,812,843 | 3/1989 | Champion, III et al. . | |
| 4,815,031 | 3/1989 | Furukawa . | |
| 4,815,121 | 3/1989 | Yoshida . | |
| 4,815,741 | 3/1989 | Small . | |
| 4,827,500 | 5/1989 | Binkerd et al. . | |
| 4,842,278 | 6/1989 | Markowicz . | |
| 4,845,739 * | 7/1989 | Katz ........................... 379/92.01 | |
| 4,847,890 | 7/1989 | Solomon et al. . | |
| 4,852,154 | 7/1989 | Lewis et al. . | |
| 4,853,882 | 8/1989 | Marshall . | |
| 4,856,050 | 8/1989 | Theis et al. . | |
| 4,866,756 * | 9/1989 | Crane et al. ........................... 379/88 | |
| 4,876,592 | 10/1989 | Von Kohorn . | |
| 4,876,717 | 10/1989 | Barron et al. . | |
| 4,882,473 | 11/1989 | Bergeron et al. . | |
| 4,893,328 | 1/1990 | Peacock . | |
| 4,893,330 | 1/1990 | Franco . | |
| 4,894,857 | 1/1990 | Szlam et al. . | |
| 4,896,345 | 1/1990 | Thorne . | |
| 4,897,867 | 1/1990 | Foster et al. . | |
| 4,899,375 | 2/1990 | Bauer et al. . | |
| 4,907,079 | 3/1990 | Turner et al. . | |
| 4,908,761 | 3/1990 | Tai . | |
| 4,908,850 * | 3/1990 | Masson et al. ........................... 379/91 | |
| 4,922,520 | 5/1990 | Bernard et al. . | |
| 4,922,522 | 5/1990 | Scanlon . | |
| 4,937,853 | 6/1990 | Brule et al. . | |
| 4,942,598 | 7/1990 | Davis . | |
| 4,942,599 | 7/1990 | Gordon et al. . | |
| 4,942,616 * | 7/1990 | Linstroth et al. ........................... 379/142 | |
| 4,943,995 | 7/1990 | Dandelin et al. . | |
| 4,955,047 | 9/1990 | Morganstein et al. . | |
| 4,959,783 | 9/1990 | Scott et al. . | |
| 4,961,217 | 10/1990 | Akiyama . | |
| 4,964,157 | 10/1990 | Aoshima . | |
| 4,965,825 | 10/1990 | Harvey et al. . | |
| 4,969,183 | 11/1990 | Reese . | |
| 4,969,185 | 11/1990 | Dorst et al. . | |
| 4,972,461 | 11/1990 | Brown et al. . | |
| 4,974,252 | 11/1990 | Osborne . | |
| 4,975,945 | 12/1990 | Carbullido . | |
| 4,989,233 | 1/1991 | Schakowsky et al. . | |
| 4,992,940 | 2/1991 | Dworkin . | |
| 4,996,705 * | 2/1991 | Entenmann et al. ........................... 379/91 | |
| 5,001,710 | 3/1991 | Gawrys et al. . | |
| 5,003,574 | 3/1991 | Denq et al. . | |
| 5,014,298 | 5/1991 | Katz . | |
| 5,017,917 | 5/1991 | Fisher et al. . | |
| 5,018,736 | 5/1991 | Pearson et al. . | |
| 5,023,904 | 6/1991 | Kaplan et al. . | |
| 5,046,183 | 9/1991 | Dorst et al. . | |
| 5,083,272 | 1/1992 | Walker et al. . | |
| 5,097,528 | 3/1992 | Gursahaney et al. . | |
| 5,109,414 | 4/1992 | Harvey et al. . | |
| 5,127,003 | 6/1992 | Doll, Jr. et al. . | |
| 5,146,491 | 9/1992 | Silver et al. . | |
| 5,181,238 | 1/1993 | Medamana et al. . | |
| 5,233,654 | 8/1993 | Harvey et al. . | |
| 5,255,183 | 10/1993 | Katz . | |
| 5,263,723 | 11/1993 | Pearson et al. . | |
| 5,333,185 | 7/1994 | Burke et al. . | |

## US 6,292,547 B1
Page 4

| 5,335,277 | 8/1994 | Harvey et al. . |
| 5,351,276 | 9/1994 | Doll, Jr. et al. . |
| 5,353,335 | 10/1994 | D'Urso et al. . |

### FOREIGN PATENT DOCUMENTS

| 1056500 | 6/1979 | (CA) . |
| 1059621 | 7/1979 | (CA) . |
| 1162336 | 2/1984 | (CA) . |
| 1225759 | 8/1987 | (CA) . |
| 2009937-2 | 8/1990 | (CA) . |
| 2929416 | 2/1981 | (DE) . |
| 3726366 | 2/1988 | (DE) . |
| 4005365 A1 | 8/1990 | (DE) . |
| 0 120 322 | 2/1984 | (EP) . |
| 0 229 170 A | 7/1987 | (EP) . |
| 0249575 | 12/1987 | (EP) . |
| 0295837 | 12/1988 | (EP) . |
| 0342295 | 11/1989 | (EP) . |
| 0434181 | 6/1991 | (EP) . |
| 0 568 114 A | 11/1993 | (EP) . |
| 0 620 669 A | 10/1994 | (EP) . |
| 9002131 | 8/1990 | (FR) . |
| 2184327A | 6/1987 | (GB) . |
| 2 230 403 A | 10/1990 | (GB) . |
| 52-17440 | 9/1977 | (JP) . |
| 56-152365 | 11/1981 | (JP) . |
| 62-239757 | 10/1987 | (JP) . |
| 500138/88 | 1/1988 | (JP) . |
| 298158/90 | 12/1990 | (JP) . |
| 41855/91 | 2/1991 | (JP) . |
| WO 87/00375 | 1/1987 | (WO) . |
| WO88/02966 | 4/1988 | (WO) . |
| WO88/05985 | 8/1988 | (WO) . |
| WO89/02139 | 3/1989 | (WO) . |
| WO89/09530 | 10/1989 | (WO) . |
| WO93/05483 | 3/1993 | (WO) . |

### OTHER PUBLICATIONS

Winckelmann, W.A., "Automatic Intercept Service", *Bell Laboratories Record*, May 1968, vol. 46, No. 5, pp. 138–143—(Article).

"Proposed Agreement Between National Enterprises Board (N.E.B.) and Delphi", Jan. 30, 1979.

Voysey, Hedley, "Nexos wins rights to comms engine", *Computing*, Sep. 6, ??, vol. 7, No. 36—(Article).

"Appraisal of The Fair Market Value of Delphi Communications ", Apr. 30, 1980—(Study). Delphi Communications—(Charts and Exhibits).

"Voice–Response System Improves Order Entry, Inventory Control", *Communication News*, Aug. 1976—(Article).

"Periphonics VOICEPACK"—(Brochure) (Undated).

"The Voice Response Peripheral That Turnes Every Touch–Tone Telephone Into A Computer Terminal", Periphonics Corporation—(Brochure) (Undated).

Rabin, Jeff, "Minorities Seek 30% Share of All Lottery Operations", *Sacramento Bee*, Apr. 12, 1985—(Article).

Advertisements (Dial Giants Baseball Trivia Game): *San Francisco Chronicle*, Jul. 3, 1984.

Curtis, Cathy, "976 numbers let you dial–a–whatever", *San Francisco Business Journal*, Nov. 26, 1984—(Article).

Ferrell, Jane, "Three little numbers for instant information", *San Francisco Chronicle*, Aug. 15, 1984—(Article).

"Dallas Telephone Call–In Game Uses Computer Voice Interface", Sep. 24, 1984—(Press Release).

Rivest, R.L., et al., "A Method for Obtaining Digital Signatures and Public–Key Cryptosystems", *Communications of the ACM*, Feb. 1978, vol. 21, No. 2, pp. 120–126—(Article).

Finnigan, Paul F, "Audiotex: The telephone as data–access equipment", *Data Communications*, 1987, pp. 155–161 (Article).

Ozawa, Y., et al., "Voice Response System and Its Applications", *Hitachi Review*, Dec. 1979, vol. 28, No. 6, pp. 301–305—(Article).

"AT&T 2: Reaches agreement with Rockwell (ROK)", Aug. 26, 1986—(Press Release). "AT&T: Expands Computer speech sytem product line", Apr. 14, 1986—(Press Release).

Adams, Cynthia, "Conversing With Computers", *Computerworld on Communications*, May 18, 1983, vol. 17, No. 20A, pp. 36–44—(Article).

Hester, S. D., et al., "The AT&T Multi–Mode Voice Systems—Full Spectrum Solutions for Speech Processing Applications", Sep. 1985, pp. 1–10—(Proceedings of the 1985 AVIOS Conference).

Davidson, Leon, "A Pushbutton Telephone for Alphanumeric Input", *Datamation*, Apr. 1966, pp. 27–30—(Article).

Advertisement: Cuervo Gold Beach Chair, VoiceMail Int'l, '83.

"Digital's All–In–1 Voice Messaging", *Digital*—(Brochure) (Undated).

"Access Voice and Mail Messages From One Familiar Source", *Insight*,—(Article) (Undated).

"Get The Message . . . !" "New Voicemail Features", *Voicemail International, Inc.,* Oct. 1984—(Article).

Brochures (TWA Crew Scheduling/PSA's Reservation System/Universal Studios Program/Dow Phone): "AVIAR The communication system that keeps you feeling", VoiceMail Int'l—(Brochure) (Undated).

"TWA VOICEMAIL, Flight Attendants Users Guide" Aug. 1986,—(Brochure).

Holtzman, Henry, "Voice Mail Soars At TWA", *Modern Office Technology* (Reprint), Mar. 1986,—(Article).

"Bid Results via VOICEMAIL—Flight Deck Crew Members", May 1, 1985 (Script).

Borden, W.S., "Flight Attendant Self Input of Monthly Bids Via Touch Tone Telephone", *In–Flight Services Bulletin*, Sep. 15, 1985—(Memo).

"Look Ma, no operators ! Automatic voice system doesmany airline jobs", *Air Transport World*, Oct. 1986—(Article).

"1,000,000 Shares Common Stock" *Voicemail International,Inc.*. Jan 10, 1984—(Public Offering Summary).

Levinson, S.E., et al., "A Conversational–Mode Airline Information and Reservation System Using Speech Input and Output", *The Bell System Technical Journal*, Jan. 1980, vol. 59, No. 1, pp. 119–137.

Emerson, S.T., "Voice Response Systems—Technology to the Rescue for Business Users", *Speech Technology*, Jan./Feb. '83, pp. 99–103—(Article).

Moslow, Jim, "Emergency reporting system for small communities", *Telephony*, Feb. 11, 1985, pp. 30–32, 34—(Article).

Rabiner, L.R., et al., "Digital Techniques for Computer Voice Response: Implementation and Applications", *Proceedings of the IEEE*, Apr. 1976, vol. 64, No. 4, pp. 416–432—(Article).

Moosemiller, J.P., "AT&T's CONVERSANT™ I Voice System" *Speech Technology*, Mar/Apr. 1986, pp. 88–93—(Article).

**US 6,292,547 B1**

Page 5

Frank, R.J., et al., "No. 4 ESS: Mass Announcement Capability", *The Bell System Tehnical Journal*, Jul/Aug. 1981, vol. 60, No., 6, Part 2, pp. 1049–1081—(Chapter from a Book).

"Chapter I General Description"*D.I.A.L. PRM/Release 3—Version 2* Mar. 1987 (Product Reference Manual).

"Announcing Release 3.3" *D–A–S–H–D.I.A.L. Application and Support Hints*, Jan/Feb. Mar. 1987, vol. 3, No. 1—(Brochure).

"D.I.A.L. Software Relase 4", *OPCOM*, Jan. 1988, Version 1—(Product Reference Manual).

Brady, R.L., et al., "Telephone Identifier Interface", *IBM Tehnical Disclosure Bulletin*, Oct. 1976, vol. 19, No. 5, pp. 1569–1571—(Article).

Corbett, A.J., "Telephone Enquiry System Using Synthetic Speech", *University of Essex*, Dec. 1974, (Thesis).

Yoshizawa, K., et al., "Voice Response System for Telephone Betting", *Hitachi Review*, Jun. 1977, vol. 26, No. 6—(Article).

Sagawa, S., et al., "Automatic Seat Reservation By Touch–Tone Telephone", *Second USA Japan Computer Conference*, 1975, vol. 2, pp. 290–294—(Article).

Smith, S.L., "Computer–Generated Speech and Man–Computer Interaction", *Human Factors*, 1970, 12(2), pp. 215–223—(Article).

Newhouse, A., et al., "On The Use of Very Low Cost Terminals", *University of Houston*, pp. 240–249—(Paper) (Undated).

Mullen, R.W., "Telephone –home's 'friendliest' Computer", *Inside Telephone Engineer And Management*, May 15, 1985, vol. 89, No. 10,—(Article).

"Telephone Computing Entering Service Bureau Business", *American Banker*, Jul. 5,1979—(Article).

Kutler, Jeffrey, "Technology, System Sharing Improve Phone Banking Outlook", *American Banker* , Dec. 7, 1979, vol. CXLIV, No. 237—(Article).

Kutler, Jeffrey, "Phone Bill Paying Accessed by Pioneer", *American Banker* , Dec. 7, 1979, vol. CXLIV, No. 237—(Article).

"User's Guide", *Dowphone* (Undated).

"Audiotex Information From Dow Jones", *The Computer Review*, Nov. 1984, vol. 2, No. 1—(Article).

"Dow Phone Adds Innovest Systems' Technical Analysis Reports" *IDP Report*, Jan. 3, 1986—(Report).

Perdue, R.J., et al., "Conversant 1 Voice System: Architecture and Applications", *AT&T Technical Journal*, Sep./Oct. 1986—(Article).

Martin, James, "Design of Man–Computer Dialogues", *IBM System Research Institute*, Chapter 16, pp. 283–306— (Chapter from a Book) (Undated).

Kaiserman, D.B., "The Role Of Audio Response In Data Collection Systems", *Proceedings of the Technical Sessions*, Paleis des Expositions, Geneva, Switzerland, Jun. 17–19, 1980 pp. 247–251—(Article).

Boies, S.J., et al., "User Interface for Audio Communication System", *IBM Technical Disclosure Bulletin*, Dec. 1989, vol. 25, No. 7A, pp. 3371–3377—(Article).

Kramer, J.J., "Human Factors Problems in the Use of Pushbutton Telephones for Data Entry", *Bell Telephone Laboratories*, Holmdel, N.J., Apr. 74, pp. 241–258—(Paper).

Cox, Jr., Floyd, "Flora Fax", Jan. 22, 1986—(Letter and Advertisements).

Isayama, Tetsuya, "Automatic Response Processing Equipment as a Multi–media Communication Node", *Japan Telecommunications Review*, 1987, vol. 29, No. 1, pp. 29–36— (Article).

Imai, Y., et al., "Shared Audio Information System Using New Audio Response Unit" *Japan Telecommunications Review*, Oct. 1981, vol. 23, No. 4, pp. 383–390—(Article).

"Distrust of computer kills home service plan" (date and source missing).

"Automatic Call Distributor/Management Information System: Interface between 1/1AESS™ Switch Central Office and Customer Premises Equipment", *Bell Communications Research*, Dec. 1986, Technical Reference TR–TSY–000306, Issue 1—(Article).

"Comparison of ACD Systems", *Connection*, Feb. 1990— (Chart).

"ACD Comparison", *Aspect*, Feb. 2, 1990—(Final Report).

"AT&T's Response to Plantiff's Second Set of Interrogatories to Defendant AT&T Corp. (Nos. 17–18)", *Ronald A. Katz Technology Licensing, L.P. and MCI Telecommunications Corp.*, Civil Action No. 97–4453 (USDC, ED PA).

Lanzeter, Ygal, "Automatic Number Identification System For Step–By–Step Exchanges", *The Ninth Convention of Electrical and Electronics Engineers In Israel* Apr. 1975— (Paper).

Flanagan, J.L., et al., "Speech Synthesis", Chapters 1, 39, 42, 45 and 46—(Chapter from a Book).

"Bell Atlantic's Bolger Wants To Be Free", *Telephony* , Jul. 14, 1986—(Article).

"Advanced New Cable TV Technology Developed For Impulse–Pay–Per–View", Jun 3., 1985 (Search).

Noll, M.A., "Introduction to Telephones & Telephone Systems", Second Edition, Chapter 9—(Chapter from a Book).

"Proposal for Kome Mediavoice Interactive Phone/Database Marketing System", "Mediavoice Startup Software Package for Kome" "Optional Mediavoice Software Packages for Kome" "Why ATI Mediavoice Is The Choice For Sucess "—(Proposal).

Meade, Jim, Dec., 29, 1992—(Letter).

"All About Voice Response", *Datapro Research Corporation*, Delran, N.J., Mar. 1972 and Sep. 1974—(Article).

"Voice Response in Banking Applications", *Datapro Research Corporation*, Delran, N.J., Oct. 1974 and Feb. 1983—(Article).

Schiller, T.R., "Field Craft Technician Communication With A Host Computer Synthesized Voice", *Proceedings AVIOS '86 Voice I/O Systems Applications Conference*, Sep. 16–18, 1986.

Rabin, Richard, "Telephone Access Applications: The Growth Market for Voice Processing", *Proceedings AVIOS '86 Voice I/O Systems Applications Conference,* Oct. 6–8, 1987.

Schuster, E.R., "B.R.U.T.U.S. Better Registration Using Touch–Tone phones for University Students", *Proceedings AVIOS '86 Voice I/O Systems Applications Conference,* Oct. 4–6, 1988.

"Exxon's Next Prey. IBM and XEROX", *BusinessWeek*, Apr. 28, 1980, pp. 92–96 and 103—(Article).

Weinstein, S.B., "Emerging Telecommunications Needs of the Card Industry ", *IEEE Communications Magazine*, Jul. 1984, vol. 22, No. 7, pp. 26–31—(Article).

"Riding Gain", *Broadcasting*, Mar. 7, 1983—(Article).

Pickup, Mike, "Bank from home, by screen or by phone", *Building Society Gazette*, Jul. 1988—(Article).

**US 6,292,547 B1**

Page 6

Pickup, Mike, "Voice Response", *Computer Systems*, Sep. 1986—(Article).

Rabiner, L.R., et al., "Isolated and Connected Word Recognition—Theory and Selected Applications", *IEEE Transaction Communications*, May 1981, Com. 29, No. 5, pp. 621, 622, 633, 644–646, 655–659—(Article).

Takahashi, K., et al., "The Audio Response System for Telephone Reservation", *U.D.C.* Oka, Y., et al., "Development of Ventilating Equipment for Shinkansan Train", *U.D.C.* —(Articles in Japanese)

Pagones, M.J., et al., "New services follow increased digitization on the long–haul transmission network", *AT&T Bell Laboratories Record*, 1983, vol. 61, pp. 25–33—(Article).

"New phone service tells customer who's calling", *Bell Laboratories Record,* 1984, vol. 62, p. 9—(Article).

Hirschman, C.B., et al., "LASS: Putting the telephone customer in charge", *Bell Laboratories Record*, 1985, vol. 63, pp. 10–16—(Article).

"AT&T building communications network for Defense Department" and "AT&T inaugurates pay–per–view TV", *Bell Laboratories Record*, 1986, vol. 64, p. 2—(Article).

"Power To . .. ", *Dialogic Corporation*, Littleton Road,—(unidentifiable Article).

"Representative Customer List For Interface Technolog's Total Entry System", "Toes Solutions—Pharmaceutical Manufacturer", "The Voice Response Solution For Answering Customer/Sales Calls", "Toes Solutions—Orthopedic Equipment" and "Toes Solutions—Convenience Store"—(Articles).

Lummis, R.C., "Speaker Verification: A Step Toward the "Checkless"Society", *Bell Laboratories Record*, pp. 254–259—(Article).

Flanagan, J.L., et al., "Synthetic voices for computers", *IEEE Spectrum*, Oct. 1970, vol. 7, No. 10, pp. 22–45—(Article).

Rabiner, L. R., et al., "Computer Synthesis of Speech by Concatenation of Formant–Coded Words", *The Bell System Technical Journal*, May/Jun. 1971, pp. 1541–1558—(Chapter from a Book).

Flanagan, J.L., et al., "Wiring Telephone Apparatus from Computer—Generated Speech", *The Bell System Technical Journal*, Feb. 1972, pp. 391–397—(Chap. from a Book).

Hornsby, Jr., Thomas G., "Voice Response Systems", *Modern Data*, Nov. 1972, pp. 46–50—(Article).

Diffie, W., et al., "New Directions in Cryptography", *IEEE Transactions On Information Theory*, Nov. 1976, vol. IT–22, No. 6, pp. 644–654—(Article).

Rosenthal, L.H., et al., "Automatic voice response: interfacing man with machine", *IEEE Spectrum*, Jul. 1974, vol. 11, No. 7—(Article).

Rosenthal, L.H., et al., "A Multiline Computer Voice Response System Utilizing ADPCM Coded Speech", *IEEE Transactions on Acoustics, Speech, and Signal Processing*, Oct. 1974, vol. ASSP–22, No. 5, pp. 339–352—(Article).

Flanagan, James L., "Computers that Talk and Listen: Man–Machine Communication by Voice", *Proceedings for the IEEE*, Apr. 1976, vol. 64, No. 4, pp. 405–415—(Article).

Maisel, Ivan, "To Put Your Baseball Savvy On The Line, Pick Up The Phone And Call", *Sports Illustrated*, Sept. 3, 1984—(Script).

Brown, Merrill, "Hollywood Saga: Who Bought J. R.?", *The Washington Post*, Final Edition, Oct. 14, 1984 –(Script).

"SPECIAL–OLYMPICS; Teams with baseball trivia expert Brad Curtis", *Business Wire*, Sep. 30, 1985—(Script).

Lucas, W.a., et al., "The Spartanburg Interactive Cable Experiments In Home Education", *Rand Corp.*, U.S. Department of Commerce, National Technical Information Service Feb., 1979—(Publication).

Martin, James, "Viewdata And The Information Society",—(Book).

Gawrys, G.W., "Ushering in the Era of ISDN", *AT&T Technology*, 1986, vol. 1, No. 1, pp. 2–9—(Article).

Cummings, J.L., et al., "AT&T Network Architecture Evolution", *AT&T Technical Journal*, May/Jun. 1987, vol. 66, Issue 3, pp. 2–12—(Article).

Yates, C.E., "Telemarketing and Technology: Perfect Business Partners", *AT&T Technology*, 1987, vol., 1, No. 3, pp. 48–55—(Article).

Herr, T.J., "ISDN Applications in Public Switched Networks", *AT&T Technology*, 1987, vol. 2, No., 3, pp. 55–65—(Article).

"Only the best. Only from Florafax", *Florafax*—(Advertisement).

Aldefeld, B., et al., "Automated Directory Listing Retrieval System Based on Isolated Word Recognition", *Proceedings of the IEEE*, Nov. 1980, vol. 68, No. 11, pp. 1364–1379—(Article).

Rabiner, L.R., et al., "On the Application of Embedded Training to Connected Letter Recognition for Directory Listing Retrieval", *AT&T Bell Laboratories Technical Journal*, Mar. 1984 vol. 63, No. 3, pp. 459–477—(Chapter from a Book).

Rosenberg, A.E., et al., "Recognition of Spoken Spelled Names for Directory Assistance Using Speaker–Independent Templates", *The Bell System Technical Journal*, Apr. 1980, vol. 59, No. 4, pp. 571–592—(Chapter from a Book).

"The Voicestar Series By Periphonics", *Periphonics*, Jan. 1986–(Publication).

"Bank–From–Home system by Periphonics Corporation".

"Bill Payment Success Story", *Periphonics Corporation.*

"A History of Imagination", *Periphonics.*

"Banking Success Story", *Periphonics Corporation.*

"DataVoice and the PDT II", *Periphonics Corporation.*

"Banking Success Story", *Periphonics Corporation*—(Brochures).

Schulman, Roger, "TeleLearning: The Computer Brings the Classroom Home", *Family Computing*, Sep., 1984, pp. 50–53–(Article).

"ICS launches new ?–home ineteractive video service package", *Cable Vision*, Sep. 3, 1984, pp. 71/73 –(Article).

"The Remarketing of Prestel", *Which Computer?*, Aug. 1984, pp. 106, 107 and ?–(Article).

"Four–Line TeleClerk Calls, Answers, Stores, Surveys", *Hardcopy*, Jan. 1985, vol. 14, No. 1—(Article).

"Peripheral Speaks on Phone", *Hardcopy*, Dec. 1984—(Article).

Page from *What's new in Computing*, Apr. 1985—(Article).

Page from *Today*, A Compuserve Publication, Jun. 1985—(Article).

Page from *Computer Communications*, Feb. 1984, vol. 7, No. 1—(Article).

Gits, Victoria, "Interactive device doesn't interrupt telephone calls", *Cable Vision*, Jun. 17, 1985, p. 20—(Article).

Cuilwik, Tony, "Reach Out & Touch The Unix System", *Unix Review*, Jun. 1985, pp. 50, 52,53 , 56—(Article).

Blackwell, Gerry, "Dial–a–Quote: first Canadian commercial audiotex service", *Computing Canada*–(Article).

A-129

## US 6,292,547 B1
Page 7

Applebaum, Simon, "Two–Way television"*Cable Vision*, Aug. 8, 1983, p. 66—(Article).

Sw??ne, Michael, "Fiber–optic TV networks lets viewers talk back", *Info World*–(Article).

Morrill, C.S., et al., "User Input Mode and Computer–Aided Instruction", *Human Factors*, 1968, 10(3), pp. 225–232 –(Chapter from a Book).

Results of Lexis Search Request for "Dial Info or Dialinfo", Date of Search Apr. 13, 1992, pp. 1–38.

Results of Lexis Search Request for "Phone Programs or International Information Network", Date of Search Apr. 15, 1992, pp. 1–35.

Van Gieson, Jr. W.D., et al., "Machine–Generated Speech for Use With Computers, and the problem of fitting a word into one half second", *Computers and Automation*, Nov. 1968, pp. 31–34—(Article).

Patel, Jay, "Utility of voice response system depends on its flexibility", *Bank Systems & Equipment*, Dec. 1988, pp. 101/103—(Article).

Buron, R.H., "Generation of a 1000–Word Vocabulary for a Pulse–Excited Vocoder Operating as an Audio Response Unit", *IEEE Transactions on Audio and Electroacoustics*, Mar. 1986, vol. AU–16, No. 1, pp. 21–25 –(Article).

Gaines, B.R., et al., "Some Experience in Interactive System Development and Application", *Proceedings of the IEEE*, Jun. 1975, vol. 63. No. 6, pp. 894–911—(Article).

"Application for Registration of Equipment to be Connected to the Telephone Network", *Federal Communication Commission*, FCC Form 730.

Dudley, Homer, "The Vocoder", Circuit Research Department, Dec. 1939, pp. 122–128 –(Chapter from a Book).

"Voice Response System Order Entry, Inventory Control".

"Vendor Index", *Audiotex Directory & Buyer's Guide*, Fall/ Winter 1989/1999, pp. 114–156.

Francas, M., et al., "Input Devices For Public Videotex Services", *Human–Computer Interaction –INTERACT '84*, 1985, pp. 171–175—(Paper).

Labrador, C., et al., "Experiments in Speech Interaction With Conventional Data Services", *Human–Computer Interaction—INTERACT'84*, 1985, pp. 225–229—(Paper).

Long, J., et al., "Transaction Processing Using Videotex or: Shopping on Prestel", *Human–Computer Interaction—INTERACT'84*, 1985, pp. 251–255—(Paper).

*Electrical Communication*, 1981, vol. 56, Nos. 1–4, pp. 1–110–(Paper).

Conway R.W., et al., "Tele–CUPL: A Telephone Time Sharing System", *Communication of the ACM*, Sep. 1967, vol. 10, No. 9, pp. 538–542—(Article).

Marill, T., et al., "DATA–DIAL: Two–Way Communication with Computers From Ordinary Dial Telephones", *Communications of the ACM*, Oct. 1963, vol. 6, No. pp. 622–624—(Article).

Witten, I.H., "Communicating With Microcomputers", pp. 121–158—(Chapter from a Book).

"Call–It–Co. Hangs Up On Dial–It In Four Markets", *The 976 Exchange*, 1984, vol. 2, pp. 1–6 (Article).

"DECtalk Help Boston's Shawmut Bank Cut Cost and Improve Service", *Digital*–(Article).

"VTK 81 Voice Computer", *Voicetek*, 1987 (Brochure).

"How a Computerized "Voice" Answers Customer's Inquiries", *Bank Automation Newsletter*, Feb. 1985, Vol. 19, No. 2 (Article).

Rickman, J., et al., "Speech Synthesizers—Communications Interface—Implementing A Touch Tone Telephone Talker With DECtalk", *The DEC Professional*, May 1985, pp. 38, 39, 42–44 (Article).

"DECTALK DELIVERS", *Digital Review*, Sep. 1985—(Article).

"DECtalk turns a telephone into a terminal",—"UNIX and Digital",—"Legal protection for semiconductor chips",—"Product safety",—*DECWORLD*, Apr. 1985, vol. 9, No. 2, pp. 1, 3, 5, 6–8—(Article).

"DECtalk: A New Text–to–Speech Product" *Digital Guideline*, Mar. 1984, vol. 8, No. 3, pp. 1–8—(Article).

*Straight Talk*, A Newsletter about the DECtalk Speech Synthesizer from Digital Equipment Corporation, vol. 1, pp. 1–6.

*Straight Talk*, A Newsletter about the DECtalk Speech Synthesizer from Digital Equipment Corporation, vol. 1, No. 2, pp. 1–7.

*Straight Talk*, A Newsletter about the DECtalk Speech Synthesizer from Digital Equipment Corporation, vol. 1, No. 3, pp. 1–8.

*Straight Talk*, A Newsletter about the DECtalk Speech Synthesizer from Digital Equipment Corporation, Vol. 1, No. 4, pp. 1–8.

*Straight Talk*, A Newsletter about the DECtalk Speech Synthesizer from Digital Equipment Corporation, Vol. 2, No. 2, pp. 1–8.

*Straight Talk*, A Newsletter about the DECtalk Speech Synthesizer from Digital Equipment Corporation, Vol. 2, No. 4, pp. 1–8.

Various Reference/Articles attached with a letter from Smithwin Associates, dated Apr. 22, 1992.

Riley, A.A., "Latest: 2–way communication by computer and telephone".

??even , W. ?., "Computer Helps Children to Add", *The New York Times*, Apr. 20, 1970.

Harvey, R.W., *Times*, The Kiplinger Magazine. "A Computerized System ???", Nov. 23, 1970, p. 14, (unidentifiable Article).

"Hardware for the cashless society", *Electronics Design 3*, Feb. 4, 1971, p. 26.

Tennant, R.P, "Advanced credit system smooths operation and hastens payout", *Data Processing Magazine*, Jun. 1971, vol. 13, No. 6, pp. 34–35.

"Computers that talk back to you", *Business Week*, Date ??.

Smith, Gene, "Chatting Via Computer", *New York Times*, Sep. 12, 1971.

*EDP Weekly*, (unidentifable Article).

"Did Anybody Here Call a Computer", *Data Management*, Feb. 196?

Skala, Martin, "Straight talk from a computer", *Christian Science Monitor*, Jan. 14, 1973.

"Computer for Watergate Probe", *Science*, Jun. 15, 1973.

"Tapping AT&T for a $50–million refund", *Business Week*, Jun. 9, 1973.

"Distrust of computer kills home service plan".

Scherer, Ron, "Chitchat with a computer", *Christian Science Monitor*, Apr. 16, 1975, p. 2.

"Trying Out the Pay–by–Phone Service", *Technology Review*, Mar./Apr. 1976, p. 15.

"Pentagon seeks more control", *Electronics*, Apr. 5, 1976, p. 39.

"Everyman's Computer Terminal", *Industrial Research*, Mar./Apr. 1976, p. 14.

## US 6,292,547 B1
#### Page 8

"DOD could save on test equipmemt".

"Talking computer speeds Ford parts", Apr. 25, 1976.

"Customers of Ten Banks Paying Bills by Phone", *Computer World*, 1976, p. 12.

"FAA to test computerized voice response to queries from pilots", *Electronics*, Nov. 25, 1976, p. 43.

Miller, F.W., "Voice Response Comes to Life with Order Entry", *Infosystems*, Oct. 1981. pp. 62/64.

Suppes, Patrick, "University–Level Computer–Assisted Instruction At Stanford: 1968–1980", *Institute for Mathematical Studies In The Social Sciences, Stanford Univesity*, 1981, pp. 589–716.

Lerner, E.J., "Products that talk", *IEEE spectrum*, Jul. 1982, pp. 32–37.

Carlsen, Clifford, "Megaphone plans to blare message on national scale", *Times*, Mar. 2, 1987.

Michelson, Marlene, "All Kinds of information at your fingertips by phone", *Business Times*, Sep. 8, 1986, vol. 3, No. 19.

Lacter, Mark, "At Megaphone, It's Always Show Time", *San Francisco Chronicle*, Jun. 9, 1986.

Table of Contents, *Megaphone Press Book*, pp. 1–3.

"Miss Simpson, will you dial–a–joke for me please ?", Cartoon.

Lacter, Mark, "At Megaphone, It's Always Show Time", *San Francisco Chronicle*, Jun. 9, 1986, Year No. 123, (different perspective).

Lacter, Mark, "Narrating Fantasy Messages –It's No Dream Job", *San Francisco Chronicle*, Jun. 9, 1986.

"Megapohone Serves High–Tech Showbiz", *San Francisco Chronicle*, Jun. 9, 1986.

"Megaphone Reaches Unique Market", *San Francisco Chronicle*, Jun. 9, 1986.

Feuer, Jack, "Asher/Gould: Megapohone Dials–a–Shop", *Adweek*, May 12, 1986.

Symanovich, Steve, "Novelty over for phone porn vendors", and continutation "Big firms breathing down necks of small phone porns outfits"*San Francisco Business Journal*, May 5, 1986.

Wilke, John, "A 'Dream' Business That's Just A Phone Call Away", *Information Processing*.

Ketcham, D.E., "Dial–a–You–Name–It", *San Francisco Chronicle*, 1986.

Carter, Alan, "What? You Didn't know Erica was engaged again?", *Daily News*, Mar. 12, 1986.

"Firm plugs into sales with time, temp lines", *Crain's New York Business*, Mar. 3, 1986, vol. II, No. 9.

Pitts, Gail, "Phone–in trivia games ring up profits", *The Denver Post*, Feb. 3, 1986.

"Merge Towards Success" IIN and Megaphone, *The 976 Exchange*, Winter 19?6 , vol. 4.

Nelson, David, "From dating to soap operas, 976 numbers come on line", *San Jose Business Journal Magazine*, Jan. 27, 1986.

Greengard, Samuel, "Dial–A–Deluge", *Business*, Nov. 1985.

"Numbers, Please", *Business*, Nov. 1985.

"The 976 Telelease Co.", *Business Opportunites Journal*, Dec. 1985.

"One–time refund for '976' charges", *San Francisco Examiner*, Nov. 7, 1985.

Kent, Debra, "Interactive phone network strectches for calls", *Advertising Age*, Oct. 17, 198?.

"Making Your Phone Talk To Computers", *U.S. News*, Sep. 23, 1985.

"Making Your Phone Talk To Computers", *U.S. News*, Sep. 23, 1985.

Mulqueen, John, "Int'l Information Network Eyes Contact With British Telecom", *Communications Week*, Sep. ??.

Moorhead, Derrol, "Humor, romance: just a call away", *Rocky Mountain Collegian*, Sep. 19, 1985, vol. 94, Iss. 32.

Keppel, Bruce, "Move Under Way to Curb Abuse of Popular Dial–It Service", *Los Angeles Times*, Sep. 1, 1985.

"Dial–a–stock", *Forbes*, Aug. 1985.

Sowa, Tom, "Games people play now include phone trivia", *Spokesman–Review*, Jul. 1985.

Larson, Judy, "976 numbers entice adults –and kids", *Fremont Argas*, Jul. 8, 1985.

Dougherty, P.H., "Advertising Telephone Is Growing As Medium", *The New York Times*, Jul. 17, 1985.

Barbieri, Richard, "Prime Time for he Telephone", *Channels*, May/Jun. 1985, pp. 54–55.

"Bank Provides Financial Fuel To Fast Track Company", *The Financial Center Bank*, First Quarter 1985, vol. II No. 1.

"Don't Phone Santa", *San Francisco Chronicle*, Letters to the Editor, Mar. 29, 1985.

Carvalho, Deborah, "Will Hillary find Happiness with Bob?", *Contra Costa Times*, Mar. 15, 1985.

Murphy, Win, "Dial–a–romance", Mar. 13–19, 1985.

?, Martha, "Love, laughs, luck: Just a phone call away", *Burlington County Times*, Feb. 17, 1985.

1985. Robinett, Stephen, "Blood From A Rock", *Venture*, Jan. 1985, pp. 38–41, 44–45.

Du Brow, Rick, "Lates hot lines for instant trivia pursuit", *Los Angeles Herald Examiner*, Dec. 6, 1984.

"Keep up with your favorite soap operas", *Contra costa Times*, Nov. 30, 1984.

Hanna, Barbara, "Inside Radio/TV".

Behr, Debra, "Victory makes and writes its own on–the–road news", and "Whose calling ? Michael fans most likely . . . ", *Los Angeles Times*, Nov. 29, 1984.

"Newcomer MEGAPHONE Has Magnanimous Goals", *The 976 Ecxhange*, Fall 1984, vol. 2.

"Phone Santa", *Vecaville Reporter*, Nov. 10, 1984.

"Dial 976 for Profits", *Time*, Sep. 3, 1984.

Pendleton, Mike, "For A Fee Your Phone Can Inform", *Burrelle's*, Jul. 19, 1984.

"Phone numbers to get details about soaps", *Burrelle's*, Jul. 18, 1984.

Gansberg, A.L., "976 phone prefix as new entertainment fad", *The Hollywood Reporter*, Jun. 21, 1984.

Carvalho, Deborah, "Another 'GH' actor disconnected with the soap", *Contra Costa Times*, May 26, 1984, p. 4.

"Keep up with your favorite soap operas", *San Francisco Examiner*.

Du Brow, Rick, "'Dial–a–soap' service offers daily TV summaries", *Los Angeles Herald Examiner*, Apr. 26, 1984. News brief, Feb. 1966.

Martin, J., et al. "The Computerized Society—An Appraisal of the impact of Computers on society over the next fifteen years", Chapter 10, pp. 211–266—(Chapter from a Book). New a products, *Datamation*Jul. 1966, vol. 12, No. 7, pp. Jul. 1989—(Article).

Meacham, L.A., et al., "Tone Ringing and Pushbutton Calling", *The Bell System Technical Journal*, 1958, pp. 339–360—(Book).

## US 6,292,547 B1

Page 9

Suppes, Patrick, "The Uses of Computers in Education", *Scientific American*, Sep. 1966, vol. 215, No. 3, pp.—(Article).

Bruckert, E., et al., "Three–tiered software and VSLI aid development system to read text aloud", *Electronics*, Apr. 21, 1983, pp. 133–138—(Article).

Hochman, David, "Implementing Automatic Number Identification", *Telecommunications*, Dec. 1978, vol. 12, No., 12—(Article).

Martin, James, "Telecommunications and the Computer", 2nd Edition, Introduction, pp. 20–23, Chapter 5, pp. 94–95, Chapter 18—(Chapter from a Book).

Martin, James, "Telematic Society", Chapter 6, pp. 45–48, Chapter 9, pp. 67–69, Chapter 20, pp. 181–188 (Chapters from a Book).

Martin, James, "The Wired Society", pp. 53–55, 71–79, 99–100, 204–205, 229–231—(Chapters from a Book).

Martin, James, "Future Developments in Tele–Communications", 2nd Edition, Box A, Chapter 1, p. 5, Chapter 7, pp. 95, 111, Chapter 9, pp. 149–105, Chapter 12, pp. 207–209, Chapter 18, pp. 310–311, Chapter 19, pp. 314–317, 320 Chapter 20, pp. 330, Chapter 23, pp. 379–401—(Chapters from a Book).

Ferrarini, E.M., "Infomania", pp. 59–61, 176–177, 191, 213–214, 223, 245, 250, 257, 285, 286—(Book).

Kimura, Y., et al., "Audio Response System," vol. 55, No. 10, pp. 49–54—(Article in Japanese).

Takano, H., "Characteristics of Mulitpair Exchange Area Telephone Cable with Cellular Polyethylene Insulation by Gas Injection Blouing", p. 55—(Article in Japanese).

Takahashi, T., et al., "SR–2000 Voice Processor and Its Application", *NEC Research and Development*, 1984, No. 73, pp. 98–105—(Paper).

"Concept Diagram Voicemail International System".

"Voicemail Instruction Manual", *Televoice International*, Jun. 1981, Index.

Eckhouse, John, "Voice mail spells relief for phone frustation", *San Francisco Examiner*, Feb. 7, 1982—(Article).

Meade, Jim, "Throw away those pink Call–back slips", *InterOffice*, Jan/Feb. 1984, vol. 3, No. 1—(Article).

Welsh, Jack, "Everybody's Talking About Talking Bouquets", *Design for Profit*, Spring 1986, pp. 7–10—(Article).

Mosco, Vincent, "Pushbutton Fantasies", Contents, Chapter 3 and 4, pp. 67–118—(Chapters from a Book).

Bretz, Rudy, "Media for Interactive Communication", Chapter 5, pp. 110–116, Chapter 7, pp. 143–153—(Chapters from a Book).

Robinson, G., et al., ""Touch–Tone" Teletext a Combined Teletext–Viewdata System", *IEEE Transactions on Consumer Electronics*, Jul. 1979, vol. CE–25, No. 3, pp. 298–303—(Article).

Voice News, Mar. 1982.

Voice News, Jun. 1982, *William W. Creitz*.

Voice News, Oct. 1982, p. 5.

Voice News, Nov./Dec. 1983.

"Consultant Report 28?", *AIS American Bell Advanced Information Systems*, Apr. 1983, pp. 27, 118–119, 123, 124—(Report).

"T–1 Board Sets Deliver High Performance All Digital T–1 Solutions", *NMS Natural MicroSystems*—(Product Bulletin).

"VBX Product Family Overview", *NMS Natural MicroSystems*, pp. 1–20—(Brochure).

"Machine Operation Manual", May 12, 1978, Issue 1, pp. 1–3, 9–10—(Manual).

Davey, J.P., "Dytel Western Region Sales Training Manual", 1985—(Manual).

Gutcho, Lynette, "DECtalk—A Year Later", *Speech Technology*, Aug./Sep. 1985, pp. 98–102—(Article).

Daniels, Richard, "Automating Customer Service", *Insurance Software Review*, Aug./Sep. 1989, pp. 60–62—(Article).

Golbey, S.B., "Fingertip Flight Service", Oct. 1985—(Article).

"ARO Goes Pushbutton", *Newsletter*, Nov. 1985, p. 9—(Article).

"ROLM Centralized Attendant Service", *ROLM Corporation*, 1979.

"AIS, Versatile Efficient Information Service", *Fujitsu Limited*, 1972, pp. 153–162—(Brochure).

Smith, S.L., et al., "Alphabetic Data Entry Via the Touch–Tone Pad: A Comment", *Human Factors*, 1971, 13(2), pp. 189–190—(Book).

Holtzman, Henry, "Still an Infant Technology VOICE MAIL", *Modern Office Technology*, Jun. 1985, pp. 78–80, 82, 84, 90—(Article).

Leander, Monica, "Voice Response—A Technology for Solving Management Problems", *Speech Technology*, Mar./Apr. 1986, pp. 50–52—(Article).

Stolker, Bud, "CompuCorder speech storage and output device. (evaluation)", *Creative Computing*, Jul. 1983, pp. 1–7.

Witten, I.H., et al., "The Telephone Enquiry Service: a man–machine system using synthetic speech", *Int. J. Man–Machine Studies*, Jul. 1977, 9, pp. 449–464—(Book).

Gould, R. L., "Fidelity's Automated Voice Response System", *Telecommunications*, Jan. 1981, pp. 27–28 –(Article)

"Fidelity Automated Service Telephone", *Fidelity Group*, 4 pages—(Manual).

"Data Set 407 Interface Specification", *Manager—Data Systems & Operations*, Jun. 1975, Issue 2, pp. 1–69 plus Table of Contents—(Manual).

Fitzwilliam, J W., et al., "Transaction Network, Telephones, and Terminals", *The Bell System Technical Journal*, Dec. 1978, vol. 57, No. 10, pp. 3325–3537—(Book).

*Inbound Outbound*, May 1988, complete issue.

Koch, Helmut, "Concord Design Services, Inc. Corporate Description", *Exacom*.

Federal Communications Commission, FDC Form 484, Registration, Registrant: Concord Design Services, Inc. *Exacom Telecommunication Systems*—Brochure.

General Description Installation and Operation Manual for Direct Inward (DID) Trunk Interface Unit, *Exacom Telecommunication Systems*, Nov. 21, 1989, Issue 3—(Manual).

General Description Installation and Operation Manual for Answering Service Monitor Syste, *Concord Design Services, Inc.*, Dec. 19, 1986, Issue 1—Manual.

"Dialogic Voice Solutions", *Dialogic Corporation*, pp. 1–72.

"Why Is T–1 Important And How Can It Be Used", *Dialogic Corporation*, Application Note, pp. 1–6.

"Use of Dialogic T–1 For Telemarketing Applications", *Dialogic Corporation*, Application Note, pp. 1–6.

"Use of Dialogic T–1 In Operator Service Applications", *Dialogic Corporation*, Application Note, pp. 1–6.

"Use of Dialogic T–1 In Telephone Company Networks", *Dialogic Corporation*, Application Note, pp. 1–10.

## US 6,292,547 B1

"Use of Dialogic T–1 Equipment in CPE Gateways", *Dialogic Corporation*, Application Note, pp. 1–4.

"Integrating Analog Devices into Dialogic–Based T–1 Voice Processing Systems", *Dialogic Corporation*, Application Note, pp. 1–16.

"Use of Dialogic Components in Automatic Number Identification (ANI) Systems", *Dialogic Corporation*, Application Note, pp. 1–16.

"Dialogic Unit Pricing", pp. 1–6.

"Voice '92 Spring Conference & Exposition", 1992, pp. 1–24—(Brochure).

"Telecom Developers '92", Jan. 1992—(Advertisement).

Newton, Henry, "The Sheer Thrill of it All", *Teleconnect*, May 1991.

"AFIPS Conference Proceedings", 1987 National Computer Conference, Jun. 15–18, 1987, Chicago, Illinois.

"Dynamic Network Allocation".

"Calling your computer is as easy as calling your broker, says AT&T", *Record*, Nov. 1985.

Singleton, L. A., "Telecommunications in the Information Age", Chapter 12, pp. 115–125—(Chapter from a Book).

Weitzen, H. S., "Telephone Magic", pp. 28–31, 38–39, 54–55, 62–67, 70–79, 82–85, 88–91, 106–115, 118–121, 126–127, 134–137, 176–177, Index—(Chapters from a Book).

Weitzen, H.S., et al., "Infopreneurs", pp. 18–19, 138–145, 206–209, Index—(Chapters from a Book).

Sullivan, Kathleen, "Paper firm relies on voice–based inventory system", *IDG Communications, Inc.*, Sep. 10, 1984—(Script).

"VTK Training Section" and "Disk Initialization Procedures for VTK–30/60", *Voicetek Corporation*—(Manual).

"VoiceStor Systems Integration Guide", *Voicetek Corporation*, May 2, 1983—(Manual).

"VTK 60 Voice Computer—Technical Description", *Voicetek Corporation*, Oct. 1986—(Manual).

"Voicetek VS–50 Telephone Interface System", Apr. 25, 1984, System Integration Guide—(Manual).

"VTK Voice System—Programmers Guide", *Voicetek*—(Manual).

"Disk Initialization Procedures for VTK–30/60", *Voicetek Corporation*—(Manual).

"VTK81 Voice Computer—Technical Description", *Voicetek Corporation*, Oct. 1986—(Manual).

"VTK Voice System—VTK/CE Guide", *Voicetek*, Jul. 6, 1987—(Manual).

Newton, Harry, "Network's Telecom dictionary", *Telecom Library Inc.*, 1991—(Advertisement).

"1987 Buyers Guide", *Teleconnect*, Jul. 1987, pp. 194, 197–210—(Brochure) .

Syntellect Inc.—Advertisements.

Various copies of Business cards.

Guncheon, M.C., "The Incredible Dial–A–Message Directory", *Contemporary Books, Inc.*, 1985—(Directory).

"Voice Box Maintenance Manual", *Periphonics*, 1986—(Manual).

"Voicepac Maintenance Manual", *Periphonics*, 1984—(Manual).

Dyer, Ellen, "Wichita Firm Sells 25% Share", Dec. 14, 1987, and "Spectrum Carving Role In Volatile Business", Jul. 7, 1986, Search Results.

"Don't Miss The Unique Gift Idea Of the Year", *Yam Educational Software*, 1987—(Advertisement).

"Welcome to the future of advertising.", *Teleline, Inc.*, 1990—(Presentation).

"Greeting Card Project", *Teleline, Inc.*, Nov. 7, 1988—(Flow Chart).

Sharkey, Betsy, "Dialing for Dollars and Data", *Adweek*, Nov. 16, 1987, pp. 6–8—(Article).

Gay, Verne, "CBS may tie rates to buying p?", 1988—(Article).

Flanagan, J.L., et al., "Synthetic Voices For Computers", *IEEE International Conference on Communications*, 1970, pp. 45–9–45–10—(Conference Record).

Rabiner, L.R., et al., "Computer Voice Response Using Low Bit Rate Synthetic Speech", *Digest IEEE 71 International Convention*, Mar. 22–25, 1971, pp. 1–2, Fig. 1–2—(Paper).

"DT1000 Digitalker Speech Synthesis Evaluation Board", *National Semiconductor Corp.*, Oct. 1980—(Manual).

"Data Set 407C Interface Specifications Nov. 1977", *Bell System Technical Reference*, Nov. 1977, pp. 1–50—(Paper).

Broomfield, R.A., et al., "Making a data terminal out of the Touch–Tone telephone", *Electronics,* Jul. 3, 1980, pp. 124–129—(Paper).

Godfrey, D., et al., "The Telidon Book—Designing and Using Videotex Systems", pp. 1–103—(Book).

"Industry Marketing Bulletin", *Honeywell EDP Wellesley Hills*, Aug. 9, 1967.

"Honeywell Communications Configuration Charts And Aids In Designing", *Data Communications*, pp. 3–1 –3–7 and A.

"Burroughs Audio Response System", Reference Information for Sales Representatives, pp. 1–6 "New Product Announcement", *Burroughs Corporation*, Feb. 5, 1968.

"Stand–Alone Lockbox Application Voice Response (Slave) Communication System Functional Specification", *Cognitronics Corporation*, Feb. 19, 1982, p. 21.

"Unlock lockbox reporting. with Cognitronics Voice Response Communications System/Banking.", *Speech–maker a divison of Cognitronics Corporation.*

"Voice Response for Banking", *Cognitronics Corporation* (Brochure).

"voice response application brief", Speech–maker–(Brochure).

"Instant credit authorization is an easy touch when any telephone is a *voice response* computer terminal", *Speech–maker a divison of Cognitronics Corporation*–(Article).

Slutsker, Gary, "Relationship marketing", *Forbes*, Apr. 3, 1989—(Article).

Finnigan, P.F., "To Our Shareholders", Jun. 1985, Apr.7, 1986, Apr. 10, 1987 –(Letters) "International Programs" (Voicemail).

Finnigan, P.F., "Our guest", *Radio–Schweiz AG Telekommunikation und Flugsicherung*, Jan., 1983, pp. 12–14, Bulletin.

Finnigan, P.F., "Voice mail", *1983 National Computer Conference*, May 16–19, 1983, Anaheim, CA, pp. 375–377 and Abstract.

"Conversations in Your Mailbox", *Software News*, Jan. 1985 –(Article).

Fredric, Paul, "Voicemail Int'l, Radio Page America To Offer A 'Pocket News Network'", *Communications Week*, Jul. 8, 1985—(Article).

"Voice–Messaging System: Use It While You're In, Not Out", *Information Week*—(Article).

"Corporate Performance –Companies To Watch", *Fortune*, Sep. 30, 1985—(Article).

## US 6,292,547 B1
Page 11

"Dream Weaver", *Jon Lindy*, Aug. 1986, pp. 32–35, 37—(Article).

"Turn any telephone into a complete electronic message service", *Voicemail*—(Brochure).

Pages from Company Brochure, *Televoice International, Inc.*

"VMI Big Talker", *Voicemail International, Inc.*—(Newsletter).

"Voiceletter No. 1", *Voicemail International, Inc.*, Dec. 1985.

"Newsline", *Voicemail International, Inc.*, Oct. 1984 and Nov. 1984.

"A New, More Productive Way to Use the Telephone", *Voicemail International, Inc.*—(Brochure).

"While You Were Out . . . "—(Brochure).

"?For People Who Can't Afford to Miss Messages", *Voicemail International, Inc.*—(Brochure).

"Voicemail The electronic news service saves time, money and nerves", *Radio–Suisse Ltd.*, (Voicemail Agent for Europe)—(Brochure).

"Are You Being Robbed of Your Time . . . ?", *Voicemail International, Inc.*—(Brochure).

"Voicemail Instruction Manual B–85", *Televoice International*, Nov. 1980—(Manual).

"Local Telephone Numbers" (for Voicemail) and "Televoice Is As Easy As 1, 2, 3 !", *Televoice International*—(Manual).

"Voicemail Instruction Manual C—25", *Televoice International*, Jun. 1981—(Manual).

"Telephone Numbers" (for Voicemail) and "How To Use Voicemail", *Televoicemail International*—(Manual).

"Message Receiving/Sending" (and others), *Voicemail International, Inc.*—(Manual).

"You Can Use Voicemail To Send And Receivce Messages At Anytime Anywhere In The World", *Voicemail International Inc.*, 1981—(Brochure).

"Advanced User Guide", *Voicemail International, Inc.*—(Manual).

"Voicemail's Basic User's Guide", *Voicemail International, Inc.*—(Manual).

"Welcome to Dowphone", *Dowphone*, Jan. 1986—(Manual).

"Telephone 1–800 Check–PDR", *Officers of Medical Economics Company, Inc.*, 1986—(Circulation/Brochure).

"Turn your telephone into an efficient electronic "mailbox"", *Western Union*, Jan. 1984—(Brochure).

"Western Union Voice Message Service User's Guide", *Western Union*, Jul. 1984—(Brochure).

"PSA's 24 hour reservation system", *PSA*, Sep. 1986—(Brochure).

"To Better Serve Your Business, We're On Call Days, Nights and Weekends.", *Maryland Business Assistance Center*—(Brochure).

"Voice Response: Breaks Trough Call Blockage.", *Business Week*, Aug. 26, 1985—( Advertisment for Preception Technology Corporation).

"Tools for heavy hitters", *Forbes*, May 6, 1985.

"The Fidelity Automated Service Telephone", *Fidelity Group*—(Manual/Brochure).

"Stockquote Hotline", *Norwest Brokerage Services*—(Brochure).

"All You Need To Get The Stock Quotes And News You Want." *Dowphone*, 1984—(Advertisement).

"The Most Respected Name in Telemarketing", *West Interactive Corporation*—(2 Brochures).

Borison, V.S. "TRANSACTION—telephone gets the fact at the point of sale", *Bell Laboratories Record*, Oct. 1975, pp. 377–383—(Article).

Demeautis, M., et al., "The TV 200 A Transactional Telephone", *Commutation & Transmission n 5*, 1985, pp. 71–82 —(Article).

Eriksson G., et al., "Voice and Data Workstations and Services in the ISDN", *Ericsson Review.*, May 1984, pp. 14–19—(Article).

Schrage, Michael, "A Game Von Meister in Pursuit of Profits", *Washington Post*, Sep. 23, 1985—(Article).

Svigals, J., "Low Cost Point–Of–Sale Terminal", *IBM Technical Disclosure Bulletin*, Sep. 1982, vol. 25, No. 4, p. 1835.

Turbat, A., "Telepayment And Electronic Money The Smart Card", *Commutation & Transmission n 5*, 1982, pp. 11–20—(Article).

"Voice Mail", *Sound & Communications*, Apr. 1983, vol. 28, No. 12, pp. 84–85—(Article).

Aso, Satoshi, "Trends and Applications of Voice Output Devices", *2209 J.E.E. Journal of Electronic Engineering*, Feb. 1982, vol. 19, No. 182, pp. 102–107—(Article).

C.R. Newson, "Merlin Voice Mail VM600," British Telecommunications Engineering, vol. 4, Apr. 1985, pp. 32–35.

Kroemer, F., "TELEBOX", Unterrichtsblätter, year 41/1988, No. 2, pp. 67–83 (Article)—no translation.

Kroemer, F., "TELEBOX", Unterrichtsblätter, year 38/1985, No. 4, pp. 131–141 (Article)—no translation.

A.S. Yatagai, "Telephonic Voice Synthesis Systems," Telecommunications, Aug. 1985, pp. 56h–l, 68.

A.J. Waite, "Getting Personal With New Technologies For Telemarketers," DM News, Feb. 15, 1987 at 50.

"Shopping via a network is no longer just talk," Data Communications, Aug. 1981 at 43.

"Growth–Oriented Systems," Restaurant Technology, Nation's Restaurant News Newspaper, Jul. 1, 1985 at 51.

"Let your fingers do the tapping . . . and the computer the talking," Modern Office Tech., May 1984 at 80.

"American Software unveils systems for IBM mainframes," Computerworld, Mar. 26, 1984 at 59.

"Business Units Get Order Entry," Computerworld, Jul. 12, 1982 at 36.

Basinger, R.G., et al., "Calling Card Service—Overall Description and Operational Characteristics", The Bell System Technical Journal, Sep., 1992.

Confalone, D.E., et al., "Calling Card Service—TSPS Hardware, Software, and Signaling Implementation", The Bell System Technical Journal, Sep., 1982.

Eigen, D.J., et al., "Calling Card Service—Human Factors Studies", The Bell Technical Journal, Sep., 1982.

Lexis Search, Nov. 1, 1984, re: System 85 Computer Process.

Lexis Search Jan. 28, 1985, re: Rolm Releases Four–Channel Phonemail Voice Message Unit.

Bulfer, Andrew F., "AT&T's Pay–Per–View Television Trial", published in AT&T Technical Journal, May/Jun., 1987.

* cited by examiner



FIG. 1

FIG. 2

| CALLER'S TELEPHONE NUMBER AND INITIALS | DATA: AGE, WEIGHT----PULSE | CALL RECORD SEQUENCE | ASSIGNED DESIGNATION | ACKNOWLEDGE DIGITS |
|---|---|---|---|---|
| 687·2222·53 47 | 176··········77 | 4951 | 4951684 | 6173 |

FIG. 5

| CARD TYPE | CARD # | CARD EXP. DATE | CUST. # | NAME ADDRESS DATA | ITEM 1 | COLOR SIZE CODE | ACKNOWLEDGE DIGITS |
|---|---|---|---|---|---|---|---|

FIG. 7

| CALLER'S TELEPHONE NUMBER | USES/ MONTH | TIME | I.D. DATA | DESIGNATION | QUESTION ANSWERS |
|---|---|---|---|---|---|



FIG.3



FIG. 4



FIG. 6



FIG. 8



US 6,292,547 B1

1

# TELEPHONIC-INTERFACE STATISTICAL ANALYSIS SYSTEM

This application is a continuation of application Ser. No. 08/475,425, filed on Jun. 7, 1995, and entitled "Telephonic-Interface Statistical Analysis System," which is a divisional of application Ser. No. 07/335,923, filed on Apr. 10, 1989, and entitled "Telephonic-Interface Statistical Analysis System," which is a continuation of application Ser. No. 07/194,258, filed on May 16, 1988, and entitled "Telephonic-Interface Statistical Analysis System," now U.S. Pat. No. 4,845,739, which is a continuation-in-part of application Ser. No. 07/018,244, filed on Feb. 24, 1987, and entitled "Statistical Analysis System For Use With Public Communication Facility," now U.S. Pat. No. 4,792,968, which is a continuation-in-part of application Ser. No. 06/753,299, filed on Jul. 10, 1985, and entitled "Statistical Analysis System For Use With Public Communication Facility," now abandoned.

## BACKGROUND AND SUMMARY OF THE INVENTION

Various forms of publicly accessible communication systems for providing access to a central station have been proposed, some involving telecommunications. However, sometimes a need for ancillary functions arise in that regard, e.g. it may be desirable to positively identify a large group of persons, as a demographically controlled group, or a specifically entitled group, then statistically analyze data from the group so as to accurately identify certain persons in the group and select a subset of at least one person. Specifically, it may be desirable to obtain medical data from an entitled group of people, to correlate such data, perhaps introduce external data, then identify a select subset of the group. In that regard, a need exists for an improved, effective, economical, and expedient system of telecommunication incorporating means for performing qualification, identification, analysis and selection of individual persons.

It has been proposed to interface persons at telephone calling stations directly with a computer facility. In accordance with such arrangements, recorded voice messages prompt callers to provide data by actuating the alphanumeric buttons that are conventionally employed for dialing from one telephone station to another. In one prior arrangement, a caller may actuate dialing buttons to selectively attain a communication channel or to address specific information in a computer. In another arrangement, dialing buttons may be actuated to specify a billing designation as for requested services. Generally, such systems are believed to have been somewhat limited in scope, often involving difficulties that are frustrating or confusing to a caller. Nevertheless, such techniques have been widely used to enhance and broaden communication.

In general, the present invention comprises a telephonic-interface system and related process for selectively utilizing both analog (voice) and digital telephonic communication in a variety of different interface formats or programs, as to select or qualify a set of callers, enable positive identification of at least certain of the callers in the set, acquire data from callers in the set, statistically analyze acquired data, as in combination and in association with external data (time independent), and accordingly to isolate a subset of the callers with verifiable identification. That is, the external data (separate from caller-provided data) may be introduced at any of a variety of different times in relation to the caller data.

2

For example, a voice origination apparatus ay prompt individual callers who (after qualification) provide select digital data to develop a record for further processing either immediately, upon the evolution of a defined set of callers or upon the establishment of select external data. Thus, following a qualification phase, the information acquisition phase may be concurrent or consecutive with respect to the processing phase. When appropriate, abort capability allows a caller to remain "off hook" and go to analog (vocal) communication. The caller then interfaces directly with an operator.

The system of the present invention may qualify an entitled set of callers, then receive answer data in the course of the call and develop identification or designation data, sequence data and statistical data. The system may then provide data cells for storing individual data while assigning confirmable identifications to the entitled set. From the set, a subset is defined. That is, in accordance with various formats, acquired data is processed in statistical relationship, or in relation to applied external data to accomplish such functional operating formats as an auction sale, a contest, a lottery, a poll, a merchandising operation, a game, and so on.

A variety of memory techniques are used to selectively activate the voice origination apparatus. Accordingly, statistical analysis and selection can be effectively and economically accomplished with respect to a substantial set of callers who are accommodated individual communication through a telephone system.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, which constitute a part of this specification, exemplary embodiments exhibiting various objectives and features hereof are set forth, specifically:

FIG. 1 is a block diagram of a system constructed in accordance with the present invention;

FIG. 2 is a fragmentary diagrammatic representation of a storage cell format as may be developed in the system of FIG. 1;

FIG. 3 is a flow diagram of one operating format of the system of FIG. 1;

FIG. 4 is a block diagram of a form of processor or function unit as may be employed in the system of FIG. 1;

FIG. 5 is a fragmentary diagrammatic representation of a storage cell format as may be developed in the system of FIG. 1 with the processor of FIG. 4;

FIG. 6 is a block diagram of elements in an operating function unit of FIG. 4;

FIG. 7 is a diagrammatic representation of a storage cell format as may be developed in the system of FIG. 4; and

FIG. 8 is a block diagram of elements in an operating function unit of FIG. 4.

FIG. 9 is a block diagram of the connections between the CPU and remote stations.

## DESCRIPTION OF THE ILLUSTRATIVE EMBODIMENTS

As required, detailed illustrative embodiments of the present invention are disclosed herein. However, physical communication systems, data formats, and operating structures in accordance with the present invention may be embodied in a wide variety of forms, some of which may be quite different from those of the disclosed embodiments. Consequently, the specific structural and functional details disclosed herein are merely representative; yet in that regard,

US 6,292,547 B1

3

they are deemed to afford the best embodiments for purposes of disclosure and to provide a basis for the claims herein which define the scope of the present invention.

Referring initially to FIG. 1, a series of remote telephone-instrument terminals T1 through Tn are represented (left). The terminals are generally similar, and accordingly, only the terminal T1 is illustrated in detail.

In the disclosed embodiment, the remote terminals T1 through Tn represent the multitude of conventional telephone terminals that are coupled to a communication facility C which may take the form of a comprehensive public telephone system for interconnecting any associated terminals T1–Tn. In accordance with the present system, the terminals T1–Tn operate through the communication facility C to be coupled with a central station D, an embodiment of which is illustrated in some detail.

Generally in accordance with the present development, individual callers use the individual telephone stations T1 through Tn to interface the station D through the communication facility C. Callers may be screened or qualified. Also in accordance herewith, the data of individual callers may be collected, correlated and tested in the station D for processing in accordance with various programs and external data. As a consequence, various objectives are accomplished. For example, a select subset of the callers may be isolated and specifically identified, or related data may be processed, or transactions may be actuated. The possibilities for application of the system are substantial and varied as will be apparent from the exemplary structure and functions as described in detail below.

In one operating process format, the public might be polled with regard to locating the specific purchasers of a defective or dangerous product. Alternatively, the public might be polled with the objective of locating persons susceptible to a specific ailment or disease. Public auctions of unprecedented participation are possible. Legal lotteries are enabled that are interesting, effective and very economical on an individual participant basis. The system also might be employed in various game formats or to automate a promotion or mail-order operation, even to the extent of including inventory control as detailed below.

In each functional operating format, the callers may be variously qualified on the basis of entitlement and may be identified for subsequent verification. The callers then may be prompted, either through the interface or externally, to provide appropriate data.

Considering the system of FIG. 1 in somewhat greater detail, it is to be understood that the communication facility C has multiplexing capability for individually coupling the terminals T1–Tn to the central station D on request. In the illustrative embodiment of the system, the communication facility C comprises a public telephone network and the individual terminals T1–Tn take the various forms of existing traditional or conventional telephone instruments.

The exemplary telephone terminal T1 is represented in some detail to include a hand piece 10 (microphone and earphone) and a panel 12 provided with a rectangular array of push buttons 14 in the conventional configuration. Of course, the hand piece 10 accommodates analog signals while the panel 12 is a digital apparatus. Generally in accordance herewith, the hand piece 10 serves to manifest analog signals vocally to the caller.

In accordance with conventional telephone practice, alphabetic and numeric designations are provided on the buttons 14. For example, several of the buttons 14 carry three letters along with a decimal digit. Specifically, the

4

button designated with the numeral "2" also carries the letters "A", "B" and "C". In that manner, the buttons 14 encompass the numerals "0–9", two symbols, and the alphabet except for the letters "Q" and "Z". Consequently, the buttons 14 accommodate the entry of decimal data, and to some extent alphabetic data.

The buttons 14 designated with symbols "*" and "#", along with the numeral "0", can be used by predetermined assignment to represent the letters "Q" and "Z" or any of a variety of other data or command components. Generally, in accordance herewith, the buttons 14 are employed to formulate digital data at the central station D in various formats determined by the instant specific use and operating format of the system.

Considering the central station D in somewhat greater detail, the communication facility C is coupled to interface a series of processing systems P1 through Pn (FIG. 1, left). specifically, the communication facility C is connected to the processing systems P1–Pn through an associated series of automatic call distributors AC1 through ACn. Each of the automatic call distributors AC1–ACn accommodates one hundred lines from the communication facility C and accordingly, may accommodate and queue up to 100 calls.

Each of the automatic call distributors AC1–ACn may take various forms as well know in the prior art, functioning to queue incoming calls for connection to a lesser number of lines. In the disclosed embodiment, from each of the call distributors AC1–ACn, fifty lines are connected respectively to the individual data processing systems P1–Pn through an interface 20 and a switch 21 Thus, in the disclosed embodiment, each of the automatic call distributors AC1–ACn can accommodate one hundred lines, fifty of which may be active in association with one of the processing systems P.

The processing systems P1–Pn are similar, therefore, only the processing system P1 is shown in any detail. Collectively, the processing systems P1–Pn are interconnected with a command computer terminal CT, at least one interface terminal IT, at least one printer PR and an audio unit AD. The command terminal CT is separately coupled to the audio unit AD.

As represented, the processing systems P1 through Pn each contain a number of individual function units or processors PR1 through PRn. Although various other configurations and arrangements may be employed, the explanation is facilitated by including a plurality of individual function units as treated in detail below.

Considering the processing system P1, fifty lines from the automatic call distributor AC1 are connected to the interface 20, an exemplary form of which may be a commercially available Centrum 9000 unit. The interface 20 incorporates modems, tone decoders, switching mechanisms, DNIS and ANI capability (call data analyzer 20a) along with voice interface capability. Note that the interface may actually perform analysis on data. However, to preserve the disclosed embodiment manageable, major analysis is explained with reference to processors.

Generally, DNIS capability is a function of the communication facility C (composite telephone system) to provide called terminal digital data indicating the called number. ANI capability is a similar function whereby the digital data indicates the calling number with calling terminal digital signals. Both capabilities are available for use with equipment as the interface 20 and to provide control through the call data analyzer 20a.

Accommodating up to fifty independent calls on separate communication paths to the central station D, the interface

US 6,292,547 B1

5

20 is capable of providing analog (voice) signals to prompt each caller. Also accommodated are digital signals including the DNIS and ANI signals. The system contemplates the possibility of utilizing sequences of lines in rotary as well as blocking sequences of lines, the numbers for which command a particular program or operation format of a function unit as disclosed in detail below.

The interface 20 provides the connection of the fifty lines to a switch 21 which is in turn coupled to fifty function units, or processors PR1–PRn. As indicated above, multiple function units, or processors, are described in the disclosed embodiment to facilitate the explanation. Of course, non-parallel techniques and multiplexed operations might well be employed as alternatives. For a similar reason, as disclosed herein, each of the processors PR1–PRn includes memory cells for each of the callers' individual data. Development and compilation of data in such cells according to various operating formats is described below. In the disclosed embodiment, the processors PR1–PRn are connected collectively to the command computer terminal CT (incorporating a CRT display), the interface terminal IT, and the printer PR. Note that the CRT display serves to visually display data regarding select subsets as explained in detail below.

Exemplary detailed structures for the processors PR1–PRn are described below; however, in general, the units may comprise a microcomputer, for example, programmed as suggested above and as disclosed in detail below to accomplish specific operating formats. As an integral part of such formats, a caller may be qualified as belonging to an entitled set of persons or to accommodate specific demographic objectives. Also, callers may be designated both with respect to their significance and their identification. For example, callers may have different significance in a format, depending on the time or sequence of their call. Also, the designation of a caller may be exceedingly important in relation to the caller eventually being isolated as part of a subset, the members of whom must be accurately verified. As described below, the designations may involve multiple elements which may include: random number assignments, encryption techniques, utilization of calling numbers, identification data, sequence of call and so on to facilitate reliable verification. Note that the communication facility C has a customer billing structure B that is interfaced by the system.

On the qualification and designation of callers, the system enters a data accumulation phase during which digital data (formatted at one of the telephone terminals T1–Tn) is processed by one of the processors PR1–PRn. In general, the processing evolves a subset (at least one caller) the members of which may be verified and confirmed.

Either during the data accumulation phase, or after the processing phase to isolate a subset, a distinct operation may involve actuating the interface terminal T1 for direct local communication between the caller and an operator at the terminal T1. Another distinct operation may involve actuation of the printer PR to provide documents in relation to the operating format, as for providing award certificates as for verifying members of an isolated subset. Also, charge slips may be generated containing at least part of the data of a particular transaction.

An appreciation of the philosophical operation of a system in accordance with the present invention may now be enhanced by considering an exemplary operation of the illustrative embodiment of FIG. 1 to isolate a subset of people who are susceptible to a particular disease or infir-

6

mity. The exemplary operation might involve a geographical area, as a large city or population center, in which a particular health problem is somewhat acute. For example, a major population center might be polled where coronary artery disease is a significant problem. Accordingly, persons most susceptible to such disease could be identified for corrective recommendations.

People of the population center could be informed of the availability of a service for statistical health analysis. Accordingly, persons interested in their individual statistical situation would be motivated to utilize the service. Specifically, individual callers would use the remote terminals T1–Tn to contact the central station D through the communication facility C and thereby provide personal information that would enable a statistical analysis in relation to existing data so as to isolate and inform (either real time or batch basis) those persons statistically most likely to be in need of corrective measures. In such applications, it may be important that the caller's identity be subject to reliable verification. Other applications or programs also may present a critical need for positively verifiable identification to the extent that credit card numbers and/or personal identification numbers may be employed.

An exemplary operation of the system, with regard to a specific caller, will now be treated referring somewhat concurrently to FIGS. 1, 2 and 3. As indicated above, FIG. 2 indicates a data storage format for a memory cell in an exemplary processor PR and now will be considered with regard to an operating format in which data is composed for a caller. Pursuing the above example, assume the existence of a caller at the remote terminal T1 (telephone number (213) 627-2222) who wishes to pursue health-related information on the basis of statistical analysis. The caller lifts the hand piece 10 and in accordance with conventional techniques actuates the push buttons 14 to call for a select operating format, e.g. telephone number (213) 627-3333 and thereby establish communication through the facility C with a designated function unit in the central station D. Receiving the call signal, the automatic call distributor AC1 associates the called number ((213) 627-3333, rendered available using standard telephone DNIS techniques) through the interface 20 and the switch 21 to attain connection with the specific processor, e.g. the processor PR1 formatting the health-related program. Accordingly, the processor PR1 cooperates with the interface 20 to cue the interface 20 to operate as a voice generator.

The sequence of operations is represented to be initiated in FIG. 3 by the "enter" block 40 which is accordingly followed by a "cue voice generator" command block 42. If the ANI equipment is not employed, the voice generator in the interface 20 formulates speech, a representative form of which might be: "Thank you for participating in the coronary artery disease statistical analysis. Please give us your telephone number by actuating the call buttons on your telephone instrument."

Acting on the instructions, the caller would push the buttons 14 in sequence to indicate his telephone number, e.g. "(213) 627-2222". Alternatively, the interface 20 can accept the calling number ((213) 627-2222) according to its provision by standard ANI equipment of the communication facility C.

The resulting data signals are communicated from the interface unit 20 (FIG. 1) to the processor PR1 for testing the telephone number as valid or entitled. Essentially, the format of a proper number prompts production of a valid or "good" signal. The test is indicated by the block 44 (FIG. 3). If the

A-143

US 6,292,547 B1

7

response is not valid or entitled, for example contains an inappropriate number of digits or has been used to a point of excess, the operation of block 46 is initiated again cuing the voice generator 30 (FIG. 1). The voice generator accordingly instructs the caller, e.g.: "You have not entered a proper telephone number. Please reenter your telephone number by pressing the appropriate call buttons." The caller is then allotted a predetermined period of time to make a proper entry with the consequence that the system moves to a test operation as indicated by the block 48 (FIG. 3). Specifically, block 48 poses the query: "Is the second try good?"

If the caller is again unsuccessful, the system purges the record as indicated by the block 50 and the call is terminated as indicated by the block 52. In an alternative mode, the processor PR1 may abort the interface and couple the interface terminal IT for direct personal communication with the caller. The interchange would then proceed, person-to-person.

If the caller responds with a proper telephone number, the operation proceeds. Specifically, the system sequences to record the response of the proper telephone number as indicated by the block 45. That is, the caller's telephone number is recorded in an assigned specific memory cell identified with the caller. The format of the cell C1 is indicated in FIG. 2. The first portion, section 53, contains a form of identification data, i.e., the caller's telephone number, i.e. "(213) 627-2222".

Note that as explained above, if the second attempt to formulate a proper number is successful, as manifest by the block 48 (FIG. 3), the response is recorded at that stage. In either case, exiting from the block 54 (FIG. 3) invokes the next operation of again queuing the voice generator as indicated by the block 56.

As an alternative format, if a selective-group polling operation is performed, or callers are otherwise to be cleared for entitlement as mentioned above, a caller may be qualified by providing a "one-time" key number. The processor PR1 may incorporate a look-up table for proper key numbers which numbers may be coded using any of a wide variety of techniques. As a simple illustrative example, the key may comprise a precise number of digits that always total a particular numerical value.

The system proceeds after the caller is qualified. Specifically, the cue to the voice generator of the interface 20 (FIG. 1) as represented by the block 56 produces a request for further information from the caller with further identification data and answer data. For example, the voice generator might request information by stating: "Please use the telephone buttons to indicate initials of your name."

The detailed operation is not represented in FIG. 3 as it is similar to the operation illustrated by the blocks 42 through 54. However, again, a proper response is registered in the storage cell C1 as illustrated in FIG. 2 by the number "53" also registered in the first section 53 of the cell.

The cycle of obtaining digital information from the caller next is repeated with respect to answer data, i.e. specific health data. For example, as illustrated in FIG. 2, the next section 58 in the cell C1 receives an accumulation of health data, including the caller's age, weight, . . . , pulse rate, and so on. Representative digital numbers are illustrated in FIG. 2.

During the course of the telephonic communication, the processor PR1 formulates identification data for the caller specifically including: the chronological sequence of the call, the assigned designation of the call, and a set of

8

acknowledgment digits for the call. Such data identification is registered in the caller's assigned cell C1 in accordance with the format of FIG. 2 being stored in sections 62, 64 and 66. Note that the data may be stored in a coded interrelationship. For example, the acknowledgment digits may be related to the call record sequence. In the illustrative example, the chronological order number of the caller is 4951. The acknowledge digits may be derived from the sequence number. For example, as illustrated, a coded relationship may be established by adding "two" to each of the individual record sequence digits. Considering the example numerically:

Adding without propagated carries:

|     |
| --- |
| 4951 |
| 2222 |
| 6173 |

Note that the confirmation data as acknowledgement digits can be extremely important, as to communicate with an isolated member of a subset. For example, identification could be published or circulated, as by a television broadcast, then respondents checked by use of confirmation data that may be confidential.

Continuing with the above example, the call chronological sequence registered for the caller is 4951 as represented in the section 62 while the acknowledge digits are 6173 as registered in the section 66. Additionally, the processor PR1 develops an assigned designation number, e.g. designation "4951684", which is registered in the section 64, the acknowledge code or digits, e.g. 6173, being registered in the section 66. These values are formulated in accordance with conventional number techniques during the data acquisition phase. With the exemplary numerals formulated, the operation proceeds.

The processor PR1 (FIG. 1) cues the internal memory. That operation is indicated by the block 68 (FIG. 3). Thus, the processor PR1 fetches the call record sequence number, assigns a designation (if not previously assigned), and encodes the sequence number as the acknowledgment digits (if not previously accomplished). These operations are indicated by the block 70 (FIG. 3).

Next, the processor PR1 (FIG. 1) cues the voice generator in the interface 20, as indicated by the block 72 (FIG. 3) to provide information to the caller. Specifically, for example, the voice generator in the interface 20 (FIG. 1) might signal: "This transaction has been designated by the number 4951684, and is further identified by the acknowledgment digits 6173. Please make a record of these numbers as they will be repeated. Specifically, the designation number is 4951684. The acknowledgment digits are 6173. Please acknowledge this transaction by pressing your telephone buttons to indicate the acknowledge digits 6173." In various applications as those involving security, the order and acknowledgment of callers may be very important. Therefore, data for confirmation associated with the order is important.

The system next proceeds to the test mode as indicated by the block 76 (FIG. 3). If the caller provides the correct acknowledgment digits, the data is confirmed in the record as indicated by the block 80 and is registered in the cell C1 (FIG. 2). Additionally, the voice generator is sequenced as indicated by the block 82 (FIG. 3) to indicate the close of the communication and that the transaction is terminated as represented by the exit block 84.

US 6,292,547 B1

9

In the event that a caller cannot confirm his acknowledgment digits, as indicated by the block 76, a repeat operation is performed as indicated respectively by the blocks 86 and 88. Specifically, the voice generator is queued for a second instructional message. In the event that the second attempt also fails, the data is purged and the call discounted as indicated by block 90 and an exit block 92. If the second try is successful (test block 88), as indicated by the block 80, the record is perfected as indicated above.

As a result of the likelihood of a large number of calls, as described above, data cells in the processors PR1–PRn (FIG. 1) are developed with specific information indicative of a statistical sampling of the populace of concern. The data of that statistical sampling may be self-generating of specific conclusions with respect to a subset of individuals, and/or supplemental data to clearly manifest a significant subset. For example, the data may indicate a significant departure from an assumed normal characteristic. Such data, accumulated from the polling may be considered by logic comparisons in the computer 22 to select the subset of persons who should be isolated.

In addition to the self-generating conclusions available from the received data, the system may involve the introduction of external data. In the physical fitness example, such external data might take the form of national statistical data. In any event, the processing operation usually involves comparison testing which compares caller data from individual memory cells of the processors P1–Pn (FIG. 1) with test data that is supplied through the command terminal CT.

In the above example, members of the public in general were invited to use the service. A number of alternatives exist which might well impact on the statistical analysis. For example, a list may be preserved by a use-rate calculator to implement a consumable key operation. That is, a user is qualified to a specific limited number of uses during a defined interval.

As another example, callers might be restricted to the purchasers of a specific product as a medical apparatus for measuring blood pressures, heart rates, or so on. In such situations, it will be apparent that the statistical data will be somewhat distorted from an average or normal sampling. Clearly, the processors P1–Pn can be programmed to take into account such considerations. In that regard, the processors might also verify identification data proffered by a caller. Such data might take the form of a credit card number or a personal identification number. Methods for verification of such numbers using computer techniques are discussed below.

As indicated above and detailed below, the system can be programmed or formatted for use in a variety of applications. Preliminary to considering exemplary forms of such applications, reference will now be made to FIG. 4 showing an exemplary structural form for the processors PR1–PRn. From the switch 21 (FIG. 1) a pair of communication lines 90 and 91 are indicated in FIG. 4 (top left). The line 90 provides signals from a processing unit 92 while the line 91 provides signals to the processing unit 92 along with other components as represented in FIG. 4. The separate lines 90 and 92 facilitate explanation.

The processing unit 92 may take the form of a minicomputer programmed to accommodate the functions of various applications, as disclosed in detail below. As indicated above, the system may utilize a plurality of independent function units or processing units, e.g., processing unit 92, operating in a somewhat parallel configuration, or alternatively, a limited number of processors may be driven sequentially to accommodate the functional operations as described.

10

The input line 91 (upper left) is connected specifically to a qualification unit 93, a sequencer 94 and a designation unit 96, as well as the processing unit 92 as indicated above. The qualification unit qualifies access from a remote terminal T1–Tn to the processing unit 92 as described in detail below. In accordance with various applications or operating formats, the qualification unit 93, the sequencer 94 and the designation unit 96 operate preliminarily with respect to individual callers. Generally, these units qualify or test callers for entitlement, develop a sequence-of-calls record and provide forms of designations for callers that may be authenticated. As described in detail below, the units function in sequence to accomplish such operations and accordingly are each individually connected to the processing unit 92 and a buffer storage 97. Essentially, the buffer storage 97 is illustrated separately from the processing unit 92 along with the unit 93, sequencer 94, unit 96, and so on, again in order to facilitate the explanation. Similarly illustrated are a memory 98 (with cells C1–Cn), a look-up table 103 and a clock 105.

Considering the processor of FIG. 4 in further detail, the qualification unit 93 (upper left) is connected to a look-up table 99 and a use-rate calculator 100. The designation unit 96 (top center) is connected to a random number generator 101 and an encryptor 102.

In view of the above structural description of the system, consideration will now be given to certain specific applications in relation to the operation of the system. In that regard, the operation of the system will next be considered to automate a mail-order facility.

Assume that- a caller at a terminal T1 (FIG. 1) dials a specific number to identify a mail order interface with the system of FIG. 1. For example, assume the telephone number "(213) 627-4444" for such an interface. Accordingly the caller dials the number at the remote terminal T1. As a result, the communication facility C couples the terminal T1 through the automatic call distributor AC1, the interface 20 and the switch 21 to a select processor PR1 identified and programmed for a mail-order operating format. Note that the communication facility C provides the dialed number ("(213) 627-4444") to the processing system P1 through well known telephonic equipment DNIS. Accordingly, a program is selected to execute the mail order interface.

As a preliminary action, a voice responder in the interface 20 might be cued by the processing unit to identify the mail-order house and indicate that the order will be taken by computer. Either before or after qualification, the caller might be advised that if he prefers to communicate directly with a person, or needs such contact at any point in the communication, he may accomplish it simply by pushing the asterisk button (*) at the terminal T1. Such action forms an abort signal that is detected by the processing unit 92 to transfer the communication to the interface terminal IT (FIG. 1). Alternatively, the customer may be asked (by voice cue) to provide detailed information as name, address, etc. which is recorded for later processing.

After the preliminary information is supplied to a caller, the qualification phase is initiated. For example, the interface 20 might actuate the terminal T1 to announce: "Please indicate the type of credit card you will use for your purchase by pushing the button number 'one' for Mastercharge, 'two' for . . . ."

The caller's response, indicating a specific credit card, will be stored in a data cell; however, the data is developed initially in the buffer 97. The format and data for the present example (in the buffer 97) will be explained with reference

US 6,292,547 B1

11

to a storage block format **104** as illustrated in FIG. **5**. The first data block **130** accordingly registers a digit to indicate the card that will be used to support the caller's purchase.

Using voice prompt, the interface **20** next instructs the caller to use the telephone buttons to indicate his credit card number and the expiration date of the card. That data is stored in the register **104**, specifically in the blocks **132** and **134** as illustrated in FIG. **5**.

Next, the caller is asked for his customer number, as it may appear on his catalog. That number is stored in a block **136** of the block format register **104**. Note that the caller may not be identified in the files of the mail-order house and in that event, the operation may be shifted to a manual operation to be continued through the interface terminal IT (FIG. **1**) as explained above. For a television-initiated mail-order transaction, other numerical codes might be employed as to key into broadcast schedules. For example, a code might be used to indicate program times and thereby enable evaluation of the productivity of such program times. Such operation may be performed during the designation-phase as described below.

To continue with the explanation of the automated format, assume that the customer has a file customer number and that it is stored in the block format register **104** along with his credit card number and expiration date. From that location, the data is checked by the qualification unit **93** (FIG. **4**) for propriety as part of the test or qualification phase of operation. The check or test is in two stages and both are performed during an interval designated t1, the qualification unit **93** operating under control of the processing unit **92**.

First, the data is verified as representing valid and proper data formats for the customer's number, the credit card number and expiration date. The second operation involves consulting a so-called negative list to assure that the identified card and customer's number have not been cancelled, as for example in the case of credit cards that have been lost or stolen. Detailed structure for such tests is described in the parent case from which this case continues and may be incorporated in the qualification unit **93**.

With the successful completion and verification of the preliminary data in the block format register **104**, the qualification phase of operation is concluded and the system next interfaces with the caller to acquire and process data for a specific order of merchandise. Note that in the mail-order operating format, the sequence of the call is not normally significant. However, the sequencer **94** may log the time during a period t2 if deemed worthwhile.

Somewhat as described above in relation to the initial operating format (health poll), the voice generator in the interface **20** prompts the caller through a series of exchanges that load the storage block format register **104** with a merchandise order. Thus, as purchase items are confirmed, the register **104** is loaded as exemplified by the blocks **140** and **142**. The interchange continues until the customer indicates he does not wish to order any additional items. The system then operates the designation unit **96** (FIG. **4**) during the interval t3 to develop and announce the acknowledgement digits as stored in the block **144** (FIG. **5**). The acknowledgement digits serve to identify the order both for the caller and the mail-order house. Accordingly, tracing is facilitated. The data (FIG. **5**) is then transferred from the buffer **97** (FIG. **4**) to a select memory cell C1–Cn.

During the next interval t4, the processing unit **92** (FIG. **4**) isolates data of the cells C1–Cn to facilitate the mail-order process. In that regard, the processor **92** may incorporate structure and processing techniques as disclosed in the parent case.

12

Of the wide variety of other operating formats and applications in accordance herewith, further examples will now be described with reference to the systems of FIGS. **1** and **4**. However, from a consideration of the operating formats treated below, it will be apparent that certain structural elements have reoccurring significance in the combination. Specifically, such elements include the structures: (1) utilizing the called number to select a specific operating format, (2) for screening or selecting callers who will be accepted based on various criteria, (3) for designating callers in a manner to enable subsequent positive identification and (4) various processing aspects of the data manipulations including the provision of at least a portion of certain ID data provided directly from the telephone apparatus. With respect to the data processing, distinctive elemental features include the utilization of external data not available during the interval of gathering data, the utilization of an interrelationship between the composite data collected during a data acquisition period, and the operation of utilizing time or sequence of callers to accomplish a subset.

As the next illustrative operating format, an instant lottery system will be described. Accordingly, assume the existence of a legalized state lottery accommodated by the telephone system utilizing a pay-to-dial number ("(213) 976-xxxx") and restricted to a limited number of uses for defined intervals of time. For example, a person might be entitled to play the lottery a limited number of times or to the extent of a limited dollar value during a predetermined interval.

From the terminal T1 (FIG. **1**) the caller would actuate the push buttons **14** to establish contact with the processing system P1 coupling would be through the communication facility C, the automatic call distributor AC1, the interface **20** and the switch **21** as described in detail above. The initial operation then involves qualification of the caller to participate in the instant winner lottery. Again, ANI or caller interface techniques may be employed. If the caller is involved, the interface **20** is actuated by the qualification unit **93** during the operating interval ti to instruct the caller: "Please key in your telephone calling number". As indicated above, an alternative involves the system simply registering the calling number on the basis of its provision by ANI equipment.

In any event, after the caller's telephone number is registered, the instruction is given: "Participation in instant winner lottery is for persons over twenty-one years of age. Accordingly, please key in the year of your birth". A driver's license or credit card number may be similarly registered to confirm age. Alternatively, the combination of telephone number and date of birth could be used. In any event, the caller's data is registered and the qualification unit **93** then functions to test the data as provided. Specifically, the caller's telephone number is checked in a look-up table **99** to determine whether or not it is a proper and currently valid number for use in the lottery. Concurrently, the number is checked by the use-rate calculator to determine the number of times it has been used in excess of a predetermined number of calls or dollar value to participate in the lottery during a current interval of monitoring.

If the data indicates a qualified caller, the system proceeds to the next phase of designating the transaction. Note that the sequence is not significant in this operating format with the consequence that the interval t2 and the operation of the sequencer **94** may be bypassed. Rather, the designation unit **96** operates during the interval t3 to provide the caller with a designation for the current transaction and if applicable, updates the file as to current use or dollar value remaining for the caller's use. As explained above, the random gen-

US 6,292,547 B1

13

erator **101** with or without the encryptor **102** may be employed to create an identification number which may include an encrypted form of the caller's telephone number. Accordingly, data for the transaction is established in the buffer **97** then set in a cell of the memory **98** (FIG. 4). Specifically, the completed data cell format might be as follows: Telephone No.—Birth Year—Designation—Random No.

The system next functions to generate the random number as indicated above which will then be tested against a series of other numbers to determine whether or not the caller is a winner. In that regard, elements in the processing unit **92** which accomplish the operation are illustrated in FIG. 6 which will now be considered in detail.

A random number generator **160** functions on command to provide a three-digit number. With the consummation of a call, the random number generator **160** is actuated to provide the caller's random number in a selected caller cell **162**. From that location, the caller's random number is compared with numbers from a register **164** by a comparator **166**. The numbers in the register **164** were previously passed through a gate **174** from the generator **160**. In the event of coincidence, the comparator provides an output "yes" signal to a line **168**. Conversely, the failure of coincidence prompts the comparator **166** to provide a "no" output to a line **170**. Essentially, a "yes" indicates a win while a "no" indicates the caller has lost.

The elements of FIG. 6 provide a random operating format to determine winners on a somewhat statistical basis; however, the system increases the probability with the passage of time when no win occurs. In that regard, at the outset of an operating cycle, the random number generator **160** provides a random number that is passed through the gate **174** to the register **164**. In the exemplary format, a three-digit number would be provided. At that stage, the caller's random number, from the cell **162**, would be compared with the single number in the register **164** by the comparator **166**. However, with the passage of time, calls are tallied or time is metered by a counter **178**. Accordingly, upon the attainment of a predetermined count, the gate **174** is again qualified to enter another number in the register **164**. Accordingly, an increasing set of numbers are held in the register **164** for comparison with each caller's number. Of course, the more numbers in the register **164**, the higher probability of a caller winning and that relationship depends upon the duration or number of calls since the last winner.

Either a win or a loss as indicated within the processing unit **92** (FIG. 4) prompts the interface **20** to respond appropriately to the caller announcing his results. If there is a win, the designation may be reinforced and additional identification may be taken as explained above. Of course, if the prize simply involves a credit on the caller's telephone bill or his credit account, identification and designation become less critical considerations.

In the event of substantial awards to be claimed, the processing system P1 (FIG. 1) may actuate the printer PR to produce a positive identification of the winner, which document may be redeemed only by the caller providing the assigned designation along with confirmation of his identification data.

Generally in relation to awards, the processing unit **92** may also utilize a random number format for determining the significance of awards. That is, a random number may be actuated to provide numerals from one through twenty, for example, the magnitude of the number generated for a caller indicating the significance of his award. Normally such

14

information would be provided to the caller and registered in his memory cell.

With respect to memory cells generally, it is to be noted that actuated memory cells may be cleared for callers who are not winners. Accordingly, a limited number of memory cells store the subset of winners for subsequent confirmation processing and so on.

As another operating process format in accordance with the present invention, consider an auction sale. As disclosed herein, the auction format is associated with television as, for example, in the form of a cable channel for dedicated use during an interval of an auction sale.

Preliminarily, in accordance with the disclosed exemplary format, persons wishing to participate in the auction sale would make preliminary arrangements involving utilization of the system to establish authorization data for qualified bidders in cells C1–Cn of the memory **98** (FIG. 4). In an alternative format, the bidders could simply be qualified immediately before bidding, as on the basis of a charge-card number or other identification.

Generally, it is contemplated that callers are coupled into the system only during the bidding on specific items of merchandise. Accordingly, some prequalification may be desirable to facilitate the rapid accumulation of a bidding group with the introduction of a unit of merchandise.

In accordance with the disclosed format, an auctioneer conducts the sale in a somewhat traditional manner, recognizing that he is interfacing a relatively large audience through the system of the present invention and with a television connection. Specifically, the auctioneer is cued as to audience reaction by a monitor incorporated in the command computer terminal CT (FIG. 1). Essentially, the auctioneer is given an abstract or summary of the relative bidding as the auction progresses. In one format, the caller sees the auction on a television receiver. That is, the monitor may be covered by a television camera to inform the audience and particularly interested bidders. Consider the detailed steps of the operation.

As the auctioneer announces the next item for sale, it is televised to potentially interested bidders. In addition to being informed of the merchandise, potential bidders might also be reminded of the telephone number for participating in the auction. Accordingly, any interested person at a remote terminal T1–Tn may dial the auction number and obtain access to the processing systems P1–Pn. The caller would have a television set available, tuned for example to a cable channel.

Any preliminary qualification as indicated above will then be performed along with any appropriate designation. With regard to the designation, unless callers are identified as part of the qualification step, the designation unit **96** (FIG. 4) assigns a limited-digit number to individual callers for use by the auctioneer interfacing the command computer and terminal CT. Further designation and sequencing as disclosed herein also constitute part of the process. To the extent that qualification and designation operations may be performed, the operations are performed as described above with reference to FIG. 4 by the qualification unit **93** and the designation unit **96**. Of course, any of the safeguards and limitations as described herein may be employed as deemed appropriate for an auction format.

After the preliminaries, the auctioneer initiates the bidding with respect to a particular item that is observed by the callers on a television receiver as through a cable channel. Note that the audio may be variously-coordinated through the telephone communication facility C and the audio chan-

US 6,292,547 B1

15                                                                                    16

nel of the caller's television. In a simple format, after an introductory phase, communication to callers with respect to the bidding is provided through the television link. Alternatively, the audio unit AD (FIG. 1) may be employed.

Essentially, the auctioneer initiates the bidding by stating an initial value for the opening bid. Callers are invited to bid by actuating the push buttons 14 (FIG. 1). For example, the auctioneer may invite an initial bid of one hundred dollars asking callers to so bid by entering an asterisk (*) by punching the button so designated. In accordance with one operating format, cells in the memory 98 (FIG. 4) are actuated to register the bidding number in identified relationship with several calls. Note that although a record may be desirable, it is not usually necessary to record all bids, particularly at initial bidding figures. In any event, the individual processing units, e.g. unit 92 in individual processors PR1–PRn are interconnected (FIG. 1) and operate to select the final and key bids.

After attaining the initial bid, the auctioneer may invite further bidding by seeking a bid of two hundred dollars or any bid. Such a bid might be accomplished either by punching the asterisk button to attain the solicited bid, or by using number buttons to enter a different bid, e.g. two hundred fifty by buttons "2", "5" and "0". Again, cells of the memory 98 are actuated to record select bids (sequence) at the higher value.

The status of the bidding is presented to the auctioneer by the monitor of the command computer terminal CT (FIG. 1). Specifically, the auctioneer is provided an indication of the number of bidders at each level. If a sizeable number of callers bid at a specific value, the auctioneer may wish to advance the price significantly for the next round of bidding. Thus, the auctioneer proceeds until a small group of remaining callers are addressed. Note that the display of the command terminal CT (FIG. 1) may also inform the auctioneer of fresh bidders.

As the selection process proceeds, signals from the clock CL (FIG. 1) are introduced to indicate the sequence of bidders. For example, assume the bidding has proceeded to a stage where only three bidders remain active. The auctioneer is informed by the command terminal CT of the order in which the callers made their bids. The sequence is also of record in the cells of the memory 78 (FIG. 4) to indicate the sequence in the event that the final bid involves more than one caller. Of course, the first caller to respond with a bid would have priority in the purchase.

Normally at the conclusion of the bidding on a particular item, the contents of the cells in the memory 98 would be purged with only the final bidders being held in general memory within the processing unit 92. Of course, it is important to maintain a record of back-up bidders in the event the sale is not consummated with respect to the first of the highest bidders. That is, a subset of the highest bidders is preserved for each item of merchandise in the event that the highest bidder fails to qualify or the sale otherwise cannot be consummated. Of course, a distinct advantage of the system is the ability to accommodate a vast auction participation group for items of substantial value and as a consequence the distillation of a subset of callers is exceedingly valuable information.

To consider another operating format in association with the television media, a system will now be described whereby television viewers participate on a real-time basis in a game show for prizes. The ability to involve television viewers in a program has the potential of expanding program interest along with the expanded participation.

Game shows in accordance herewith may take any of a wide variety of forms as several well known programs in which studio contestants compete for prizes. In utilizing the system of the present invention to involve remote participants, it may be desirable to preliminarily qualify and designate callers as explained above. Specifically, prior to participating in an actual game show, interested participants interface the system as depicted in FIG. 1, and in the course of an exchange as described above, the qualification unit 93 and the designation unit 96 cooperate with the processing unit 92 to accomplish preliminary data on potential participants in cells of the memory 96.

Various games will involve different screening processes and clearances. For example, a child's television game format may require parental clearance and in that regard written communication may be required for approvals. Such approval may require the assignment of a personal identification number to the child player as qualifying identification data.

As explained above, clearances may be perfected through the look-up table 99 (FIG. 4) in association with the qualification unit 93 or approvals through a consumable key step may be extended to incorporate functions of the processing unit 92 in association with the memory 98. For example, if qualification simply involves a check-off operation, the look-up table 99 will normally be employed. However, in the case of preregistration for a participant, as in the case of the auction sale, the memory 98 is involved with the qualification unit 93 through the processing unit 92 to establish a data cell C1–Cn for each qualified participant. Thus, each potential participant to be qualified interfaces with the processing unit 92 during a preliminary interval of operation to provide data in one of the cells C1–CN to facilitate qualification for participation during a real-time game show.

At the time of the show, callers are qualified simply by reference to their assigned memory cell data for a verification. Thereafter, the caller's exchange information to supplement their data as with respect to the play which follows. Specifically for example, a caller might select a studio audience participant with whom the caller is to be allied. The interface operation may be essentially as described above wherein a voice generator in the interface 20 (FIG. 1) provides signals which activate the remote telephone unit to speak the instruction: "If you wish to play with Player No. 1, please push button No. 1; if you wish to play with Player No. 2, please push button No. 2 . . . and so on". The caller may also be instructed to indicate the extent of a wager. For example, "Push the number button indicating the points you wish to risk".

The participant data is stored in an assigned cell of the memory 98 (FIG. 4) for the caller and as the game proceeds, the processing unit 92 tallies the caller's score. Scores are interrelated between individual processing units to actuate the terminal CT. Thus, individual accounting occurs for each of the calling participants on an on-line basis dependent upon the success of the studio players and their association with the callers. On-going accounting data may be provided at intervals or real time by the recorded voice to each contestant.

According to the described format, after an interval of play, the processing units, as the unit 92 (FIG. 4), operate to isolate a subset of caller-players who have amassed the highest scores. Of course, various arrangements may be provided for awarding prizes to the select subset of winning callers.

A-148

US 6,292,547 B1

17

The above format involves a real-time game show with an on-line operating format. A somewhat similar format involves nonreal-time operation and in that sense, callers may interface with the system of the present invention before and after the show; however, not primarily during the show. Such a show might involve a quiz for callers based on their ability to perceive and remember occurrences within the show. Preregistration may be employed, however, is not essential. Rather, callers may call after the broadcast of a program. In that event, sequence or time clocking may be very important to limit or control individual interfaces to a specific time or geographic "window". That is, as suggested above, allocation-routing equipment and techniques may be employed in various of the formats to window callers. With the system, callers are screened or qualified at the time of a call, identified in a particular calling sequence, designated for identification and quiz answers are given for subsequent processing. Alternatively, players could participate by providing their credit card for billing or be billed through the "pay-to-dial" network. Consider an exemplary format.

A key to participation in the game show may involve the purchase of a particular product. For example, a person desiring to participate may purchase a product which carries a concealed key number. The number serves as a caller's key to participation in the game show.

In accordance with the disclosed operating format, after watching the broadcast of a television show (possibly a serial episode) the participant actuates the push buttons 14 at one of the remote terminals T1–Tn to accomplish an interface communication with the select operating format. For example, the caller may actuate the buttons 14 for the station number "277-7777" which identifies the game format of current description.

Assume responsive operation of the communication facility C to couple the caller through the automatic call distributor AC1 to the interface 20. Upon establishing a connection, the interface 20 receives the caller's telephone number through ANI equipment and a data cell in the memory 98 (FIG. 4) is assigned to the caller. Specifically, for example, associative coupling is provided for the caller through the switch 21 (FIG. 1) to the processor PR1 containing the memory 98 (FIG. 4) and a cell C2 assigned to the caller. A block format 200 is illustrated in FIG. 7 indicating the data that is developed in the cell C2. At the outset, the caller's telephone number is stored in a section 201 followed by uses/month in section 202.

Next, the caller is greeted and requested to give the key number entitling him to participate in the game show. The instruction constitutes an initial action to take place in an interval of qualification during the time t1. The caller actuates the buttons 14 providing digital representations to the qualification unit 93 (FIG. 4) and the look-up table 99 is consulted. Note that the table 99 may be a large, shared unit that tabulates each of the key numbers and accounts for their use. If the caller has identified a proper key number, the process proceeds and the key number is accounted, i.e. incremented or decremented to the limit of use if any. Alternatively, a repeat information operation may be requested as described in detail above.

As a further check during the qualification stage, the use-rate calculator 100 may function to determine whether or not an excessive number of calls have originated from the designated number. Thus, consideration involves calls or value with reference to a predetermined period of time. Again, a shared calculator may be used or addressing may obtain selectivity on the basis of calling numbers. If a large

18

number of calls have originated from a single telephone terminal, a fraudulent situation may be suggested. Assuming no such indication occurs, the number of uses is registered in a section 200 (FIG. 7) and the operation proceeds from the interval t1 to interval t2.

During the interval t2, the sequencer 94 registers the precise time of the call in the buffer storage 97, specifically in a section 204 as illustrated in FIG. 7. With the entry of such data, the system passes from the operating interval t2 to t3.

The caller is next asked to identify himself in some specific manner. For example, the caller may simply be asked to provide the year of his birth. Alternatively, somewhat comprehensive information may be taken as in the form of drivers' license numbers, social security numbers and so on. Of course, such data may be employed for subsequent identification of the caller and, accordingly, is registered in the buffer storage 97 (FIG. 4). Specifically, identification information is registered in section 206 of the block 200 as shown in FIG. 7.

In addition to receiving identification information from a caller, the system assigns a designation to the caller; Specifically, the random number generator 101 (FIG. 4) provides a number which may be encrypted along with other identification data as the caller's personal identification to provide a numerical designation that is registered in the storage 97. Specifically, the designation is stored in a section 208 as illustrated in FIG. 7. With the designation complete, the interval t3 terminates initiating the data accumulation phase which occurs during an operating interval t4.

At this juncture, operating elements within the processing unit 92 will be considered in relation to an explanation of the manner in which select questions are provided to a caller and his answers received and recorded for subsequent processing to determine winners.

Preliminarily, reference will be made to FIG. 8 showing elements involved in the operating format which are contained in the processing unit 92 (FIG. 4) in association with the memory 98. To avoid confusion, the elements identified in FIG. 8 are designated by fresh numerals.

To accommodate the exemplary operating format, a dramatic program might be recorded preparatory to the television broadcast. A substantial number of questions would then be formulated based on the dramatic program. For example, "How many people were present when the will was read?"

It is contemplated that the dramatic program would be broadcast to different geographical segments of the country during different time intervals. To accommodate the different time intervals, it is proposed to utilize different questions for each geographic segment. That is, the basic format can remain the same, only the questions change by time zone to avoid study and collaboration on questions as a result of time shifts. A question propounded to a Chicago caller should not be repeated to a Los Angeles caller. In any event, callers might be given three questions randomly drawn from a pool serving one geographic segment and three questions drawn from a different pool serving another geographic segment.

The signals for prompting a voice generator are registered in memory sections MS1 through MSn. Each of the memory sections MS1–MSn is served by an address input AI1–AIn respectively. Similarly, the address inputs AI1–AIn are instructed by random number generators NG1–NGn, in turn actuated by decoders DE1–DEn. Consider the operating sequence of the memory MS1 as an example.

The decoder DE1 is responsive to telephone calling numbers (provided by ANI equipment) indicative of a

A-149

US 6,292,547 B1

19

particular geographic area. Note, for example, that area code numbers afford an effective geographic classification of callers which is very useful in many formats or processes of statistical analysis in accordance herewith. Note that geographic (or other) classification in accordance herewith is also accomplished by the called numbers provided. Each of several television stations would solicit calls for different numbers as a result, either by DNIS or call channeling. Select processors would be reached through the interface units, e.g. interface **20** FIG. **1**. In operation, the decoder DE1 determines a call is from a specific geographic area and accordingly provides a signal to actuate the random number generator NG1. As a consequence, the random number generator NG1 provides a series of three random numbers in the form of addresses for the memory **92**, FIG. **4**. That is, the addresses may simply comprise three alphanumeric bits supplied to the address input AI1 to prompt the provision of three sets of voice generator signals for announcing the three questions in sequence. For example, the first question might be as suggested above: "Push the button on your telephone for the number of persons present in the room when the will was read".

The voice generator signals are supplied from the memory MS1 (within the processing unit **92**, FIG. **4**) to the interface **20** (FIG. **1**) which generates audio signals to actuate the caller's hand piece **10**. Accordingly, the caller is instructed to answer three questions, the responses being recorded in a section **210** of the data block **200** (FIG. **7**). Note that the clock **105** (FIG. **4**) may be utilized to limit the response period allowed each caller.

As indicated above, to accommodate broadcast of the program in a different time slot for a different geographic area, the decoder DEn (FIG. **8**) actuates the random number generator NGn to address the memory MSn to provide three different questions as a result of a random selection. Accordingly, within a time or times (perhaps limited and offset) after the conclusion of the program, a substantial number of callers are accounted for in cells of the memory **98** and similar units of the composite system. The cells indicate sequences of calling and also may contain billing data where appropriate. Thus, pay-to-dial operations avoid the need for billing, yet it may still be made of record.

Subsequent to the data accumulation phase of operation, the processing unit **92** (and its equivalents) is actuated during an off-line processing interval to isolate the subset of callers correctly responding to the questions. In accordance with one format, the subset of successful callers may be reduced to a sub-subset as by a random computer "draw" to define a group of significant winners. That is, a random number generator may be employed as explained above.

As an alternative to subsequent processing, the system may inform callers of their success during the course of the interface telephone call. That is, callers might simply be informed by cuing the voice generator: "Your answers are correct and in accordance with the program game, you will now be entered in the sweepstakes draw for the prize . . . " Thus, the format defines a subset then further selects a sub-subset of winners. In any of the various formats, the status of the analysis can be televised by selecting a camera focused on the interface terminal IT.

Still another operating format for the system takes the form of polling operations to determine opinion or facts. An illustrative form of the format is disclosed below again in association with a television broadcast.

Generally, the illustrative polling format is contemplated in association with a television broadcast addressing a

20

matter of current interest as, for example, a political issue or election. A master of ceremonies propounds questions to a viewing audience, many of whom are on-line through an interface of a system of the present invention. The master of ceremonies or commentator instructs the callers who are regulated and controlled by the system of the present invention to provide digital data which the system processes to inform the commentator as with regard to subsets of callers. For example, the commentator may be statistically informed as to the numbers of callers holding specific views. Consider a specific exemplary operating format.

Assume the existence of a system in accordance with the present invention installed for use in association with a television broadcasting facility. Of course, various previous arrangements could be involved; however, according to one arrangement a commentator simply invites members of the viewing audience to call a specific number and express their views with respect to a specific issue. Callers located at terminals T1–Tn (FIG. **1**) activate the terminals to accomplish an interface with one of the processing systems P1–Pn as explained above. Note that the processor (or the interface **20** may involve operation of the qualification unit **93** (FIG. **4**) to prevent callers from loading the poll. That is, to prevent multiple calls from a single terminal that would distort a poll, the qualification unit **93** registers calls in association with the use-rate calculator **100**. Interfacing a specific processor, callers are screened by the qualification unit **93** (FIG. **4**). In such a poll, it may be important to control the sampling group on a statistical basis. For example, it may be desirable to limit callers from each of several geographic areas. Accordingly, by the use of ANI equipment, the caller's telephone number is provided to the qualification unit **93** during the preliminary interval t1, and a determination is performed with regard to the number of involved callers from the geographic area using the look-up table **99**. On attaining a full quota from a specific area, a subsequent caller may be informed that the lines are full. Alternatively, the caller may be requested to provide his telephone number for screening in the event ANI equipment is not available.

The caller may be requested to provide additional information so as to poll a balanced group. For example, a caller might be asked questions concerning age, political registration and so on by prompting the interface unit **20** to pose audio questions and testing the digital results through the qualification unit **93** as with reference to the look-up table **99**.

As indicated above, in the event that the broadcast television program is one of a series, it may be desirable to limit the extent of participation over a period of several programs. Accordingly, the use-rate calculator **100** (FIG. **4**) may be employed in association with the qualification unit **93**. That is, if a calling number has participated in a prior poll, it may be denied access for a subsequent poll or its data not counted. Such operation would involve the use-rate calculator **100** in association with the qualification unit **93** performing logic tests to actuate the voice generator of the interface **20** for providing an appropriate interchange with a caller.

With the screening or qualification of a select group of callers, the sequencer **94** (FIG. **4**) may or may not be involved to identify the order of callers. Also, the designation unit **96** may or may not be involved in view of the fact that for many polls there is little interest in subsequently identifying callers.

In the poll-format operation of the system, it is important to provide a capability of defining select intervals during

A-150

US 6,292,547 B1

21

which callers may provide data. In one arrangement, with the consummation of a communication interface between a caller and a processor unit, the audio of the-television broadcast is keyed from the audio unit AD through the switch **21** (FIG. **1**) for communication to the caller.

With a multiplicity of callers in interface relationship with the processors PR1–PRn as function units, a polling question is stated, for example: "If you favor expanded trade with . . . at the tone press button one; if you do not, press button two".

To control the interval of polling, the command computer terminal CT (FIG. **1**) is actuated to enable the callers timely access to the processors.

At the expiration of a polling interval, the interfaces may be terminated or additional questions may be propounded. In any event, subsequent to the data-gathering phase, the bulk data is supplied to the command computer terminal CT incorporating computing facility to isolate subsets for communication by the broadcast. Accordingly, an effective on-line poll can be conducted with statistical sampling control and prompt display of responses.

As explained above, the arrangement of the function unit (or units) may be variously embodied in a single processor or many processors, depending on various considerations as time sharing, multiplexing, paralleling and so on. The systems as described above embody the components bulked together in one location. However, components of the system could be spaced apart geographically, using dedicated lines or polling techniques. An illustrative embodiment is shown in FIG. **9**.

Call distributors CD1–CDn are at different geographic locations along with associated interface units IA1–IAn and IB1–IBn. Each of the interface units, as unit IA1 is coupled to a central processor **251** as indicated by lines **252, 254, 256** and **258**. Each of the lines may take the form of a dedicated telephone line or a polling telephonic coupling.

In the operation of the system of FIG. **9**, the call distributors CD are coupled to a telephonic communication system and accordingly allow the interface units I to provide interface communication between the central processing unit **251** and a multitude of remote terminals T1–Tn as illustrated in FIG. **1**. With data accumulated in the cells, it may be variously down loaded as to a central processing station. Thus, the distributed-component system is capable of executing the various formats as explained above with reference to the illustrative structure.

In view of the above explanation of exemplary systems, it will be appreciated that other embodiments of the present invention may be employed in many applications to accumulate statistical data, process such data, and define subsets of callers of concern. While certain exemplary operations have been stated herein, and certain detailed structures have been disclosed, the appropriate scope hereof is deemed to be in accordance with the claims as set forth below.

What is claimed is:

**1**. A control system for use with a communication facility including remote terminals for individual callers, wherein each of said remote terminals comprises a telephonic instrument including a voice communication device, and a digital input device in the form of an array of alphabetic numeric buttons for providing caller data signals, said control system comprising:

a processor unit for processing said caller data signals supplied by individual callers via said remote terminals;

interface structure for interfacing said communication facility to said processor unit wherein said interface

22

structure receives data signals prior to the close of communication with the caller, including called number data signals (DNIS) and calling number identification data signals automatically provided by said communication facility and said caller data signals supplied by the individual callers via said remote terminals;

voice generator for providing prompts to said individual callers in response to which said individual callers provide said caller data signals, said caller data signals including caller qualification data for qualifying said individual callers;

testing caller customer number data as part of said caller qualification data supplied by the individual callers as at least certain of said caller data signals against a file of stored customer number data;

means for controlling said processor unit in accordance with said called number identification data signals (DNIS) to process at least certain of said caller data signals in accordance with a select format from a plurality of formats identified by said called number identification data signals (DNIS); and

a switch that transfers the individual callers to a manual operation in the event the individual callers do not qualify during the testing step.

**2**. A control system according to claim **1**, wherein at least certain of said individual callers at certain of said remote terminals are also subject to qualification based on said calling number identification data signals.

**3**. A control system according to claim **1**, wherein said processor unit generates data identifying an order and provides the data to the individual callers.

**4**. A control system according to claim **3**, wherein the data identifying the order is number data.

**5**. A control system according to claim **4**, wherein the number data is provided as acknowledgement data to the individual callers.

**6**. A control system according to claim **4**, wherein the number data is provided in chronological sequence.

**7**. A control system according to claim **1**, wherein the qualification data is indicative of a consumable key.

**8**. A control system according to claim **1**, wherein the caller data signals include item number data.

**9**. A control system according to claim **1**, wherein the caller data signals include a second form of identification data.

**10**. A control system according to claim **1**, wherein said file of stored customer number data includes negative file data.

**11**. An analysis control system for use with a communication facility including remote terminals for individual callers, wherein each of said remote terminals comprises a telephonic instrument including a voice communication device and digital input device in the form of an array of alphabetic numeric buttons for providing data and wherein said communication facility has a capability to automatically provide terminal digital data, indicating a calling telephone number, said analysis control system comprising:

interface structure coupled to said communication facility to interface said remote terminals for voice and digital communication and including means to provide caller data signals representative of data relating to said individual callers provided from said remote terminals or automatically provided by the communication facility with respect to the remote terminals prior to the close of communication with the callers including caller personal identification data entered by the caller

A-151

US 6,292,547 B1

23

via the digital input device and said terminal digital data indicative of a calling telephone number;

record testing structure connected to receive and test said caller data signals indicative of said terminal digital data representative of said calling telephone number and said caller personal identification data against previously stored terminal digital data and caller personal identification data;

storage structure for storing certain of said data provided by said individual callers including item data for ordering particular items; and

analysis structure for receiving and processing said caller data signals under control of said record testing structure.

**12.** An analysis control structure according to claim **11** wherein said callers further provide credit card number data as caller data signals.

**13.** An analysis control system according to claim **12,** wherein said individual callers further provide expiration data with respect to said credit card number data as caller data signals.

**14.** An analysis control system according to claim **13,** wherein said individual callers receive authorization on-line.

**15.** An analysis control system according to claim **14,** wherein the credit card number data is received as billing data.

**16.** An analysis control system according to claim **14,** wherein said analysis structure further comprises a processor that generates data identifying an order and provides at least certain of the data to the individual callers.

**17.** A control system according to claim **11,** wherein said analysis structure further comprises a processor that generates data identifying an order and provides at least certain of the data to the individual callers.

**18.** A control system according to claim **11,** wherein the data identifying the order is number data.

**19.** A control system according to claim **18** wherein the number data is provided as acknowledgement data to the individual callers.

**20.** A control system according to claim **18** wherein the number data is provided to the individual callers in chronological sequence.

**21.** A method for implementing a service for controlling an order of an item or items for use with a communication facility including remote terminals for individual callers, wherein each of said remote terminals comprises a telephonic instrument including a voice communication device and a digital input device in the form of an array of alphabetic numeric buttons for providing data, said method comprising the steps of:

interfacing said remote terminals for voice and digital communication and receiving data signals prior to the close of communication from callers at said remote terminals including said caller data signals developed by said remote terminals;

providing prompts to said individual callers in response to which said individual callers can provide said caller data signals including caller qualification data for qualifying callers;

receiving from said callers customer number data in addition to one other form of identification data as a part of the caller qualification data;

verifying said customer number data and said other form of identification data entered by said callers;

24

receiving from said callers order data including item data entered by said callers via said digital input device;

receiving from said callers additional data relating to said item data;

processing said caller entered data to implement said order; and

providing individual callers with computer generated data to identify said order for individual callers.

**22.** A method according to claim **21,** wherein the computer generated data identifying the order is provided to the individual callers as acknowledgement data.

**23.** A method according to claim **21,** wherein the computer generated number data is provided to the individual callers in chronological sequence.

**24.** A method according to claim **21,** wherein the data identifying the order identifies the order for a mail order house.

**25.** A method according to claim **21,** wherein data identifying the order facilitates tracing.

**26.** A method according to claim **21,** further comprising the step of:

receiving called number identification signals (DNIS) automatically provided by said communication facility as a part of said data signals.

**27.** A method according to claim **20,** further comprising the step of:

receiving calling number identification signals automatically provided by said communication facility as a part of said data signals.

**28.** A method according to claim **21,** wherein the receiving step includes receiving calling number identification signals automatically provided by said communication facility as a part of said data signals.

**29.** A method according to claim **21,** wherein in response to prompts said individual callers enter credit card data.

**30.** A method according to claim **29,** wherein in response to prompts said individual callers enter data on a type of credit card.

**31.** A method according to claim **29** wherein said callers enter credit card number data as credit card data.

**32.** A method according to claim **31** wherein in response to said prompts said callers enter credit card expiration data as credit card data.

**33.** A method according to claim **32,** further comprising the step of:

verifying on-line the credit card number data and the credit card expiration data.

**34.** A method according to claim **31,** wherein said credit card number data is received as billing data.

**35.** A method according to claim **21** wherein said order is a television initiated order.

**36.** A method according to claim **35,** wherein at least certain of the data relating to the order entered by said callers is coded data displayed on the television.

**37.** A method according to claim **21,** wherein the customer number data provided by the callers is associated with a limit restricting use of the service to an extent of a dollar value.

**38.** A method according to claim **21,** wherein the customer number data provided by the callers is associated with a limit restricting use of the service up to a certain number of uses.

**39.** A method according to claim **21,** wherein the customer number data provided by the callers is associated with a limit restricting use of the service to a limited period of time.

**40.** A method according to claim **21,** further comprising the step of:

controlling inventory of items with certain order data.

US 6,292,547 B1

25

**41**. A method according to claim **40**, wherein the controlling step controls the inventory of items on-line.

**42**. A method according to claim **21** wherein the verifying step further comprises the step of:

verifying the customer number data provided by the callers against a list of negative customer numbers.

**43**. A method according to claim **21** wherein said other form of identification data is social security number data.

**44**. A method according to claim **21** wherein said other form of identification data is PIN data.

**45**. A method according to claim **21** wherein the callers order multiple items during the course of a call.

**46**. A method according to claim **45**, wherein the facility operating the service is a mail order house.

26

**47**. A method according to claim **21**, wherein the data identifying the order identifies the order for a facility operating the service.

**48**. A method according to claim **21**, wherein the additional data provided by the callers includes the size of the item.

**49**. A method according to claim **21**, wherein the additional data provided by the caller includes the color of the item.

**50**. A method according to claim **21**, wherein the additional data provided by the caller includes the size and color of the item.

\*    \*    \*    \*    \*

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,292,547 B1                                                    Page 1 of  3
DATED          : September 18, 2001
INVENTOR(S)  : Ronald A. Katz

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Title page,
Item [56], **References Cited**, U.S. PATENT DOCUMENTS:
Delete "3,794,219" and replace with -- 3,794,774 --
Delete "4,489,439" and replace with -- 4,489,438 --
After "4,757,267  7/1988 Riskin" please insert -- 379/113 --
After "4,996,705  2/1991
Entenmann et al." delete "379/91" and replace with -- 379/93.13 --

FOREIGN PATENT DOCUMENTS:
Delete "52-17440" and replace   with -- 52-17740 --

OTHER PUBLICATIONS:
At "The Voice Response..." delete "Turnes" and replace with -- Turns --
At "Brochures" delete "feeling" and replace with -- flying --
At "Look Ma, no operators!" delete "doesmany" and replace with -- does many --
At "1,000,000 Shares Common Stock" delete "al,Inc.." and replace with -- al, Inc. --
At "D.I.A.L. Software...." delete "Relase" and insert -- Release --
At "Brady, R.L. et al.," delete Tehnical" and replace with -- Technical --
At "Kaiserman, D.B.," delete "Paleis" and replace with -- Palais --
Delete "Power To. .." and replace with -- Power To… --
At "Flanagan, J.L.," delete "Chap." and replace with -- Chapter --
Delete "Lucas, W.a.," and replace with -- Lucas, W.A., --
At "ICS launches" delete "ineteracive viedeo" and replace with -- interactive video --
At Cuilwik, Tony" delete "52,53 ," and replace with -- 52, 53, --
At "Van Gieson" after "of fitting a" please insert -- spoken --
At "Vendor Index" delete "1989/1999" and replace with -- 1989/1990 --
At DECtalk Help..." delete "Cost" and replace with -- Costs --
At the first entry which begins with "Straight Talk" after "vol. 1," insert -- No. 1 --
At "Hardware for..." delete "cashless society" and insert -- 'cashless society' --, also
delete "Electronics" and insert -- Electronic --
Delete ""Distrust of computer kills home service plan"."
Delete "Lacter, Mark, "At Megaphone, It's Always Show Time", San Francisco
Chronicle, Jun. 9, 1986, Year No. 123, (different perspective)."
Delete "Megapohone" and insert -- Megaphone --

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,292,547 B1                                    Page 2 of  3
DATED         : September 18, 2001
INVENTOR(S)   : Ronald A. Katz

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

OTHER PUBLICATIONS cont'd,
At "Kent, Debra" delete "strectches" and insert -- stretches --
Delete second occurrence of "Making Your Phone Talk to Computers", U.S. News, Sep.
23, 1985."
Delete "1985. Robinett" and replace with -- Robinett --
At "Keep up with your favorite..." delete "costa" and replace with -- Costa --
At Behr, Debra, delete ""Victory" and replace with -- '"Victory' --
At "Newcomer MEGAPHONE" delete "Ecxhange" and replace with -- Exchange --
Delete "News brief" and replace with -- News briefs --
Delete "New a products" and replace with -- New products --, also delete "Jul. 1989"
and replace with -- 7/89 --
At Takano, H." delete "Mulitpair" and replace with -- Multipair --
At "General Description..." delete "Syste" and replace with -- System --
At "Newton, Harry" delete "Network's" and replace with -- Newton's --
Delete "voice response" and replace with -- Voice response --
At "Finnegan, P.F." after "-(Letters)." insert a hard return, so that "International
Programs" begins a new entry.
At "You Can Use..." delete "Receivce" and replace with -- Receive --
At Basinger, R.G." delete "1992" and replace with -- 1982 --

Column 17,
Line 53, delete "and-the" and replace with -- and the --

Column 20,
Line 32, delete "unit" and replace with -- unit --
Line 67, delete "the-system" and replace with -- the system --

Column 21,
Line 3, delete "the-television" and replace with -- the television --

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,292,547 B1                                     Page 3 of 3
DATED         : September 18, 2001
INVENTOR(S)   : Ronald A. Katz

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Column 22,
Line 12, before "testing caller" please insert -- means for --
Line 66, delete "callers" and replace with -- caller, --

Column 24,
Line 25, delete "20" and replace with -- 21 --

Signed and Sealed this

Nineteenth Day of November, 2002

Attest:

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

*Attesting Officer*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,292,547 B1                                    Page 1 of 1
DATED         : September 18, 2001
INVENTOR(S)   : Ronald A. Katz

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

<u>Column 24,</u>
Line 8, insert -- number -- after "generated".

Signed and Sealed this

Third Day of May, 2005

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

(12) **EX PARTE REEXAMINATION CERTIFICATE** (7734th)

# United States Patent

Katz

(10) **Number:**    **US 6,292,547 C1**

(45) **Certificate Issued:**    **Sep. 14, 2010**

(54) **TELEPHONIC-INTERFACE STATISTICAL ANALYSIS SYSTEM**

(75) Inventor: **Ronald A. Katz**, Los Angeles, CA (US)

(73) Assignee: **Ronald A. Katz Technology Licensing, L.P.**, Beverly Hills, CA (US)

**Reexamination Request:**
No. 90/006,979, Mar. 26, 2004
No. 90/007,087, Jun. 9, 2004

**Reexamination Certificate for:**
Patent No.:       **6,292,547**
Issued:           **Sep. 18, 2001**
Appl. No.:        **09/270,241**
Filed:            **Mar. 15, 1999**

Certificate of Correction issued Nov. 19, 2002.

Certificate of Correction issued May 3, 2005.

**Related U.S. Application Data**

(63) Continuation of application No. 08/475,425, filed on Jun. 7, 1995, now Pat. No. 6,035,021, which is a division of application No. 07/335,923, filed on Apr. 10, 1989, now Pat. No. 6,016,344, which is a continuation of application No. 07/194,258, filed on May 16, 1988, now Pat. No. 4,845,739, which is a continuation-in-part of application No. 07/018, 244, filed on Feb. 24, 1987, now Pat. No. 4,792,968, which is a continuation-in-part of application No. 06/753,299, filed on Jul. 10, 1985, now abandoned.

(51) **Int. Cl.**
| | |
|---|---|
| *A63F 3/08* | (2006.01) |
| *G07C 11/00* | (2006.01) |
| *G07C 15/00* | (2006.01) |
| *H04M 3/36* | (2006.01) |
| *H04M 3/38* | (2006.01) |
| *H04M 3/436* | (2006.01) |
| *H04M 3/46* | (2006.01) |
| *H04M 3/493* | (2006.01) |
| *H04M 3/51* | (2006.01) |
| *H04M 11/00* | (2006.01) |
| *H04M 3/42* | (2006.01) |
| *H04M 3/487* | (2006.01) |
| *H04M 3/50* | (2006.01) |
| *H04Q 3/00* | (2006.01) |
| *H04Q 3/545* | (2006.01) |
| *H04Q 3/66* | (2006.01) |
| *H04Q 3/72* | (2006.01) |
| *H04Q 3/74* | (2006.01) |
| *H04Q 3/64* | (2006.01) |

(52) **U.S. Cl.** .................................. 379/93.12; 379/91.02
(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2,998,489 | A | | 8/1961 | Riesz |
| 3,141,931 | A | | 7/1964 | Zarouni |
| 3,194,892 | A | * | 7/1965 | Glenner ...................... 379/246 |
| 3,243,514 | A | * | 3/1966 | Moore et al. ................ 379/183 |
| 3,453,389 | A | | 7/1969 | Shaer |

(Continued)

OTHER PUBLICATIONS

VCT Quarterly Newsletter vol. 2, No. 3, Winter 1987.*

VCT Quarterly Newsletter vol. 1, No. 2, Winter 1986.*

Yoshizawa et al. "Voice Response System for Telephone Betting" in Hitachi Review, 26(6), Jun. 1977, pp. 215–220.*

(Continued)

*Primary Examiner*—Erik Kielin

(57) **ABSTRACT**

A system D interfaces with a multiplicity of individual terminals T1-Tn of a telephone network facility C, at the terminals callers are prompted by voice-generated instructions to provide digital data that is identified for positive association with a caller and is stored for processing. The caller's identification data is confirmed using various techniques and callers may be ranked and accounted for on the basis of entitlement, sequence or demographics. Callers are assigned random designations that are stored along with statistical and identification data. A break-off control circuit may terminate the computer interface aborting to a terminal for direct communication with an operator. Real-time operation processing is an alternative to stored data. The accumulation of stored data (statistical, calling order sequence, etc.) is variously processed and correlated as with developed or established data to isolate a select group of subset of callers who can be readily identified and reliably confirmed. Different program formats variously control the processing of statistical data as for auction sales, contests, lotteries, polls, commercials and so on.



**US 6,292,547 C1**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,484,560 A | | 12/1969 | Jaeger |
| 3,651,503 A | * | 3/1972 | Kono ............................ 360/1 |
| 3,702,392 A | * | 11/1972 | St. Jean ...................... 235/380 |
| 3,728,486 A | | 4/1973 | Kraus |
| 3,778,553 A | * | 12/1973 | Rackman ................. 379/93.27 |
| 3,798,360 A | | 3/1974 | Feistel .......................... 380/37 |
| 3,833,885 A | * | 9/1974 | Gentile et al. ............... 235/379 |
| 3,959,603 A | | 5/1976 | Nilssen et al. ................. 377/42 |
| 4,007,336 A | | 2/1977 | Hutton, Sr. ................... 179/18 |
| 4,031,324 A | | 6/1977 | Dudonis |
| 4,071,698 A | | 1/1978 | Barger, Jr. et al. |
| 4,149,042 A | | 4/1979 | Balzer et al. |
| 4,197,430 A | | 4/1980 | Dowden |
| 4,256,928 A | | 3/1981 | Lesea |
| RE30,580 E | | 4/1981 | Goldman et al. |
| 4,302,632 A | | 11/1981 | Vicari |
| 4,310,727 A | | 1/1982 | Lawser |
| 4,400,587 A | | 8/1983 | Taylor |
| 4,429,187 A | | 1/1984 | Butcher |
| 4,556,970 A | | 12/1985 | Flanagin et al. ............... 370/58 |
| 4,567,323 A | | 1/1986 | Lottes |
| 4,656,623 A | | 4/1987 | Dalby |
| 4,677,609 A | | 6/1987 | Piereth |
| 4,726,056 A | | 2/1988 | An |
| 4,737,983 A | | 4/1988 | Frauenthal et al. |
| 4,776,004 A | | 10/1988 | Bauer |
| 4,788,682 A | * | 11/1988 | Vij et al. ..................... 379/259 |
| 4,797,911 A | * | 1/1989 | Szlam et al. |
| 4,797,913 A | * | 1/1989 | Kaplan et al. ........... 379/91.02 |
| 4,858,123 A | | 8/1989 | Alexoff |
| 4,918,719 A | | 4/1990 | Daudelin |
| 5,027,384 A | | 6/1991 | Morganstein |

OTHER PUBLICATIONS

Emerson et al. "Voice Response System—Technology to the Rescue for Business Users" in Speech Technology Jan./Feb. 1983, pp. 99–103.*

AT&T's Conversant 1 Voice System, John P. Moosemiller, Speech Technology Mar./Apr. 1986.*

Robert Self, *AT&T Kills 800 Service,* Inbound/Outbound, May 1988.

US–Sprint; "US Sprint unveils fiber optic 800 service," Business Wire, May 20, 1987.

New Telnet Contracts, "US Sprint to launch 800 service in Sept.," Communications Daily, May 21, 1987.

Powers, Pam, "Toll–Free Fracas; US Sprint enter 800 service fray," Network World, May 25, 1987.

Wallace, Bob, "Marketing team banks on DEC–Rockwell link; Software blends power of VAX and Galaxy ACD," Network World, Feb. 1, 1988.

"Destination Wichita," Wichita Business, May 1988.

*Alaska–Airlines; (ALK) Alaska Airlines offers a Christmas gift to lift any occasion,* Business Wire, Nov. 10, 1986.

*The Teleconnect Dictionary,* (Harry Newton ed., Bookcrafters, Chelsea, MI 1987).

"Galaxy Switching Products Integrated Switching System (ISS) Call Processing Functional Description," Rockwell International, Aug. 1984, Bates Nos. Rockwell 03891–03934.

"PABX, Interconnect and the Future Office Controller," International Resource Development, Inc., Aug. 1980, Report #139.

"Common Channel Interoffice Signaling," Bell System Technical Journal (series of articles), Feb. 1978, vol. 57, No. 2, pp. 225–282 [table of contents only].

Kettley, A.W. et al., "TSPS No. 1; Operational Programs," Bell System Technical Journal, Nov. 1970, vol. 49, No. 9, pp. 2625–2623.

Helsey, G., et al., "Building Blocks, D–MUMS Delphi Multi–Media Universal Messaging System, The Building Block Concept, An Overview," Sep. 21, 1981 [Lotito Supplemental Materials 2, Bates Nos. TMOB 360–0010615 to TMOB 360–0010733].

Delphi Communications Corporation, Delta 2 System Concepts and Facilities, vol. 1, System Architecture, Jul. 1981 [Lotito Supplemental Materials 4, Bates Nos. TMOB_ 360–0010791 to TMOB_360–0010990].

"Store & Forward Voice Switching," Report 145, International Resource Development Inc., Jan. 1980 [Lotito Supplemental Materials 6, Bates Nos. TMOB_360–0018165 to TMOB_360–0018177].

Hattori, Shimmi et al., "A Design Model for a Real–Time Voice Storage System," IEEE Transactions on Communications, vol. COM–30, No. 1, Jan. 1982 [Lotito Supplemental Materials 7, Bates Nos. TMOB_360–0018178 to TMOB_ 360–0018181].

Molotsky, Irvin, et al., "Briefing; Play It Again, On Hold," The New York Times, Aug. 25, 1985.

Bruns, Don, "Agency service review: phone system cross–sells customers," National Underwriter (Property & Casualty/Employee Benefits Ed.). Cincinnati, Issue 43, pp. 38, Oct. 26, 1987.

Hitchings, B., "It's really daylight robbery—or is it?" Nationwide News Pty Limited Herald, Aug. 26, 1987.

Lee, Gordon, "Jingles and Radio Spots Make Hits for Seattle Sound Studio Puget Sound B," Scripss–Howard Business Publications 1985; Business Dateline; Puget Sound Business Journal, Sep. 2, 1985.

Gillespie, Jon, "Hold 'Em Maximizes Phone Time, Prevents Costly Lawsuits," San Antonio Business Journal, San Antonio, vol. 2, Issue 6; Sec. 1, p. 13, Feb. 29, 1988.

S. Sirazi, C. Bestler, T. Rossen and G. Reichard, Jr.,"Comparative Study of Hybrid–IPPV Implementations," *NCTA Technical Papers,* 1985, pp. 27–33, presented Jun. 3, 1984 to Cable 85, in Las Vegas, NV.

Wallace, Bob, "Call It Telethievery," ComputerWorld, Jul. 4, 1984, pp. 31–33, 35–36.

The Voice, VCT Quarterly Newsletter (Voice Computer Technologies Corporation, Norcross, GA), vol. 2, No. 3, Winter 1987 (6 pgs.).

Kanichiro Yoshizawa, et al., *Voice Response System for Telephone Betting,* 26 Hitachi Review 215 (1977), pp. 215–220.

The Yankee Group, Cable and the Telcos: from Confrontation to Detente, 162–167 (Jun. 1983).

John Moosemiller, *AT&T's Conversant™ 1 Voice System,* Speech Technology,(Mar./Apr. 1986), (7 pgs.).

Robert Perdue, et al., *Conversant® 1 Voice System: Architecture and Applications,* AT&T Techical Journal, Sep/Oct. 1986 (14 pgs.).

The Voice, VCT Quarterly Newsletter (Voice Computer Technologies Corporation, Norcross, GA), vol. 1, No. 2, Winter 1986 (6 pgs.).

* cited by examiner

US 6,292,547 C1

**1**

## EX PARTE
## REEXAMINATION CERTIFICATE
## ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

Matter enclosed in heavy brackets **[ ]** appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **11-20**, **27**, **28**, **40**, **41** and
**48-50** is confirmed.

Claims **1-10**, **21-26**, **29-39** and **42-47** are cancelled.

*    *    *    *    *

# EXHIBIT Z



US007941151B2

(12) **United States Patent**
Rudolf et al.

(10) Patent No.: **US 7,941,151 B2**
(45) Date of Patent: **May 10, 2011**

(54) **METHOD AND SYSTEM FOR PROVIDING CHANNEL ASSIGNMENT INFORMATION USED TO SUPPORT UPLINK AND DOWNLINK CHANNELS**

(75) Inventors: **Marian Rudolf**, Montreal (CA);
**Stephen G. Dick**, Nesconset, NY (US);
**Phillip J. Pietraski**, Huntington Station, NY (US)

(73) Assignee: **InterDigital Technology Corporation**, Wilmington, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/709,970**

(22) Filed: **Feb. 23, 2007**

(65) **Prior Publication Data**

US 2007/0173262 A1     Jul. 26, 2007

**Related U.S. Application Data**

(63) Continuation of application No. 10/902,704, filed on Jul. 29, 2004, now Pat. No. 7,200,405.

(60) Provisional application No. 60/523,049, filed on Nov. 18, 2003.

(51) **Int. Cl.**
*H04W 72/00*     (2009.01)
(52) **U.S. Cl.** ...................... **455/450**; 455/451; 455/452.1
(58) **Field of Classification Search** ................... 455/450
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,142,539 A | 8/1992 | Dahlin et al. |
| 5,301,247 A | 4/1994 | Rasmussen et al. |
| 5,355,412 A | 10/1994 | Kangas |
| 5,357,525 A | 10/1994 | Moriue et al. |
| 5,390,197 A | 2/1995 | MacDonald et al. |
| 5,404,355 A | 4/1995 | Raith |
| 5,659,569 A | 8/1997 | Padovani et al. |
| 5,689,518 A | 11/1997 | Galand et al. |
| 5,722,077 A | 2/1998 | Kanai |
| 5,845,212 A | 12/1998 | Tanaka |

(Continued)

FOREIGN PATENT DOCUMENTS

| CA | 2374815 | 12/2000 |
|---|---|---|

(Continued)

OTHER PUBLICATIONS

Mouly et al. "Chapter 4, The Radio Interface," The GSM System for Mobile Communications; 1992, pp. 186-259.

(Continued)

*Primary Examiner* — David Q Nguyen
(74) *Attorney, Agent, or Firm* — Volpe and Koenig, P.C.

(57) **ABSTRACT**

A method and wireless communication system for providing channel assignment information used to support an uplink (UL) channel and a downlink (DL) channel. The system includes at least one Node-B and at least one wireless transmit/receive unit (WTRU). The WTRU communicates with the Node-B via a common control channel, the UL channel and the DL channel. The WTRU receives a message from the Node-B via the common control channel. The message includes an indication of whether the message is intended for assigning radio resources to the UL channel or the DL channel. The WTRU determines whether the message is intended for the WTRU and, if so, the WTRU determines whether the message is for assigning radio resources to the UL channel or the DL channel. The WTRU takes an appropriate action based on whether the message is for assigning radio resources to the UL channel or the DL channel.

**58 Claims, 2 Drawing Sheets**



## US 7,941,151 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,917,810 | A | 6/1999 | De Bot |
| 5,917,840 | A | 6/1999 | Cheney et al. |
| 5,930,706 | A | 7/1999 | Raith |
| 6,005,871 | A | 12/1999 | Petersen et al. |
| 6,134,597 | A | 10/2000 | Rieth et al. |
| 6,172,971 | B1 | 1/2001 | Kim |
| 6,201,811 | B1 | 3/2001 | Larsson et al. |
| 6,424,632 | B1 | 7/2002 | Poret et al. |
| 6,430,163 | B1 | 8/2002 | Mustajarvi et al. |
| 6,735,185 | B1 | 5/2004 | Noneman |
| 6,850,509 | B2 | 2/2005 | Lee et al. |
| 6,859,445 | B1 | 2/2005 | Moon et al. |
| 6,882,727 | B1 | 4/2005 | Vialen et al. |
| 6,901,104 | B1 * | 5/2005 | Du et al. ...................... 375/142 |
| 6,915,473 | B2 | 7/2005 | Bolourchi et al. |
| 6,928,066 | B1 | 8/2005 | Moon et al. |
| 7,054,633 | B2 | 5/2006 | Seo et al. |
| 7,079,848 | B2 | 7/2006 | Das et al. |
| 7,181,298 | B1 | 2/2007 | Yoshio et al. |
| 7,184,447 | B1 | 2/2007 | Koo et al. |
| 7,200,788 | B2 | 4/2007 | Hiraki et al. |
| 7,366,105 | B2 | 4/2008 | Yi et al. |
| 7,394,799 | B2 | 7/2008 | Li et al. |
| 7,558,228 | B2 | 7/2009 | Lee et al. |
| 7,693,110 | B2 | 4/2010 | Love et al. |
| 7,783,953 | B2 | 8/2010 | Bolourchi et al. |
| 2002/0051431 | A1 | 5/2002 | Choi et al. |
| 2002/0093918 | A1 | 7/2002 | Kim et al. |
| 2002/0181422 | A1 * | 12/2002 | Parantainen et al. ......... 370/337 |
| 2003/0219037 | A1 * | 11/2003 | Toskala et al. ................ 370/496 |
| 2004/0043783 | A1 | 3/2004 | Anderson |
| 2004/0085939 | A1 | 5/2004 | Boumendil et al. |
| 2004/0085989 | A1 | 5/2004 | Boumendil et al. |
| 2010/0318886 | A1 | 12/2010 | Bolourchi et al. |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 19855242 | 5/2000 |
| EP | 1006670 | 6/2000 |
| EP | 1248476 | 10/2002 |
| EP | 1324500 | 12/2002 |
| EP | 1324500 | 7/2003 |
| EP | 1351424 | 10/2003 |
| GB | 2382956 | 12/2001 |
| GB | 2383956 | 12/2001 |
| GB | 2372409 | 8/2002 |
| JP | 01-196774 | 8/1989 |
| JP | 05-236073 | 9/1993 |
| JP | 08-316967 | 11/1996 |
| JP | 11-136138 | 5/1999 |
| JP | 11-196070 | 7/1999 |
| TW | 276382 | 5/1996 |
| TW | 276382 | 9/2005 |
| WO | 99/38076 | 7/1999 |
| WO | 00/21210 | 4/2000 |
| WO | 00/28763 | 5/2000 |
| WO | 00/30378 | 5/2000 |
| WO | 00/57660 | 9/2000 |
| WO | 01/01609 | 1/2001 |
| WO | 01/05050 | 1/2001 |
| WO | 02/51177 | 6/2002 |
| WO | 02/096030 | 11/2002 |

### OTHER PUBLICATIONS

3GPP TSG RAN WG Tdoc R1-02-0018, Nokia, "Compact Signalling of Multi-code Allocation for HSDPA, version 2," Espoo, Finland, Jan. 2002.

3GPP TSG RAN WG 1 Tdoc R1-02-1277, Noika, "Two Threshold Node B Packet Scheduling," Shanghai, China, Nov. 2002.

3GPP TSG RAN WG 1 Tdoc R1-02-1350, Motorola, "Design Considerations for Enhanced Uplink Dedicated Channel," Shanghai, China, Nov. 2002.

3GPP TSG RAN WG 1 Tdoc R1-02-1277, Nokia, "Two Threshold Node B Packet Scheduling," Shanghai, China, Nov. 2002.

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Feasibility Study for Enhanced Uplink for UTRA FDD (Release 6)," 3GPP TR 25.896 V1.0.2 (Oct. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Feasibility Study for Enhanced Uplink for UTRA FDD (Release 6)," 3GPP TR 25.896 V6.0.0 (Mar. 2004).

"DL Control Channel Structures for Parameters Sent Simultaneously With HS-DSCH TTI." TSG-RAN WG1/WG2 Adhoc on HSDPA, Sophia Antipolis, France, (Apr. 5-6, 2001).

Balachandran et al., "Design of a Medium Access Control Feedback Mechanism for Cellular TDMA Packet Data Systems", IEEE Journal on Selected Areas in Communications, vol. 18, No. 9, pp. 1719-1730, (Sep. 2000).

Gourgue, "Air Interface of the Future European Fully Digital Trunk Radio System", Proceedings of the Vehicular Technology Conference, vol. CONF. 43, pp. 714-717 (May 1993).

Interdigital Communication Corporation, "Implicit UE Identification for HSDPA Downlink Signaling", TDOC R1-01-0810, 3GPP RAN WG1 Meeting 22, (Aug. 2001), available at: http://www.3goo.org/ftp.tsg_ran/WG1_RL1.

Interdigital, "Updated Recommendation for UE-specific CRC", TDOC R1-01-1066, 3GPP TSG RAN WG 1 AD HOC Meeting On HSDPA, (Nov. 2001), available at http://www.3gpp.org/ftp/tsg_ran/WG1_RL1.

Motorola, "Control Channel Structure for High Speed DSCH (HS-DSCH)," TSGR1#16(00) 1242, R2-12A010021, pp. 1-5 (Apr. 5-6, 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; High Speed Downlink Packet Access; Overall UTRAN Description (Release 5)," 3GPP TR 25.855 v0.0.3; (May 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Feasibility Study for Enhanced Uplink for UTRA FDD (Release 6)," 3GPP TR 25.896 V1.0.1, pp. 16-21 (Oct. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; High Speed Downlink Packet Access; Overall UTRAN Description (Release 5)," 3GPP TR 25.855 V5.0.0 (Sep. 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Multiplexing and channel coding (FDD) (Release 1999)," 3GPP TS 25.212 V3.5.0 (Dec. 2000).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Multiplexing and channel coding (FDD) (Release 1999)," 3GPP TS 25.212 V3.7.0 (Sep. 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Multiplexing and channel coding (FDD) (Release 4)," 3GPP TS 25.212 V4.2.0 (Sep. 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Multiplexing and channel coding (TDD) (Release 1999)," 3GPP TS 25.222 V3.6.0 (Mar. 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Multiplexing and channel coding (TDD) (Release 4)," 3GPP TS 25.222 V4.0.0 (Mar. 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Multiplexing and channel coding (TDD) (Release 4)," 3GPP TS 25.222 V4.1.0 (Sep. 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Multiplexing and channel coding (TDD) (Release 1999)," 3GPP TS 25.222 V3.7.0 (Sep. 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; UTRAN Overall Description (Release 1999)," 3GPP TS 25.401 V3.6.0 (Mar. 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; UTRAN Overall Description (Release 1999)," 3GPP TS 25.401 V3.8.0 (Sep. 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; UTRAN Overall Description (Release 4)," 3GPP TS 25.401 V4.0.0 (Mar. 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; UTRAN Overall Description (Release 4)," 3GPP TS 25.401 V4.2.0 (Sep. 2001).

US 7,941,151 B2
Page 3

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; UTRAN Overall Description (Release 5)," 3GPP TS 25.401 V5.1.0 (Sep. 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; UTRA High Speed Downlink Packet Access (HSDPA); Overall Description; Stage 2 (Release 5)," 3GPP TS 25.308 V5.0.0 (Sep. 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical channels and mapping of transport channels onto physical channels (TDD) (Release 1999)," 3GPP TS 25.221 V3.6.0 (Mar. 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical channels and mapping of transport channels onto physical channels (TDD) (Release 1999)," 3GPP TS 25.221 V3.8.0 (Sep. 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical channels and mapping of transport channels onto physical channels (TDD) (Release 4)," 3GPP TS 25.221 V4.0.0 (Mar. 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical channels and mapping of transport channels onto physical channels (TDD) (Release 4)," 3GPP TS 25.221 V4.2.0 (Sep. 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical Layer Procedures (FDD) (Release 1999)," 3GPP TS 25.214 v3.6.0 (Mar. 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical Layer Procedures (FDD) (Release 1999)," 3GPP TS 25.214 v3.8.0 (Sep. 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical Layer Procedures (FDD) (Release 4)," 3GPP TS 25.214 v4.0.0 (Mar. 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical Layer Procedures (FDD) (Release 4)," 3GPP TS 25.214 v4.2.0 (Sep. 2001).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Multiplexing and channel coding (FDD) (Release 4)," 3GPP TS 25.212 V4.0.0 (Dec. 2000).

3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Multiplexing and channel coding (Release 8); 3GPP TS 36.212 V0.2.1 (Nov. 2006).

3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Physical layer procedures (Release 8); 3GPP TS 36.213 V0.2.1 (Oct. 2006).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Multiplexing and channel coding (FDD) (Release 1999)," 3GPP TS 25.212 V3.11.0 (Sep. 2002).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Multiplexing and channel coding (FDD) (Release 4)," 3GPP TS 25.212 V4.6.0 (Sep. 2002).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Multiplexing and channel coding (FDD) (Release 5)," 3GPP TS 25.212 V5.6.0 (Sep. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Multiplexing and channel coding (FDD) (Release 5)," 3GPP TS 25.212 V5.9.0 (Jun. 2004).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Multiplexing and channel coding (FDD) (Release 6)," 3GPP TS 25.212 V6.2.0 (Jun. 2004).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Multiplexing and channel coding (TDD) (Release 1999)," 3GPP TS 25.222 V3.10.0 (Sep. 2002).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Multiplexing and channel coding (TDD) (Release 4)," 3GPP TS 25.222 V4.6.0 (Dec. 2002).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Multiplexing and channel coding (TDD) (Release 4)," 3GPP TS 25.222 V4.7.0 (Dec. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Multiplexing and channel coding (TDD) (Release 5)," 3GPP TS 25.222 V5.5.0 (Jun. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Multiplexing and channel coding (TDD) (Release 5)," 3GPP TS 25.212 V5.6.0 (Dec. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Multiplexing and channel coding (TDD) (Release 6)," 3GPP TS 25.222 V6.0.0 (Dec. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; UTRAN Overall Description (Release 1999)," 3GPP TS 25.401 V3.10.0 (Jun. 2002).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; UTRAN Overall Description (Release 4)," 3GPP TS 25.401 V4.6.0 (Dec. 2002).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; UTRAN Overall Description (Release 5)," 3GPP TS 25.401 V5.6.0 (Jun. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; UTRAN Overall Description (Release 5)," 3GPP TS 25.401 V5.8.0 (Jun. 2004).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; UTRAN Overall Description (Release 6)," 3GPP TS 25.401 V6.1.0 (Jun. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; UTRAN Overall Description (Release 6)," 3GPP TS 25.401 V6.3.0 (Jun. 2004).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; UTRA High Speed Downlink Packet Access (HSDPA); Overall Description; Stage 2 (Release 5)," 3GPP TS 25.308 V5.4.0 (Mar. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; UTRA High Speed Downlink Packet Access (HSDPA); Overall Description; Stage 2 (Release 5)," 3GPP TS 25.308 V5.5.0 (Mar. 2004).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; UTRA High Speed Downlink Packet Access (HSDPA); Overall Description; Stage 2 (Release 6)," 3GPP TS 25.308 V6.1.0 (Mar. 2004).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical channels and mapping of transport channels onto physical channels (TDD) (Release 1999)," 3GPP TS 25.221 V3.11.0 (Sep. 2002).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical channels and mapping of transport channels onto physical channels (TDD) (Release 4)," 3GPP TS 25.221 V4.7.0 (Dec. 2002).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical channels and mapping of transport channels onto physical channels (TDD) (Release 5)," 3GPP TS 25.221 V5.5.0 (Jun. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical channels and mapping of transport channels onto physical channels (TDD) (Release 6)," 3GPP TS 25.221 V6.1.0 (Jun. 2004).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical Layer Procedures (FDD) (Release 1999)," 3GPP TS 25.214 v3.12.0 (Mar. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical Layer Procedures (FDD) (Release 4)," 3GPP TS 25.214 v4.6.0 (Mar. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical Layer Procedures (FDD) (Release 5)," 3GPP TS 25.214 v5.6.0 (Sep. 2003).

Third Generation Partnership Project, "Technical Specification Group Radio Access Network; Physical Layer Procedures (FDD) (Release 5)," 3GPP TS 25.214 v5.9.0 (Jun. 2004).

* cited by examiner



**FIG. 1**



**FIG. 3**



*FIG. 2*

US 7,941,151 B2

**1**

# METHOD AND SYSTEM FOR PROVIDING CHANNEL ASSIGNMENT INFORMATION USED TO SUPPORT UPLINK AND DOWNLINK CHANNELS

## CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. patent application Ser. No. 10/902,704, filed Jul. 29, 2004 now U.S. Pat. No. 7,200,405, which claims the benefit of U.S. Provisional Application No. 60/523,049 filed on Nov. 18, 2003, which is incorporated by reference as if fully set forth.

## FIELD OF INVENTION

The present invention is related to a wireless communication system. More particularly, the present invention is related to a method and system for providing channel assignment information to support uplink and downlink transmissions.

## BACKGROUND

High speed downlink packet access (HSDPA) has been developed to increase downlink (DL) efficiency and throughput in universal mobile telecommunication system (UMTS) Release 5 (R5) wideband code division multiple access (W-CDMA) systems. The key advantages of HSDPA as compared to UMTS R99/R4 are fast and dynamic link adaptation in the DL and a fast layer 1 hybrid automatic repeat request (H-ARQ). Fast link adaptation is achieved by fast scheduling DL transmissions in a base station, coupled with fast layer 1 DL signaling channels. The signaling channel, a high speed shared control control channel (HS-SCCH), conveys radio resource allocation information to a plurality of wireless transmit/receive units (WTRUs).

In frequency division duplex (FDD), an HS-SCCH is sent by means of a spreading factor (SF)=128 channelization code during a three (3) time slot transmission time interval (TTI). The HS-SCCH indicates that data would be transmitted to a WTRU on a high speed downlink shared channel (HS-DSCH) after a particular time offset. The HS-SCCH carries the following information: 1) channelization-code-set information (7 bits); 2) modulation scheme information (1 bit); 3) transport-block size information (6 bits); 4) H-ARQ process information (3 bits); 5) redundancy and constellation version (3 bits); 6) new data indicator (1 bit); and 7) a WTRU identity (16 bits).

The HS-SCCH is sent over three (3) time slots (2 ms TTI), but consists of two (2) fields. Field **1** (first time slot) contains channelization code mapping and modulation format information; and field **2** (second and third time slots) contains transport block size, H-ARQ information, redundancy version and a new data indicator along with a WTRU-specific cyclic redundancy check (CRC).

Alternatively, an enhanced uplink (EU) increases uplink (UL) efficiency and throughput. H-ARQ and Node-B scheduling is part of the EU. Similar to an HSDPA, a new shared DL control channel for EU operation provides fast and dynamic allocation of UL radio resources for UL transmissions. The shared DL control channel for the EU needs to ensure low allocation latencies and efficient radio resources management for UL transmissions. Hereinafter, the shared DL control channel for the purposes of an EU is simply referred to as a UL resource assignment channel.

In order to implement an EU along with an HSDPA, another UL resource assignment channel for the EU could be

**2**

introduced on top of an existing HS-SCCH for an HSDPA. Thus, it is possible to introduce a separate set of SF=128 DL channels as UL resource assignment channels. With this approach, a WTRU would be required to monitor one or more UL resource assignment channels in addition to the HS-SCCHs for an HSDPA operation. Although this approach is conceptually simple, there are many disadvantages with this scheme, such as WTRU complexity, WTRU battery efficiency, and DL spreading code usage.

Therefore, an efficient EU channel assignment scheme is necessary for supporting both an EU and an HSDPA operation.

## SUMMARY

In one embodiment, the present invention is a method and wireless communication system for providing channel assignment information for supporting a UL channel and a DL channel. The system includes at least one Node-B and at least one WTRU. The WTRU communicates with the Node-B via a common control channel, the UL channel and the DL channel. The WTRU receives a message from the Node-B via the common control channel. The message includes an indication of whether the message is intended for assigning radio resources to the UL channel or the DL channel. The WTRU determines whether the message is intended for the WTRU and, if so, the WTRU determines whether the message is for assigning radio resources to the UL channel or the DL channel. The WTRU takes an appropriate action based on whether the message is for assigning radio resources to the UL channel or the DL channel.

In another embodiment, the present invention is a method and time-slotted wireless communication system. The system includes at least one Node-B, a radio network controller (RNC) which controls the Node-B, and at least one WTRU which communicates with the Node-B via a common control channel, a UL channel and a DL channel. The RNC transmits a message to the WTRU indicating which time slot TTIs support UL channel transmissions and which time slot TTIs support DL channel transmissions.

## BRIEF DESCRIPTION OF THE DRAWINGS

A more detailed understanding of the invention may be had from the following description of a preferred example, given by way of example and to be understood in conjunction with the accompanying drawing wherein:

FIG. **1** is a block diagram of a wireless communication system operating in accordance with the present invention;

FIG. **2** is a look-up table for channelization code set mapping in an HSDPA, which is utilized in conjunction with the system of FIG. **1**; and

FIG. **3** is a flowchart of a process including method steps for implementing uplink channel assignment signaling in accordance with the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The present invention will be described with reference to the drawing figures wherein like numerals represent like elements throughout.

Hereafter, the terminology "WTRU" includes but is not limited to a user equipment, a mobile station, a fixed or mobile subscriber unit, a pager, or any other type of device capable of operating in a wireless environment. When referred to hereafter, the terminology "Node-B" includes but

US 7,941,151 B2

3

is not limited to a base station, a site controller, an access point or any other type of interfacing device in a wireless environment.

The present invention is applicable to any type of wireless communication systems such as UMTS-time division duplex (TDD) and FDD, time division synchronous code division multiple access (TDSCDMA), code division multiple access 2000 (CDMA 2000), and CDMA in general or any other type of wireless communication system.

The features of the present invention may be incorporated into an integrated circuit (IC) or be configured in a circuit comprising a multitude of interconnecting components.

The present invention will be described in reference to an HSDPA and an EU, and the terms HSDPA and EU are used interchangeably with DL and UL, respectively. However, it should be understood that the reference to an HSDPA and an EU is just for describing the preferred embodiment of the present invention, and the teachings of the present invention may be applied to any system for utilizing a common control channel for transmitting channel assignment information for both UL and DL transmissions simultaneously.

FIG. **1** is a block diagram of a system **100** for supporting UL and DL operations in accordance with the present invention. The system **100** includes an RNC **102**, a Node-B **104**, and a WTRU **106**. The Node-B **104** is controlled by the RNC **102**, and dynamically allocates radio resources for both UL and DL transmissions from and to the WTRU **106**. Three channels are established between the Node-B **104** and the WTRU **106**. The channels are a DL channel **108**, a UL channel **110**, and a common control channel **112**. The common control channel **112** is utilized for transmission of channel assignment information for both UL and DL transmissions.

The Node-B **104** is configured to support an HSDPA and EU operation. Therefore, each Node-B **104** dynamically allocates radio resources for DL and UL transmissions to and from the WTRU **106** through an HS-DSCH and an EU channel, respectively. The radio resources assignment information for both the HS-DSCH and the EU is transmitted through the common control channel **112**.

In accordance with the present invention, the common control channel **112** is utilized for the transmission of radio resources assignment information for both UL and DL transmissions and a specific indication is provided to distinguish whether the radio resource assignment is for either UL or DL transmission. Therefore, the common control channel **112** occupies a shared DL radio resource space, as defined by a set of SF=128 channelization codes, for both DL and UL transmissions simultaneously, and the WTRU **106** is configured to recognize whether a particular transmission is intended for assigning radio resources for the DL or the UL transmissions.

In accordance with a first embodiment of the present invention, an indication that a particular radio resource is assigned for a UL transmission is provided by means of one or more of the impossible combinations in the channelization code set mapping in a current HSDPA. FIG. **2** is a look-up table for channelization code set mapping currently used in the HSDPA. An HS-SCCH uses seven (7) bits to inform the WTRU **106** which SF=16 channelization codes are used for the corresponding HS-DSCH. Out of the 128 possible combinations, eight (8) combinations are not currently used in an HSDPA (see the labeled "redundant area" in FIG. **2**). One or more of the eight (8) unused combinations is used for assigning radio resources or indicating that the demodulated transmission is for UL transmission, not DL transmission. Therefore, if the WTRU **106** determines that a channelization-code-set corresponds to one of the impossible combinations of FIG. **2**, the WTRU **106** recognizes that the transmission is for

4

assignment of radio resources for UL transmission, rather than DL transmission, or that the codes corresponding to the channelization-code-set are assigned to UL transmissions.

In accordance with a second embodiment of the present invention, an indication that a particular radio resource is assigned for UL transmission is provided by means of a WTRU-specific CRC. Under current HSDPA specifications, a WTRU-specific CRC is contained in an HS-SCCH field **2**. A 16-bit CRC is computed from the information to be transmitted, and the computed CRC is masked with a unique 16-bit WTRU identity (ID). The masked CRC is transmitted to a WTRU **106** as a WTRU-specific CRC.

In accordance with the second embodiment of the present invention, this WTRU-specific CRC is modified in a unique and deterministic way to indicate that the demodulated transmission is for UL transmission, rather than DL transmission. For example, a WTRU-specific CRC computed for an HSDPA is inverted for an EU before performing a channel coding. A WTRU **106** performs two (2) different comparisons, preferably simultaneously, in performing a CRC of the received transmission. If the WTRU **106** succeeds in decoding the received transmission with a WTRU-specific CRC, the WTRU **106** recognizes that the transmission is intended for an HSDPA, and if the WTRU **106** succeeds in decoding the received transmission with an inverted WTRU-specific CRC, the WTRU **106** recognizes that the transmission is intended for an EU.

In accordance with a third embodiment of the present invention, an indication that a particular radio resource is assigned for an EU is provided by means of a WTRU-specific masking sequence. Under current HSDPA specifications, a 40-bit sequence of field **1** is masked with a 40-bit WTRU-specific intermediate code sequence which is generated from a 16-bit WTRU ID.

In accordance with the third embodiment, the WTRU-specific masking on field **1** is modified in a unique and deterministic way to indicate that a transmission is intended for an EU, not for an HSDPA. For example, the inverted 16-bit CRC generated in the second embodiment may be used to derive the 40-bit long masking sequence. If the WTRU **106** succeeds in decoding the received transmission with a WTRU-specific masking sequence, the WTRU **106** recognizes that the transmission is intended for an HSDPA, and if the WTRU **106** succeeds in decoding the received transmission with an inverted WTRU-specific masking sequence, the WTRU **106** recognizes that the transmission is intended for an EU.

With this method, the WTRU **106** can make the distinction whether an EU or an HSDPA channel assignment has been transmitted after having received only field **1** of the HS-SCCH transmission.

Alternatively, WTRU IDs are allocated by the network in such a way that a particular WTRU ID does not collide with another WTRU ID. For example, a first WTRU's inverted ID for EU may be used to indicate a second WTRU's HSDPA service. Therefore, simultaneous detection of presence of a UL resource assignment channel and an HS-SCCH is facilitated.

In accordance with a fourth embodiment of the present invention, an indication that a particular radio resource is assigned for an EU is provided by means of radio resource control (RRC) context signaling. Preferably, a Node-B **104** allocates separate radio resources for transmission of UL radio resources assignment and DL radio resources assignment. Alternatively, an RNC **102** allocates separate radio resources for transmission of UL radio resources assignment and DL radio resources assignment by using RRC signaling messages.

US 7,941,151 B2

5

For example, an RRC signaling message from the RNC **102** may inform a WTRU **106** in which TTIs to expect an HS-SCCH or a UL resource assignment channel. Under current R5 HSDPA specifications, fifteen (15) time slots include one (1) frame, and three (3) time slots include one (1) TTI. "Even" TTIs may include, for example, time slots 2, 4, 6, 8, 10, 12 and 14, and "odd" TTIs may include, for example, time slots 1, 3, 5, 7, 9, 11, 13 and 15.

In accordance with the present invention, an RRC transmits signals indicating that a transmission in "even" TTIs is for an HS-SCCH and a transmission in "odd" TTIs is for a UL resource assignment channel. By not allowing a transmission for an HS-SCCH to be transmitted in "odd" TTIs, backwards compatibility with R5 WTRUs can be ensured. The same set of SF=128 resources can be used for an HS-SCCH and a UL resource assignment channel.

In accordance with a fifth embodiment of the present invention, an indication that a particular radio resource is assigned for an EU is provided by means of layer 1 indication on an associated DL dedicated channel (DCH). One or more bits on the associated DL DCH are used to indicate imminent occurrence of a UL resource assignment channel as opposed to an HS-SCCH by means of a fixed and pre-determined timing relationship.

FIG. 3 is a flowchart of a process **200** including method steps for implementing UL channel assignment signaling in accordance with the present invention. After the process **200** is initiated (step **202**), a message for radio resource assignment is transmitted via a common control channel from a Node-B **104** to a WTRU **106**. The WTRU **106** receives and demodulates the message using predetermined codes every predetermined TTI, for example, every 2 ms (step **204**). The WTRU **106** then determines if the message is intended for the WTRU **106** (step **206**). A WTRU-specific CRC may be utilized for this purpose. If the WTRU **106** determines that the message is intended for the WTRU **106**, the WTRU **106** determines whether the message is for the assignment of radio resources for DL transmission or UL transmission implementing one of the embodiments of the present invention described above (step **208**). The WTRU **106** then takes appropriate actions (step **210**) depending on the decision in step **208** to receive or transmit data packet via DL or UL channels. For example, the WTRU **106** may recognize exactly when to initialize a data reception procedure via the DL channel **108** or when to initialize a data transmission procedure via the UL channel **110**. Currently, an HS-SCCH for an HSDPA announces an incoming data packet for the WTRU with a fixed two (2) slot offset, whereas the present invention can inform the WTRU when it has an opportunity to transmit a packet via the UL, (e.g., four slots from now).

While this invention has been particularly shown and described with reference to preferred embodiments, it will be understood by those skilled in the art that various changes in form and details may be made therein without departing from the scope of the invention described hereinabove.

What is claimed is:

1. A method for utilizing channel assignment information for an uplink shared channel or a downlink shared channel, the method comprising:

a wireless transmit/receive unit (WTRU) receiving downlink control information including downlink or uplink channel assignment information via a same physical downlink control channel, both downlink channel assignment information and uplink channel assignment information being received via the same physical downlink control channel;

6

the WTRU determining whether the downlink control information is intended for the WTRU based on WTRU identity (ID)-masked cyclic redundancy check (CRC) parity bits, and if so determining whether the channel assignment information is for assigning radio resources for the uplink shared channel or the downlink shared channel; and

the WTRU utilizing the radio resources for the uplink shared channel or the downlink shared channel.

2. The method of claim **1**, wherein the WTRU ID-masked CRC parity bits are derived from a sixteen bit CRC.

3. The method of claim **1**, wherein the downlink control information includes modulation and coding scheme information.

4. The method of claim **1**, wherein the downlink control information includes a new data indicator.

5. The method of claim **1**, wherein the downlink control information includes a redundancy version.

6. The method of claim **1**, wherein the downlink control information includes hybrid automatic repeat request (H-ARQ) information.

7. The method of claim **1**, wherein the physical downlink control channel is a common channel.

8. The method of claim **1**, wherein the physical downlink control channel carries both downlink and uplink channel assignment information simultaneously.

9. The method of claim **1**, wherein the downlink control information indicates whether the channel assignment information is for the uplink shared channel or the downlink shared channel.

10. The method of claim **1**, wherein the determination of whether the channel assignment information is for assigning radio resources for the uplink shared channel or the downlink shared channel is based on the WTRU ID-masked CRC parity bits.

11. The method of claim **1**, wherein the determination of whether the channel assignment information is for assigning radio resources for the uplink shared channel or the downlink shared channel is based on a WTRU-specific masking sequence.

12. The method of claim **1**, wherein the determination of whether the channel assignment information is for assigning radio resources for the uplink shared channel or the downlink shared channel is based on radio resource control (RRC) signaling.

13. The method of claim **1**, wherein the determination of whether the channel assignment information is for assigning radio resources for the uplink shared channel or the downlink shared channel is based on a transmit time interval.

14. The method of claim **1**, wherein the determination of whether the channel assignment information is for assigning radio resources for the uplink shared channel or the downlink shared channel is based on at least one of the WTRU ID-masked CRC parity bits, a WTRU-specific masking sequence, radio resource control (RRC) signaling, or a transmit time interval.

15. The method of claim **1** wherein the downlink channel assignment information is carried in one time interval and the uplink channel assignment information is carried in another time interval.

16. A wireless transmit/receive unit (WTRU) for utilizing channel assignment information for an uplink shared channel or a downlink shared channel, the WTRU comprising:

a receiver configured to receive downlink control information including downlink or uplink channel assignment information via a same physical downlink control channel, both downlink channel assignment information and

US 7,941,151 B2

7

uplink channel assignment information being received via the same physical downlink control channel; and a controller configured to determine whether the downlink control information is intended for the WTRU based on WTRU identity (ID)-masked cyclic redundancy check (CRC) parity bits and to determine whether the channel assignment information is for assigning radio resources for the uplink shared channel or the downlink shared channel, and utilizing the radio resources for the uplink shared channel or the downlink shared channel.

17. The WTRU of claim 16, wherein the WTRU ID-masked CRC parity bits are derived from a sixteen bit CRC.

18. The WTRU of claim 16, wherein the downlink control information includes modulation and coding scheme information.

19. The WTRU of claim 16, wherein the downlink control information includes a new data indicator.

20. The WTRU of claim 16, wherein the downlink control information includes a redundancy version.

21. The WTRU of claim 16, wherein the downlink control information includes hybrid automatic repeat request (H-ARQ) information.

22. The WTRU of claim 16, wherein the physical downlink control channel is a common channel.

23. The WTRU of claim 16, wherein the physical downlink control channel carries both downlink and uplink channel assignment information simultaneously.

24. The WTRU of claim 16, wherein the downlink control information indicates whether the channel assignment information is for the uplink shared channel or the downlink shared channel.

25. The WTRU of claim 16, wherein the determination of whether the channel assignment information is for assigning radio resources for the uplink shared channel or the downlink shared channel is based on the WTRU ID-masked CRC parity bits.

26. The WTRU of claim 16, wherein the determination of whether the channel assignment information is for assigning radio resources for the uplink shared channel or the downlink shared channel is based on a WTRU-specific masking sequence.

27. The WTRU of claim 16, wherein the determination of whether the channel assignment information is for assigning radio resources for the uplink shared channel or the downlink shared channel is based on radio resource control (RRC) signaling.

28. The WTRU of claim 16, wherein the determination of whether the channel assignment information is for assigning radio resources for the uplink shared channel or the downlink shared channel is based on a transmit time interval.

29. The WTRU of claim 16, wherein the determination of whether the channel assignment information is for assigning radio resources for the uplink shared channel or the downlink shared channel is based on at least one of the WTRU ID-masked CRC parity bits, a WTRU-specific masking sequence, radio resource control (RRC) signaling, or a transmit time interval.

30. The WTRU of claim 16 wherein the downlink channel assignment information is carried in one time interval and the uplink channel assignment information is carried in another time interval.

31. A Node-B for selectively providing channel assignment information to a wireless transmit/receive unit (WTRU) for an uplink shared channel and or a downlink shared channel, the Node-B comprising:

8

a scheduler for generating configured to generate channel assignment information to assign radio resources to the WTRU for the uplink shared channel and or the downlink shared channel; and

a transmitter for transmitting configured to transmit downlink control information including uplink or downlink channel assignment information and WTRU identity (ID)-masked cyclic redundancy check (CRC) parity bits to the WTRU via a same physical downlink control channel, both downlink channel assignment information and uplink channel assignment information being transmitted via the same physical downlink control channel, the downlink control information including an indication indicating whether the channel assignment information is for assigning the radio resources for the uplink shared channel or the downlink shared channel.

32. The Node-B of claim 31, wherein the WTRU ID-masked CRC parity bits are derived from a sixteen bit CRC.

33. The Node-B of claim 31, wherein the downlink control information includes modulation and coding scheme information.

34. The Node-B of claim 31, wherein the downlink control information includes a new data indicator.

35. The Node-B of claim 31, wherein the downlink control information includes a redundancy version.

36. The Node-B of claim 31, wherein the downlink control information includes hybrid automatic repeat request (H-ARQ) information.

37. The Node-B of claim 31, wherein the physical downlink control channel is a common channel.

38. The Node-B of claim 31, wherein the physical downlink control channel carries both downlink and uplink channel assignment information simultaneously.

39. The Node-B of claim 31, wherein the indicating whether the channel assignment information is for assigning the radio resources for the uplink shared channel or downlink shared channel is based on the WTRU ID-masked CRC parity bits.

40. The Node-B of claim 31, wherein the indicating whether the channel assignment information is for assigning the radio resources for the uplink shared channel or downlink shared channel is based on a WTRU-specific masking sequence.

41. The Node-B of claim 31, wherein the indicating whether the channel assignment information is for assigning the radio resources for the uplink shared channel or downlink shared channel is based on radio resource control (RRC) signaling.

42. The Node-B of claim 31, wherein the indicating whether the channel assignment information is for assigning the radio resources for the uplink shared channel or downlink shared channel is based on a transmit time interval.

43. The Node-B of claim 31, wherein the indicating whether the channel assignment information is for assigning the radio resources for the uplink shared channel or downlink shared channel is based on at least one of the WTRU ID-masked CRC parity bits, a WTRU-specific masking sequence, radio resource control (RRC) signaling, or a transmit time interval.

44. The Node-B of claim 31 wherein the downlink channel assignment information is carried in one time interval and the uplink channel assignment information is carried in another time interval.

45. A method for providing channel assignment information for an uplink shared channel or a downlink shared channel via a downlink control channel, the method comprising:

US 7,941,151 B2

9

a Node B generating channel assignment information to assign radio resources to a wireless transmit/receive unit (WTRU) for the uplink shared channel or the downlink shared channel; and

the Node B transmitting downlink control information including uplink or downlink channel assignment information and WTRU identity (ID)-masked cyclic redundancy check (CRC) parity bits to the WTRU via a same physical downlink control channel, both downlink channel assignment information and uplink channel assignment information being transmitted via the same physical downlink control channel, the downlink control information including an indication indicating whether the channel assignment information is for assigning the radio resources for the uplink shared channel or the downlink shared channel.

**46**. The method of claim **45**, wherein the WTRU ID-masked CRC parity bits are derived from a sixteen bit CRC.

**47**. The method of claim **45**, wherein the downlink control information includes modulation and coding scheme information.

**48**. The method of claim **45**, wherein the downlink control information includes a new data indicator.

**49**. The method of claim **45**, wherein the downlink control information includes a redundancy version.

**50**. The method of claim **45**, wherein the downlink control information includes hybrid automatic repeat request (H-ARQ) information.

**51**. The method of claim **45**, wherein the physical downlink control channel is a common channel.

**52**. The method of claim **45**, wherein the physical downlink control channel carries both downlink and uplink channel assignment information simultaneously.

10

**53**. The method of claim **45**, wherein the indicating whether the channel assignment information is for assigning the radio resources for the uplink shared channel or downlink shared channel is based on the WTRU ID-masked CRC parity bits.

**54**. The method of claim **45**, wherein the indicating whether the channel assignment information is for assigning the radio resources for the uplink shared channel or downlink shared channel is based on a WTRU-specific masking sequence.

**55**. The method of claim **45**, wherein the indicating whether the channel assignment information is for assigning the radio resources for the uplink shared channel or downlink shared channel is based on radio resource control (RRC) signaling.

**56**. The method of claim **45**, wherein the indicating whether the channel assignment information is for assigning the radio resources for the uplink shared channel or downlink shared channel is based on a transmit time interval.

**57**. The method of claim **45**, wherein the indicating whether the channel assignment information is for assigning the radio resources for the uplink shared channel or downlink shared channel is based on at least one of the WTRU ID-masked CRC parity bits, a WTRU-specific masking sequence, radio resource control (RRC) signaling, or a transmit time interval.

**58**. The method of claim **45** wherein the downlink channel assignment information is carried in one time interval and the uplink channel assignment information is carried in another time interval.

*    *    *    *    *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,941,151 B2                                            Page 1 of 2
APPLICATION NO.   : 11/709970
DATED             : May 10, 2011
INVENTOR(S)       : Rudolf et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

ON THE TITLE PAGE

Item (75) "Inventors:" delete "Phillip" and insert --Philip--.

Item (63) "Related U.S. Application Data", delete "10/902,704" and insert --10/902,740--.

Item (56) U.S. PATENT DOCUMENTS, page 2, left column, after "2004/0043783 A1 3/2004 Anderson", delete "2004/0085939 A1 5/2004 Boumendil et al.".

Item (56) FOREIGN PATENT DOCUMENTS, page 2, left column, after "EP 1248476 10/2002", delete "EP 1324500 12/2002".

Item (56) FOREIGN PATENT DOCUMENTS, page 2, left column, after "GB 2382956 12/2001", delete "GB 2383956 12/2001".

Item (56) FOREIGN PATENT DOCUMENTS, page 2, left column, after "TW 276382 5/1996", delete "TW 276382 9/2005".

Item (56) OTHER PUBLICATIONS, page 2, left column, after "R1-02-1277," delete "Noika," and insert --Nokia,--.

Item (56) OTHER PUBLICATIONS, page 2, right column, after "WGI Meeting 22, (Aug. 2001) available at http://www", delete ".3goo." and insert --.3gpp.--.

Item (56) OTHER PUBLICATIONS, page 3, right column, after "(Release 5)," 3GPP TS", delete "25.212" and insert --25.222--.

Signed and Sealed this
Twenty-seventh Day of December, 2011

David J. Kappos
*Director of the United States Patent and Trademark Office*

**CERTIFICATE OF CORRECTION (continued)**                                    Page 2 of 2
**U.S. Pat. No. 7,941,151 B2**

IN THE SPECIFICATION

At column 1, line 10, after "Ser. No." delete "10/902,704" and insert --10/902,740--.

IN THE CLAIMS

At Claim 31, column 7, line 64, after "Node-B for", delete "selectively".

At Claim 31, column 7, line 66, after "shared channel", delete "and".

At Claim 31, column 8, line 1, after "a scheduler" delete "for generating".

At Claim 31, column 8, line 3, after "shared channel", delete "and".

At Claim 31, column 8, line 5, after "a transmitter", delete "for transmitting".

# EXHIBIT AA

Provisional Patent Application
Chapin & Huang/BWC
December 14, 2001

Attorney Docket No. EDL01-01p

1

---

Certificate of Express Mail Under 37 C.F.R. 1.10

I hereby certify that this correspondence is being deposited with the United States Postal Service with sufficient postage as Express Mail in an envelope addressed to: **BOX PATENT APPLICATION**, Assistant Commissioner for Patents, Washington, DC 20231 on:

Date: _December 17, 2001_          Express Mailing Label No.: _ET121822870US_

Signature: _Crystal Slason_

Typed or Printed Name: _____ Crystal Slason _____

---

Attorney Docket No.:        ELD01-01p

Inventors:          Scott B. Petrack              Joshua Poritz
                    137 Gardner Road             205 Gardner Road
                    Brookline, MA 02445          Brookline, MA 02445
                    Citizenship: United States   Citizenship: United States

# METHODS AND APPARATUS PROVIDING A WEB BASED MESSAGING SYSTEM

## FIELD OF THE INVENTION

The present invention relates to the computer network-based messaging systems. More particularly, the present invention relates systems that provide client-client and client-server messaging capabilities over a computer network such as the Internet.

conventional instant messaging systems include "AOL instant messenger", "MSN Messenger", "Lotus Sametime" and the like. Each of these conventional systems have a number of characteristics that they share in common with each other.

Generally, such IM systems provide a set of real-time computer clients which enable a group of computer users to send messages between each other (i.e., between the client computers) as long as the client computers are all connected in some fashion or another to a computer network such as the Internet. In addition, conventional IM systems require client software applications that implement instant the messaging system techniques, such as IM protocols. Such IM client applications can perform, be interpreted, run, executed or otherwise operated on a wide variety of computing platforms, including personal computers, workstations, cell-phones and personal digital assitants (PDAs), laptop computers, and the like. Such client-based IM software applications may comprise one or more applets (e.g., downloadable Java programs), downloadable executable instant messaging programs (e.g., IM executables), browser plug-ins, or other such applications that a user of a client computer system accesses, downloads, installs and/or otherwise obtains and operates in order to enable his or her client computer to partake in instant messaging with other client computer systems. The other client computer systems also must download a similar and compatible instant messaging client application in order for IM system to properly function.

Conventional instant messaging client software applications typically use a specialized instant messaging protocol for exchange of instant messages between one client and in instant messaging server operating within an instant messaging service providers facility. Upon receipt of an instant message from one client, the instant messaging server software can use a similar proprietary protocol to forward the instant message to the recipient client instant messaging software in a real-time or near-real-time manner such that the recipient client receives and can then respond to the instant message with a return instant message. In this manner, conventional instant messaging client software applications interact with instant messaging server software which relays messages between clients to give the perception to those client of an instant messaging "conversation" which takes place between clients.

SUMMARY OF THE INVENTION

Conventional instant messaging system platforms (i.e., instant messaging client software applications and associated server applications) suffer from a variety of deficiencies. In particular,

EDL01-01p                                3

conventional instant messaging systems require that the instant messaging client software applications must be written anew for each separate computerized device platform upon which the instant messaging system is to operate. One reason for this is that the technology which is available for all the platforms to use in an equal manner is baseline World Wide Web technology, which generally consists of a 'browser' which can render HTML and Javascript. Conventional instant messaging system platforms views such baseline technology is insufficient to support complex instant messaging system features which conventional instant messaging system designers view as being required in order to develop commercially viable instant messaging systems. This baseline technology is not yet entirely universal across platforms (for example, not every cell-phone has a browser in it), tough this is rapidly changing and most 'data-connected' device now being built have at least this simple baseline capability. In addition, over the years of development of instant messaging systems, a number of attempts have been made to make the universally available functions be greater. Most notably, there was a time when many developers thought that the Java programming language would be supported on a wide variety of platforms. But in fact it has proved to be a very difficult task to make a Java platform that can run universally on any device. In addition, Java has been felt to be too proprietary a platform (as it is owned by a single company). In addition, Java is quite complex and thus it is difficult to run an acceptable version of Java on the cheapest computing platforms that have limited processing resources. Further still, while Java is still widely used and is an important technology, it is not the case that every data-connected device can support an application (i.e., an applet) written in Java since such applets require extensive Java virtual machine resources to be installed and enabled on client platforms in order for downloaded Java applets to properly operate. As a result of these issues, conventional instant messaging systems are implemented using more advanced technologies other than the simple baseline capabilities available to most all devices. Due to this result, users of instant messaging systems are required to download and install or otherwise obtain custom and sometimes proprietary software applications, executables or applets which implement the complex features of conventional instant messaging systems. Stated more generally, conventional instant messaging systems require access to custom written software and use customized or proprietary protocols in order to properly operate.

It is to be understood that Java should not be confused with Javascript. Generally, Java is a computer language that requires a 'virtual machine' to be specially and specifically installed on the

EDL01-01p                                        4

computer or other platform in order to run or interpret the java code, while "Javascript" is a simple scripting language which most conventional Web browsers support natively.

DESCRIPTION OF EMBODIMENTS OF THE INVENTION

Embodiments of the invention provide a web-based multi-party real-time or "instant" message system in which the web clients can properly operate using HTML/HTTP and Javascript without requiring client users of the system to download and install proprietary or customized instant messaging software applications or applets which operate using proprietary instant messaging protocols. According to embodiments of the invention, no java or ActiveX of any kind is required for implementation of messaging system as explained herein. In particular, the messaging system configured according to embodiments of the invention can be used to implement an "Instant Message" (IM) system, but also any other type of data-network based applications. Since embodiments of the invention rely on baseline Web technologies which are preexistent inmost every computerized device platform, embodiments of the invention can expand the capabilities of applications to exchange messaging information in support of systems that go beyond the scope of user to user text based instant messaging systems.

As an example, types of example applications that can directly benefit from embodiments of the invention are such systems as real-time financial news and quote services, emergency weather and disaster alerting services, multi-player games, and monitoring / notification systems of many types. Another use of the technology provided by embodiments of the invention is to enable application clients that control telephone systems in ways which save money or enhance productivity for users and enterprises. As an example, one use of the technology provided by embodiments of the invention is to enable real-time telephone call control from nothing but an ordinary web client, without the use of customized Java applications, proprietary protocols and without the requirement for downloading and installing specialized software in the client device.

Embodiments of the invention provide a messaging system which is capable of true multi-way communication in real-time (limited only by communication bandwidth between devices within the system), where the endpoint devices need ONLY be capable of supporting standard simple HTML and Javascript. One reason that this is beneficial is that it enables instant messaging application developers to create applications that use the messaging technology provided by

EDL01-01p                                    5

embodiments of the invention that can run on computers and other devices which support nothing more than standard ordinary web-browsers.

To exemplify the importance of this aspect of embodiments of the invention, consider the design and operation of the conventional instant messaging applications discussed above. Each one of these conventional instant messaging systems requires the client computer device to obtain and install special device-resident instant messaging application code which is dedicated to that conventional instant messaging application. This conventional application code remains installed in the client device even when the instant messaging application is not in use thus consuming storage space and potentially processing resources when a client user of the device is not performing instant messaging processing. In addition, in order to improve a conventional end-user client such as by providing a new release of an instant messaging system with additional features, the user must again obtain (i.e., download) the newest version of the instant messaging client application code and must install such code using a manual procedure. Creating and testing this end user code is enourmously expensive; it is very difficult to manage the upgrades and convince end users to download a new version. In addition, in some cases, it is a major problem to get a user to download the application client in the first place. Within a business environment, many enterprises do not allow or severely restrict the kinds of applications which can be downloaded and/or installed on a computer within the enterprise environment. Embodiments of the present invention solve these problems by requiring no download at all.

Embodiments of the invention are based in part on two system elements. The first element provides a messaging web server configured according to one embodiment of the invention which does not close a TCP protocol connection to a messaging web client (also configured according to one embodiment of the invention as well) after the server has finished sending an initial response. From the point of view of the web client, the server has not in fact finished responding. The web client 'believes' that the network is acting a bit slow, and that the requested data is simply taking its time to make its way back to the requesting client. To keep the connection "alive", the server can transmit null data so as to let the client not close the connection. In essence, the messages are sent to the client computer from the server in slow drabs, message by message, over a continuously open single message connection through which or from which the client believes it is only receiving one message. Each individual message is sent 'instantly' (i.e. as soon as possible) by the server and is interjected into the continuously open message connection to the client, but from the

EDL01-01p                                          6

point of view of the web client and http protocol, the message never seems to finish arriving. The message data is thus displayed by the client and the client continues to wait for additional data, with the understanding that the first message that established the initial message connection has never completely arrived at the client.

The second element or component configured according to one embodiment of the invention operates such that the messages sent over the continuously open connection between server in the client are encapsulated within Javascript in such a way that the receiving web messaging client uses the new message as part of content which replaces the former content the display window. This is done within JavaScript by using code which refreshes certain variables. For example, a variable "old-messages" can be appended with the former 'new-message', and then 'new-message' can be updated to reflect the new message coming in.

A fully working example embodiment of the invention including the aforementioned client and server system elements is disclosed in the appendix which follows this description. In that example embodiment, the embodiment makes use of "div" tags within HTML in order to facilitate the naming of pieces of content. In operation, a table is displayed to the user which contains the messages data sent so far, and each time a new portion of message data or content comes in, the table is updated to reflect the arrival of the new message.

Although the example system described in the appendix implements only instant messaging, the same system can be configured to pass messages in real-time between any user interface within a web-browser and a server. It is not required that the server be primarily a web server and that the client be an instant messaging client for use by a user to receive only text messages. Rather, the "messaging server" configured according to embodiments of the invention can operate as a messaging gateway which relays real-time messages to and from the 'real' back-end server and a user interface operating on the client computing system platform can implement the messaging client according to embodiments of invention to receive these messages for a purpose other displaying text to the user on the client. In other words, embodiments of the invention provide a messaging client design and a messaging server design which can be used for instant messaging war which can be used to pass text or other types of data between a back and application of the server and a client application operating in conjunction with the messaging client implemented according to embodiments of the invention using simple HTML and JavaScript,

without the requirement for use of downloading specialized applications or utilizing specialized plug-ins or virtual machines (e.g., job of virtual machines) within the client computing platform.

Embodiments of the system described herein thus make it possible to replace a proprietary message protocol between client and server by a standard web protocol such as http. The benefits to the makers of such a system can include (but are not limited to) the ability to write a purely web-based rich UI which incorporates real-time server feedback, the ease of deploying / managing / upgrading such UI clients (only a URL needs to be distributed), and the simplicity gained by utilizing standardized web protocols (http over TCP and SSL) which allow operation of embodiments of the invention to pass messages between firewalls which might otherwise exclude proprietary instant messaging protocols.

In the absence of embodiments of the present invention, in messaging system developer is limited to either deploying clients which are written with compiled or interpreted code (such as C++, Java, etc.), or to the very restricted possibilities that are contained within the "pure-pull" Web model. With an embodiment of the invention, the system developer is equipped with all the advantages of the simplest most basic web client/server model, but all the richness of a code-based client.

In addition to aforementioned embodiments, another embodiment provides a messaging server that can maintain  a long-lived connection to a back-end system such as an application server. This connection, like the messaging connection between the client and ther messaging server, can be kept open for as long as the web messaging client has a connection open to the web server element described here.   Such embodiments can enable an ordinary web client (with nothing but html and javascript support) to become a full SIP client. The server technology described here is used to maintain a connection to the SIP server for the life of the http connection from the ordinary web browser (SIP is an IETF standards-track protocol that is used for a wide variety of real-time signaling functions).

It is to be understood that there are many uses of two-party and mult-party real-time messaging systems as a core technology for applications. A great many of the most popular Internet applications require this technology. An exception would be 'classical' world-wide web application itself, which is based on a 'one-way' messaging system (essentially, the web client "pulls" information from a web server), and email (which is a non-real-time messaging system). In fact, many attempts have been made to incorporate 'push' into the world-wide web, and they have all

EDL01-01p                    8

failed, so the web remains a 'pull' technology. All of the attempts made so far have been based on a new software application client which must be downloaded to the computer, written in any number of languages, java or otherwise.

Please note that a "messaging" system has uses far beyond the problem of people who need to exchange messages. The users of this system may in fact be computers or other devices themselves, and the messages passed might be entirely invisible to any human being. A very large number of Internet applications require the real-time passing of data messages from one host on the internet to another, or among a group of internet hosts.

Follwing the claims set forth below is an Appendix that includes source code as a set of files which contain a full implementation of html, javascript, and perl code which implement one example of an instant messaging system that uses the system elements of embodiments of the inventions described above.

EDL01-01p                              9

What is claimed is:

1.  A method for receiving messages, the method comprising the steps of:

opening an messaging connection between a messaging client and a messaging server;

receiving message data of a first type over the open message connection;

maintaining the message connection in an open state between the messaging client and the messaging server, such that the messaging client perceives that message data received over the messaging connection is not yet completely received;

receiving message data of a second type over the open messaging connection; and

repeating the steps of receiving message data of a first type, maintaining the message connection in an open state, and receiving message data of a second type such that individual messages contained in the message data of the first and second types are successively received and such that that the messaging client perceives that message data received over the messaging connection is not yet completely received.

2.  A messaging system comprising:

a messaging client;

a messaging server;

a computer network coupling the messaging client and the messaging server;

the messaging client configured to:

establish a message connection with the messaging server over the computer network using only hypertext-related protocols and a simple scripting language;

receive a message connection response from the server indicating that the message connection is an open message connection;

receiving message data of a first type containing the contents of a first message over the open message connection;

receiving message data of a second type containing the contents of a second message over the open message connection;

repeating the steps of receiving message data while maintaining the open message connection and while awaiting delivery of a message termination indicator

EDL01-01p                                    10

indicating that a message associated with the message connection has been completely received by the messaging client;

the messaging server configured to:

establish a message connection with the messaging client over the computer network using only hypertext-related protocols and a simple scripting languag a

transmit a message connection response to the messaging server identifying the message connection has an open message connection;

transmitting message data of a first type containing the contents of a first message from the messaging server over the open message connection to the messaging client;

transmitting message data of a second type containing the contents of a second message over the open message connection to the messaging client

repeating the steps of transmitting in order to provide a continuous stream of message data over the open message connection, the continuous stream of message data comprising a plurality of messages perceived by the messaging client as a single continuous message received over the open message connection.

EDL01-01p                           11

APPENDIX CONTAINING CODE FOR WORKING IMPLENTATION OF ONE EXAMPLE
EMBODIMENT OF THE INVENTION

```
Blank.html

<HTML>
<HEAD>
<TITLE></TITLE>
<META name="description" content="">
<META name="keywords" content="">
<META name="generator" content="CuteHTML">
</HEAD>
<BODY BGCOLOR="#FFFFFF" TEXT="#000000" LINK="#0000FF" VLINK="#800080">
<!--Don't forget to add your FREE HitBOX statistics to your web page. To
do so, click on Tools\Online Services\Add statistics...-->

</BODY>
</HTML>
```

```
ctrlWindow.html

<?xml version="1.0" encoding="UTF-8"?>
<!DOCTYPE html PUBLIC "-//W3C//DTD XHTML 1.0 Transitional//EN"
"http://www.w3.org/TR/xhtml1/DTD/xhtml1-transitional.dtd">
<html xmlns="http://www.w3.org/1999/xhtml" xml:lang="en" lang="en">
<head>
<title>IM Control Window for <<USERNAME>></title>
</head>

<frameset cols="100%" rows="100%, *" frameborder="0" framespacing="0"
border="no">
    <frame name="IMCtrlWindow"
src="<<SCRIPTFILE>>?action=display_imctrl_main&authnum=<<AUTHNUM>>"
scrolling="no" noresize="noresize">

    <frameset cols="100%" rows="100%, *" frameborder="0" framespacing="0"
border="no">
        <frame name="IMRecv"
src="<<SCRIPTFILE>>?action=new_imrecv&authnum=<<AUTHNUM>>" scrolling="no"
noresize="noresize">

<<EXITFRAMES>>
    </frameset>

</frameset>

</html>
```

```
im.conf

; SIP SERVER & CONNECTION PREFERENCES
```

EDL01-01p                12

```
; sipHost: The hostname of the machine on which the SIP server is running
sipHost = "eiab.edial.com"

; sipPort: The port number on which that SIP server is running
sipPort = 8443

; expireTimer: If the IM script is unable to connect to the SIP server after
;              this number of seconds, give up and display an error message.
expireTimer = 10

; keepAliveInterval: To ensure that the HTTP connection between the script and
;                    the server stays up while a user is logged into the IM
;                    system, a byte of data will be sent by the script over
;                    the HTTP connection at this interval (in seconds).
;                    If a firewall involved is configured to close an HTTP
;                    connection that is idle for fewer than 60 seconds, modify
;                    this number accordingly.  This number should not be
greater
;                    than 60.
keepAliveInterval = 60


; SERVER PATHS

; HTMLDir: The path to directory containing all the HTML files that the IM
;          script requires access to.  Be aware that it is NOT evalutated
;          for environment variables. This may be any path to a directory that
;          is valid on the operating system upon which the script resides.
;          The IM script must have read permission on the files in this dir.
;          IMPORTANT: Do not include a trailing slash in this path.
HTMLDir = "."

; logDir: The path to the directory containing the IM log files.
;          This path follows the same rules as the HTMLDir path.  Additionally,
;          The IM script must have write permission on this directory.
logDir = "./log"

; mediaDir: The path to the directory containing the sound and images files
that
;             the HTML files located in HTMLDir use.  This path must be a valid
;             web path. Only the apache server needs read permission on the files
;             in this directory.
;             NOTE: Placing this directory anywhere in cgi-bin may be
problematic.
mediaDir = "/im"


; LOGIN-RELATED PREFERENCES

; loginPresence: The user status that will be exposed to the outside world when
;                that user logs in.
loginPresence = "Taking calls"

; loginExpireTimer: The numbers of seconds that a login lasts for.  After this
;                   number of seconds, the client must send a REGISTER.  The
;                   maximum permitted value for this number is 3600.
```

EDL01-01p                    13

```
loginExpireTimer = 3600


; LOGGING-RELATED PREFERENCES (except for paths)

; loggingLevel: The level of information that will be logged
;    = 0: Absolutely no logging; don't even try to open log file
;    = 1: Log ONLY errors
;    = 2: Log errors and basic activity information
;    = 3: Debug mode; log all information, including the exact text that the IM
;         script sends to and receives from the SIP server.
loggingLevel = 3

; logIMSubjects: Should the texts of the IMs be logged?
;    = 0: Don't log the texts of the IMs; always log subject as <HIDDEN>.
;    = 1 (or non-zero value): Always log IM subjects.
logIMSubjects = 1

; logFileNameFormat: The format of the log file names.  [time] represents the
;                    date/time the log file is created in format YYYYMMDD.
logFileNameFormat = "im.log.[time]"

; logFileDuration: How often a new log file is created (in days).
;                  Must be a positive integer.
logFileDuration = 1


; SERVER-PROTECTIVE MAXIMUMS

; maxAllowedTotalProcs: If the total number of processes currently running on
;                       this machine is greater than to this number when a
;                       user attempts to log in to the IM system, display an
;                       error message specifying that the server is too busy
;                       to accept logins at this time.
maxAllowedTotalProcs = 250

; maxAllowedIMProcs: If the total number of IM processes currently running on
;                    this machine is greater thanthis number when a user
;                    attempts to log in to the IM system, display an error
;                    message specifying that the server is too busy to accept
;                    logins at this time.
maxAllowedIMProcs = 50

; maxAllowedUserInstances: If a single user already has this number of IM
;                          Control windows open in a single browser
;                          simultaneously and tries to open another, don't
;                          allow it but display the error message below.
maxAllowedUserInstances = 2


; ERROR MESSAGES

; maxAllowedTotalProcsError: When a user attempts to log in and
;                            maxAllowedTotalProcs has been exceeded, display
;                            this error message.
maxAllowedTotalProcsError = "The eDial server is too busy to allow users to log
in at this time.  Please try again later."
```

EDL01-01p                    14

```
; maxAllowedIMProcsError: When a user attempts to log in and maxAllowedIMProcs
;                         has been exceeded, display this error message.
maxAllowedIMProcsError = "The eDial server is too busy to allow users to log in
at this time.  Please try again later."

; maxAllowedUserInstancesError: When a single user attempts to open a new
;                              IM Control Window and maxAllowedUserInstances
;                              has been reached, display this error message.
maxAllowedUserInstancesError = "You have the maximum number of permitted IM
Control windows open.  Please close one of them first."

; noUsernameError: The error message a user sees when he or she fails to enter
;                  his or her username hen logging in.
noUsernameError = "Please enter your eDial username below."

; noPasswordError: The error message a user sees when he or she fails to enter
;                  his or her password hen logging in.
noPasswordError = "Please enter your eDial password below."

; invalidLoginError: The error message a user sees when the SIP server returns
;                    an "Unauthorized" error in response to the user's login.
invalidLoginError = "The username/password combination you entered below is not
valid."


; IM SENDING/RECEIVING PREFERENCES

; maxIMLength: The maximum permitted length of an instant message (in
;              characters).  If the length of a sent IM is greater than this
;              number of characters and the user is somehow able to bypass the
;              client-side enforcement of this length, IM is truncated to an IM
;              of this length.
maxIMLength = 500

; submitOnEnter: Should an IM be sent when a user typing an IM presses ENTER?
;    = 1 [or non-zero value]: If a user type an IM and presses ENTER, the IM
;         will be sent whether the user's cursor is in the IM message field or
;         the recipient field.  A user, however, will not be able to type
;         multiline IMs because of this.
;    = 0: The user may only submit an IM by pressing the "Send IM" button or by
;         pressing ENTER when his/her cursor is in the recipient field; hence,
;         a use could submit an IM by pressing TAB+ENTER when his/her cursor is
;         located in the message field.  Pressing ENTER while the cursor is in
;         the message field brings it to the next line rather than sending the
;         IM.  A user will be able to type multiline IMs with this setting.
submitOnEnter = 1

; errorTimeout: The maximum number of seconds the script will wait after
sending
;                an IM to receive an error message (such as 480 User Temporarily
;                Unavailable or 404 User Not Found) from the SIP server.  In
most
;                cases, setting this to 0.5 is just fine.  If you expect a very
;                busy SIP server, you may wish to set it to 3.0.  The higher you
;                set this, however, the slower instant messenging will be.
errorTimeout = 0.5
```

EDL01-01p                                    15

```
; maxOpenWindows: The maximum number of IM windows that each IM Control Window
;                 may have open at one time.  If a user tries to open a new IM
;                 window when he/she has already has this number of windows
open
;                 or a remote user tries to start a new IM session with that
;                 user, an error will be displayed an the new IM window won't
;                 open.  If the user wishes to open another IM window, he/she
;                 must close one first.
maxOpenWindows = 10


; IM QUEUE NUMBERS

; IMSendQueue: The number of IM Sending frames the user is given.  When a user
;              types an instant message and clicks "Send IM", a JavaScript
;              searches for an available IM Sending frame (i.e. one that is not
;              currently sending an IM).  If at least one of these "hidden"
;              frames is available, the user's IM Data is placed into that
;              frame's form and that form is submitted to the IM script, which
;              sends the IM.  If none are available, the IM is queued.  It is
;              released as soon as the next IM Sending frame becomes available.
;              Setting a small IMSendQueue (e.g. 3) is a way to reduce the
;              number of CPU cycles & processes the IM system may use.  Setting
;              a large IMSendQueue (e.g. 8) increases the overall smoothness of
;              IM sending and allows the user to send IMs in rapid succession.
;              Typical is 5.  Don't set this smaller than 1 or larger than 8.
IMSendQueue = 3

; IMExitQueue: The number of IM Ending frames the user is given.  When a user
;              closes one of his/her IM windows, a JavaScript searches for an
;              available IM Ending frame (i.e. one that is not currently ending
;              an IM session).  If at least one of these "hidden" frames is
;              available, the user's IM session data is placed into that
frame's
;              form and that form is submitted to the IM script, which informs
;              the other participant(s) that the user has closed his/her
window.
;              If no IM Ending frames are available, the request is queued.  It
;              is released as soon as the next IM Ending frame becomes
available.
;              Setting a small IMEndQueue (e.g. 1) is a [minor] way of reducing
;              the number of CPU cycles & processes the IM system may use.
;              Setting a large IMEndQueue (e.g. 5) helps to ensure the
;              reliability of the IM script's informing the other
participant(s)
;              of the closed IM window.
;              Typical is 3.  Don't set this smaller than 1 or larger than 8.
IMExitQueue = 3


; IM STYLE & DISPLAY PREFERENCES

; exitNotifyMessage: The message displayed on one's IM window when a remote
user
;                    closes his IM window.  *user* represents the username of
;                    the user who closed his or her IM window.
```

A-189

EDL01-01p                16

```
exitNotifyMessage = "*user* just closed his/her IM window."

; userNotFoundMessage: The message displayed on one's IM window he/she tries
;                      to send an IM to a nonexistent eDial user.
userNotFoundMessage = "The eDial ID to which you sent the above IM does not
signify a valid eDial user."

; userUnavailableMessage: The message displayed on one's IM window he/she tries
;                         to send an IM to a valid eDial user who isn't logged
;                         in.
userUnavailableMessage = "The eDial user to whom you sent the above IM is not
currently logged in."

; IMRecvColor: The color in which the eDial username to the left of each IM
that
;             that a user receives is displayed.
IMRecvColor = "#0000CC"

; IMSendColor: The color in which the eDial username of the left of each IM
that
;             that a user sends is displayed.
IMSendColor = "#FF3333"

; msgColor: The color in which notification messages (e.g. "the user you tried
;           to IM is not logged in...") are displayed in a user's IM window.
msgColor = "#009900"
```

---

```
IMData.html

<?xml version="1.0" encoding="UTF-8"?>
<!DOCTYPE html PUBLIC "-//W3C//DTD XHTML 1.0 Transitional//EN"
"http://www.w3.org/TR/xhtml1/DTD/xhtml1-transitional.dtd">
<html xmlns="http://www.w3.org/1999/xhtml" xml:lang="en" lang="en">
<head>
<title>IM Data</title>
<!-- 9pt font textarea for nn? -->
<style type="text/css">
.txtarea
{
    font-family: Tahoma, Verdana, Arial;
    font-size: 8pt;
}

.inputField
{
    font-family: Tahoma, Verdana, Arial;
    font-size: 8pt;
}
</style>
<script>
var callID = "<<CALLID>>";
var txtMaxLength = <<MAXIMLENGTH>>;
var submitOnENTER = <<SUBMITONENTER>>;
var loaded = false;
var recipHasFocus = false;
```

EDL01-01p                          17

```
var isNS = (navigator.appName == "Netscape");
var isIE = (navigator.appName == "Microsoft Internet Explorer");

if (submitOnENTER)
{
    if (document.layers)
        document.captureEvents(Event.KEYPRESS);

    document.onkeypress = function (evt) {
        var key =
            document.all ? event.keyCode :
            evt.which ? evt.which : evt.keyCode;
        if (key == 13)
        {
            if (document.IMDataForm.onsubmit())
                document.IMDataForm.submit();
            if (!isIE)
                document.IMDataForm.message.select();

            return false;
        }
    }
}

function reFocus() {
    if (!document.all && !document.getElementById)
        document.IMDataForm.IMDataBox.blur();
}

function txtInit() {
    document.IMDataForm.message.focus();

    if (isIE)
    {
        document.IMDataBox.document.open("text/html", "replace");
        document.IMDataBox.document.write("<span style=\"position:absolute;
left:2; top:0; font-family:Tahoma; font-size:8pt\">\n<span style=\"font-
size:0\"> </span>");

        document.IMDataForm.message.style.pixelWidth += 1;
    }

    loaded = true;
    parent.opener.initQueueFlush(callID);
}

function sizeAdjust() {
    // To fix display problems in certain versions of IE

    if (isIE)
    {
        // Fixes a resize bug in certain browsers
        document.body.style.width += 1;
        document.body.style.width -= 1;
    }
}
```

EDL01-01p                          18

```
function checkMaxLength(textarea, evt) {
    if (textarea.selected && evt.shiftKey)
        // ignore shift click for select
        return true;
    var allowKey = false;
    if (textarea.selected && textarea.selectedLength > 0)
        allowKey = true;
    else
    {
        var keyCode =
            document.layers ? evt.which : evt.keyCode;
        if ((keyCode < 32 && keyCode != 13) || (keyCode >= 37 && keyCode <=
40))
            // Allow control and arrow keys, but not necessarily the ENTER key
            allowKey = true;
        else if (keyCode == 13)  // ENTER key pressed
            if (submitOnENTER)
                allowKey = true;
            else
                allowKey = textarea.value.length < txtMaxLength;
        else
            allowKey = textarea.value.length < txtMaxLength;
    }
    textarea.selected = false;
    return allowKey;
}

function storeSelection(field) {
    if (document.all)
    {
        field.selected = true;
        field.selectedLength =
          field.createTextRange ?
            document.selection.createRange().text.length : 1;
    }
}
</script>
</head>
<body background="<<MEDIADIR>>/grad8testgif.gif" marginheight="1"
onload="sizeAdjust()" onunload="parent.opener.sendBYE(callID,
document.IMDataForm.recip.value)">

<script>
if (isIE)
    document.write('<span style="position:absolute; top:5; left:10; width:100%;
height:100%">');
</script>

<table border="0" cellpadding="0" cellspacing="0" width="100%" height="100%">
  <tr>
    <td width="100%" height="65%">

    <table border="0" cellpadding="0" cellspacing="0" width="100%"
height="100%">
      <tr height="14">
        <td>
```

A-192

EDL01-01p                                    19

```
        <script>
        if (isIE)
                document.write('<img src="<<MEDIADIR>>/imtitle.gif" width="15"
height="14" align="center"> ');
        else
                document.write('<img src="<<MEDIADIR>>/imtitle_nn.gif" width="15"
height="18" align="center"> ');
        </script>
        <span style="font-family:Tahoma, Verdana, Arial; font-size:8pt; font-
weight:bold; color:#333333">Instant Message<br></span>
        </td>
      </tr>
      <tr>
        <td valign="top">
        <form name="IMDataForm" id="IMDataForm"
onsubmit="parent.opener.sendIM(parent); return false">
        <span class="txtarea">
        <script>
        if (isIE)
                document.writeln('<iframe name="IMDataBox" id="IMDataBox"
style="position:relative; width:100%; height:95%" scrolling="yes"></iframe>');
        else
                document.writeln('<textarea name="IMDataBox" id="IMDataBox"
class="txtarea" style="position:relative; width:100%; height:95%; font-
family:Tahoma, Verdana, Arial; font-size:8pt" cols="40" rows="11"
wrap="virtual" align="top" readonly="readonly" onfocus="reFocus()">
</textarea>');
        </script>
        </span>
        </td>
      </tr>
    </table>

    </td>
  </tr>

  <tr>
    <td width="100%" height="22%">

    <script>
    if (isIE)
        document.write('<span style="position:relative; left:-1; top:-2">');
    </script>
    <span class="txtarea">
    <textarea name="message" class="txtarea" style="width:100%; height:80%;
font-family:Tahoma, Verdana, Arial; font-size:8pt" cols="40" rows="3"
wrap="virtual" align="top" onkeydown="return checkMaxLength(this, event)"
onselect="storeSelection(this)"></textarea>
    </span>
    <script>
    if (isIE)
        document.write('</span>');
    </script>

    </td>
  </tr>
```

EDL01-01p                    20

```
    <tr>
      <script>
      if (isIE)
          document.write('<td width="100%" height="13%" valign="top">');
      else
          document.write('<td width="100%" height="13%">');
      </script>
      <script>
      if (isIE)
          document.write('<span style="position:relative; left:-1; top:-5">');
      </script>

      <table border="0" cellpadding="0" cellspacing="0" width="100%">
        <tr>
          <td width="30" height="20" valign="bottom">
          <img src="<<MEDIADIR>>/recip.gif" border="0" align="top" width="26"
height="20">
          </td>
          <td width="75%">
          <span class="inputField">
          <input type="text" name="recip" value="<<RECIPINIT>>" style="width:98%;
font-family:Tahoma, Verdana, Arial; font-size:8pt" size="30" maxlength="250"
onfocus="recipHasFocus = true" onblur="recipHasFocus = false">
          </span>
          </td>
          <td height="20" valign="bottom">
          <input type="image" src="<<MEDIADIR>>/sendim.gif" border="0"
align="top" width="55" height="20">
          </td>
        </tr>
        </form>
      </table>
      <script>
      if (isIE)
          document.write('</span>');
      </script>

      </td>
    </tr>
</table>

<script>
txtInit();
</script>

</body>
</html>
```

---

```
IMIntro.html

<?xml version="1.0" encoding="UTF-8"?>
<!DOCTYPE html PUBLIC "-//W3C//DTD XHTML 1.0 Transitional//EN"
"http://www.w3.org/TR/xhtml1/DTD/xhtml1-transitional.dtd">
<html xmlns="http://www.w3.org/1999/xhtml" xml:lang="en" lang="en">
```

EDL01-01p                                    21

```html
<head>
  <title>Instant Messaging System Login</title>
  <style type="text/css">
  .headerText {
    font-family:Verdana, Arial, Helvetica, Sans-Serif;
      font-size:18px;
      font-weight:bold;
  }
  .fieldText {
    font-family:Verdana, Arial, Helvetica, Sans-Serif;
      font-size:12px;
      font-weight:bold;
  }
  </style>
</head>
<body onload="document.loginForm.username.focus()">
<span class="headerText" style="color:#666666">
Welcome to the eDial Instant Messenging System
</span>
<br />
<img src="<<MEDIADIR>>/bluegrad.gif" width="90%" height="3" alt="-----" />
<p> </p>
<form name="loginForm" id="loginForm" method="post" action="<<SCRIPTFILE>>">
<input type="hidden" name="action" value="login_user" />
<table width="100%" border="0" cellpadding="0" cellspacing="2">
  <tr>
    <td align="center">
    <<ERRORS>>
    </td>
  </tr>
  <tr>
    <td> </td>
  </tr>
  <tr>
    <td align="center">
    <table border="0" cellpadding="1" cellspacing="0">
      <tr>
        <td bgcolor="#9999FF">
        <table border="0" cellpadding="1" cellspacing="1">
          <tr>
            <td bgcolor="#006699" height="25">
            <span class="headerText" style="color:#FFFFFF">Please Log In</span>
            </td>
          </tr>
          <tr>
            <td bgcolor="#999999" valign="top" height="100%">
            <table border="0" cellpadding="1" cellspacing="3">
              <tr>
              <td><span class="fieldText"
style="color:#333333">Username:</span></td>
                <td><span class="fieldText"><input type="text" name="username"
value="<<USERNAME>>" size="25" maxlength="50" class="fieldText" style="font-
weight:normal" /></span></td>
              </tr>
              <tr>
                <td><span class="fieldText"
style="color:#333333">Password:</span></td>
```

A-195

EDL01-01p                                22

```
            <td><span class="fieldText"><input type="password"
name="password" size="25" maxlength="50" class="fieldText" style="font-
weight:normal" /></span></td>
            </tr>
            <tr><td colspan="2"> </td></tr>
            <tr>
            <td colspan="2" align="center">
            <span class="fieldText">
            <input type="submit" value="Log In" />
            </span>
            </td>
            </tr>
          </table>
        </td>
      </tr>
    </table>
    </td>
  </tr>
</table>
</td>
</tr>
</table>
</form>
</body>
</html>
```

---

```
IMLoggedIn.html

<?xml version="1.0" encoding="UTF-8"?>
<!DOCTYPE html PUBLIC "-//W3C//DTD XHTML 1.0 Transitional//EN"
"http://www.w3.org/TR/xhtml1/DTD/xhtml1-transitional.dtd">
<html xmlns="http://www.w3.org/1999/xhtml" xml:lang="en" lang="en">
<head>
<title>Logged In to the eDial Service</title>
</head>

<frameset cols="100%" rows="100%, *" frameborder="0" framespacing="0"
border="no">
  <frame name="regBrowserWindow"
src="<<SCRIPTFILE>>?action=display_login_success&authnum=<<AUTHNUM>>">
  <frame name="IMCtrlWindow"
src="<<SCRIPTFILE>>?action=open_imctrl&authnum=<<AUTHNUM>>">
</frameset>

<body>
<noframes>
<font face="Verdana, Arial, Helvetica" size="6" color="#FF0000"><b>
We're're sorry, but you cannot use the eDial Instant Messaging system because
your browser does not support frames.<br>
Please <a href="http://www.microsoft.com/ie">download</a> and install the
latest version of Internet Explorer to continue.
</b></font>
</noframes>
</body>
```

EDL01-01p                              23

```
</html>
```

---

```
IMRecv.html

<?xml version="1.0" encoding="UTF-8"?>
<!DOCTYPE html PUBLIC "-//W3C//DTD XHTML 1.0 Transitional//EN"
"http://www.w3.org/TR/xhtml1/DTD/xhtml1-transitional.dtd">
<html xmlns="http://www.w3.org/1999/xhtml" xml:lang="en" lang="en">
<head>
<title>IM Receive Window</title>

<!--<embed src="<<MEDIADIR>>/Alert.wav" hidden="true" name="alertSound"
id="alertSound" mastersound="mastersound" autostart="false">-->
<script>
// Constants
var NEW_IM      = 0;
var EXISTING_IM = 1;

var FROM_WINDOW = 0;
var FROM_QUEUE  = 1;

var wasSent     = 0;
var wasReceived = 1;

// Configuration Options
var maxOpenWindows = <<MAXOPENWINDOWS>>;
var IMSendQueue    = <<IMSENDQUEUE>>;
var IMExitQueue    = <<IMEXITQUEUE>>;
var txtMaxLength   = <<MAXIMLENGTH>>;

var IMRecvColor    = "<<IMRECVCOLOR>>";
var IMSendColor    = "<<IMSENDCOLOR>>";
var msgColor       = "<<MSGCOLOR>>";

var IMWindowWidth  = 410;
var IMWindowHeight = 260;

var totalOpenWindows = 0;

var openWindowData = new Array(maxOpenWindows);
var exitQueue      = new Array();

var loaded   = false;
var authnum  = <<AUTHNUM>>;
var username = "<<USERNAME>>";
var suppressConnError = 0;
var cookieInterval;

// Easy test to see if user is using IE
var isIE = (navigator.appName == "Microsoft Internet Explorer");

// Define various utility functions used throughout this page

if (window.Array && Array.prototype)
{
```

EDL01-01p                        24

```
        if (!Array.prototype.push)
            Array.prototype.push = _Array_push;
        if (!Array.prototype.shift)
            Array.prototype.shift = _Array_shift;
        if (!String.prototype.trim)
            String.prototype.trim = _String_trim;
}

function _Array_push() {
        for (var a = 0; a < arguments.length; a++)
            this[this.length] = arguments[a];
        return this.length;
}

function _Array_shift() {
        var arrayElement = this[0];

        for (var i = 1; i < this.length; i++)
            this[i - 1] = this[i];
        this.length = this.length - 1;

        if (arrayElement)
            return arrayElement;
        else
            return null;
}

function _String_trim() {
        if (this == '')
            return this;

        if (parseInt(navigator.appVersion) >= 4)
            return this.replace(/^\s+/g, '').replace(/\s+$/g, '');
        else
        {
            var strBegin = 0, strLen = this.length, strEnd = strLen - 1;
            while (strBegin < strLen && this.charAt(strBegin) == ' ')
                strBegin++;
            while (strEnd > 0 && this.charAt(strEnd) == ' ')
                strEnd--;
            return this.substring(strBegin, strEnd + 1);
        }
}

/* Creates an "IM Window" object;
   Comprised of window object handler, index in object array, an init
   queue buffer, a send queue buffer, a window position object, and
   a Call-ID. */

function IMWindow(win, winIndex, callID) {
        this.win       = win;
        this.winIndex  = winIndex;

        this.initQueue = new Array();
        this.sendQueue = new Array();

        this.pos       = determineWindowOffset();
```

EDL01-01p                                25

```
        if (callID)
            this.callID = callID;
        else
            this.callID = Math.floor(Math.random() * Math.pow(2,64));
}

/* Creates an "IM" object;
   Comprised of sender's eDial ID (null in case of notification message),
   the actual IM, and an indication as to whether to user sent it or
   received it. */

function IM(sender, msg, origin) {
    this.sender = sender;
    this.msg   = msg;
    this.origin = origin;
}

function openIMWindow(windowType, initIM, callID) {
    var thisWindowNum;

    if ((thisWindowNum = findAvailWindow()) == null)
    {
        if (windowType == NEW_IM)
            alert("You already have " + openWindowData.length + " IM windows
open, which is the maximum number permitted." + "\n" +
                  "Please close one of your IM windows and try again.");
        else
            alert("Someone tried to start a new IM conversation with you, but
you already have " + openWindowData.length + " IM windows open, " + "\n" +
                  "which is the maximum number of open IM windows permitted." +
"\n" +
                  "For new IM windows to appear, please close at least one of
your IM windows.");
        return;
    }

    openWindowData[thisWindowNum] = new IMWindow(null, thisWindowNum, callID);
    totalOpenWindows++;
    var thisIMWindow = openWindowData[thisWindowNum];

    var isResizable = (isIE ? "yes" : "no");
    thisIMWindow.win = window.open("","_blank",
                                        "left="         +
thisIMWindow.pos.posLeft +
                                        ",top="         +
thisIMWindow.pos.posTop  +
                                        ",width="       + IMWindowWidth
+
                                        ",height="      + IMWindowHeight
+
                                        ",resizable=" + isResizable
+
                                        ",border=no");
    thisIMWindow.win.opener = window;  // Primarily for a bug in IE3
```

EDL01-01p                           26

```
    var newWindowLoc = "<<SCRIPTFILE>>?action=new_im&authnum=" + authnum +
"&callID=" + thisIMWindow.callID);
    if (windowType == EXISTING_IM)
        newWindowLoc += "&recip=" + initIM.sender;
    thisIMWindow.win.location = newWindowLoc;

    if (windowType == EXISTING_IM && initIM)
        initQueueAppend(thisIMWindow, initIM);

    return thisIMWindow;
}

function findAvailWindow() {
    for (var i = 0; i < openWindowData.length; i++)
        if (!openWindowData[i] || !openWindowData[i].win ||
openWindowData[i].win.closed)
            return i;
    return null;
}

function findAvailSendFrame(thisIMWindow) {
    if (thisIMWindow == null)
        return null;

    var availFrame;
    for (var f = 1; f <= IMSendQueue; f++)
        if ((availFrame = eval("thisIMWindow.IMSend" + f)) &&
availFrame.loaded)
            return availFrame;
    return null;
}

function findAvailExitFrame() {
    var availFrame;
    for (var f = 1; f <= IMExitQueue; f++)
        if ((availFrame = eval("parent.IMExit" + f)) && availFrame.loaded)
            return availFrame;
    return null;
}

function determineWindowOffset() {
    switch (totalOpenWindows)
    {
        case 0:  // Align top-left
            this.posLeft = 10;
            this.posTop  = 10;
            break;
        case 1:  // Align top-right
            this.posLeft = (screen.availWidth  - 20 - IMWindowWidth);
            this.posTop  = 10;
            break;
        case 2:  // Align bottom-left
            this.posLeft = 10;
            this.posTop  = (screen.availHeight - 30 - IMWindowHeight);
            break;
        case 3:  // Align bottom-right
            this.posLeft = (screen.availWidth  - 20 - IMWindowWidth)
```

EDL01-01p                         27

```
                    this.posTop  = (screen.availHeight - 30 - IMWindowHeight);
                    break;
             default:
                    this.posLeft = Math.floor(Math.random() * (screen.availWidth  - 20
- IMWindowWidth)) + 1;
                    this.posTop  = Math.floor(Math.random() * (screen.availHeight - 30
- IMWindowHeight)) + 1;
        };
        return this;
}

function initQueueAppend(thisIMWindow, thisIM) {
        thisIMWindow.initQueue.push(thisIM);
}

function initQueueFlush(callID) {
        if (!callID)
            return null;

        var thisIMWindow;
        if ((thisIMWindow = getWindowHandler(callID)) != null)
        {
            if (thisIMWindow.win && thisIMWindow.win.IMDataWin &&
thisIMWindow.win.IMDataWin.loaded && !thisIMWindow.win.closed)
                for (var q = 0; q < thisIMWindow.initQueue.length; q++)
                    displayIM(thisIMWindow.win, thisIMWindow.initQueue[q]);

            thisIMWindow.initQueue = null;
        }
}

function sendQueueAppend(thisIMWindow, thisIM) {
        thisIMWindow.sendQueue.push(thisIM);
}

function sendQueueShift(callID) {
        if (!callID)
            return null;

        var thisIMWindow;
        if ((thisIMWindow = getWindowHandler(callID)) != null)
        {
            var thisIM = thisIMWindow.sendQueue.shift();
            if (thisIM != null)  // An IM is in the queue (else, queue is empty).
                sendIM(thisIMWindow.win, FROM_QUEUE, thisIM);
        }
        else
        {
            // User closed IM window before queued IM could be sent
        }
}

function exitQueueAppend(callID) {
        exitQueue.push(callID);
}

function exitQueueShift() {
```

EDL01-01p                          28

```
        var callID;
        if ((callID = exitQueue.shift()) != null)
            sendBYE(callID);
}

function makeIM(sender, msg, origin) {
        // This is merely an interface through which a JavaScript on another page
        // could create an IM object when it does not inherently have direct
        // access to IM objects.

        return new IM(sender, msg, origin);
}

function addIM(callID, thisIM) {
        if (!callID)
            return null;

        var thisIMWindow;
        if ((thisIMWindow = getWindowHandler(callID)) != null)
            if (thisIMWindow.win && thisIMWindow.win.IMDataWin &&
thisIMWindow.win.IMDataWin.loaded && !thisIMWindow.win.closed)
                displayIM(thisIMWindow.win, thisIM);
            else
                initQueueAppend(thisIMWindow, thisIM);
        else
            openIMWindow(EXISTING_IM, thisIM, callID);
}

/* In sendIM(), IMSource and thisIM are needed only if
   this IM's source is the sendQueue of a window */

function sendIM(thisIMWindow, IMSource, thisIM) {
        var IMDataForm, message, recip;
        if (!IMSource)
            IMSource = FROM_WINDOW;

        if (IMSource == FROM_WINDOW)
        {
            IMDataForm = thisIMWindow.IMDataWin.document.IMDataForm;
            message = IMDataForm.message.value;
            recip   = IMDataForm.recip.value.trim();

            if (recip != null && recip != IMDataForm.recip.value)
                IMDataForm.recip.value = recip;

            if (message == '')
            {
                alert("Please enter the text of the instant message that is to be
sent.");
                IMDataForm.message.focus();
                return null;
            }
            if (recip == '')
            {
                alert("Please enter the eDial ID of the person to whom this IM will
be sent.");
                IMDataForm.recip.focus();
```

A-202

EDL01-01p                                    29

```
            return null;
        }
        if (message.length > txtMaxLength + 1)
        {
            alert("The maximum permitted length of an IM is " + txtMaxLength +
" characters.\n" +
                    "Yours is " + message.length + " characters in length.");
            IMDataForm.message.focus();
            return null;
        }
    }
    else
    {
        if (!thisIM)
            return null;

        message = thisIM.message;
        recip   = thisIM.recip;
    }

    var IMSendFrame;
    if ((IMSendFrame = findAvailSendFrame(thisIMWindow)) != null)
    {
        var IMSendForm = IMSendFrame.document.IMSendForm;

        IMSendForm.message.value = message;
        IMSendForm.recip.value   = recip;
        IMSendForm.submit();
    }
    else
    {
        var thisIMWindowObj = getWindowHandlerByObj(thisIMWindow);
        sendQueueAppend(thisIMWindowObj, new IM(username, message, wasSent));
    }

    if (IMSource == FROM_WINDOW)
    {
        displayIM(thisIMWindow, new IM(username, message, wasSent));

        IMDataForm.recip.focus();  // Fixes a resize bug in certain browsers
        IMDataForm.message.value = '';
        IMDataForm.message.focus();
    }
}

function displayIM(thisIMWindow, thisIM) {
    var IMDataForm = thisIMWindow.IMDataWin.document.IMDataForm;
    if (thisIM.origin == wasReceived && thisIM.sender != null && thisIM.sender
!= IMDataForm.recip.value && !thisIMWindow.IMDataWin.recipHasFocus)
        IMDataForm.recip.value = thisIM.sender;

    if (isIE)
    {
        while(thisIM.msg.indexOf("\n") >= 0)
            thisIM.msg = thisIM.msg.replace("\n", "<br>");

        var displayColor = (thisIM.sender != null ?
```

EDL01-01p                                    30

```
                (thisIM.origin == wasReceived ? IMRecvColor : IMSendColor) :
msgColor);

        var IMDataBox = thisIMWindow.IMDataWin.document.IMDataBox;
            IMDataBox.document.write("<span style=\"color:"   + displayColor   +
                            "; font-weight:bold\">");
        if (thisIM.sender != null)
        {
            // Alert sound sometimes causes JavaScript error; look into this
later.
            // if (thisIM.origin == wasReceived && document.alertSound &&
document.alertSound.readyState == "complete")
            //     document.alertSound.play()
            IMDataBox.document.write(thisIM.sender + ":</span>\n" + thisIM.msg
+ "<br>\n\n");
        }
        else
            IMDataBox.document.write(thisIM.msg + "</span><br>\n\n");

        IMDataBox.scrollBy(0, IMDataBox.document.body.clientHeight ?
            IMDataBox.document.body.clientHeight : IMDataBox.innerHeight);
    }
    else
    {
        var IMDataBox = thisIMWindow.IMDataWin.document.IMDataForm.IMDataBox;

        // Alert sound sometimes causes JavaScript error; look into this later.
        // if (thisIM.origin == wasReceived && document.alertSound &&
document.alertSound.readyState == "complete")
        //     document.alertSound.play()

        if (thisIM.sender != null)
            IMDataBox.value += "<" + thisIM.sender + "> ";
        IMDataBox.value += thisIM.msg + "\n ";
    }
}

function sendBYE(callID, remoteUsers) {
    if (!callID || !remoteUsers)
        return null;

    var IMExitFrame;
    if ((IMExitFrame = findAvailExitFrame()) != null)
    {
        var IMExitForm = IMExitFrame.document.IMExitForm;
        IMExitForm.callID.value = callID;
        IMExitForm.recip.value  = remoteUsers.trim();
        IMExitForm.submit();
    }
    else
        exitQueueAppend(callID);
}

function getWindowHandler(callID) {
    for (var i = 0; i < openWindowData.length; i++)
        if (openWindowData[i] && openWindowData[i].callID == callID)
            return openWindowData[i];  // Found window associated with CallID
```

EDL01-01p                                31

```
        return null;
}

function getWindowHandlerByObj(winObj) {
    for (var i = 0; i < openWindowData.length; i++)
        if (openWindowData[i] && openWindowData[i].win == winObj)
            return openWindowData[i];  // Found window associated with window
object
    return null;
}

function numOpenWindows() {
    var numOpen = 0;
    for (var i = 0; i < openWindowData.length; i++)
        if (openWindowData[i] && openWindowData[i].win &&
!openWindowData[i].win.closed)
            numOpen++;
    return numOpen;
}

function lostConnError() {
    if (suppressConnError)
        return;

    alert("Your connection to the eDial server was lost.\n" +
          "This probably occurred because either you shut down your internet
connection or the eDial server is experiencing problems.\n" +
          "It is also possible that your firewall closed the connection for
inactivity.\n\n" +
          "You can no longer send and receive IMs through your current IM
Control Window because its connection was lost.\n" +
          "Please choose the Log Out button on your panel, make sure your
internet connection is up, and log in again.");
}

function confirmUnload() {
    var numOpen = 0;
    var warning = "Caution: You should always use the Log Out button on your IM
Control window to exit.\nIf you attempt to exit by choosing OK below, you may
not be able to log in again without\nclosing your browser window first.";

    if ((numOpen = numOpenWindows()) != 0)
    {
        var numWindowsText = (numOpen > 1 ? "all " + numOpen + " IM windows" :
"the IM window");
        return("If you do so, " + numWindowsText + " that you currently have
open will become useless.\n\n" + warning);
    }
    else
        return(warning);
}

function cancelConfirm() {
    window.onbeforeunload = null;
    destroyCookies();
}
```

EDL01-01p                                    32

```
function destroyCookies() {
    // Clear current cookies; use variable authnum
    var expireDate = new Date;
        expireDate.setDate(expireDate.getDate() - 1)

    document.cookie = "ed_auth" + authnum + "-user=; expires=" + expireDate +
"; path=/";
    document.cookie = "ed_auth" + authnum + "-auth=; expires=" + expireDate +
"; path=/";
    document.cookie = "ed_auth" + authnum + "-step=; expires=" + expireDate +
"; path=/";
}


function getCookie(cookieName) {
    var searchString = cookieName + "=";
    if (document.cookie.length > 0)
    {
        var cookieOffset = document.cookie.indexOf(searchString);
        if (cookieOffset != -1)
        {
            cookieOffset += searchString.length;
            cookieEnd    = document.cookie.indexOf(";", cookieOffset);
            if (cookieEnd == -1)
                cookieEnd = document.cookie.length;
          return document.cookie.substring(cookieOffset, cookieEnd);
        }
    }
    else
        return '';
}

function refreshCookies() {
    // Reset "expires" parameters of cookies

    var userCookie = getCookie("ed_auth" + authnum + "-user");
    var authCookie = getCookie("ed_auth" + authnum + "-auth");

    var nowDate = new Date();
    var newDate = new Date();
    newDate.setTime(nowDate.getTime() + 1000 * 60 * 5);
    newDate = newDate.toGMTString();

    document.cookie = "ed_auth" + authnum + "-user=" + userCookie + ";
expires=" + newDate + "; path=/";
    document.cookie = "ed_auth" + authnum + "-auth=" + authCookie + ";
expires=" + newDate + "; path=/";
}

function doUnload() {
    destroyCookies();

    var numOpen = 0;
    if ((numOpen = numOpenWindows()) != 0)
    {
        // Close all open IM windows
        for (var i = 0; i < openWindowData.length; i++)
```

EDL01-01p                                        33

```
              if (openWindowData[i] && openWindowData[i].win &&
!openWindowData[i].win.closed)
              openWindowData[i].win.close();
    }

    clearInterval(cookieInterval);
}

function viewPrefs() {
    alert("This feature will be implemented in an upcoming release.");
}
</script>
</head>
<body onload="lostConnError()" onbeforeunload="confirmUnload()"
onunload="clearInterval(cookieInterval)">
<script>
loaded = true;
window.onbeforeunload = confirmUnload;
refreshCookies();
cookieInterval = setInterval("refreshCookies()", 1000 * 60 * 4);
parent.document.title = "IM Control Window for " + username + " (ready)";
</script>
```

---

```
imtest.pl

#!/usr/bin/perl

use strict;
no strict 'refs';
use Socket;

# Set various error constants
my $CONTACT_ADMIN_NOW = "Please contact your server administrator immediately";
my $MUST_BE_INSTALLED = "is not installed or is misconfigured.  It must be
installed and configured for instant messaging to work correctly";
my $INTERNAL_ERROR    = "A serious internal error occurred on the eDial
server";
my $ON_CONNECT        = "when attempting to connect to the eDial server";
my $FAIL_ON_CONNECT   = "failure occurred $ON_CONNECT";
my $PM                = "Perl module";
my $BEGIN_ERROR_FONT  = qq[<span style="font-family:Verdana, Arial, Helvetica;
font-size:10pt; font-weight:bold; color:#FF0000">];
my $END_ERROR_FONT    = qq[</span>];
my ($IS_ERROR, $IS_REGMSG) = (0 .. 1);
my $action = '';

# Declare miscellaneous gloabals and constants
my ($myhostname, $sockport, $ctx, $ssl);
my ($bigint1, $bigint2, $callid);
my (%users, %sessions);

my ($have_displayed_headers, $have_performed_sslinit,
$have_performed_base64init, $have_performed_callidgeninit,
$have_opened_sip_connection) =
    (0,                        0,                         0,
0,                            0);
```

EDL01-01p                                34

```perl
my ($NO_QUICK_REGISTER, $DO_QUICK_REGISTER) = (0 .. 1);
my ($DO_LOGOUT_USERS,   $NO_LOGOUT_USERS)  = (0 .. 1);

# How the script identifies itself to local and remote systems
my $user_agent  = "nph-im.pl";
my $my_filename = "nph-im.pl";  # MUST be set to filename of this script

# Prepare and open configuration file
print "read conf...\n";
my $conf_file  = "./im.conf";
my %conf = %{read_conf_file($conf_file)};

# Set connection and login timeouts
my $timeout = $conf{'expireTimer'} || 10;

# Prepare and open logfile
my $LOGLEVEL_EXCL = 1;
my ($NO_LOGGING, $ERROR, $ACTIVITY, $DEBUG) = (0 .. 3);  # Logging mode
constants
my $have_opened_logfile = 0;
print "open log...\n";
open_log();

my %form = ( 'action' => 'cmd_action' );
=pod
print "open connection...\n";
open_sip_connection($conf{'sipHost'}, $conf{'sipPort'});
print "add user...\n";
my %user = %{add_user(\%users, "josh%40edial.com", "1234")};
print "Global user hash: ", to_scalar(\%user), "\n";
print "Entry in users hash: ", to_scalar($users{"josh%40edial.com"}), "\n";
print "login...\n";
SIP_login($users{'josh%40edial.com'}, \&null_func);
print "add session...\n";
my $callid = add_session(\%sessions, '', $users{"josh%40edial.com"},
"santo%40edial.com");
print "send im...\n";
print "Sesssions: ", to_scalar(\%sessions), "\n";
print "Call-ID = $callid\n";
SIP_send_im($sessions{$callid}, "Hi, Santo!!!!", \&null_func, 0);
print "logout...\n";
print "Users: ", to_scalar(\%users), "\n";
SIP_logout($users{'josh%40edial.com'});
print "close connection...\n";
close_sip_connection();
=cut
    print "login_user...\n";
login_user();

sub null_func {
    print "[null_func called]\n";
}

sub read_conf_file {
    my $conf_file = shift;
    my %conf;
```

EDL01-01p                      35

```
    open CONF, $conf_file or cgi_die("read_conf_file(): Failed to open
configuration file $conf_file in read mode",
                                "An error occurred when attempting to read
the server configuration file");
    while (<CONF>)
    {
      # Allow different styles of comments within the logfile

      # Skip comment markers within single or double quotes
      my $qskip_begin = '(?:(?!.*?["\'])))';
      my $qskip_end   = '(?!.*?["\']))';
      my $comment_begin = join '', $qskip_begin, '\s*(;|\#|\/\/\*)\s*',
$qskip_end;
      my $inline_comment = join '', $qskip_begin,
'\s*(;.*?;|\#.*?\#|\/\/\*.*?\*\/)\s*', $qskip_end;

      s/$inline_comment//go;
      next if (/^\s*$comment_begin/o || /^\s*\[.*\]\s*$/ || !/=/);
      s/\s*$comment_begin.*$//o;

      # If option or option name is null, ignore; otherwise, split on first
equals sign and insert name & value into hash
      chomp;
      last if ($_ eq '');
      my ($optname, $optval) = split /\s*=\s*/, $_, 2;
      last if ($optname eq '');
      $optval =~ s/^[\"\']?(.*?)[\"\']?$/$1/ms;  # Get rid of quotes
surrounding value
      # $optval = eval($optval);

      $conf{$optname} = $optval;
    }
    close CONF;

    return \%conf;
}

sub open_log {
    return if (!$conf{'loggingLevel'} || $conf{'loggingLevel'} <= 0 ||
$have_opened_logfile);

    $conf{'logFileDuration'}   ||= 1;                # Default to creating new
logfile each day
    $conf{'logFileNameFormat'} ||= "im.log.[time]"; # Default to creating
logfile with name format "im.log.[time]"
    $conf{'logDir'}            ||= ".";               # Default to creating
logfile in current directory

    print "create directory...\n";
    print "dir = $conf{'logDir'}\n";
    print "dir exists\n" if (-e $conf{'logDir'});
    print "is dir\n" if (-d $conf{'logDir'});
    create_directory($conf{'logDir'}) if (!-e $conf{'logDir'} || !-d
$conf{'logDir'});
    print "done.\n";
```

```perl
    my $current_time = time;
    my $logfilename;

    my $days_old_counter;
    for ($days_old_counter = $conf{'logFileDuration'}; $days_old_counter >= 0;
--$days_old_counter)
      {
        my @check_time = localtime($current_time - ($conf{'logFileDuration'} *
86400 - $days_old_counter * 86400));
        my $time_string = sprintf("%04D%02D%02D", $check_time[5] + 1900,
$check_time[4] + 1, $check_time[3]);

        $logfilename =  "$conf{'logDir'}/$conf{'logFileNameFormat'}";
        $logfilename =~ s/\[time\]/$time_string/go;

        if (-e $logfilename && !-d $logfilename)
          {
            open LOG, ">>$logfilename" or cgi_die("open_log(): Unable to open log
file $logfilename in append mode",
                                                  "The server logfile could not
be opened correctly");
            $have_opened_logfile = 1;
            write_log("open_log(): Logfile $logfilename exists; logfile opened in
append mode.", $DEBUG);
            my $fh = select(LOG);
            $| = 1;
            select($fh);
            return;
          }
      }

    open LOG, ">$logfilename" or cgi_die("open_log(): Unable to create and
write to log file $logfilename",
                                          "The server logfile could not be opened
correctly");
    $have_opened_logfile = 1;
    write_log("open_log(): Logfile $logfilename does not exist; logfile opened
in write mode.", $DEBUG);

    # NOTE: Check to see if Win32 allows the same file open by multiple
processes.
}
sub login_user {
    my $total_procs = 0;
    my $im_procs    = 0;

    my $error_message = '';

    # Check number of user instances...

    if (($conf{'maxAllowedTotalProcs'} || 250) >= 0 &&
($conf{'maxAllowedIMProcs'} || 50) >= 0 && opendir PROCLIST, "/proc")
      {
        if (my @procdirs = readdir PROCLIST)
          {
            print scalar(@procdirs), " files are in /proc\n";
            my $procdirname;
```

EDL01-01p                                37

```perl
        foreach $procdirname (@procdirs)
        {
            next if (!-d "/proc/$procdirname" || $procdirname eq '.' ||
$procdirname eq '..');
            if ($procdirname =~ /^\s*\d+\s*$/)
            {
                if (++$total_procs > ($conf{'maxAllowedTotalProcs'} || 250))
                {
                  $error_message = $conf{'maxAllowedTotalProcsError'} ||
                        "The eDial server is too busy to allow users to log
in at this time.  Please try again later.";
                  last;
                }

                if (open PROC, "/proc/$procdirname/cmdline")
                {
                  my $cmdline =  <PROC>;
                  if ($cmdline)
                  {
                    $cmdline =~ s/\0/ /g;

                    if ($cmdline =~ /^\s*perl.+$my_filename/o)
                    {
                        if (++$im_procs > ($conf{'maxAllowedIMProcs'} || 50))
                        {
                          $error_message = $conf{'maxAllowedIMProcsError'} ||
                                "The eDial server is too busy to allow users to
log in at this time.  Please try again later.";
                          last;
                        }
                    }
                  }
                  close PROC;
                }
            }
        }
    }
    write_log("login_user(): Total processess = $total_procs.  IM Processes =
$im_procs", $DEBUG);
    }
    else
    {
        write_log("login_user(): Proc filesystem is not supported or is
inaccessible to this script.", $DEBUG);
    }
    print "Error message = $error_message\n";
    print "Total procs = $total_procs; IM procs = $im_procs\n";

    # Log in user...

    # Set cookies...
    display_headers();
}


sub open_sip_connection {
    return if ($have_opened_sip_connection);
```

EDL01-01p                          38

```perl
    ssl_init() if (!$have_performed_sslinit);

    my $sip_hostname = shift;
    my $sip_port     = shift;

    my ($sip_host, $packed_addr, $sockname, $sockaddr, $con);
    my $sub_call = "open_sip_connection($sip_hostname, $sip_port)";
    no strict 'subs';

    write_log("$sub_call: Connecting to SIP server...", $ACTIVITY);

    local ($SIG{'ALRM'}) =
        sub
          {
            cgi_die("$sub_call: The connection routine was not completed even
after $timeout seconds",
                    "A server timeout occurred $ON_CONNECT");
        };

    my $conn_status = eval
      {
        alarm($timeout);
        socket(SOCK, PF_INET, SOCK_STREAM, getprotobyname('tcp')) or
cgi_die("$sub_call: Unable to open TCP socket", "A protocol $FAIL_ON_CONNECT");

        if ($ENV{'SIP_HOST'})
          {
            $sip_host = gethostbyname($ENV{'SIP_HOST'}) or cgi_die("$sub_call:
gethostbyname($ENV{'SIP_HOST'}) failed",
                                                                  "A needed
hostname could not be resolved $ON_CONNECT");

            if   ($ENV{'SIP_PORT'}) { $sip_port = $ENV{'SIP_PORT'}; }
            if   ($ENV{'SSL_PORT'}) { $sip_port = $ENV{'SSL_PORT'}; }
            else                    { $sip_port += 40; }
          }
        else
          {
            $sip_host = gethostbyname($sip_hostname) or cgi_die("$sub_call:
gethostbyname($sip_hostname) failed",
                                                              "A needed
hostname could not be resolved $ON_CONNECT");
          }

        $packed_addr = sockaddr_in($sip_port, $sip_host);
        connect(SOCK, $packed_addr) or cgi_die("$sub_call: connect() to
$sip_hostname:$sip_port failed", "The attempt to connect to the eDial server
failed");

        $sockname = getsockname(SOCK);
        ($sockport, $sockaddr) = sockaddr_in($sockname);
        $myhostname = substr(gethostbyaddr($sockaddr, AF_INET), 0, 20);

        # Turn off output buffering on socket and restore default STDOUT.
        my $old_filehandle = select(SOCK);
        $| = 1;
          select($old_filehandle);
```

A-212

EDL01-01p                                    39

```perl
        $ctx = Net::SSLeay::CTX_v3_new() or cgi_die("$sub_call: Failed to create
SSL_CTX [Net::SSLeay::CTX_v3_new() failed]", "A ciphering $FAIL_ON_CONNECT");
        Net::SSLeay::CTX_set_cipher_list($ctx,
"!ADH:!RSA:!NULL:!IDEA:HIGH+DSS:MEDIUM+DSS");

        $ssl = Net::SSLeay::new($ctx) or cgi_die("$sub_call: Failed to create SSL
[Net::SSLeay::new() failed]", "An SSL $FAIL_ON_CONNECT");
        Net::SSLeay::set_fd($ssl, fileno(SOCK));
        $con = Net::SSLeay::connect($ssl) or cgi_die("$sub_call: Failed to
establish SSL connection with SIP server [Net::SSLeay::connect() failed]",
                                        "A secure connection
failure occurred $ON_CONNECT");
        "OK";
    };
    alarm(0);

    use strict 'subs';
    write_log("open_sip_connection($sip_hostname, $sip_port): Connection
routine completed.", $DEBUG);
    exit($conn_status || 1) unless ($conn_status && $conn_status eq "OK");

    $have_opened_sip_connection = 1;
}

sub close_sip_connection {
    return if (!$have_opened_sip_connection);

    my $do_logout_users = shift || $DO_LOGOUT_USERS;
    unless ($do_logout_users == $NO_LOGOUT_USERS)
    {
      my ($username, $userinfo);
      while (($username, $userinfo) = each %users)
      {    SIP_logout($users{$username}) if ($userinfo->{'loggedin'}); }
    }

    Net::SSLeay::free($ssl);
    Net::SSLeay::CTX_free($ctx);
    close SOCK;

    $have_opened_sip_connection = 0;
}

#############################
#
# GET_TCP_MSG
#
#############################

sub get_sip_msg2 {
    my $cnt  = 0;
    my $rmsg = "";
    my $c;
    my $in   = "";
    my $body = "";
    my $prev = 0;
```

EDL01-01p

40

```perl
    do {
        $c = Net::SSLeay::read($ssl, 1);
        if(!defined($c)) {
            if($! eq '') {
                cgi_die("get_sip_msg(): Lost connection", "lost conn");
        #       close_socket();
        #       abort_client("Error: [Lost connection.]");
            }
            return 0;
        }
    } while ($c =~ /\s/);
    $in = $c;
    if ($in eq '') {
        cgi_die("get_sip_msg(): Lost connection 2", "lost conn 2");
        #close_socket();
        #abort_client("Error: [Lost connection.]");
        return 0;
    }
    while (($cnt == 0)){
        $c = Net::SSLeay::read($ssl, 1);
        $in = join "", $in, $c;
        if ($c eq "\n"){
            if ($prev == 1) {
                $cnt = 1;
            }
            elsif ($prev != 0) {
                $rmsg = join "", $rmsg, $in;
            }
            $in = "";
            $prev = 1;
        }
        elsif ($c ne "\r") {
            $prev = -1;
        }
    }
    my ($clen) = $rmsg =~ /ength:[ *](\d*)/o;
    if ($clen > 0) {
        $body = Net::SSLeay::read($ssl, $clen);
        $rmsg .= $body;
    }
    $in = $rmsg;
    if ($in =~ /^\s/) {
        print unpack "C", $in;
        print "STARTS WITH WHITE SPACE\n";
    }
    return $in;
}

sub get_sip_msg {
    return if (!$have_opened_sip_connection);

    my ($read_char, $content_body);
    my $response_text  = "";
    my $newline_number = 0;
    my $content_length = 0;
```

EDL01-01p                                     41

```
    my $lost_conn_realerror = join '', "*WARNING*: Lost connection to SIP
server in the midst of a Net::SSLeay::read().\n",
                                  "(Characters read thus far = *chars*;
action = $form{'action'}).\n",
                              "THIS IS THE LIKELY RESULT OF A SERVER
FAILURE.  LOOK INTO THIS IMMEDIATELY; OS_ERROR";
    my $lost_conn_showerror = "Your connection to the eDial server was lost";
    my $select_realerror   = join '', "*WARNING*: An error occurred on the SIP
socket's file descriptor in the midst of\n",
                              "a select() statement. (action =
$form{'action'}).  Check the OS_ERROR for possible connection loss.\n",
                              "THIS IS THE LIKELY RESULT OF A SERVER
FAILURE.  LOOK INTO THIS IMMEDIATELY; OS_ERROR";

    # If user object is provided, block until data is avilable for reading or
that user's login will expire soon.
    print "get_sip_msg called. (", scalar(@_), ")\n";

    my $userobj = shift || '';
    #my $userobj;

        my ($read_mask, $exception_mask,  $chars_found, $time_left) =
            ('',           '',              '',           0,          0);
        vec($read_mask,  fileno(SOCK), 1) = 1;
        #vec($write_mask, fileno(SOCK), 1) = 1;
        $exception_mask = $read_mask;

    if ($userobj && ref($userobj) && ref($userobj) eq 'HASH')
    {
        my %user = %$userobj;

        # Automatically time out after login is 90% expired if no explicit
timeout is provided.
        my $have_data = 0;
        my $have_set_timeout = 0;
        my $timeout_val = shift;
        print "Entering loop...\n";

        while (!$have_data)
        {
            if (!$timeout_val)
            {   $timeout_val = 0.90 * ($user{'expires'} - (time -
$user{'logintime'})); }
            else
            {
              $have_set_timeout = 1;
            }

            print "Calling select(2) with timeout $timeout_val...\n";
            ($chars_found, $time_left) = select($read_mask, undef,
$exception_mask, $timeout_val);
            print "select(2) returned $chars_found.\n";

            if ($chars_found < 0)
            {
              close_sip_connection($NO_LOGOUT_USERS);
              cgi_die("get_sip_msg(): $select_realerror", $lost_conn_showerror);
```

EDL01-01p                                          42

```perl
                   }
               elsif ($chars_found == 0)
               {
                 if ($have_set_timeout)
                 {
                     write_log("get_sip_msg(): No error response received in time
alloted.  Assume IM send successful.", $DEBUG);
                     return '';
                 }
                 else
                 {
                     write_log("get_sip_msg(): Login for $user{'username'} will
expire soon.  The user will now be logged in again.", $ACTIVITY);
                     SIP_login(\%user, \&null_func);
                     %user = %{$users{$user{'username'}}};
                 }
               }
               else
               {   $have_data = 1; }
           }
       }
       else { print "userobj = ", to_scalar($userobj), "; ref = ", ref($userobj),
"; userloggedin = ", $userobj->{'loggedin'}, "\n"; }
       # Read until a two newlines, one right after the other, are encountered.
       print "Reading data...\n";
       while ($newline_number != 2)
       {
           $read_char = Net::SSLeay::read($ssl, 1);
           if (!defined($read_char))
           {
             close_sip_connection($NO_LOGOUT_USERS);
               $lost_conn_realerror =~ s/\*chars\*/length($response_text)/e;
             cgi_die("get_sip_msg(): $lost_conn_realerror", $lost_conn_showerror);
           }

           $response_text = join '', $response_text, $read_char;
           if ($read_char eq "\n")
           {
               if ($newline_number == 1)
             {
               $newline_number = 2;
               last;
             }
               else
               {   $newline_number = 1; }
           }
           elsif ($read_char ne "\r")
           {   $newline_number = 0; }
       }

       # If a valid content length number was found, read that number of
characters more.
       ($content_length) = ($response_text =~ /^Content-Length:\s*(\d+)/msi);
       if ($content_length && $content_length =~ /^\d+$/)
       {
           $content_body = Net::SSLeay::read($ssl, $content_length);
           if (!defined($content_body) || length($content_body) < $content_length)
```

EDL01-01p                                43

```perl
        {
          close_sip_connection($NO_LOGOUT_USERS);
            $lost_conn_realerror =~ s/\*chars\*/length($response_text)/e;
          cgi_die("get_sip_msg(): $lost_conn_realerror", $lost_conn_showerror);
        }

        $response_text = join '', $response_text, $content_body;
    }

    # Return a reference to the text read from the SIP server; this is slightly
more efficient than returning the text itself.
    return \$response_text;
}

sub SIP_login {
    # Don't even try to log in before a SIP connection has been opened.
    open_sip_connection($conf{'sipHost'} || 'localhost', $conf{'sipPort'} ||
443) if (!$have_opened_sip_connection);

    my $user     = shift;
    my $func_ref = shift;
    my %user;
    my $username;

    # Allow SIP_login to be called in one of two ways:
    #   1) SIP_login($userobj_ref, $func_ref)    --> with a reference to a
user object and a function reference.
    #   2) SIP_login($username, $func_ref, ...)  --> with a username, a
function reference, and other items (namely: password, expiretimer, presence,
    #                                        and tag) that are passed
on to add_user() in order to create a new user object before logging in.
    # A user object structure is defined in and may be created through
add_user().
    # The function referenced by $func_ref is called after each SIP message is
received and passed the received SIP message in addition to the SIP
    # message which merited that SIP response.

    if (!@_)
    {
      if (ref($user) && ref($user) eq 'HASH')
      {
          %user     = %$user;
          $username = $user{'username'};
      }
      else
      {   return; }
    }
    else
    {
      $username = $user;
      %user = %{add_user(\%users, $username, @_)};
    }

    my $presence_len = length($user{'presence'}) + 1;
    my $cseq = time;

    my $message = <<END_MESSAGE;
```

EDL01-01p                                    44

```
REGISTER sip:$username\@sip.metatel.com SIP/2.0
Via: SIP/2.0/tcp $myhostname:$sockport
From: sip:$username\@metatel.com
To: sip:$username\@metatel.com
Call-ID: $user{'callid'}\@$myhostname
CSeq: $cseq REGISTER
Contact: sip:$username\@metatel.com;tag=$user{'tag'}
Expires: $user{'expires'}
Authorization: Basic $user{'auth'}
User-Agent: $user_agent
Content-Length: $presence_len
Content-Type: text/x-metatel1.0-presence

$user{'presence'}
END_MESSAGE

    write_log("SIP_login($username): ---LOGGING USER INTO SIP SERVER---
\n$message\n", $DEBUG);
    write_log("SIP_login($username): Logging user $username into SIP server;
NEW:Call-ID=$user{'callid'}; CSeq=$cseq; expires=$user{'expires'};
tag=$user{'tag'}",
              $ACTIVITY, $LOGLEVEL_EXCL);

    print "Writing message...\n";
    Net::SSLeay::write($ssl, $message) or cgi_die("Write failed", "Write
failed");

    my $current_response;
    eval
    {
      alarm($timeout);
      while ($current_response !~ /NOTIFY|SIP\/\d\.\d [3456789]/)
      {
          write_log("Awaiting response...", $DEBUG);
          print "Awaiting response...\n";

          $user{'logintime'} = time;
          $current_response = ${get_sip_msg(\%user)};

          print "Got response.\n";
          write_log("SIP_login($username): ---RECEIVED RESPONSE FROM SIP
SERVER---\n$current_response\n", $DEBUG);

          &$func_ref(\$message, \$current_response);
      }
    };
    alarm(0);

    cgi_die("SIP_login($username): $@", "A failure occurred when attempting to
log in") if ($@);

    write_log("SIP_login($username): $username was logged in successfully.",
$DEBUG);

    $users{$username}{'loggedin'}  = 1;
    $users{$username}{'logintime'} = time;
    %user = %{$users{$username}};
```

EDL01-01p                                  45

```perl
}

sub SIP_logout {
    my $user = shift;
    my %user;
    my $username;

    # Use technique analogous SIP_login()'s, except that no function reference
is needed because no response is expected.
    if (!@_)
    {
      if (ref($user) && ref($user) eq 'HASH')
      {
          %user     = %$user;
          $username = $user{'username'};
      }
      else
      {   print "failed\n"; return; }
    }
    else
    {
      $username = $user;
      %user = %{add_user(\%users, $username, @_)};
    }

    print "h = $have_opened_sip_connection\n";
    print "u = $user{'loggedin'}\n";
    return if (!$have_opened_sip_connection || !$user{'loggedin'});

    my $presence_len = length($user{'presence'}) + 1;
    my $cseq = time;

    # NOTE: Send a BYE for the call ID before logging out.

    my $message = <<END_MESSAGE;
REGISTER sip:$username\@sip.metatel.com SIP/2.0
Via: SIP/2.0/tcp $myhostname:$sockport
From: sip:$username\@metatel.com
To: sip:$username\@metatel.com
Call-ID: $user{'callid'}\@$myhostname
CSeq: $cseq REGISTER
Contact: sip:$username\@metatel.com;tag=$user{'tag'};expires=0
Expires: 0
Authorization: Basic $user{'auth'}
User-Agent: $user_agent
Content-Length: $presence_len
Content-Type: text/x-metatel1.0-presence

$user{'presence'}
END_MESSAGE

    print "logging logout...\n";
    write_log("SIP_logout($username): ---LOGGING USER OUT OF SIP SERVER---
\n$message\n", $DEBUG);
    write_log("SIP_logout($username): Logging user $username out of SIP server;
END:Call-ID=$user{'callid'}; CSeq=$cseq; tag=$user{'tag'}",
              $ACTIVITY, $LOGLEVEL_EXCL);
```

EDL01-01p                                            46

```
        Net::SSLeay::write($ssl, $message);

        $users{$username}{'loggedin'}  = 0;
        %user = %{$users{$username}};
}

sub SIP_send_im {
    my $session       = shift;
    my $instant_msg   = shift;
    my $func_ref      = shift;
    my $do_quick_reg  = shift || $NO_QUICK_REGISTER;

    my %session;
    my $callid;

    # Allow SIP_send_im to be called in one of two ways:
    #   1) SIP_send_im($sessionobj_ref, $func_ref) --> with a reference to a
    session object and a function reference.
    #   2) SIP_send_im($callid, $func_ref, ...)    --> with a call ID, a
    function reference, and other items (namely: a user object and a remote
    #                                              username) that are
    passed onto add_session() in order to create a new session object
    #                                                     before sending an IM.
    # A session object structure is defined in and may be created through
    add_session().
    # The function referenced by $func_ref is called after each SIP message is
    received and passed the received SIP message in addition to the SIP
    # message which merited that SIP response.
    # If SIP_send_im() is called using method 2 and the "user object" argument
    is not a user object but a username, all arguments remaining after
    # the call to add_session() are passed onto add_user() in order to create
    that user object.

    if (!@_)
    {
        if (ref($session) && ref($session) eq 'HASH')
        {
            %session = %$session;
            $callid  = $session{'callid'};
        }
        else
        {   print "Bad usage.\n"; return; }
    }
    else
    {
        $callid = $session;
        %session = %{add_session(\%sessions, $callid, @_)};
    }

    # Don't even try to send an instant message before the user sending it is
    logged in (unless a "quick REGISTER" is being performed,
    # in which case the script makes sure a SIP connection is open first).
    if (!$session{'localuser'}{'loggedin'})
    {
        unless ($do_quick_reg)  { SIP_login($session{'localuser'},
    \&validate_user_onimsend); }
```

A-220

EDL01-01p                           47

```
    else                    { open_sip_connection($conf{'sipHost'} ||
'localhost', $conf{'sipPort'} || 443) if (!$have_opened_sip_connection); }
    }

    my $localusername = $session{'localuser'}{'username'};  # Because this
item is referred to quite frequently in the SIP message
    my $cseq        = time;
    my $auth_header = ($do_quick_reg == $DO_QUICK_REGISTER ?
"\nAuthorization: Basic $session{'localuser'}{'auth'}" : '');

    if (length($instant_msg) > ($conf{'maxIMLength'} || 500))
    {    $instant_msg = substr($instant_msg, 0, ($conf{'maxIMLength'} || 500));
}
    $instant_msg   =~ s/\n/\n\t/g;  # Conform to SIP standard in indicating IM
subject to remote client.

    my $message = <<END_MESSAGE;
INVITE sip:$localusername\@sip.metatel.com SIP/2.0
Via: SIP/2.0/tcp $myhostname:$sockport
Subject: $instant_msg
From: "$localusername" <sip:$localusername\@metatel.com>
To: $session{'remoteusers'}
Call-ID: $session{'callid'}\@$myhostname
CSeq: $cseq INVITE $auth_header
User-Agent: $user_agent
Content-Length: 0

END_MESSAGE

    my $log_im_subjects = $conf{'logIMSubjects'} || 0;
    my $logged_message = $message;
        $logged_message =~ s/^Subject: $instant_msg/Subject: <HIDDEN>/msi if
(!$log_im_subjects);

    write_log("SIP_send_im(): ---SENDING IM: $localusername >>
$session{'remoteusers'}---\n$logged_message\n", $DEBUG);
    write_log("SIP_send_im(): Sending IM ($localusername -->
$session{'remoteusers'}); Call-ID=$session{'callid'}; CSeq=$cseq",
            $ACTIVITY, $LOGLEVEL_EXCL);
    $logged_message = undef;

    Net::SSLeay::write($ssl, $message);

    my $current_response;
    eval
    {
      alarm($timeout);
      while ($current_response !~ /SIP\/\d\.\d [3456789]/)
        {
          write_log("SIP_send_im(): Will wait a brief amount of time for
possible response...", $DEBUG);
          print "errorTimeout = $conf{'errorTimeout'}\n";

          $current_response = ${get_sip_msg($session{'localuser'},
($conf{'errorTimeout'} || 0.5))};
          write_log("SIP_send_im(): ---RECEIVED RESPONSE FROM SIP SERVER---
\n$current_response\n", $DEBUG);
```

A-221

EDL01-01p                                    48

```
            last if (!$current_response || $current_response =~ /^\s+$/);
            &$func_ref(\$message, \$current_response);
        }
    };
    alarm(0);

    if ($do_quick_reg == $DO_QUICK_REGISTER)
    {
        write_log("SIP_send_im(): $localusername was logged in successfully.",
$DEBUG);

        $users{$localusername}{'loggedin'}  = 1;
        $users{$localusername}{'logintime'} = time;

        $session{'localuser'} = $users{$localusername};
    }
}

sub SIP_end_callid {
    my $session      = shift;
    my $func_ref     = shift;
    my $do_quick_reg = shift;

    my %session;
    my $callid;

    # SIP_end_callid() is called in exactly the same fashion as SIP_send_im().
    if (!@_)
    {
        if (ref($session) && ref($session) eq 'HASH')
        {
            %session = %$session;
            $callid  = $session{'callid'};
        }
        else
        {   return; }
    }
    else
    {
        $callid = $session;
        %session = %{add_session(\%sessions, $callid, @_)};
    }

    # Don't even try to end a session with the user involved being logged in
(unless a "quick REGISTER" is being performed,
    # in which case the script makes sure a SIP connection is open first).
    if (!$session{'localuser'}{'loggedin'})
    {
        unless ($do_quick_reg)  { SIP_login($session{'localuser'},
\&validate_user_onimexit); }
        else            { open_sip_connection($conf{'sipHost'} ||
'localhost', $conf{'sipPort'} || 443) if (!$have_opened_sip_connection); }
    }

    my $localusername =  $session{'localuser'}{'username'};  # Because this
item is referred to quite frequently in the SIP message
```

EDL01-01p                                    49

```
    my $cseq            =  time;
    my $auth_header    = ($do_quick_reg == $DO_QUICK_REGISTER ?
"\nAuthorization: Basic $session{'localuser'}{'auth'}" : '');

    my $message = <<END_MESSAGE;
BYE sip:$localusername\@sip.metatel.com SIP/2.0
Via: SIP/2.0/tcp $myhostname:$sockport
Subject:
From: "$localusername" <sip:$localusername\@metatel.com>
To: $session{'remoteusers'}
Call-ID: $session{'callid'}\@$myhostname
CSeq: $cseq BYE $auth_header
User-Agent: $user_agent
Content-Length: 0

END_MESSAGE

    write_log("SIP_end_callid(): ---SENDING BYE: $localusername >>
$session{'remoteusers'}---\n$message\n", $DEBUG);
    write_log("SIP_end_callid(): Exiting IM ($localusername -->
$session{'remoteusers'}); Call-ID=$session{'callid'}; CSeq=$cseq",
            $ACTIVITY, $LOGLEVEL_EXCL);

    Net::SSLeay::write($ssl, $message);

    my $current_response;
    eval
    {
      alarm($timeout);
      while ($current_response !~ /SIP\/\d\.\d \d+/)
      {
          $current_response = ${get_sip_msg($session{'localuser'})};
          write_log("SIP_end_callid(): ---RECEIVED RESPONSE FROM SIP SERVER---
\n$current_response\n", $DEBUG);

          &$func_ref(\$message, \$current_response);
      }
    };
    alarm(0);

    if ($do_quick_reg == $DO_QUICK_REGISTER)
    {
        write_log("SIP_end_callid(): $localusername was logged in successfully.",
$DEBUG);

        $users{$localusername}{'loggedin'}  = 1;
        $users{$localusername}{'logintime'} = time;

        $session{'localuser'} = $users{$localusername};
    }
}

sub handle_incoming_sip_messages {
    # Don't even try to handle SIP messages before a SIP connection has been
opened.
    open_sip_connection($conf{'sipHost'} || 'localhost', $conf{'sipPort'} ||
443) if (!$have_opened_sip_connection);
```

EDL01-01p                                    50

```perl
    my $user = shift;
    my %user;
    my $username;

    # handle_incoming_sip_messages() is called in the same maner as
SIP_login(), except that no function reference is needed.
    if (!@_)
    {
        if (ref($user) && ref($user) eq 'HASH')
        {
            %user    = %$user;
            $username = $user{'username'};
        }
        else
        {   return; }
    }
    else
    {
        $username = $user;
        %user = %{add_user(\%users, $username, @_)};
    }

    # Don't even try to handle SIP messages without the user involved being
logged in.
    if (!$have_opened_sip_connection)
    {   open_sip_connection($conf{'sipHost'} || 'localhost', $conf{'sipPort'}
|| 443) if (!$have_opened_sip_connection); }
    if (!$user{'loggedin'})
    {   SIP_login(\%user, \&validate_user_onimsend); }

    write_log("handle_incoming_sip_messages(): Ready to accept incoming SIP
messages [e.g. IMs]", $ACTIVITY);
    my $current_response;
    while ($current_response = ${get_sip_msg(\%user)})
    {
        write_log("handle_incoming_sip_messages(): ---RECEIVED RESPONSE FROM
SIP SERVER---\n$current_response\n", $DEBUG);

        $current_response =~ s/\A\s*//ms;  # Trim whitespace

        # Handle NOTIFYs, INVITEs, BYEs; ignore status messages.
        if ($current_response =~ /^INVITE/i)
        {
            # Handle INVITES from multiple users at a later time.
            my $callid = ($current_response =~ /^Call-ID: (.+?)/msi);
        }
        # Do not forget to replace newline + tab in incoming IM with newline
only.
    }
}

sub write_log {
    return if (!$conf{'loggingLevel'} || $conf{'loggingLevel'} <= 0);

    my $logtext = shift;
    my $min_required_logging_level = shift;
```

```
    my $log_option = shift || 0;

    if (($log_option != $LOGLEVEL_EXCL && $min_required_logging_level <=
$conf{'loggingLevel'}) ||
        ($log_option == $LOGLEVEL_EXCL && $min_required_logging_level ==
$conf{'loggingLevel'}))
    {
        #my $fh = select(LOG);
        #$| = 1;
        #select($fh);
      $logtext = join '', scalar(localtime()), " [$ENV{'REMOTE_ADDR'}]:  ",
$logtext, "\n";
        if ($have_opened_logfile)  { print LOG $logtext; }

        # In the rare instance that the logfile could not be opened, use the
system logger.
        else                      {      $logtext =~ s/\n/ \\\n/g;
system("logger -p $min_required_logging_level -s $user_agent: $logtext"); }
    }
}

sub create_directory {
    my @dirs_to_create = (shift);
    my $sub_call = join '', "create_directory(", to_scalar(\@dirs_to_create),
")";

    while (@dirs_to_create)
    {
        my $dir = shift @dirs_to_create;
        my $parent_dir;
        ($parent_dir = $dir) =~ s/(\/.*?)$//;
        if ($parent_dir && !-e $parent_dir)
        {
            unshift @dirs_to_create, $parent_dir, $dir;
          print "dirs_to_create = ", (join ' ', @dirs_to_create), "\n";
            sleep(1);
            redo;
        }
        if (!mkdir($dir, 0777))
        {
            if ($dir ne $dirs_to_create[$#dirs_to_create])
            {
                cgi_die("$sub_call: Unable to create directory $dir (for the
sake of being able to create directory $dirs_to_create[$#dirs_to_create])",
                    "A disk operation failed on the eDial server");
            }
            else
            {
                cgi_die("$sub_call: Unable to create directory $dir",
                    "A disk operation failed on the eDial server");
            }
        }
    }
}

sub cgi_msg {
    my $real_message = shift;
```

EDL01-01p                                52

```
    my $show_message = shift;

    $action = '';
    if ($action eq '')
    {
    }
    else
    {
      cgi_die($real_message, $show_message, $IS_REGMSG);
    }
}

sub cgi_die {
    my $real_error    = shift;
    my $show_error    = shift;
    my $message_type  = shift || $IS_ERROR;

    alarm(0);

    my $OS_error = $^E || $! || $@ || '[Reason unknown]';
    write_log("$real_error: $OS_error", $ERROR);

    display_headers();

    my $display_text = <<END_INIT_TEXT;
<html>
<head>
  <title>An error has occurred</title>
</head>
<body>
$BEGIN_ERROR_FONT
END_INIT_TEXT

if ($message_type == $IS_ERROR)
{   $display_text = join '', $display_text, "$INTERNAL_ERROR:<br />\n",
"$show_error.<br />\n", "$CONTACT_ADMIN_NOW\n"; }
else
{   $display_text = join '', $display_text, "$show_error.<br />\n"; }

$display_text = join '', $display_text, <<END_DISPLAY_TEXT;
$END_ERROR_FONT
<p>
<form>
<input type="button" onClick="javascript:parent.history.go(-1)" value="Go Back"
/>
         
<input type="button" onClick="javascript:parent.location.reload()" value="Try
Again" />
</form>
</p>
</body>
</html>
END_DISPLAY_TEXT

    print $display_text;
    write_log("cgi_die(): --SENDING TO BROWSER--\n$display_text", $DEBUG);
    write_log("cgi_die(): Exiting with status code 1...", $DEBUG);
```

EDL01-01p                              53

```perl
      exit(1);
}

sub to_scalar {
    my $variable_ref = shift;
    my $var_type     = ref($variable_ref);

    if    ($var_type eq 'SCALAR')  { return $$variable_ref; }
    elsif ($var_type eq 'ARRAY')   { return join ', ', @$variable_ref; }
    elsif ($var_type eq 'HASH')
    {
      my ($hashkey, $hashval, @return_string);
      while (($hashkey, $hashval) = each %$variable_ref)
        {  push @return_string, "$hashkey = $hashval"; }

      return join ', ', @return_string;
    }
}
sub ssl_init {
    return if ($have_performed_sslinit);

    # require Socket;
    # Socket->import('PF_INET', 'SOCK_STREAM', 'sockaddr_in');

    eval  { require Net::SSLeay; };

    if ($@)
    {
        cgi_die("ssl_init(): The Net::SSLeay (SSL) $PM is not installed or
failed to load correctly",
                "A needed $PM $MUST_BE_INSTALLED");
    }

    Net::SSLeay::load_error_strings();
    Net::SSLeay::SSLeay_add_ssl_algorithms();
    Net::SSLeay::randomize();

    $have_performed_sslinit = 1;
}

sub base64_init {
    return if ($have_performed_base64init);

    eval
    {
      require MIME::Base64;
        MIME::Base64->import('encode_base64');
    };

    if ($@)
    {
        cgi_die("base64_init(): MIME::Base64 $PM is not installed or failed to
load correctly",
                "A needed $PM $MUST_BE_INSTALLED");
    }

    $have_performed_base64init = 1;
```

EDL01-01p                              54

```perl
}

sub callidgen_init {
    return if ($have_performed_callidgeninit);

    require Math::BigInt;

    my $sa = "eth0";
    my @x  = unpack "H8" x 6, $sa;
    my $a  = hex($x[4]) & 0xffff;
    my $b  = Math::BigInt->new(hex($x[5]));
    my $a1 = Math::BigInt->new(0x10000000) * 0x10;
    my $a2 = $a1->bmul($a);

    $bigint1 = $a1 * 0x10000;
    $bigint2 = $b->badd($a2);

    $have_performed_callidgeninit = 1;
}

sub make_callid {
    callidgen_init() if (!$have_performed_callidgeninit);

    my $callid = int(rand 2**16);
    $callid = $bigint2 + ($callid * $bigint1);
    $callid =~ s/\+//;

    return $callid;
}

sub make_base64 {
    base64_init() if (!$have_performed_base64init);
    my $encoded = encode_base64(join ':', @_);
    chomp($encoded);

    return $encoded;
}


sub add_user {
    my $users_hash = shift;
    my %user;

    $user{'username'} =  shift;
    $user{'username'} =~ s/\@/\%40/g;

    $user{'auth'}     = make_base64($user{'username'}, shift());
    $user{'loggedin'} = 0;
    $user{'logintime'} = 0;
    $user{'callid'}   = make_callid();
    $user{'expires'}  = shift || $conf{'loginExpireTimer'} || 3600;
    $user{'presence'} = shift || $conf{'loginPresence'}    || 'Taking calls';
    $user{'tag'}      = shift || $conf{'loginTag'}         || 'general';

    $users_hash->{$user{'username'}} = { %user };
    print "Added user; now: ", to_scalar($users_hash), "\n";
    return $users_hash->{$user{'username'}};
}
```

EDL01-01p                                55

```perl
sub add_session {
    my $sessions_hash = shift;
    my %session;

    $session{'callid'}      = shift || make_callid();
    $session{'localuser'}   = shift;
    $session{'remoteusers'} = shift;

    if (!ref($session{'localuser'}) || ref($session{'localuser'}) ne 'HASH')
    {   $session{'localuser'} = add_user(\%users, $session{'localuser'}, @_); }

    my $to_party_string = '';
    # my @to_parties = split /\s*[;,]\s*/, $session{'remoteusers'};
    my @to_parties = ($session{'remoteusers'});  # Comment out this line and
uncomment the above line when multiple recipients are fully implemented.
    my $to_party;
    foreach $to_party (@to_parties)
    {
        if ($to_party !~ /^\s*\+/)
        {
            $to_party =~ s/\s//g;
            $to_party =~ s/\@/\%40/;
            if (length($to_party_string) == 0) { $to_party_string =
"\"$to_party\" <sip:$to_party\@metatel.com>";   }
            else                              { $to_party_string = join '',
$to_party_string, ",\"$to_party\" <sip:$to_party\@metatel.com>"; }
        }
    }
    $session{'remoteusers'} = $to_party_string;

    $sessions_hash->{$session{'callid'}} = { %session };
    return $session{'callid'};

    # NOTE: (Should possibly provide routine to modify remote users later on)
}

sub display_headers {
    return if ($have_displayed_headers);

    my @cookies = @_;

    my $protocol   = $ENV{'SERVER_PROTOCOL'} || "HTTP/1.1";
    my $serversoft = $ENV{'SERVER_SOFTWARE'} || "Apache/1.3.16";

    my $headertext = join '', "$protocol 200 OK\n",
                              "Server: $serversoft\n",
                              "Content-type: text/html\n";
    my $cookie;
    foreach $cookie (@cookies)
    {   $headertext = join '', $headertext, "Set-Cookie: $cookie\n"; }

    write_log(join('', "display_headers(", to_scalar(\@cookies), ")--SENDING
HEADERS TO BROWSER--\n$headertext"), $DEBUG);
    print $headertext, "\n";
    $have_displayed_headers = 1;
}
```

A-229

EDL01-01p                          56

```
exit;
```

---

```
index.html
<?xml version="1.0" encoding="UTF-8"?>
<!DOCTYPE html PUBLIC "-//W3C//DTD XHTML 1.0 Transitional//EN"
"http://www.w3.org/TR/xhtml1/DTD/xhtml1-transitional.dtd">
<html xmlns="http://www.w3.org/1999/xhtml" xml:lang="en" lang="en">
<head>
  <title>Instant Messaging System Login</title>
  <style type="text/css">
  .headerText {
     font-family:Verdana, Arial, Helvetica, Sans-Serif;
        font-size:18px;
        font-weight:bold;
  }
  .fieldText {
     font-family:Verdana, Arial, Helvetica, Sans-Serif;
        font-size:12px;
        font-weight:bold;
  }
  </style>
</head>
<body onload="document.loginForm.username.focus()">
<span class="headerText" style="color:#666666">
Welcome to the eDial Instant Messenging System
</span>
<br />
<img src="bluegrad.gif" width="90%" height="3" alt="-----" />
<p> </p>
<form name="loginForm" id="loginForm" action="/cgi-bin/im/nph-im.pl"
method="post">
<input type="hidden" name="action" value="login_user" />
<table width="100%" border="0" cellpadding="0" cellspacing="0">
  <tr>
    <td> </td>
  </tr>
  <tr>
    <td> </td>
  </tr>
  <tr>
    <td align="center">
    <table border="0" cellpadding="1" cellspacing="0">
      <tr>
        <td bgcolor="#9999FF">
        <table border="0" cellpadding="1" cellspacing="1">
          <tr>
            <td bgcolor="#006699" height="25">
            <span class="headerText" style="color:#FFFFFF">Please Log In</span>
            </td>
          </tr>
          <tr>
            <td bgcolor="#999999" valign="top" height="100%">
```

EDL01-01p                    57

```
            <table border="0" cellpadding="1" cellspacing="3">
              <tr>
                <td><span class="fieldText"
style="color:#333333">Username:</span></td>
                <td><span class="fieldText"><input type="text" name="username"
size="25" maxlength="50" class="fieldText" style="font-weight:normal"
/></span></td>
              </tr>
              <tr>
                <td><span class="fieldText"
style="color:#333333">Password:</span></td>
                <td><span class="fieldText"><input type="password"
name="password" size="25" maxlength="50" class="fieldText" style="font-
weight:normal" /></span></td>
              </tr>
              <tr><td colspan="2"> </td></tr>
              <tr>
                <td colspan="2" align="center">
                <span class="fieldText">
                <input type="submit" value="Log In" />
                </span>
                </td>
              </tr>
            </table>
            </td>
          </tr>
        </table>
        </td>
      </tr>
    </table>
    </td>
  </tr>
</table>
</form>
</body>
</html>
```

---

```
nph-im.pl

#!/usr/bin/perl

use strict;
use Socket;

no strict 'refs';

# Set various error constants
my $CONTACT_ADMIN_NOW = "Please contact your server administrator
immediately.";
my $MUST_BE_INSTALLED = "is not installed or is misconfigured.  It must be
installed and configured for instant messaging to work correctly";
my $INTERNAL_ERROR   = "A serious internal error occurred on the eDial
server";
my $ON_CONNECT       = "when attempting to connect to the eDial server";
```

EDL01-01p                                        58

```perl
my $FAIL_ON_CONNECT   = "failure occurred $ON_CONNECT";
my $PM                = "Perl module";
my $BEGIN_ERROR_FONT  = qq[<span style="font-family:Verdana, Arial, Helvetica;
font-size:10pt; font-weight:bold; color:#FF0000">];
my $END_ERROR_FONT    = qq[</span>];
my $BEGIN_ERHEAD_FONT = qq[<span style="font-family:Verdana, Arial, Helvetica;
font-size:18px; font-weight:bold; color:#CC0000">];
my $END_ERHEAD_FONT   = qq[</span>];
my $MAX_LOG_BUFFER    = 1024;
my ($IS_ERROR, $IS_REGMSG) = (0 .. 1);


# Declare miscellaneous gloabals and constants
my ($myhostname, $sockport, $ctx, $ssl);
my ($bigint1, $bigint2, $callid);
my (%users, %sessions);
my ($total_queue, $current_pos, $indent, $frame_name, $frame_src);  # Special
for particular actions
my $im_send_error;
my $prev_keepalive_time = time;


my ($have_displayed_headers, $have_performed_sslinit,
$have_performed_base64init, $have_performed_callidgeninit,
$have_opened_sip_connection) =
     (0,                        0,                        0,
0,                        0);

my ($NO_QUICK_REGISTER, $DO_QUICK_REGISTER)          = (0 .. 1);
my ($DO_LOGOUT_USERS,   $NO_LOGOUT_USERS)            = (0 .. 1);
my ($TIMEOUT_KEEPALIVE, $TIMEOUT_LOGIN, $TIMEOUT_BOTH) = (0 .. 2);

# How the script identifies itself to local and remote systems
my $user_agent  = "nph-im.pl";
my $my_filename = "nph-im.pl";  # MUST be set to filename of this script

# Prepare and open configuration file
my $conf_file  = "./im.conf";
my %conf = %{read_conf_file($conf_file)};

# Set connection and login timeouts
my $timeout = $conf{'expireTimer'} || 10;

# Prepare and open logfile
my $LOGLEVEL_EXCL = 1;
my ($NO_LOGGING, $ERROR, $ACTIVITY, $DEBUG) = (0 .. 3);  # Logging mode
constants
my $have_opened_logfile = 0;
open_log();

# Obtain form data
my %form = %{parse_form_data()};

# Set SIGTERM to subroutine that ends all IM sessions and logs out all users.
$SIG{'TERM'} = \&full_cleanup;

# Perform the appropriate action
my $action = $form{'action'};
```

EDL01-01p                          59

```
my @valid_actions = qw(login_user  display_login_success  open_imctrl
new_imctrl       display_imctrl_main  new_imrecv
                     new_imexit  do_imexit                    new_im
display_im_main  new_imsend              do_imsend);
if ($action && grep { /$action/ } @valid_actions)
{    &$action(); }
else
{    display_login(); }


sub read_conf_file {
    my $conf_file = shift;
    my %conf;

    open CONF, $conf_file or cgi_die("read_conf_file(): Failed to open
configuration file $conf_file in read mode",
                            "An error occurred when attempting to read
the server configuration file");
    while (<CONF>)
    {
        # Allow different styles of comments within the logfile

        # Skip comment markers within single or double quotes
        my $qskip_begin = '(?:(?!.*?["\'])';
        my $qskip_end   = '(?!.*?["\'])';
        my $comment_begin = join '', $qskip_begin, '\s*(;|\#|\/\/\*)\s*',
$qskip_end;
        my $inline_comment = join '', $qskip_begin,
'\s*(;.*?;|\#.*?\|\/\*.*?\*\/)\s*', $qskip_end;

        s/$inline_comment//go;
        next if (/^\s*$comment_begin/o || /^\s*\[.*\]\s*$/ || !/=/);
        s/\s*$comment_begin.*$//o;

        # If option or option name is null, ignore; otherwise, split on first
equals sign and insert name & value into hash
        chomp;
        last if ($_ eq '');
        my ($optname, $optval) = split /\s*=\s*/, $_, 2;
        last if ($optname eq '');
        $optval =~ s/^[\"\']?(.*?)[\"\']?$/$1/ms;  # Get rid of quotes
surrounding value
        # $optval = eval($optval);

        $conf{$optname} = $optval;
    }
    close CONF;

    return \%conf;
}

sub open_log {
    return if (!$conf{'loggingLevel'} || $conf{'loggingLevel'} <= 0 ||
$have_opened_logfile);

    $conf{'logFileDuration'}   ||= 1;                # Default to creating new
logfile each day
```

EDL01-01p                                    60

```perl
    $conf{'logFileNameFormat'} ||= "im.log.[time]"; # Default to creating
logfile with name format "im.log.[time]"
    $conf{'logDir'}              ||= ".";            # Default to creating
logfile in current directory

    create_directory($conf{'logDir'}) if (!-e $conf{'logDir'} || !-d
$conf{'logDir'});

    my $current_time = time;
    my $logfilename;
    my $found_logfile = 0;

    my $days_old_counter;
    for ($days_old_counter = $conf{'logFileDuration'}; $days_old_counter > 0; -
-$days_old_counter)
        {
        my @check_time = localtime($current_time - ($conf{'logFileDuration'} *
86400 - $days_old_counter * 86400));
        my $time_string = sprintf("%04D%02D%02D", $check_time[5] + 1900,
$check_time[4] + 1, $check_time[3]);

        $logfilename = "$conf{'logDir'}/$conf{'logFileNameFormat'}";
        $logfilename =~ s/\[time\]/$time_string/go;

        if (-e $logfilename && !-d $logfilename)
        {
            open LOG, ">>$logfilename" or cgi_die("open_log(): Unable to open log
file $logfilename in append mode",
                                            "The server logfile could not
be opened correctly");
            $have_opened_logfile = 1;
                write_log("open_log(): Logfile $logfilename exists; logfile opened
in append mode.", $DEBUG);

            $found_logfile = 1;
            last;
        }
    }

    if (!$found_logfile)
    {
        open LOG, ">$logfilename" or cgi_die("open_log(): Unable to create and
write to log file $logfilename",
                                "The server logfile could not be opened
correctly");
        $have_opened_logfile = 1;
        write_log("open_log(): Logfile $logfilename does not exist; logfile
opened in write mode.", $DEBUG);
    }

    handle_autoflush(*LOG);

    # NOTE: Check to see if Win32 allows the same file open by multiple
processes.
}

sub parse_form_data {
```

EDL01-01p                                     61

```perl
    my ($request_method, $query, @key_value_pairs, $pair, $key, $prev, $value);
    my %form;

    $request_method = uc($ENV{'REQUEST_METHOD'});
    if    ($request_method eq 'GET')    { $query =
$ENV{'QUERY_STRING'}    }
    elsif ($request_method eq 'POST')  { read(STDIN, $query,
$ENV{'CONTENT_LENGTH'}) }
    else
    {
       cgi_die("parse_form_data(): Unsupported request method
$ENV{'REQUEST_METHOD'}",
                "This program was called in an invalid manner");
    }

    # WARNING: $query may contain a password.  Be careful when choosing to log
in DEBUG mode.
    write_log("parse_form_data(): REQUEST_METHOD=$request_method;
QUERY_STRING=$query", $DEBUG);
    @key_value_pairs = split /&/, $query;

    foreach $pair (@key_value_pairs)
    {
        ($key, $value)  =   split /=/, $pair;

        $value          =~  tr/+/ /;
        $value          =~  s/%([\dA-Fa-f][\dA-Fa-f])/pack "C", hex($1)/eg;
        $value          =~  s/\r//g;

        if (exists $form{$key})    { $form{$key} = join "\0", $form{$key},
$value;    }
        elsif ($key eq 'newcheck')
        {
           if ($form{$prev} != 1)
           {
               $form{$value} = 0;
               delete $form{$key};
           }
        }
        else                       { $form{$key} = $value;
}

        $prev = $key;
    }

    my $action = $form{'action'};
    write_log("parse_form_data(): Script called with action $action",
$ACTIVITY);

    if ($request_method eq 'GET' && ($action eq 'login_user' || $action eq
'do_imexit' || $action eq 'do_imsend'))
    {
       cgi_msg("parse_form_data(): WARNING: method=$request_method;
action=$action; browser=$ENV{'HTTP_USER_AGENT'}.  Person might not be using web
browser",
                "This program was called in an invalid manner");
    }
```

EDL01-01p                              62

```
        return \%form;
}

sub display_login {
        my $media_dir = $conf{'mediaDir'} || ".";
        write_log("display_login(): Script was called with no action attribute.
Defaulting to displaying login page...");

        display_headers();
        deliver_html("IMIntro.html",
                    ('ERRORS' => '', 'SCRIPTFILE' => $my_filename, 'MEDIADIR' =>
$media_dir, 'USERNAME' => '', 'PASSWORD' => '')
                    );
        exit;
}

sub login_user {
        my $total_procs = 0;
        my $im_procs    = 0;

        my $error_message = '';

        # Basic form validation
        if ($form{'username'} =~ /^\s*$/)
        {   $error_message = $conf{'noUsernameError'}   || "Please enter your eDial
username below.<BR>\n"; }
        elsif ($form{'password'} =~ /^\s*$/)
        {   $error_message = $conf{'noPasswordError'}   || "Please enter your eDial
password below.<BR>\n"; }

        elsif (length($form{'username'}) > 50)   # Something's not right
        {   $error_message = $conf{'invalidLoginError'} || "No user with that
username and password exists."; }
        elsif (length($form{'password'}) > 50)   # Ditto
        {   $error_message = $conf{'invalidLoginError'} || "No user with that
username and password exists."; }

        write_log("login_user(): Error occurred in basic validation;
username=$form{'username'}; error=$error_message", $DEBUG)
            if ($error_message);

        # Limit the number of instances a user may be logged in.
        my $username_instances    = 0;
        my $auth_instances        = 0;
        my $greatest_instance_num = 0;

        if (!$error_message)
        {
          if ($ENV{'HTTP_COOKIE'})
          {
              # write_log("login_user(): HTTP_COOKIE = $ENV{'HTTP_COOKIE'}",
$DEBUG);
              while ($ENV{'HTTP_COOKIE'} =~ /ed_auth(\d+)-
(user|auth)\s*=([^;\s]+)/g)
                  {
                    if ($2 eq 'user')
```

```
        {    ++$username_instances; }
        else
        {
                $greatest_instance_num = ($1 > $greatest_instance_num ? $1 :
$greatest_instance_num);

                if (++$auth_instances >= ($conf{'maxAllowedUserInstances'} ||
2))
                {
                    $error_message = $conf{'maxAllowedUserInstancesError'} ||
                        "You have the maximum number of permitted IM Control
Panel windows opened.  Please close one of them first.";
                }
            }
        }
    }
    ++$greatest_instance_num;
    write_log("login_user(): Total user instances = $auth_instances; New
instance = $greatest_instance_num", $DEBUG);

    if ($username_instances != $auth_instances)
    {
        write_log("login_user(): WARNING: Inconsistency!  No. auth cookies =
$auth_instances; No. username cookies = $username_instances.", $ERROR);
        $error_message = join '', "You have a cookie inconsistency.  Close
your browser window and retry.  ",
                            "If this problem persists, contact your
server administrator.";
    }
}

# Take care of all errors thus far (except for server business errors)
here.
if ($error_message)
{
    display_headers();
    deliver_html("IMIntro.html",
                    ('ERRORS'     =>
"$BEGIN_ERROR_FONT$error_message$END_ERROR_FONT",
                'SCRIPTFILE' => $my_filename,
                'MEDIADIR'   => ($conf{'mediaDir'} || "."),
                'USERNAME'   => $form{'username'},
                'PASSWORD'   => $form{'password'})
            );
    exit;
}

# Log in user and validate password
my $username =  $form{'username'};    # Just to avoid several hash lookups
    $username =~ s/\@/%40/;

open_sip_connection($conf{'sipHost'} || 'localhost', $conf{'sipPort'} ||
443);
add_user(\%users, $username, $form{'password'});
SIP_login($users{$username}, \&validate_user_onlogin);
```

EDL01-01p                64

```
    # If all is well, continue here; otherwise, validate_user_onlogin() will
have taken care of errors, closed connection, and exited.
    if ($users{$username}{'loggedin'})
    {
        SIP_logout($users{$username});
        close_sip_connection();

        write_log("login_user(): User $username was logged in and out
successfully.", $ACTIVITY);

        # If possible, do not permit user to log in if there is too much activity
on the server.
        if (($conf{'maxAllowedTotalProcs'} || 250) >= 0 &&
($conf{'maxAllowedIMProcs'} || 50) >= 0 && opendir PROCLIST, "/proc")
        {
            if (my @procdirs = readdir PROCLIST)
            {
              my $procdirname;
              foreach $procdirname (@procdirs)
              {
                next if (!-d "/proc/$procdirname" || $procdirname eq '.' ||
$procdirname eq '..');
                if ($procdirname =~ /^\s*\d+\s*$/)
                {
                  if (++$total_procs > ($conf{'maxAllowedTotalProcs'} || 250))
                  {
                      $error_message = $conf{'maxAllowedTotalProcsError'} ||
                        "The eDial server is too busy to allow users to log in
at this time.  Please try again later.";
                      last;
                  }

                  if (open PROC, "/proc/$procdirname/cmdline")
                  {
                    my $cmdline =  <PROC>;
                    if ($cmdline)
                    {
                      $cmdline =~ s/\0/ /g;

                      if ($cmdline =~ /^\s*perl.+$my_filename/o)
                      {
                          if (++$im_procs > ($conf{'maxAllowedIMProcs'} ||
50))
                          {
                            $error_message = $conf{'maxAllowedIMProcsError'}
||
                                "The eDial server is too busy to allow users
to log in at this time.  Please try again later.";
                            last;
                          }
                      }
                    }
                    close PROC;
                  }
                }
              }
            }
        }
```

A-238

EDL01-01p                    65

```
            write_log("login_user(): Total processes = $total_procs (at least).
IM Processes = $im_procs (at least)", $DEBUG);
        }
        else
        {
            write_log("login_user(): Process checking is disabled or proc
filesystem is not supported or is inaccessible to this script.", $DEBUG);
        }

        # Take care of server busy errors here
        if ($error_message)
        {
            display_headers();
            deliver_html("IMIntro.html",
                    ('ERRORS'      =>
"$BEGIN_ERROR_FONT$error_message$END_ERROR_FONT",
                     'SCRIPTFILE' => $my_filename,
                     'MEDIADIR'    => ($conf{'mediaDir'} || "."),
                     'USERNAME'    => $form{'username'},
                     'PASSWORD'    => $form{'password'})
                );
            exit;
        }

        # If execution still continues here, the user is all set to have his/her
login cookies set.

        # Prepare to set cookies; display HTTP headers.
        my $hostname = $ENV{'SERVER_NAME'} || $ENV{'HTTP_HOST'} ||
$ENV{'SERVER_ADDR'};
        if (!$hostname)
        {
            require Sys::Hostname;
            $hostname = eval { Sys::Hostname::hostname() } || '';
        }

        my $auth = $users{$username}{'auth'};

        # Encode username/authorization element in cookie
        $username =~ s/\%40/\@/g;
        $username =~ s/([^a-zA-Z0-9\s])/sprintf("%%%X", ord($1))/eg;
        $auth =~ s/([^a-zA-Z0-9\s])/sprintf("%%%X", ord($1))/eg;

        my $username_cookie = "ed_auth$greatest_instance_num-user=$username;
path=/; domain=$hostname";
        my $auth_cookie     = "ed_auth$greatest_instance_num-auth=$auth; path=/;
domain=$hostname";
        my $step_cookie     = "ed_auth$greatest_instance_num-step=A; path=/";
        display_headers($username_cookie, $auth_cookie, $step_cookie);

        deliver_html("IMLoggedIn.html",
                    ('SCRIPTFILE' => $my_filename,
                     'AUTHNUM'    => $greatest_instance_num)
                );
    }
    else
    {
```

EDL01-01p                                66

```perl
        write_log("login_user(): Login failed but the error was not handled.",
$DEBUG);
    }

    exit;
}

sub display_login_success {
    my $instance_num = $form{'authnum'};
    write_log("display_login_success(): User instance number = $instance_num",
$DEBUG);

    if (my($step_cookie) = check_for_cookies($instance_num, 'B'))
    {
        write_log("display_login_success(): Displaying login success page...",
$DEBUG);

        display_headers("ed_auth$instance_num-step=$step_cookie; path=/");
        deliver_html("IMIntroLoggedIn.html",
                    {'MEDIADIR' => ($conf{'mediaDir'} || ".")}
                );
    }

    exit;
}

sub open_imctrl {
    my $instance_num = $form{'authnum'};
    write_log("open_imctrl(): User instance number = $instance_num", $DEBUG);

    if (my($step_cookie) = check_for_cookies($instance_num, 'C'))
    {
        write_log("open_imctrl(): Opening IM Control Window...", $DEBUG);

        display_headers("ed_auth$instance_num-step=$step_cookie; path=/");
        deliver_html("ctrlOpen.html",
                    {'SCRIPTFILE' => $my_filename,
            'AUTHNUM'     => $instance_num)
                );
    }

    exit;
}

sub new_imctrl {
    my $instance_num = $form{'authnum'};
    write_log("new_imctrl(): User instance number = $instance_num", $DEBUG);

    if (my($step_cookie) = check_for_cookies($instance_num, 'D'))
    {
        write_log("new_imctrl(): Creating IM Control Window...", $DEBUG);

        my $full_frame_string = make_frame_string($conf{'IMExitQueue'} || 3,
'IMExit', "$my_filename?action=new_imexit&authnum=$instance_num");

        my $username;
```

EDL01-01p                           67

```
         ($username) =  ($ENV{'HTTP_COOKIE'} =~ /ed_auth$instance_num-
user=([^;\s]+)/o);
         $username =~ s/%([\dA-Fa-f][\dA-Fa-f])/pack "C", hex($1)/eg;  # De-
hex username for display

        display_headers("ed_auth$instance_num-step=$step_cookie; path=/");
        deliver_html("ctrlWindow.html",
                      ('SCRIPTFILE' => $my_filename,
               'AUTHNUM'    => $instance_num,
               'USERNAME'   => $username,
               'EXITFRAMES' => $full_frame_string)
                    );
    }

    exit;
}

sub display_imctrl_main {
    my $instance_num = $form{'authnum'};
    write_log("display_imctrl_main(): User instance number = $instance_num",
$DEBUG);

    if (my($step_cookie) = check_for_cookies($instance_num, 'E'))
    {
        write_log("display_imctrl_main(): Displaying visible frame of IM Control
Window...", $DEBUG);

        display_headers("ed_auth$instance_num-step=$step_cookie; path=/");
        deliver_html("ctrlWindowMain.html",
                      ('MEDIADIR' => ($conf{'mediaDir'} || "."))
                    );
    }

    exit;
}

sub new_imrecv {
    my $instance_num = $form{'authnum'};
    write_log("new_imrecv(): User instance number = $instance_num", $DEBUG);

    if (my($step_cookie) = check_for_cookies($instance_num, 'F'))
    {
        write_log("new_imrecv(): Initializing IM reception frame...", $DEBUG);

    my ($username, $auth);
        ($username) = ($ENV{'HTTP_COOKIE'} =~ /ed_auth$instance_num-
user=([^;\s]+)/o);
        ($auth)     = ($ENV{'HTTP_COOKIE'} =~ /ed_auth$instance_num-
auth=([^;\s]+)/o);

        # De-hex username and authorization cookies
        $username =~ s/%([\dA-Fa-f][\dA-Fa-f])/pack "C", hex($1)/eg;
        $auth     =~ s/%([\dA-Fa-f][\dA-Fa-f])/pack "C", hex($1)/eg;

        display_headers("ed_auth$instance_num-step=$step_cookie; path=/");
        deliver_html("IMRecv.html",
                      ('MEDIADIR'       => ($conf{'mediaDir'}       || "."),
```

EDL01-01p                                            68

```perl
                    'MAXOPENWINDOWS' => ($conf{'maxOpenWindows'} || 10),
                    'IMSENDQUEUE'    => ($conf{'IMSendQueue'}    || 5),
                    'IMEXITQUEUE'    => ($conf{'IMExitQueue'}    || 3),
                    'MAXIMLENGTH'    => ($conf{'maxIMLength'}    || 500),
                    'IMRECVCOLOR'    => ($conf{'IMRecvColor'}    || "#0000CC"),
                    'IMSENDCOLOR'    => ($conf{'IMSendColor'}    || "#FF3333"),
                    'MSGCOLOR'       => ($conf{'msgColor'}       || "#009900"),
                    'AUTHNUM'        => $instance_num,
                    'USERNAME'       => $username,
                    'SCRIPTFILE'     => $my_filename
                  )
                );
        # Flush output buffer
        $| = 1;
        $| = 0;

        $username =~ s/\@/\%40/g;

        open_sip_connection($conf{'sipHost'} || 'localhost', $conf{'sipPort'} ||
443);
        add_user(\%users, $username, "$auth\n");  # Add "\n" to indicate that
authorization element is already encoded.
        SIP_login($users{$username}, \&validate_user_onimsend);

        if ($users{$username}{'loggedin'})
        {
            handle_incoming_sip_messages($users{$username});
        }
        else
        {
            cgi_die("new_imrecv(): The user is not logged in for some strange
reason; see previous error messages.",
                    "An internal error occurred when the eDial server attempted to
log you in");
        }

        # Execution should never continue beyond this point.
        write_log("new_imrecv(): Execution left handle_incoming_sip_messages()
for some strange reason.  Exiting...", $DEBUG);
    }

    exit;
}

sub new_imexit {
    my $instance_num = $form{'authnum'};
    write_log("new_imexit(): User instance number = $instance_num", $DEBUG);

    if (check_for_cookies($instance_num))
    {
        write_log("new_imexit(): Creating IM Exit Frame...", $DEBUG);

        display_headers();
        deliver_html("IMExit.html",
                     ('SCRIPTFILE' => $my_filename,
                      'AUTHNUM'    => $instance_num)
                    );
```

EDL01-01p                               69

```
        }

        exit;
}

sub do_imexit {
        my $instance_num = $form{'authnum'};
        write_log("do_imexit(): User instance number = $instance_num", $DEBUG);

        if (check_for_cookies($instance_num))
        {
           my $callid        = $form{'callid'};
           my $remote_users = $form{'recip'};
           my $is_error      = 0;

           if (!$callid)
           {
                write_log("do_imexit(): That's odd; there was no valid Call-ID in the
IM Exit form submitted.  Forgoing IM exit...", $ERROR);
                $is_error = 1;
           }
           if (!$remote_users)
           {
                write_log("do_imexit(): That's odd; there was no valid remote user
list in the IM Exit form submitted.  Forgoing IM exit...", $ERROR);
                $is_error = 1;
           }

           unless ($is_error)
           {
                write_log("do_imexit(): Preparing to exit IM session...", $DEBUG);

                $remote_users =~ s/\@/\%40/g;

                my ($username, $auth);
                ($username) = ($ENV{'HTTP_COOKIE'} =~ /ed_auth$instance_num-
user=([^;\s]+)/o);
                ($auth)     = ($ENV{'HTTP_COOKIE'} =~ /ed_auth$instance_num-
auth=([^;\s]+)/o);

                open_sip_connection($conf{'sipHost'} || 'localhost', $conf{'sipPort'}
|| 443);
                add_user(\%users, $username, "$auth\n");  # Add "\n" to indicate that
authorization element is already encoded.
                add_session(\%sessions, $callid, $users{$username}, $remote_users);
                SIP_end_callid($sessions{$callid}, \&validate_response_onimexit,
$DO_QUICK_REGISTER);

                write_log("do_imexit(): IM exit completed.  Logging out and closing
connection...", $DEBUG);

                SIP_logout($users{$username}) if ($users{$username}{'loggedin'});
                close_sip_connection();
           }

           display_headers();
           deliver_html("IMExit.html",
```

EDL01-01p                              70

```
                    ('SCRIPTFILE' => $my_filename,
                     'AUTHNUM'    => $instance_num)
                );
    }
    exit;
}

sub new_im {
    my $instance_num = $form{'authnum'};
    write_log("new_im(): User instance number = $instance_num", $DEBUG);

    if (check_for_cookies($instance_num))
    {
        write_log("new_im(): Creating IM window...", $DEBUG);

        my $callid      = $form{'callID'} or
             cgi_msg("new_im(): No valid Call-ID was provided in the new_im
request.  There may be an error in the IM script",
                   "Your IM Control Window failed to provide a Call-ID for this
window.  Close this window and try again");
        my $remote_users = $form{'recip'} || '';
        write_log("new_im(): Call-ID=$callid; RecipInit=$remote_users", $DEBUG);

        my $full_frame_string = make_frame_string($conf{'IMSendQueue'} || 5,
'IMSend',

"$my_filename?action=new_imsend&authnum=$instance_num&callID=$callid");

        display_headers();
        deliver_html("IMWindow.html",
                    ('SCRIPTFILE' => $my_filename,
                     'AUTHNUM'    => $instance_num,
                     'CALLID'     => $callid,
                     'RECIPINIT'  => $remote_users || '',
                     'SENDFRAMES' => $full_frame_string)
                );
    }

    exit;
}

sub display_im_main {
    my $instance_num = $form{'authnum'};
    write_log("display_im_main(): User instance number = $instance_num",
$DEBUG);

    if (check_for_cookies($instance_num))
    {
        write_log("display_im_main(): Displaying visible frame of IM window...",
$DEBUG);

        my $callid      = $form{'callID'} or
             cgi_msg("display_im_main(): No valid Call-ID was provided in the
display_im_main request.  There may be an error in the IM script",
                   "Your IM Control Window failed to provide a Call-ID for this
window.  Close this window and try again");
```

```
        my $remote_users = $form{'recipInit'} || '';  # Same as $form{'recip'}
in new_im()
        write_log("display_im_main(): Call-ID=$callid; RecipInit=$remote_users",
$DEBUG);

        display_headers();
        deliver_html("IMData.html",
                        ('MEDIADIR'       => ($conf{'mediaDir'} || "."),
                    'AUTHNUM'        => $instance_num,
                    'CALLID'         => $callid,
                    'MAXIMLENGTH'    => ($conf{'maxIMLength'} || 500),
                    'SUBMITONENTER'  => ($conf{'submitOnEnter'} || 0),
                    'RECIPINIT'      => $remote_users)
                    );
    }

    exit;
}

sub new_imsend {
    my $instance_num = $form{'authnum'};
    write_log("new_imsend(): User instance number = $instance_num", $DEBUG);

    if (check_for_cookies($instance_num))
    {
        write_log("new_imsend(): Creating IM Send Frame...", $DEBUG);

        my $callid = $form{'callID'} or
            cgi_msg("new_imsend(): No valid Call-ID was provided in the
new_imsend request.  There may be an error in the IM script",
                    "Your IM window failed to provide a Call-ID for your IM.  Close
this window and try again");
        write_log("new_imsend(): Call-ID=$callid", $DEBUG);

        display_headers();
        deliver_html("IMSend.html",
                        ('SCRIPTFILE'   => $my_filename,
                    'AUTHNUM'       => $instance_num,
                    'CALLID'        => $callid,
                    'IMSENDERROR' => '')
                    );
    }

    exit;
}

sub do_imsend {
    my $instance_num = $form{'authnum'};
    write_log("do_imsend(): User instance number = $instance_num", $DEBUG);

    # NOTE: $im_send_error is a global variable
    if (check_for_cookies($instance_num))
    {
        my $callid  = $form{'callID'};
        if (!$callid)
        {
```

```
        write_log("do_imsend(): No valid Call-ID was provided in the IM form.
There may be an error in the IM script", $ERROR);
        $im_send_error = 'alert("Your IM could not be sent because no valid
Call-ID was provided by your IM window.");';
    }
    my $remote_users = $form{'recip'};
    if (!$remote_users)
    {
        my $error_msg = "Your IM could not be sent because no recipients were
specified in your IM window.";

        write_log("do_imsend(): No remote usernames were provided in the IM
form.  There may be an error in the IM script", $ERROR);
        $im_send_error = <<END_NOUSERS_ERROR;
alert("$error_msg");
parent.opener.addIM("$callid", parent.opener.makeIM(null, "$error_msg", 1));
END_NOUSERS_ERROR
    }
    my $instant_msg = $form{'message'} || '';

    if (length($instant_msg) > ($conf{'maxIMLength'} || 500))
    {   $instant_msg = substr($instant_msg, 0, ($conf{'maxIMLength'} ||
500)); }

    unless ($im_send_error)
    {
        write_log("do_imsend(): Preparing to send IM...", $DEBUG);

        $remote_users =~ s/\@/\%40/g;

        my ($username, $auth);
        ($username) = ($ENV{'HTTP_COOKIE'} =~ /ed_auth$instance_num-
user=([^;\s]+)/o);
        ($auth)     = ($ENV{'HTTP_COOKIE'} =~ /ed_auth$instance_num-
auth=([^;\s]+)/o);

        $username =~ s/%([\dA-Fa-f][\dA-Fa-f])/pack "C", hex($1)/eg;
        $username =~ s/\@/\%40/;
        $auth     =~ s/%([\dA-Fa-f][\dA-Fa-f])/pack "C", hex($1)/eg;

        open_sip_connection($conf{'sipHost'} || 'localhost', $conf{'sipPort'}
|| 443);
        add_user(\%users, $username, "$auth\n");  # Add "\n" to indicate that
authorization element is already encoded.
        add_session(\%sessions, $callid, $users{$username}, $remote_users);
        SIP_send_im($sessions{$callid}, $instant_msg,
\&validate_response_onimsend, $DO_QUICK_REGISTER);

        write_log("do_imsend(): The IM was sent.  Closing SIP connection...",
$DEBUG);
        close_sip_connection();
    }
    write_log("do_imsend(): IM Send Error:\n$im_send_error", $DEBUG) if
($im_send_error);

    display_headers();
    deliver_html("IMSend.html",
```

A-246

EDL01-01p                          73

```
                    ('SCRIPTFILE'  => $my_filename,
                'AUTHNUM'      => $instance_num,
                'CALLID'       => $callid,
                'IMSENDERROR' => ($im_send_error || ''))
            );
    }
    exit;
}


# IMPORTANT: This subroutine assumes that display_headers() has been called
already
sub deliver_html {
    my $HTML_filename = shift;
    my %substitutions = @_;
    my $buffer_length = 0;
    my $html_logtext  = '';

    my $HTML_path = $conf{'HTMLDir'} || ".";
    open HTML, "$HTML_path/$HTML_filename" or
        cgi_die("deliver_html($HTML_filename): Failed to open HTML file
$HTML_path/$HTML_filename to deliver it to browser",
            "Data required to continue is missing on the server");

    write_log("deliver_html($HTML_filename): --SENDING TO BROWSER--", $DEBUG);
    while (<HTML>)
    {
        my      ($subst_tag, $subst_val);
        while (($subst_tag, $subst_val) = each %substitutions)
        {    s/<<$subst_tag>>/$subst_val/ig; }
        print;

        if (($conf{'loggingLevel'} || 0) >= $DEBUG)
        {
            $buffer_length += length;
            $html_logtext   = join '', $html_logtext, $_;

            if ($buffer_length >= $MAX_LOG_BUFFER)
            {
                chomp $html_logtext;
                write_log($html_logtext, $DEBUG);

                $html_logtext  = '';
                $buffer_length = 0;
            }
        }
    }

    close HTML;

    if (($conf{'loggingLevel'} || 0) >= $DEBUG)
    {
        chomp $html_logtext;
        write_log($html_logtext, $DEBUG);
    }
}
```

EDL01-01p                                    74

```perl
sub check_for_cookies {
    my $instance_num = shift;
    my $step_letter  = shift || '';

    write_log("check_for_cookies($instance_num): Validating cookies...",
$DEBUG);

    my ($username_cookie, $auth_cookie, $step_cookie);
    if ($instance_num > 0 && $instance_num == int($instance_num) &&
$ENV{'HTTP_COOKIE'})
    {
        ($username_cookie) = ($ENV{'HTTP_COOKIE'} =~ /ed_auth$instance_num-
user=([^;\s]+)/);
        ($auth_cookie)     = ($ENV{'HTTP_COOKIE'} =~ /ed_auth$instance_num-
auth=([^;\s]+)/);
        ($step_cookie)     = ($ENV{'HTTP_COOKIE'} =~ /ed_auth$instance_num-
step=([^;\s]+)/);
    }

    if ($step_letter)
    {
        if (index($step_cookie, $step_letter) >= 0)
        {
            cgi_msg("check_for_cookies($instance_num, $step_letter): A particular
page was attempted to be loaded more than once for $username_cookie",
                    "You must have reloaded a page when you were not supposed to.
Please go back and log in");
        }
        $step_cookie = join '', $step_cookie, $step_letter;
    }

    if ($username_cookie && $auth_cookie)
    {  return $step_cookie || 1; }
    else
    {
        cgi_msg("check_for_cookies($instance_num): Username or auth cookie is not
set!  InstanceNo=$instance_num; user=$username_cookie; auth=$auth_cookie",
                "You are not logged in properly.  Please go back and log in");
        return 0;
    }
}

sub handle_autoflush {
    my $handle_to_flush = shift;

    my $current_default_handle = select($handle_to_flush);
    $| = 1;
    select($current_default_handle);
}

sub ssl_init {
    return if ($have_performed_sslinit);

    # require Socket;
    # Socket->import('PF_INET', 'SOCK_STREAM', 'sockaddr_in');

    eval  { require Net::SSLeay; };
```

EDL01-01p                              75

```perl
        if ($@)
        {
              cgi_die("ssl_init(): The Net::SSLeay (SSL) $PM is not installed or
failed to load correctly",
                      "A needed $PM $MUST_BE_INSTALLED");
        }

        Net::SSLeay::load_error_strings();
        Net::SSLeay::SSLeay_add_ssl_algorithms();
        Net::SSLeay::randomize();

        $have_performed_sslinit = 1;
}

sub base64_init {
        return if ($have_performed_base64init);

        eval
        {
          require MIME::Base64;
             MIME::Base64->import('encode_base64');
        };

        if ($@)
        {
              cgi_die("base64_init(): MIME::Base64 $PM is not installed or failed to
load correctly",
                      "A needed $PM $MUST_BE_INSTALLED");
        }

        $have_performed_base64init = 1;
}

sub callidgen_init {
        return if ($have_performed_callidgeninit);

        require Math::BigInt;

        my $sa = "eth0";
        my @x  = unpack "H8" x 6, $sa;
        my $a  = hex($x[4]) & 0xffff;
        my $b  = Math::BigInt->new(hex($x[5]));
        my $a1 = Math::BigInt->new(0x10000000) * 0x10;
        my $a2 = $a1->bmul($a);

        $bigint1 = $a1 * 0x10000;
        $bigint2 = $b->badd($a2);

        $have_performed_callidgeninit = 1;
}

sub make_callid {
        callidgen_init() if (!$have_performed_callidgeninit);

        my $callid = int(rand 2**16);
        $callid = $bigint2 + ($callid * $bigint1);
```

A-249

EDL01-01p                                      76

```perl
    $callid =~ s/\+//;

    return $callid;
}

sub make_base64 {
    base64_init() if (!$have_performed_base64init);
    my $encoded = encode_base64(join ':', @_);
    chomp($encoded);

    return $encoded;
}

sub add_user {
    my $users_hash = shift;
    my %user;

    $user{'username'} = shift;
    $user{'username'} =~ s/\@/\%40/g;

    # If authorization element ends with a newline, consider it already encoded
and chomp off newline; otherwise, encode it.
    my      $auth =  shift;
    unless ($auth =~ /\n$/)
    {   $user{'auth'} = make_base64($user{'username'}, $auth); }
    else
    {
      chomp($auth);
      $user{'auth'} = $auth;
    }

    $user{'loggedin'}  = 0;
    $user{'logintime'} = 0;
    $user{'callid'}    = make_callid();
    $user{'expires'}   = shift || $conf{'loginExpireTimer'} || 3600;
    $user{'presence'}  = shift || $conf{'loginPresence'}    || 'Taking calls';

    $users_hash->{$user{'username'}} = { %user };
    write_log("add_user(): Added $user{'username'} to users table.", $DEBUG);

    return $users_hash->{$user{'username'}};
}

sub add_session {
    my $sessions_hash = shift;
    my %session;

    $session{'callid'}      = shift || make_callid();
    $session{'localuser'}   = shift;
    $session{'remoteusers'} = shift;

    if (!ref($session{'localuser'}) || ref($session{'localuser'}) ne 'HASH')
    {   $session{'localuser'} = add_user(\%users, $session{'localuser'}, @_); }

    my $to_party_string = '';
    # my @to_parties = split /\s*[;,]\s*/, $session{'remoteusers'};
```

A-250

```
    my @to_parties = ($session{'remoteusers'});   # Comment out this line and
uncomment the above line when multiple recipients are fully implemented.
    my $to_party;
    foreach $to_party (@to_parties)
    {
        if ($to_party !~ /^\s*\+/)
        {
            $to_party =~ s/\s//g;
            $to_party =~ s/\@/\%40/;
            if (length($to_party_string) == 0) { $to_party_string =
"\"$to_party\" <sip:$to_party\@metatel.com>";   }
            else            { $to_party_string = join '',
$to_party_string, ",\"$to_party\" <sip:$to_party\@metatel.com>"; }
        }
    }
    $session{'remoteusers'} = $to_party_string;

    $sessions_hash->{$session{'callid'}} = { %session };
    write_log("add_session(): Added session (Call-ID=$session{'callid'}) to
sessions table.", $DEBUG);

    return $session{'callid'};

    # NOTE: (Should possibly provide routine to modify remote users later on)
}

sub display_headers {
    return if ($have_displayed_headers);

    my @cookies = @_;

    my $protocol   = $ENV{'SERVER_PROTOCOL'} || "HTTP/1.1";
    my $serversoft = $ENV{'SERVER_SOFTWARE'} || "Apache/1.3.16";

    my @time       = gmtime();
    my @daysofweek  = qw(Sun Mon Tue Wed Thu Fri Sat);
    my @daysofmonth = qw(Jan Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec);
    my $date       = sprintf("%s, %02d %s %d %02d:%02d:%02d GMT",
                        $daysofweek[$time[6]], $time[3],
$daysofmonth[$time[4]], $time[5] + 1900, $time[2], $time[1], $time[0]);

    my $headertext = join '', "$protocol 200 OK\n",
                        "Date: $date\n",
                        "Server: $serversoft\n",
                        "Content-type: text/html\n";
    # [NOTE: Use "secure" attribute for cookies when HTTPS is supported]
    my $cookie;
    foreach $cookie (@cookies)
    {   $headertext = join '', $headertext, "Set-Cookie: $cookie\n"; }

    write_log(join('', "display_headers(", to_scalar(\@cookies), "): --SENDING
HEADERS TO BROWSER--\n$headertext"), $DEBUG);
    print $headertext, "\n";
    $have_displayed_headers = 1;
}

sub open_sip_connection {
```

A-251

EDL01-01p                           78

```
    return if ($have_opened_sip_connection);
    ssl_init() if (!$have_performed_sslinit);

    my $sip_hostname = shift;
    my $sip_port     = shift;

    my ($sip_host, $packed_addr, $sockname, $sockaddr, $con);
    my $sub_call = "open_sip_connection($sip_hostname, $sip_port)";
    no strict 'subs';

    write_log("$sub_call: Connecting to SIP server...", $ACTIVITY);

    local ($SIG{'ALRM'}) =
        sub
        {
           cgi_die("$sub_call: The connection routine was not completed even
after $timeout seconds",
                    "A server timeout occurred $ON_CONNECT");
        };

    my $conn_status = eval
    {
      alarm($timeout);
      socket(SOCK, PF_INET, SOCK_STREAM, getprotobyname('tcp')) or
cgi_die("$sub_call: Unable to open TCP socket", "A protocol $FAIL_ON_CONNECT");

      if ($ENV{'SIP_HOST'})
      {
          $sip_host = gethostbyname($ENV{'SIP_HOST'}) or cgi_die("$sub_call:
gethostbyname($ENV{'SIP_HOST'}) failed",
                                                      "A needed
hostname could not be resolved $ON_CONNECT");

          if    ($ENV{'SIP_PORT'}) { $sip_port = $ENV{'SIP_PORT'}; }
          if    ($ENV{'SSL_PORT'}) { $sip_port = $ENV{'SSL_PORT'}; }
          else                     { $sip_port += 40; }
      }
      else
      {
          $sip_host = gethostbyname($sip_hostname) or cgi_die("$sub_call:
gethostbyname($sip_hostname) failed",
                                                      "A needed
hostname could not be resolved $ON_CONNECT");
      }

      $packed_addr = sockaddr_in($sip_port, $sip_host);
      connect(SOCK, $packed_addr) or cgi_die("$sub_call: connect() to
$sip_hostname:$sip_port failed", "The attempt to connect to the eDial server
failed");

      $sockname = getsockname(SOCK);
      ($sockport, $sockaddr) = sockaddr_in($sockname);
      $myhostname = substr(gethostbyaddr($sockaddr, AF_INET), 0, 20);

      # Turn off output buffering on socket and restore default STDOUT.
      handle_autoflush(*SOCK);
```

A-252

EDL01-01p                        79

```
        $ctx = Net::SSLeay::CTX_v3_new() or cgi_die("$sub_call: Failed to create
SSL_CTX [Net::SSLeay::CTX_v3_new() failed]", "A ciphering $FAIL_ON_CONNECT");
        Net::SSLeay::CTX_set_cipher_list($ctx,
"!ADH:!RSA:!NULL:!IDEA:HIGH+DSS:MEDIUM+DSS");

        $ssl = Net::SSLeay::new($ctx) or cgi_die("$sub_call: Failed to create SSL
[Net::SSLeay::new() failed]", "An SSL $FAIL_ON_CONNECT");
        Net::SSLeay::set_fd($ssl, fileno(SOCK));
        $con = Net::SSLeay::connect($ssl) or cgi_die("$sub_call: Failed to
establish SSL connection with SIP server [Net::SSLeay::connect() failed]",
                                                    "A secure connection
failure occurred $ON_CONNECT");
      "OK";
    };
    alarm(0);

    cgi_die("$sub_call: $@", "A $FAIL_ON_CONNECT") if ($@);

    use strict 'subs';
    write_log("$sub_call: Connection routine completed.", $DEBUG);
    exit($conn_status || 1) unless ($conn_status && $conn_status eq "OK");

    $have_opened_sip_connection = 1;
}

sub close_sip_connection {
    return if (!$have_opened_sip_connection);

    my $do_logout_users = shift || $DO_LOGOUT_USERS;
    unless ($do_logout_users == $NO_LOGOUT_USERS)
    {
      my ($username, $userinfo);
      while (($username, $userinfo) = each %users)
      {   SIP_logout($userinfo) if ($userinfo->{'loggedin'}); }
    }

    Net::SSLeay::free($ssl);
    Net::SSLeay::CTX_free($ctx);
    close SOCK;

    write_log("close_sip_connection(): SIP connection is now closed.", $DEBUG);
    $have_opened_sip_connection = 0;
}

sub SIP_login {
    # Don't even try to log in before a SIP connection has been opened.
    open_sip_connection($conf{'sipHost'} || 'localhost', $conf{'sipPort'} ||
443) if (!$have_opened_sip_connection);

    my $user     = shift;
    my $func_ref = shift;
    my %user;
    my $username;

    # Allow SIP_login to be called in one of two ways:
    #   1) SIP_login($user, $func_ref)          --> with a reference to a
user object and a function reference.
```

EDL01-01p                              80

```
     #    2) SIP_login($username, $func_ref, ...)  --> with a username, a
function reference, and other items (namely: password, expiretimer, and
presence)
     #                                                that are passed on to
add_user() in order to create a new user object before logging in.
     # A user object structure is defined in and may be created through
add_user().
     # The function referenced by $func_ref is called after each SIP message is
received and passed the received SIP message in addition to the SIP
     # message which merited that SIP response.

     if (!@_)
     {
       if (ref($user) && ref($user) eq 'HASH')
       {
         %user    = %$user;
         $username = $user{'username'};
       }
       else
       {
         write_log("SIP_login($username): User argument is not a valid hash
reference.  Returning...", $DEBUG);
         return;
       }
     }
     else
     {
       $username = $user;
       %user = %{add_user(\%users, $username, @_)};
     }

     my $presence_len = length($user{'presence'}) + length("\n");
     my $cseq = time;

     my $message = <<END_MESSAGE;
REGISTER sip:$username\@sip.metatel.com SIP/2.0
Via: SIP/2.0/tcp $myhostname:$sockport
From: sip:$username\@metatel.com
To: sip:$username\@metatel.com
Call-ID: $user{'callid'}
CSeq: $cseq REGISTER
Contact:
sip:$username\@metatel.com;tag=$user{'callid'}\@$myhostname;expires=$user{'expi
res'}
Expires: $user{'expires'}
Authorization: Basic $user{'auth'}
User-Agent: $user_agent
Content-Length: $presence_len
Content-Type: text/x-metatel1.0-presence

$user{'presence'}
END_MESSAGE

     write_log("SIP_login($username): ---LOGGING USER INTO SIP SERVER---
\n$message\n", $DEBUG);
     write_log("SIP_login($username): Logging user $username into SIP server;
NEW:Call-ID=$user{'callid'}; CSeq=$cseq; expires=$user{'expires'}",
```

EDL01-01p                              81

```perl
                    $ACTIVITY, $LOGLEVEL_EXCL);

    Net::SSLeay::write($ssl, $message);

    local ($SIG{'ALRM'}) =
        sub
        {
            cgi_die("SIP_login($username): The login routine was not completed
even after $timeout seconds",
                    "A server timeout occurred when attempting to log in to the
eDial server");
        };

    my $current_response = '';
    eval
    {
        alarm($timeout);
        while ($current_response !~ /SIP\/\d\.\d \d+/)
        {
            write_log("SIP_login($username): Awaiting response...", $DEBUG);

            $user{'logintime'} = time;  # A temporary setting to make
get_sip_msg() happy.
            $current_response = ${get_sip_msg(\%user)};
            write_log("SIP_login($username): ---RECEIVED RESPONSE FROM SIP
SERVER---\n$current_response\n", $DEBUG);

            &$func_ref(\$message, \$current_response);
        }
    };
    alarm(0);

    cgi_die("SIP_login($username): $@", "A failure occurred when attempting to
log in") if ($@);

    if ($current_response !~ /SIP\/\d\.\d [3456789]/)
    {
        write_log("SIP_login($username): $username was logged in
successfully.", $DEBUG);

        $users{$username}{'loggedin'}  = 1;
        $users{$username}{'logintime'} = time;
    }
    else
    {   write_log("SIP_login($username): Failed to log in $username.", $DEBUG);
}

    %user = %{$users{$username}};
}

sub SIP_logout {
    my $user = shift;
    my %user;
    my $username;

    # Use technique analogous SIP_login()'s, except that no function reference
is needed because no response is expected.
```

EDL01-01p                    82

```
    if (!@_)
    {
      if (ref($user) && ref($user) eq 'HASH')
      {
          %user     = %$user;
          $username = $user{'username'};
      }
      else
      {
          write_log("SIP_logout(): User argument is not a valid hash reference.
Returning...", $DEBUG);
          return;
      }
    }
    else
    {
        $username = $user;
        %user = %{add_user(\%users, $username, @_)};
    }

    return if (!$have_opened_sip_connection || !$user{'loggedin'});

    my $presence_len = length($user{'presence'}) + length("\n");
    my $cseq = time;

    # NOTE: Send a BYE for the call ID before logging out.

    my $message = <<END_MESSAGE;
REGISTER sip:$username\@sip.metatel.com SIP/2.0
Via: SIP/2.0/tcp $myhostname:$sockport
From: sip:$username\@metatel.com
To: sip:$username\@metatel.com
Call-ID: $user{'callid'}
CSeq: $cseq REGISTER
Contact: sip:$username\@metatel.com;tag=$user{'callid'}\@$myhostname;expires=0
Expires: 0
Authorization: Basic $user{'auth'}
User-Agent: $user_agent
Content-Length: $presence_len
Content-Type: text/x-metatel1.0-presence

$user{'presence'}
END_MESSAGE

    write_log("SIP_logout($username): ---LOGGING USER OUT OF SIP SERVER---
\n$message\n", $DEBUG);
    write_log("SIP_logout($username): Logging user $username out of SIP server;
END:Call-ID=$user{'callid'}; CSeq=$cseq",
              $ACTIVITY, $LOGLEVEL_EXCL);

    Net::SSLeay::write($ssl, $message);

    $users{$username}{'loggedin'} = 0;
    %user = %{$users{$username}};
}

sub SIP_send_im {
```

A-256

EDL01-01p                                      83

```perl
    my $session       = shift;
    my $instant_msg   = shift;
    my $func_ref      = shift;
    my $do_quick_reg  = shift || $NO_QUICK_REGISTER;


    my %session;
    my $callid;


    # Allow SIP_send_im to be called in one of two ways:
    #    1) SIP_send_im($session, $instant_msg, $func_ref, $do_quick_reg)
    #        --> with a reference to a session object, an IM, a function
    reference, and indicator as to whether to perform "quick register" or not.
    #    2) SIP_send_im($callid, $instant_msg, $func_ref, $do_quick_reg, ...)
    #        --> with a call ID, an IM, a function reference, an indicator
    as to where to perform a "quick register" or not, and other items
    #           (namely: a call ID, a user object, and a remote username)
    that are passed onto add_session() in order to create a new session
    #           object before sending an IM.
    # A session object structure is defined in and may be created through
    add_session().
    # The function referenced by $func_ref is called after each SIP message is
    received and passed the received SIP message in addition to the SIP
    # message which merited that SIP response.
    # If SIP_send_im() is called using method 2 and the "user object" argument
    is not a user object but a username, all arguments remaining after
    # the call to add_session() are passed onto add_user() in order to create
    that user object.

    if (!@_)
    {
        if (ref($session) && ref($session) eq 'HASH')
        {
            %session = %$session;
            $callid  = $session{'callid'};
        }
        else
        {
            write_log("SIP_send_im(): User argument is not a valid hash
    reference.  Returning...", $DEBUG);
            return;
        }
    }
    else
    {
        $callid = $session;
        %session = %{add_session(\%sessions, $callid, @_)};
    }

    # Don't even try to send an instant message before the user sending it is
    logged in (unless a "quick REGISTER" is being performed,
    # in which case the script makes sure a SIP connection is open first).
    if (!$session{'localuser'}{'loggedin'})
    {
        unless ($do_quick_reg)  { SIP_login($session{'localuser'},
    \&validate_user_onimsend); }
        else                    { open_sip_connection($conf{'sipHost'} ||
    'localhost', $conf{'sipPort'} || 443) if (!$have_opened_sip_connection); }
```

A-257

EDL01-01p                              84

```
    }
    my $localusername = $session{'localuser'}{'username'};  # Because this
item is referred to quite frequently in the SIP message
    my $cseq       = time;
    my $auth_header = ($do_quick_reg == $DO_QUICK_REGISTER ?
"\nAuthorization: Basic $session{'localuser'}{'auth'}" : '');

    # if (length($instant_msg) > ($conf{'maxIMLength'} || 500))
    # {  $instant_msg = substr($instant_msg, 0, ($conf{'maxIMLength'} ||
500)); }

    my $message_len = length($instant_msg);

    # $instant_msg =~ s/\n/sprintf "%%%02X%%%02X", 13, 10/eg;  --> Only when
the old "INVITE for IM" is used; here, however, MESSAGE is used.

    my $message = <<END_MESSAGE;
MESSAGE sip:$localusername\@sip.metatel.com SIP/2.0
Via: SIP/2.0/tcp $myhostname:$sockport
From: "$localusername" <sip:$localusername\@metatel.com>
To: $session{'remoteusers'}
Call-ID: $session{'callid'}
CSeq: $cseq MESSAGE $auth_header
User-Agent: $user_agent
Content-Length: $message_len
Content-Type: text/plain

$instant_msg
END_MESSAGE

    chomp $message;
    my $log_im_subjects = $conf{'logIMSubjects'} || 0;
    my $logged_message = $message;
    $logged_message =~ s/(\r?\n\r?\n)$instant_msg/$1<HIDDEN>/i if
(!$log_im_subjects);

    write_log("SIP_send_im(): ---SENDING IM: $localusername >>
$session{'remoteusers'}---\n$logged_message\n", $DEBUG);
    write_log("SIP_send_im(): Sending IM ($localusername -->
$session{'remoteusers'}); Call-ID=$session{'callid'}; CSeq=$cseq",
              $ACTIVITY, $LOGLEVEL_EXCL);
    $logged_message = undef;

    Net::SSLeay::write($ssl, $message);

    local ($SIG{'ALRM'}) =
        sub
        {
          cgi_die("SIP_send_im(): The IM sending routine was not completed even
after $timeout seconds",
                  "A server timeout occurred when attempting to send an IM");
      };

    my $current_response = '';
    eval
    {
```

A-258

EDL01-01p                                85

```perl
        alarm($timeout);
        # Change regexp a bit if 200 OKs are always received for quick-registers.
        while ($current_response !~ /SIP\/\d\.\d [3456789]/)
        {
                write_log("SIP_send_im(): Will wait a brief amount of time for
possible response...", $DEBUG);

                $current_response = ${get_sip_msg($session{'localuser'},
($conf{'errorTimeout'} || 0.5))};
                write_log("SIP_send_im(): ---RECEIVED RESPONSE FROM SIP SERVER---
\n$current_response\n", $DEBUG);

                last if (!$current_response || $current_response =~ /^\s+$/);
                &$func_ref(\$message, \$current_response, $session{'callid'});  # The
function this references receives the Call-ID as its third argument.
        }
    };
    alarm(0);

    cgi_die("SIP_send_im(): $@", "A failure occurred when attempting to send an
IM") if ($@);

    if ($do_quick_reg == $DO_QUICK_REGISTER)
    {
        my $statcode;
        ($statcode) = ($current_response !~ /SIP\/\d\.\d (\d+)/);

        if ($current_response !~ /SIP\/\d\.\d [3456789]/ || !$statcode ||
$statcode == 480 || $statcode == 404)
        {
                write_log("SIP_send_im(): $localusername was logged in
successfully.", $DEBUG);

                $users{$localusername}{'loggedin'}  = 1;
                $users{$localusername}{'logintime'} = time;
        }
        else
        {   write_log("SIP_send_im(): Failed to log in $localusername.",
$DEBUG); }

        $session{'localuser'} = $users{$localusername};
    }
}

sub SIP_end_callid {
    my $session    = shift;
    my $func_ref   = shift;
    my $do_quick_reg = shift;

    my %session;
    my $callid;

    # SIP_end_callid() is called in exactly the same fashion as SIP_send_im(),
except that there is no instant message.
    if (!@_)
    {
        if (ref($session) && ref($session) eq 'HASH')
```

A-259

EDL01-01p                                86

```
      {
          %session = %$session;
          $callid  = $session{'callid'};
      }
      else
      {
          write_log("SIP_end_callid(): User argument is not a valid hash
reference.  Returning...", $DEBUG);
          return;
      }
   }
   else
   {
      $callid = $session;
      %session = %{add_session(\%sessions, $callid, @_)};
   }

   # Don't even try to end a session with the user involved being logged in
(unless a "quick REGISTER" is being performed,
   # in which case the script makes sure a SIP connection is open first).
   if (!$session{'localuser'}{'loggedin'})
   {
      unless ($do_quick_reg)  { SIP_login($session{'localuser'},
\&validate_user_onimsend); }
      else                    { open_sip_connection($conf{'sipHost'} ||
'localhost', $conf{'sipPort'} || 443) if (!$have_opened_sip_connection); }
   }

   my $localusername =  $session{'localuser'}{'username'};  # Because this
item is referred to quite frequently in the SIP message
   my $cseq       =  time;
   my $auth_header  = ($do_quick_reg == $DO_QUICK_REGISTER ?
"\nAuthorization: Basic $session{'localuser'}{'auth'}" : '');

   my $message = <<END_MESSAGE;
BYE sip:$localusername\@sip.metatel.com SIP/2.0
Via: SIP/2.0/tcp $myhostname:$sockport
Subject:
From: "$localusername" <sip:$localusername\@metatel.com>
To: $session{'remoteusers'}
Call-ID: $session{'callid'}
CSeq: $cseq BYE $auth_header
User-Agent: $user_agent
Content-Length: 0

END_MESSAGE

   write_log("SIP_end_callid(): ---SENDING BYE: $localusername >>
$session{'remoteusers'}---\n$message\n", $DEBUG);
   write_log("SIP_end_callid(): Exiting IM ($localusername -->
$session{'remoteusers'}); Call-ID=$session{'callid'}; CSeq=$cseq",
            $ACTIVITY, $LOGLEVEL_EXCL);

   Net::SSLeay::write($ssl, $message);

   local ($SIG{'ALRM'}) =
        sub
```

EDL01-01p                              87

```
        {
            cgi_die("SIP_end_callid(): The IM exiting routine was not completed
even after $timeout seconds",
                        "A server timeout occurred when attempting to exit an IM");
        };

    my $current_response = '';
    eval
    {
        alarm($timeout);
        while ($current_response !~ /SIP\/\d\.\d \d+/)
        {
            write_log("SIP_end_callid(): Awaiting response...", $DEBUG);

            $current_response = ${get_sip_msg($session{'localuser'})};
            write_log("SIP_end_callid(): ---RECEIVED RESPONSE FROM SIP SERVER---
\n$current_response\n", $DEBUG);

            &$func_ref(\$message, \$current_response);
        }
    };
    alarm(0);

    cgi_die("SIP_end_callid(): $@", "A failure occurred when attempting to end
an IM") if ($@);

    if ($do_quick_reg == $DO_QUICK_REGISTER)
    {
        my $statcode;
        ($statcode) = ($current_response !~ /SIP\/\d\.\d (\d+)/);

        if ($current_response !~ /SIP\/\d\.\d [3456789]/ || !$statcode ||
$statcode == 480 || $statcode == 404 || $statcode == 481)
        {
            write_log("SIP_end_callid(): $localusername was logged in
successfully.", $DEBUG);

            $users{$localusername}{'loggedin'}  = 1;
            $users{$localusername}{'logintime'} = time;
        }
        else
        {   write_log("SIP_end_callid(): Failed to log in $localusername.",
$DEBUG); }

        $session{'localuser'} = $users{$localusername};
        }
}

sub handle_incoming_sip_messages {
    # Don't even try to handle SIP messages before a SIP connection has been
opened.
    open_sip_connection($conf{'sipHost'} || 'localhost', $conf{'sipPort'} ||
443) if (!$have_opened_sip_connection);

    my $user = shift;
    my %user;
    my $username;
```

EDL01-01p                                88

```
    # handle_incoming_sip_messages() is called in the same manner as
SIP_login(), except that no function reference is needed.
    if (!@_)
    {
      if (ref($user) && ref($user) eq 'HASH')
      {
          %user     = %$user;
          $username = $user{'username'};
      }
      else
      {   return; }
    }
    else
    {
      $username = $user;
      %user = %{add_user(\%users, $username, @_)};
    }

    # Don't even try to handle SIP messages without the user involved being
logged in.
    if (!$have_opened_sip_connection)
    {   open_sip_connection($conf{'sipHost'} || 'localhost', $conf{'sipPort'}
|| 443) if (!$have_opened_sip_connection); }
    if (!$user{'loggedin'})
    {   SIP_login(\%user, \&validate_user_onimsend); }

    write_log("handle_incoming_sip_messages(): Ready to accept incoming SIP
messages [e.g. IMs]", $ACTIVITY);
    my $logged_response  = '';
    my $current_response = '';
    $conf{'logIMSubjects'} ||= 0;

    while ($current_response = ${get_sip_msg(\%user)})
    {
        %user = %{$users{$username}};  # Update user information for local use;
very important.

        $current_response =~ s/\A\s*//ms;  # Trim whitespace

          $logged_response = $current_response;
        if (!$conf{'logIMSubjects'})
        {
            if    ($current_response =~ /^INVITE/)   { $logged_response =~
s/^(Subject:\s*).*?\r?\n(?!\s)/$1<HIDDEN>\n/msi; }
            elsif ($current_response =~ /^MESSAGE/)  { $logged_response =~
s/(\r?\n\r?\n).+$/$1<HIDDEN>\n/msi;               }
        }

        write_log("handle_incoming_sip_messages(): ---RECEIVED RESPONSE FROM
SIP SERVER---\n$logged_response\n", $DEBUG);

        $logged_response = undef;  # Free up memory

        # Handle NOTIFYs, INVITEs, MESSAGES, and BYEs; ignore other messages.
        if ($current_response =~ /^(MESSAGE|INVITE)/i)
        {
```

A-262

EDL01-01p

89

```perl
      my $message_type = uc($1);
      my ($callid, $cseq, $instant_msg, $from_line, $to_line, $remote_ua);

      if ($message_type eq 'MESSAGE')
      {
          ($callid,   $cseq,   $from_line, $to_line, $remote_ua) =
get_headers(\$current_response,
          ("Call-ID", "CSeq", "From",       "To",       "User-Agent"));

          $instant_msg = get_body(\$current_response);
      }
      else
      {
          # INVITEs for IMs are antiquated, but they are still accepted here.
The script ignores INVITEs for calls, though.

          ($callid,   $cseq,   $instant_msg, $from_line, $to_line, $remote_ua)
= get_headers(\$current_response,
          ("Call-ID", "CSeq", "Subject*",   "From",       "To",       "User-
Agent"));

          my $message_body = get_body(\$current_response);
          if ($message_body && $message_body =~ /\s*v\s*=/ms)
          {
              my $from_users = get_users($from_line);
              my $to_users   = get_users($to_line);

              write_log("handle_incoming_sip_messages(): Ignoring call status
update ($to_users <-- $from_users); Call-ID=$callid; User-Agent=$remote_ua",
                  $DEBUG);
              next;
          }

          $instant_msg =~ s/\%0D\%0A/\\n/ig;  # Decode hex-encoded newlines
      }

      my $from_users = get_users($from_line);
        my $to_users   = get_users($to_line);

      write_log("handle_incoming_sip_messages(): Received IM ($to_users <--
$from_users); Call-ID=$callid; CSeq=$cseq; User-Agent=$remote_ua", $ACTIVITY);

      # my @valid_users = grep  { $to_users =~ /(^|;)$_($|;)/ } keys
%users;
      my @my_users = ((grep  { $to_users =~ /(^|;)$_($|;)/ } keys
%users)[0]);  # Comment out this line & uncomment above line when multiuser IM
supported
      if (@my_users)
      {
        my ($my_user, $from_users_display);
            # Multi-user instant messenging only:
        # foreach $my_user (@my_users)
        # {   $to_users =~ s/$my_user;|;$my_user|$my_user//g; }
        # $from_users = join ';', $from_users, $to_users;

        $from_users_display =  $from_users;
        $from_users_display =~ s/\%40/\@/g;
```

A-263

```
        # Make instant message "JavaScript-ready".
        $instant_msg =~ s/\n/\\n/g;
            $instant_msg =~ s/\r//g;
        $instant_msg =~ s/([\'\"])/\\\'/g;


        foreach $my_user (@my_users)  # Loop might not be needed; SIP
server might auto. send a message for each user logged in.
                {
                add_session(\%sessions, $callid, $users{$my_user},
$from_users);  # Update remote user list for that session

                my $display_im_code = "<script>addIM(\"$callid\", new
IM(\"$from_users_display\", \"$instant_msg\", 1))</script>\n";
                write_log("handle_incoming_sip_messages(): --DISPLAYING IM ON
BROWSER--\n$display_im_code", $DEBUG);

                    print $display_im_code;  # Done!  Hand it over to
JavaScript to display IM.

                # Flush output buffer
                $| = 1;
                $| = 0;
            }
        }
        else
        {
            write_log("handle_incoming_sip_messages(): None of my users
correspond to any of the users in the To: line; ignoring", $DEBUG);
        }
    }
    elsif ($current_response =~ /^BYE/i)
    {
        my ($callid,    $cseq,    $from_line, $to_line, $remote_ua) =
get_headers(\$current_response,
            ("Call-ID", "CSeq", "From",      "To",     "User-Agent"));

        my $from_user = get_users($from_line);
        my $to_users  = get_users($to_line);

        # This may not be how the SIP server indicates that this is a BYE for
a call; come back to this later.
        my  $BYE_body = get_body(\$current_response);
        if ($BYE_body && $BYE_body =~ /\s*v\s*=/ms)
        {
            write_log("handle_incoming_sip_messages(): Ignoring call status
update ($to_users <-- $from_user); Call=ID=$callid; User-Agent=$remote_ua",
                    $DEBUG);
            next;
        }

        write_log
            ("handle_incoming_sip_messages(): Received IM Exit Notification
($to_users <-- $from_user); Call-ID=$callid; CSeq=$cseq; User-
Agent=$remote_ua",
                $ACTIVITY);
```

EDL01-01p                    91

```
        # my @valid_users = grep  { $to_users =~ /(^|;)$_($|;)/ } keys
%users;
        my @my_users    = ((grep  { $to_users =~ /(^|;)$_($|;)/ } keys
%users)[0]);  # Comment out this line & uncomment above line when multiuser IM
supp.
        my @my_sessions =  grep  { $callid  =~ /^$_$/        } keys
%sessions;
        if (@my_users && @my_sessions)
        {
          $from_user =~ s/\%40/\@/g;

          my $exit_notify_message =  $conf{'exitNotifyMessage'} || "*user*
just closed his/her IM window.";
              $exit_notify_message =~ s/\*user\*/$from_user/g;
              $exit_notify_message =~ s/\n/\\n/g;
              $exit_notify_message =~ s/([\'\"])/\\\'/g;


          my $my_user;
          foreach $my_user (@my_users)
              {
              my $display_im_code = "<script>addIM($callid, new IM(null,
$exit_notify_message, 1))</script>\n";
                  write_log("handle_incoming_sip_messages(): --DISPLAYING IM EXIT
NOTIFICATION ON BROWSER--\n$display_im_code", $DEBUG);

                  print $display_im_code;  # Done!  Hand it over to
JavaScript to display IM exit notification.
              }
          }
          else
          {
            write_log(
                "handle_incoming_sip_messages(): None of my users or none of my
sessions correspond to any of the users in the To: line; ignoring", $DEBUG);
          }
        }
      elsif ($current_response =~ /^NOTIFY/i)
        {
          my ($callid,   $cseq,   $from_line, $to_line) =
get_headers(\$current_response,
              ("Call-ID", "CSeq",  "From",       "To"));
          my $new_presence = get_body(\$current_response);

          my $from_user = get_users($from_line);
          my $to_user   = get_users($to_line);

          write_log
              ("handle_incoming_sip_messages(): Received Presence Update
($to_user <-- $from_user); Call-ID=$callid; CSeq=$cseq; New
Presence=$new_presence",
              $ACTIVITY);

          if (grep  { /^$to_user$/ } keys %users)
          {
            # At the time, nothing is really done with presence updates; they
are just logged.
          }
```

A-265

EDL01-01p

92

```perl
        else
        {
          write_log("handle_incoming_sip_messages(): None of my users
correspond to any of the users in the To: line; ignoring", $DEBUG);
        }
      }
      else
      {
        write_log("handle_incoming_sip_messages(): I do not handle that type
of SIP message; ignoring", $DEBUG);
      }
    }
    continue
    {
      $current_response = '';  # Free up memory
    }
}

sub validate_user_onlogin {
    my $msg_sent     = ${shift()};
    my $msg_received = ${shift()};
    my $error_message = '';

    if (!defined $msg_received)
    {
        $error_message = "The eDial server failed to respond.  It might be
experiencing problems.  $CONTACT_ADMIN_NOW";  # No response
    }
    elsif ($msg_received =~ /SIP\/\d\.\d (\d+)(?:\s+\(.\)\s+)?(.+?)\r?\n/)  #
Check this regexp again.
    {
        write_log("validate_user_onlogin(): Status code = $1; Explanation =
$2", $DEBUG);

        if ($1 == 200)  # OK
        { return; }
        elsif ($1 == 401)  # Unauthorized
        { $error_message = $conf{'invalidLoginError'} || "The
username/password combination you entered below is not valid."; }
        else  # Other SIP errror
        {
            write_log("validate_user_onlogin(): Received unexpected response from
SIP server:\n---SENT---\n$msg_sent\n---RECEIVED---\n$msg_received", $ERROR);
            $error_message = error_map($1, $2);
        }
    }
    else
    { return; }

    if ($error_message)
    {
        close_sip_connection() if ($have_opened_sip_connection);
        display_headers();
        deliver_html("IMIntro.html",
                       ('ERRORS'      =>
"$BEGIN_ERROR_FONT$error_message$END_ERROR_FONT",
                        'SCRIPTFILE' => $my_filename,
```

EDL01-01p                          93

```
                    'MEDIADIR'   => ($conf{'mediaDir'} || "."),
                    'USERNAME'   => $form{'username'},
                    'PASSWORD'   => $form{'password'})
                );
        exit;
    }
}

sub validate_user_onimsend {
    my $msg_sent     = ${shift()};
    my $msg_received = ${shift()};

    if (!defined $msg_received)
    {
        cgi_die("validate_user_onimsend(): Received undef response for login;
the eDial server must have failed to respond with $timeout seconds",
            "The eDial server failed to respond.  It might be experiencing
problems.  Close your IM Control Window and try again later");
    }
    elsif ($msg_received =~ /SIP\/\d\.\d (\d+)(?:\s+\(.\)\s+)?(.+?)\r?\n/)  #
Check this regexp again.
    {
        write_log("validate_user_onimsend(): Status code = $1; Explanation =
$2", $DEBUG);

        if ($1 == 200)  # OK
        {   return; }
        elsif ($1 == 401)  # Unauthorized; this shouldn't occur unless the user
changed his/her password while logged in.
        {
            cgi_msg("validate_user_onimsend(): Received unexpected unauthorized
response for login after cookie was set.  Perhaps user changed password?",
                join('', "You are not logged in properly.  Perhaps the eDial
server is experiencing problems or you changed your password ",
                "while you are logged in.  Close your IM Control
Window and log in again"));
        }
        else  # Other SIP error
        {
            write_log("validate_user_onimsend(): Received unexpected response
from SIP server:\n---SENT---\n$msg_sent\n---RECEIVED---\n$msg_received",
$ERROR);

            my $error_message = error_map($1, $2);
            cgi_die("validate_user_onimsend(): Sending error [$error_message]
back to user for unexpected SIP response",
                $error_message);
        }
    }
    else
    {   return; }
}

sub validate_response_onimexit {
    my $msg_sent     = ${shift()};
    my $msg_received = ${shift()};
```

EDL01-01p                            94

```
if (!defined $msg_received)
{
      write_log("validate_response_onimexit(): Received undef response for IM
exit; the eDial server must have failed to respond with $timeout seconds",
            $ERROR);
      return;
}
elsif ($msg_received =~ /SIP\/\d\.\d (\d+)(?:\s+\(.\)\s+)?(.+?)\r?\n/)  #
Check this regexp again.
{
      write_log("validate_response_onimexit(): Status code = $1; Explanation
= $2", $DEBUG);

      if ($1 == 200)  # OK
      {  return; }
      elsif ($1 == 401)  # Unauthorized; this shouldn't occur unless the user
changed his/her password while logged in.
            {
            cgi_msg("validate_response_onimexit(): Received unexpected
unauthorized response for IM exit after cookie was set.  Perhaps user changed
password?",
            join('', "You are not logged in properly.  Perhaps the eDial
server is have problems or you changed your password ",
                        "while you are logged in.  Close your IM Control
Window and log in again"));
      }
      elsif ($1 == 404)  # User not found; don't make a big deal out of this
here.
            {
            write_log("validate_response_onimexit(): One or more users to whom
the BYE was sent do not exist.", $ACTIVITY);
            return;
      }
      elsif ($1 == 480)  # User (or server) temporarily unavailable; don't
make a big deal out of this here.
            {
            write_log("validate_response_onimexit(): One or more users to whom
the BYE was sent was not logged in.", $ACTIVITY);
            return;
      }
      elsif ($1 == 481)  # Session does not exist; don't make a big deal out
of this here.
            {
            write_log("validate_response_onimexit(): A BYE was sent to end a
nonexistent session, according to the SIP server.", $ACTIVITY);
            return;
      }
      else  # Other SIP error; (perhaps a regular IM Exit page should be
sent back instead of an error page?)
            {
            write_log("validate_response_onimexit(): Received unexpected response
from SIP server:\n---SENT---\n$msg_sent\n---RECEIVED---\n$msg_received",
$ERROR);

            my $error_message = error_map($1, $2);
            cgi_die("validate_response_onimexit(): Sending error [$error_message]
back to user for unexpected SIP response",
```

EDL01-01p                                    95

```
                    "$error_message\nBecause there might be a problem with your IM
Control Window, you should now Log Off and try again.");
        }
    }
    else
    {   return; }
}

sub validate_response_onimsend {
    my $msg_sent     = ${shift()};
    my $msg_received = ${shift()};
    my $callid       = shift;  # Special for this subroutine

    # NOTE: $im_send_error is a global variable.

    if (!defined $msg_received)
    {
        my $error_msg = "The eDial server failed to respond.  It might be
experiencing problems.  Close your IM window and try again later";

        write_log("validate_response_onimsend(): Received undef response for IM
send; the eDial server must have failed to respond with $timeout seconds",
                $ERROR);
        $im_send_error = <<END_NORESPONSE_ERROR;
alert("$error_msg");
parent.opener.addIM("$callid", parent.opener.makeIM(null, "$error_msg", 1));
END_NORESPONSE_ERROR
        return;
    }
    elsif ($msg_received =~ /SIP\/\d\.\d (\d+)(?:\s+\(.\)\s+)?(.+?)\r?\n/)   #
Check this regexp again.
    {
        write_log("validate_response_onimsend(): Status code = $1; Explanation
= $2", $DEBUG);

        if ($1 == 200)  # OK
        {   return; }
        elsif ($1 == 401)  # Unauthorized; this shouldn't occur unless the user
changed his/her password while logged in.
        {
            my $error_msg = join '', "You are not logged in properly.  Perhaps
the eDial server is experiencing problems or you changed your password ",
                            "while you are logged in.  Close your IM
Control Window and log in again";

            write_log("validate_response_onimsend(): Received unexpected
unauthorized response for IM send after cookie was set.  Perhaps user changed
password?",
                    $ERROR);
            $im_send_error = <<END_UNAUTHORIZED_ERROR;
alert("$error_msg");
parent.opener.addIM("$callid", parent.opener.makeIM(null, "$error_msg", 1));
END_UNAUTHORIZED_ERROR
            return;
        }
        elsif ($1 == 404)  # User not found
        {
```

EDL01-01p                          96

```
        $im_send_error = join '', "parent.opener.addIM(\"$callid\",
parent.opener.makeIM(null, \"",
                            $conf{'userNotFoundMessage'} || "The eDial
ID to which you sent the above IM does not signify a valid eDial user.",
                            "\", 1))";
        return;
    }
    elsif ($1 == 480)  # User temporarily unavailable
    {
        if (lc(substr($2, 0, 4)) eq 'user')
        {
            $im_send_error = join '', "parent.opener.addIM(\"$callid\",
parent.opener.makeIM(null, \"",
                            $conf{'userUnavailableMessage'} || "The
eDial user to whom you sent the above IM is not currently logged in.",
                            "\", 1))";
        }
        else
        {
            my $error_msg = error_map($1, $2);

            write_log("validate_response_onimsend(): Received unexpected $1 $2
response.  Returning error to user...", $ERROR);
            $im_send_error = <<END_480_ERROR;
alert("$error_msg");
parent.opener.addIM("$callid", parent.opener.makeIM(null, "$error_msg", 1));
END_480_ERROR
        }
        return;
    }
    else
    {
        # Work on this later: be careful not to expose IMs.
        write_log("validate_response_onimsend(): Received unexpected response
from SIP server:\n---SENT---\n$msg_sent\n---RECEIVED---\n$msg_received",
$ERROR);

        my $error_message = error_map($1, $2);
        write_log("validate_response_onimsend(): Sending error
[$error_message] back to user for unexpected SIP response", $ERROR);
        $im_send_error = <<END_SIP_ERROR;
alert("$error_message");
parent.opener.addIM("$callid", parent.opener.makeIM(null, "$error_message",
1));
END_SIP_ERROR
        return;
    }
    }
    else
    {   return; }
}

sub error_map {
    my $statcode = shift;
    my $expl     = shift;
    my $verbose_error;
```

A-270

EDL01-01p                               97

```perl
    # Take care of easy, one-to-one status code --> error message mapping right
here;
    my %error_map =
        (401 => 'Your username/password combination is not valid; perhaps you are
not logged in properly.',
        402 => 'You are currently suspended from activity on the eDial server.',
        403 => 'You are not the controller of the call or you are authorized to
perform the action you attempted.',
        404 => 'You attempted to IM or make a call to a non-existent eDial
user.',
        413 => 'You are not permitted to make a conference call involving that
many people.',
        481 => 'That person is not currently in the call in which you are
involved.',
        503 => 'You have too many users logged into the eDial server.  Please
close one or more of your Control windows.');

    # Map status codes to more verbose errors; here, there is usally more than
one possible error for each status code.
    if ($statcode == 400)
    {
        if    ($expl =~ /Bad Request/i)   { $verbose_error = "The eDial server was
unable to understand your request."; }
        elsif ($expl =~ /Bad SIP/i)       { $verbose_error = "The eDial server was
unable to understand your request."; }
        elsif ($expl =~ /Bad SDP/i)       { $verbose_error = "The eDial server was
unable to understand your call-related request."; }
        else                              { $verbose_error = "The eDial server was
unable to understand your request."; }
    }
    elsif ($statcode == 406)
    {
        if ($expl =~ /Forbidden/i)
        {   $verbose_error = "You are not permitted to perform such an action
upon that call, for you are not that call's controller."; }
        elsif ($expl =~ /Not acceptable/i)
        {   $verbose_error = "You have too many users logged in to the eDial
server.  Pleae close at least one of your Control windows."; }
    }
    elsif ($statcode == 480)
    {
        if ($expl =~ /User/i && $expl =~ /Temporarily Unavailable/i)
        {   $verbose_error = "A user involved is not currently logged in."; }
        elsif ($expl =~ /TNS/i && $expl =~ /available/i)
        {   $verbose_error = "A component of the eDial server required to make
calls is temporarily unavailable.  Please try again later."; }
        elsif ($expl =~ /Transfer target/i && $expl =~ /available/i)
        {   $verbose_error = "The eDial user to whom you are trying to transfer
the call is not currently logged in."; }
        else
        {   $verbose_error = "A component of the eDial server is temporarily
unavailable and may be undergoing maintenance.  Try again soon."; }
    }
    elsif ($statcode == 503)
    {
        $verbose_error = "The eDial service is temporarily unavailable.  Please
try again later.";
```

                                    A-271

EDL01-01p                          98

```
            }
        elsif (exists $error_map{$statcode})
        {
          # Easy, one-to-one mapping
          $verbose_error = $error_map{$statcode};
        }
        else
        {
          $verbose_error = "An unknown error occurred.  $CONTACT_ADMIN_NOW.";
        }

        write_log("error_map(): Mapped error to: $verbose_error", $DEBUG);
        return $verbose_error;
}

sub get_headers {
        my $response_text   = ${shift()};

        my @wanted_headers = @_;
        my @header_values  = ();

        my $wanted_header;
        my $header_value;

        foreach $wanted_header (@wanted_headers)
        {
            unless (substr($wanted_header, -1, 1) eq '*')
            {   ($header_value) = ($response_text =~
/^$wanted_header:\s*(.+?)\r?\n/msi); }
            else
            {
                substr($wanted_header, -1, 1) = '';
                ($header_value) = ($response_text =~
/^$wanted_header:\s*(.+?)\r?\n(?!\s)/msi);
            }

            push @header_values, $header_value;
        }

        return (wantarray ? @header_values : join "\n", @header_values);
}

sub get_body {
        my $response_text   = ${shift()};

        my ($response_body) = ($response_text =~ /\r?\n\r?\n(.+)$/s);
        return $response_body;
}

sub get_users {
        # Support user aliases at a later time.

        my $user_line = shift;

        my @raw_users = split /\s*,\s*/, $user_line;
        my @usernames;
        my $this_username;
```

EDL01-01p

99

```perl
    my $raw_user;
    foreach $raw_user (@raw_users)
    {
        ($this_username) = ($raw_user =~ /^.*?sip:(.+?)([@,:;>].*?)?$/);
        push @usernames, $this_username;
    }

    return (wantarray ? @usernames : join ";", @usernames);
}

sub get_sip_msg {
    return if (!$have_opened_sip_connection);

    my ($read_char, $content_body);
    my $response_text  = "";
    my $newline_number = 0;
    my $content_length = 0;

    my $lost_conn_realerror = join '', "*WARNING*: Lost connection to SIP
server in the midst of a Net::SSLeay::read().\n",
                              "(Characters read thus far = *chars*;
action = $form{'action'}).\n",
                              "THIS IS THE LIKELY RESULT OF A SERVER
FAILURE.  LOOK INTO THIS IMMEDIATELY; OS_ERROR";
    my $lost_conn_showerror = "\nYour connection to the eDial server was
lost.\nThis likely occurred because the eDial server was shut down.  If you
have any IM windows open, they are probably useless now.  You should log out
and try coming back later";
    my $select_realerror = join '', "*WARNING*: An error occurred on the SIP
socket's file descriptor in the midst of\n",
                              "a select() statement. (action =
$form{'action'}).  Check the OS_ERROR for possible connection loss.\n",
                              "THIS IS THE LIKELY RESULT OF A SERVER
FAILURE.  LOOK INTO THIS IMMEDIATELY; OS_ERROR";

    # If user object is provided, block until data is avilable for reading or
that user's login will expire soon.
    my $userobj = shift || '';
    if ($userobj && ref($userobj) && ref($userobj) eq 'HASH')
    {
        my %user = %$userobj;

        my ($read_mask, $exception_mask, $chars_found, $time_left) = ('', '', 0,
0);
        vec($read_mask, fileno(SOCK), 1) = 1;
        $exception_mask = $read_mask;

        # Automatically time out after login is 90% expired if no explicit
timeout is provided.
        # In addition, keep HTTP connection alive by sending a byte over it once
every $keepalive_interval seconds.
        # NOTE: $prev_keepalive_time is a global veriable.
        my $have_data = 0;
        my $timeout_was_provided = 0;
        my $timeout_val = shift;
```

EDL01-01p                         100

```
    my $login_timeout_val     = 0;
    my $keepalive_timeout_val = 0;
    my $keepalive_interval    = $conf{'keepAliveInterval'} || 60;
    my $timeout_type;

    $timeout_was_provided = 1 if ($timeout_val);

    while (!$have_data)
    {
        if (!$timeout_was_provided)
        {
            $login_timeout_val     = 0.90 * ($user{'expires'} - (time -
$user{'logintime'}));
            $keepalive_timeout_val = $keepalive_interval - (time -
$prev_keepalive_time);

            if ($keepalive_timeout_val <= $login_timeout_val)
            {
                $timeout_val = $keepalive_timeout_val;

                if ($keepalive_timeout_val < $login_timeout_val)  {
$timeout_type = $TIMEOUT_KEEPALIVE; }
                else                                              {
$timeout_type = $TIMEOUT_BOTH;        }
            }
            else
            {
                $timeout_val  = $login_timeout_val;
                $timeout_type = $TIMEOUT_LOGIN;
            }
        }
        write_log("get_sip_msg(): select(2); Timeout=$timeout_val...",
$DEBUG);

        ($chars_found, $time_left) = select($read_mask, undef,
$exception_mask, $timeout_val);

        if ($chars_found < 0)
        {
          close_sip_connection($NO_LOGOUT_USERS);
          cgi_die("get_sip_msg(): $select_realerror", $lost_conn_showerror);
        }
        elsif ($chars_found == 0)
        {
          if ($timeout_was_provided)
          {
                write_log("get_sip_msg(): No error response received in time
alloted.  Assume IM send successful.", $DEBUG);
                return '';
          }
          else
          {
                if ($timeout_type == $TIMEOUT_LOGIN || $timeout_type ==
$TIMEOUT_BOTH)
                {
                    write_log("get_sip_msg(): Login for $user{'username'} will
expire soon.  The user will now be logged in again.", $ACTIVITY);
```

EDL01-01p                                101

```perl
                        SIP_login(\%user, \&validate_user_onimsend);
                        %user = %{$users{$user{'username'}}};
                    }
                    if ($timeout_type == $TIMEOUT_KEEPALIVE || $timeout_type ==
$TIMEOUT_BOTH)
                    {
                        write_log("get_sip_msg(): Sending data byte to browser to
prevent connection from becoming idle.", $DEBUG);
                        $| = 1;
                        print " ";
                        $| = 0;
                        $prev_keepalive_time = time;
                    }

                    # Reset bit masks here because they are cleared when select(2)
times out.
                        vec($read_mask, fileno(SOCK), 1) = 1;
                        $exception_mask = $read_mask;
                }
            }
            else
            {   $have_data = 1; }
        }
    }

    # Read until a two newlines, one right after the other, are encountered.
    while ($newline_number != 2)
    {
        $read_char = Net::SSLeay::read($ssl, 1);
        if (!defined($read_char) || length($read_char) == 0)
        {
            close_sip_connection($NO_LOGOUT_USERS);
            $lost_conn_realerror =~ s/\*chars\*/length($response_text)/e;
            cgi_die("get_sip_msg(): $lost_conn_realerror", $lost_conn_showerror);
        }

        $response_text = join '', $response_text, $read_char;
        if ($read_char eq "\n")
        {
            if ($newline_number == 1)
            {
                $newline_number = 2;
                last;
            }
            else
            {   $newline_number = 1; }
        }
        elsif ($read_char ne "\r")
        {   $newline_number = 0; }
    }

    # If a valid content length number was found, read that number of
characters more.
    ($content_length) = ($response_text =~ /^Content-Length:\s*(\d+)/msi);
    if ($content_length && $content_length =~ /^\d+$/)
    {
        $content_body = Net::SSLeay::read($ssl, $content_length);
```

EDL01-01p                                102

```
     if (!defined($content_body) || length($content_body) < $content_length)
     {
       close_sip_connection($NO_LOGOUT_USERS);
         $lost_conn_realerror =~ s/\*chars\*/length($response_text)/e;
       cgi_die("get_sip_msg(): $lost_conn_realerror", $lost_conn_showerror);
     }

     $response_text = join '', $response_text, $content_body;
   }

   # Return a reference to the text read from the SIP server; this is slightly
more efficient than returning the text itself.
   return \$response_text;
}

sub write_log {
   return if (!$conf{'loggingLevel'} || $conf{'loggingLevel'} <= 0);

   my $logtext = shift;
   my $min_required_logging_level = shift;
   my $log_option = shift || 0;

   if (($log_option != $LOGLEVEL_EXCL && $min_required_logging_level <=
$conf{'loggingLevel'}) ||
       ($log_option == $LOGLEVEL_EXCL && $min_required_logging_level ==
$conf{'loggingLevel'})
     {
       $logtext = join '', scalar(localtime()), " [$ENV{'REMOTE_ADDR'}]:  ",
$logtext, "\n";
       if ($have_opened_logfile)  { print LOG $logtext; }

       # In the rare instance that the logfile could not be opened, use the
system logger.
       else
       {
         chomp $logtext;
         $logtext =~ s/\n/ \\\n/g;
         $logtext =~ s/\'/\\\'/g;

         system("logger -p $min_required_logging_level -s $user_agent:
'$logtext'");
       }
     }
}

sub create_directory {
   my @dirs_to_create = (shift);
   my $sub_call = join '', "create_directory(", to_scalar(\@dirs_to_create),
")";

   while (@dirs_to_create)
   {
       my $dir = shift @dirs_to_create;
       my $parent_dir;
       ($parent_dir = $dir) =~ s/(\/.*?)$//;
       if ($parent_dir && !-e $parent_dir)
       {
```

EDL01-01p                                103

```
            unshift @dirs_to_create, $parent_dir, $dir;
            redo;
        }
        if (!mkdir($dir, 0777))
        {
            if ($dir ne $dirs_to_create[$#dirs_to_create])
            {
                cgi_die("$sub_call: Unable to create directory $dir (for the
sake of being able to create directory $dirs_to_create[$#dirs_to_create])",
                        "A disk operation failed on the eDial server");
            }
            else
            {
                cgi_die("$sub_call: Unable to create directory $dir",
                        "A disk operation failed on the eDial server");
            }
        }
    }
}

sub make_frame_string {
    $total_queue = shift;  # Global variable
    $frame_name  = shift;  # Global variable
    $frame_src   = shift;  # Global variable

    $current_pos = 1;  # Global variable

    my %new_frame      = ('number' => $current_pos);
    my @frame_structure = ();
    $frame_structure[0] = \%new_frame;
    ++$current_pos;

    my $num_uncatered       = $total_queue - 1;
    my $frame_structure_ref = \@frame_structure;

    write_log("make_frame_string(): Creating frame structure:
total_queue=$total_queue...", $DEBUG);
    make_frame_structure($frame_structure_ref, $num_uncatered);

    $indent = 4;  # Global variable

    write_log("make_frame_string(): Converting frame structure: frame_names are
$frame_name; frame_srcs are $frame_src...", $DEBUG);
    my $full_frame_string = frame_structure_convert($frame_structure_ref);

    return $full_frame_string;
}

# NOTE: Requires that global variables $total_queue and $current_pos are
initialized
sub make_frame_structure {
    my $frame_structure = shift;
    my $num_uncatered   = shift;

    my $start_framecreate = 0;
    my $end_framecreate = 0;
    my @new_frame_structure = ();
```

EDL01-01p

104

```perl
    my $new_frame_ref = \@new_frame_structure;

    if ($num_uncatered > 3)
    {
      my %new_frame = ('number' => $current_pos);
      $new_frame_structure[0] = \%new_frame;
      make_frame_structure($new_frame_ref, $num_uncatered - 3);

      $start_framecreate = 1;
      $end_framecreate    = ($total_queue - $current_pos + 1 > 3 ? 3 :
$total_queue - $current_pos + 1);
    }
    else
    {
      --$current_pos;

      $start_framecreate = 0;
      $end_framecreate    = ($total_queue - $current_pos + 1 > 3 ? 3 :
$total_queue - $current_pos + 1);
      --$end_framecreate if ($total_queue <= 3);  # Special case where first
level is last level and level isn't full
    }

    my $current_frame;
    for ($current_frame = $start_framecreate; $current_frame <=
$end_framecreate; ++$current_frame)
    {
      my %new_frame = ('number' => $current_pos);
      $new_frame_structure[$current_frame] = \%new_frame;
      ++$current_pos;
    }

    $frame_structure->[0] = $new_frame_ref;
}

# NOTE: Requires that global variables $indent, $frame_name, and $frame_src are
initialized
sub frame_structure_convert {
    my $frame_structure = shift;
    my $frame_string    = '';

    my $current_frame;
    for ($current_frame = 0; $current_frame < scalar(@$frame_structure);
++$current_frame)
    {
      next if (!ref($frame_structure->[$current_frame]));

      if (ref($frame_structure->[$current_frame]) eq 'ARRAY')
      {
        $frame_string = join '', $frame_string, ' ' x $indent, qq{<frameset
cols="50%, *" rows="50%, *" frameborder="0" framespacing="0" border="no">\n};
        $indent += 2;

        $frame_string = join '', $frame_string,
frame_structure_convert($frame_structure->[$current_frame]);
```

A-278

EDL01-01p                               105

```
            $indent -= 2;
            $frame_string = join '', $frame_string, ' ' x $indent,
qq{</frameset>\n};
        }
        else
        {
            $frame_string = join '', $frame_string, ' ' x $indent,
              qq{<frame name="$frame_name$frame_structure->[$current_frame]-
>{'number'}" src="$frame_src" scrolling="no" noresize="noresize">\n};
        }
    }

    return $frame_string;
}

sub full_cleanup {
    # End all session feature will be added soon...

    # Log out all users
    write_log("full_cleanup(): Caught SIGTERM; logging out all users...",
$DEBUG);

    my ($username, $userinfo);
    while (($username, $userinfo) = each %users)
    {   SIP_logout($userinfo) if ($userinfo->{'loggedin'}); }

    # Close SIP connection
    write_log("full_cleanup(): About to close SIP connection...", $DEBUG);
    close_sip_connection();
    close LOG;

    write_log("full_cleanup(): -- EXITING NOW --\n", $DEBUG);
    exit;
}

sub cgi_msg {
    my $real_message = shift;
    my $show_message = shift;

    cgi_die($real_message, $show_message, $IS_REGMSG);
}

sub cgi_die {
    my $real_error   = shift;
    my $show_error   = shift;
    my $message_type = shift || $IS_ERROR;

    alarm(0);

    my $OS_error = $^E || $! || $@ || '[Reason unknown]';
    write_log("$real_error: $OS_error", $ERROR);

    display_headers();

    my $display_text = <<END_INIT_TEXT;
<?xml version="1.0" encoding="UTF-8"?>
```

EDL01-01p                              106

```
<!DOCTYPE html PUBLIC "-//W3C//DTD XHTML 1.0 Transitional//EN"
"http://www.w3.org/TR/xhtml1/DTD/xhtml1-transitional.dtd">
<html xmlns="http://www.w3.org/1999/xhtml" xml:lang="en" lang="en">
<head>
END_INIT_TEXT

if ($message_type == $IS_ERROR)
{
    my $js_show_error =  $show_error;
        $js_show_error =~ s/\n/\\n/g;

    my $alert_msg = '';
        $alert_msg =
qq[<script>alert("$INTERNAL_ERROR:\\n$js_show_error.\\n\\n$CONTACT_ADMIN_NOW");
suppressConnError = true</script>]
        if ($action eq 'new_imrecv' || $action eq 'do_imsend' || $action eq
'do_imexit');

    $display_text = join '', $display_text, <<END_ERROR_TEXT;
  <title>An error has occurred</title>
</head>
<body>
$alert_msg
$BEGIN_ERHEAD_FONT
An error has occurred
$END_ERHEAD_FONT
<p />
$BEGIN_ERROR_FONT
$INTERNAL_ERROR:<br />
$show_error.
<br />$CONTACT_ADMIN_NOW
END_ERROR_TEXT
}
else
{
    my $js_show_error =  $show_error;
        $js_show_error =~ s/\n/\\n/g;

    my $alert_msg = '';
        $alert_msg = qq[<script>alert("$js_show_error."); suppressConnError =
true</script>]
        if ($action eq 'new_imrecv' || $action eq 'do_imsend' || $action eq
'do_imexit');

    $display_text = join '', $display_text, <<END_MSG_TEXT;
  <title>There was a problem with your request</title>
</head>
<body>
$alert_msg
$BEGIN_ERHEAD_FONT
There was a problem with your request
$END_ERHEAD_FONT
<p />
$BEGIN_ERROR_FONT
$show_error.<br />
END_MSG_TEXT
}
```

EDL01-01p                    107

```
$display_text = join '', $display_text, <<END_DISPLAY_TEXT;
$END_ERROR_FONT
<p>
<form>
<input type="button" onclick="javascript:parent.history.go(-1)" value="Go Back"
/>
         
<input type="button" onclick="javascript:parent.location.reload()" value="Try
Again" />
</form>
</p>
</body>
</html>
END_DISPLAY_TEXT

    print $display_text;
    write_log("cgi_die(): --SENDING TO BROWSER--\n$display_text", $DEBUG);
    write_log("cgi_die(): Exiting with status code 1...", $DEBUG);
    exit(1);
}

sub to_scalar {
    my $variable_ref = shift;
    my $var_type     = ref($variable_ref);

    if    ($var_type eq 'SCALAR') { return $$variable_ref; }
    elsif ($var_type eq 'ARRAY')   { return join ', ', @$variable_ref; }
    elsif ($var_type eq 'HASH')
    {
      my ($hashkey, $hashval, @return_string);
      while (($hashkey, $hashval) = each %$variable_ref)
        {   push @return_string, "$hashkey = $hashval"; }

      return join ', ', @return_string;
    }
}
```

---

```
ctrlOpen.html

<?xml version="1.0" encoding="UTF-8"?>
<!DOCTYPE html PUBLIC "-//W3C//DTD XHTML 1.0 Transitional//EN"
"http://www.w3.org/TR/xhtml1/DTD/xhtml1-transitional.dtd">
<html xmlns="http://www.w3.org/1999/xhtml" xml:lang="en" lang="en">
<head>
<title>Control Window Opener</title>
<script language="JavaScript">
function openWindow()
{
    var isIE = (navigator.appName == "Microsoft Internet Explorer");

    var winWidth = screen.availWidth - (isIE ? 8 : 10);
    var winHeight = screen.availHeight - (isIE ? 28 : 30);

    var imWin = window.open("","_blank","left=0,top=" + (winHeight - 150) +
",width=" +
```

EDL01-01p                    108

```
                        winWidth + ",height=150,resizable=yes,border=no");
        imWin.location = "<<SCRIPTFILE>>?action=new_imctrl&authnum=<<AUTHNUM>>";
}
</script>
</head>
<body onload="openWindow()">
</body>
</html>
```

---

```
ctrlWindowMain.html

<?xml version="1.0" encoding="UTF-8"?>
<!DOCTYPE html PUBLIC "-//W3C//DTD XHTML 1.0 Transitional//EN"
"http://www.w3.org/TR/xhtml1/DTD/xhtml1-transitional.dtd">
<html xmlns="http://www.w3.org/1999/xhtml" xml:lang="en" lang="en">
<head>
<title>IM Control Window</title>
<script>
var NEW_IM = 0;
var tryOpenInterval = null;
var haveOpenedIMWindow = false;

function openIMWindow() {
    haveOpenedIMWindow = true;
    doFunctionCall("parent.IMRecv.openIMWindow(NEW_IM)");
}

function viewPrefs() {
    doFunctionCall("parent.IMRecv.viewPrefs()");
}

function logout() {
    if (parent.IMRecv.loaded && haveOpenedIMWindow)
        {
        var numOpen = 0;
        if ((numOpen = parent.IMRecv.numOpenWindows()) != 0)
            {
            var numWindowsText = (numOpen > 1 ? " all " + numOpen + " IM
windows" : " the IM window");
            var closeWindowsOK = confirm("Are you sure you want to exit?\n\nIf
you do so," + numWindowsText + " that you currently have open will be
closed.\n\nChoose OK to exit or Cancel not to exit.");

            if (closeWindowsOK)
                doFunctionCall("parent.IMRecv.doUnload()");
            else
                return;
            }
        }

    if (parent.IMRecv.loaded)
        parent.IMRecv.cancelConfirm();
    parent.close();
}
```

EDL01-01p                                    109

```
function doFunctionCall(functionCall) {
    if (parent.IMRecv.loaded)
        eval(functionCall);
    else
        tryOpenInterval = window.setInterval("tryFunctionCall(" + functionCall
+ ")", 100);
}

function tryFunctionCall(functionCall) {
    if (parent.IMRecv.loaded)
    {
        if (tryOpenInterval != null)
            window.clearInterval(tryOpenInterval);
        eval(functionCall);
    }
}
</script>
</head>
<body marginwidth="0" marginheight="0" bgcolor="#FFC080">
<span style="position:absolute; left:0; top:0; width:105%; height:100%">
<script>
var isIE = (navigator.appName == "Microsoft Internet Explorer");
var tblWidth;
if (isIE)
    tblWidth = "98%";
else
    tblWidth = "100%";
document.writeln('<table border="0" cellpadding="2" cellspacing="0" width="' +
tblWidth + '" height="100%">');
</script>
    <tr bgcolor="#0000CC">
        <td width="100%" align="center" colspan="4">
        <span style="font-family:Tahoma; font-size:8pt; font-weight:bold;
color:#FFFFFF; letter-spacing:5px">
        This is the IM Control Window    
        </span>
        </td>
    </tr>
    <tr>
        <td align="center" colspan="3" width="100%">
        <table cellpadding="4" cellspacing="0" border="0" width="99%">
        <tr>
            <td bgcolor="maroon" style="line-height:10pt">
            <span style="font-family:Verdana; font-size:10pt; font-weight:bold;
color:#FFFFFF">The Purpose of this Window</span>
            </td>
        </tr>
        <tr>
            <td bgcolor="navy" valign="top">
            <span style="font-family:Verdana; font-size:9pt; color:#FFFFFF">
            <span style="line-height:15px">
            <li style="list-style-type:square">You may open new Instant Message
(IM) windows through this window in order to initiate IM converstations
            <li style="list-style-type:square">New IM windows will appear on your
screen when others include you in IM conversations while this window is open
            <br>
            </span>
```

EDL01-01p                                    110

```
        <script>
        if (isIE)
            document.writeln('<span style="font-size:3px; line-
height:3px"> </span><br>');
        else
            document.writeln('<span style="font-size:1px; line-
height:1px"> </span><br>');
        </script>
        <span style="font-weight:bold">
        If you close this window, you will be logged out of the eDial server
and all of your open IM windows will be closed.
        </span>
        </span>
        </td>
      </tr>
    </table>
    </td>
    <td width="1%">
     
    </td>
  </tr>
  <tr bgcolor="teal">
    <td width="33%" height="100%" valign="top" align="center">
    <a style="text-decoration:none" href="javascript:openIMWindow()">
    <img src="<<MEDIADIR>>/newim.gif" border="0" width="32" height="32">
    <br>
    <span style="font-family:MS Sans Serif; font-size:7pt; color:#FFFFFF">
    New IM
    </span>
    </a>
    </td>
    <td width="33%" height="100%" valign="top" align="center">
    <a style="text-decoration:none" href="javascript:viewPrefs()">
    <img src="<<MEDIADIR>>/prefs.gif" border="0" width="32" height="32">
    <br>
    <span style="font-family:MS Sans Serif; font-size:7pt; color:#FFFFFF">
    Preferences
    </span>
    </a>
    </td>
    <td width="33%" height="100%" valign="top" align="center">
    <a style="text-decoration:none" href="javascript:logout()">
    <img src="<<MEDIADIR>>/logout.gif" border="0" width="32" height="32">
    <br>
    <span style="font-family:MS Sans Serif; font-size:7pt; color:#FFFFFF">
    Log Out
    </span>
    </a>
    </td>
    <td width="1%">
     
    </td>
  </tr>
</table>
</span>
</body>
</html>
```

EDL01-01p                          111

---

imcopy.pl

```perl
#!/usr/bin/perl

use strict;
use Socket;

no strict 'refs';

# Set various error constants
my $CONTACT_ADMIN_NOW = "Please contact your server administrator
immediately.";
my $MUST_BE_INSTALLED = "is not installed or is misconfigured.  It must be
installed and configured for instant messaging to work correctly";
my $INTERNAL_ERROR    = "A serious internal error occurred on the eDial
server";
my $ON_CONNECT        = "when attempting to connect to the eDial server";
my $FAIL_ON_CONNECT   = "failure occurred $ON_CONNECT";
my $PM                = "Perl module";
my $BEGIN_ERROR_FONT  = qq[<span style="font-family:Verdana, Arial, Helvetica;
font-size:10pt; font-weight:bold; color:#FF0000">];
my $END_ERROR_FONT    = qq[</span>];
my $BEGIN_ERHEAD_FONT = qq[<span style="font-family:Verdana, Arial, Helvetica;
font-size:18px; font-weight:bold; color:#CC0000">];
my $END_ERHEAD_FONT   = qq[</span>];
my $MAX_LOG_BUFFER    = 1024;
my ($IS_ERROR, $IS_REGMSG) = (0 .. 1);

# Declare miscellaneous gloabals and constants
my ($myhostname, $sockport, $ctx, $ssl);
my ($bigint1, $bigint2, $callid);
my (%users, %sessions);
my ($total_queue, $current_pos, $indent, $frame_name, $frame_src);  # Special
for particular actions
my $im_send_error;
my $prev_keepalive_time = time;

my ($have_displayed_headers, $have_performed_sslinit,
$have_performed_base64init, $have_performed_callidgeninit,
$have_opened_sip_connection) =
    (0,                        0,                         0,
0,                           0);

my ($NO_QUICK_REGISTER, $DO_QUICK_REGISTER)          = (0 .. 1);
my ($DO_LOGOUT_USERS,   $NO_LOGOUT_USERS)            = (0 .. 1);
my ($TIMEOUT_KEEPALIVE, $TIMEOUT_LOGIN, $TIMEOUT_BOTH) = (0 .. 2);

# How the script identifies itself to local and remote systems
my $user_agent = "nph-im.pl";
my $my_filename = "nph-im.pl";  # MUST be set to filename of this script

# Prepare and open configuration file
my $conf_file  = "./im.conf";
my %conf = %{read_conf_file($conf_file)};
```

EDL01-01p                              112

```
# Set connection and login timeouts
my $timeout = $conf{'expireTimer'} || 10;

# Prepare and open logfile
my $LOGLEVEL_EXCL = 1;
my ($NO_LOGGING, $ERROR, $ACTIVITY, $DEBUG) = (0 .. 3);  # Logging mode
constants
my $have_opened_logfile = 0;
open_log();

# Obtain form data
my %form = %{parse_form_data()};

# Set SIGTERM to subroutine that ends all IM sessions and logs out all users.
$SIG{'TERM'} = \&full_cleanup;

# Perform the appropriate action
my $action = $form{'action'};
my @valid_actions = qw(login_user  display_login_success  open_imctrl
new_imctrl          display_imctrl_main  new_imrecv
                    new_imexit  do_imexit                    new_im
display_im_main  new_imsend         do_imsend);
if ($action && grep  { /$action/ } @valid_actions)
{   &$action(); }
else
{   display_login(); }


sub read_conf_file {
    my $conf_file = shift;
    my %conf;

    open CONF, $conf_file or cgi_die("read_conf_file(): Failed to open
configuration file $conf_file in read mode",
                            "An error occurred when attempting to read
the server configuration file");
    while (<CONF>)
    {
        # Allow different styles of comments within the logfile

        # Skip comment markers within single or double quotes
        my $qskip_begin = '(?:(?!.*?["\'"]))';
        my $qskip_end   = '(?!.*?["\'"])';
        my $comment_begin = join '', $qskip_begin, '\s*(;|\#|\/\*)\s*',
$qskip_end;
        my $inline_comment = join '', $qskip_begin,
'\s*(;.*?;|\#.*?\#|\/\*.*?\*\/)\s*', $qskip_end;

        s/$inline_comment//go;
        next if (/^\s*$comment_begin/o || /^\s*\[.*\]\s*$/ || !/=/);
        s/\s*$comment_begin.*$//o;

        # If option or option name is null, ignore; otherwise, split on first
equals sign and insert name & value into hash
        chomp;
        last if ($_ eq '');
        my ($optname, $optval) = split /\s*=\s*/, $_, 2;
```

EDL01-01p                          113

```perl
        last if ($optname eq '');
        $optval =~ s/^[\"\']?(.*?)[\"\']?$/$1/ms;  # Get rid of quotes
surrounding value
        # $optval = eval($optval);

        $conf{$optname} = $optval;
    }
    close CONF;

    return \%conf;
}

sub open_log {
    return if (!$conf{'loggingLevel'} || $conf{'loggingLevel'} <= 0 ||
$have_opened_logfile);

    $conf{'logFileDuration'}    ||= 1;              # Default to creating new
logfile each day
    $conf{'logFileNameFormat'} ||= "im.log.[time]"; # Default to creating
logfile with name format "im.log.[time]"
    $conf{'logDir'}             ||= ".";            # Default to creating
logfile in current directory

    create_directory($conf{'logDir'}) if (!-e $conf{'logDir'} || !-d
$conf{'logDir'});

    my $current_time = time;
    my $logfilename;
    my $found_logfile = 0;

    my $days_old_counter;
    for ($days_old_counter = $conf{'logFileDuration'}; $days_old_counter > 0; -
-$days_old_counter)
    {
        my @check_time = localtime($current_time - ($conf{'logFileDuration'} *
86400 - $days_old_counter * 86400));
        my $time_string = sprintf("%04D%02D%02D", $check_time[5] + 1900,
$check_time[4] + 1, $check_time[3]);

        $logfilename = "$conf{'logDir'}/$conf{'logFileNameFormat'}";
        $logfilename =~ s/\[time\]/$time_string/go;

        if (-e $logfilename && !-d $logfilename)
        {
            open LOG, ">>$logfilename" or cgi_die("open_log(): Unable to open log
file $logfilename in append mode",
                                        "The server logfile could not
be opened correctly");
            $have_opened_logfile = 1;
              write_log("open_log(): Logfile $logfilename exists; logfile opened
in append mode.", $DEBUG);

            $found_logfile = 1;
            last;
        }
    }
```

EDL01-01p                                114

```perl
    if (!$found_logfile)
    {
        open LOG, ">$logfilename" or cgi_die("open_log(): Unable to create and
write to log file $logfilename",
                              "The server logfile could not be opened
correctly");
        $have_opened_logfile = 1;
        write_log("open_log(): Logfile $logfilename does not exist; logfile
opened in write mode.", $DEBUG);
    }

    handle_autoflush(*LOG);

    # NOTE: Check to see if Win32 allows the same file open by multiple
processes.
}

sub parse_form_data {
    my ($request_method, $query, @key_value_pairs, $pair, $key, $prev, $value);
    my %form;

    $request_method = uc($ENV{'REQUEST_METHOD'});
    if    ($request_method eq 'GET')  { $query =
$ENV{'QUERY_STRING'}    }
    elsif ($request_method eq 'POST')  { read(STDIN, $query,
$ENV{'CONTENT_LENGTH'}) }
    else
    {
        cgi_die("parse_form_data(): Unsupported request method
$ENV{'REQUEST_METHOD'}",
                "This program was called in an invalid manner");
    }

    # WARNING: $query may contain a password.  Be careful when choosing to log
in DEBUG mode.
    write_log("parse_form_data(): REQUEST_METHOD=$request_method;
QUERY_STRING=$query", $DEBUG);
    @key_value_pairs = split /&/, $query;

    foreach $pair (@key_value_pairs)
    {
        ($key, $value)  =  split /=/, $pair;

        $value          =~  tr/+/ /;
        $value          =~  s/%([\dA-Fa-f][\dA-Fa-f])/pack "C", hex($1)/eg;
        $value          =~  s/\r//g;

        if (exists $form{$key})      { $form{$key} = join "\0", $form{$key},
$value; }
        elsif ($key eq 'newcheck')
        {
            if ($form{$prev} != 1)
            {
                $form{$value} = 0;
                delete $form{$key};
            }
        }
```

A-288

EDL01-01p                                   115

```
        else                       { $form{$key} = $value;
}

        $prev = $key;
    }

    my $action = $form{'action'};
    write_log("parse_form_data(): Script called with action $action",
$ACTIVITY);

    if ($request_method eq 'GET' && ($action eq 'login_user' || $action eq
'do_imexit' || $action eq 'do_imsend'))
        {
        cgi_msg("parse_form_data(): WARNING: method=$request_method;
action=$action; browser=$ENV{'HTTP_USER_AGENT'}.  Person might not be using web
browser",
                "This program was called in an invalid manner");
        }

    return \%form;
}

sub display_login {
    my $media_dir = $conf{'mediaDir'} || ".";
    write_log("display_login(): Script was called with no action attribute.
Defaulting to displaying login page...");

    display_headers();
    deliver_html("IMIntro.html",
            ('ERRORS' => '', 'SCRIPTFILE' => $my_filename, 'MEDIADIR' =>
$media_dir, 'USERNAME' => '', 'PASSWORD' => '')
            );
    exit;
}

sub login_user {
    my $total_procs = 0;
    my $im_procs    = 0;

    my $error_message = '';

    # Basic form validation
    if ($form{'username'} =~ /^\s*$/)
    {   $error_message = $conf{'noUsernameError'}   || "Please enter your eDial
username below.<BR>\n"; }
    elsif ($form{'password'} =~ /^\s*$/)
    {   $error_message = $conf{'noPasswordError'}   || "Please enter your eDial
password below.<BR>\n"; }

    elsif (length($form{'username'}) > 50)    # Something's not right
    {   $error_message = $conf{'invalidLoginError'} || "No user with that
username and password exists."; }
    elsif (length($form{'password'}) > 50)    # Ditto
    {   $error_message = $conf{'invalidLoginError'} || "No user with that
username and password exists."; }
```

EDL01-01p                    116

```
     write_log("login_user(): Error occurred in basic validation;
username=$form{'username'}; error=$error_message", $DEBUG)
     if ($error_message);

   # Limit the number of instances a user may be logged in.
   my $username_instances   = 0;
   my $auth_instances       = 0;
   my $greatest_instance_num = 0;

   if (!$error_message)
   {
     if ($ENV{'HTTP_COOKIE'})
     {
         # write_log("login_user(): HTTP_COOKIE = $ENV{'HTTP_COOKIE'}",
$DEBUG);
         while ($ENV{'HTTP_COOKIE'} =~ /ed_auth(\d+)-
(user|auth)\s*=([^;\s]+)/g)
         {
           if ($2 eq 'user')
           {   ++$username_instances; }
           else
           {
             $greatest_instance_num = ($1 > $greatest_instance_num ? $1 :
$greatest_instance_num);

             if (++$auth_instances >= ($conf{'maxAllowedUserInstances'} ||
2))
             {
                $error_message = $conf{'maxAllowedUserInstancesError'} ||
                    "You have the maximum number of permitted IM Control
Panel windows opened.  Please close one of them first.";
             }
           }
         }
     }
     ++$greatest_instance_num;
     write_log("login_user(): Total user instances = $auth_instances; New
instance = $greatest_instance_num", $DEBUG);

     if ($username_instances != $auth_instances)
     {
         write_log("login_user(): WARNING: Inconsistency! No. auth cookies =
$auth_instances; No. username cookies = $username_instances.", $ERROR);
         $error_message = join '', "You have a cookie inconsistency.  Close
your browser window and retry.  ",
                                "If this problem persists, contact your
server administrator.";
     }
   }

   # Take care of all errors thus far (except for server business errors)
here.
   if ($error_message)
   {
     display_headers();
     deliver_html("IMIntro.html",
```

A-290

EDL01-01p                    117

```
                         ('ERRORS'         =>
"$BEGIN_ERROR_FONT$error_message$END_ERROR_FONT",
                'SCRIPTFILE' => $my_filename,
                'MEDIADIR'   => ($conf{'mediaDir'} || "."),
                'USERNAME'   => $form{'username'},
                'PASSWORD'   => $form{'password'})
            );
    exit;
  }

  # Log in user and validate password
  my $username = $form{'username'};   # Just to avoid several hash lookups
    $username =~ s/\@/%40/;

  open_sip_connection($conf{'sipHost'} || 'localhost', $conf{'sipPort'} ||
443);
  add_user(\%users, $username, $form{'password'});
  SIP_login($users{$username}, \&validate_user_onlogin);

  # If all is well, continue here; otherwise, validate_user_onlogin() will
have taken care of errors, closed connection, and exited.
  if ($users{$username}{'loggedin'})
  {
    SIP_logout($users{$username});
    close_sip_connection();

    write_log("login_user(): User $username was logged in and out
successfully.", $ACTIVITY);

    # If possible, do not permit user to log in if there is too much activity
on the server.
    if (($conf{'maxAllowedTotalProcs'} || 250) >= 0 &&
($conf{'maxAllowedIMProcs'} || 50) >= 0 && opendir PROCLIST, "/proc")
    {
        if (my @procdirs = readdir PROCLIST)
        {
          my $procdirname;
          foreach $procdirname (@procdirs)
          {
            next if (!-d "/proc/$procdirname" || $procdirname eq '.' ||
$procdirname eq '..');
            if ($procdirname =~ /^\s*\d+\s*$/)
            {
              if (++$total_procs > ($conf{'maxAllowedTotalProcs'} || 250))
              {
                $error_message = $conf{'maxAllowedTotalProcsError'} ||
                  "The eDial server is too busy to allow users to log in
at this time.  Please try again later.";
                last;
              }

              if (open PROC, "/proc/$procdirname/cmdline")
              {
                my $cmdline = <PROC>;
                if ($cmdline)
                {
                  $cmdline =~ s/\0/ /g;
```

A-291

EDL01-01p                                    118

```
                    if ($cmdline =~ /^\s*perl.+$my_filename/o)
                    {
                        if (++$im_procs > ($conf{'maxAllowedIMProcs'} ||
50))
                        {
                            $error_message = $conf{'maxAllowedIMProcsError'}
||
                                "The eDial server is too busy to allow users
to log in at this time.  Please try again later.";
                            last;
                        }
                    }
                }
                close PROC;
            }
        }
    }
}
        write_log("login_user(): Total processes = $total_procs (at least).
IM Processes = $im_procs (at least)", $DEBUG);
    }
    else
    {
        write_log("login_user(): Process checking is disabled or proc
filesystem is not supported or is inaccessible to this script.", $DEBUG);
    }

    # Take care of server busy errors here
    if ($error_message)
    {
        display_headers();
        deliver_html("IMIntro.html",
                ('ERRORS'       =>
"$BEGIN_ERROR_FONT$error_message$END_ERROR_FONT",
                 'SCRIPTFILE' => $my_filename,
                 'MEDIADIR'    => ($conf{'mediaDir'} || "."),
                 'USERNAME'    => $form{'username'},
                 'PASSWORD'    => $form{'password'})
                );
        exit;
    }

    # If execution still continues here, the user is all set to have his/her
login cookies set.

    # Prepare to set cookies; display HTTP headers.
    my $hostname = $ENV{'SERVER_NAME'} || $ENV{'HTTP_HOST'} ||
$ENV{'SERVER_ADDR'};
    if (!$hostname)
    {
        require Sys::Hostname;
        $hostname = eval { Sys::Hostname::hostname() } || '';
    }

    my $auth = $users{$username}{'auth'};
```

EDL01-01p                                    119

```perl
     # Encode username/authorization element in cookie
     $username =~ s/\%40/\@/g;
     $username =~ s/([^a-zA-Z0-9\s])/sprintf("%%%X", ord($1))/eg;
     $auth     =~ s/([^a-zA-Z0-9\s])/sprintf("%%%X", ord($1))/eg;

     my $username_cookie = "ed_auth$greatest_instance_num-user=$username;
path=/; domain=$hostname";
     my $auth_cookie     = "ed_auth$greatest_instance_num-auth=$auth; path=/;
domain=$hostname";
     my $step_cookie     = "ed_auth$greatest_instance_num-step=A; path=/";
     display_headers($username_cookie, $auth_cookie, $step_cookie);

     deliver_html("IMLoggedIn.html",
                     ('SCRIPTFILE' => $my_filename,
                      'AUTHNUM'    => $greatest_instance_num)
                  );
   }
   else
   {
     write_log("login_user(): Login failed but the error was not handled.",
$DEBUG);
   }

   exit;
}

sub display_login_success {
   my $instance_num = $form{'authnum'};
   write_log("display_login_success(): User instance number = $instance_num",
$DEBUG);

   if (my($step_cookie) = check_for_cookies($instance_num, 'B'))
   {
     write_log("display_login_success(): Displaying login success page...",
$DEBUG);

     display_headers("ed_auth$instance_num-step=$step_cookie; path=/");
     deliver_html("IMIntroLoggedIn.html",
                     ('MEDIADIR' => ($conf{'mediaDir'} || "."))
                  );
   }

   exit;
}

sub open_imctrl {
   my $instance_num = $form{'authnum'};
   write_log("open_imctrl(): User instance number = $instance_num", $DEBUG);

   if (my($step_cookie) = check_for_cookies($instance_num, 'C'))
   {
     write_log("open_imctrl(): Opening IM Control Window...", $DEBUG);

     display_headers("ed_auth$instance_num-step=$step_cookie; path=/");
     deliver_html("ctrlOpen.html",
                     ('SCRIPTFILE' => $my_filename,
                      'AUTHNUM'    => $instance_num)
```

EDL01-01p                          120

```
                    );
      }

      exit;
}

sub new_imctrl {
      my $instance_num = $form{'authnum'};
      write_log("new_imctrl(): User instance number = $instance_num", $DEBUG);

      if (my($step_cookie) = check_for_cookies($instance_num, 'D'))
      {
         write_log("new_imctrl(): Creating IM Control Window...", $DEBUG);

         my $full_frame_string = make_frame_string($conf{'IMExitQueue'} || 3,
'IMExit', "$my_filename?action=new_imexit&authnum=$instance_num");

         display_headers("ed_auth$instance_num-step=$step_cookie; path=/");
         deliver_html("ctrlWindow.html",
                        ('SCRIPTFILE' => $my_filename,
                 'AUTHNUM'    => $instance_num,
                 'EXITFRAMES' => $full_frame_string)
                    );
      }

      exit;
}

sub display_imctrl_main {
      my $instance_num = $form{'authnum'};
      write_log("display_imctrl_main(): User instance number = $instance_num",
$DEBUG);

      if (my($step_cookie) = check_for_cookies($instance_num, 'E'))
      {
         write_log("display_imctrl_main(): Displaying visible frame of IM Control
Window...", $DEBUG);

         display_headers("ed_auth$instance_num-step=$step_cookie; path=/");
         deliver_html("ctrlWindowMain.html",
                        ('MEDIADIR' => ($conf{'mediaDir'} || ".")))
                    );
      }

      exit;
}

sub new_imrecv {
      my $instance_num = $form{'authnum'};
      write_log("new_imrecv(): User instance number = $instance_num", $DEBUG);

      if (my($step_cookie) = check_for_cookies($instance_num, 'F'))
      {
         write_log("new_imrecv(): Initializing IM reception frame...", $DEBUG);

         my ($username, $auth);
```

EDL01-01p                       121

```perl
        ($username) = ($ENV{'HTTP_COOKIE'} =~ /ed_auth$instance_num-
user=([^;\s]+)/o);
        ($auth)    = ($ENV{'HTTP_COOKIE'} =~ /ed_auth$instance_num-
auth=([^;\s]+)/o);

        # De-hex username and authorization cookies
        $username =~ s/%([\dA-Fa-f][\dA-Fa-f])/pack "C", hex($1)/eg;
        $auth     =~ s/%([\dA-Fa-f][\dA-Fa-f])/pack "C", hex($1)/eg;

        display_headers("ed_auth$instance_num-step=$step_cookie; path=/");
        deliver_html("IMRecv.html",
                ('MEDIADIR'       => ($conf{'mediaDir'}      || "."),
                'MAXOPENWINDOWS' => ($conf{'maxOpenWindows'} || 10),
                'IMSENDQUEUE'    => ($conf{'IMSendQueue'}    || 5),
                'IMEXITQUEUE'    => ($conf{'IMExitQueue'}    || 3),
                'MAXIMLENGTH'    => ($conf{'maxIMLength'}    || 500),
                'IMRECVCOLOR'    => ($conf{'IMRecvColor'}    || "#0000CC"),
                'IMSENDCOLOR'    => ($conf{'IMSendColor'}    || "#FF3333"),
                'MSGCOLOR'       => ($conf{'msgColor'}       || "#009900"),
                'AUTHNUM'        => $instance_num,
                'USERNAME'       => $username,
                'SCRIPTFILE'     => $my_filename
                )
                );
        # Flush output buffer
        $| = 1;
        $| = 0;

        $username =~ s/\@/\%40/g;

        open_sip_connection($conf{'sipHost'} || 'localhost', $conf{'sipPort'} ||
443);
        add_user(\%users, $username, "$auth\n");  # Add "\n" to indicate that
authorization element is already encoded.
        SIP_login($users{$username}, \&validate_user_onimsend);

        if ($users{$username}{'loggedin'})
        {
            handle_incoming_sip_messages($users{$username});
        }
        else
        {
            cgi_die("new_imrecv(): The user is not logged in for some strange
reason; see previous error messages.",
                "An internal error occurred when the eDial server attempted to
log you in");
        }

        # Execution should never continue beyond this point.
        write_log("new_imrecv(): Execution left handle_incoming_sip_messages()
for some strange reason.  Exiting...", $DEBUG);
    }

    exit;
}

sub new_imexit {
```

A-295

EDL01-01p                                    122

```perl
    my $instance_num = $form{'authnum'};
    write_log("new_imexit(): User instance number = $instance_num", $DEBUG);

    if (check_for_cookies($instance_num))
    {
        write_log("new_imexit(): Creating IM Exit Frame...", $DEBUG);

        display_headers();
        deliver_html("IMExit.html",
                        ('SCRIPTFILE' => $my_filename,
                     'AUTHNUM'     => $instance_num)
                    );
    }

    exit;
}

sub do_imexit {
    my $instance_num = $form{'authnum'};
    write_log("do_imexit(): User instance number = $instance_num", $DEBUG);

    if (check_for_cookies($instance_num))
    {
        my $callid       = $form{'callid'};
        my $remote_users = $form{'recip'};
        my $is_error     = 0;

        if (!$callid)
        {
            write_log("do_imexit(): That's odd; there was no valid Call-ID in the
IM Exit form submitted.  Forgoing IM exit...", $ERROR);
            $is_error = 1;
        }
        if (!$remote_users)
        {
            write_log("do_imexit(): That's odd; there was no valid remote user
list in the IM Exit form submitted.  Forgoing IM exit...", $ERROR);
            $is_error = 1;
        }

        unless ($is_error)
        {
            write_log("do_imexit(): Preparing to exit IM session...", $DEBUG);

            $remote_users =~ s/\@/\%40/g;

            my ($username, $auth);
            ($username) = ($ENV{'HTTP_COOKIE'} =~ /ed_auth$instance_num-
user=([^;\s]+)/o);
            ($auth)     = ($ENV{'HTTP_COOKIE'} =~ /ed_auth$instance_num-
auth=([^;\s]+)/o);

            open_sip_connection($conf{'sipHost'} || 'localhost', $conf{'sipPort'}
|| 443);
            add_user(\%users, $username, "$auth\n");  # Add "\n" to indicate that
authorization element is already encoded.
            add_session(\%sessions, $callid, $users{$username}, $remote_users);
```

EDL01-01p                              123

```
            SIP_end_callid($sessions{$callid}, \&validate_response_onimexit,
$DO_QUICK_REGISTER);

            write_log("do_imexit(): IM exit completed.  Logging out and closing
connection...", $DEBUG);

            SIP_logout($users{$username}) if ($users{$username}{'loggedin'});
            close_sip_connection();
        }

        display_headers();
        deliver_html("IMExit.html",
                        ('SCRIPTFILE' => $my_filename,
                         'AUTHNUM'    => $instance_num)
                    );

    }
    exit;
}

sub new_im {
    my $instance_num = $form{'authnum'};
    write_log("new_im(): User instance number = $instance_num", $DEBUG);

    if (check_for_cookies($instance_num))
    {
        write_log("new_im(): Creating IM window...", $DEBUG);

    my $callid      = $form{'callID'} or
            cgi_msg("new_im(): No valid Call-ID was provided in the new_im
request.  There may be an error in the IM script",
                    "Your IM Control Window failed to provide a Call-ID for this
window.  Close this window and try again");
        my $remote_users = $form{'recip'} || '';
        write_log("new_im(): Call-ID=$callid; RecipInit=$remote_users", $DEBUG);

        my $full_frame_string = make_frame_string($conf{'IMSendQueue'} || 5,
'IMSend',

"$my_filename?action=new_imsend&authnum=$instance_num&callID=$callid");

            display_headers();
            deliver_html("IMWindow.html",
                            ('SCRIPTFILE' => $my_filename,
                     'AUTHNUM'    => $instance_num,
                     'CALLID'     => $callid,
                     'RECIPINIT'  => $remote_users || '',
                     'SENDFRAMES' => $full_frame_string)
                        );

    }

    exit;
}

sub display_im_main {
    my $instance_num = $form{'authnum'};
    write_log("display_im_main(): User instance number = $instance_num",
$DEBUG);
```

EDL01-01p                                124

```perl
    if (check_for_cookies($instance_num))
    {
        write_log("display_im_main(): Displaying visible frame of IM window...",
$DEBUG);

        my $callid        = $form{'callID'} or
            cgi_msg("display_im_main(): No valid Call-ID was provided in the
display_im_main request.  There may be an error in the IM script",
                "Your IM Control Window failed to provide a Call-ID for this
window.  Close this window and try again");
        my $remote_users = $form{'recipInit'}  || '';  # Same as $form{'recip'}
in new_im()
        write_log("display_im_main(): Call-ID=$callid; RecipInit=$remote_users",
$DEBUG);

        display_headers();
        deliver_html("IMData.html",
                        ('MEDIADIR'      => ($conf{'mediaDir'} || "."),
                        'AUTHNUM'       => $instance_num,
                        'CALLID'        => $callid,
                        'MAXIMLENGTH'   => ($conf{'maxIMLength'} || 500),
                        'SUBMITONENTER' => ($conf{'submitOnEnter'} || 0),
                        'RECIPINIT'     => $remote_users)
                    );
    }

    exit;
}

sub new_imsend {
    my $instance_num = $form{'authnum'};
    write_log("new_imsend(): User instance number = $instance_num", $DEBUG);

    if (check_for_cookies($instance_num))
    {
        write_log("new_imsend(): Creating IM Send Frame...", $DEBUG);

        my $callid = $form{'callID'} or
            cgi_msg("new_imsend(): No valid Call-ID was provided in the
new_imsend request.  There may be an error in the IM script",
                "Your IM window failed to provide a Call-ID for your IM.  Close
this window and try again");
        write_log("new_imsend(): Call-ID=$callid", $DEBUG);

        display_headers();
        deliver_html("IMSend.html",
                        ('SCRIPTFILE'   => $my_filename,
                        'AUTHNUM'       => $instance_num,
                        'CALLID'        => $callid,
                        'IMSENDERROR' => '')
                    );
    }

    exit;
}
```

EDL01-01p                                    125

```perl
sub do_imsend {
    my $instance_num = $form{'authnum'};
    write_log("do_imsend(): User instance number = $instance_num", $DEBUG);

    # NOTE: $im_send_error is a global variable
    if (check_for_cookies($instance_num))
    {
      my $callid  = $form{'callID'};
      if (!$callid)
      {
            write_log("do_imsend(): No valid Call-ID was provided in the IM form.
There may be an error in the IM script", $ERROR);
            $im_send_error = 'alert("Your IM could not be sent because no valid
Call-ID was provided by your IM window.");';
      }
      my $remote_users = $form{'recip'};
      if (!$remote_users)
      {
            my $error_msg = "Your IM could not be sent because no recipients were
specified in your IM window.";

            write_log("do_imsend(): No remote usernames were provided in the IM
form.  There may be an error in the IM script", $ERROR);
            $im_send_error = <<END_NOUSERS_ERROR;
alert("$error_msg");
parent.opener.addIM("$callid", new IM(null, "$error_msg", 1));
END_NOUSERS_ERROR
      }
      my $instant_msg = $form{'message'} || '';

      if (length($instant_msg) > ($conf{'maxIMLength'} || 500))
      {   $instant_msg = substr($instant_msg, 0, ($conf{'maxIMLength'} ||
500)); }

      unless ($im_send_error)
      {
            write_log("do_imsend(): Preparing to send IM...", $DEBUG);

            $remote_users =~ s/\@/\%40/g;

            my ($username, $auth);
            ($username) = ($ENV{'HTTP_COOKIE'} =~ /ed_auth$instance_num-
user=([^;\s]+)/o);
            ($auth)     = ($ENV{'HTTP_COOKIE'} =~ /ed_auth$instance_num-
auth=([^;\s]+)/o);

            $username =~ s/%([\dA-Fa-f][\dA-Fa-f])/pack "C", hex($1)/eg;
            $username =~ s/\@/\%40/;
            $auth     =~ s/%([\dA-Fa-f][\dA-Fa-f])/pack "C", hex($1)/eg;

            open_sip_connection($conf{'sipHost'} || 'localhost', $conf{'sipPort'}
|| 443);
            add_user(\%users, $username, "$auth\n");  # Add "\n" to indicate that
authorization element is already encoded.
            add_session(\%sessions, $callid, $users{$username}, $remote_users);
            SIP_send_im($sessions{$callid}, $instant_msg,
\&validate_response_onimsend, $DO_QUICK_REGISTER);
```

EDL01-01p                                   126

```
        write_log("do_imsend(): The IM was sent.  Closing SIP connection...",
$DEBUG);
        close_sip_connection();
    }
    write_log("do_imsend(): IM Send Error:\n$im_send_error", $DEBUG) if
($im_send_error);

    display_headers();
    deliver_html("IMSend.html",
                    ('SCRIPTFILE'  => $my_filename,
                    'AUTHNUM'      => $instance_num,
                    'CALLID'       => $callid,
                    'IMSENDERROR' => ($im_send_error || ''))
                );
    }
    exit;
}


# IMPORTANT: This subroutine assumes that display_headers() has been called
already
sub deliver_html {
    my $HTML_filename = shift;
    my %substitutions = @_;
    my $buffer_length = 0;
    my $html_logtext  = '';

    my $HTML_path = $conf{'HTMLDir'} || ".";
    open HTML, "$HTML_path/$HTML_filename" or
        cgi_die("deliver_html($HTML_filename): Failed to open HTML file
$HTML_path/$HTML_filename to deliver it to browser",
            "Data required to continue is missing on the server");

    write_log("deliver_html($HTML_filename): --SENDING TO BROWSER--", $DEBUG);
    while (<HTML>)
    {
        my    ($subst_tag, $subst_val);
        while (($subst_tag, $subst_val) = each %substitutions)
        {   s/<<$subst_tag>>/$subst_val/ig; }
        print;

        if (($conf{'loggingLevel'} || 0) >= $DEBUG)
        {
            $buffer_length += length;
            $html_logtext  = join '', $html_logtext, $_;

            if ($buffer_length >= $MAX_LOG_BUFFER)
            {
                chomp $html_logtext;
                write_log($html_logtext, $DEBUG);

                $html_logtext  = '';
                $buffer_length = 0;
            }
        }
    }
```

EDL01-01p                                127

```
        close HTML;

        if (($conf{'loggingLevel'} || 0) >= $DEBUG)
        {
          chomp $html_logtext;
          write_log($html_logtext, $DEBUG);
        }
}

sub check_for_cookies {
        my $instance_num = shift;
        my $step_letter  = shift || '';

        write_log("check_for_cookies($instance_num): Validating cookies...",
$DEBUG);

        my ($username_cookie, $auth_cookie, $step_cookie);
        if ($instance_num > 0 && $instance_num == int($instance_num) &&
$ENV{'HTTP_COOKIE'})
        {
          ($username_cookie) = ($ENV{'HTTP_COOKIE'} =~ /ed_auth$instance_num-
user=([^;\s]+)/);
          ($auth_cookie)     = ($ENV{'HTTP_COOKIE'} =~ /ed_auth$instance_num-
auth=([^;\s]+)/);
          ($step_cookie)     = ($ENV{'HTTP_COOKIE'} =~ /ed_auth$instance_num-
step=([^;\s]+)/);
        }

        if ($step_letter)
        {
          if (index($step_cookie, $step_letter) >= 0)
          {
            cgi_msg("check_for_cookies($instance_num, $step_letter): A particular
page was attempted to be loaded more than once for $username_cookie",
                    "You must have reloaded a page when you were not supposed to.
Please go back and log in");
          }
          $step_cookie = join '', $step_cookie, $step_letter;
        }

        if ($username_cookie && $auth_cookie)
        {   return $step_cookie || 1; }
        else
        {
          cgi_msg("check_for_cookies($instance_num): Username or auth cookie is not
set!  InstanceNo=$instance_num; user=$username_cookie; auth=$auth_cookie",
                  "You are not logged in properly.  Please go back and log in");
          return 0;
        }
}

sub handle_autoflush {
        my $handle_to_flush = shift;

        my $current_default_handle = select($handle_to_flush);
        $| = 1;
```

EDL01-01p                                    128

```perl
        select($current_default_handle);
}

sub ssl_init {
        return if ($have_performed_sslinit);

        # require Socket;
        # Socket->import('PF_INET', 'SOCK_STREAM', 'sockaddr_in');

        eval  { require Net::SSLeay; };

        if ($@)
        {
                cgi_die("ssl_init(): The Net::SSLeay (SSL) $PM is not installed or
failed to load correctly",
                        "A needed $PM $MUST_BE_INSTALLED");
        }

        Net::SSLeay::load_error_strings();
        Net::SSLeay::SSLeay_add_ssl_algorithms();
        Net::SSLeay::randomize();

        $have_performed_sslinit = 1;
}

sub base64_init {
        return if ($have_performed_base64init);

        eval
        {
          require MIME::Base64;
                MIME::Base64->import('encode_base64');
        };

        if ($@)
        {
                cgi_die("base64_init(): MIME::Base64 $PM is not installed or failed to
load correctly",
                        "A needed $PM $MUST_BE_INSTALLED");
        }

        $have_performed_base64init = 1;
}

sub callidgen_init {
        return if ($have_performed_callidgeninit);

        require Math::BigInt;

        my $sa = "eth0";
        my @x  = unpack "H8" x 6, $sa;
        my $a  = hex($x[4]) & 0xffff;
        my $b  = Math::BigInt->new(hex($x[5]));
        my $a1 = Math::BigInt->new(0x10000000) * 0x10;
        my $a2 = $a1->bmul($a);

        $bigint1 = $a1 * 0x10000;
```

A-302

EDL01-01p                    129

```
        $bigint2 = $b->badd($a2);

        $have_performed_callidgeninit = 1;
}

sub make_callid {
        callidgen_init() if (!$have_performed_callidgeninit);

        my $callid = int(rand 2**16);
        $callid = $bigint2 + ($callid * $bigint1);
        $callid =~ s/\+//;

        return $callid;
}

sub make_base64 {
        base64_init() if (!$have_performed_base64init);
        my $encoded = encode_base64(join ':', @_);
        chomp($encoded);

        return $encoded;
}

sub add_user {
        my $users_hash = shift;
        my %user;

        $user{'username'} = shift;
        $user{'username'} =~ s/\@/\%40/g;

        # If authorization element ends with a newline, consider it already encoded
and chomp off newline; otherwise, encode it.
        my      $auth = shift;
        unless ($auth =~ /\n$/)
        {       $user{'auth'} = make_base64($user{'username'}, $auth); }
        else
        {
          chomp($auth);
          $user{'auth'} = $auth;
        }

        $user{'loggedin'}  = 0;
        $user{'logintime'} = 0;
        $user{'callid'}    = make_callid();
        $user{'expires'}   = shift || $conf{'loginExpireTimer'} || 3600;
        $user{'presence'}  = shift || $conf{'loginPresence'}    || 'Taking calls';
        $user{'tag'}       = shift || $conf{'loginTag'}         || 'general';

        $users_hash->{$user{'username'}} = { %user };
        write_log("add_user(): Added $user{'username'} to users table.", $DEBUG);

        return $users_hash->{$user{'username'}};
}

sub add_session {
        my $sessions_hash = shift;
        my %session;
```

A-303

EDL01-01p                          130

```
    $session{'callid'}      = shift || make_callid();
    $session{'localuser'}   = shift;
    $session{'remoteusers'} = shift;

    if (!ref($session{'localuser'}) || ref($session{'localuser'}) ne 'HASH')
    {   $session{'localuser'} = add_user(\%users, $session{'localuser'}, @_); }

    my $to_party_string = '';
    # my @to_parties = split /\s*[;,]\s*/, $session{'remoteusers'};
    my @to_parties = ($session{'remoteusers'});  # Comment out this line and
uncomment the above line when multiple recipients are fully implemented.
    my $to_party;
    foreach $to_party (@to_parties)
    {
        if ($to_party !~ /^\s*\+/)
        {
            $to_party =~ s/\s//g;
            $to_party =~ s/\@/\%40/;
            if (length($to_party_string) == 0) { $to_party_string =
"\"$to_party\" <sip:$to_party\@metatel.com>";  }
            else                               { $to_party_string = join '',
$to_party_string, ",\"$to_party\" <sip:$to_party\@metatel.com>"; }
        }
    }
    $session{'remoteusers'} = $to_party_string;

    $sessions_hash->{$session{'callid'}} = { %session };
    write_log("add_session(): Added session (Call-ID=$session{'callid'}) to
sessions table.", $DEBUG);

    return $session{'callid'};

    # NOTE: (Should possibly provide routine to modify remote users later on)
}

sub display_headers {
    return if ($have_displayed_headers);

    my @cookies = @_;

    my $protocol   = $ENV{'SERVER_PROTOCOL'} || "HTTP/1.1";
    my $serversoft = $ENV{'SERVER_SOFTWARE'} || "Apache/1.3.16";

    my @time       = gmtime();
    my @daysofweek = qw(Sun Mon Tue Wed Thu Fri Sat);
    my @daysofmonth = qw(Jan Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec);
    my $date       = sprintf("%s, %02d %s %d %02d:%02d:%02d GMT",
                        $daysofweek[$time[6]], $time[3],
$daysofmonth[$time[4]], $time[5] + 1900, $time[2], $time[1], $time[0]);

    my $headertext = join '', "$protocol 200 OK\n",
                        "Date: $date\n",
                        "Server: $serversoft\n",
                        "Content-type: text/html\n";
    # [NOTE: Use "secure" attribute for cookies when HTTPS is supported]
    my $cookie;
```

EDL01-01p                    131

```perl
    foreach $cookie (@cookies)
    {  $headertext = join '', $headertext, "Set-Cookie: $cookie\n"; }

    write_log(join('', "display_headers(", to_scalar(\@cookies), "): --SENDING
HEADERS TO BROWSER--\n$headertext"), $DEBUG);
    print $headertext, "\n";
    $have_displayed_headers = 1;
}

sub open_sip_connection {
    return if ($have_opened_sip_connection);
    ssl_init() if (!$have_performed_sslinit);

    my $sip_hostname = shift;
    my $sip_port     = shift;

    my ($sip_host, $packed_addr, $sockname, $sockaddr, $con);
    my $sub_call = "open_sip_connection($sip_hostname, $sip_port)";
    no strict 'subs';

    write_log("$sub_call: Connecting to SIP server...", $ACTIVITY);

    local ($SIG{'ALRM'}) =
        sub
        {
          cgi_die("$sub_call: The connection routine was not completed even
after $timeout seconds",
                    "A server timeout occurred $ON_CONNECT");
        };

    my $conn_status = eval
      {
        alarm($timeout);
        socket(SOCK, PF_INET, SOCK_STREAM, getprotobyname('tcp')) or
cgi_die("$sub_call: Unable to open TCP socket", "A protocol $FAIL_ON_CONNECT");

        if ($ENV{'SIP_HOST'})
        {
            $sip_host = gethostbyname($ENV{'SIP_HOST'}) or cgi_die("$sub_call:
gethostbyname($ENV{'SIP_HOST'}) failed",
                                                            "A needed
hostname could not be resolved $ON_CONNECT");

            if    ($ENV{'SIP_PORT'})  { $sip_port  = $ENV{'SIP_PORT'}; }
            if    ($ENV{'SSL_PORT'})  { $sip_port  = $ENV{'SSL_PORT'}; }
            else                      { $sip_port += 40; }
        }
        else
        {
            $sip_host = gethostbyname($sip_hostname) or cgi_die("$sub_call:
gethostbyname($sip_hostname) failed",
                                                            "A needed
hostname could not be resolved $ON_CONNECT");
        }

        $packed_addr = sockaddr_in($sip_port, $sip_host);
```

EDL01-01p                      132

```
        connect(SOCK, $packed_addr) or cgi_die("$sub_call: connect() to
$sip_hostname:$sip_port failed", "The attempt to connect to the eDial server
failed");

        $sockname = getsockname(SOCK);
        ($sockport, $sockaddr) = sockaddr_in($sockname);
        $myhostname = substr(gethostbyaddr($sockaddr, AF_INET), 0, 20);

        # Turn off output buffering on socket and restore default STDOUT.
        handle_autoflush(*SOCK);

        $ctx = Net::SSLeay::CTX_v3_new() or cgi_die("$sub_call: Failed to create
SSL_CTX [Net::SSLeay::CTX_v3_new() failed]", "A ciphering $FAIL_ON_CONNECT");
        Net::SSLeay::CTX_set_cipher_list($ctx,
"!ADH:!RSA:!NULL:!IDEA:HIGH+DSS:MEDIUM+DSS");

        $ssl = Net::SSLeay::new($ctx) or cgi_die("$sub_call: Failed to create SSL
[Net::SSLeay::new() failed]", "An SSL $FAIL_ON_CONNECT");
        Net::SSLeay::set_fd($ssl, fileno(SOCK));
        $con = Net::SSLeay::connect($ssl) or cgi_die("$sub_call: Failed to
establish SSL connection with SIP server [Net::SSLeay::connect() failed]",
                                    "A secure connection
failure occurred $ON_CONNECT");
        "OK";
    };
    alarm(0);

    cgi_die("$sub_call: $@", "A $FAIL_ON_CONNECT") if ($@);

    use strict 'subs';
    write_log("$sub_call: Connection routine completed.", $DEBUG);
    exit($conn_status || 1) unless ($conn_status && $conn_status eq "OK");

    $have_opened_sip_connection = 1;
}

sub close_sip_connection {
    return if (!$have_opened_sip_connection);

    my $do_logout_users = shift || $DO_LOGOUT_USERS;
    unless ($do_logout_users == $NO_LOGOUT_USERS)
    {
      my ($username, $userinfo);
      while (($username, $userinfo) = each %users)
      {   SIP_logout($userinfo) if ($userinfo->{'loggedin'}); }
    }

    Net::SSLeay::free($ssl);
    Net::SSLeay::CTX_free($ctx);
    close SOCK;

    write_log("close_sip_connection(): SIP connection is now closed.", $DEBUG);
    $have_opened_sip_connection = 0;
}

sub SIP_login {
    # Don't even try to log in before a SIP connection has been opened.
```

EDL01-01p                    133

```perl
    open_sip_connection($conf{'sipHost'} || 'localhost', $conf{'sipPort'} ||
443) if (!$have_opened_sip_connection);

    my $user     = shift;
    my $func_ref = shift;
    my %user;
    my $username;

    # Allow SIP_login to be called in one of two ways:
    #    1) SIP_login($user, $func_ref)        --> with a reference to a
user object and a function reference.
    #    2) SIP_login($username, $func_ref, ...)  --> with a username, a
function reference, and other items (namely: password, expiretimer, presence,
    #                                      and tag) that are passed
on to add_user() in order to create a new user object before logging in.
    # A user object structure is defined in and may be created through
add_user().
    # The function referenced by $func_ref is called after each SIP message is
received and passed the received SIP message in addition to the SIP
    # message which merited that SIP response.

    if (!@_)
    {
      if (ref($user) && ref($user) eq 'HASH')
      {
          %user     = %$user;
          $username = $user{'username'};
      }
      else
      {
          write_log("SIP_login($username): User argument is not a valid hash
reference.  Returning...", $DEBUG);
          return;
      }
    }
    else
    {
      $username = $user;
      %user = %{add_user(\%users, $username, @_)};
    }

    my $presence_len = length($user{'presence'}) + length("\n");
    my $cseq = time;

    my $message = <<END_MESSAGE;
REGISTER sip:$username\@sip.metatel.com SIP/2.0
Via: SIP/2.0/tcp $myhostname:$sockport
From: sip:$username\@metatel.com
To: sip:$username\@metatel.com
Call-ID: $user{'callid'}\@$myhostname
CSeq: $cseq REGISTER
Contact: sip:$username\@metatel.com;tag=$user{'tag'}
Expires: $user{'expires'}
Authorization: Basic $user{'auth'}
User-Agent: $user_agent
Content-Length: $presence_len
Content-Type: text/x-metatel1.0-presence
```

A-307

EDL01-01p                    134

```
$user{'presence'}
END_MESSAGE

    write_log("SIP_login($username): ---LOGGING USER INTO SIP SERVER---
\n$message\n", $DEBUG);
    write_log("SIP_login($username): Logging user $username into SIP server;
NEW:Call-ID=$user{'callid'}; CSeq=$cseq; expires=$user{'expires'};
tag=$user{'tag'}",
            $ACTIVITY, $LOGLEVEL_EXCL);

    Net::SSLeay::write($ssl, $message);

    local ($SIG{'ALRM'}) =
        sub
        {
            cgi_die("SIP_login($username): The login routine was not completed
even after $timeout seconds",
                    "A server timeout occurred when attempting to log in to the
eDial server");
        };

    my $current_response = '';
    eval
    {
        alarm($timeout);
        while ($current_response !~ /SIP\/\d\.\d \d+/)
        {
            write_log("SIP_login($username): Awaiting response...", $DEBUG);

            $user{'logintime'} = time;  # A temporary setting to make
get_sip_msg() happy.
            $current_response = ${get_sip_msg(\%user)};
            write_log("SIP_login($username): ---RECEIVED RESPONSE FROM SIP
SERVER---\n$current_response\n", $DEBUG);

            &$func_ref(\$message, \$current_response);
        }
    };
    alarm(0);

    cgi_die("SIP_login($username): $@", "A failure occurred when attempting to
log in") if ($@);

    if ($current_response !~ /SIP\/\d\.\d [3456789]/)
    {
        write_log("SIP_login($username): $username was logged in
successfully.", $DEBUG);

        $users{$username}{'loggedin'}  = 1;
        $users{$username}{'logintime'} = time;
    }
    else
    {   write_log("SIP_login($username): Failed to log in $username.", $DEBUG);
}

    %user = %{$users{$username}};
```

A-308

EDL01-01p                    135

```perl
}

sub SIP_logout {
    my $user = shift;
    my %user;
    my $username;

    # Use technique analogous SIP_login()'s, except that no function reference
is needed because no response is expected.
    if (!@_)
    {
        if (ref($user) && ref($user) eq 'HASH')
        {
            %user    = %$user;
            $username = $user{'username'};
        }
        else
        {
            write_log("SIP_logout(): User argument is not a valid hash reference.
Returning...", $DEBUG);
            return;
        }
    }
    else
    {
        $username = $user;
        %user = %{add_user(\%users, $username, @_)};
    }

    return if (!$have_opened_sip_connection || !$user{'loggedin'});

    my $presence_len = length($user{'presence'}) + length("\n");
    my $cseq = time;

    # NOTE: Send a BYE for the call ID before logging out.

    my $message = <<END_MESSAGE;
REGISTER sip:$username\@sip.metatel.com SIP/2.0
Via: SIP/2.0/tcp $myhostname:$sockport
From: sip:$username\@metatel.com
To: sip:$username\@metatel.com
Call-ID: $user{'callid'}\@$myhostname
CSeq: $cseq REGISTER
Contact: sip:$username\@metatel.com;tag=$user{'tag'};expires=0
Expires: 0
Authorization: Basic $user{'auth'}
User-Agent: $user_agent
Content-Length: $presence_len
Content-Type: text/x-metatel1.0-presence

$user{'presence'}
END_MESSAGE

    write_log("SIP_logout($username): ---LOGGING USER OUT OF SIP SERVER---
\n$message\n", $DEBUG);
    write_log("SIP_logout($username): Logging user $username out of SIP server;
END:Call-ID=$user{'callid'}; CSeq=$cseq; tag=$user{'tag'}",
```

EDL01-01p                                                  136

```
                $ACTIVITY, $LOGLEVEL_EXCL);

    Net::SSLeay::write($ssl, $message);

    $users{$username}{'loggedin'}  = 0;
    %user = %{$users{$username}};
}

sub SIP_send_im {
    my $session      = shift;
    my $instant_msg  = shift;
    my $func_ref     = shift;
    my $do_quick_reg = shift || $NO_QUICK_REGISTER;

    my %session;
    my $callid;

    # Allow SIP_send_im to be called in one of two ways:
    #    1) SIP_send_im($session, $instant_msg, $func_ref, $do_quick_reg)
    #          --> with a reference to a session object, an IM, a function
reference, and indicator as to whether to perform "quick register" or not.
    #    2) SIP_send_im($callid, $instant_msg, $func_ref, $do_quick_reg, ...)
    #          --> with a call ID, an IM, a function reference, an indicator
as to where to perform a "quick register" or not, and other items
    #          (namely: a call ID, a user object, and a remote username)
that are passed onto add_session() in order to create a new session
    #          object before sending an IM.
    # A session object structure is defined in and may be created through
add_session().
    # The function referenced by $func_ref is called after each SIP message is
received and passed the received SIP message in addition to the SIP
    # message which merited that SIP response.
    # If SIP_send_im() is called using method 2 and the "user object" argument
is not a user object but a username, all arguments remaining after
    # the call to add_session() are passed onto add_user() in order to create
that user object.

    if (!@_)
    {
        if (ref($session) && ref($session) eq 'HASH')
        {
            %session = %$session;
            $callid  = $session{'callid'};
        }
        else
        {
            write_log("SIP_send_im(): User argument is not a valid hash
reference.  Returning...", $DEBUG);
            return;
        }
    }
    else
    {
        $callid = $session;
        %session = %{add_session(\%sessions, $callid, @_)};
    }
```

A-310

EDL01-01p                         137

```perl
    # Don't even try to send an instant message before the user sending it is
logged in (unless a "quick REGISTER" is being performed,
    # in which case the script makes sure a SIP connection is open first).
    if (!$session{'localuser'}{'loggedin'})
    {
        unless ($do_quick_reg)  { SIP_login($session{'localuser'},
\&validate_user_onimsend); }
        else                    { open_sip_connection($conf{'sipHost'} ||
'localhost', $conf{'sipPort'} || 443) if (!$have_opened_sip_connection); }
    }

    my $localusername = $session{'localuser'}{'username'};  # Because this
item is referred to quite frequently in the SIP message
    my $cseq        = time;
    my $auth_header = ($do_quick_reg == $DO_QUICK_REGISTER ?
"\nAuthorization: Basic $session{'localuser'}{'auth'}" : '');

    # if (length($instant_msg) > ($conf{'maxIMLength'} || 500))
    # {  $instant_msg = substr($instant_msg, 0, ($conf{'maxIMLength'} ||
500)); }

    my $message_len = length($instant_msg) + length("\n");

    # $instant_msg =~ s/\n/sprintf "%%02X%%02X", 13, 10/eg;  --> Only when
the old "INVITE for IM" is used; here, however, MESSAGE is used.

    my $message = <<END_MESSAGE;
MESSAGE sip:$localusername\@sip.metatel.com SIP/2.0
Via: SIP/2.0/tcp $myhostname:$sockport
From: "$localusername" <sip:$localusername\@metatel.com>
To: $session{'remoteusers'}
Call-ID: $session{'callid'}\@$myhostname
CSeq: $cseq MESSAGE $auth_header
User-Agent: $user_agent
Content-Length: $message_len
Content-Type: text/plain

$instant_msg
END_MESSAGE

    my $log_im_subjects = $conf{'logIMSubjects'} || 0;
    my $logged_message  = $message;
    $logged_message =~ s/(\r?\n\r?\n)$instant_msg/$1<HIDDEN>/i if
(!$log_im_subjects);

    write_log("SIP_send_im(): ---SENDING IM: $localusername >>
$session{'remoteusers'}---\n$logged_message\n", $DEBUG);
    write_log("SIP_send_im(): Sending IM ($localusername -->
$session{'remoteusers'}); Call-ID=$session{'callid'}; CSeq=$cseq",
                $ACTIVITY, $LOGLEVEL_EXCL);
    $logged_message = undef;

    Net::SSLeay::write($ssl, $message);

    local ($SIG{'ALRM'}) =
        sub
        {
```

A-311

EDL01-01p                     138

```
            cgi_die("SIP_send_im(): The IM sending routine was not completed even
after $timeout seconds",
                    "A server timeout occurred when attempting to send an IM");
        };

    my $current_response = '';
    eval
    {
        alarm($timeout);
        # Change regexp a bit if 200 OKs are always received for quick-registers.
        while ($current_response !~ /SIP\/\d\.\d [3456789]/)
        {
            write_log("SIP_send_im(): Will wait a brief amount of time for
possible response...", $DEBUG);

            $current_response = ${get_sip_msg($session{'localuser'},
($conf{'errorTimeout'} || 0.5))};
            write_log("SIP_send_im(): ---RECEIVED RESPONSE FROM SIP SERVER---
\n$current_response\n", $DEBUG);

            # last if (!$current_response || $current_response =~ /^\s+$/);
            &$func_ref(\$message, \$current_response, $session{'callid'});  # The
function this references receives the Call-ID as its third argument.
        }
    };
    alarm(0);

    cgi_die("SIP_send_im(): $@", "A failure occurred when attempting to send an
IM") if ($@);

    if ($do_quick_reg == $DO_QUICK_REGISTER)
    {
        my $statcode;
        ($statcode) = ($current_response !~ /SIP\/\d\.\d (\d+)/);

        if ($current_response !~ /SIP\/\d\.\d [3456789]/ || !$statcode ||
$statcode == 480 || $statcode == 404)
        {
            write_log("SIP_send_im(): $localusername was logged in
successfully.", $DEBUG);

            $users{$localusername}{'loggedin'}  = 1;
            $users{$localusername}{'logintime'} = time;
        }
        else
        {   write_log("SIP_send_im(): Failed to log in $localusername.",
$DEBUG); }

        $session{'localuser'} = $users{$localusername};
    }
}

sub SIP_end_callid {
    my $session      = shift;
    my $func_ref     = shift;
    my $do_quick_reg = shift;
```

A-312

EDL01-01p                    139

```
    my %session;
    my $callid;

    # SIP_end_callid() is called in exactly the same fashion as SIP_send_im(),
except that there is no instant message.
    if (!@_)
    {
      if (ref($session) && ref($session) eq 'HASH')
      {
          %session = %$session;
          $callid = $session{'callid'};
      }
      else
      {
          write_log("SIP_end_callid(): User argument is not a valid hash
reference.  Returning...", $DEBUG);
          return;
      }
    }
    else
    {
      $callid = $session;
      %session = %{add_session(\%sessions, $callid, @_)};
    }

    # Don't even try to end a session with the user involved being logged in
(unless a "quick REGISTER" is being performed,
    # in which case the script makes sure a SIP connection is open first).
    if (!$session{'localuser'}{'loggedin'})
    {
      unless ($do_quick_reg)  { SIP_login($session{'localuser'},
\&validate_user_onimsend); }
      else              { open_sip_connection($conf{'sipHost'} ||
'localhost', $conf{'sipPort'} || 443) if (!$have_opened_sip_connection); }
    }

    my $localusername = $session{'localuser'}{'username'};  # Because this
item is referred to quite frequently in the SIP message
    my $cseq    = time;
    my $auth_header  = ($do_quick_reg == $DO_QUICK_REGISTER ?
"\nAuthorization: Basic $session{'localuser'}{'auth'}" : '');

    my $message = <<END_MESSAGE;
BYE sip:$localusername\@sip.metatel.com SIP/2.0
Via: SIP/2.0/tcp $myhostname:$sockport
Subject:
From: "$localusername" <sip:$localusername\@metatel.com>
To: $session{'remoteusers'}
Call-ID: $session{'callid'}\@$myhostname
CSeq: $cseq BYE $auth_header
User-Agent: $user_agent
Content-Length: 0


END_MESSAGE

    write_log("SIP_end_callid(): ---SENDING BYE: $localusername >>
$session{'remoteusers'}---\n$message\n", $DEBUG);
```

A-313

EDL01-01p                                140

```
        write_log("SIP_end_callid(): Exiting IM ($localusername -->
$session{'remoteusers'}); Call-ID=$session{'callid'}; CSeq=$cseq",
                $ACTIVITY, $LOGLEVEL_EXCL);

        Net::SSLeay::write($ssl, $message);

        local ($SIG{'ALRM'}) =
                sub
                {
                    cgi_die("SIP_end_callid(): The IM exiting routine was not completed
even after $timeout seconds",
                        "A server timeout occurred when attempting to exit an IM");
            };

        my $current_response = '';
        eval
        {
            alarm($timeout);
            while ($current_response !~ /SIP\/\d\.\d \d+/)
            {
                write_log("SIP_end_callid(): Awaiting response...", $DEBUG);

                $current_response = ${get_sip_msg($session{'localuser'})};
                write_log("SIP_end_callid(): ---RECEIVED RESPONSE FROM SIP SERVER---
\n$current_response\n", $DEBUG);

                &$func_ref(\$message, \$current_response);
            }
        };
        alarm(0);

        cgi_die("SIP_end_callid(): $@", "A failure occurred when attempting to end
an IM") if ($@);

        if ($do_quick_reg == $DO_QUICK_REGISTER)
        {
            my $statcode;
            ($statcode) = ($current_response !~ /SIP\/\d\.\d (\d+)/);

            if ($current_response !~ /SIP\/\d\.\d [3456789]/ || !$statcode ||
$statcode == 480 || $statcode == 404 || $statcode == 481)
            {
                write_log("SIP_end_callid(): $localusername was logged in
successfully.", $DEBUG);

                $users{$localusername}{'loggedin'}  = 1;
                $users{$localusername}{'logintime'} = time;
            }
            else
            {   write_log("SIP_end_callid(): Failed to log in $localusername.",
$DEBUG); }

            $session{'localuser'} = $users{$localusername};
        }
}

sub handle_incoming_sip_messages {
```

EDL01-01p                               141

```
    # Don't even try to handle SIP messages before a SIP connection has been
opened.
    open_sip_connection($conf{'sipHost'} || 'localhost', $conf{'sipPort'} ||
443) if (!$have_opened_sip_connection);

    my $user = shift;
    my %user;
    my $username;

    # handle_incoming_sip_messages() is called in the same manner as
SIP_login(), except that no function reference is needed.
    if (!@_)
    {
        if (ref($user) && ref($user) eq 'HASH')
        {
            %user    = %$user;
            $username = $user{'username'};
        }
        else
        {   return; }
    }
    else
    {
        $username = $user;
        %user = %{add_user(\%users, $username, @_)};
    }

    # Don't even try to handle SIP messages without the user involved being
logged in.
    if (!$have_opened_sip_connection)
    {   open_sip_connection($conf{'sipHost'} || 'localhost', $conf{'sipPort'}
|| 443) if (!$have_opened_sip_connection); }
    if (!$user{'loggedin'})
    {   SIP_login(\%user, \&validate_user_onimsend); }

    write_log("handle_incoming_sip_messages(): Ready to accept incoming SIP
messages [e.g. IMs]", $ACTIVITY);
    my $logged_response  = '';
    my $current_response = '';
    $conf{'logIMSubjects'} ||= 0;

    while ($current_response = ${get_sip_msg(\%user)})
    {
        %user = %{$users{$username}};  # Update user information for local use;
very important.

        $current_response =~ s/\A\s*//ms;  # Trim whitespace

        $logged_response = $current_response;
        if (!$conf{'logIMSubjects'})
        {
            if    ($current_response =~ /^INVITE/)   { $logged_response =~
s/^(Subject:\s*).*?\r?\n(?!\s)/$1<HIDDEN>\n/msi; }
            elsif ($current_response =~ /^MESSAGE/)  { $logged_response =~
s/(\r?\n\r?\n).+$/$1<HIDDEN>\n/msi;          }
        }
```

```
        write_log("handle_incoming_sip_messages(): ---RECEIVED RESPONSE FROM
SIP SERVER---\n$logged_response\n", $DEBUG);

        $logged_response = undef;  # Free up memory

    # Handle NOTIFYs, INVITEs, MESSAGES, and BYEs; ignore other messages.
    if ($current_response =~ /^(MESSAGE|INVITE)/i)
    {
        my $message_type = uc($1);
        my ($callid, $cseq, $instant_msg, $from_line, $to_line, $remote_ua);

        if ($message_type eq 'MESSAGE')
        {
            ($callid,   $cseq,  $from_line, $to_line, $remote_ua) =
get_headers(\$current_response,
            ("Call-ID", "CSeq", "From",       "To",      "User-Agent"));

            $instant_msg = get_body(\$current_response);
        }
        else
        {
            # INVITEs for IMs are antiquated, but they are still accepted here.
The script ignores INVITEs for calls, though.

            ($callid,   $cseq,  $instant_msg, $from_line, $to_line, $remote_ua)
= get_headers(\$current_response,
            ("Call-ID", "CSeq", "Subject*",   "From",      "To",      "User-
Agent"));

            my $message_body = get_body(\$current_response);
            if ($message_body && $message_body =~ /\s*v\s*=/ms)
            {
                my $from_users = get_users($from_line);
                my $to_users   = get_users($to_line);

                write_log("handle_incoming_sip_messages(): Ignoring call status
update ($to_users <-- $from_users); Call=ID=$callid; User-Agent=$remote_ua",
                        $DEBUG);
                next;
            }

            $instant_msg =~ s/\%0D\%0A/\\n/ig;  # Decode hex-encoded newlines
        }

        my $from_users = get_users($from_line);
         my $to_users   = get_users($to_line);

        write_log("handle_incoming_sip_messages(): Received IM ($to_users <--
$from_users); Call-ID=$callid; CSeq=$cseq; User-Agent=$remote_ua", $ACTIVITY);

        # my @valid_users = grep { $to_users =~ /(^|;)$_($|;)/ } keys
%users;
        my @my_users = ((grep  { $to_users =~ /(^|;)$_($|;)/ } keys
%users)[0]);  # Comment out this line & uncomment above line when multiuser IM
supported
        if (@my_users)
        {
```

EDL01-01p

143

```perl
        my ($my_user, $from_users_display);
            # Multi-user instant messenging only:
    # foreach $my_user (@my_users)
    # {   $to_users =~ s/$my_user;|;$my_user|$my_user//g; }
    # $from_users = join ';', $from_users, $to_users;

        $from_users_display =  $from_users;
        $from_users_display =~ s/\%40/\@/g;

        # Make instant message "JavaScript-ready".
        $instant_msg =~ s/\n/\\n/g;
        $instant_msg =~ s/([\'\"])/\\\'/g;

        foreach $my_user (@my_users)  # Loop might not be needed; SIP
server might auto. send a message for each user logged in.
                {
                add_session(\%sessions, $callid, $users{$my_user},
$from_users);  # Update remote user list for that session

                my $display_im_code = "<script>addIM(\"$callid\", new
IM(\"$from_users_display\", \"$instant_msg\", 1))</script>\n";
                write_log("handle_incoming_sip_messages(): --DISPLAYING IM ON
BROWSER--\n$display_im_code", $DEBUG);

                print $display_im_code;  # Done!  Hand it over to
JavaScript to display IM.

                # Flush output buffer
                $| = 1;
                $| = 0;
                }
            }
        else
            {
            write_log("handle_incoming_sip_messages(): None of my users
correspond to any of the users in the To: line; ignoring", $DEBUG);
            }
        }
    elsif ($current_response =~ /^BYE/i)
        {
        my ($callid,   $cseq,   $from_line, $to_line, $remote_ua) =
get_headers(\$current_response,
            ("Call-ID", "CSeq",  "From",      "To",     "User-Agent"));

        my $from_user = get_users($from_line);
        my $to_users  = get_users($to_line);

        # This may not be how the SIP server indicates that this is a BYE for
a call; come back to this later.
        my  $BYE_body = get_body(\$current_response);
        if ($BYE_body && $BYE_body =~ /\s*v\s*=/ms)
            {
            write_log("handle_incoming_sip_messages(): Ignoring call status
update ($to_users <-- $from_user); Call=ID=$callid; User-Agent=$remote_ua",
                    $DEBUG);
            next;
            }
```

```
        write_log
            ("handle_incoming_sip_messages(): Received IM Exit Notification
($to_users <-- $from_user); Call-ID=$callid; CSeq=$cseq; User-
Agent=$remote_ua",
            $ACTIVITY);

        # my @valid_users = grep  { $to_users =~ /(^|;)$_($|;)/ } keys
%users;
        my @my_users    = ((grep  { $to_users =~ /(^|;)$_($|;)/ } keys
%users)[0]);  # Comment out this line & uncomment above line when multiuser IM
supp.
        my @my_sessions =  grep  { $callid   =~ /^$_$/        } keys
%sessions;
        if (@my_users && @my_sessions)
        {
          $from_user =~ s/\%40/\@/g;

          my $exit_notify_message = $conf{'exitNotifyMessage'} || "*user*
just closed his/her IM window.";
            $exit_notify_message =~ s/\*user\*/$from_user/g;
            $exit_notify_message =~ s/\n/\\n/g;
            $exit_notify_message =~ s/([\'\"])/\\\'/g;

          my $my_user;
          foreach $my_user (@my_users)
            {
            my $display_im_code = "<script>addIM($callid, new IM(null,
$exit_notify_message, 1))</script>\n";
            write_log("handle_incoming_sip_messages(): --DISPLAYING IM EXIT
NOTIFICATION ON BROWSER--\n$display_im_code", $DEBUG);

                print $display_im_code;  # Done!  Hand it over to
JavaScript to display IM exit notification.
            }
          }
          else
          {
            write_log(
                "handle_incoming_sip_messages(): None of my users or none of my
sessions correspond to any of the users in the To: line; ignoring", $DEBUG);
          }
        }
        elsif ($current_response =~ /^NOTIFY/i)
        {
          my ($callid,   $cseq,   $from_line, $to_line) =
get_headers(\$current_response,
            ("Call-ID", "CSeq",  "From",     "To"));
          my $new_presence = get_body(\$current_response);

          my $from_user = get_users($from_line);
            my $to_user   = get_users($to_line);

          write_log
              ("handle_incoming_sip_messages(): Received Presence Update
($to_user <-- $from_user); Call-ID=$callid; CSeq=$cseq; New
Presence=$new_presence",
```

EDL01-01p                                    145

```perl
            $ACTIVITY);

        if (grep  { /^$to_user$/ } keys %users)
            {
            # At the time, nothing is really done with presence updates; they
are just logged.
            }
        else
            {
            write_log("handle_incoming_sip_messages(): None of my users
correspond to any of the users in the To: line; ignoring", $DEBUG);
            }
        }
    else
        {
        write_log("handle_incoming_sip_messages(): I do not handle that type
of SIP message; ignoring", $DEBUG);
        }
    }
    continue
    {
        $current_response = '';  # Free up memory
    }
}

sub validate_user_onlogin {
    my $msg_sent     = ${shift()};
    my $msg_received = ${shift()};
    my $error_message = '';

    if (!defined $msg_received)
    {
        $error_message = "The eDial server failed to respond.  It might be
experiencing problems.  $CONTACT_ADMIN_NOW";  # No response
    }
    elsif ($msg_received =~ /SIP\/\d\.\d (\d+) ([\w\s]+)\r?\n/)  # Check this
regexp again.
    {
        write_log("validate_user_onlogin(): Status code = $1; Explanation =
$2", $DEBUG);

        if ($1 == 200)  # OK
        {   return; }
        elsif ($1 == 401)  # Unauthorized
        {   $error_message = $conf{'invalidLoginError'} || "The
username/password combination you entered below is not valid."; }
        else  # Other SIP errror
        {
            write_log("validate_user_onlogin(): Received unexpected response from
SIP server:\n---SENT---\n$msg_sent\n---RECEIVED---\n$msg_received", $ERROR);
            $error_message = error_map($1, $2);
        }
    }
    else
    {   return; }

    if ($error_message)
```

EDL01-01p                          146

```
    {
        close_sip_connection() if ($have_opened_sip_connection);
        display_headers();
        deliver_html("IMIntro.html",
                        ('ERRORS'     =>
"$BEGIN_ERROR_FONT$error_message$END_ERROR_FONT",
                     'SCRIPTFILE' => $my_filename,
                     'MEDIADIR'   => ($conf{'mediaDir'} || "."),
                     'USERNAME'   => $form{'username'},
                     'PASSWORD'   => $form{'password'})
                    );
        exit;
    }
}

sub validate_user_onimsend {
    my $msg_sent     = ${shift()};
    my $msg_received = ${shift()};

    if (!defined $msg_received)
    {
        cgi_die("validate_user_onimsend(): Received undef response for login;
the eDial server must have failed to respond with $timeout seconds",
            "The eDial server failed to respond.  It might be experiencing
problems.  Close your IM Control Window and try again later");
    }
    elsif ($msg_received =~ /SIP\/\d\.\d (\d+) ([\w\s]+)\r?\n/)  # Check this
regexp again.
    {
        write_log("validate_user_onimsend(): Status code = $1; Explanation =
$2", $DEBUG);

        if ($1 == 200)  # OK
        {  return; }
        elsif ($1 == 401)  # Unauthorized; this shouldn't occur unless the user
changed his/her password while logged in.
            {
            cgi_msg("validate_user_onimsend(): Received unexpected unauthorized
response for login after cookie was set.  Perhaps user changed password?",
                join('', "You are not logged in properly.  Perhaps the eDial
server is experiencing problems or you changed your password ",
                             "while you are logged in.  Close your IM Control
Window and log in again"));
        }
        else  # Other SIP errror
            {
            write_log("validate_user_onimsend(): Received unexpected response
from SIP server:\n---SENT---\n$msg_sent\n---RECEIVED---\n$msg_received",
$ERROR);

            my $error_message = error_map($1, $2);
            cgi_die("validate_user_onimsend(): Sending error [$error_message]
back to user for unexpected SIP response",
                $error_message);
        }
    }
    else
```

A-320

EDL01-01p

147

```
    {  return; }
}

sub validate_response_onimexit {
    my $msg_sent     = ${shift()};
    my $msg_received = ${shift()};

    if (!defined $msg_received)
    {
        write_log("validate_response_onimexit(): Received undef response for IM
exit; the eDial server must have failed to respond with $timeout seconds",
            $ERROR);
        return;
    }
    elsif ($msg_received =~ /SIP\/\d\.\d (\d+) ([\w\s]+)\r?\n/)  # Check this
regexp again.
    {
        write_log("validate_response_onimexit(): Status code = $1; Explanation
= $2", $DEBUG);

        if ($1 == 200)  # OK
        {  return; }
        elsif ($1 == 401)  # Unauthorized; this shouldn't occur unless the user
changed his/her password while logged in.
        {
            cgi_msg("validate_response_onimexit(): Received unexpected
unauthorized response for IM exit after cookie was set.  Perhaps user changed
password?",
                join('', "You are not logged in properly.  Perhaps the eDial
server is have problems or you changed your password ",
                    "while you are logged in.  Close your IM Control
Window and log in again"));
        }
        elsif ($1 == 404)  # User not found; don't make a big deal out of this
here.
        {
            write_log("validate_response_onimexit(): One or more users to whom
the BYE was sent does not exist.", $ACTIVITY);
            return;
        }
        elsif ($1 == 480)  # User (or server) temporarily unavailable; don't
make a big deal out of this here.
        {
            write_log("validate_response_onimexit(): One or more users to whom
the BYE was sent was not logged in.", $ACTIVITY);
            return;
        }
        elsif ($1 == 481)  # Session does not exist; don't make a big deal out
of this here.
        {
            write_log("validate_response_onimexit(): A BYE was sent to end a
nonexistent session, according to the SIP server.", $ACTIVITY);
            return;
        }
        else  # Other SIP errror; (perhaps a regular IM Exit page should be
sent back instead of an error page?)
        {
```

EDL01-01p                          148

```
        write_log("validate_response_onimexit(): Received unexpected response
from SIP server:\n---SENT---\n$msg_sent\n---RECEIVED---\n$msg_received",
$ERROR);

        my $error_message = error_map($1, $2);
        cgi_die("validate_response_onimexit(): Sending error [$error_message]
back to user for unexpected SIP response",
            "$error_message\nBecause there might be a problem with your IM
Control Window, you should now Log Off and try again.");
    }
  }
  else
  {   return; }
}

sub validate_response_onimsend {
    my $msg_sent      = ${shift()};
    my $msg_received  = ${shift()};
    my $callid        = shift;  # Special for this subroutine

    # NOTE: $im_send_error is a global variable.

    if (!defined $msg_received)
    {
        my $error_msg = "The eDial server failed to respond.  It might be
experiencing problems.  Close your IM window and try again later";

        write_log("validate_response_onimsend(): Received undef response for IM
send; the eDial server must have failed to respond with $timeout seconds",
            $ERROR);
        $im_send_error = <<END_NORESPONSE_ERROR;
alert("$error_msg");
parent.opener.addIM("$callid", new IM(null, "$error_msg", 1));
END_NORESPONSE_ERROR
        return;
    }
    elsif ($msg_received =~ /SIP\/\d\.\d (\d+) ([\w\s]+)\r?\n/)  # Check this
regexp again.
    {
        write_log("validate_response_onimsend(): Status code = $1; Explanation
= $2", $DEBUG);

        if ($1 == 200)  # OK
        {   return; }
        elsif ($1 == 401)  # Unauthorized; this shouldn't occur unless the user
changed his/her password while logged in.
        {
            my $error_msg = join '', "You are not logged in properly.  Perhaps
the eDial server is experiencing problems or you changed your password ",
                            "while you are logged in.  Close your IM
Control Window and log in again";

            write_log("validate_response_onimsend(): Received unexpected
unauthorized response for IM send after cookie was set.  Perhaps user changed
password?",
                $ERROR);
            $im_send_error = <<END_UNAUTHORIZED_ERROR;
```

A-322

EDL01-01p                                    149

```perl
                alert("$error_msg");
                parent.opener.addIM("$callid", new IM(null, "$error_msg", 1));
END_UNAUTHORIZED_ERROR
                        return;
        }
        elsif ($1 == 404)  # User not found
          {
            $im_send_error = join '', "parent.opener.addIM(\"$callid\", new
IM(null, \"",
                                        $conf{'userNotFoundMessage'} || "The eDial
ID to which you sent the above IM does not exist.",
                                        "\", 1))";
            return;
        }
        elsif ($1 == 480)  # User temporarily unavailable
          {
            if (lc(substr($1, 0, 4)) eq 'user')
              {
                $im_send_error = join '', "parent.opener.addIM(\"$callid\", new
IM(null, \"",
                                        $conf{'userUnavailableMessage'} || "The
eDial user to whom you sent the above IM is not currently logged in.",
                                        "\", 1))";
              }
            else
              {
                my $error_msg = error_map($1, $2);

                write_log("validate_response_onimsend(): Received unexpected $1 $2
response.  Returning error to user...", $ERROR);
                $im_send_error = <<END_480_ERROR;
                alert("$error_msg");
                parent.opener.addIM("$callid", new IM(null, "$error_msg", 1));
END_480_ERROR
                return;
        }
        else
          {
            # Work on this later: be careful not to expose IMs.
            write_log("validate_response_onimsend(): Received unexpected response
from SIP server:\n---SENT---\n$msg_sent\n---RECEIVED---\n$msg_received",
$ERROR);

            my $error_message = error_map($1, $2);
            write_log("validate_response_onimsend(): Sending error
[$error_message] back to user for unexpected SIP response", $ERROR);
            $im_send_error = <<END_SIP_ERROR;
                alert("$error_message");
                parent.opener.addIM("$callid", new IM(null, "$error_message", 1));
END_SIP_ERROR
                        return;
        }
    }
    else
      {    return; }
}
```

A-323

EDL01-01p                                    150

```perl
sub error_map {
    my $statcode = shift;
    my $expl     = shift;
    my $verbose_error;

    # Take care of easy, one-to-one status code --> error message mapping right
here;
    my %error_map =
        (401 => 'Your username/password combination is not valid; perhaps you are
not logged in properly.',
         402 => 'You are currently suspended from activity on the eDial server.',
         403 => 'You are not the controller of the call or you are authorized to
perform the action you attempted.',
         404 => 'You attempted to IM or make a call to a non-existent eDial
user.',
         413 => 'You are not permitted to make a conference call involving that
many people.',
         481 => 'That person is not currently in the call in which you are
involved.',
         503 => 'You have too many users logged into the eDial server.  Please
close one or more of your Control windows.');

    # Map status codes to more verbose errors; here, there is usally more than
one possible error for each status code.
    if ($statcode == 400)
    {
        if    ($expl =~ /Bad Request/i)   { $verbose_error = "The eDial server was
unable to understand your request."; }
        elsif ($expl =~ /Bad SIP/i)       { $verbose_error = "The eDial server was
unable to understand your request."; }
        elsif ($expl =~ /Bad SDP/i)       { $verbose_error = "The eDial server was
unable to understand your call-related request."; }
        else                              { $verbose_error = "The eDial server was
unable to understand your request."; }
    }
    elsif ($statcode == 406)
    {
        if ($expl =~ /Forbidden/i)
        {   $verbose_error = "You are not permitted to perform such an action
upon that call, for you are not that call's controller."; }
        elsif ($expl =~ /Not acceptable/i)
        {   $verbose_error = "You have too many users logged in to the eDial
server.  Pleae close at least one of your Control windows."; }
    }
    elsif ($statcode == 480)
    {
        if ($expl =~ /User/i && $expl =~ /Temporarily Unavailable/i)
        {   $verbose_error = "A user involved is not currently logged in."; }
        elsif ($expl =~ /TNS/i && $expl =~ /available/i)
        {   $verbose_error = "A component of the eDial server required to make
calls is temporarily unavailable.  Please try again later."; }
        elsif ($expl =~ /Transfer target/i && $expl =~ /available/i)
        {   $verbose_error = "The eDial user to whom you are trying to transfer
the call is not currently logged in."; }
        else
```

A-324

EDL01-01p                                151

```perl
       {  $verbose_error = "A component of the eDial server is temporarily
unavailable and may be undergoing maintenance.  Try again soon."; }
       }
       elsif ($statcode == 503)
       {
          $verbose_error = "The eDial service is temporarily unavailable.  Please
try again later.";
       }
       elsif (exists $error_map{$statcode})
       {
          # Easy, one-to-one mapping
          $verbose_error = $error_map{$statcode};
       }
       else
       {
          $verbose_error = "An unknown error occurred.  $CONTACT_ADMIN_NOW.";
       }

       write_log("error_map(): Mapped error to: $verbose_error", $DEBUG);
       return $verbose_error;
}

sub get_headers {
       my $response_text  = ${shift()};

       my @wanted_headers = @_;
       my @header_values  = ();

       my $wanted_header;
       my $header_value;

       foreach $wanted_header (@wanted_headers)
       {
          unless (substr($wanted_header, -1, 1) eq '*')
          {  ($header_value) = ($response_text =~
/^$wanted_header:\s*(.+?)\r?\n/msi); }
          else
          {
             substr($wanted_header, -1, 1) = '';
             ($header_value) = ($response_text =~
/^$wanted_header:\s*(.+?)\r?\n(?!\s)/msi);
          }

          push @header_values, $header_value;
       }

       return (wantarray ? @header_values : join "\n", @header_values);
}

sub get_body {
       my $response_text  = ${shift()};

       my ($response_body) = ($response_text =~ /\r?\n\r?\n(.+)$/s);
       return $response_body;
}

sub get_users {
```

EDL01-01p                              152

```perl
    # Support user aliases at a later time.

    my $user_line = shift;

    my @raw_users = split /\s*,\s*/, $user_line;
    my @usernames;
    my $this_username;

    my $raw_user;
    foreach $raw_user (@raw_users)
    {
      ($this_username) = ($raw_user =~ /^.*?sip:(.+?)([@,:;>].*?)?$/);
      push @usernames, $this_username;
    }

    return (wantarray ? @usernames : join ";", @usernames);
}

sub get_sip_msg {
    return if (!$have_opened_sip_connection);

    my ($read_char, $content_body);
    my $response_text  = "";
    my $newline_number = 0;
    my $content_length = 0;

    my $lost_conn_realerror = join '', "*WARNING*: Lost connection to SIP
server in the midst of a Net::SSLeay::read().\n",
                                       "(Characters read thus far = *chars*;
action = $form{'action'}).\n",
                                       "THIS IS THE LIKELY RESULT OF A SERVER
FAILURE.  LOOK INTO THIS IMMEDIATELY; OS_ERROR";
    my $lost_conn_showerror = "\nYour connection to the eDial server was
lost.\nThis likely occurred because the eDial server was shut down.  If you
have any IM windows open, they are probably useless now.  You should log out
and try coming back later";
    my $select_realerror  = join '', "*WARNING*: An error occurred on the SIP
socket's file descriptor in the midst of\n",
                                       "a select() statement. (action =
$form{'action'}).  Check the OS_ERROR for possible connection loss.\n",
                                       "THIS IS THE LIKELY RESULT OF A SERVER
FAILURE.  LOOK INTO THIS IMMEDIATELY; OS_ERROR";

    # If user object is provided, block until data is avilable for reading or
that user's login will expire soon.
    my $userobj = shift || '';
    if ($userobj && ref($userobj) && ref($userobj) eq 'HASH')
    {
      my %user = %$userobj;

      my ($read_mask, $exception_mask, $chars_found, $time_left) = ('', '', 0,
0);
      vec($read_mask, fileno(SOCK), 1) = 1;
      $exception_mask = $read_mask;

      # Automatically time out after login is 90% expired if no explicit
timeout is provided.
```

A-326

EDL01-01p                                    153

```
        # In addition, keep HTTP connection alive by sending a byte over it once
every $keepalive_interval seconds.
        # NOTE: $prev_keepalive_time is a global veriable.
        my $have_data = 0;
        my $timeout_was_provided = 0;
        my $timeout_val = shift;

        my $login_timeout_val     = 0;
        my $keepalive_timeout_val = 0;
        my $keepalive_interval    = $conf{'keepAliveInterval'} || 60;
        my $timeout_type;

        $timeout_was_provided = 1 if ($timeout_val);

        while (!$have_data)
        {
            if (!$timeout_was_provided)
            {
                $login_timeout_val     = 0.90 * ($user{'expires'} - (time -
$user{'logintime'}));
                $keepalive_timeout_val = $keepalive_interval - (time -
$prev_keepalive_time);

                if ($keepalive_timeout_val <= $login_timeout_val)
                {
                    $timeout_val = $keepalive_timeout_val;

                    if ($keepalive_timeout_val < $login_timeout_val)  {
$timeout_type = $TIMEOUT_KEEPALIVE; }
                    else                                             {
$timeout_type = $TIMEOUT_BOTH;        }
                }
                else
                {
                    $timeout_val  = $login_timeout_val;
                    $timeout_type = $TIMEOUT_LOGIN;
                }
            }
            write_log("get_sip_msg(): select(2); Timeout=$timeout_val...",
$DEBUG);

            ($chars_found, $time_left) = select($read_mask, undef,
$exception_mask, $timeout_val);

            if ($chars_found < 0)
            {
                close_sip_connection($NO_LOGOUT_USERS);
                cgi_die("get_sip_msg(): $select_realerror", $lost_conn_showerror);
            }
            elsif ($chars_found == 0)
            {
                if ($timeout_was_provided)
                {
                    write_log("get_sip_msg(): No error response received in time
alloted.  Assume IM send successful.", $DEBUG);
                    return '';
                }
```

EDL01-01p                                    154

```perl
            else
            {
                if ($timeout_type == $TIMEOUT_LOGIN || $timeout_type ==
$TIMEOUT_BOTH)
                {
                    write_log("get_sip_msg(): Login for $user{'username'} will
expire soon.  The user will now be logged in again.", $ACTIVITY);
                    SIP_login(\%user, \&validate_user_onimsend);
                    %user = %{$users{$user{'username'}}};
                }
                if ($timeout_type == $TIMEOUT_KEEPALIVE || $timeout_type ==
$TIMEOUT_BOTH)
                {
                    write_log("get_sip_msg(): Sending data byte to browser to
prevent connection from becoming idle.", $DEBUG);
                    $| = 1;
                    print " ";
                    $| = 0;
                    $prev_keepalive_time = time;
                }

                # Reset bit masks here because they are cleared when select(2)
times out.
                vec($read_mask, fileno(SOCK), 1) = 1;
                $exception_mask = $read_mask;
            }
        }
        else
        {   $have_data = 1; }
    }
}

# Read until a two newlines, one right after the other, are encountered.
while ($newline_number != 2)
{
    $read_char = Net::SSLeay::read($ssl, 1);
    if (!defined($read_char) || length($read_char) == 0)
    {
        close_sip_connection($NO_LOGOUT_USERS);
        $lost_conn_realerror =~ s/\*chars\*/length($response_text)/e;
        cgi_die("get_sip_msg(): $lost_conn_realerror", $lost_conn_showerror);
    }

    $response_text = join '', $response_text, $read_char;
    if ($read_char eq "\n")
    {
        if ($newline_number == 1)
        {
        $newline_number = 2;
        last;
        }
        else
        {   $newline_number = 1; }
    }
    elsif ($read_char ne "\r")
    {   $newline_number = 0; }
}
```

A-328

EDL01-01p                                        155

```
    # If a valid content length number was found, read that number of
characters more.
    ($content_length) = ($response_text =~ /^Content-Length:\s*(\d+)/msi);
    if ($content_length && $content_length =~ /^\d+$/)
    {
        $content_body = Net::SSLeay::read($ssl, $content_length);
        if (!defined($content_body) || length($content_body) < $content_length)
        {
          close_sip_connection($NO_LOGOUT_USERS);
            $lost_conn_realerror =~ s/\*chars\*/length($response_text)/e;
          cgi_die("get_sip_msg(): $lost_conn_realerror", $lost_conn_showerror);
        }

        $response_text = join '', $response_text, $content_body;
    }

    # Return a reference to the text read from the SIP server; this is slightly
more efficient than returning the text itself.
    return \$response_text;
}

sub write_log {
    return if (!$conf{'loggingLevel'} || $conf{'loggingLevel'} <= 0);

    my $logtext = shift;
    my $min_required_logging_level = shift;
    my $log_option = shift || 0;

    if (($log_option != $LOGLEVEL_EXCL && $min_required_logging_level <=
$conf{'loggingLevel'}) ||
        ($log_option == $LOGLEVEL_EXCL && $min_required_logging_level ==
$conf{'loggingLevel'}))
    {
        $logtext = join '', scalar(localtime()), " [$ENV{'REMOTE_ADDR'}]:  ",
$logtext, "\n";
        if ($have_opened_logfile)  { print LOG $logtext; }

        # In the rare instance that the logfile could not be opened, use the
system logger.
        else
        {
            chomp $logtext;
            $logtext =~ s/\n/ \\\n/g;
            $logtext =~ s/\'/\\\'/g;

            system("logger -p $min_required_logging_level -s $user_agent:
'$logtext'");
        }
    }
}

sub create_directory {
    my @dirs_to_create = (shift);
    my $sub_call = join '', "create_directory(", to_scalar(\@dirs_to_create),
")";
```

EDL01-01p                                    156

```perl
    while (@dirs_to_create)
    {
        my $dir = shift @dirs_to_create;
        my $parent_dir;
        ($parent_dir = $dir) =~ s/(\/.*?)$//;
        if ($parent_dir && !-e $parent_dir)
        {
            unshift @dirs_to_create, $parent_dir, $dir;
            redo;
        }
        if (!mkdir($dir, 0777))
        {
            if ($dir ne $dirs_to_create[$#dirs_to_create])
            {
                cgi_die("$sub_call: Unable to create directory $dir (for the
sake of being able to create directory $dirs_to_create[$#dirs_to_create])",
                    "A disk operation failed on the eDial server");
            }
            else
            {
                cgi_die("$sub_call: Unable to create directory $dir",
                    "A disk operation failed on the eDial server");
            }
        }
    }
}

sub make_frame_string {
    $total_queue = shift;  # Global variable
    $frame_name  = shift;  # Global variable
    $frame_src   = shift;  # Global variable

    $current_pos = 1;  # Global variable

    my %new_frame       = ('number' => $current_pos);
    my @frame_structure = ();
    $frame_structure[0] = \%new_frame;
    ++$current_pos;

    my $num_uncatered      = $total_queue - 1;
    my $frame_structure_ref = \@frame_structure;

    write_log("make_frame_string(): Creating frame structure:
total_queue=$total_queue...", $DEBUG);
    make_frame_structure($frame_structure_ref, $num_uncatered);

    $indent = 4;  # Global variable

    write_log("make_frame_string(): Converting frame structure: frame_names are
$frame_name; frame_srcs are $frame_src...", $DEBUG);
    my $full_frame_string = frame_structure_convert($frame_structure_ref);

    return $full_frame_string;
}


# NOTE: Requires that global variables $total_queue and $current_pos are
initialized
```

EDL01-01p                                         157

```
sub make_frame_structure {
    my $frame_structure = shift;
    my $num_uncatered   = shift;

    my $start_framecreate = 0;
    my $end_framecreate   = 0;
    my @new_frame_structure = ();

    my $new_frame_ref = \@new_frame_structure;

    if ($num_uncatered > 3)
        {
        my %new_frame = ('number' => $current_pos);
        $new_frame_structure[0] = \%new_frame;
        make_frame_structure($new_frame_ref, $num_uncatered - 3);

        $start_framecreate = 1;
        $end_framecreate   = ($total_queue - $current_pos + 1 > 3 ? 3 :
$total_queue - $current_pos + 1);
        }
    else
        {
        --$current_pos;

        $start_framecreate = 0;
        $end_framecreate   = ($total_queue - $current_pos + 1 > 3 ? 3 :
$total_queue - $current_pos + 1);
        --$end_framecreate if ($total_queue <= 3);  # Special case where first
level is last level and level isn't full
        }

    my $current_frame;
    for ($current_frame = $start_framecreate; $current_frame <=
$end_framecreate; ++$current_frame)
        {
        my %new_frame = ('number' => $current_pos);
        $new_frame_structure[$current_frame] = \%new_frame;
        ++$current_pos;
        }

    $frame_structure->[0] = $new_frame_ref;
}

# NOTE: Requires that global variables $indent, $frame_name, and $frame_src are
initialized
sub frame_structure_convert {
    my $frame_structure = shift;
    my $frame_string    = '';

    my $current_frame;
    for ($current_frame = 0; $current_frame < scalar(@$frame_structure);
++$current_frame)
        {
        next if (!ref($frame_structure->[$current_frame]));

        if (ref($frame_structure->[$current_frame]) eq 'ARRAY')
            {
```

EDL01-01p                                    158

```
            $frame_string = join '', $frame_string, ' ' x $indent, qq{<frameset
cols="50%, *" rows="50%, *" frameborder="0" framespacing="0" border="no">\n};
            $indent += 2;

            $frame_string = join '', $frame_string,
frame_structure_convert($frame_structure->[$current_frame]);

            $indent -= 2;
            $frame_string = join '', $frame_string, ' ' x $indent,
qq{</frameset>\n};
        }
        else
        {
            $frame_string = join '', $frame_string, ' ' x $indent,
              qq{<frame name="$frame_name$frame_structure->[$current_frame]-
>{'number'}" src="$frame_src" scrolling="no" noresize="noresize">\n};
        }
    }

    return $frame_string;
}

sub full_cleanup {
    # End all session feature will be added soon...

    # Log out all users
    write_log("full_cleanup(): Caught SIGTERM; logging out all users...",
$DEBUG);

    my ($username, $userinfo);
    while (($username, $userinfo) = each %users)
    {    SIP_logout($userinfo) if ($userinfo->{'loggedin'}); }

    # Close SIP connection
    write_log("full_cleanup(): About to close SIP connection...", $DEBUG);
    close_sip_connection();
    close LOG;

    write_log("full_cleanup(): -- EXITING NOW --\n", $DEBUG);
    exit;
}

sub cgi_msg {
    my $real_message = shift;
    my $show_message = shift;

    cgi_die($real_message, $show_message, $IS_REGMSG);
}

sub cgi_die {
    my $real_error   = shift;
    my $show_error   = shift;
    my $message_type = shift || $IS_ERROR;

    alarm(0);

    my $OS_error = $^E || $! || $@ || '[Reason unknown]';
```

A-332

EDL01-01p                                159

```
    write_log("$real_error: $OS_error", $ERROR);

    display_headers();

    my $display_text = <<END_INIT_TEXT;
<?xml version="1.0" encoding="UTF-8"?>
<!DOCTYPE html PUBLIC "-//W3C//DTD XHTML 1.0 Transitional//EN"
"http://www.w3.org/TR/xhtml1/DTD/xhtml1-transitional.dtd">
<html xmlns="http://www.w3.org/1999/xhtml" xml:lang="en" lang="en">
<head>
END_INIT_TEXT

if ($message_type == $IS_ERROR)
{
    my $js_show_error =  $show_error;
        $js_show_error =~ s/\n/\\n/g;

    my $alert_msg = '';
        $alert_msg =
qq[<script>alert("$INTERNAL_ERROR:\\n$js_show_error.\\n\\n$CONTACT_ADMIN_NOW");
suppressConnError = true</script>]
            if ($action eq 'new_imrecv' || $action eq 'do_imsend' || $action eq
'do_imexit');

    $display_text = join '', $display_text, <<END_ERROR_TEXT;
  <title>An error has occurred</title>
</head>
<body>
$alert_msg
$BEGIN_ERHEAD_FONT
An error has occurred
$END_ERHEAD_FONT
<p />
$BEGIN_ERROR_FONT
$INTERNAL_ERROR:<br />
$show_error.
<br />$CONTACT_ADMIN_NOW
END_ERROR_TEXT
}
else
{
    my $js_show_error =  $show_error;
        $js_show_error =~ s/\n/\\n/g;

    my $alert_msg = '';
        $alert_msg = qq[<script>alert("$js_show_error."); suppressConnError =
true</script>]
            if ($action eq 'new_imrecv' || $action eq 'do_imsend' || $action eq
'do_imexit');

    $display_text = join '', $display_text, <<END_MSG_TEXT;
  <title>There was a problem with your request</title>
</head>
<body>
$alert_msg
$BEGIN_ERHEAD_FONT
There was a problem with your request
```

```
$END_ERHEAD_FONT
<p />
$BEGIN_ERROR_FONT
$show_error.<br />
END_MSG_TEXT
}

$display_text = join '', $display_text, <<END_DISPLAY_TEXT;
$END_ERROR_FONT
<p>
<form>
<input type="button" onclick="javascript:parent.history.go(-1)" value="Go Back"
/>
         
<input type="button" onclick="javascript:parent.location.reload()" value="Try
Again" />
</form>
</p>
</body>
</html>
END_DISPLAY_TEXT

    print $display_text;
    write_log("cgi_die(): --SENDING TO BROWSER--\n$display_text", $DEBUG);
    write_log("cgi_die(): Exiting with status code 1...", $DEBUG);
    exit(1);
}

sub to_scalar {
    my $variable_ref = shift;
    my $var_type     = ref($variable_ref);

    if    ($var_type eq 'SCALAR')  { return $$variable_ref; }
    elsif ($var_type eq 'ARRAY')   { return join ', ', @$variable_ref; }
    elsif ($var_type eq 'HASH')
        {
        my ($hashkey, $hashval, @return_string);
        while (($hashkey, $hashval) = each %$variable_ref)
            {  push @return_string, "$hashkey = $hashval"; }

        return join ', ', @return_string;
        }
}
```

---

```
IMExit.html


<?xml version="1.0" encoding="UTF-8"?>
<!DOCTYPE html PUBLIC "-//W3C//DTD XHTML 1.0 Transitional//EN"
"http://www.w3.org/TR/xhtml1/DTD/xhtml1-transitional.dtd">
<html xmlns="http://www.w3.org/1999/xhtml" xml:lang="en" lang="en">
<head>
<title>IM Exit Frame</title>
</head>
```

```
<script>
var loaded = false;

function alertAcceptReady()
{
    loaded = true;
    if (parent.IMRecv && parent.IMRecv.loaded)
        parent.IMRecv.exitQueueShift();
}
</script>
<body onunload="loaded = false" onload="alertAcceptReady()">

<form name="IMExitForm" id="IMExitForm" action="<<SCRIPTFILE>>" method="post">
<input type="hidden" name="action" value="do_imexit">
<input type="hidden" name="authnum" value="<<AUTHNUM>>">
<input type="hidden" name="callID" value="">
<input type="hidden" name="recip" value="">
</form>

</body>
</html>
```

```
IMIntroLoggedIn.html

<?xml version="1.0" encoding="UTF-8"?>
<!DOCTYPE html PUBLIC "-//W3C//DTD XHTML 1.0 Transitional//EN"
"http://www.w3.org/TR/xhtml1/DTD/xhtml1-transitional.dtd">
<html xmlns="http://www.w3.org/1999/xhtml" xml:lang="en" lang="en">
<head>
   <title>Instant Messaging System Login</title>
   <style type="text/css">
   .headerText {
      font-family:Verdana, Arial, Helvetica, Sans-Serif;
         font-size:18px;
         font-weight:bold;
   }
   .fieldText {
      font-family:Verdana, Arial, Helvetica, Sans-Serif;
         font-size:12px;
         font-weight:bold;
   }
   .successText {
      font-family:Verdana, Arial, Helvetica, Sans-Serif;
         font-size:10pt;
         font-weight:bold;
      color:#00FF00;
   }
   </style>
</head>
<body>
<span class="headerText" style="color:#666666">
Welcome to the eDial Instant Messenging System
</span>
<br>
<img src="<<MEDIADIR>>/bluegrad.gif" width="90%" height="3" border="0">
```

EDL01-01p                          162

```
<table width="100%" height="50%" border="0" cellpadding="0" cellspacing="0">
  <tr>
    <td align="center">
    <table border="0" cellpadding="1" cellspacing="0">
      <tr>
        <td bgcolor="#9999FF">
        <table border="0" cellpadding="1" cellspacing="1">
          <tr>
            <td bgcolor="#006699" height="25">
            <span class="headerText" style="color:#FFFFFF">Login
Successful</span>
            </td>
          </tr>
          <tr>
            <td bgcolor="#999999" valign="top" height="100%">
            <span class="successText">
            You have successfully logged in to the eDial service.<br>
            In a moment, an IM Control Window should appear at the bottom of
your screen.
            <p>
            You may continue to use this window to browse the web while you are
logged in to the eDial service.
            </span>
            </td>
          </tr>
        </table>
        </td>
      </tr>
    </table>
    </td>
  </tr>
</table>

<noscript>
<p>
<font face="Verdana, Arial, Helvetica" size="2" color="#FF0000"><b>
We're sorry, but you cannot use the eDial Instant Messaging system because your
browser does not support JavaScript or JavaScript is disabled in your browser
preferences.<br>
Please enable JavaScript and reload this page or a
href="http://www.microsoft.com/ie">download</a> and install the latest version
of Internet Explorer to continue.
</b></font>
</noscript>

</body>
</html>
```

---

```
IMOpen.html

<HTML>
<HEAD>
<TITLE>IMOpen</TITLE>
```

EDL01-01p                    163

```
<SCRIPT LANGUAGE="JavaScript">
var windowOpen = 0;

function openWindow()
{
    var isIE = (navigator.appName == "Microsoft Internet Explorer");
    if (!windowOpen)
    {
        var isResizable = (isIE ? "yes" : "no");
        var imWin =
window.open("","","left=50,top=50,width=410,height=260,resizable=" +
isResizable + ",border=no");
        imWin.location = "imWindow.html";
        windowOpen = 1;
    }
}
</SCRIPT>
</HEAD>
<BODY>
<SCRIPT LANGUAGE="JavaScript">openWindow();</SCRIPT>
</BODY>
</HTML>
```

IMSend.html

```
?xml version="1.0" encoding="UTF-8"?>
<!DOCTYPE html PUBLIC "-//W3C//DTD XHTML 1.0 Transitional//EN"
"http://www.w3.org/TR/xhtml1/DTD/xhtml1-transitional.dtd">
<html xmlns="http://www.w3.org/1999/xhtml" xml:lang="en" lang="en">
<head>
<title>IM Send Frame</title>
</head>
<script>
var loaded = false;
var callID = "<<CALLID>>";


<<IMSENDERROR>>

function alertAcceptReady()
{
    loaded = true;
    parent.opener.sendQueueShift(callID);
}
</script>
<body onunload="loaded = false" onload="alertAcceptReady()">
<form name="IMSendForm" id="IMSendForm" action="<<SCRIPTFILE>>" method="post">
<input type="hidden" name="action" value="do_imsend">
<input type="hidden" name="authnum" value="<<AUTHNUM>>">
<input type="hidden" name="callID" value="<<CALLID>>">
<input type="hidden" name="message" value="">
<input type="hidden" name="recip" value="">
</form>

</body>
</html>
```

A-337

EDL01-01p                                    164

---

```
IMWindow.html

<?xml version="1.0" encoding="UTF-8"?>
<!DOCTYPE html PUBLIC "-//W3C//DTD XHTML 1.0 Transitional//EN"
"http://www.w3.org/TR/xhtml1/DTD/xhtml1-transitional.dtd">
<html xmlns="http://www.w3.org/1999/xhtml" xml:lang="en" lang="en">
<head>
<title>IM Window</title>
</head>

<frameset cols="100%" rows="100%, *" frameborder="0" framespacing="0"
border="no">
   <frame name="IMDataWin"
src="<<SCRIPTFILE>>?action=display_im_main&authnum=<<AUTHNUM>>&callID=<<CALLID>
>&recipInit=<<RECIPINIT>>" scrolling="no" noresize="noresize">
<<SENDFRAMES>>
</frameset>

</html>
```

---

```
im-index.html

<?xml version="1.0" encoding="UTF-8"?>
<!DOCTYPE html PUBLIC "-//W3C//DTD XHTML 1.0 Transitional//EN"
"http://www.w3.org/TR/xhtml1/DTD/xhtml1-transitional.dtd">
<html xmlns="http://www.w3.org/1999/xhtml" xml:lang="en" lang="en">
<head>
   <title>Instant Messaging System Login</title>
   <style type="text/css">
   .headerText {
     font-family:Verdana, Arial, Helvetica, Sans-Serif;
        font-size:18px;
        font-weight:bold;
     }
   .fieldText {
     font-family:Verdana, Arial, Helvetica, Sans-Serif;
        font-size:12px;
        font-weight:bold;
     }
   </style>
</head>
<body onload="document.loginForm.username.focus()">
<span class="headerText" style="color:#666666">
Welcome to the eDial Instant Messenging System
</span>
<br />
<img src="bluegrad.gif" width="90%" height="3" alt="-----" />
<p> </p>
<form name="loginForm" id="loginForm" action="/cgi-bin/im/nph-im.pl"
method="post">
<input type="hidden" name="action" value="login_user" />
<table width="100%" border="0" cellpadding="0" cellspacing="0">
```

---

A-338

EDL01-01p

165

```
<tr>
  <td> </td>
</tr>
<tr>
  <td> </td>
</tr>
<tr>
  <td align="center">
  <table border="0" cellpadding="1" cellspacing="0">
    <tr>
      <td bgcolor="#9999FF">
      <table border="0" cellpadding="1" cellspacing="1">
        <tr>
          <td bgcolor="#006699" height="25">
          <span class="headerText" style="color:#FFFFFF">Please Log In</span>
          </td>
        </tr>
        <tr>
          <td bgcolor="#999999" valign="top" height="100%">
          <table border="0" cellpadding="1" cellspacing="3">
            <tr>
              <td><span class="fieldText"
style="color:#333333">Username:</span></td>
              <td><span class="fieldText"><input type="text" name="username"
size="25" maxlength="50" class="fieldText" style="font-weight:normal"
/></span></td>
            </tr>
            <tr>
              <td><span class="fieldText"
style="color:#333333">Password:</span></td>
              <td><span class="fieldText"><input type="password"
name="password" size="25" maxlength="50" class="fieldText" style="font-
weight:normal" /></span></td>
            </tr>
            <tr><td colspan="2"> </td></tr>
            <tr>
              <td colspan="2" align="center">
              <span class="fieldText">
              <input type="submit" value="Log In" />
              </span>
              </td>
            </tr>
          </table>
          </td>
        </tr>
      </table>
      </td>
    </tr>
  </table>
  </td>
</tr>
</table>
</form>
</body>
</html>
```

A-339

# EXHIBIT 11



## Illustrated Computer Dictionary For Dummies®, 2nd Edition

Published by
**IDG Books Worldwide, Inc.**
An International Data Group Company
919 E. Hillsdale Blvd.
Suite 400
Foster City, CA 94404

Text and art copyright © 1995 by IDG Books Worldwide, Inc. All rights reserved. No part of this book, including interior design, cover design, and icons, may be reproduced or transmitted in any form, by any means (electronic, photocopying, recording, or otherwise) without the prior written permission of the publisher.

Library of Congress Catalog Card No.: 95-77668

ISBN: 1-56884-218-X

Printed in the United States of America

10 9 8 7 6 5 4 3 2 1

2A/QW/QX/ZV

Distributed in the United States by IDG Books Worldwide, Inc.

Distributed by Macmillan Canada for Canada; by Computer and Technical Books for the Caribbean Basin; by Contemporanea de Ediciones for Venezuela; by Distribuidora Cuspide for Argentina; by CITFC for Brazil; by Ediciones ZETA S.C.R. Ltda. for Peru; by Editorial Limusa SA for Mexico; by Transworld Publishers Limited in the United Kingdom and Europe; by Al-Maiman Publishers & Distributors for Saudi Arabia; by Simron Pty. Ltd. for South Africa; by IDG Communications (HK) Ltd. for Hong Kong; by Toppan Company Ltd. for Japan; by Addison Wesley Publishing Company for Korea; by Longman Singapore Publisher Ltd. for Singapore, Malaysia, Thailand, and Indonesia; by Unalis Corporation for Taiwan; by WS Computer Publishing Company, Inc. for the Philippines; by WoodsLane Enterprises Ltd. for New Zealand.

For general information on IDG Books Worldwide's books in the U.S., please call our Consumer Customer Service department at 800-762-2974. For reseller information, including discounts and premium sales, please call our Reseller Customer Service department at 800-434-3422.

For information on where to purchase IDG Books Worldwide's books outside the U.S., contact IDG Books Worldwide at 415-655-3021 or fax 415-655-3295.

For information on translations, contact Marc Jeffrey Mikulich, Director, Foreign & Subsidiary Rights, at IDG Books Worldwide, 415-655-3018 or fax 415-655-3295.

For sales inquiries and special prices for bulk quantities, write to the address above or call IDG Books Worldwide at 415-655-3200.

For information on using IDG Books Worldwide's books in the classroom, or for ordering examination copies, contact Jim Kelly at 800-434-2086.

For authorization to photocopy items for corporate, personal, or educational use, please contact Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923, or fax 508-750-4470.

**Limit of Liability/Disclaimer of Warranty:** The authors and publisher have used their best efforts in preparing this book. IDG Books Worldwide, Inc., and the author make no representation or warranties with respect to the accuracy or completeness of the contents of this book and specifically disclaim any implied warranties of merchantability or fitness for any particular purpose and shall in no event be liable for any loss of profit or other commercial damage, including but not limited to special, incidental, consequential, or other damages.

**Trademarks:** All brand names and product names used in this book are trademarks, registered trademarks, or trade names of their respective holders. IDG Books Worldwide is not associated with any product or vendor mentioned in this book.

 is a registered trademark under exclusive license to IDG Books Worldwide, Inc., from International Data Group, Inc.

*cookie* **89**

### controller

**Pronunciation:** *kon-troll-er.*

**Meaning:** As silly as it sounds, something that controls something else. A hard disk controller is the circuitry that controls the hard drive, connecting it to the computer. A video controller (more commonly, video adapter) controls your monitor and connects it to the computer's motherboard.

**Sentence:** "The problem with Laverne is that her mouth lacks a *controller.*"

### conventional memory

**Pronunciation:** *kon-ven-shin-null mem-or-ree.*

**Meaning:** On IBM PC and compatible computers, the first 640 kilobytes of memory (RAM). This was the limit for a long time, and many programs still can access only conventional memory. (See also *upper memory, expanded memory,* and *extended memory.*)

**Sentence:** "In the era of multimegabyte computers, it's a severe drag that we still have to put up with the *conventional memory* limitation."

### converter

**Pronunciation:** *kon-vert-her.*

**Meaning:** Hardware or software that changes one item into another, such as an AC to DC power converter or a WordPerfect to Microsoft Word document file converter.

**Sentence:** "Tim's too lame to buy WordPerfect. So I had to use a special file *converter* so that he could use my WordPerfect files in WordStar."

### cookie

**Pronunciation:** *koo-kee.*

**Meaning:** A thin, baked piece of flavored dough that tastes great and contains nearly every chemical and substance known to man that causes heart disease, cancer, and tooth decay. It also refers to a goodie, present, or prize included in a computer program.



**Sentence:** "To keep us happy in the office, our IS guy installed a *cookie* that pops up and tells us a joke each time we log onto the network. Alas, the joke most often is 'network unavailable.'"



# EXHIBIT 12


LIBRARY
5 PALO ALTO SQUARE
PALO ALTO, CA 94306

# Dictionary of
# Computing

### Fourth Edition

Oxford  New York  Tokyo
OXFORD UNIVERSITY PRESS
1996

Oxford University Press, Walton Street, Oxford OX2 6DP

Oxford  New York

Athens  Auckland  Bangkok  Bogota  Bombay
Buenos Aires  Calcutta  Cape Town  Dar es Salaam
Delhi  Florence  Hong Kong  Istanbul  Karachi
Kuala Lumpur  Madras  Madrid  Melbourne
Mexico City  Nairobi  Paris  Singapore
Taipei  Tokyo  Toronto

and associated companies in
Berlin  Ibadan

Oxford is a trade mark of Oxford University Press

Published in the United States
by Oxford University Press Inc., New York

© Market House Books, 1983, 1986, 1990, 1996

First published 1993
Reprinted 1983, 1984, 1985
Second Edition 1986
Third Edition 1990
Reprinted 1990, 1991 (twice), 1992
Fourth Edition 1996

All rights reserved. No part of this publication may be
reproduced, stored in a retrieval system, or transmitted, in any
form or by any means, without the prior permission in writing of Oxford
University Press. Within the UK, exceptions are allowed in respect of any
fair dealing for the purpose of research or private study, or criticism or
review, as permitted under the Copyright, Designs and Patents Act, 1988, or
in the case of reprographic reproduction in accordance with the terms of
licences issued by the Copyright Licensing Agency. Enquiries concerning
reproduction outside those terms and in other countries should be sent to
the Rights Department, Oxford University Press, at the address above.

This book is sold subject to the condition that it shall not,
by way of trade or otherwise, be lent, re-sold, hired out, or otherwise
circulated without the publisher's prior consent in any form of binding
or cover other than that in which it is published and without a similar
condition including this condition being imposed
on the subsequent purchaser.

A catalogue record for this book is available from the British Library

Library of Congress Cataloging in Publication Data
(Data available)
ISBN 0–19–853855–3

Text prepared by Market House Books Ltd, Aylesbury
Printed in Great Britain by
Biddles Ltd, Guildford & King's Lynn

**CLEAR** 76

**clear** An *instruction or *microinstruction that causes a designated variable, register, or counter to be set to the all-zero state (i.e. cleared).

**Clear** A language for writing formal *specifications, first described by R.M. Burstall and J.A. Goguen in 1977. The language provides a formalism for expressing a complex specification hierarchically as a combination of simpler ones. This formalism can be given a precise semantics using ideas familiar from *algebra and *category theory.

**CLI** *Abbrev. for* command-line interface.

**click** To press and release a button on a *mouse or similar device, or (as a noun) the action of pressing and releasing a button. This will be interpreted by the current program as a request for some action to be performed. Most mice have one, two, or three buttons, so the prefixed forms *left click, right click, middle click* are often used. The *double click* consists of two clicks of the same button in quick succession; when performed too quickly or too slowly then the user's intention is misunderstood. To *click and drag* involves holding a button down while moving the mouse; this technique is often used first to select (click) and then to move (drag) an object on the screen.

**click and drag** *See* click.

**client** In general, someone or something receiving a service of some kind. Within computing the term frequently refers to one element of a *client/server system, typically an *application, that communicates with the end-user by means of a *server.

**client/server (c/s)** In general terms a client receives a service of some sort from a server. As applied to computing, the relationship between the *clients and the *servers is formalized so as to allow different aspects of a computational task to be subdivided among a server, which acts as an agent on behalf of the end-user, and a collection of clients for the service(s) offered by that server. Each client needs to bring about the completion of a set of activities that represent components of a complete computational task; the client achieves this by requesting services from the collection of servers for each separate activity. Clearly it may be necessary to complete some activities before others can be started, while it may be possible to allow some activities to be run in any order or to be run all at the same time. When a client calls on a server to perform a service, the client will indicate the service to be carried out and the details of the way in which the server should respond to the client when the service is completed. The response from the server may indicate successful conclusion, together with the value of the result, or may indicate some form of failure. The role of the client is to combine the responses from the servers, and to ensure that the separate subactivities are run in such a way as to observe any necessary constraints on the order in which they are initiated or completed.

It is not necessary for the clients and the servers to be running on the same computer system. Indeed, the use of client/server systems is especially effective where many users on a network require a range of different services, which can be best supplied by the use of a specialized hardware configuration provided at a small number of locations on the network.

Many of the ideas underlying client/server computing were first given a firm definition in the *X Windows system. *See also* interprocess communication, remote procedure call.

**clip art** Simple drawings held in digital form on a computer. These items are often supplied in large libraries of files that can easily be incorporated into word processor or presentation graphics documents. They are either supplied as a component of a software package, such as a word processing package, or as a separate product. The individual pictures are often line drawings of a single object, free of background material.

**clipboard** A temporary storage location where a section *cut or *copied from displayed textual or graphical information is held until it can be *pasted into another location. The technique can be used within a text editor or word processor session to move or copy within a given document, or in a *graphical user

programming was well suited to the control of the complex sequences of register transfers required by CISC instruction sets. Contemporary RISC processors with their emphasis on the rapid execution of simple instruction sets usually employ random logic control to optimize performance.

**control flow** The sequence of execution of statements in a program.

**control-flow graph** A *directed graph representing the sequence of execution in a program unit, in which nodes represent branching points or subprogram calls in a program, and arcs represent linear sequences of code. From the control-flow graph an analysis can show

the structure of the program,
starts and ends of program segments,
unreachable code and dynamic halts,
branches from within loops,
entry and exit points for loops,
paths through the program.
*See also* static analysis.

**control key** *See* keyboard, control character.

**controlled sharing** Making used resources available to more than one using resource through an *access control mechanism.

**controller** A subsystem that governs the functions of attached devices but generally does not change the meaning of the data that may pass through it. The attached devices are usually peripherals or communication channels. One of the functions of the controller may involve processing the data stream in order to format it for transmission or recording.

**control line** A conductor in a multiwire interface that conveys a control signal.

**control memory** *Another name for* microprogram store.

**control points** Points used in the specification of curves to define the general required shape.

**control record** A record that contains *control totals* derived by summing values from other records in a file. The totals may or may not have some sensible meaning. Their purpose is to check that none of the preceding records

has been lost or altered in some way. *See also* hash total.

**control sequence** A string of characters used to control the operation of a peripheral device. The composition of these strings is defined in ISO 6429. This standard does allow latitude for manufacturers to define proprietary sequences for specific purposes, and many such sequences are in use; 7-bit and 8-bit versions of the *control characters are defined. An earlier standard widely used in the US is ANSI X3.64. *See also* escape sequence.

**control stack** A stack mechanism that contains an instruction sequence. It is part of the control unit in a computer with stack architecture. *See* stack processing.

**control structure** A syntactic form in a language to express flow of control. Common control structures are

if...then...else,    while...do,
repeat...until,    and    case.

**control total** *See* control record.

**control unit (CU)** The portion of a *central processor that contains the necessary *registers, *counters, and other elements to provide the functionality required to control the movement of information between the memory, the *ALU, and other portions of the machine.

In the simplest form of the classical von Neumann architecture, the control unit contains a *program counter, an *address register, and a register that contains and decodes the *operation code. The latter two registers are sometimes jointly called the *instruction register*. This control unit then operates in a two-step *fetch-execute* cycle. In the fetch step the instruction is obtained (fetched) from memory and the decoder determines the nature of the instruction. If it is a *memory reference instruction the execute step carries out the necessary operation(s) and memory reference(s). In some cases, e.g. a *nonmemory reference instruction, there may be no execute step. When the instruction calls for *indirect addressing, an additional step, usually called "defer", is required to obtain the indirect address from the memory. The last action during the execute step is to incre-

## PROCESS CALCULUS

entity, despite the fact that the operation may actually be achieved by some sequence of lower-level operations (*see also* abstraction). Procedural abstraction has been extensively employed since the early days of computing, and virtually all programming languages provide support for the concept (e.g. the SUBROUTINE of Fortran, the procedure of Algol, Pascal, Ada, etc.).

**procedural cohesion** *See* cohesion.

**procedural language** An *imperative *procedure-oriented language.

**procedure** A section of a program that carries out some well-defined operation on data specified by *parameters. It can be *called from anywhere in a program, and different parameters can be provided for each call.

The term procedure is generally used in the context of high-level languages; in assembly language the word *subroutine is more commonly employed.

**procedure-oriented language** A programming language that enables a program to be specified by defining a collection of *procedures. These procedures may call each other, and are called by the main program (which can itself be regarded as a procedure).

**process** 1. **(task)** A stream of activity. A process is defined by its code, i.e. the ordered set of machine instructions defining the actions that the process is to take, the contents of its *workspace, i.e. the set of data values that it can read, write, and manipulate, and its *process descriptor, which defines the current status of any resources that are allocated to the process.

2. To carry out the actions defined by the sequence of instructions that make up the code of a program.

**process algebra** The algebraic study of abstract computing processes. Suppose that there is a set $A$ of basic computational actions (such as assignments, tests, sends, requests), and that these actions can be combined to form finite and infinite processes. There are a number of operations that, given two processes $p_1$ and $p_2$, can form new processes; examples are the *sequential composition* $p_1 \cdot p_2$ and *parallel composition* $p_1 || p_2$ of the

processes. There is a great deal of freedom to define and interpret such operations and the processes they create, especially if the actions and processes may exist concurrently and communicate in various ways. Methods of communication and cooperation between processes are at the heart of process algebra. Process algebra studies semantic ideas using mainly standard algebraic methods, including: axiomatic theories whose axioms are often equations; equivalence relations (e.g. several kinds of bisimulation); algebraic constructions; and computable algebras. An example of a set of axioms for process algebra is the set ACP of J. A. Bergstra and J. W. Klop; this was developed from earlier work on *process calculuses by R. Milner and others, and has subsequently been extended and adapted to express the huge range of semantic phenomena exhibited in modern concurrent communicating systems.

The motivation behind process algebra is to model computing systems using processes and to specify the systems by equations based on appropriate operators on processes. Thus concurrent computing systems are specified by equations and their semantics are obtained by solving fixed-point equations. Various related semantic and logical methods are used, including: *initial algebra semantics; *operational semantics based on transition systems; metric space and topological methods; and *modal and *temporal logics for reasoning about processes.

Process algebra has the potential to become a general theory of computing, relevant to system modeling and parallel-program development. There is much research needed to develop its foundations, tools, and applications.

**process calculus** The study of abstract computing processes by means of various formal systems and calculuses. An early influential calculus was the calculus of communicating systems (CCS) of R. Milner. This has given rise to many adaptations and new approaches to a theory of processes. For example, it led to the systematic development of *process algebra to which many process calculuses may be said to belong, and it inspired an influential

**PROCESS CONTROL**                                    388

reformulation of the parallel language *CSP as a process calculus by C. A. R. Hoare.

**process control** Use of a dedicated computer (known as a *process controller*) to control a specific industrial or manufacturing process. Information (sensed) from that process is used as a source of data; computations made upon that data determine control signals to be sent to the process. The computations may involve some statistical properties (such as moving average) for *statistical process control*.

In general there are two forms of process control: *continuous* and *discrete*. Continuous process control is involved with the manufacturing of some form of continuous product, primarily chemicals, an example being the automatic control of a catalytic cracker for petroleum distillation. Although chemicals may be manufactured in batches, this is still considered a continuous process since the variables that control the process can be varied continuously. Discrete control is concerned with the manufacturing of individual (discrete) items, as in the welding of two parts to form a larger assembly. Discrete process control has strong connections with *industrial robotics. See also* numerical control, computer-aided manufacturing, computer-integrated manufacturing.

**process descriptor** A set of information that defines the status of resources allocated to a *process. When a system contains a number of processes, any of which may be active at any one time, there will be for each process a descriptor defining the status of that process. Within the descriptor the *ready* indicator shows whether the particular process is able to proceed, or whether it must await the completion of some other activity before it can be executed by the CPU. For processes that are unable to run, the process descriptor will indicate the reason for which that process is *suspended* and will contain pointers to relevant queues and semaphores. The process descriptor will also contain a copy of the contents of the processor registers that are to be reinstated when the process is restarted. When a process is running, the process descriptor will contain information (the *resource descriptor*) on the resources allocated to the process and on the permissible operations on these resources.

**process model** *See* software development process model.

**process modeling** A form of modeling where the model produced is a *software or *system development process.

**processor** A computer, usually/often the *central processor. *See also* microprocessor, I/O processor, communication processor.

**processor allocation** The measure of the amount of processor resource that is available to a *process. Normally the allocation will be expressed as a time, or as a number of instructions to be executed.

**processor status word (PSW)** A word that describes fully the condition of a processor at each instant. It indicates which classes of operations are allowed and which are forbidden, and the status of all interrupts associated with the processor. It will also contain the address of the instruction currently being executed. The PSW is held in a *register known as the *processor status register. See also* program status word.

**processor time (CPU time)** The time for which a *process has been receiving service from the processor. *See also* system accounting.

**product group** *Another name for* direct product.

**production** *See* grammar, semi-Thue system.

**production rule system (production system)** A programming language in which the programs consist of *condition* $\Rightarrow$ *action* rules; these rules are known as *productions* or *production rules*. The programs are interpreted by a repetition of the following operations: all rules whose conditions are satisfied are found, one of them is selected, and its action is called. Such systems are often known as *rule-based systems* in artificial intelligence.

**production run** Execution of a program in the normal way to produce useful results. *Compare* dry run.

**productive time** *See* available time.

**SERIAL IN SERIAL OUT**                                                444

munication may be *asynchronous*, where the data characters include start and stop bits to delimit the data, or *synchronous*, where such additional bits are omitted and the delimiting of the data depends purely on timing. Asynchronous serial communication is more flexible whereas synchronous serial communication makes better use of available bandwidth. Asynchronous methods are generally used with dial-up modems or for general connection of simple serial peripherals. Synchronous methods are usually to be found where *leased lines or proprietary interfaces are used.

**serial in serial out (SISO)** A term used to describe a *shift register that, by implication, cannot be loaded in parallel and cannot be read in parallel: data can only enter or leave the device serially.

**serial interface** A connection point through which information is transferred one digital bit at a time. The rate may be high, e.g. 10 megabits per second as in Ethernet, or as slow as 110 bits per second via an RS232C interface. The term is sometimes applied to interfaces such as the RS232C and RS422 in which the data is transferred serially via one path, but some control signals can be transferred simultaneously via parallel paths. *Compare* parallel interface, serial-parallel.

**serial-parallel** A combination of serial and parallel processing; for example, a decimal string is often processed as 4 bits in parallel, and successive 4-bit units are processed serially.

**serial port** An input/output socket on a computer or other device that is used for *serial input/output, often making use of the *RS232C standard. The physical port may have a 25- or 9-pin subminiature D connector or an RJ45 connector (which looks like a telephone connector). From the software, a serial port is usually treated as a *device rather than a file.

**serial printer** A printer that prints one character at a time in the sequence in which they appear in the line of text. The sequence may be taken from left to right, or it may be in alternate directions for alternate lines thus avoiding an unproductive carriage-return

movement. All serial printers have an arrangement in which a print head moves parallel to the paper and along the line to be printed. The print may be formed by impacting an inked ribbon against the paper, as in the case of *dot matrix printers, or by one of the nonimpact marking technologies such as *inkjet or *thermal printers. In some designs the productivity is increased when printing other than complete lines by arranging for the head to move at high speed when passing blank areas. The direction in which the line is to be printed is also optimized.

The speed of a serial printer appears slow compared to the equivalent character per second rate for a *line printer printing full lines. However, the serial printer's ability to print short lines more quickly improves its performance on applications with short lines, such as addresses and amounts on preprinted forms. A 200 cps serial printer can print some types of consumer bills at a rate equivalent to 300 lines per minute.

**serial process** A *process in which stages in the process are executed in a strictly serial manner, one stage completing before the next starts, and with only one stage active at any one instant.

**serial programming** *See* single threading.

**serial transfer** Transmission of information as sequential units. For example, if two computers connected by a single wire wish to communicate an 8-bit unit of information, the sending computer would transmit each of the eight bits in sequence over the wire, while the receiving computer would reassemble the sequential bits into the original 8-bit units. *Compare* parallel transfer.

**serpentine recording** A method of recording on magnetic tape (usually in cartridge form) where each track is recorded separately and alternate tracks are recorded in opposite directions, so that it is not necessary to rewind the tape after recording each track.

**server** A system on a network that provides a service to other systems connected to the network. The term was originally restricted to the case where both the server and the systems it served were on the same local area network, and where the server was likely to

be expensive in comparison with the systems it served. The term is now used much more generally, applying to systems where the server and the system to which it provides a service (the client) may be linked by a metropolitan area network or wide area network, and where the server may be much less costly than the client. *See also* client/server, file server, compute server.

**service bit** A bit in an *X25 *packet that indicates whether the packet is formatted to contain primarily data or control information.

**service engineering** Any maintenance, *preventive or *remedial.

**service level agreement (SLA)** An agreement between the supplier of a service and the users of that service that sets out the levels of service that will be offered, preferably in quantitative terms, and the obligations on the user of the service. A typical agreement for a computing service or network service will set out the expected levels of service measured in terms of one or more of the following: availability, fault reporting, recovery from breakdowns, traffic levels, throughput, response times, training and advisory services, and similar measures of the service quality as seen by the end-user. The agreement will also set out user costs and charges, the provision of access to premises for service contractors, and standards of training to be achieved by users. The agreement may form part of a legal contract, yet is equally likely to be found within a single large organization where one unit within the organization offers services to other units, but where a legally enforceable contract would not be appropriate.

**session layer** of network protocol function. *See* seven-layer reference model.

**set 1.** A collection of distinct objects of any sort. The objects in the set are called its *members* or *elements*. An element can occur at most once in a set and order or arrangement is unimportant. If $x$ is a member of the set $S$ it is customary to write

$$x \in S$$

If $x$ is not a member of $S$ this can be expressed as

$$x \notin S$$

and is equivalent to

$$\text{NOT} \ (x \in S)$$

i.e. $\in$ and $\notin$ can be regarded as operators. When any element in set $S$ is also in set $T$, and vice versa, the two sets are said to be *identical* or *equal*.

A *finite set* has a fixed finite number of members and a notation such as

$$\{\text{Ada, Pascal, Cobol, C}\}$$

is possible; the members are separated by commas and here are just the names of various programming languages. When the number of elements is not finite, the set is said to be *infinite* and explicit enumeration of the elements is not then possible.

Infinite and finite sets can be described using a *predicate or statement such as $p(x)$ that involves $x$ and is either true or false, thus

$$\{x \mid p(x)\}$$

This is read as "the set of all elements $x$ for which $p(x)$ is true", the elements being characterized by the common property $p$. Examples of sets described in this way are (letting $R$ be the set of real numbers):

$$\{(x,y) \mid x \in R, y \in R, \text{and } x + y = 9\}$$
$$\{n \mid n \text{ is a prime number}\}$$
$$\{l \mid l \text{ is the name of a language}\}$$

There is an implicit assumption here that there is some algorithm for deciding whether $p(x)$ is true or false in any particular case.

The idea of a set is fundamental to mathematics. It forms the basis for all ideas involving *functions, *relations, and indeed any kind of *algebraic structure. Authors differ considerably in the way they define sets. A mathematical logician will distinguish carefully between classes and sets, basically to ensure that paradoxes such as *Russell's paradox cannot occur in sets. However, the informal definition is adequate for most purposes.

*See also* operations on sets.

**2.** Any data structure representing a set of elements. One example is a *characteristic vector.

**3.** To cause the condition or state of a switch, signal, or storage location to change to the positive condition.

**set algebra** The *algebra that consists of the *set of *subsets of some *universal set $U$

**time sharing** A technique, first advocated by Christopher Strachey, for sharing the time of a computer among several jobs, switching between them so rapidly that each job appears to have the computer to itself. *See also* multiaccess system.

**time slicing** Process scheduling in which a *process is allowed to run for a predefined period of time, now called a *quantum, before rescheduling. *See also* scheduling algorithm.

**timestamp** The time and date of an operation or event when automatically added to a screen display, log file, or output file of a computer procedure. It is a valuable aid to the tracking down of errors and can be used as part of an auditing process. The time and date are derived from the computer's internal *real-time clock.

**timing analysis** The use of structural information of a program and a knowledge of the processor instruction or module execution times to synthesize the temporal behavior of a software system. For sequential systems this is a simple analysis. For highly concurrent systems the use of simulation techniques or queuing models may be necessary, and system performance/time response becomes stochastic rather than deterministic. *See also* performance testing.

**timing diagram** A graphical description of the operation of a *sequential circuit; the state(s) of all the relevant variables (inputs, internal memory, and outputs) are shown as functions along the time dimension.

**tint fill** *See* soft fill.

**TIP** *Acronym for* terminal interface processor. A specially configured *IMP that was the ARPANET equivalent of a *PAD.

**tip node** *Another name for* leaf node.

**Tk** A toolkit of windowing functions added to *Tcl that simplifies the production of X Window system interfaces to applications.

**T²L** *See* TTL.

**TLB** *Abbrev. for* translation look-aside buffer.

**TLU** *Abbrev. for* table lookup.

**TM** *Abbrev. for* Turing machine.

**toggle 1.** Anything that can be set to one of two states. It usually conveys meaning, as in "printer on/printer off", or at a lower level "direct address/indirect address", or perhaps in a word-processing system "bold on/bold off".

**2.** To change the state of a toggle.

**toggling speed** *Another name for* switching speed.

**token 1.** One of the meaningful units (names, constants, reserved words, etc.) in the input to a compiler. The *lexical analyzer breaks up the input, which is a stream of characters, into a sequence of tokens.

**2.** A unique sequence of bits granting send permission on a network. *See* token ring, token bus.

**3.** *See* Petri net.

**token bus** A form of network (usually a *local area network) in which access to the transmission medium is controlled by a *token. The network stations (nodes) are interconnected by a *bus, i.e. signals are placed on the transmission medium by one station and can be read by all the other stations. If the signal is a token, indicating that the station that was last transmitting has now finished, the token is passed from station to station in a strict sequence. In a *token ring this sequence is determined by the order in which stations are physically connected to the transmission medium. A station wishing to transmit will start to do so by removing the token from the bus and replacing it with the data to be transmitted; when transmission is complete, the transmitting station will reinitiate the token passing process.

A token bus system has the advantage that the priority of stations can be redefined by redefining the order in which stations are permitted to acquire the token.

**token ring** A *ring network architecture configured on the basis that each station (node) on the ring awaits the arrival of a *token from the adjacent upstream node, indicating that it is allowed to send information toward the downstream node. The network is configured in a manner that ensures that only a single token is present on the ring at one time. When a sending node intercepts the token, it

**WORLD WIDE WEB**

- Checking of spelling according to general and specialist dictionary files.
- Document formatting and printing using a choice of paper sizes and formats with multiple copies as required.
- Text justification to specified margins with automatic hyphenation.
- Ability to create a document from a standard template, e.g. one containing a company letter heading.
- Use of alternative character sets such as bold, italic, underlined.
- Layout of tables, figures, etc.
- Substitution of variable information when printing the document for easy production of form letters, etc.

**word processor 1.** A computer program to perform *word processing.

**2.** A system designed specifically for word processing.

**word size (word length)** *See* word.

**word wrap** *See* wraparound.

**work area** *Another name for* workspace.

**workbench** *Another name for* software development environment.

**work file** *See* file.

**working set** The set of *pages currently in use by a process. A process running in a *virtual memory environment can be regarded as having a subset of its total address space actually in use over any short period of time. The objective of the *memory management system is to ensure that for each process those pages, and only those pages, that are actually in use are retained in memory, thus maximizing the *hit rate for these pages.

**workspace (work area)** A block of locations within the main memory that are used for the temporary storage of data during processing. The user of an application such as a spreadsheet, word processor, or statistical package perceives the workspace as the space containing, and hence limiting, the tables, graphics, documents, data matrices, etc., that are currently being operated upon.

**workstation** A position for an operator that is equipped with all the facilities required to perform a particular type of task. A satisfactory workstation must take into account desk,

seating, media-handling, and storage facilities and also lighting and other environmental factors such as noise, drafts, and glare.

A workstation is often a powerful computer system that has excellent graphics and a very fast processor, is highly interactive, and is usually part of a network. Such systems are much used in engineering, electronics, energy, and aerospace industries, and in universities. Applications include *CAD, *desktop publishing, and *AI research. In data processing and office systems the basic electronic equipment would normally be a visual display and keyboard; however there may also be ancillary electronic equipment such as magnetic storage devices, printer, OCR, or bar-code scanner.

**world coordinates (WC)** The preferred coordinate system used by an application.

**World Wide Web (Web, WWW, W3, W3)** A distributed information service that was developed at CERN, the European Laboratory for Particle Physics, Geneva, in the early 1990s. The Web is a large-scale distributed *hypermedia system that is based on cooperating *servers attached to a network, usually the *Internet, and allows access to "documents" containing "links". It is accessed using a workstation that is connected to the network and is running a suitable utility program.

Within the Web, documents are presented in *hypertext mark-up language (HTML), and may consist of textual material or a number of other forms, such as graphics, still or moving video images, or audio clips. Each form of document has associated with it a *player, a means of displaying that document on a suitably configured workstation. Within a document there will be material to be displayed and usually one or more links, which in a text document appear as highlighted words or phrases, or as icons. The links hold embedded pointers to other documents located elsewhere on the Web by the use of a *URL. A URL contains information specifying the network protocols to be used, the network address of the server holding the document, and the local index entry for that document. Activating a link, typically by

# EXHIBIT 13

THE ULTIMATE COMPUTER REFERENCE

*Microsoft* Press







Over **8,000** Entries

with online updates available quarterly

Microsoft

# Computer Dictionary

## Fourth Edition

- *Three new appendixes, including Y2K, file extensions, and Internet domains*
- *Searchable text on CD-ROM*
- *Extensive coverage of hardware, software, the Internet, and more!*
- *Detailed illustrations and diagrams for easy reference*

PUBLISHED BY
Microsoft Press
A Division of Microsoft Corporation
One Microsoft Way
Redmond, Washington 98052-6399

Copyright © 1999 by Microsoft Corporation

All rights reserved. No part of the contents of this book may be reproduced or transmitted in any form or by any means without the written permission of the publisher.

Library of Congress Cataloging-in-Publication Data
Microsoft Computer Dictionary. -- 4th ed.
        p. cm.
    Previous eds. published under title: Microsoft Press computer
  dictionary
    ISBN 0-7356-0615-3
    1. Computers Dictionaries.   2. Microcomputers Dictionaries.
  I. Microsoft Press computer dictionary.
  QA76.15.M538   1999
  004'.03--dc21                                        99-20168
                                                        CIP

Printed and bound in the United States of America.

  2  3  4  5  6  7  8  9   MLML    4  3  2  1  0  9

Distributed in Canada by Penguin Books Canada Limited.

A CIP catalogue record for this book is available from the British Library.

Microsoft Press books are available through booksellers and distributors worldwide. For further information about international editions, contact your local Microsoft Corporation office or contact Microsoft Press International directly at fax (425) 936-7329. Visit our Web site at mspress.microsoft.com.

Macintosh, Power Macintosh, QuickTime, and TrueType fonts are registered trademarks of Apple Computer, Inc. Kodak is a registered trademark of the Eastman Kodak Company. Intel is a registered trademark and Indeo is a trademark of Intel Corporation. Active Desktop, Active Directory, ActiveMovie, Active Platform, ActiveX, Authenticode, BackOffice, DirectInput, DirectX, Microsoft, Microsoft Press, MS-DOS, MSN, NetMeeting, NetShow, Visual Basic, Visual C++, Visual J++, WebTV, WebTV Network, Win32, Win32s, Windows, Windows NT, and XENIX are either registered trademarks or trademarks of Microsoft Corporation in the United States and/or other countries. PANTONE is a registered trademark of Pantone, Inc. Other product and company names mentioned herein may be the trademarks of their respective owners.

The example companies, organizations, products, people, and events depicted herein are fictitious. No association with any real company, organization, product, person, or event is intended or should be inferred.

**Acquisitions Editor:** Christey Bahn
**Project Editor:** Kim Fryer

objects (blocks of information) that are created in their own applications. These objects can either be physically *embedded* in the destination document, or they can be *linked* to it while remaining in the originating file. Both embedded and linked objects can be edited. Linked objects, however, can be updated to reflect changes made to the source file. *See also* ActiveX, OLE, OpenDoc.



**compound statement** *n.* A single instruction composed of two or more individual instructions.

**compress[1]** *n.* A proprietary UNIX utility for reducing the size of data files. Files compressed with this utility have the extension .Z added to their names.

**compress[2]** *vb.* To reduce the size of a set of data, such as a file or a communications message, so that it can be stored in less space or transmitted with less bandwidth. Data can be compressed by removing repeated patterns of bits and replacing them with some form of summary that takes up less space; restoring the repeated patterns decompresses the data. Lossless compression methods must be used for text, code, and numeric data files; lossy compression may be used for video and sound files. *See also* lossless compression, lossy compression.

**compressed digital video** *n. See* CDV (definition 1).

**compressed disk** *n.* A hard disk or floppy disk whose apparent capacity to hold data has been increased through the use of a compression utility, such as Stacker or Double Space. *See also* data compression.

**compressed drive** *n.* A hard disk whose apparent capacity has been increased through the use of a compression utility, such as Stacker or Double Space. *See also* compressed disk, data compression.

**compressed file** *n.* A file whose contents have been compressed by a special utility program so that it occupies less space on a disk or other storage device than in its uncompressed (normal) state. *See also* installation program, LHARC, PKUNZIP, PKZIP, utility program.

**Compressed SLIP** \kəm-presd` slip`\ *n.* Short for **Compressed Serial Line Internet Protocol.** A version of SLIP using compressed Internet address information, thereby making the protocol faster than SLIP. *Acronym:* CSLIP. *See also* SLIP.

**compression** *n. See* data compression.

**compressor** *n.* A device that limits some aspect of a transmitted signal, such as volume, in order to increase efficiency.

**CompuServe** *n.* An online information service that is a subsidiary of America Online. CompuServe provides information and communications capabilities, including Internet access. It is primarily known for its technical support forums for commercial hardware and software products and for being one of the first large commercial online services. CompuServe also operates various private network services.

**computation-bound** *adj.* Of, pertaining to, or characteristic of a situation in which the performance of a computer is limited by the number of arithmetic operations the microprocessor must perform. When a system is computation-bound, the microprocessor is overloaded with calculations. *Also called* CPU-bound.

**compute** *vb.* **1.** To perform calculations. **2.** To use a computer or cause it to do work.

**computer** *n.* Any device capable of processing information to produce a desired result. No matter how large or small they are, computers typically perform their work in three well-defined steps: (1) accepting input, (2) processing the input according to predefined rules (programs), and (3) producing output. There are several ways to categorize computers, including class (ranging from microcomputers to supercomputers), generation (first through fifth generation), and mode of processing (analog versus digital). See the table. *See also* analog, digital (definition 2), integrated circuit, large-scale integration, very-large-scale integration.

**computer-aided design** *n. See* CAD.

**computer-aided design and drafting** *n. See* CADD.

**computer-aided design/computer-aided manufacturing** *n. See* CAD/CAM.

**computer-aided engineering** *n. See* CAE.

**computer-aided instruction** *n. See* CAI.

**computer-aided learning** *n. See* CAI.

**computer-aided manufacturing** *n. See* CAM (definition 1).

**computer-aided testing** *n. See* CAT (definition 1).

**Computer and Business Equipment Manufacturers Association** *n. See* CBEMA.

| converter | copy |
|---|---|

ASCII values, and decimal-to-hexadecimal tables. Several conversion tables are in Appendixes A–E.

**converter** *n.* Any device that changes electrical signals or computer data from one form to another. For example, an analog-to-digital converter translates analog signals to digital signals.

**converter box** *n. See* converter.

**cookbook**[1] *adj.* Of, pertaining to, or characteristic of a book or manual that presents information using a step-by-step approach. For example, a cookbook approach to programming might present a series of sample programs that the reader could analyze and adapt to his or her own needs.

**cookbook**[2] *n.* A computer book or manual that presents information using a step-by-step approach. Most often, *cookbook* refers to a programming guide, but it can refer to a book that shows how to accomplish specialized tasks in an application.

**cooked mode** *n.* One of two forms (the other being raw mode) in which an operating system such as UNIX or MS-DOS "sees" the handle, or identifier, for a character-based device. If the handle is in cooked mode, the operating system stores each character in a buffer and gives special treatment to carriage returns, end-of-file markers, and linefeed and tab characters, sending a line of data to a device, such as the screen, only after it reads a carriage-return or end-of-file character. In cooked mode, characters read from standard input are often automatically echoed (displayed) on the screen. *Compare* raw mode.

**cookie** *n.* **1.** A block of data that a server returns to a client in response to a request from the client. **2.** On the World Wide Web, a block of data that a Web server stores on a client system. When a user returns to the same Web site, the browser sends a copy of the cookie back to the server. Cookies are used to identify users, to instruct the server to send a customized version of the requested Web page, to submit account information for the user, and for other administrative purposes. **3.** Originally an allusion to "fortune cookie," a UNIX program that outputs a different message, or "fortune," each time it is used. On some systems, the cookie program is run during user logon.

**cookie filtering tool** *n.* A utility that prevents a cookie on a Web browser from relaying information about the user requesting access to a Web site. *See also* cookie (definition 2).

**cooperative multitasking** *n.* A type of multitasking in which one or more background tasks are given processing time during idle times in the foreground task only if the foreground task allows it. This is the primary mode of multitasking in the Macintosh operating system. *See also* background[1], context switching, foreground[1], multitasking, time slice. *Compare* preemptive multitasking.

**cooperative processing** *n.* A mode of operation characteristic of distributed systems in which two or more computers, such as a mainframe and a microcomputer, can simultaneously carry out portions of the same program or work on the same data. *Compare* distributed processing.

**coordinate** *n.* Any element in a group of references to a particular location, such as the intersection of a certain row and column. In computer graphics and displays, coordinates specify such elements as points on a line, the corners of a square, or the location of a pixel on the screen. In other computer applications, coordinates specify cells on a spreadsheet, data points on a graph, locations in memory, and so on. *See also* Cartesian coordinates, polar coordinates.

**coordinate dimensioning** *n.* A form of spatial positioning in which a point is described, relative to a fixed reference, in terms of its distance and direction along predefined axes. *See also* Cartesian coordinates, three-dimensional model, two-dimensional model.

**coordinated universal time format** *n. See* Universal Time Coordinate.

**copper chip** *n.* A microprocessor that uses copper (rather than the more common aluminum) to connect transistors in a computer chip. Copper chip technology, which was developed by IBM and introduced in 1997, can be expected to boost the speed of a microprocessor by as much as 33 percent.

**coprocessor** *n.* A processor, distinct from the main microprocessor, that performs additional functions or assists the main microprocessor. The most common type of coprocessor is the floating-point coprocessor, also called a numeric or math coprocessor, which is designed to perform numeric calculations faster and better than the general-purpose microprocessors used in personal computers. *See also* floating-point processor.

**copy** *vb.* To duplicate information and reproduce it in another part of a document, in a different file or memory location, or in a different medium. A copy

**C**

113

# EXHIBIT 14



# IBM

# Dictionary of Computing

▼ The most comprehensive computing dictionary ever published

▼ More than 18,000 entries

**Limitation of Liability**

While the Editor and Publisher of this book have made reasonable efforts to ensure the accuracy and timeliness of the information contained herein, neither the Editor nor the Publisher shall have any liability with respect to loss or damage caused or alleged to be caused by reliance on any information contained herein.

Copyright © 1994 by International Business Machines Corporation. All rights reserved. Printed in the United States of America. Except as permitted under the United States Copyright Act of 1976, no part of this publication may be reproduced or distributed in any form or by any means, or stored in a data base or retrieval system, without the prior written permisssion of the publisher.

1 2 3 4 5 6 7 8 9 0   DOC/DOC   9 9 8 7 6 5 4 3

ISBN 0-07-031488-8 (HC)
ISBN 0-07-031489-6 (PBK)

*The sponsoring editor for this book was Daniel A. Gonneau and the production supervisor was Thomas G. Kowalczyk.*

*Printed and bound by R. R. Donnelley & Sons Company.*

**Tenth Edition (August 1993)**

This is a major revision of the *IBM Dictionary of Computing,* SC20-1699-8, which is made obsolete by this edition. Changes are made periodically to the information provided herein.

It is possible that this material may contain reference to, or information about, IBM products (machines and programs), programming, or services that are not announced in your country. Such references or information must not be construed to mean that IBM intends to announce such IBM products, programming, or services in your country. Comments may be addressed to IBM Corporation, Department E37/656, P. O. Box 12195, Research Triangle Park, NC 27709.

**International Edition**

Copyright © 1994 by International Business Machines Corporation. Exclusive rights by McGraw-Hill, Inc. for manufacture and export. This book cannot be re-exported from the country to which it is consigned by McGraw-Hill. The International Edition is not available in North America.

When ordering this title, use ISBN 0-07-113383-6.

This book is printed on acid-free paper.

**cleartext**                                    **[107]**                                    **clipping**

*Note:* There may be other "clear" keys on the machine used to cancel specified functions.

**cleartext** Synonym for plaintext.

**clear user data** In X.25 communications, data optionally included in the clear request packet by the user application.

**C library** A system library that contains common C language subroutines for file access, string operators, character operations, memory allocation, and other functions.

**click** To press and release a button on a pointing device without moving the pointer off the choice. See double-click. See also drag select.

**client** (1) A user. (2) A functional unit that receives shared services from a server. (T). (3) In an AIX distributed file system environment, a system that is dependent on a server to provide it with programs or access to programs. (4) In AIX Enhanced X-Windows, an application program that connects to an Enhanced X-Windows server by means of an inter-process communication (IPC) path, such as a Transmission Control Protocol (TCP) connection or a shared memory buffer. The program can be referred to as the client of the server, but it is actually the interprocess communication path itself. Programs with multiple paths open to the server are viewed as multiple clients by the protocol. (5) In AIX Enhanced X-Windows, a Toolkit routine that uses a widget in an application or for composing another widget. (6) In AIXwindows, a software program that fills the role of the client in the traditional client-server model upon which Enhanced X-Windows and AIXwindows are based.

**client agent** See Location Broker Client Agent.

**client area** In SAA Advanced Common User Access architecture, the part of the window inside the border that is below the action bar. It is the user's workspace, where a user types information and selects choices from selection fields. In primary windows, it is the area where an application programmer presents the objects that a user works on.

**client end node** An end node for which the network node provides network services.

**client-server** In TCP/IP, the model of interaction in distributed data processing in which a program at one site sends a request to a program at another site and awaits a response. The requesting program is called a client; the answering program is called a server.

**client-side caching** In the AIX operating system, a high-speed buffer storage that contains frequently accessed information associated with a client applica-

tion. The primary purpose of client-side caching is to reduce access time to key information.

**client window** The window in which the application displays output and receives input. This window is located inside the frame window, under the window title bar and any menu bar, and within any scroll bars.

**client workstation** In the NetView Graphic Monitor Facility, a workstation that depends on a server workstation to provide it with views and status information. A client workstation receives status information from the server workstation over an LU 6.2 session.

**clip** (1) In SAA Advanced Common User Access architecture, to truncate information by removing those parts of a displayed image that lie outside a given boundary. (2) In multimedia applications, a section of recorded, filmed, or videotaped material. See also audio clip, video clip.

**clip art** In personal computer software applications, machine-readable artwork that can be retrieved from a file (a "clipboard file") and used completely or in part to create graphics such as computer-generated foils, slides, and hardcopy or softcopy graphs, charts, or pictures.

**clipboard** In SAA Common User Access architecture, an area of computer memory, or storage, that temporarily holds data. Data in the clipboard is available to other applications.

**clip list** In AIX Enhanced X-Windows, a list of rectangles designated for clipping.

**clipping** (1) In computer graphics, removing those parts of display elements that lie outside of given boundary. (I) (A) (2) In System/38 graphics, the process of cutting off the picture at the edge of the window but allowing the lines to be constructed on world coordinates that extend outside the window. (3) In AIX graphics, removal of parts of a primitive that overlap the boundaries of a window. The part of a primitive that appears in the window is displayed and the rest is ignored. There are several types of clipping that occur in the system. Three-dimensional drawing primitives are clipped to the boundaries of a frustum (for perspective transformations) or to a rhombohedron (for orthographic projections). This three-dimensional clipping applies as well to the origin of character strings, but not to the characters themselves. A two-dimensional clipping is also performed, in which all drawing is clipped to the boundaries of the Enhanced X-Windows window. For character strings, clipping of the individual characters to the screenmask is performed. See fine clipping, gross clipping. See also clipping planes, screenmask, transformation, window. (4) Synonym for scissoring.

**compound string**                    **[129]**                    **computer-aided design (CAD)**

**compound string** A type of string designed to simplify national language support by allowing text to be displayed without hard-coding language-dependent attributes such as character sets and text.

**compress** (1) In a character string, to reduce the space taken on a data medium by repetitive characters. (T)   (2) To save storage space by eliminating gaps, empty fields, redundancy, or unnecessary data to shorten the length of records or files.   (3) To move files, libraries, or folders together on disk to create a continuous area of unused space.

**compressed audio** Audio resulting from the process of digitally encoding and decoding up to 40 seconds of voice-quality audio for each individual videodisc, resulting in a potential for over 150 hours of audio per 12-inch videodisc.   Synonymous with still-frame audio.

**compressed disk file** In System/36, a file that contains unprocessed records.

**compressed encoding** (1) A process in which a contiguous string of bits, characters, or data units is reduced to a shorter string in such a way that a second contiguous string, yielding the same short string, cannot be found and the process cannot be reversed. (2) A process in which variable-length messages are reduced to a shorter, fixed-length message.

**compressed pattern storage** Storage that holds the extended fonts for the 3800 printer.

**compressed video** Video resulting from the process of digitally encoding and decoding a video image or segment using a variety of computer techniques to reduce the amount of data required to represent the content accurately.

**compression** (1) The process of eliminating gaps, empty fields, redundancies, and unnecessary data to shorten the length of records or blocks.   (2) In SNA, the replacement of a string of up to 64 repeated characters by an encoded control byte to reduce the length of the data stream sent to the LU-LU session partner. The encoded control byte is followed by the character that was repeated (unless that character is the prime compression character).   See also compaction, string control byte.   (3) In Data Facility Hierarchical Storage Manager, the process of moving data instead of allocated space during migration and recall in order to release unused space.   (4) Contrast with decompression.

**compressor** An electronic device that compresses the volume range of a signal.   See also compandor, expandor.

**COM printer** A page printer that produces on a photographic film a microimage of each page.   Synonymous with computer output microfilm printer. (T)   (A)

**compromise** In computer security, a violation of the security policy of a system in which unauthorized intentional or unintentional disclosure, modification, or destruction, or loss, of an object, may have occurred.

**compromise net** A network, used in conjunction with a hybrid coil to balance a subscriber's loop, that is adjusted for an average loop length or an average subscriber's set, or both, to secure compromise (not precision) isolation between the two directional paths of the hybrid.

**compromising emanations** In computer security, unintentional intelligence-bearing signals that may convey data and that, if intercepted and analyzed, may compromise sensitive information being processed or transmitted by a computer system.

**COMPUSEC** Computer security.

**computational stability** The degree to which a computational process remains valid when subjected to effects such as errors, mistakes, or malfunctions.   (A)

**compute mode** That operating mode of an analog computer during which the solution is in progress. Synonymous with operate mode.   (T)

**computer** A functional unit that can perform substantial computations, including numerous arithmetic operations and logic operations without human intervention during a run.   In information processing, the term computer usually describes a digital computer.   A computer may consist of a stand-alone unit or may consist of several interconnected units.   (T)

**computer abuse** In computer security, a willful or negligent unauthorized activity that affects the availability, confidentiality, or integrity of computer resources.   Computer abuse includes fraud, embezzlement, theft, malicious damage, unauthorized use, denial of service, and misappropriation.   See also information system abuse.

**computer-aided (CA)** Pertaining to a technique or process in which part of the work is done with the assistance of a data processing system.   Synonymous with computer-assisted.   (T)

**computer-aided design (CAD)** The use of a computer to design or change a product, tool, or machine, such as using a computer for drafting or illustrating.

*Note:*  Sometimes, CAD and CAM are used together and expressed as CAD/CAM.   (T)

serially reusable resource (SRR)          [612]                    serviceability

**serially reusable resource (SRR)** A logical resource or object that can be accessed by one task at a time.

**serially shared resource** In ACF/TCAM, a resource that is defined to more than one host node but can be owned by only one host node at a time.   Serially shared resources can be binary synchronous or start-stop lines or stations, physical units (PUs), or logical units (LUs).  See also concurrently shared resource.

**serial interchange node search**   A search request for a specific target sent sequentially to each interchange node in an APPN network.

**serial networks**  A group of SNA networks connected in series by gateways.

**serial number**  An integer denoting the position of an item in a series.  (I)   (A)

**serial operation** (1) Pertaining to the sequential or consecutive execution of two or more operations in a single device such as an arithmetic and logic unit. (A)   (2) Deprecated term for sequential operation.  (3) Contrast with parallel operation.

**serial-parallel converter**  Synonym for staticizer. (T)

**serial port**  An access point through which a computer transmits or receives data, one bit at a time.  Contrast with parallel port.

**serial printer**  Synonym for character printer.

**serial processing** (1) Pertaining to sequential or consecutive execution of two or more processes in a single device, such as a channel or processing unit. (A)   (2) Contrast with parallel processing.

**serial search**  A search in which the members of a set are consecutively examined, beginning with the first member and ending with the last.

**serial sort**  A sort that requires only sequential access to the items in a set.  A serial sort can be performed using only serial access storage devices. (A)

**serial terminal**  A terminal that transmits elements of a signal one after the other.  Contrast with parallel terminal.

**serial-to-parallel converter**  Synonym for deserializer.

**serial transfer**  A transfer of data in which elements are transferred in succession over a single line.

**serial transmission** (1) The sequential transmission of the signal elements of a group representing a character or other entity of data. (I)   (2) In data communication, transmission at successive intervals of signal

elements constituting the same telegraph or data signal.  The sequential elements may be transmitted with or without interruption, provided that they are not transmitted simultaneously;   for example, telegraph transmission by a time divided channel. (A)   (3) Contrast with parallel transmission.

**serveability**  The ability of a service to be obtained, within specified tolerances and other given conditions, when requested by the user and continue to be provided for a requested duration. (T)

**server** (1) A functional unit that provides shared services to workstations over a network;  for example, a file server, a print server, a mail server. (T)   (2) In a network, a data station that provides facilities to other stations;  for example, a file server, a print server, a mail server. (A)   (3) In the AIX operating system, an application program that usually runs in the background and is controlled by the system program controller.  (4) In AIX Enhanced X-Windows, a program that provides the basic windowing mechanism.  It handles interprocess communication (IPC) connections from clients, demultiplexes graphics requests onto screens, and multiplexes input back to clients.  (5) See name server.  (6) In TCP/IP, a system in a network that handles the requests of a system at another site, called a client-server.

**server grabbing**  In the AIX operating system, the action of a client seizing the server for exclusive use to prevent processing requests from other client connections until the grab is complete.  This is typically a transient state for such things as rubber-banding and pop-up menus or to run requests indivisibly.   See button grabbing, key grabbing, keyboard grabbing, pointer grabbing.  See also active grab, passive grab.

**server workstation**  In the NetView Graphic Monitor Facility, a workstation with the graphic monitor.  This workstation uses the graphic monitor and the view administrator for administrative functions.  The server workstation sends status information to client workstations over an LU 6.2 session.

**service** (1) In Open Systems Interconnection architecture, a capability of a given layer and the layers below it that is provided to the next higher layer.  The service of a given layer is provided at the boundary between this layer and the next higher layer. (T)   (2) A customer-related or product-related business function such as design/manufacturing error correction, installation planning, maintenance, customer education, or programming assistance.  (3) The common-carrier facilities provided to meet customers' data transmission requirements;  for example, telephone service.

**serviceability**  The capability to perform effective problem determination, diagnosis, and repair on a data processing system.

# EXHIBIT 15

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SOUND VIEW INNOVATIONS, LLC, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 1:16-CV-116-RGA |
| v. | ) |
| | ) |
| FACEBOOK, INC., | ) **JURY TRIAL DEMANDED** |
| | ) |
| Defendant. | ) |
| | ) |

**DECLARATION OF SANDEEP CHATTERJEE, PH.D.**

1

**TABLE OF CONTENTS**

I.      QUALIFICATIONS ...................................................................................6

II.     MATERIALS CONSIDERED .....................................................................8

III.    LEGAL PRINCIPLES ...............................................................................8

        A.      General Principles of Claim Construction ...............................8

        B.      Principles of Interpretation of "Means Plus Function" Terms...............9

IV.     LEVEL OF SKILL IN THE ART ...........................................................10

V.      THE '845 PATENT ..................................................................................13

        A.      Brief Overview of the '845 Patent .........................................13

        B.      The Asserted Claims of the '845 Patent .................................13

        C.      Analysis of Claim Construction Disputes................................14

                1.      Terms 1-2:  "spin" / "spinning" / "spinning on the lock" ..........14

                2.      Term 3:  "process" .........................................................16

VI.     THE '371 PATENT ..................................................................................18

        A.      Brief Overview of the '371 Patent .........................................18

        B.      The Asserted Claims of the '371 Patent .................................18

        C.      Analysis of Claim Construction Disputes................................19

                1.      Terms 6-8:  "controller" terms ......................................19

                2.      Term 10: "[said time stamp is generated as a function of a] time stamp counter" ....................................................................21

VII.    THE '181 PATENT ..................................................................................23

        A.      Brief Overview of the '181 Patent .........................................23

        B.      The Asserted Claims of the '181 Patent .................................23

        C.      Analysis of Claim Construction Disputes................................23

                1.      Term 11: "means to store a list of users including user access type, identification, password and name"..........................23

                2.      Term 12: "means for a user to input identification and password information"..............................................................25

                3.      Term 13: "means at said server to compare said user input information with stored information and based on user verification and user access type provide said user with a list of other users for which said user has access" ....................26

VIII.   THE '786 PATENT ..................................................................................27

2

A.  Brief Overview of the '786 Patent ............................................................27

B.  The Asserted Claims of the '786 Patent ....................................................28

C.  Analysis of Claim Construction Disputes ..................................................29

    1.  Term 16: "means in said client for inputting a user identification (ID) and user password" ............................................................29

    2.  Term 17: "means in said client for storing a unique client address" .........29

    3.  Term 18: "communication means at said client for passing said ID, password and address to said server via said Internet in response to a request therefrom" ...................................................................30

    4.  Term 19: "means at said server to store information respecting said client and to compare said stored information with said user ID and user password" ...........................................................................31

    5.  Term 20: "means at said server to store dynamic status information respecting said user, said dynamic status information being one of enabled, disabled or active" ..................................................32

    6.  Term 21: "means to authorize log in of said user if said ID and password agree with said stored information and if said user status is enabled" ...................................................................................33

IX.  THE '486 PATENT .................................................................................34

A.  Brief Overview of the '486 Patent ............................................................34

B.  The Asserted Claims of the '486 Patent ....................................................34

C.  Analysis of Claim Construction Disputes ..................................................36

    1.  Terms 23 and 27-31: "messaging client" and "messaging client configured to . . ." ...............................................................36

    2.  Terms 24 and 32-36: "messaging server" and "messaging server configured to . . ." ...............................................................39

    3.  Term 25: "hyper-text related protocols" .................................................42

    4.  Term 26: "simple scripting language" ....................................................43

X.  THE '860 PATENT .................................................................................44

A.  Brief Overview of the '860 Patent ............................................................44

B.  The Asserted Claims of the '860 Patent ....................................................45

C.  Analysis of Claim Construction Disputes ..................................................46

    1.  Terms 44 and 45: "server" and "the server being operative to . . ." ..........46

    2.  Terms 48-50: "context element," "pattern element," "replacement element" ...............................................................................48

3

3.     Term 51: "virtual client device" ...............................................................49

4.     Terms 52-54: "interpolating proxy server" and "an interpolating proxy server . . . operative to . . ."............................................................50

4

I, Sandeep Chatterjee, Ph.D., declare and state as follows:

1.      I have been retained on behalf of defendant Facebook, Inc. ("Facebook") as a technical expert to give my opinions as to the scope and meaning that would have been given to certain terms and phrases appearing in certain claims of U.S. Patent No. 5,991,845 ("the '845 patent"), U.S. Patent No. 6,125,371 ("the '371 patent"), U.S. Patent No. 6,732,181 ("the '181 patent"), U.S. Patent No. 7,366,786 ("the '786 patent"), U.S. Patent No. 7,412,486 ("the '486 patent"), U.S. Patent No. 8,135,860 ("the '860 patent") (collectively, "the patents-in-suit") by one of ordinary skill in the art at the time of the alleged inventions, and to respond to certain positions taken by plaintiff Sound View Innovations, LLC ("Sound View") regarding these issues. Except as otherwise noted, I have personal knowledge of the facts contained in this Declaration, and I would testify to those facts under oath if called on to do so.

2.      I understand that Sound View has asserted the following claims against Facebook: claim 13 of the '845 patent; claims 1-3, 8-10 of the '371 patent; claims 5-9 of the '181 patent; claims 1-4, 7 of the '786 patent; claim 19 of the '486; and claims 1-3, 5, 7-10, 13, 18 of the '860 patent.  For purposes of this declaration, I limit my discussion to only these claims.  If, at any time in the future, Sound View asserts other patents or claims against Facebook, I reserve the right to amend or supplement this Declaration accordingly.

3.      I reserve the right to revise, supplement and/or amend my opinions in this Declaration based on future positions taken by Sound View, its experts, additional documents, testimony, or other information provided by the plaintiff or its witnesses, any orders from the Court, or as I may otherwise find necessary.

5

## I.    QUALIFICATIONS

4.    I am the Chief Executive Officer of Experantis LLC, a technology consulting company.  I am also the Dean of the Mobility Center of Excellence at the International Institute of Digital Technologies.  Previously, I was the Executive Vice President and Chief Technology Officer of SourceTrace Systems, Inc., a technology and services company enabling the delivery of secure remote electronic services over landline and wireless telecommunications networks.

5.    I received my bachelor's degree in Electrical Engineering and Computer Science from the University of California, Berkeley in 1995.  I received my master's degree in Computer Science from the Massachusetts Institute of Technology (MIT) in 1997, and my doctorate in Computer Science from MIT in 2001.  I received a certificate of completion for an executive education program on global leadership from Harvard University in 2011.  My doctoral dissertation at MIT, entitled "Composable System Resources for Networked Systems," involving networked client architectures and systems, was selected as one of the top inventions in the history of MIT's Laboratory for Computer Science.  This invention is showcased in a time capsule at the Museum of Science in Boston, Massachusetts.

6.    In 2011, I was named a Young Global Leader.  This honor, bestowed each year by the World Economic Forum, recognizes and acknowledges the top leaders—all below the age of 40—from around the world for their professional accomplishments, commitment to society, and potential to contribute to shaping the future of the world.  In 2016, I was appointed to the World Economic Forum's expert network as an expert in technology and innovation.

7.    From 1997, I was the Entrepreneur-in-Residence at FidelityCAPITAL, the venture capital arm of Fidelity Investments.  In 1999, I founded and served as President and Chief Technology Officer (CTO) of Satora Networks, which developed tools and technologies

6

for building appliances and services for the Internet using wireless and other technologies to extend it beyond the desktop.

8.     In 2001, I joined Bluestone Software's Mobile Middleware Labs as a Senior Engineer developing applications and systems infrastructure for enterprise Java/J2EE, Web services, and enterprise mobile solutions.  After the completion of Hewlett-Packard's ("HP") acquisition of Bluestone, I became a Senior Member of the Technical Staff at HP's Middleware Division.  I was responsible for architecting and developing the company's next-generation Web services platform for enterprise as well as mobile environments, known as the Web Services Mediator.

9.     I was part of the Expert Group that developed the JSR-00172 J2ME (Java 2 Platform, Micro Edition) Web Services Specification, the worldwide standard for mobile Web services.  I have been an invited speaker at conferences throughout the world, including the 2003 Automated Software Engineering Conference, the 2003 and 2004 International Multiconference in Computer Science & Computer Engineering, the 2004 IASTED International Conference on Software Engineering and Applications, and the 2004 IEEE International Conference on e Technology, e-Commerce, and e-Service.  I served as the General Chair for the 2004 International Symposium on Web Services and Applications.

10.    I am the co-author, with James Webber, of the book "Developing Enterprise Web Services: An Architect's Guide" (published by Prentice-Hall in 2004).  This book has been adopted by over 100 universities and colleges around the world and has been translated or reprinted in numerous countries around the world.

11.    I also have served as a columnist on mobile and enterprise software systems for a number of IT magazines, including Java Boutique and Dataquest.

7

12.     I have attached a more detailed list of my qualifications as Exhibit A.  Based on my academic and professional experiences, I believe that I am qualified in the technology fields pertaining to this case, as at least a person of ordinary skill in the art.

13.     I am being compensated for my time on this case at my standard hourly rate plus expenses.  I have no financial interest in the outcome of this litigation, and will be paid for my time regardless of whether I testify at trial or whether the court rules in accordance with my conclusions.

## II.     MATERIALS CONSIDERED

14.     The analysis that I provide in this Declaration is based on my education and experience in the field of computer systems, as well as on the documents I have considered, including the  patents-in-suit and their file histories, the parties' Joint Claim Construction Chart, including the exhibits and appendices.  Exhibit B to this declaration lists these materials.

## III.    LEGAL PRINCIPLES

### A.     General Principles of Claim Construction

15.     The legal principles set forth in this section were provided to me by counsel for Facebook. I am informed that a purpose of claim construction is to determine the meaning and scope of patent claims asserted to be infringed. I understand that in district court litigation patent claims are generally given the meaning that the terms would have to a person of ordinary skill in the art in question as of the earliest claimed priority date.[1]

16.     I understand that the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the

---

[1] I also understand that the claim construction standard applied in district court litigation is different than the "broadest reasonable interpretation" standard applied in PTO proceedings (such as inter partes review) involving an unexpired patent.

8

context of the entire patent, including the specification. I further understand that when construing the claims of a patent, the principal considerations are the plain language of the claim (including the surrounding claim language and context), the patent specification and the prosecution history, which I understand are called, collectively, the "intrinsic evidence." I understand that while a claim is to be read in light of the specification, one must generally avoid importing limitations into the claim from the specification. I am also informed that the prosecution history can often inform the meaning of the claim by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.

17.    I understand that if a claim, read in light of the specification delineating the patent, and the prosecution history, fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention, then the claim is indefinite.

### B.    Principles of Interpretation of "Means Plus Function" Terms

18.    I understand that an element in a claim may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and that such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof. I further understand that a structure in specification can qualify as a "corresponding structure" only of the specification clearly links that structure to the function specified in the claim. I understand that if a corresponding structure for a means-plus-function element cannot be identified in the specification, then the claim is indefinite.

19.    I am further informed that in context of computer-implemented inventions (such as claims that recite processes that are performed by software running on a computer), the

9

"corresponding structure" in the specification cannot simply be a general purpose computer or microprocessor; instead, the structure must also disclose a specific algorithm for performing the claimed function(s). I am further informed that even where a specification discloses a physical structure for performing the function (such as a general purpose computer), the claim will be invalid as indefinite if the specification fails to disclose the algorithm for performing the recited claim function.

20.    I understand that when a patent claim element lacks the word "means," there is a presumption that the claim element is not a means-plus function element. I also understand that this presumption may be overcome if the claim element in question fails to recite sufficiently definite structure (such as a "nonce" word), or else recites function without reciting sufficient structure for performing that function.

21.    I understand that the above analyses are to be performed on a case-by-case basis, for each patent.

## IV.    LEVEL OF SKILL IN THE ART

22.    As I noted earlier, it is my understanding that claims terms are generally given the meaning they would have to a person of ordinary skill in the art in question as of the earliest claimed priority date. In this section, I describe the level of knowledge and experience a person of ordinary skill in the art would have.

23.    I understand that the following factors may be considered in establishing the level of ordinary skill in the art relevant to the patents-in-suit: type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field.

10

24.     The '845 patent was filed on October 21, 1996.  The '371 patent was filed on August 19, 1997.  The '181 patent was filed on June 26, 2002, and claims priority to April 29, 1998.  The '786 patent was filed on March 10, 2004, and claims priority to April 29, 1998.  The '486 patent was filed on September 12, 2002, and claims priority to December 14, 2001. The '860 patent was filed on July 20, 2000.  For purposes of this Declaration, I have assumed the effective filing date of each of the patents-in-suit to be the earliest filing date identified by each patent.

25.     Regarding the '845 patent, in my opinion "a person of ordinary skill in the art" as of October 1996 would have possessed a Bachelor of Science Degree in Electrical/Computer Engineering or Computer Science (or related subjects), plus two years of related technical experience with computer systems involving multi processing and interprocess communication or synchronization, or a person with both Bachelor and Master Degrees in Electrical/Computer Engineering or Computer Science (or related subjects) and somewhat less technical experience. Sufficient relevant professional or practical experience may substitute for academic experience.

26.     Regarding the '371 patent, in my opinion "a person of ordinary skill in the art" as of August 1997 would have possessed a Bachelor of Science Degree in Electrical/Computer Engineering or Computer Science (or related subjects), plus two years of related technical experience with computer systems involving databases and record management, including multi version databases, or a person with both Bachelor and Master Degrees in Electrical/Computer Engineering or Computer Science (or related subjects) and somewhat less technical experience. Sufficient relevant professional or practical experience may substitute for academic experience.

27.     Regarding the '181 and '786 patents, in my opinion "a person of ordinary skill in the art" as of April 1998 would have possessed a Bachelor of Science Degree in

11

Electrical/Computer Engineering or Computer Science (or related subjects), plus two years of related technical experience with distributed computer systems and access control, or a person with both Bachelor and Master Degrees in Electrical/Computer Engineering or Computer Science (or related subjects) and somewhat less professional experience. Sufficient relevant professional or practical experience may substitute for academic experience.

28.     Regarding the '486 patent, in my opinion "a person of ordinary skill in the art" as of December 2001 would have possessed a Bachelor of Science Degree in Electrical/Computer Engineering or Computer Science (or related subjects), plus two years of related technical experience with distributed computer systems involving Web technologies such as Hypertext Transfer Protocol ("HTTP"), Hypertext Markup Language ("HTML") and JavaScript, or a person with both Bachelor and Master Degrees in Electrical/Computer Engineering or Computer Science (or related subjects) and somewhat less technical experience. Sufficient relevant professional or practical experience may substitute for academic experience.

29.     Regarding the '860 patent, in my opinion "a person of ordinary skill in the art" as of July 2000 would have possessed a Bachelor of Science Degree in Electrical/Computer Engineering or Computer Science (or related subjects), plus two years of related technical experience with distributed computer systems involving Web technologies such as Web servers, HTML and Extensible Markup Language ("XML"), or a person with both Bachelor and Master Degrees in Electrical/Computer Engineering or Computer Science (or related subjects) and somewhat less technical experience. Sufficient relevant professional or practical experience may substitute for academic experience.

30.     I further note that my opinions would not change if a slightly different formulation for a person of ordinary skill in the art was used for each of the patents-in-suit. For

12

example, if the person of ordinary skill in the art had less than two years of practical experience but had more computer science education than a bachelor's degree, or had more than two years of experience but less formal education, such a person could still qualify as a person of ordinary skill in the art for purposes of the patents-in-suit.

31.     My opinions regarding the level of ordinary skill in the art are based on, among other things, my over two decades of experience in the field of computer science and engineering, my understanding of the basic qualifications that would be relevant to an individual tasked with investigating methods and systems in the relevant area, and my familiarity with the backgrounds of colleagues, both past and present.  Although my qualifications exceed those of a person of ordinary skill in the art, both on the effective filing dates (as set forth above) for each of the patents-in-suit and today, I have nevertheless applied the perspective of a person of ordinary skill in the art in rendering my opinions below.

## V.     THE '845 PATENT

### A.     Brief Overview of the '845 Patent

32.     The '845 patent relates generally to the use of spin locks in a multi process computing system, and in particular a recoverable spin lock system in which processes are able to use the lock despite the potential termination of a process holding the lock or a process spinning on the lock.  The recoverable spin lock system purports to be an improvement over a prior art "MCS algorithm" described in a 1991 paper by John M. Mellor-Crummey and Michael L. Scott entitled "Algorithms for Scalable Synchronization on Shared-Memory Multiprocessors."

### B.     The Asserted Claims of the '845 Patent

33.     I understand that Sound View is asserting independent claim 13 of the '845 patent against Facebook.

13

34. Independent claim 13 recites:

13. A method for providing multiple processes with mutually exclusive access to a shared resource in a system having a lock associated with the shared resource, possession of the lock signifying exclusive access to the shared resource, wherein processes desiring access to the shared resource spin on the lock until the lock is acquired, the method comprising the steps of:

maintaining a linked queue structure of data records corresponding to a queue of processes including processes spinning on the lock and a process possessing the lock, one data record per process;

transferring the lock from the process possessing the lock to a process next in the queue;

conducting a cleanup process if one or more processes in the queue have terminated, said cleanup process removing said one or more terminated processes from the queue and reassembling the linked queue structure.

## C.  Analysis of Claim Construction Disputes

### 1.  Terms 1-2:  "spin" / "spinning" / "spinning on the lock"

35. I understand that Facebook proposes that the term "spinning on the lock" means "repeatedly trying to acquire a lock in a tight loop; i.e., busy waiting" while Sound View proposes that the term "spinning" simply means "waiting."

36. In my opinion, Facebook's proposed construction is consistent with both definitional language in the '845 patent as well as the understanding of one of ordinary skill in the art.  One of ordinary skill in the art would consider Sound View's proposal to be overbroad because, as I explain below, there are a number of different ways in which "waiting" on a lock can be accomplished in a computer system, and "spinning" is only one of them.

37. The '845 patent states that "an implementation in which a process repeatedly tries to acquire the lock in a tight loop is called a spin lock and the activity or retrying is known as

14

'busy waiting' or simply 'spinning'." '845, 1:55-58.  One of ordinary skill in the art would have understood this statement to convey definition to the term "spinning" and "spinning on the lock" by using the phrases "is called" and "is known as" and by putting the term "spinning" in quotation marks.

38.    This definitional language is also consistent with the understanding of one of ordinary skill in the art.  Generally speaking, there are two ways that a process can "wait" on a lock.  First, the process can "block."  This generally means that the computer's operating system will suspend execution of the process by de-scheduling it so that it does not consume processor time as it waits.  When the lock that the "blocked" process is waiting for becomes available, the operating system "wakes up" the process and resumes executing its associated instructions.

39.    The second way that a process can "wait" is by "spinning," which is also sometimes referred to as "busy waiting."  When "spinning" is used, the process continues to execute and repeatedly checks whether it can obtain the lock.  This may be accomplished using a "while" loop in which the processor repeatedly cycles through a set of instructions until a specified condition occurs (for example, the lock becomes available).  Appendix A of the '845 patent provides an example of spinning using a "while" loop:

```
A13:        while(mynode→locked != OWNED);//spin
```

'845, Appendix A at line A13.  With spinning, the process continues to consume processor time. "Spinning" is generally regarded as more efficient than using "blocking" when the lock is rarely used or the wait time is extremely short.

40.    Prior art cited during prosecution confirms this understanding of "waiting" to those skilled in the art.  A 1990 paper by Thomas E. Anderson entitled "The Performance of

15

A-381

Spin Lock Alternatives for Shared-Memory Multiprocessors" states that "[w]hen a lock is busy, the waiting process can either [1] block, relinquishing the processor to do other work, or [2] spin ('busy-wait') until the lock is released."  Anderson, p.6 (bracketed enumeration and underlining added).  Similarly, the Mellor-Crummey paper mentioned above states that "[s]ynchronization constructs can be divided into two classes:  [1] *blocking* constructs that deschedule waiting processes and [2] *busy-wait* constructs in which processes repeatedly test shared variables to determine when they may proceed." Mellor-Crummey, p.22 (bracketed enumeration and underlining added).

41.    Therefore, one of ordinary skill in the art would not understand "spinning" or "spinning on the lock" to simply mean "waiting" or "waiting on the lock."

## 2.    Term 3:  "process"

42.    While the term "process" may colloquially refer generally to some sort of activity or series of steps, the term as used in computer systems has a more specific meaning to one of ordinary skill in the art.

43.    Generally speaking, a computer program (such as Microsoft Word) is simply a set of instructions.  The computer program may be stored on a non-volatile storage medium, such as a hard disk drive.  In order to execute the instructions, a computer's operating system creates a "process" that has an associated block of memory (such as RAM) exclusive to the process into which the program's instructions are loaded and that is used to store data specific to the executing program, such as intermediate computational data generated as the program is executed.  The operating system also creates one or more threads of execution associated with the process to actually carry out the instructions.

16

44.    I have reviewed the definitional language for a "process" in U.S. Patent No. 5,392,433, which I understand forms part of the intrinsic record for the '845 patent.  The '433 patent states:

> [A] "process" is defined as an address space (range of available addresses) and one or more threads of control that execute within that address space and its required system resources. A "thread" is a single sequential flow of control within a process. A "program" is a set of instructions that tell a process what to do. Within a single process, all threads and programs share the same address space. A process does not share an address space with any other process.

'433 patent, 3:22-36.

45.    In my opinion, this definition is consistent with the understanding of  the term "process" that I described above and that one of one of ordinary skill in the art would have had for the '845 patent.  For example, the '845 patent describes a computer system having an operating system in which multiple processes are executed and capable of addressing memory. '845, 1:12-19.

46.    In the context of computer systems and the '845 patent, it would be imprecise and overbroad to equate a "process" with a "task" or a "stream of activity," as Sound View does in its  Opening Claim Construction Brief.  As I explained above, one of ordinary skill in the art would understand that a "process" is a well-defined concept that includes various characteristics, and simply calling a "process" a "task" or "stream of activity," improperly ignores them.  Under Sound View's interpretation, nearly anything performed by a computer could be a "process." For example, the mere act of opening a file could be a process; moving a cursor with a mouse could be a process; receiving a stream of data over a network could be a process.  One of ordinary skill in the art would not understand any of these examples to be a "process."

17

## VI.    THE '371 PATENT

### A.    Brief Overview of the '371 Patent

47.    The '371 patent generally relates to database systems, and more specifically to a multi version database system in which versions of records stored in a database are deleted based on a "measurable characteristic" of the database's memory and on time stamps associated with the versions.

### B.    The Asserted Claims of the '371 Patent

48.    I understand that Sound View is asserting claims 1-3, 8-10 of the '371 patent against Facebook, of which claims 1 and 8 are independent claims. Each of the asserted independent claims is set forth below.

49.    Independent claim 1 recites:

1. A processing system for use with a database of data records, said database stored in a memory, comprising:

a time stamping controller that assigns a time stamp to transactions to be performed on said database;

a versioning controller that creates multiple versions of ones of said data records affected by said transactions that are update transactions; and

an aging controller that monitors a measurable characteristic of said memory and deletes ones of said multiple versions of said ones of said data records in response to said time stamp and said measurable characteristic thereby to increase a capacity of said memory.

50.    Independent claim 8 recites:

8. A method of operating a processing system for use with a database of data records, said database stored in a memory, comprising the steps of:

assigning a time stamp to transactions to be performed on said database;

18

creating multiple versions of ones of said data records affected by said transactions that are update transactions;

monitoring a measurable characteristic of said memory; and

deleting ones of said multiple versions of said ones of said data records in response to said time stamp and said measurable characteristic thereby to increase a capacity of said memory.

**C.    Analysis of Claim Construction Disputes**

**1.    Terms 6-8: "controller" terms**

51.    Claim 1 of the '371 patent recites a "time stamping controller," a "versioning controller," and an "aging controller" that perform various functions.

52.    One of ordinary skill in the art understands that a "controller" is functional in nature and does not have any particular structure.  This is confirmed by trade dictionaries, which describe a "controller" in functional terms.  For example, the Dictionary of Computing (4th ed. 1996, Oxford) describes a "controller" as  "[a] subsystem that governs functions of attached devices but generally does not change the meaning of the data that may pass through it" (p.106). The Illustrated Computer Dictionary for Dummies (2nd ed. 1995) defines a controller as "something that controls something else" (p.89).

53.    The description of a controller from the '371 patent is consistent with these functional definitions.  The patent states that the concept of a "controller" is familiar to one of ordinary skill in the art, but acknowledges that a controller is not associated with any particular structure:  "[c]ontrollers may be implemented in software, firmware, hardware, or some suitable combination of at least two of the three."  '371, 4:55-57.

54.    As noted above, claim 1 does not merely recite a "controller" but instead recites a "time stamping controller," a "versioning controller" and an "aging controller."  The terms "time

19

stamping," "versioning," and "aging" merely add functional language to the term "controller" and do not impart any structural significance to the term. Nor do any other limitations in the claim inform the structural character of each claimed controller.

55.    The functions associated with the "time stamping controller", "versioning controller" and "aging controller" come from the claim language itself:

- Time stamping controller: Assign a time stamp to transactions to be performed on said database.

- Versioning controller: Create multiple versions of ones of said data records affected by said transactions that are update transactions.

- Aging controller: Monitor a measurable characteristic of said memory and delete ones of said multiple versions of said ones of said data records in response to said time stamp and said measurable characteristic thereby to increase a capacity of said memory.

'371, 9:12-22 (claim 1).

56.    In my opinion, the specification fails to disclose a corresponding structure and algorithm for the recited functions. For example, figure 1 of the '371 sets forth a "flow diagram of an exemplary method for controlling multi-versioned data records according to the present invention," but steps corresponding to the claimed functions are simply single boxes that largely paraphrase the claim language:



'371, Fig. 1 (excerpt, time stamping controller).

20



'371, Fig. 1 (excerpt, versioning controller).



'371, Fig. 1 (excerpt, aging controller).

57.    While figure 2 of the '371 provides a more detailed flow diagram for operations of an exemplary aging controller, the figure still fails to set forth algorithms for setting forth how the specific steps of monitoring and deleting are carried out.

58.    Sound View, in its Opening Claim Construction Brief, cites to and highlights a single phrase from the '371 patent that states that "[t]hose skilled in the art should be familiar with the use of controllers in processing environments generally," and concludes that "[b]ecause one of ordinary skill in the art would readily be able to discern the structural meaning of 'time stamping controller,' 'versioning controller,' and 'aging controller,' the Court should find that they are not means-plus-function terms…."   Sound View's Opening Claim Construction Brief at pp. 4-5.  I disagree with Sound View.  Just because one of ordinary skill may be familiar with the *use of* controllers does not mean that one of ordinary skill would know or be able to discern the structure(s) and/or algorithm(s) of a specific type of controller or a controller capable of performing a specific function.

### 2.    Term 10: "[said time stamp is generated as a function of a] time stamp counter"

59.    This term is recited in dependent claim 2 and 9 of the '371 patent.

21

60.    For the same reasons discussed above for the "controller" terms, the term "time stamp counter" is also a nonce word and the specification fails to disclose a corresponding structure.   In fact, the specification states that a "time stamp counter" is "also a controller." '371, 4:64-5:4.  The concept of a "time stamp counter" is generally known to one of ordinary skill in the art, but it is a functional concept that is not implemented with any particular structure and algorithm.  A dictionary definition offered by Sound View (Ex. R), supports the functional nature of the time stamp counter, defining a "counter" as a "variable" that is "used to record the number of occurrences of a given event during the execution of a computer program."  The understanding of a "time stamp counter" being functional in nature is further confirmed by the language of the claim itself, which states that the time stamp is generated <u>as a function</u> of a time stamp counter and by the depiction of the time stamp counter **145** in figure 1 (excerpted at right) as simply a single labeled box.



61.    In my opinion, the specification fails to disclose a corresponding structure and algorithm for the function of the time stamp counter.  The function of time stamp counter—i.e., generate a time stamp—comes from the claim language itself.  '371, 9:23-25 & 9:59-60 (claims 2 & 9).  Based on my review of the '371 patent, no algorithm to generate a time stamp is disclosed.  The specification does state that "an advantageous embodiment, time stamp counter **145** is associated with a conventional system clock (not shown) of processing system **100**," '371, 5:1-4, but the specification fails to set forth how the time stamp counter is "associated" with the system clock or the algorithm that such a time stamp counter might use to generate a time stamp.

22

## VII.    THE '181 PATENT

### A.    Brief Overview of the '181 Patent

62.    The '181 patent relates generally to a network-based customer service application and system and more specifically to such a system for management of communication services from a service provider by a customer of the provider.  Among the features described is one in which a service user, depending on the user's access type, can access and manage accounts of other users by providing a list of those other users to the service user to select from.

### B.    The Asserted Claims of the '181 Patent

63.    I understand that Sound View is asserting claims 5-9 of the '181 patent against Facebook, of which claim 5 is an independent claim. The asserted independent claim is set forth below.

64.    Independent claim 5 recites:

> 5. A system for providing a user of an Internet-based communication system selective access to information relating to other users comprising: a server having means to store a list of users including user access type, identification, password and name; a user client having means for a user to input identification and password information; and means at said server to compare said user input information with stored information and based on user verification and user access type provide said user with a list of other users for which said user has access.

### C.    Analysis of Claim Construction Disputes

#### 1.    Term 11: "means to store a list of users including user access type, identification, password and name"

65.    This term is recited in independent claim 5 of the '181 patent.

66.    I understand that the parties agree that this phrase is subject to § 112(f) and that the function is "store a list of users including user access type, identification, password and

23

name." The limitation here does not merely recite generic storage of data, but the storage of specific types and categories of information for later retrieval, as recited in subsequent limitations of the claim. A generic computer without special programming could not store the specific categories of information recited in the claim.

67. I was unable to identify an algorithm associated with this function disclosed in the '181 patent. The '181 patent states that "the application maintains a list of users" and that "[f]or each user the application stores a user Id, a user password, a user type, and customer name" '181, 19:6-7, but it fails to set forth any algorithm—whether it be as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure.

68. Sound View, in its Opening Claim Construction Brief, asserts that the corresponding structures are "shared memory in RAM, a hard drive." Sound View also appears to assert that the "System API, User API and Customer API" are associated with the System Information Cache, which Sound View contends is the "shared memory in RAM." As to the "hard drive," Sound View points to a "backup procedure."

69. I have reviewed Sound View's contentions regarding the alleged corresponding structure. In my opinion, the "System Information Cache" (the "shared memory in RAM") is not clearly linked to the claimed function. For example, the "User API" that Sound View points to simply "provides" a list of user accounts, it does not mention storing them, nor does it expressly state that the list includes user access type, identification, password and name as required by the claim. '181, 7:22-25. Similarly, the '860 patent states simply that the "System Information Cache" stores "user profile data," and does not state that the data is stored as a list or that the data includes user access type, identification, password and name. '181, 5:47-49. The "hard

24

drive" suffers from the same problems.  It is not clear that the hard drive stores user access type, identification, password and name and that the data is stored as a list.

70.    Sound View has also not identified any algorithms associated with the "shared memory in RAM" or the "hard drive" for carrying out the claimed function.  The various APIs identified by Sound View provide functionality for accessing the "shared memory in RAM," but no specifics are disclosed.  Similarly, the "backup process" that Sound View points to in connection with the "hard drive" provides only an uninformative box, '181, Fig. 16 (excerpted at right), possibly related to the claimed storing function.



### 2.    Term 12: "means for a user to input identification and password information"

71.    This term is recited in independent claim 5 of the '181 patent.

72.    I understand that the parties agree that this phrase is subject to § 112(f) and agree that the function is "enabling a user to input identification and password information."

73.    I was unable to identify an algorithm associated with this function disclosed in the '181 patent.  For example, the '181 patent states that "[w]hen a user requests access to the SD application, the application requires the user to enter a user Id and a user password," '181, 12:47-49, and further provides the unhelpful figure reproduced at right, id., Fig. 5 (excerpt).  Neither these disclosures nor the rest of the '181 patent, set forth any algorithm for the claimed function.



74.    Sound View, in its Opening Claim Construction Brief, identifies "a composed page within a WWW browser" as the corresponding structure.  This identification is neither sufficiently linked to the claimed function nor discloses the required algorithm.  The '181 patent

<div align="center">25</div>

simply states that the application requires a user to enter a user ID and password and that a TCP/IP message is sent with the user ID and password from the client to the server. '181, 12:47-49, 13:22-23. The patent does not state that a user enters a user ID and password using a "composed page within a WWW browser." Moreover, the patent does not disclose any algorithm for how the "composed page within a WWW browser" might allow a user to input identification and password information.

3.     **Term 13: "means at said server to compare said user input information with stored information and based on user verification and user access type provide said user with a list of other users for which said user has access"**

75.     This term is recited in independent claim 5 of the '181 patent.

76.     I understand that the parties agree that this phrase is subject to § 112(f) and agree that the function is "comparing said user input information with stored information and based on user verification and user access type provide said user with a list of other users for which said user has access."

77.     I was unable to identify an algorithm associated with this function disclosed in the '181 patent. For example, the '181 patent states that "[t]he application validates the information provided against the list of users stored in the application," '181, 12:49-51, and further provides the unhelpful figure reproduced at right, *id.*, Fig. 5 (excerpt). The patent further states that "[i]f the user type is 'internal' then it returns a HTML page that displays a 'Switch Customer Account' presenting the list of customers for the user that are of user type as 'internal' else it returns a HTML page without this 'Switch Customer Account' capability." '181, 19:16-23. The "Switch Customer Account" feature, however, at

26

best pertains to the latter part of the claimed function; it does not disclose any algorithm for performing the comparison and user verification functions.

78.     Sound View, in its Opening Claim Construction Brief, asserts that the corresponding structure is a variety of things:  "a login CGI, the system shared memory's simple user database, Web API, System API, and a drop box selection menu."  But Sound View's proposal is just a threadbare listing of functional components.  It provides no description—let alone an algorithm—for how those components work together to perform the claimed function. For example, with respect to the "Login CGI," the patent explains that "CGI" is a "standard for interfacing external applications with information servers, such as HTTP or Web servers," and makes clear that a "CGI program"—such as the "login CGI"—is essentially another way of generically describing "software for logging in."  '181, 20:57-60.  The term "API" similarly refers generically to an "application program interface," which is simply a way of providing software routines for accessing certain information.  '181, 4:52-54.  The recitation of a "Web API" and a "System API" in Sound View's construction provides no clue as to how those APIs are employed to perform the claimed function.  Finally, the "drop box selection menu" in Sound View's proposal is merely a disembodied user interface component that is not linked to the login CGI, Web API, System API, or other component in Sound View's proposal.

## VIII.   THE '786 PATENT

### A.     Brief Overview of the '786 Patent

79.     The '786 patent shares a nearly identical specification the '181 patent and therefore also relates generally to a network-based customer service application and system and more specifically to such a system for management of communication services from a service provider by  a customer of the provider.  Among the features described is one in which the

27

system tracks the status of a user in order to determine whether the user is authorized to access the system.  For example, if the user is already logged into the system from one computer and tries to login using another computer, the system prompts the user to log out from the first computer.

**B.    The Asserted Claims of the '786 Patent**

80.    I understand that Sound View is asserting claims 1-4 and 7 of the '786 patent against Facebook, of which claim 1 is an independent claim. The asserted independent claim is set forth below.

81.    Independent claim 1 recites:

1. A system for authorizing a user of a client to have access to a server via the Internet comprising:

means in said client for inputting a user identification (ID) and user password;

means in said client for storing a unique client address;

communication means at said client for passing said ID, password and address to said server via said Internet in response to a request therefrom;

means at said server to store information respecting said client and to compare said stored information with said user ID and user password;

means at said server to store dynamic status information respecting said user, said dynamic status information being one of enabled, disabled or active; and

means to authorize log in of said user if said ID and password agree with said stored information and if said user status is enabled.

28

C.    **Analysis of Claim Construction Disputes**

1.    **Term 16: "means in said client for inputting a user identification (ID) and user password"**

82.    This term is recited in independent claim 1 of the '786 patent.

83.    Like the '181 patent, the asserted claims of the '786 patent concern an alleged invention carried out by a computer (claim 1 relates to accessing a "server" via the "Internet"). Because this term is nearly identical to term 12, this term fails to disclose a corresponding structure and algorithm for the reasons explained above for term 12.

2.    **Term 17: "means in said client for storing a unique client address"**

84.    This term is recited in independent claim 1 of the '786 patent.

85.    I understand that the parties agree that this phrase is subject to § 112(f) and agree that the function is "storing a unique client address." Like the "means to store" limitation in the '181 patent, the limitation here does not merely recite generic storage of data, but the storage of specific client address information. The patent discloses no algorithm for performing this function.

86.     I was unable to identify any structure or algorithm associated with this function disclosed in the '786 patent. The '786 patent does discuss IP addresses, which can be (but are not necessarily) unique, stating that "[u]ser Ids and IP address are transferred within HTTP protocol request and response header for each request and response" and that "[t]he client sends a TCP/IP message containing user Id and password to the server. The IP address of the client is included in the TCP/IP message." '786, 9:35-37, 13:49-51. However, it fails to set forth where or how the IP address is stored in the client. It further fails to disclose any algorithm for performing the storage of the unique client address. In fact, the '786 patent does not appear to

29

disclose any sort of memory or other storage device associated with the client that could store the claimed unique client address.

87.     Sound View, in its Opening Claim Construction Brief, asserts that the corresponding structure is the "address field of a TCP/IP message."  However, as I noted above, the patent simply states that the client sends a TCP/IP message and that the message includes the client's IP address.  The patent does not state that the TCP/IP message (or the address field) is stored in the client, nor does it identify where or how.  Moreover, a TCP/IP message itself is simply data, it cannot "store" anything; storing a TCP/IP message, as with any other data, requires some sort of storage medium, such as computer memory.  RFC 793, the TCP/IP protocol specification that Sound View relies on, similarly fails to disclose any sort of storage medium at a client for a TCP/IP message.

### 3.    Term 18: "communication means at said client for passing said ID, password and address to said server via said Internet in response to a request therefrom"

88.     This term is recited in independent claim 1 of the '786 patent.

89.     I understand that the parties agree that this phrase is subject to § 112(f) and agree that the function is "passing said ID, password and address to said server via said Internet in response to a request therefrom."

90.     I was unable to identify any structure or algorithm associated with this function disclosed in the '786 patent.  The '786 patent does discuss sending a user ID, password and IP address from a client to a server, stating that "[u]ser Ids and IP address are transferred within HTTP protocol request and response header for each request and response" and that "[t]he client sends a TCP/IP message containing user Id and password to the server. The IP address of the client is included in the TCP/IP message."  '786, 9:35-37, 13:49-51.  However, the patent fails to

30

set forth any structure and algorithm at the client for communicating that information. In fact, the '786 patent does not appear to disclose any sort of communication means or device associated with the client that could carry out the claimed "passing" function. While the patent states that a client can include a web browser, '786, 3:46-53, web browser software alone is not enough to pass information over a network—networking hardware (such as a network interface card) and software (such a device drivers) are necessary.

91.     Sound View, in its Opening Claim Construction Brief, proposes that the corresponding structure is a "TCP/IP message." As I noted above, a TCP/IP message is simply data and TCP/IP itself specifies how various pieces of data should be formatted. Other means are required to actually transmit a TCP/IP message over a network such as the Internet. These other means, as well as the algorithm they might use, are not disclosed in the patent.

**4.     Term 19: "means at said server to store information respecting said client and to compare said stored information with said user ID and user password"**

92.     This term is recited in independent claim 1 of the '786 patent.

93.     I understand that the parties agree that this phrase is subject to § 112(f) and agree that the function is "storing information respecting said client and comparing said stored information with said user ID and user password."

94.     I was unable to identify any algorithm associated with this function disclosed in the '786 patent. The '786 patent does discuss storing information and comparing information, stating for example:

- For each user the application stores a user Id, a user password, status, and an IP address. When a user requests access to the SD application, the application requires the user to enter a user Id and a user password. The application validates the

31

information provided against the list of users stored in the application.

- The Login CGI uses the system shared memory's simple user database for user access authorization.

'786, 13:4-10, 10:15-17.  None of these disclosures provide the required algorithm.

95.     Sound View, in its Opening Claim Construction Brief, proposes that the corresponding structure is a "login CGI, the system shared memory's simple user database." However, as I explained above for the '181 patent, there is no algorithm disclosed detailing how the "shared memory" carries out a "storing" function.  As to the "comparing" function, the patent provides the unhelpful block diagram shown at right. '786, Fig. 5.  Moreover, as I noted above, a "login CGI" is essentially another way of generically describing "software for logging in," and the patent fails to disclose the implementation of the "login CGI."



### 5.     Term 20: "means at said server to store dynamic status information respecting said user, said dynamic status information being one of enabled, disabled or active"

96.     This term is recited in independent claim 1 of the '786 patent.

97.     I understand that the parties agree that this phrase is subject to § 112(f) and agree that the function is "storing dynamic status information respecting said user."

98.     I was unable to identify any algorithm associated with the claimed function disclosed in the '786 patent.  The specification of the '786 patent does not use the phrase "dynamic status information."  However, the patent does disclose a "status" associated with a user, that "user profile data" is stored in shared memory, and that information related to a user is backed up on a hard drive.  '786, 5:57-59, 9:13-15, 13:5-6.  Sound View, in its Opening Claim

32

Construction Brief, proposes the shared memory and hard drive are the corresponding structure for the claimed function. However, as I discussed above for a similar claim limitation from the '181 patent, the '786 patent fails to set forth any associated algorithm for carrying out a storing function.

   **6. Term 21: "means to authorize log in of said user if said ID and password agree with said stored information and if said user status is enabled"**

  99. This term is recited in independent claim 1 of the '786 patent.

  100. I understand that the parties agree that this phrase is subject to § 112(f) and agree that the function is "authorizing log in of said user if said ID and password agree with said stored information and if said user status is enabled."

  101. I was unable to identify any algorithm associated with the claimed function disclosed in the '786 patent. For example, figure 5 of the '786 patent provides only unhelpful flow diagram boxes, such as the two shown at right, that largely repeat the claim language. '786, Fig. 5 (excerpts). The written description also does little more than repeat claim language: "If the user name and password matches, the application checks the user's status in the application. If the user's status is 'enabled' then the user is logged onto the system and the user's status is changed to 'active'." '786, 13:6-14.



  102. Sound View, in its Opening Claim Construction Brief, proposes that the corresponding structure is "a Javascript cookie." However, a "cookie" is simply a piece of data; other means are required to actually perform functions involving that data. For example, the Microsoft Computer Dictionary (4th ed. 1999) states that a cookie is "[a] block of data," p.113. Moreover, the '786 patent does not disclose any algorithm for how the "Javascript cookie" is

<div align="center">33</div>

created or used—for an authorization function or otherwise. In addition, while the patent states that the system may "verify the JavaScript cookie to see if the server will go on to service [a] request at all" '786, 13:46-47, the patent makes clear that the cookie is only used *after* a user's status is changed from enabled to active, *id.*, 13:12-14. Therefore, there is a fundamental sequencing problem with Sound View's proposal: a Javascript cookie cannot be the claimed means to authorize login because by the time the cookie may be used, a user's status is no longer "enabled." Moreover, there is no disclosure that a Javascript cookie is used in the first instance to perform authorization using a user ID and password when a user's status is only "enabled" and not "active." For example, the patent nowhere states that a cookie contains both a user ID and password.

## IX.    THE '486 PATENT

### A.    Brief Overview of the '486 Patent

103.    The '486 patent relates generally to a messaging system, and more specifically to a messaging system in which messages are received by a computer system using only an ordinary web browser, HTTP, HTML and JavaScript and without using specialized messaging software, Java applets or ActiveX software. Multiple messages are received by a client over a single connection with a server. Messages may be those exchanged between human users or other kinds of messages, such as between computer applications.

### B.    The Asserted Claims of the '486 Patent

104.    I understand that Sound View is asserting claim 19 of the '486 patent against Facebook, of which claim 19 is an independent claim. The asserted independent claim is set forth below.

105.    Independent claim 19 recites:

34

19. A messaging system comprising:

a messaging client;

a messaging server;

a computer network coupling the messaging client and the messaging server;

the messaging client configured to:

establish a message connection with the messaging server over the computer network using only hypertext-related protocols and a simple scripting language;

receive a message connection response from the server indicating that the message connection is an open message connection;

receiving message data of a first type containing the contents of a first message over the open message connection;

receiving message data of a second type containing the contents of a second message over the open message connection;

repeating the steps of receiving message data while maintaining the open message connection and while awaiting delivery of a message termination indicator indicating that a message associated with the message connection has been completely received by the messaging client;

the messaging server configured to:

establish a message connection with the messaging client over the computer network using only hypertext-related protocols and a simple scripting language;

transmit a message connection response to the messaging client identifying the message connection has an open message connection;

transmitting message data of a first type containing the contents of a first message from the messaging server over the open message connection to the messaging client;

35

transmitting message data of a second type containing the contents of a second message over the open message connection to the messaging client;

repeating the steps of transmitting in order to provide a continuous stream of message data over the open message connection, the continuous stream of message data comprising a plurality of messages perceived by the messaging client as a single continuous message received over the open message connection for display on the messaging client independent of the operating system thereof and exclusive of proprietary messaging software residing and previously stored on the messaging client.

### C.    Analysis of Claim Construction Disputes

#### 1.    Terms 23 and 27-31: "messaging client" and "messaging client configured to . . ."

106.    Claim 19 of the '486 patent recites a "messaging client" that perform various functions.

107.    One of ordinary skill in the art understands that a "client" is functional in nature and does not have any particular structure.  This is confirmed by trade dictionaries, which describe a "client" in functional terms.  For example, the IBM Dictionary of Computing (1994) defines a "client" as a "[a] functional unit that receives shared services from a server" (p.107). The Dictionary of Computing (4th ed. 1996, Oxford) similarly defines the term as "[i]n general, someone or something receiving a service of some kind" (p.76).  Even the dictionary definition offered by Sound View describes a "client" in functional, generic terms as "node or software program (front-end device) that requests services from a server."  *See* Ex. U at p.73.

108.    The description of a "messaging client" in the '486 patent itself is consistent with these definitions, describing it generally as something that receives messaging services from a server.  '486, 10:28-31 ("A plurality of messaging client computer systems **130-1** and **130-2** are

36

coupled to the computer network **101** and are in communication with the message server

computer system **110**").  While the messaging client of the '486 patent is limited to a computing

context, it is shown and described as a generic, general

purpose computer.  *See, e.g.*, '486, Fig. 1 (excerpt at right),

7:15-22 (discussing components such as input output

interface, communications interface, and processor).  The '486 patent further states that "the

system of the invention can be embodied strictly as a software program, as software and

hardware, or as hardware alone."  '486, 7:55-57.  The "messaging client" is a generic description

of hardware or software that performs messaging functions.

109.    Moreover, even if the "messaging client" may be a computer, it remains a nonce

word.  The term "computer" is a generic description of a large number of devices that can

perform a computing function.

110.    This generic description is confirmed by technical dictionaries.  For example, the

Microsoft Computer Dictionary (4th ed. 1999) defines the term "computer" as "[a]ny device

capable of processing information to produce a desired result" (p.102 (emphasis added)).  This

"defined" "computer" is devoid of structure.  As another example, the IBM Dictionary of

Computing (1994) provides a definition of "computer" that I find is also devoid of any structure,

defining the term as "[a] functional unit that can perform substantial computations, including

numerous arithmetic operations and logic operations without human intervention during a run"

(p.129 (emphasis added)).

111.    The nature of computers themselves also makes clear that a "computer" lacks

definite structure.  While some types of more specialized electronic devices—for example,

radios, cameras, digital alarm clocks—can perform useful functions "out-of-the-box," without

<div align="center">37</div>

additional components or modifications, a generic computer is different. A "computer" must include additional software or other programming to do something useful. But unlike more specialized electronic devices, the number and types of tasks that a computer can be programmed to perform are potentially limitless. Conversely, a computer without any such special programming or software will generally perform no useful function.

112. For these reasons, the word "computer" (and "client") does not connote sufficiently definite structure as used in the patent. It is the additional software or programming that transforms a generic "computer" into something concrete that is actually capable of performing the operations in the claim.

113. While the claim recites a "messaging client," the term "messaging" merely adds functional language to the term "client" and does not impart any structural significance to the term. Nor do any other limitations in the claim inform the structural character of each claimed controller.

114. The functions of messaging client come from the claim language itself:

- establish a message connection with the messaging server over the computer network using only hypertext-related protocols and a simple scripting language

- receive a message connection response from the server indicating that the message connection is an open message connection

- receiving message data of a first type containing the contents of a first message over the open message connection

- receiving message data of a second type containing the contents of a second message over the open message connection

- repeating the steps of receiving message data while maintaining the open message

38

> connection and while awaiting delivery of a message termination indicator indicating that a message associated with the message connection has been completely received by the messaging client

'486, 35:33-53 (claim 19).

115.    Based on my review of the '486 patent, the specification fails to disclose corresponding structure for the recited functions.  The specification discusses a "client message handler application" "operating within the messaging client **130-1**," '486, e.g., 11:9-13, Fig. 4 (excerpt at right), but it does not set forth an algorithm for how the client, alone or with the client message handler application, carries out the recited functions.  The specification further discusses using some combination of HTTP, HTML and JavaScript in the system, but omits configuration details.  '486, 8:30-37 ("[W]eb clients can be configured to properly operate to exchange messages using HTML/HTTP and JavaScript").

116.    Sound View, in its Opening Claim Construction Brief, proposes that "messaging client" means "a web browser operating on a computing platform."  I disagree.  The patent describes a web browser as "client message handler **145**." '486, e.g., 11:8-13 ("client message handler application **145-1** (e.g., the web browser)"), 12:53-60 ("to the continually awaiting client message handler **145** (i.e., to the web browser)"), Fig. 4 (excerpt above right).  The computing device, as shown in the excerpt of figure 4 above, is identified as the "messaging client."

### 2.    Terms 24 and 32-36: "messaging server" and "messaging server configured to . . ."

117.    Claim 19 of the '486 patent recites a "messaging server" that perform various functions.

39

118.    One of ordinary skill in the art, for substantially the same reasons discussed above for "client," understands that a "server" is functional nature and does not have any particular structure.  This is confirmed by trade dictionaries, which describe a "server" in functional terms.  For example, the IBM Dictionary of Computing (1994) defines a "server" as a "[a] functional unit that provides shared services to workstations over a network; for example, a file server, a print server, a mail server" (p.612).  The Dictionary of Computing (4th ed. 1996, Oxford) similarly defines the term as "[a] system on a network that provides a service to other systems connected to the network" (p.444-445).  Even the dictionary definition offered by Sound View describes a "server" in functional, generic terms as "a computer or program that responds to commands from a client."  *See* Ex. V at p.474.

119.    The description of a "messaging server" in the '486 patent itself is consistent with these definitions, describing it generally as a something provides messaging services to clients.  '486, 10:28-31 ("A plurality of messaging client computer systems **130-1** and **130-2** are coupled to the computer network **101** and are in communication with the message server computer system **110**").)  While the messaging server of the '486 patent is limited to a computing context, it is described as a generic computer and depicted as a simple box.  *See, e.g.*, '486, Fig. 1 (excerpt at right), 7:15-22 (discussing components such as input output interface, communications interface, and processor).  The '486 patent further states that "the system of the invention can be embodied strictly as a software program, as software and hardware, or as hardware alone."  '486, 7:55-57.  Thus, the "messaging server" is a generic description of hardware or software that performs messaging functions.  Even if the "messaging server" may be a computer, it remains a nonce word as used in the patent for all of the reasons

40

discussed above for the term "client."  Likewise, the term "messaging" does not impart any structural significance to the term "server," nor do any other limitations in the claim.

120.    The functions of messaging server come from the claim language itself:

- establish a message connection with the messaging client over the computer network using only hypertext-related protocols and a simple scripting language

- transmit a message connection response to the messaging client  identifying the message connection has an open message connection

- transmitting message data of a first type containing the contents of a first message from the messaging server over the open message connection to the messaging client

- transmitting message data of a second type containing the contents of a second message over the open message connection to the messaging client

- repeating the steps of transmitting  in order to provide a continuous stream of message data over the open message connection, the continuous stream of message data comprising a plurality of messages perceived by the messaging client as a single continuous message received over the open message connection for display on the messaging client independent of the operating system thereof and exclusive of proprietary messaging software residing and previously stored on the messaging client

'486, 35:55-36:10 (claim 19).  Based on my review of the '486 patent, the specification fails to disclose corresponding structure for the recited functions.    The specification discusses a "message handler process" "that operates in the



message server **110**" '486, e.g., 22:51-52, Fig. 4 (excerpt at right), but it does not set forth an algorithm for how the server, alone or with the message handler process, carries out the recited functions.

121.    Sound View, in its Opening Claim Construction Brief, proposes that "messaging server" means "a computer system that handles messages and responds to commands from a client."  However, Sound View's proposal is simply a description of a generic computing device. While the concept of a server is known, as shown by dictionary definitions, those definitions do not indicate that one of ordinary skill would understand there to be sufficiently concrete structure associated with that concept.

### 3.    Term 25: "hyper-text related protocols"

122.    The term "hyper-text related protocols" appears in Claim 19 of the '486 patent, which states "establish a message connection with the messaging client over the computer network using only hypertext-related protocols and a simple scripting language."

123.    The term "hyper-text related protocols" does not have an ordinary or customary meaning in the field of computer science, nor does it have an ordinary or customary meaning to one of skill in the art of the '486 patent.  Further, neither Claim 19 nor the remainder of the '486 patent provide any indication of the meaning of "hyper-text related protocols" in the context of the '486 patent.

124.    The term "hyper-text related protocols" (or variants thereof) is not used anywhere in the detailed description or figures of the '486 patent.  The only hyper-text protocol disclosed by the patent is the hypertext transport protocol.  *See, e.g.*, '486, 3:45; 4:41.  Thus, the '486 patent specification does not provide any detail regarding what constitutes a "hyper-text related protocol."  For example, one of ordinary skill would not understand whether the disclosed

42

hypertext transport protocol (HTTP) is a "hyper-text related protocol" or not.  Additionally, one of ordinary skill would be unsure how or in what way the protocol must be "related" to "hyper-text."

125.    The problem with this nebulous term is that it potentially encompasses far more than the well-known Hypertext Transfer Protocol (HTTP) on which web communications are typically based.  The term "hyper-text *related* protocols" begs the question of which other types of communications techniques are potentially covered.  For example, if a user sends an email message (using the standard email protocol) that contains a link to an HTML page, is that transmission being effectuated using "hyper-text *related* protocols"?  Or if a user sends a text message that includes such a link?  Or an e-mail message that includes HTML content?  Or even sends a hardcopy printout of a web page using postal mail?  Any one of these communications techniques potentially uses a "hyper-text *related* protocol" simply by using HTML as a means of representing the content being delivered.  One of ordinary skill would be unsure how or in what way the protocol must be "related" to "hyper-text."

126.    In my opinion, therefore, the claim fails to inform with reasonable certainty those skilled in the art about the scope of the invention.

### 4.    Term 26: "simple scripting language"

127.    The term "simple scripting language" appears in Claim 19 of the '486 patent, which states "establish a message connection with the messaging client over the computer network using only hypertext-related protocols and a simple scripting language."

128.    "Simple scripting language" does not have an ordinary or customary meaning in the field of computer science, nor does it have an ordinary or customary meaning to one of skill in the art of the '486 patent.  Further, neither Claim 19 nor the remainder of the '486 patent

43

provide any indication of the meaning of "simple scripting language" in the context of the '486 patent.

129.    While the meaning of the term "scripting language" is generally known to one of ordinary skill in the art, it is not clear what makes a particular "scripting language" a "simple" one.  While the '486 patent identifies JavaScript as a purported example of a "simple scripting language," '486, 3:15-17, it fails to offer any objective criteria for one of ordinary skill in the art to determine whether any other scripting language is "simple."  Therefore, whether a particular scripting language is "simple" will vary among individuals.  For example, different computer programmers and scientists can have different opinions about whether a scripting language is "simple" based on a numerous of factors including differences in the experience, roles and duties.  A "simple" scripting language could be one that is relatively easy to learn, or it could be one that has a relatively basic and limited language and vocabulary, or it could be one whose functionality is relatively limited, or it could be one that requires only relatively few system resources to be carried out, or it could interpreted any number of other ways.  Without any objective definition to a person of ordinary skill in the art, the claim fails to inform with reasonable certainty those skilled in the art about the scope of the invention.

## X.    THE '860 PATENT

### A.    Brief Overview of the '860 Patent

130.    The '860 patent generally relates to a network-based system for performing transcoding.  A server alters content requested by a client in accordance with one or more "augmentation files" associated with the client and/or the requested content, and provides that altered content to the client.

44

**B.    The Asserted Claims of the '860 Patent**

131.    I understand that Sound View is asserting claims 1-3, 5, 7-10, 13 and 18 of the

'860 patent against Facebook, of which claims 1, 13 and 18 are independent claims. The asserted

independent claims are set forth below.

132.    Independent claim 1 recites:

> 1. An apparatus for use in a computer network, the apparatus comprising:
>
> at least one server within the network, the server being operative to process a client request generated by a client device to determine a particular client type associated with the client device, to retrieve web content identified in the client request, to retrieve one or more augmentation files associated with at least one of the web content and the particular client type, and to alter the retrieved web content in accordance with the one or more augmentation files, wherein the altered web content is delivered to the client device;
>
> wherein the server parses the retrieved web content into one or more component structures, and subsequently applies a pattern matching process to recognize designated component structure subject to alteration in accordance with the one or more augmentation files; and
>
> wherein the pattern matching process comprises comparing a given one of the component structures of the retrieved web content to predetermined component structures represented by respective tokens in the one or more augmentation files.

133.    Independent claim 13 recites:

> 13. An apparatus for use in a computer network, the apparatus comprising:
>
> at least one server within the network, the server being operative to process a client request generated by a client device to determine a particular client type associated with the client device, to retrieve web content identified in the client request, to retrieve one or more augmentation files associated with at least one of the web content and the particular client type, and to alter the retrieved web content in accordance with the one or more augmentation

45

files, wherein the altered web content is delivered to the client device;

wherein the client device comprises a virtual client device having a combination of a plurality of different sets of features provided by multiple distinct physical client devices.

134.    Independent claim 18 recites:

18. A processing system comprising:

a web server operative to store web content; and

an interpolating proxy server at least temporarily coupled to the web server and operative to process a client request generated by a client device to determine a particular client type associated with the client device, to retrieve web content identified in the client request and stored on the web server, to retrieve one or more augmentation files associated with the web content and the particular client type, and to alter the retrieved web content in accordance with the one or more augmentation files, wherein the altered web content is delivered to the client device;

the interpolating proxy server being further operative to parse the retrieved web content into one or more component structures, and subsequently to apply a pattern matching process to recognize designated component structure subject to alteration in accordance with the one or more augmentation files;

wherein the pattern matching process comprises comparing a given one of the component structures of the retrieved web content to predetermined component structures represented by respective tokens in the one or more augmentation files.

**C.    Analysis of Claim Construction Disputes**

**1.    Terms 44 and 45: "server" and "the server being operative to . . ."**

135.    Independent claims 1 and 13 of the '486 recite a "server being operative to" perform a number of functions.

136.    As explained above for the term "messaging server" for the '486 patent, the term "server" is functional nature and does not have any particular structure. The '860 patent's use of

46

that term appears consistent with the functional dictionary definitions cited earlier, describing simply a "server device or system." '860, 3:7-10. Thus, as used in the '860 patent, the term "server" is a nonce word. I address the term "interpolating proxy server" separately below.

137.    The functions of server come from the claim language itself: "process a client request generated by a client device to determine a particular client type associated with the client device, to retrieve web content identified in the client request, to retrieve one or more augmentation files associated with at least one of the web content and the particular client type, and to alter the retrieved web content in accordance with the one or more augmentation files, wherein the altered web content is delivered to the client device." '860, 9:15-24 (claim 1), 10:12-21 (claim 13).

138.    Based on my review of the '860 patent, the specification fails to disclose corresponding structure for the recited functions. Instead, it essentially repeats the recited functions with result-oriented statements that fail to offer additional detail that could provide sufficient structure. '860, e.g., 3:53-4:3 (determine client type), 4:10-13 & 7:43-47 (retrieve web content and retrieve augmentation file). While the patent purports to identify various ways that a client type could be determined, '860, 3:65-4:15, or web content altered, '860, 4:30-5:51, it fails to set forth detailed steps to implement them.

139.    Sound View proposes that the term "server" means "a single server device or system as well as sets or other groupings or arrangements of multiple server devices or systems." I disagree with Sound View's proposed construction. Sound View's proposal simply offers the tautological statement that a server can be a single server or multiple servers without explaining what a "server" actually is.

47

A-413

**2.    Terms 48-50: "context element," "pattern element," "replacement element"**

140.    Claim 8 of the '860 patent recites "a pattern matching expression comprising context, pattern, precedence and replacement elements."  The terms "context element," "pattern element," and "replacement element" have no accepted meaning to one of ordinary skill in the art.  Although the words "context," "pattern," "replacement" and "element" are separately known, one of ordinary skill in the art can only speculate as to the meaning of the disputed terms.

141.    The specification does not provide sufficient guidance to one of ordinary skill in the art.  It repeats the claim language, stating "[a]n example pattern matching expression includes context, pattern, precedence and replacement elements." '860, 5:33-34.  It does not use the phrase "pattern element."  The specification states that a "context element" may contain "one or more pattern:replacement instructions," but it is not clear whether those instructions constitute "pattern elements" and "replacement elements."  '860, 5:34-36.  The patent further states that a "context element" may be "a structure scope constraining expression," but the meaning of that statement is also not clear. '860, 5:34-36.  While the '860 patent states that "[t]he context can be as simple as an HTML context such as <BODY> and </BODY> constructs," '860, 5:45-51, this "simple" context fails to inform one of ordinary skill about the scope of a "context element," particularly in view of the patent's statement that "[t]he context element may be a structure scope constraining expression containing one or more instructions of the form pattern:replacement." '860, 2:15-20.

142.    Therefore, in my opinion, the claim fails to inform with reasonable certainty those skilled in the art about the scope of the invention.

48

### 3.     Term 51: "virtual client device"

143.     Independent claim 13 recites a "virtual client device."

144.     The term "virtual client device" has no accepted meaning to one of ordinary skill in the art.  Although the meaning of the phrase "client device" is generally known, one of ordinary skill in the art must speculate as to the meaning of a "virtual client device."  For example, the term might refer to a simulated, non-physical device that has the functionality of a client but that resides on the server that it communicates with; or it might refer to two or more physically-distinct devices that together have the functionality of a client and are regarded conceptually as a single device; or it might refer to something else entirely.

145.     I have reviewed the file history for the '860 patent, which only creates further confusion.  During prosecution, the applicants stated that the "virtual client device" "is not a device that can perform many features that separate physical devices can perform," nor is it "an actual client device at all, but rather something that is simulated or artificially created." 06/27/2005 Amendment and Response to Office Action, pp.8-9.  However, the specification appears to teach that a "virtual client device" is at least composed of multiple physical devices. '860, 7:66-8:4 ("'virtual client' type "may be a combination of different sets of features provided by multiple distinct physical client devices, such as the PhoneBrowser **204** and the WAP telephone **210** in the example of FIG. 2.").)  One of ordinary skill in the art, in view of these conflicting teachings, would be unable to discern the meaning of "virtual client device."

146.     Therefore, in my opinion, the claim fails to inform with reasonable certainty those skilled in the art about the scope of the invention.

49

### 4.    Terms 52-54: "interpolating proxy server" and "an interpolating proxy server . . . operative to . . ."

147.    Independent claim 18 of the '486 patent recites the "interpolating proxy server" terms.

148.    As I explained above for the term "messaging server" for the '486 patent and the term "server" for the '860 patent, the term "server" is functional nature and does not have any particular structure and as used in the patent is a nonce word that is devoid of structure. The terms "interpolating" and "proxy" are functional concepts that do not add structural limitations. The patent states that "interpolating" is "include[s] operations such as transcoding or translation, as well as other types of processing operations involving web content." '860, 3:30-33. Sound View's own dictionary definition notes that a "proxy" simply describes something that provides an intermediary function. (Ex. W, p.241.)

149.    The functions of the "interpolating proxy server" come from the claim language:

- "process a client request generated by a client device to determine a particular client type associated with the client device, to retrieve web content identified in the client request and stored on the web server, to retrieve one or more augmentation files associated with the web content and the particular client type, and to alter the retrieved web content in accordance with the one or more augmentation files, wherein the altered web content is delivered to the client device" and

- "parse the retrieved web content into one or more component structures, and subsequently to apply a pattern matching process to recognize designated component structure subject to alteration in accordance with the one or more augmentation files" '860, 12:10-26 (claim 18). These functions are substantially identical, for purposes of § 112(f)

50

analysis, to the functions of the "server" recited in claims 1 and 13. Therefore, for the same reasons discussed above for the term "server," the specification fails to disclose the required corresponding structure.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 2, 2017 in California.

Sandeep Chatterjee, Ph.D.

51

# EXHIBIT A



**Harvard University**
Exec. Ed., Global Leadership

**Massachusetts Institute of Technology**
Ph.D., Computer Science
M.S., Computer Science

# Sandeep Chatterjee, Ph.D.

Chief Executive Officer

**University of California at Berkeley**
B.S., Electrical Engineering & Computer

## Professional Summary

Sandeep Chatterjee, Ph.D. is a seasoned technology expert and business professional with almost two decades of hands-on contributions as a thought leader, technologist, consultant, entrepreneur, and author. He is an expert in computer software and hardware systems, with particular emphasis on distributed systems and architectures, service-oriented architectures (SOAs), software-as-a-service (SaaS) and Web Services, end-to-end security, quality-of-service (QoS), communications and telecommunications systems, as well as mobile and wireless systems and applications. He is the co-author of a book on developing enterprise computing systems, which has been adopted by over 100 universities worldwide.

Dr. Chatterjee also has extensive experience with providing expert testimony for intellectual property and commercial litigation, including for high stakes patent litigation, copyright and trade secret misappropriation, contract disputes and patent licensing cases. He has testified at trial, and has had his deposition taken more than 30 times. Dr. Chatterjee combines strong experience with expert testimony within the context of litigation together with worldwide experience in designing, architecting and implementing complex computing systems.

## Achievements & Awards

- Named a **Young Global Leader** by the **World Economic Forum** for professional accomplishments, commitment to society and potential to contribute to shaping the future of the world.
- Doctoral dissertation at the Massachusetts Institute of Technology (MIT) was selected as one of the **most important inventions in computing**, and the invention is preserved and showcased in a time-capsule at the Museum of Science in Boston, Massachusetts. Other recipients of this honor include **Bill Gates** (founder of Microsoft) and **Tim Berners-Lee** (inventor of the World Wide Web).
- Technology solution designed by Dr. Chatterjee was identified as a Bloomberg Innovation, and featured on Bloomberg TV's "**Bloomberg Innovators**" program.
- Member of the **JSR 172 Expert Group** that defined the worldwide standard for J2ME mobile Web services.

**Sandeep Chatterjee, Ph.D.**

sandeep@experantis.com
+1 650-759-6523

---

## Professional Experience

From:           2016
To:             present
Organization:   International Institute of Digital Technologies
Title:          Dean, Mobility Center of Excellence
Summary:        International Institute of Digital Technologies (IIDT) is a leading institute of higher education, focused on digital technologies.


From:           2013
To:             present
Organization:   Experantis LLC
Title:          Chief Executive Officer
Summary:        Experantis LLC provides consultation and services in all facets of commercial litigation.


From:           2011
To:             present
Organization:   World Economic Forum
Title:          Young Global Leader; Member of the Expert Network
Summary:        The World Economic Forum is an international institution for public-private cooperation, and its mission is cited as "committed to improving the state of the world by engaging business, political, academic, and other leaders of society to shape global, regional, and industry agendas."


From:           2007
To:             2013
Organization:   Shuv Gray LLC
Title:          Chief Executive Officer
Summary:        Shuv Gray LLC provides information technology and intellectual property consultation and services.


From:           2007
To:             2012
Organization:   SourceTrace Systems, Inc.
Title:          Chief Technology Officer & Executive Vice President
Summary:        SourceTrace Systems is a leading vendor of end-to-end mobile and wireless distributed transactional systems for the financial services, agricultural commodities, and product distribution markets around the world.


From:           2004
To:             2007
Organization:   Cyndeo LLC
Title:          Chief Executive Officer
Summary:        Founded Cyndeo to be a leading provider of enterprise integration and mobilization solutions as well as technology strategy consulting and outsourcing services to global corporations, government agencies, and major not-for-profit organizations. Cyndeo provides consulting, software engineering development, and management services to

**Sandeep Chatterjee, Ph.D.**

sandeep@experantis.com
+1 650-759-6523

companies and organizations of all sizes, from Fortune Global 100 corporations to small organizations in developing countries.

| | |
|---|---|
| From: | 2001 |
| To: | 2002 |
| Organization: | Hewlett-Packard (Palo Alto, CA) |
| Title: | Senior Member of Technical Staff |
| Summary: | Independently identified a need in the mobile and e-Business marketplace for a more flexible Web Services platform. Invented a patent-pending (applied) solution, and led the development as well as the initial sales and marketing efforts. |

- This next-generation J2EE (HP/Bluestone app server) Web Services solution ties together the emerging Web Services standards, end-to-end transactions, and optimized mobile services & applications.

- Led and managed the entire lifecycle of the product from conception, architectural design, product development, QA, documentation, senior management approval, patent filing, preparation for marketing launch at JavaOne, as well as interfacing with early adopter customers and strategic partners.

- Managed relationships with multiple HP organizations and teams that contributed to the overall solution.

- Positioned the product, targeted key early adopters and partners, and leveraged my own contacts to build successful strategic relationships.

- Selected to provide support to HP/Bluestone's top sales manager, and helped land a strategic account in the Asia-Pac market.

- Selected as the representative for Hewlett Packard to the JSR 172 Expert Group that is defining the worldwide standard for J2ME mobile Web Services.

| | |
|---|---|
| From: | 1999 |
| To: | 2000 |
| Organization: | Satora Networks |
| Title: | Founder & Chief Technology Officer |
| Summary: | Founded Satora Networks to create wireless platforms and services for Internet devices based on the technologies invented by Dr. Chatterjee as part of his Ph.D. research at MIT Lab for Computer Science. |

- Raised venture funding, recruited the management and core engineering teams, set corporate and product strategy, handled customer and partner relations, and managed overall corporate affairs.

- Architected and led the development of the StrongARM-based mobile hardware platform, Linux-based mobile OS, client-side services, and server-side J2EE environment.

- Landed key customer and partner wins, managed revenue and burn rate to become profitable early on, and oversaw the growth of the company.

**Sandeep Chatterjee, Ph.D.**

sandeep@experantis.com
+1 650-759-6523

| | |
|---|---|
| From: | 1995 |
| To: | 2001 |
| Organization: | MIT Lab for Computer Science |
| Title: | Doctoral Researcher |
| Summary: | Designed a modular system architecture that supports the cost-effective development of network devices and services. The system consists of Lego-like commodity hardware and standards-based software components that are quickly composed together through a development environment into optimized end-user devices as well as client-side services. |

- Architected and implemented the entire system: a Linux-based client software environment, a wireless network and StrongARM processor-based device hardware platform, as well as a Web-based design and optimization environment and tool.

- Successfully mentored and managed a research group of 6 Masters and Bachelors students.

- The technology underlying Dr. Chatterjee's thesis was selected as one of the top inventions in thirty-five year history of MIT Laboratory for Computer Science.

| | |
|---|---|
| From: | 1997 |
| To: | 1999 |
| Organization: | FidelityCAPITAL (Boston, MA) |
| Title: | Entrepreneur-In-Residence |
| Summary: | Worked with Fidelity senior management and FidelityCAPITAL partners to source, analyze, and fund technology start-ups strategic to Fidelity interests. |

- Evaluated business plans submitted to Fidelity for venture funding, and analyzed emerging market and technology trends to identify opportunities for internal spin-offs in the telecom and eBusiness spaces.

- Founded and served as President & CTO of a wireless devices and services company (Satora Networks) that was seed funded by Fidelity.

---

## Litigation Support Experience

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Enterprise Software Patent Infringement |
| Law Firm: | Morrison & Foerster |
| Case Name: | Software AG and Software AG v. BEA Systems |
| Services Provided: | Retained as BEA's expert; submitted two expert reports; deposed twice; prepared for trial (exhibits, testimony, cross examination). |
| Disposition: | Settled |
| Date: | 2004 |

**Sandeep Chatterjee, Ph.D.**

sandeep@experantis.com
+1 650-759-6523

---

*Expert Engagement:*
Type of Matter:       Enterprise software intellectual property litigation.
Law Firm:             Morrison & Foerster
Case Name:
Services Provided:    Consultant to attorney
Disposition:          Settled
Date:                 2004-2005

*Expert Engagement:*
Type of Matter:       Mobile software intellectual property litigation.
Law Firm:             Perkins Coie
Case Name:            Esmertec v. Tao Group
Services Provided:    Retained as Esmertec's expert; submitted two expert reports.
Disposition:          Settled
Date:                 2006

*Expert Engagement:*
Type of Matter:       Enterprise and mobile software intellectual property litigation.
Law Firm:             McDermott Will & Emery
Case Name:            Metrologic Instruments v. Symbol Technologies
Services Provided:    Retained as Metrologic's expert
Disposition:          Settled
Date:                 2006-2007

*Expert Engagement:*
Type of Matter:       Distributed and mobile computing trade secret litigation.
Law Firm:             Haralson, Miller, Pitt, Feldman & McAnally
Case Name:            Modular Mining Systems (Komatsu Ltd.) v. Jigsaw Systems et al.
Services Provided:    Retained as Modular's expert; submitted two expert reports; deposed.
Disposition:          Summary judgment
Date:                 2006-2008

*Expert Engagement:*
Type of Matter:       Distributed systems, mobile computing and object oriented programming
                      intellectual property litigation.
Law Firm:             Kirkland & Ellis
Case Name:
Services Provided:    Consultant to attorney
Disposition:          Settled
Date:                 2007

*Expert Engagement:*
Type of Matter:       Communications software and systems intellectual property litigation.
Law Firm:             Carey Rodriguez Greenberg & Paul
Case Name:            Catch Curve v. Venali
Services Provided:    Retained as Venali's expert; submitted two expert reports
Disposition:          Summary judgment
Date:                 2008

**Sandeep Chatterjee, Ph.D.**

sandeep@experantis.com
+1 650-759-6523

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Distributed computing and network routing systems intellectual property litigation. |
| Law Firm: | Vinson & Elkins |
| Case Name: | WebXChange v. Dell |
| Services Provided: | Retained as Dell's expert |
| Disposition: | Summary judgment |
| Date: | 2008-2010 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Communications systems intellectual property litigation. |
| Law Firm: | Kirkland & Ellis |
| Case Name: | Motorola, Inc. et al. v. Rembrandt Technologies, LP |
| Services Provided: | Retained as the plaintiffs' expert; submitted expert report |
| Disposition: | Settled |
| Date: | 2009 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Database and object mapping intellectual property litigation. |
| Law Firm: | Kirkland & Ellis |
| Case Name: | DataTern v. United Airlines |
| Services Provided: | Retained as United Airlines' expert |
| Disposition: | Settled |
| Date: | 2009 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Control systems intellectual property litigation. |
| Law Firm: | Morgan Lewis & Bockius |
| Case Name: | Finisar v. Source Photonics |
| Services Provided: | Retained as Finisar's expert; source code review |
| Disposition: | Settled |
| Date: | 2010 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Mobile systems intellectual property litigation. |
| Law Firm: | Agility IP |
| Case Name: | MShift v. Digital Insight |
| Services Provided: | Retained as MShift's expert; two expert reports; |
| Disposition: | Summary judgment |
| Date: | 2010 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Mobile systems intellectual property litigation. |
| Law Firm: | Morgan Lewis & Bockius |
| Case Name: | OpenWave v. 724 Solutions |
| Services Provided: | Retained as OpenWave's expert; source code review |
| Disposition: | Settled |
| Date: | 2010 |

**Sandeep Chatterjee, Ph.D.**

sandeep@experantis.com
+1 650-759-6523

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Mobile systems intellectual property litigation. |
| Law Firm: | Winston Strawn |
| Case Name: | Ganas v. Charles Schwab et al |
| Services Provided: | Retained as Charles Schwab's expert |
| Disposition: | Settled |
| Date: | 2011 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Mobile systems intellectual property litigation. |
| Law Firm: | Drinker Biddle |
| Case Name: | De Lage Landen Operational Services v. Third Pillar Systems |
| Services Provided: | Retained as Third Pillar's expert |
| Disposition: | Settled |
| Date: | 2011 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Mobile systems trade secret misappropriation litigation. |
| Law Firm: | Berliner Cohen |
| Case Name: | Damodharan Ulagaratchalan v  Dhyan Infotech |
| Services Provided: | Retained as Dhyan's expert; source code review |
| Disposition: | Settled |
| Date: | 2011 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Control systems intellectual property litigation. |
| Law Firm: | Morgan Lewis & Bockius |
| Case Name: | Finisar v. Oplink |
| Services Provided: | Retained as Finisar's expert; source code review |
| Disposition: | Settled |
| Date: | 2011 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Mobile systems intellectual property litigation. |
| Law Firm: | Ropes & Gray |
| Case Name: | Motorola Mobility (Google) v. Microsoft |
| Services Provided: | Retained as Google's expert; source code review |
| Disposition: | Settled |
| Date: | 2011-2012 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Wireless networking & management intellectual property litigation. |
| Law Firm: | Kirkland & Ellis |
| Case Name: | Netgear v. Ruckus Wireless |
| Services Provided: | Retained as Netgear's expert; source code review |
| Disposition: | Adjudicated |
| Date: | 2012-2013 |

**Sandeep Chatterjee, Ph.D.**

sandeep@experantis.com
+1 650-759-6523

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Mobile systems intellectual property litigation. |
| Law Firm: | Morgan Lewis & Bockius |
| Case Name: | XpertUniverse v. Cisco Systems |
| Services Provided: | Retained as Cisco's expert; submitted expert report; source code review; deposition; trial |
| Disposition: | Adjudicated |
| Date: | 2012-2013 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Distributed computing systems contract litigation. |
| Law Firm: | Berliner Cohen |
| Case Name: | Skillnet Solutions v. Entertainment Publications |
| Services Provided: | Retained as Entertainment's expert |
| Disposition: | Dismissed |
| Date: | 2013 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Mobile systems intellectual property litigation. |
| Law Firm: | Mayer Brown |
| Case Name: | Aeritas v. US Airways, Inc., Delta Airlines, Inc., Alaska Air Group |
| Services Provided: | Retained as the airlines' expert; submitted 3 expert reports; source code review; depositions |
| Disposition: | Settled |
| Date: | 2013 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Distributed systems intellectual property litigation. |
| Law Firm: | Ropes & Gray |
| Case Name: | Wellogix v. ADP et. al. |
| Services Provided: | Retained as ADP's expert |
| Disposition: | Stayed |
| Date: | 2013 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Trade secret misappropriation litigation. |
| Law Firm: | Hopkins & Carley |
| Case Name: | Bradford Technologies v. NCV Software et al. |
| Services Provided: | Retained as Bradford's expert; submitted expert report; mediation |
| Disposition: | Settled |
| Date: | 2013 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Mobile systems intellectual property litigation. |
| Law Firm: | Fish & Richardson P.C. |
| Case Name: | Ericsson Inc. v. Samsung Electronics Co., Ltd. et al. |
| Services Provided: | Retained as Samsung's expert; source code review |
| Disposition: | Settled |
| Date: | 2013 |

**Sandeep Chatterjee, Ph.D.**

sandeep@experantis.com
+1 650-759-6523

---

*Expert Engagement:*
Type of Matter:        Contract dispute litigation.
Law Firm:              Morgan Lewis & Bockius
Case Name:             AMC Technologies v. Cisco Systems
Services Provided:     Retained as Cisco's expert; submitted expert report; deposition
Disposition:           Settled
Date:                  2013


*Expert Engagement:*
Type of Matter:        Trade secret misappropriation litigation.
Law Firm:              Lexanalytica
Case Name:             PQ Labs v. Qi et. al.
Services Provided:     Retained as defendants' expert; source code review; deposition
Disposition:           Adjudicated
Date:                  2013


*Expert Engagement:*
Type of Matter:        Distributed systems and security intellectual property litigation.
Law Firm:              Troutman Sanders
Case Name:             Media Rights Technologies, Inc. v. Capital One Financial Corporation
Services Provided:     Retained as Capital One's expert; source code review; expert reports; declaration
Disposition:           Adjudicated
Date:                  2013


*Expert Engagement:*
Type of Matter:        Distributed computing intellectual property litigation.
Law Firm:              Rothwell, Figg, Ernst & Manbeck, P.C.
Case Name:             SecureBuy v. CardinalCommerce
Services Provided:     Retained as SecureBuy's expert; *inter partes* review; declarations
Disposition:           Settled
Date:                  2013


*Expert Engagement:*
Type of Matter:        Distributed computing intellectual property litigation.
Law Firm:              Mayer Brown LLP
Case Name:             American Airlines , Inc. et al. v. Loyalty Conversion Systems Corporation
Services Provided:     Retained as the airlines' expert; covered business method petitions; declarations
Disposition:           Adjudicated
Date:                  2014


*Expert Engagement:*
Type of Matter:        Mobile computing and security intellectual property litigation.
Law Firm:              Dickstein Shapiro, LLP
Case Name:             Tierra Intellectual Borinquen, Inc.  v. Toshiba Corporation et. al.
Services Provided:     Retained as Toshiba's expert; declaration; expert report
Disposition:           Settled
Date:                  2014

**Sandeep Chatterjee, Ph.D.**

sandeep@experantis.com
+1 650-759-6523

---

*Expert Engagement:*
| | |
|---|---|
| Type of Matter: | Distributed computing systems and software intellectual property litigation. |
| Law Firm: | Reed Smith, LLP |
| Case Name: | Kroy IP Holdings, LLC v. Safeway, Inc. and The Kroger Co. |
| Services Provided: | Retained as the defendants' expert; expert report |
| Disposition: | |
| Date: | 2014 |

*Expert Engagement:*
| | |
|---|---|
| Type of Matter: | Secure mobile computer hardware and software intellectual property litigation. |
| Law Firm: | White & Case LLP |
| Case Name: | Maxim Integrated Products, Inc. v. JPMorgan Chase & Co. |
| Services Provided: | Retained as JPMorgan Chase's expert; 3 expert reports |
| Disposition: | Settled |
| Date: | 2014 |

*Expert Engagement:*
| | |
|---|---|
| Type of Matter: | Computer hardware and software antitrust litigation. |
| Law Firm: | Morgan Lewis & Bockius LLP |
| Case Name: | In Re: Keurig Green Mountain Single Serve Coffee Antitrust Litigation. |
| Services Provided: | Retained as plaintiffs' expert; declarations |
| Disposition: | |
| Date: | 2014 |

*Expert Engagement:*
| | |
|---|---|
| Type of Matter: | Mobile computer and location-based systems intellectual property litigation. |
| Law Firm: | Morgan Lewis & Bockius LLP |
| Case Name: | Unwired Planet LLC v. Square, Inc. |
| Services Provided: | Retained as plaintiffs' expert; source code review; declarations |
| Disposition: | |
| Date: | 2014 |

*Expert Engagement:*
| | |
|---|---|
| Type of Matter: | Distributed computing systems intellectual property litigation. |
| Law Firm: | Morrison & Foerster LLP |
| Case Name: | AirWatch LLC v. Good Technology Corporation et al. |
| Services Provided: | Retained as plaintiff's expert; declaration |
| Disposition: | |
| Date: | 2014 |

*Expert Engagement:*
| | |
|---|---|
| Type of Matter: | Mobile computer and location-based systems intellectual property litigation. |
| Law Firm: | Goodwin Procter LLP |
| Case Name: | Unwired Planet LLC v. Square, Inc. |
| Services Provided: | Retained as plaintiff/patent owner's expert; source code review; covered business methods review; *inter partes* review; declarations; deposition |
| Disposition: | |
| Date: | 2015 |

**Sandeep Chatterjee, Ph.D.**

sandeep@experantis.com
+1 650-759-6523

---

*Expert Engagement:*
Type of Matter:      Distributed computing systems intellectual property litigation.
Law Firm:            Morrison & Foerster LLP
Case Name:           Good Technology Corporation et al. v. AirWatch LLC
Services Provided:   Retained as defendant's expert; *inter partes* review; declaration
Disposition:
Date:                2015


*Expert Engagement:*
Type of Matter:      Mobile computer and location-based systems intellectual property litigation.
Law Firm:            Schwegman Lundberg & Woessner
Case Name:           Square, Inc. v. Unwired Planet LLC
Services Provided:   Retained as patent owner's expert; covered business methods review; declaration
Disposition:
Date:                2015


*Expert Engagement:*
Type of Matter:      Mobile computer and location-based systems intellectual property litigation.
Law Firm:            EIP
Case Name:           Square, Inc. v. Unwired Planet LLC
Services Provided:   Retained as patent owner's expert; *inter partes* review; declaration
Disposition:
Date:                2015


*Expert Engagement:*
Type of Matter:      Software systems intellectual property litigation.
Law Firm:            Mayer Brown LLP
Case Name:           American Express Company et al. v. Signature Systems, LLC
Services Provided:   Retained as petitioner's expert; covered business methods review; declaration
Disposition:
Date:                2015


*Expert Engagement:*
Type of Matter:      Software and backup systems intellectual property litigation.
Law Firm:            Morrison & Foerster LLP
Case Name:           Farstone Technology, Inc. v. Apple, Inc.
Services Provided:   Retained as Apple's expert; source code review; expert reports (2); declarations; deposition
Disposition:
Date:                2015


*Expert Engagement:*
Type of Matter:      Distributed computing systems intellectual property litigation.
Law Firm:            Baker Botts LLP
Case Name:           MobileIron, Inc. v. Good Technology Corporation
Services Provided:   Retained as petitioner's expert; *inter partes* review; declaration
Disposition:
Date:                2015

**Sandeep Chatterjee, Ph.D.**

sandeep@experantis.com
+1 650-759-6523

---

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Cloud computing and data migration intellectual property litigation. |
| Law Firm: | Ropes & Gray |
| Case Name: | BitTitan v. SkyKick |
| Services Provided: | Retained as defendant's expert; declarations; deposition |
| Disposition: | Settled |
| Date: | 2015 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Breach of contract, fraud litigation involving large scale enterprise software. |
| Law Firm: | Orrick |
| Case Name: | State of Oregon v. Oracle et al. |
| Services Provided: | Retained as defendants' expert |
| Disposition: | Settled |
| Date: | 2016 |

*Expert Engagement:*

| | |
|---|---|
| Type of Matter: | Document processing intellectual property litigation. |
| Law Firm: | Mayer Brown |
| Case Name: | Capital Security Systems v. NCR et al. |
| Services Provided: | Retained as defendants' expert; expert report |
| Disposition: | |
| Date: | 2016 |

## Non-Litigation Consulting Projects

*Consulting Engagement:*

| | |
|---|---|
| Type of Matter: | Enterprise software architecture and development |
| Client: | Sevak Solutions, Inc. |
| Services Provided: | Architect, specify, and develop enterprise-class software for secure financial transactioning in multiple markets and countries around the world |
| Date: | 2005-2006 |

*Consulting Engagement:*

| | |
|---|---|
| Type of Matter: | Enterprise software architecture and development |
| Client: | United States Agency for International Development (USAID) |
| Services Provided: | Specify and develop financial transactioning and tracking software |
| Date: | 2004-2005 |

*Consulting Engagement:*

| | |
|---|---|
| Type of Matter: | Training services |
| Client: | South Korean Ministry of Information and Communications |
| Services Provided: | Conducted a workshop to train selected university professors and corporate researchers on properly using mobile and distributed technology for strategic and financial growth. |
| Date: | 2004 |

**Sandeep Chatterjee, Ph.D.**

sandeep@experantis.com
+1 650-759-6523

*Consulting Engagement:*

| | |
|---|---|
| Type of Matter: | Product and service strategy and development |
| Client: | Hewlett-Packard Company |
| Services Provided: | Analyze market opportunities for new, market-specific technology product and service offerings |
| Date: | 2004 |

*Consulting Engagement:*

| | |
|---|---|
| Type of Matter: | Mobile enterprise software |
| Client: | ACCION International |
| Services Provided: | Specified, architected, and developed a mobile enterprise software system for optimizing wireless transactioning. |
| Date: | 2003 |

*Consulting Engagement:*

| | |
|---|---|
| Type of Matter: | Market, technology and services strategy development |
| Client: | Hewlett-Packard Laboratories |
| Services Provided: | Analyzed multiple country-specific market needs and opportunities, and proposed technology and service offerings |
| Date: | 2003 |

## Publications

1. Chatterjee, Sandeep and Webber, James, <u>Developing Enterprise Web Services: An Architect's Guide</u> (Pearson Education Korea Ltd. and Hong Reung Science Pub. Co. 2005), Korean Trans.

2. Chatterjee, Sandeep and Webber, James, <u>Developing Enterprise Web Services: An Architect's Guide</u> (Prentice Hall 2004).

3. Chatterjee, Sandeep and Webber, James, <u>Developing Enterprise Web Services: An Architect's Guide</u> (Pearson Education Singapore Pvt. Ltd. 2004), Indian Reprint.

4. Chatterjee, Sandeep, "Enterprise Technology:  Web Services:  The Next Revolution in IT," in *Dataquest* (March 2004).

5. Chatterjee, Sandeep, "Enterprise 2004 Trends:  On A Cautious Note," *Dataquest* (Feb. 2004).

6. Chatterjee, Sandeep, "A Real-World Web Services-Based Application," *JavaBoutique* (http://javaboutique.internet.com/articles/WSApplications/realWorld3_1.html).

7. Chatterjee, Sandeep, "Write Once, Run Anywhere Web Services," *JavaBoutique* (http://javaboutique.internet.com/articles/WSApplications/realWorld2_1.html).

8. Chatterjee, Sandeep, "Developing Real World Web Services-Based Applications," *JavaBoutique* (http://javaboutique.internet.com/articles/WSApplications/).

9. Chatterjee, Sandeep, Doctoral Thesis Dissertation, "Composable System Resources As An Architecture For Networked Systems," Massachusetts Institute of Technology (2001).

10. Keckler, Stephen W., Chang, Andrew, Lee, Whay Sing, Chatterjee, Sandeep, and Dally, William J., "Concurrent Event Handling Through Multithreading," *IEEE Trans. Computers* 48(9), pages 903-916 (1999).

**Sandeep Chatterjee, Ph.D.**

sandeep@experantis.com
+1 650-759-6523

11. Chatterjee, Sandeep and Devadas, Srinivas, "MASC Composable Computing Infrastructure For Intelligent Environments," *Proceedings of the Industrial Electronics Conference*, pages 132-138 (1999).

12. Chatterjee, Sandeep, "SANI: A Seamless and Non-Intrusive Framework and Agent for Creating Intelligent Interactive Homes," *Second International Conference on Autonomous Agents*, pages 436-440 (1998).

13. Chatterjee, Sandeep, "Towards A MASC Appliances-Based Educational Paradigm," *ACM Symposium on Applied Computing*, pages 112-116 (1998).

14. Chatterjee, Sandeep, "Towards Rapidly Deployable Intelligent Environments," *American Association for Artificial Intelligence Symposium on Intelligent Environments*, pages 31-36 (1998).

15. Chatterjee, Sandeep, "The ModuleC Network Architecture: A Novel Approach Of Computing Through Information Appliances," *IEEE International Symposium on Consumer Electronics* (1997).

16. Chatterjee, Sandeep, Masters Thesis, "Asynchronous Event Handling," Massachusetts Institute of Technology Technical Report (May 1997).

17. Tennenhouse, David L. and Chatterjee, Sandeep, "The First 10 Feet: The Missing Story For Encouraging User Investment In Universal Broadband Connectivity" (October 1996).

18. Chatterjee, Sandeep and Faraboschi, Paolo, "The VLIW Trace Scheduling Compiler Visual Analysis System," Hewlett-Packard Laboratories Internal Technical Report (September 1995).

19. Chatterjee, Sandeep and Donohue, Richard J., "Electron Gamma Shower Windows 2," *International Conference on Monte Carlo Simulations in Nuclear & High Energy Physics* (February 1993).

A-432

# EXHIBIT B

## EXHIBIT B – MATERIALS CONSIDERED

Patents-in-suit and file histories

Joint Claim Construction Chart dated December 22, 2016 and appendices and exhibits

Sound View Innovations, LLC's Opening Claim Construction Brief dated January 19, 2017 and exhibits

IBM Dictionary of Computing (1994)

Microsoft Computer Dictionary (4th ed. 1999)

The Dictionary of Computing (4th ed. 1996, Oxford)

The Illustrated Computer Dictionary for Dummies (2nd ed. 1995)


Any other documents cited in the body of my Declaration.

# Exhibit 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ORACLE CORPORATION and | ) | |
| ORACLE U.S.A. INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-414 (SLR) |
| | ) | |
| EPICREALM LICENSING, LP, | ) | |
| | ) | |
| Defendant. | ) | |

## PARTIES' PROPOSED ELEMENT-BY-ELEMENT CLAIM CONSTRUCTION CHART

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ James W. Parrett, Jr.*

_____
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302.658.9200
mgraham@mnat.com
jparrett@mnat.com

*Attorneys for Oracle Corporation*
*and Oracle U.S.A. Inc.*


OF COUNSEL:

James G. Gilliland
Theodore T. Herhold
Chad E. King
Robert J. Artuz
Eric M. Hutchins
TOWNSEND AND TOWNSEND AND CREW LLP
379 Lytton Avenue
Palo Alto, CA 94301
650.326.2400

POTTER ANDERSON & CORROON LLP

*/s/ David E. Moore*

_____
Richard L. Horwitz (#2246)
David E. Moore (#3083)
1313 N. Market Street
Hercules Plaza Sixth Floor
P.O. Box 951
Wilmington, DE 19899-0951
302.984.000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for epicRealm Licensig, LP*


OF COUNSEL:

George S. Bosy
JENNER & BLOCK
330 N. Wabash Avenue
Chicago, IL 60611-7603

Dorian Daley
Peggy E. Bruggman
Matthew M. Sarboraria
ORACLE CORPORATION
ORACLE U.S.A., INC.
500 Oracle Parkway
Redwood Shores, CA  94065

Dated:  June 30, 2008

| Claim Term | Oracle's Proposed Construction | epicRealm's Proposed Construction |
|---|---|---|
| connection cache<br><br>('554 patent – claim 4) | a store of information identifying open connections to data sources for eliminating subsequent connect times to those data sources | no construction is necessary |
| data sources<br><br>('554 patent – claims 1-5, 8-9, 11)<br>('335 patent – claims [1], [15])[1] | computerized repositories from which data may be retrieved electronically | no construction is necessary |
| dispatcher<br><br>('554 patent – claim 1, 9, 11)<br>('335 patent – claims 2, 16) | a software program for determining which page server should be used to process a dynamic web page generation request | no construction is necessary |
| dispatching / dispatching said request to said page server<br><br>('554 patent – claims 1, 9, 11)<br>('335 patent – claims 2, 16) | analyzing a request to make an informed selection of which page server should process the request, and sending the request to that page server | examining a request to make an informed selection of which page server should process the request based on dynamic information maintained about page servers, the dynamic information indicating which page server can more efficiently process the request, and sending the request to the selected page server |
| HTTP-compliant device<br><br>('335 patent – claims 15, 16) | a device running software that implements the Hypertext Transfer Protocol | a device that is compliant with the communication protocol known as HyperText Transport Protocol (HTTP) |
| intercepting said request at said HTTP-compliant | receiving a request at the HTTP-compliant device and diverting | at least intercepting the handling of a request at a said HTTP- |

---

[1]     Claim numbers in brackets signify unasserted independent claims upon which asserted dependent claims rely.

1

| Claim Term | Oracle's Proposed Construction | epicRealm's Proposed Construction |
|---|---|---|
| device<br><br>('335 patent – claim [1], [15]) | the request before the HTTP-compliant device executable can process the request | compliant device |
| intercepting said request at said second computer system<br><br>('554 patent – claims 9, 10) | receiving a request at the second computer system and diverting the request before the second computer system executable can process the request | no construction is necessary |
| intercepting said request at said Web server<br><br>('554 patent – claims 1, 11)<br>('335 patent – claims [1]) | receiving a request at the Web server machine and diverting the request before the Web server executable can process the request | intercepting the handling of a request at a Web server |
| interceptor<br><br>('554 patent – claim 10) | a software component that performs intercepting | no construction is necessary |
| logging into<br><br>('554 patent – claim 5) | presenting credentials that allow access to | no construction is necessary |
| machine readable medium<br><br>('554 patent – claim 11) | a hard disk, floppy disk, CD-ROM, magnetic tape, or other magnetic or optical data storage medium | no construction is necessary |
| page server<br><br>('554 patent – claims 1, 4, 7, 9, 10, 11)<br>('335 patent – claim [1], [15]) | page generating software, running on a processor separate from that of the Web server, that generates dynamic Web pages<br><br>Claims 9 of the '554 Patent and claims 15 and 29 of the '335 Patent are likewise construed with the substitution of "second computer system" and "HTTP- | page-generating software that generates a dynamic Web page |

| Claim Term | Oracle's Proposed Construction | epicRealm's Proposed Construction |
|---|---|---|
| | compliant device" respectively for "Web server." | |
| releasing<br><br>('554 patent – claims 1, 9, 11)<br>('335 patent – claims [1], [15]) | (see below) | freeing |
| said page server receiving said request and releasing said Web server [or second computer system or HTTP-compliant device] to process other requests<br><br>('554 patent – claims 1, 9, 11)<br>('335 patent – claims [1], [15]) | said page server receiving said request and said page server performing an act (separate from merely receiving the request) to free the Web server to process other requests.<br><br>Claims 9 of the '554 Patent and claims 15 and 29 of the '335 Patent are likewise construed with the substitution of "second computer system" and "HTTP-compliant device" respectively for "Web server." | (see proposed construction for "releasing" above) |
| request<br><br>('554 patent – all)<br>('335 patent – all) | a message that asks for a Web page specified by a URL | a message that asks for a Web page |
| router<br><br>('554 patent – claims 9, 10) | a device that intercepts and dispatches dynamic Web page generation requests | no construction is necessary |
| Web page<br><br>('554 patent – claims 1, 3, 6, 7, 9, 11)<br>('335 patent – claim [1]) | a file containing embedded commands in a Web formatting language such as HTML, capable of being displayed on a Web browser | Web content displayable through a Web browser |

3

Case 1:16-cv-00116-RGA  Document 33-1  Filed 03/09/17  Page 441 of 464 PageID #: 1971

| Claim Term | Oracle's Proposed Construction | epicRealm's Proposed Construction |
|---|---|---|
| Web server<br><br>('554 patent – claims 1, 11)<br>('335 patent – claim [1]) | HTTP-compliant server software, or a machine running such software, that receives Web page requests and returns Web pages in response to the requests | software, or a machine having software, that receives Web page requests and returns Web pages in response to the requests |
| Means for generating [said request]<br><br>('554 patent – claim 9) | § 112 ¶6 corresponding function:  generating said request<br><br>structure:<br><br>a processor of a computer that is, or has, a Web client running a Web browser | "a processor of a computer that is, or has, a Web client running a Web browser" or equivalents thereof |
| Means for receiving [said request from said first computer]<br><br>('554 patent – claim 9) | § 112 ¶6 corresponding function:  receiving said request from said first computer<br><br>structure:<br><br>a processor of a computer that is, or has, a Web server running a Web server executable | "a processor of a computer that is, or has, a Web server running Web server executable" or equivalents thereof |
| Page server processing means<br><br>('554 patent – claim 9) | § 112 ¶6 corresponding function:  processing dynamic Web page generation requests<br><br>corresponding structure:<br><br>a processor of a computer that runs software for generating dynamic Web pages | "a processor of a computer that runs page server software (wherein page server software is page-generating software that generates a dynamic Web page)" or equivalents thereof |

2389667.1

4

EXHIBIT 17

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/949,568 | 09/24/2004 | Harri Lakkala | P1777US00 | 3228 |

11764        7590        03/13/2013
Ditthavong Mori & Steiner, P.C.
44 Canal Center Plaza
Suite 322
Alexandria, VA 22314

| EXAMINER |
|---|
| CHEEMA, UMAR |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2444 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 03/13/2013 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

docket@dcpatent.com
ipadmin@dcpatent.com

PTOL-90A (Rev. 04/07)

Patent Trial and Appeal Board
**Informative**
Standard Operating Procedure 2

UNITED STATES PATENT AND TRADEMARK OFFICE
————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————————

*Ex parte* HARRI LAKKALA, RIKU SUOMELA,
and ILKKA SALMINEN
————————————

Appeal 2011-001526
Application 10/949,568
Technology Center 2400

————————————

Before:  ALLEN R. MacDONALD, LINDA E. HORNER,
MICHAEL W. KIM, BARBARA A. BENOIT, and
LYNNE E. PETTIGREW, *Administrative Patent Judges*.

PETTIGREW, *Administrative Patent Judge*.

DECISION ON APPEAL

Appeal 2011-001526
Application 10/949,568

## STATEMENT OF THE CASE

Appellants appeal under 35 U.S.C. § 134 from a final rejection of claims 1, 2, 4-9, 11-16, 18-28, 30-35, 37-42, 44-52, 79, 80, and 82-85. We have jurisdiction under 35 U.S.C. § 6(b).

We affirm-in-part. We also enter a new ground of rejection pursuant to 37 C.F.R. § 41.50(b).

### Appellants' Invention

Appellants' invention is directed to an apparatus and method for creating, storing, and using personal information relating to a real-world, earth-shaking event ("ESE") event. Spec. 1. Claims 1 and 27 are illustrative of the invention (formatting added):

> 1.    A method, comprising:
>
> [(a)] receiving a message of an event at a user device;
>
> [(b)] creating at the user device metadata relating to the event in response to the received message of the event and storing the created metadata in a memory at the device;
>
> [(c)] collecting content data in response to receiving the message of the event to generate a content data set relating to the message of the event; and
>
> [(d)] adding the created metadata to the content data set.
>
> 27.    A user device, comprising:
>
> [(a)] a memory device for storing a program; and
>
> [(b)] a processor in communication with the memory device, the processor is configured with the program to:
>
> > [(i)] control receiving a message of an event at the user device;
> >
> > [(ii)] control at the user device creation of metadata relating to the event in response to the received

2

Appeal 2011-001526
Application 10/949,568

> message of the event and control storing the created metadata in the memory device;
>
> [(iii)] control collection of content data in response to the received message of the event to generate a content data set relating to the message of the event; and
>
> [(iv)] control adding of the created metadata to the content data set.

*Rejection on Appeal*

The Examiner relied upon the following prior art in rejecting the claims on appeal:

| | | |
|---|---|---|
| Keyes | US 6,516,427 B1 | Feb. 4, 2003 |
| Pather | US 7,177,859 B2 | Feb. 13, 2007 |
| Kovacs | EP 1 296 253 A1 | Mar. 26, 2003 |

The Examiner rejected claims 1, 2, 4-9, 11-16, 18-28, 30-35, 37-42, 44-52, 79, 80, and 82-85 under 35 U.S.C. § 103(a) as being unpatentable over Pather, Keyes, and Kovacs.

ISSUE ON APPEAL

Did the Examiner err in rejecting claims 1, 2, 4-9, 11-16, 18-28, 30-35, 37-42, 44-52, 79, 80, and 82-85 under 35 U.S.C. § 103(a) because the combination of Pather, Keyes, and Kovacs fails to disclose or suggest creating at the user device metadata relating to the event in response to the received message of the event and collecting content data in response to the received message of the event?

3

Appeal 2011-001526
Application 10/949,568

## NEW GROUND OF REJECTION

Pursuant to our authority under 37 C.F.R. § 41.50(b), we enter a new ground of rejection for claims 27, 28, 30-35, 37-42, 44-52, and 80 under 35 U.S.C. § 112, second paragraph, for indefiniteness. Specifically, we construe "a processor . . . configured . . . to" perform various control functions, as recited in independent claim 27, as a "means-plus-function" limitation subject to 35 U.S.C. § 112, sixth paragraph, and conclude that the Specification's failure to disclose an algorithm corresponding to the recited functions renders the claim indefinite under 35 U.S.C. § 112, second paragraph.

## FINDINGS OF FACT

### *Appellants' Invention*

1.    The Specification discloses that the present invention may be implemented in user device 100a, which may be a wireless or wired device that has been enabled to communicate over a network. Examples include a hand-held wireless telephone, a personal digital assistant, a laptop or personal computer, a set-top box, a digital camera or camcorder, a digital audio device, a television, a digital radio device, a digital video recorder, a wrist watch, and a global positioning system receiver. Spec. 3-4; Fig. 1.

2.    The Specification states that user device 100a may receive notice of a real-world, earth-shaking event ("ESE") from an event provider 120. Spec. 4, 8; Fig. 3 (step 302).

3.    The Specification discloses that once notice of an event has been received, user device 100a may create an ESE data set in response to a notification of the event. Spec. 5, 9; Fig. 3 (steps 306, 308). This may

4

Appeal 2011-001526
Application 10/949,568

involve collecting content, e.g., "the user manually creating video, image, audio or text data using device 100a," or "device 100a automatically sending context information using sensors that are either integral or peripheral to the device." Spec. 5; *see also* Spec. 14; Fig. 3 (step 322).

4.     The Specification discloses that user device 100a creates metadata for use in storing and retrieving an ESE data set. Spec. 14; Fig. 3 (step 320). "The metadata may be based on the name, description, time and date information, location information and/or the like." Spec. 14.

5.     The Specification discloses that the "metadata is added to the collected content by way of, e.g., embedding it within the content, storing it with the content or otherwise associating it with the content." Spec. 14; Fig. 3 (step 324).

6.     The Specification discloses that "[u]ser device 100a may also include a CPU 200 and associated memory 205 containing programming for controlling, in accordance with the present invention, data processing and transfer operations among the various elements of device 100a via a data transfer bus 250." Spec. 6.

*Dictionary Definitions*

7.     AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1398 (4th ed. 2006) (defining "processor" as "2. *Computer Science* **a.** A computer. **b.** A central processing unit. **c.** A program that translates another program into a form acceptable by the computer being used.").

8.     MICROSOFT COMPUTER DICTIONARY 92 (5th ed. 2002) (defining "central processing unit" as "CPU"); *id.* at 132 (defining "central processing unit" as "[a]cronym for **c**entral **p**rocessing **u**nit. The computational and control unit of a computer. The CPU is the device that interprets and

5

Appeal 2011-001526
Application 10/949,568

executes instructions . . . By definition, the CPU is the chip that functions as the 'brain' of a computer.  In some instances, however, the term encompasses both the processor and the computer's memory or, even more broadly, the main computer console (as opposed to peripheral equipment).").

## PRINCIPLES OF LAW

### *35 U.S.C. § 112, Sixth Paragraph*

Special rules of claim construction allow for claim limitations drafted in functional language and are set forth in 35 U.S.C. § 112, sixth paragraph, which provides for:

> [a]n element in a claim for a combination may be expressed as a means or step for performing a specified function *without the recital of structure, material, or acts in support thereof,* and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, sixth paragraph (emphasis added).  While this provision permits a claim limitation to be set forth using solely functional language, it operates to restrict such claim limitations to those structures, materials, or acts disclosed in the specification (or their equivalents) that perform the claimed function.  *Personalized Media Comm'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703 (Fed. Cir. 1998).

The Federal Circuit has established that use of the term "means" is central to the analysis of whether a claim limitation should be interpreted in accordance with 35 U.S.C. § 112, sixth paragraph: use of the word "means" creates a rebuttable presumption that the inventor intended to invoke § 112, sixth paragraph, whereas failure to use the word "means" creates a rebuttable presumption that the inventor did not intend the claims to be

6

Appeal 2011-001526
Application 10/949,568

governed by § 112, sixth paragraph.  *Id.* at 703-04*; Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367, 1373 (Fed. Cir. 2012).

When an inventor has not signaled an intent to invoke § 112, sixth paragraph, by using the term "means," the presumption against its invocation is strong but can be overcome if "the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function."  *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002) (internal quotation marks and citation omitted)).  A claim limitation that "essentially is devoid of anything that can be construed as structure" can overcome the presumption.  *Flo Healthcare*, 697 F.3d at 1374.  The presumption may be overcome by a claim limitation that uses a non-structural term that is "simply a nonce word or a verbal construct that is not recognized as the name of structure" but is merely a substitute for the term "means for" associated with functional language.  *Lighting World*, 382 F.3d at 1360.  Claim language that further defines a term that otherwise would be a nonce word can denote sufficient structure to avoid construction under § 112, sixth paragraph, *MIT v. Abacus Software,* 462 F.3d 1344, 1354 (Fed. Cir. 2006), as can a claim limitation that contains a term that "is used in common parlance or by persons of skill in the pertinent art to designate structure," *Lighting World,* 382 F.3d at 1359.  Nor will claim language invoke a § 112, sixth paragraph, construction if persons of ordinary skill in the art reading the specification understand the term to be the name for a structure that performs the function, even when the term covers a broad class of structures or identifies the structures by their function.  *Greenberg v.*

7

Appeal 2011-001526
Application 10/949,568

*Ethicon Endo-Surgery, Inc.,* 91 F.3d 1580, 1583 (Fed. Cir. 1996) ("Many devices take their names from the functions they perform.").

*Indefiniteness Analysis for Computer-Implemented*
*Claim Limitations Interpreted Under*
*35 U.S.C. § 112, Sixth Paragraph*

A claim limitation interpreted in accordance with 35 U.S.C. § 112, sixth paragraph, is construed to cover the corresponding structures, materials, or acts disclosed in the specification (and their equivalents) that perform the claimed function. *Personalized Media*, 161 F.3d at 703. For a computer-implemented claim limitation interpreted under § 112, sixth paragraph, the corresponding structure must include the algorithm needed to transform the general purpose computer or processor disclosed in the specification into the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Thus, the specification must sufficiently disclose an algorithm to transform the general purpose computer or processor to a special purpose processor programmed to perform the disclosed algorithm. *Id.* at 1338. An algorithm is defined, for example, as "a finite sequence of steps for solving a logical or mathematical problem or performing a task." MICROSOFT COMPUTER DICTIONARY 23 (5th ed. 2002). An applicant may express the algorithm in any understandable terms including as a mathematical formula, in prose, in a flow chart, or "in any other manner that provides sufficient structure." *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008).

An indefiniteness rejection under § 112, second paragraph, is appropriate if the specification discloses no corresponding algorithm

8

Appeal 2011-001526
Application 10/949,568

associated with a computer or processor. *Aristocrat*, 521 F.3d at 1337-38.
Mere reference to a general purpose computer or processor with appropriate programming without providing an explanation of the appropriate programming, or to "software" without providing detail about the means to accomplish the software function, is not an adequate disclosure. *Id.* at 1334; *Finisar*, 523 F.3d at 1340-41. In addition, simply reciting the claimed function in the specification, while saying nothing about how the computer or processor ensures that those functions are performed, is not a sufficient disclosure for an algorithm which, by definition, must contain a sequence of steps. *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1384 (Fed. Cir. 2009).

If the specification explicitly discloses an algorithm, the sufficiency of the disclosure must be determined in light of the level of ordinary skill in the art. *Aristocrat*, 521 F.3d at 1337. The specification must sufficiently disclose an algorithm to transform a general purpose processor to a special purpose processor so that a person of ordinary skill in the art can implement the disclosed algorithm to achieve the claimed function. *Id.* at 1338.

ANALYSIS

*Claim Construction – Claim 27*

Claim 27 recites a user device comprising (a) a memory device for storing a program and (b) a processor in communication with the memory device and configured with the program to (i) "control receiving a message of an event at the user device," (ii) "control at the user device creation of metadata relating to the event in response to the received message of the event and control storing of the created metadata in the memory device,"

9

Appeal 2011-001526
Application 10/949,568

(iii) "control collection of content data in response to the received message of the event to generate a content data set relating to the message of the event," and (iv) "control adding of the created metadata to the content data set." The "processor" limitation is set forth using functional language, raising the issue whether the limitation should be treated as a "means-plus-function" limitation under 35 U.S.C. § 112, sixth paragraph. The absence of the word "means" creates the strong rebuttable presumption that the inventors did not intend the "processor" limitation to be governed by § 112, sixth paragraph. *See Flo Healthcare*, 697 F.3d at 1373. To determine whether the presumption is overcome, we must decide whether the term "processor" as used in claim 27 is one that connotes structure, or is instead a verbal construct devoid of structure that is used as a substitute for the term "means for." *See Lighting World*, 382 F.3d at 1360.

First, we consider how a skilled artisan would understand the term "processor" as used in claim 27. Based on our review of dictionary definitions, we conclude that a skilled artisan would not recognize "processor" as the name of a sufficiently definite structure for performing the control functions recited by the "processor" limitation. Rather, a person skilled in the art of computer programming would recognize the term "processor" to mean a general purpose computer, a central processing unit ("CPU"), or a program that translates another program into a form acceptable by the computer being used. FF7, FF8; *see Lighting World*, 382 F.3d at 1360-61 (consulting dictionaries to determine whether a claim term has a generally understood meaning that denotes structure). This interpretation is consistent with Appellants' Specification, which refers only to a CPU, without providing a definition of "processor" or any additional

10

Appeal 2011-001526
Application 10/949,568

description sufficient to inform a skilled artisan that the term connotes a sufficiently definite structure. FF6; *see Lighting World*, 382 F.3d at 1361 (consulting specification to determine whether a claim term denotes structure).

We also consider whether the control functions performed by the processor in claim 27 are functions typically found in a commercially available off-the-shelf processor. If a general purpose processor would be capable of performing the claimed functions, then a skilled artisan might understand the claim term "processor" to provide sufficient structure for performing those functions. *See In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) (functions such as "processing," "receiving," and "storing" that can be achieved by any general purpose computer without special programming do not require disclosure of more structure than the general purpose processor that performs those functions). In this case, however, we conclude that at least two of the functions performed by the processor in claim 27—controlling the collection of content data and controlling the creation of metadata—are not typical functions found in a general purpose processor and would require additional programming of the processor to implement. Therefore, unlike the claimed "control unit" comprising "a CPU and a partitioned memory system" that was held to provide sufficient structure to perform the claimed function of "controlling the communication unit," *see LG Elecs., Inc. v. Bizcom Elecs., Inc.,* 453 F.3d 1364, 1372 (Fed. Cir. 2006), *rev'd on other grounds, Quanta Computer, Inc. v. LG Elecs., Inc.,* 553 U.S. 617 (2008), here the claimed control functions cannot be executed by a general purpose processor without

11

Appeal 2011-001526
Application 10/949,568

additional programming. Accordingly, the claimed "processor" alone is not sufficient structure to perform the functions in claim 27.

The term "processor" also appears in claim 27 by itself without a structural modifier, which is further evidence that the term is a nonce word that is not recognized as the name of structure. *See Flo Healthcare*, 697 F.3d at 1374 (holding that "the generic term 'mechanism' standing alone may connote no more structure than the term 'means,'" but the term "height adjustment mechanism" designates a class of generally-understood structures). Nor does claim 27 include any structure connected to the processor that would indicate the processor itself is a sufficiently definite structure. Claim 27 is unlike the claims in *Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 649 F.3d 1350, 1359-60 (Fed. Cir. 2011), in which the claimed "computing unit" that was held to connote sufficiently definite structure was claimed to be connected to a modernizing device and to generate a destination signal for transmission to the modernizing device and was further claimed to be connected to floor terminals of the elevator system and evaluate incoming call reports, destination floors, and identification codes to generate the destination signal for processing by the modernizing device. In contrast, claim 27 does not recite any structure connected to the "processor" other than a memory device, which is not sufficient for performing the control recited functions. Nor does claim 27 recite the specific steps that the processor undertakes to perform the recited control functions.

The term "processor" in claim 27 is also different from the claim terms "circuit" and "circuitry," which have been held to denote sufficiently definite structure to avoid the application of § 112, sixth paragraph. *See*

12

Appeal 2011-001526
Application 10/949,568

*MIT*, 462 F.3d at 1354-56; *Linear Tech. Corp. v. Impala Linear Corp.,* 379
F.3d 1311, 1320-21 (Fed. Cir. 2004); *Apex Inc. v. Raritan Comp., Inc.,* 325
F.3d 1364, 1374 (Fed. Cir. 2003). The term "circuit" coupled with a
description in the claims of the circuit's operation typically conveys the
structural arrangement of the circuit's components. *See MIT*, 462 F.3d at
1355; *Linear Tech.*, 379 F.3d at 1320; *Apex*, 325 F.3d at 1373. In contrast,
the recited processor and claim language here do not convey to a person
skilled in the art anything about the internal components, structure, or
specific operation of the processor.

For these reasons, we conclude that the term "processor" as used in
claim 27 is a non-structural term that would not be understood by a skilled
artisan as having sufficiently definite structure to perform the recited control
functions. The term is used as merely a substitute for the term "means for"
associated with recited functional language and thus invokes the application
of § 112, sixth paragraph. We also conclude that dependent claims 28, 30-
35, 37-42, 44-52, and 80 contain no additional language connoting structure
sufficient to perform the recited functions, nor do they recite specific steps
that the processor undertakes to perform the recited functions. These claims,
therefore, are also interpreted under § 112, sixth paragraph.

*New Ground of Rejection under 35 U.S.C. § 112,*
*Second Paragraph – Claim 27*

Having concluded that the "processor" limitation in claim 27 invokes
the application of § 112, sixth paragraph, we now consider whether
Appellants' Specification discloses sufficient corresponding structure for
performing the claimed control functions. *See Aristocrat*, 521 F.3d at 1333.
Because the limitations of claim 27 are computer-implemented and cannot

13

Appeal 2011-001526
Application 10/949,568

all be performed by a general purpose computer without any special programming, we must determine whether the Specification discloses an algorithm that transforms a general purpose processor into a special purpose processor that performs the claimed functions. *Id.*; *cf. Katz*, 639 F.3d at 1316.

The only portion of the Specification that describes the processor and its associated functions provides that the user device may include a CPU and a memory "containing programming for controlling, in accordance with the present invention, data processing and transfer operations among the various elements" of the user device. FF6. That description is merely a general statement that fails to mention the specific control functions recited in claim 27, much less provide any detailed steps as to how the processor would perform functions such as controlling creation of metadata and controlling collection of content data.

The Specification does contain a flow chart illustrating a process by which content data and metadata are created, stored, and used. FF2-FF5 (citing Fig. 3). However, the flow chart presents the process at a high level without reference to the control functions to be performed by the processor. Even if the steps shown in the flow chart could somehow be understood as corresponding to the functions ascribed to the claimed processor, the flow chart and accompanying description in the Specification would simply be restating the claimed functions without conveying to a skilled artisan how the processor ensures that the functions are performed. As such, the Specification fails to disclose an algorithm that transforms the general purpose processor into a special purpose processor programmed to perform

14

Appeal 2011-001526
Application 10/949,568

the control functions recited in claim 27.  *See Blackboard*, 574 F.3d at 1384;
*Aristocrat*, 521 F.3d at 1334.

Because Appellants' Specification fails to disclose an algorithm for
performing the functions recited in the "processor" limitation of claim 27, it
fails to describe sufficient corresponding structure as required for a
limitation interpreted under 35 U.S.C. § 112, sixth paragraph.  Accordingly,
we enter a new ground of rejection of claim 27 as being unpatentable under
35 U.S.C. § 112, second paragraph, as indefinite.  Claims 28, 30-35, 37-42,
44-52, and 80 depend from claim 27 and therefore are also indefinite under
35 U.S.C. § 112, second paragraph.  As such, we also enter a new ground of
rejection of claims 28, 30-35, 37-42, 44-52, and 80 on this same basis.

### Rejection under 35 U.S.C. § 103(a) – Claim 1

In rejecting independent claim 1 under 35 U.S.C. § 103(a), the
Examiner finds that Pather substantially discloses the claimed invention,
including receiving a message of an event at a user device, collecting content
data and creating metadata relating to the event, and adding the metadata to
the collected content data.  Ans. 4, 10-11; Pather, col. 2, ll. 53-64; col. 7, l.
55 – col. 8, l. 30; col. 21, ll. 24-31; col. 23, ll.3-15.  The Examiner finds,
however, that Pather does not teach that (i) metadata relating to the event is
created *at the user device* and *in response to the received message of the
event*, and (ii) content data is collected *in response to receiving the message
of the event*.  Ans. 4-6.  The Examiner relies on Keyes and Kovacs for these
features and concludes that the claimed invention would have been obvious
over the combination of Pather, Keyes, and Kovacs.  Ans. 5-6, 11-12.

15

Appeal 2011-001526
Application 10/949,568

Appellants contend that the Examiner erred in rejecting the claims under 35 U.S.C. § 103(a) because the combination of references does not teach "collecting content data *in response to receiving the message of the event*" or "creating *at the user device* metadata relating to the event *in response to the received message of the event*," as recited in claim 1. App. Br. 4-10. Appellants specifically challenge some of the Examiner's findings regarding Kovacs and Keyes and further contend that the Examiner does not provide a rational basis for combining Pather and Keyes.

We have reviewed the Examiner's § 103(a) rejection in light of Appellants' arguments that the Examiner has erred. We disagree with Appellants' conclusions.

First, Appellants argue that Kovacs teaches content data collection that occurs *automatically*, not *in response to receiving a message of an event*, as recited in claim 1. App. Br. 7. We disagree. Kovacs discloses a recording device, such as a digital camera or camcorder, that collects electronic content (i.e., a recording) and includes a module for gathering context information from which metadata relating to the recording can be created. Kovacs, ¶¶ [0011], [0024], [0032]. Metadata is then stored with the recording (i.e., the collected content data). Kovacs, ¶¶ [0011], [0032]. Appellants rely on the following statement in Kovacs: "[w]henever a recording device records electronic content, the context gathering module **automatically** gathers the current context of the recording device . . . ." App. Br. 7 (quoting Kovacs, ¶ [0032]) (emphasis added by Appellant). While this sentence describes the automatic nature of *context-gathering* in Kovacs, it does not teach that *content data* is collected automatically, as Appellants assert. Instead, as set forth in claim 1, the recording device in

16

Appeal 2011-001526
Application 10/949,568

Kovacs starts collecting content data (i.e., begins a recording) in response to a received message of an event (e.g., a signal from the User Control Unit to start a recording). *See* Kovacs, ¶ [0041].

Appellants further argue that Kovacs does not teach creating metadata *in response to a received message of an event*, as recited in claim 1. App. Br. 7. A careful review of the Examiner's rejection, however, shows that the Examiner does not rely on Kovacs for such a teaching but rather relies on Keyes. Ans. 5, 11-12. Therefore, Appellants' arguments with respect to Kovacs do not show error in the Examiner's rejection.

Next, Appellants allege error in the Examiner's findings regarding Keyes. Keyes discloses a peripheral device that sends a message to a remote diagnostic device in the event of a malfunction. Keyes, col. 4, ll. 29-36; Fig. 2A. The remote diagnostic device sends a response message to the peripheral device that causes a diagnostic application on the peripheral device to execute a particular diagnostic subroutine, producing results that can be sent to the remote diagnostic device. Keyes, col. 4, ll. 42-57; Fig. 2B.

Appellants state that the Examiner appears to be equating the response message of Keyes to the metadata relating to the event that is created at the user device in claim 1. App. Br. 8. Based on this understanding, Appellants contend that Keyes's response message, consisting of instructions to execute a diagnostic subroutine resident on the peripheral device or executable code for diagnosing the cause of a peripheral device malfunction, cannot be reasonably interpreted as metadata relating to the event, nor is it created at the peripheral device. *Id.*

Based on our review of Keyes and the Examiner's Answer, we understand the Examiner to be equating the response message received at the

17

Appeal 2011-001526
Application 10/949,568

peripheral device in Keyes to the *message of the event* received at the user device in Appellants' claim 1, rather than the metadata created at the user device. Ans. 5. Receipt of the response message in Keyes causes the peripheral device to execute a diagnostic subroutine that produces results relating to the device malfunction, just as receipt of the event message in claim 1 causes the user device to create metadata relating to the event. *See* Keyes, col. 4, ll. 42-57; Fig. 2B. Thus, Appellants' argument, which is based on a misunderstanding of the Examiner's rejection, does not demonstrate that the Examiner erred in relying on Keyes.

Finally, Appellants contend that "the Examiner did not provide any basis to establish that the skilled artisan would have been realistically led by anything in [Pather] or [Keyes] to modify the subscription-based notification system of [Pather] to include any teaching of a system for remote diagnosis of peripheral device malfunctions disclosed in [Keyes]." App. Br. 9. The Examiner, however, cites Keyes for the general concept that data creation at a user device may be triggered by receipt of an event message, rather than for Keyes's specific teachings relating to remote diagnosis of peripheral device malfunctions. Ans. 5. Appellants have not presented any persuasive arguments or evidence that a person of ordinary skill in the art would not have had the knowledge and skills rendering him capable of combining the features of Keyes and Pather to have metadata creation triggered by an event message and performed at the user device rather than at a central location. *See DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1368 (Fed. Cir. 2006).

For the foregoing reasons, we sustain the Examiner's § 103(a) rejection of claim 1, as well as the rejection of dependent claims 2, 4-9, 11-

18

Appeal 2011-001526
Application 10/949,568

16, 18-26, and 79, for which Appellants have not made separate, detailed arguments.  We also sustain the Examiner's § 103(a) rejection of claim 82, which contains similar limitations, as well as dependent claims 83-85, for which Appellants have not made separate, detailed arguments.

For the reasons discussed in the previous section, claims 27, 28, 30-35, 37-42, 44-52, and 80 are indefinite.  Therefore, we reverse, *pro forma*, the Examiner's § 103(a) rejection of these claims because it was necessarily based on speculation and assumptions as to the scope of the claims.  *See In re Steele*, 305 F.2d 859, 862-63 (CCPA 1962).  Specifically, as there is no algorithm disclosed in the Specification corresponding to the functions recited in independent claim 27, there is no way to determine whether any prior art discloses the same or equivalent structure to the structure encompassed by claim 27.  Of course, if these claims were not construed under § 112, sixth paragraph, and therefore were not indefinite under § 112, second paragraph, we would sustain the Examiner's § 103(a) rejection of claim 27, which contains similar limitations to claim 1, as well as the rejection of dependent claims 28, 30-35, 37-42, 44-52, and 80, for which Appellants have not made separate, detailed arguments.

DECISION

The Examiner's decision to reject claims 1, 2, 4-9, 11-16, 18-26, 79, and 82-85 under 35 U.S.C. § 103(a) is affirmed.  The Examiner's decision to reject claims 27, 28, 30-35, 37-42, 44-52, and 80 under 35 U.S.C. § 103(a) is reversed *pro forma*.

19

Appeal 2011-001526
Application 10/949,568

Pursuant to 37 C.F.R. § 41.50(b), we enter a new ground of rejection for claims 27, 28, 30-35, 37-42, 44-52, and 80 under 35 U.S.C. § 112, second paragraph.

Section 41.50(b) provides that "[a] new ground of rejection pursuant to this paragraph shall not be considered final for judicial review." 37 C.F.R. § 41.50(b) also provides that the Appellant, WITHIN TWO MONTHS FROM THE DATE OF THE DECISION, must exercise one of the following two options with respect to the new ground of rejection to avoid termination of the appeal as to the rejected claims:

> (1) *Reopen prosecution*. Submit an appropriate amendment of the claims so rejected or new evidence relating to the claims so rejected, or both, and have the matter reconsidered by the examiner, in which event the proceeding will be remanded to the examiner . . . .

> (2) *Request rehearing*. Request that the proceeding be reheard under § 41.52 by the Board upon the same record . . . .

Should Appellants elect to prosecute further before the Examiner pursuant to 37 C.F.R. § 41.50(b)(1), in order to preserve the right to seek review under 35 U.S.C. §§ 141 or 145 with respect to the affirmed rejection, the effective date of the affirmance is deferred until conclusion of the prosecution before the Examiner unless the affirmed rejection is overcome.

If Appellants elect prosecution before the Examiner and this does not result in allowance of the application, abandonment, or a second appeal, the case should be returned to the Patent Trial and Appeal Board for final action on the affirmed rejection, including any timely request for rehearing thereof.

No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136(a)(1)(iv).

20

Appeal 2011-001526
Application 10/949,568

## AFFIRMED-IN-PART; 37 C.F.R. § 41.50(b)

msc